COLIN REARDON (NY Bar #4945655)
E-mail: colin.reardon@cfpb.gov
Phone: (202) 435-9668
E. VANESSA ASSAE-BILLE (NY Bar #5165501)
E-mail: elisabeth.assae-bille@cfpb.gov
Phone: (202) 435-7688
1700 G Street, NW
Washington, D.C. 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar #264787) – Local Counsel
E-mail: leanne.hartmann@cfpb.gov
Phone: (415) 844-9787
301 Howard St., Suite 1200
San Francisco, CA 94105
Fax: (415) 844-9788

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection,<br><br>Plaintiff,<br><br>vs.<br><br>Chou Team Realty, LLC et al.,<br><br>Defendants. | Case No.: 8-20-cv-00043-JVS-ADS<br><br>**MEMORANDUM IN OPPOSITION TO RELIEF DEFENDANTS XO MEDIA, LLC AND KENNETH LAWSON'S MOTION TO DISMISS** |

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ........................................................................ ii

3  INTRODUCTION  ....................................................................................1

4  BACKGROUND ......................................................................................2

5      A. The Student Loan Debt Relief Companies' Violations.............................3

6      B. Lawson and XO's Interest in and Profits from the Student Loan Debt

7         Relief Companies  ..........................................................................4

8      C. Limited Partnership Agreements.........................................................6

9      D. Lawson and XO's Awareness of Illegal Conduct  .................................7

10 ARGUMENT ........................................................................................10

11 I.  STANDARD OF REVIEW  ....................................................................10

12 II. LAWSON AND XO'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER

13      JURISDICTION SHOULD BE DENIED ..................................................11

14     A. Lawson and XO's Status as Investors in an Illegal Scheme Does Not

15        Give Them a *Per Se* Legitimate Claim to the Profits of that Scheme .....12

16       1.  Investors Who Receive Profits Traceable to Unlawful Conduct are

17           Proper Relief Defendants  ...........................................................13

18       2.  The Cases Lawson and XO Cite do Not Support Dismissal ..............16

19       3.  Lawson and XO Made No Investment in Two of the Student Loan

20           Debt Relief Defendants  ..............................................................19

21     B. Lawson and XO Cannot Claim to Have Received the Allegedly Ill-

22        Gotten Funds in Good Faith ...........................................................20

23 III. THE BUREAU HAS ADEQUATELY ALLEGED THAT LAWSON AND XO ARE

24      RELIEF DEFENDANTS  ....................................................................21

25 CONCLUSION ......................................................................................24

26

27

28

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................11

*Caltex Plastics v. Lockheed Martin Corp.*,
   824 F.3d 1156 (9th Cir. 2016) ...................................................11

*CFPB v. NDG Fin. Corp.*,
   No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .............. 12, 14

*CFTC v. Gresham*,
   No. 09-cv-75, 2012 WL 1606037 (N.D. Ga. May 7, 2012) .................. 18, 19

*CFTC v. Walsh*,
   618 F.3d 218 (2d Cir. 2010) .......................................................20

*FTC v. Direct Marketing Concepts, Inc.*,
   648 F. Supp. 2d 202 (D. Mass. 2009).........................................16

*FTC v. LeadClick Media, LLC*,
   838 F.3d 158 (2d Cir. 2016) ........................................... 13, 17, 20

*FTC v. LeanSpa, LLC*,
   No. 11-cv-1715, 2015 WL 1004240 (D. Conn. Mar. 5, 2015) ....................17

*In re Toyota Motor Corp.*,
   790 F. Supp. 2d 1152 (C.D. Cal. 2011)........................................21

*Janvey v. Adams*,
   588 F.3d 831 (5th Cir. 2009) ......................................................18

*Janvey v. Brown*,
   767 F.3d 430 (5th Cir. 2014) ......................................................18

*Johnson v. Studholme*,
   619 F. Supp. 1347 (D. Colo. 1985) .............................................19

*Jones v. HSBC*,
   No. 11-cv-02939, 2012 WL 1299203 (S.D. Cal. Apr. 13, 2012)..................21

*SEC v. AIC, Inc.*,
    No. 3:11-cv-176, 2013 WL 5134411 (E.D. Tenn. Sept. 12, 2013)...............13

*SEC v. Aragon Capital Advisors, LLC*,
    No. 07-cv-919, 2011 WL 3278907 (S.D.N.Y. July 26, 2011) ......... 15, 16, 18

*SEC v. Aragon Capital Management, LLC*,
    672 F. Supp. 2d 421 (S.D.N.Y. 2009) ..........................................................14

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ........................................................................16

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998) .......................................................... 11, 13, 16

*SEC v. Donnan*,
    No. 12-cv-2831, 2014 WL 11829334 (N.D. Ga. Sept. 15, 2014) .......... 18, 19

*SEC v. Founding Partners Capital Mgmt.*,
    639 F. Supp. 2d 1291 (M.D. Fla. 2009) .......................................................17

*SEC v. George*,
    426 F.3d 786 (6th Cir. 2005) ................................................................ 18, 19

*SEC v. Rosenthal*,
    426 Fed. App'x 1 (2d Cir. 2011) .................................................................15

*SEC v. Rosenthal*,
    650 F.3d 156 (2d Cir. 2011) ........................................................................15

*SEC v. Ross*,
    504 F.3d 1130 (9th Cir. 2007) .............................................................. 12, 13

*SEC v. Thornes*,
    No. 14-cv-1598, 2015 WL 12672734 (C.D. Cal. July 20, 2015)............13, 20

*SEC v. World Capital Mkt.*,
    864 F.3d 996 (9th Cir 2017) .......................................................... 10, 12, 21

*W.R. Grace & Co. v. W. U.S. Industries, Inc.*,
    608 F.2d 1214 (9th Cir. 1979).....................................................................20

*Yakama Indian Nation v. State of Wash. Dep't of Revenue,*

   176 F.3d 1241 (9th Cir. 1999) ..................................................................23

**Statutes**

12 U.S.C. § 5531 ...........................................................................................4

12 U.S.C. § 5536 ...........................................................................................4

15 U.S.C. § 1681b ..........................................................................................3

**Regulations**

16 C.F.R. § 310.3(a)(2)(x) ...........................................................................4

16 C.F.R. § 310.3(a)(5) .................................................................................4

16 C.F.R. § 310.4(a)(5)(i) .........................................................................4, 7

**Rules**

Fed. R. Civ. P. 15(a) ...................................................................................23

Fed. R. Civ. P. 12(b)(6) .......................................................................11, 21

Fed. R. Civ. P. 12(b)(1) .......................................................................10, 12

# INTRODUCTION

The Complaint filed by the Bureau of Consumer Financial Protection ("Bureau") alleges a scheme to market and sell student loan debt-relief services that was, from start to finish, pervaded by unlawful conduct.  By his own admission, Kenneth Lawson ("Lawson") and an entity he controlled—XO Media, LLC ("XO")—received hundreds of thousands of dollars in profits from the student loan debt-relief companies involved in the alleged misconduct.

Courts may "exercise their broad equitable powers to order disgorgement from non-violating third parties who have received proceeds of others' violations to which the third parties have no legitimate claim."  *SEC v. World Capital Mkt.*, Inc., 864 F.3d 996, 1003 (9th Cir. 2017).  Those non-violating third-parties are known as "relief defendants" or "nominal defendants."  *Id.* at 1003-4.  The Complaint alleges that Lawson and XO are relief defendants because they received distributions of profits traceable to the illegal conduct alleged in the Complaint to which they have no rightful claim.  As a matter of equity, Lawson and XO should be required to disgorge those funds, so that the Bureau can return the funds to the consumers from whom the funds were illegally taken.

In their motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Lawson and XO do not claim that the debt-relief companies complied with the law.  Nor do they dispute that the profits they received resulted from the violations alleged in the Complaint.  Rather, Lawson and XO argue (1) that evidence outside the pleadings proves they were "bona fide" and "innocent" investors and are therefore not proper relief defendants, which allegedly deprives this Court of subject matter jurisdiction over the claim against them; and (2) that the Complaint does not allege enough facts to support a plausible relief defendant claim against them.  They are wrong on both counts.

*First*, Lawson and XO's motion to dismiss for lack of subject matter jurisdiction is based on the premise that their status as investors entitles them to keep funds that were wrongfully taken from consumers.  But courts have recognized that investors, including limited partners like Lawson and XO, who have received profits resulting from illegal conduct are proper relief defendants. Lawson and XO ignore those decisions and mischaracterize the cases they do cite, which largely involved creditors rather than investors or other equity owners.  Further, contrary to their assertions, evidence that the Bureau is submitting with this Opposition shows they were not "innocent" investors. Their lack of good faith provides an independent reason to deny their motion to dismiss for lack of subject matter jurisdiction.

*Second*, the Bureau's Complaint adequately alleges Lawson and XO are proper relief defendants because they have received distributions of profits from the student loan debt-relief companies traceable to unlawful conduct and have no legitimate claim to such funds.  And even if the Complaint's allegations were insufficient, the Bureau should be granted leave to amend.

## BACKGROUND[1]

In early 2015, Lawson contributed capital to help launch Docu Prep Center, the first of a group of five student loan debt-relief companies—Docu Prep Center, Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services (collectively, the

---

[1] Lawson and XO submitted evidence outside the scope of the Complaint in support of their Rule 12(b)(1) motion.  The Bureau is submitting additional evidence with this Opposition.  *See* Declaration of Colin Reardon ("Reardon Decl.") and its exhibits.  Unless otherwise noted, all exhibits cited in this Opposition are attached to the Reardon Declaration.

"Student Loan Debt Relief Companies").[2]  This investment was channeled through XO, in which Lawson held a 90% ownership interest.[3]  Over the next two years, Lawson, through XO, received limited partnership interests in all five Student Loan Debt Relief Companies.  In some instances, Lawson and XO made a capital contribution to the companies, but in other instances, they appear to have received limited partnership interests without investing any capital.

The companies in which Lawson held partnership interests coordinated with other defendants to market and sell their services in a manner that violated the Fair Credit Reporting Act ("FCRA"), Consumer Financial Protection Act of 2010 ("CFPA"), and the Telemarketing Sales Rule ("TSR").  These illegal practices were profitable, resulting in distributions to Lawson and XO totaling over $585,000.[4]

### A.    The Student Loan Debt Relief Companies' Violations

The Complaint alleges that the Student Loan Debt Relief Companies violated FCRA by marketing their services using prescreened consumer reports (also known as "prescreened lists") improperly obtained from Experian by an associated mortgage company known as Monster Loans.[5]  The consumer reports included consumers' names, addresses, and student loan balances, and were used by the Student Loan Debt Relief Companies to send direct mail.[6]  When Monster Loans stopped improperly purchasing consumer reports in 2017, several of the individual defendants coordinated to create a new sham mortgage

---

[2] *See* Ex. A (email string regarding Lawson's contribution to "get the business off the ground"); Ex. B at 79-80; *see also* Complaint, ECF No. 1 at ¶¶ 16-26 ("Compl.") (identifying companies).

[3] Ex. C at 123-24 (testimony that Lawson invested in Student Loan Debt Relief Companies through XO and had 90% interest); *see also* Compl. ¶ 51.

[4] Declaration of Kenneth Lawson ¶¶ 2, 6, ECF No. 69-1 ("Lawson Decl.").

[5] Compl. ¶¶ 52-63, 147-152; *see also* 15 U.S.C. §§ 1681b(c), (f).

[6] Compl. ¶¶ 52, 60.

brokerage—Lend Tech Loans, Inc.—to perpetuate the scheme to illegally obtain consumer reports.[7]

After obtaining these prescreened lists, the Student Loan Debt Companies engaged in practices that violated the CFPA and TSR by deceptively representing to consumers that (1) the consumers would obtain lower interest rates by consolidating their federal student loans, (2) the consumers would improve their credit scores by consolidating their loans, and (3) the U.S. Department of Education would become the "new servicer" on their loans.[8]  Further, the companies violated the TSR by collecting more than $15 million in illegal advance fees from thousands of consumers nationwide.[9]

## B.    Lawson and XO's Interests in and Profits from the Student Loan Debt Relief Companies

Each of the five Student Loan Debt Relief Companies was structured as a pair of entities—a corporation and a limited partnership.[10]  For each business, the corporation was the general partner of the associated limited partnership.[11] The Complaint alleges that three individual relief defendants—Lawson, Thomas Chou, and Sean Cowell—held limited partnership interests in the five Student Loan Debt Relief Companies.[12]  It further alleges that they and entities under their respective control received distributions of profits from the Student

---

[7] Compl. ¶¶ 63-70; *see also* Ex. Q at 232-34 (testimony by Defendant Martinez that Lend Tech Loans was a "sham" and "not a real company").
[8] Compl. ¶¶ 89-102, 156-68, 174-86; *see also* 12 U.S.C. §§ 5531, 5536; 16 C.F.R. §§ 310.3 (a)(2)(x), (a)(5).
[9] Compl. ¶¶ 103-106, 153-55; *see also* 16 C.F.R. § 310.4(a)(5)(i).
[10] Compl. ¶¶ 16-26.
[11] Compl. ¶¶ 17, 20, 22, 24, 26.  For example, Direct Document Solutions, Inc. was the general partner of Direct Document Solutions, LP.
[12] Compl. ¶¶ 34, 41, 51.  The Complaint also alleges that Chou and Cowell participated in the FCRA violations, *see id.* ¶¶ 61, 70, and that Defendant Jawad Nesheiwat also held limited partnership interests in the companies, *see id.* ¶ 36.

Loan Debt Relief Companies traceable to funds obtained through the violations of the CFPA and TSR described in the Complaint.[13]

Lawson, through XO, received a limited partnership interest in Docu Prep Center in 2015, and subsequently received limited partnership interests in the other four Student Loan Debt Relief Companies as they were created over the next two years.[14]  In a declaration filed with his motion, Lawson states that that XO made a total of $150,000 in capital contributions to the Student Loan Debt Relief Companies, and that XO received $585,044.60 in distributions from those companies.[15]  Lawson also states that XO passed $277,959 of those distributions on to him.[16]  Other evidence indicates the companies made distributions to the limited partners between May 2016 and August 2018.[17]

Although Lawson's declaration implies that he and XO made capital contributions to each of the five Student Loan Debt Relief Companies, they appear not to have made capital contributions to two of the five companies. The limited partnership agreements for Direct Document Solutions, LP and Secure Preparation Services, LP both indicate that XO's "Initial Capital

---

[13] Compl. ¶¶ 30-32, 34, 41, 51, 200.

[14] Ex. C at 123-24; ECF No. 69-3 at pp. 7, 8 (Oct. 2015 agreement for Certified Doc Prep Services); ECF No. 69-2 at pp. 6, 32 (Aug. 2016 agreement for Assure Direct Services); Ex. D at ML00005319, 5343 (Jan. 2017 agreement for Direct Document Solutions); Ex. E at ML00005353, 5379 (Jan. 2017 agreement for Secure Preparation Services).

[15] Lawson Decl. at ¶¶ 2, 6.  The Bureau intends to confirm the precise amounts distributed to XO and Lawson in discovery.

[16] Lawson Decl. at ¶ 6.  The Bureau intends to determine in discovery whether additional amounts were passed on to Lawson, including whether such additional funds were commingled with his and XO's other assets.

[17] Ex. F (letter listing distributions to Defendant Cowell).

Contribution Obligation" was zero.[18]  The agreements provided XO with a 14.88% and an 11.91% interest in the two entities, respectively.[19]

### C.   Limited Partnership Agreements

Lawson and XO's interest in four of the Student Loan Debt Relief Companies is set forth in limited partnership agreements.[20]  Their interest in the fifth company does not appear to be based upon a written agreement.[21] Lawson's declaration attaches the full limited partnership agreement for one of the five Student Loan Debt Relief Companies, Assure Direct Services (the "ADS LP Agreement").[22]

Under the ADS LP Agreement, the property of the limited partnership was "owned by the Partnership as an entity" and not by its individual partners.[23] The partners owned "interests… in the Partnership."[24]  Limited partners like XO were not entitled to withdraw their capital contributions "unless all liabilities of the Partnership … have been paid or unless the Partnership has assets sufficient to pay the same as they become due."[25]  The agreement does not guarantee limited partners any return on their investment, including any return of their capital contributions.[26]  The agreement further provides that the

---

[18] Ex. D at ML00005343; Ex. E at ML00005379.
[19] Ex. D at ML00005343; Ex. E at ML00005379.
[20] *See* ECF Nos. 69-2, 69-3; Ex. D; Ex. E.
[21] Lawson did not attach a limited partnership agreement for Document Preparation Services, LP.  The Bureau received testimony during its investigation that no agreement exists for that entity.  Ex. G at 55-56.
[22] *See* ECF 69-2 ("ADS LP Agreement").
[23] ADS LP Agreement § 2.7.
[24] *Id.* § 2.7.
[25] *Id.* § 5.4.
[26] *Id.* §§ 6.1 to 6.8 (sections concerning "Allocations of Income, Loss and Distributions").

1 entity's partners (including at least 50% of its limited partners) had to approve

2 the timing and amount of all distributions.[27]

3       Evidence the Bureau obtained before filing suit calls into question

4 whether these agreements were actually followed.  One witness told the Bureau

5 that "there were pieces of paper and there were agreements and these kinds of

6 things," but that in practice "[i]t was all done very loosey-goosey.  And it was

7 chaotic."  He also described the process of issuing distributions as "sloppy

8 chaos."[28]

9     **D.**    **Lawson and XO's Awareness of Illegal Conduct**

10       Evidence the Bureau obtained in its pre-suit investigation indicates that

11 Lawson and XO were aware of unlawful conduct by the Student Loan Debt

12 Relief Companies.

13       Lawson appears to have been aware of the conduct that would constitute

14 a TSR advance fee violation almost from the start of the first Student Loan Debt

15 Relief Company's operations.[29]  In 2015, he received emails referring to Docu

16 Prep Center's practice of selling its services over the phone,[30] and also received

17 an email indicating that Docu Prep Center had switched payment processors to

18 obtain consumers' fees within only seven to nine days—long before the

19 company could reasonably have delivered the results the TSR requires to

20 lawfully collect fees.[31]

21

22 [27] *Id.* § 6.4; *see also id.* § 1.5 (defining "Approved by the Partners").
[28] *See* Ex. C at p. 96-97, 111.

23 [29] *See* Compl. ¶¶ 103-106, 153-55; *see also* 16 C.F.R. § 310.4(a)(5)(i).

24 [30] Ex. A (January 2015 email to Lawson explaining business would have a "30
man call center"); Ex. H (March 2015 email to Lawson noting low "call

25 volume" in response to initial mailings).

26 [31] Ex. I (Defendant David Sklar in July 2015: "[W]e've moved to RAM, a new
payment processor.  RAM makes our funds available between 7 to 9 days after

27 the client has made their ACH payment, which is much improved over the 45

28 day turn time we were initially anticipating.").

Emails produced to the Bureau also suggest that by April 2016 Lawson was aware that the Student Loan Debt Relief Companies were using Experian consumer reports to market debt relief services.[32]  Lawson himself admitted in a declaration submitted to the Bureau that he became "aware of the possible misuse of Experian consumer reports … in about late 2016-early 2017."[33]  Later emails indicate that Lawson supported efforts to continue misusing consumer reports thereafter.  For example, in May 2017, Defendants Thomas Chou and Jawad Nesheiwat engaged in a lengthy email discussion brainstorming how to use a sham mortgage business to deceive Experian into issuing a new account so that they could continue to funnel consumer reports to the Student Loan Debt Relief Companies.[34]  In a May 11, 2017 email, Nesheiwat notes that "Ken" (i.e., Kenneth Lawson) had provided a recommendation at a recent investor retreat regarding where to locate the sham business.[35]  The following month, Defendant Lend Tech Loans, Inc. was registered as a purported mortgage brokerage in order to improperly obtain consumer reports from Experian.[36]

---

[32] Ex. J (Defendant Sklar: "We have ironed out a new deal with Experian as far as our Data purchasing is concerned.  We have cut the cost per record from .18 cents to .09 cents and have realized that this data is performing with greater response percentages as well as closing ratios.").

[33] Ex. K at ¶ 13.  The declaration was submitted as part of the Bureau's Notice and Opportunity to Respond and Advise (NORA) process.

[34] Ex. L at ML00022456 (Nesheiwat: "Experian … will require a permanent commercial location where they will need to pass an initial inspection and possibly annual. … I need to have a story behind it to make sense for the volume of data.  Its [sic] very important to me personally with the risk involved to cover my butt.")

[35] Id. (Nesheiwat: "As Ken had recommended at the last retreat this needs to be far enough away but where we can still have the access.").

[36] Compl. ¶¶ 64-65.  Further, in a November 2017 email exchange, Defendant David Sklar told Lawson that a separate tax debt relief business was "99% towards regaining our access to the Experian data."  Ex. M.  Lawson's response was: "Sounds great buddy."  Id.

Evidence also suggests that XO's co-owner Mikael Van Loon, a close associate of Lawson's, was aware of unlawful conduct by the Student Loan Debt Relief Companies.  Van Loon owned the remaining 10% of XO, at times acted as a representative of Lawson and other limited partners in dealings with the companies, and also worked at Monster Loans with several of the individual defendants.[37]  Emails indicate that Van Loon attended meetings with Defendant Nesheiwat and others regarding ordering consumer reports from Experian for the Student Loan Debt Relief Companies.[38]  As the representative of the limited partners, including XO and Lawson, Van Loon also received an August 2017 email from Defendant Frank Anthony Sebreros regarding efforts to "solve[]" Experian, which appears to refer to Lend Tech Loans' efforts to deceive Experian into granting it an account.[39]

Another email string involving Van Loon from May 2016 indicates that he was aware that federal regulators were taking enforcement action against similar student debt-relief companies (including one in Orange County) for charging unlawful fees and engaging in deceptive advertising.[40]  In the same email string, Defendant Robert Hoose indicated that Docu Prep Center had "gotten … past" banks' due diligence requirements by presenting misleading

---

[37] Ex. C at 34, 49-50, 96-97, 123-24.

[38] Ex. N.

[39] Ex. O (Sebreros: "We have moved into strictly recycled data [*i.e.,* previously used consumer reports] until Experian is solved.").  Lend Tech Loans' application to Experian was pending when the email was sent, and was approved two and half weeks later.  Ex. B at 267-68; *see also* Ex. Q at 232-34.

[40] Ex. P at ML00002796 (Email to Van Loon: "I know that you are aware of the FTC's recent actions against another student loan businesses [sic] in the Orange County area.… [I]f it is the case that DocuPrep's business is not materially different than those that have gotten caught up in regulatory trouble, a serious discussion about major changes to the model is critical.").

information about itself.[41]  Another author suggested that the company's conduct amounted to a "house of cards" and risked exposing its bank partners to "potential fraud claims."[42]

Further, XO and Lawson continued receiving distributions from the Student Loan Debt Relief Companies even after those companies fired their employees and ceased enrolling new customers in September 2017.[43]  That shut down was in direct response to the Bureau's issuance of Civil Investigative Demands seeking information regarding potential FCRA, TSR, and CFPA violations by the companies.[44]  Yet Lawson and XO, along with other limited partners, continued receiving distributions from the businesses until well into 2018.[45]

## ARGUMENT

### I.  STANDARD OF REVIEW

Lawson and XO move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that evidence presented with their motion proves that they are not proper relief defendants.  XO Br. at 12-19.  To support this Opposition, the Bureau is submitting the additional evidence discussed above to present a more accurate and complete picture of the relevant facts.  *See supra* pp. 2-10 & n.1.  In deciding a Rule 12(b)(1) motion challenging the factual basis for jurisdiction over a relief-defendant

---

[41] Ex. P at ML00002795 (Hoose to Defendant Sean Cowell: "Sean I thought you said you had a clean packet of all our info that has gotten us past the banks merchant teams before.").
[42] Ex. P at ML00002797.
[43] Ex. Q at 217-220 (testimony of Defendant Martinez regarding process for making distributions to limited partners, including "Ken" (i.e., Kenneth Lawson)).
[44] Ex. B at 230-31; Ex. Q at 50-51.
[45] Ex. Q at 217-220; Ex. R (post-shutdown checks); *see also* Ex. F (letter listing distributions to Defendant Cowell).

claim, the court may consider evidence outside the pleadings and resolve factual disputes to the extent the existence of jurisdiction turns on disputed factual issues.  *World Capital Mkt.*, 864 F.3d at 1004.  To demonstrate this Court's jurisdiction over Lawson and XO as relief defendants, the Bureau must show that they "(1) received ill-gotten funds and (2) do not have a legitimate claim to those funds."  *Id.*

To survive a motion to dismiss under Rule 12(b)(6), a complaint need include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A motion to dismiss should be denied where a plaintiff alleges enough facts to "nudge[] their claims across the line from conceivable to plausible."  *Id.*  The Court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff."  *Caltex Plastics v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

## II.   LAWSON AND XO'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION SHOULD BE DENIED

Lawson and XO are proper relief defendants because they received profit distributions traceable to the Student Loan Debt Relief Companies' illegal conduct.  Every dollar Lawson and XO took stemmed from those companies' deceptive marketing practices and their charging of illegal upfront fees in violation of the TSR.  The Bureau's relief defendant claim against them fits comfortably within caselaw establishing a court's subject matter jurisdiction over such claims, which stems from "[t]he broad equitable powers of the federal courts," which "can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."  *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998).  While a bank or trustee that acts as a custodian of property is one example of a potential relief defendant, *see* XO Br. at 6, "the term is

broad enough to encompass persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in [an] underlying securities enforcement action." *World Capital Mkt.*, 864 F.3d at 1004 (quoting *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007)).[46]

Lawson and XO do not dispute that the profits they received are traceable to the unlawful conduct at the center of this action.  Their sole argument is that, as investors, they have a "legitimate ownership interest" in all the profits they received and are therefore not proper relief defendants.  XO Br. at 12-13.  Their Rule 12(b)(1) motion fails for two independent reasons: (1) their argument that an investor, including a limited partner, has a legitimate claim to keep ill-gotten profits is wrong and contrary to precedent; and (2) they lack a legitimate claim to keep such profits because they did not receive them in good faith.[47]

A.    **Lawson and XO's Status as Investors in an Illegal Scheme Does Not Give Them a *Per Se* Legitimate Claim to the Profits of That Scheme**

Lawson and XO argue that they received distributions of profits "in return for bona fide passive investments" in the Student Loan Debt Relief Companies, citing Lawson's declaration and the limited partnership agreement for Assure Direct Services, LP.  XO Br. at 13-14.  Their argument is contrary to precedents recognizing that investors, including limited partners, who receive profits resulting from illegal conduct are proper relief defendants.  Their

---

[46] Like other law enforcement agencies, the Bureau may seek disgorgement from relief defendants.  *See CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *20-21 (S.D.N.Y. 2016).  Lawson and XO do not challenge the Bureau's ability to seek disgorgement from relief defendants.  *See* XO Br. at 10 n.3.

[47] At times, Lawson and XO's motion erroneously suggests that the U.S. Securities and Exchange Commission is a plaintiff in this case.  *See* XO Br. at 9, 10 (referring to "SEC").  It appears they meant to refer to the Bureau.

argument also fails as a factual matter with respect to the two Student Loan Debt Relief Companies from which they received distributions but made no capital contribution.

### 1.    Investors Who Receive Profits Traceable to Unlawful Conduct are Proper Relief Defendants

In addressing what qualifies as a "legitimate claim" to funds traceable to unlawful conduct, several courts have indicated that disgorgement may not be sought from "relief defendants who have provided some form of valuable consideration in good faith." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 177 (2d Cir. 2016); *see also SEC v. Thornes*, No. 14-cv-1598, 2015 WL 12672734, at *3 (C.D. Cal. July 20, 2015); *SEC v. AIC, Inc.*, No. 3:11-CV-176, 2013 WL 5134411, at *17 (E.D. Tenn. Sept. 12, 2013).  In line with that standard, courts have recognized that a legitimate claim to ill-gotten funds exists where an employee or vendor receives compensation for providing services to the wrongdoer, *see Ross*, 504 F.3d at 1142, or where a creditor receives repayment on an outstanding loan, *see LeadClick Media, LLC*, 838 F.3d at 177.  But, as discussed below, courts have also recognized that investors and other equity owners—who put their funds at risk in the hope of profits—do not have a legitimate claim to profits resulting from unlawful conduct.[48]  Lawson and XO's repeated argument that they provided "consideration" as investors (XO Br. at 6-7, 14, 18) ignores the distinction drawn in the caselaw between investors who receive profits (who may be proper relief defendants) and creditors and service providers who receive repayment for loans or services (who generally are not).

---

[48] Although the Ninth Circuit has not addressed whether an investor who receives profits traceable to unlawful conduct is a proper relief defendant, it has emphasized that "the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing."  *Colello*, 139 F.3d at 676.

1    For example, in an action brought by the Bureau involving an unlawful

2  payday lending scheme, the court denied a motion to dismiss filed by relief

3  defendants who owned interests in the defendant entities and received profits in

4  the form of dividends. *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211, 2016 WL

5  7188792, at *21 (S.D.N.Y. Dec. 2, 2016).  The court held that "[t]hese funds, if

6  obtained as profits from activity that violated federal law, are proper subjects of

7  a potential future disgorgement order." *Id.*

8    A series of related decisions in an SEC insider trading case are

9  particularly instructive.  In *SEC v. Aragon Capital Management, LLC*, 672 F.

10 Supp. 2d 421 (S.D.N.Y. 2009), a limited partnership received capital

11 contributions from limited partners, and an individual defendant used the

12 limited partnership's account to execute unlawful insider trades.  *Id.* at 428,

13 438.  The SEC named the limited partners who were not involved in the insider

14 trades as relief defendants and sought disgorgement of their profits from the

15 illegal trades.[49]  At summary judgment, the district court ordered the relief

16 defendants to disgorge their proportional share of the unlawful proceeds of the

17 trades.  *Id.* at 444.  The court rejected their argument they were entitled to

18 reduce the disgorgement amount based on their capital contributions, noting

19 that "[b]y choosing to operate … as a limited partnership, [the defendant]

20 created a situation in which any funds paid into the partnership by the limited

21 partners would ordinarily be constituted equity contributions, not loans." *Id.* at

22 442-43.  It therefore followed that the partners "are not entitled to any offset

23 against the SEC's claim for disgorgement" of profit distributions resulting from

24 unlawful activity.  *Id.*

25

26 ───────────────

27 [49] *Id.* at 441 ("[T]he Relief Defendants are joined solely because they were
   limited partners in Aragon, which distributed the proceeds of Amir's illegal
28 trading to them in approximately May 2005.").

The Second Circuit affirmed in relevant part, holding that the relief defendants' "status as limited partners" did not give them "a legitimate claim to ill-gotten profits that were commingled in the partnership's account." *SEC v. Rosenthal*, 426 Fed. App'x 1, 3-4 (2d Cir. 2011).[50]  Further, because the "balance in the [limited partnership's] account after the distributions was less than the amount of illicit profits, the distributions must necessarily have contained funds subject to disgorgement." *Id.* at 3.  In a subsequent district court decision (after the SEC amended its complaint and the relief defendants moved to dismiss the remaining claims against them), the court again rejected the argument that the limited partners were "not proper relief defendants."  *SEC v. Aragon Capital Advisors, LLC*, No. 07-cv-919, 2011 WL 3278907, at *19 (S.D.N.Y. July 26, 2011).  The court reasoned that, because of the underlying illegal conduct in the case, the limited partnership "had no 'profits' that could legitimately be distributed," and the limited partners named as relief defendants "consequently had no ownership interest in those distributions when they were made." *Id.* at 20.[51]

The reasoning of these decisions applies here:  When they made capital contributions to the Student Loan Debt Relief Companies under the limited partnership agreements, those funds became assets of the companies.[52]  Lawson and XO's capital contributions to and possession of a limited partnership interest in the Student Loan Debt Relief Companies did not give them a

---

[50] The Second Circuit vacated a different portion of the district court's decision on other grounds in a separate opinion.  *See SEC v. Rosenthal*, 650 F.3d 156 (2d Cir. 2011).

[51] The court relied, in part, on Delaware law, which provides that limited partners do not own the specific assets of the partnership, and that the partnership could not make a distribution resulting in its liabilities exceeding its assets.  *Id.* at *19-20.  The ADS LP Agreement and California law operate similarly.  *See supra* p. 6; Cal. Corp. Code § 15905.08(b)(2).

[52] *See supra* p. 6 (citing ADS LP Agreement § 2.7).

legitimate claim to keep ill-gotten profits generated by the businesses. Lawson and XO would only have had a rightful claim to receive distributions if the companies had generated "'profits' that could legitimately be distributed." *Aragon Capital Advisors*, 2011 WL 3278907, at *20. But Lawson and XO do not claim that any of the distributions they received are traceable to *lawful* sales by Student Loan Debt Relief Companies. That is not surprising: As alleged in the Complaint, the companies' business model was built around engaging in deceptive marketing, charging unlawful advance fees, and misusing consumer reports.[53]

At bottom, Lawson and XO argue that any investment in a business gives the investor a legitimate claim to the ill-gotten gains of the business and places the money beyond the reach of equity. If that were so, wrongdoers could immunize their unlawful proceeds (and defeat full relief to victims) by transferring money back to those who funded the enterprise. The creators of illegal schemes could easily create corporate structures to shield illegitimate assets. They could also "circumvent the [court's] power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives." *SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998). That is not, and should not be, the law, and the "broad equitable powers of the federal courts" exist precisely for cases like this one. *Colello*, 139 F.3d at 676.

        2.   The Cases Lawson and XO Cite Do Not Support Dismissal

Lawson and XO's motion ignores decisions recognizing that limited partners and other investors who receive ill-gotten profits are proper relief defendants. The cases they do cite are simply inapposite.

For example, in *FTC v. Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d 202 (D. Mass. 2009), the court denied disgorgement not because investors are

---

[53] *See* Compl. ¶¶ 52-70, 84-106.

categorically immune from it, but because the court was uncertain whether the shareholder distributions at issue included ill-gotten gains in the first place. *Id.* at 222-23 (amounts "may or may not have included [tainted] proceeds" and "may have been a legitimate distribution"). Lawson and XO's assertion that their preferred view is "[i]mplicit in the court's holding," XO Br. at 15, rests on a mis-reading of the decision. And Lawson and XO make no claim that any of the profits they received were untainted proceeds.

The Second Circuit's decision in *FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016), is distinguishable—and instructive. There, as the district court explained, the central issue was whether advances made by a parent corporation to its subsidiary were "essentially investments made in the hope of future returns," or were instead "bona fide loans." *FTC v. LeanSpa, LLC*, 11-CV-1715, 2015 WL 1004240, at *18 (D. Conn. Mar. 5, 2015). The district court concluded that the advances were not loans, and therefore held that the parent corporation lacked a legitimate claim to keep funds that derived from the subsidiary's deceptive marketing. *See id.* at 18-19. On appeal, the Second Circuit reversed—but only because it concluded that that the advances were in fact loans, and not distributions to the parent corporation. *See LeadClick Media*, 838 F.3d 178-79. In other words, the outcome of the case turned on whether the alleged relief defendant had received the ill-gotten funds as a return on investments, or as the repayment of loans. Here, by contrast, Lawson and XO admit that they were investors and not creditors—which dooms their argument that they have a legitimate claim to keep ill-gotten funds.

Similarly, *SEC v. Founding Partners Capital Mgmt.*, 639 F. Supp. 2d 1291 (M.D. Fla. 2009), is distinguishable because it involved a debtor-creditor relationship. *Id.* at 1294 (finding legitimate claim to funds where it was "undisputed that Sun Capital received the loan proceeds pursuant to written

loan agreements with Stable–Value" that created a "debtor-creditor relationship").

The Fifth Circuit's decision in *Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009), is likewise distinguishable. *Janvey* involved a Ponzi scheme in which a bank entered into a "debtor-creditor relationship" with holders of certificates of deposit ("CDs"). *Id.* at 834-35. Because of that debtor-creditor relationship, the court held that a receiver could not treat holders of the CDs who received proceeds from the scheme as relief defendants. *Id.* at 835. *Janvey* did not involve limited partners or other equity investors. The *Aragon Capital Advisors* case, discussed above, expressly distinguished *Janvey v. Adams* on that basis, noting that "in this case the Limited Partners made equity contributions to [the partnership], not loans, and therefore were not creditors of the partnership." 2011 WL 3278907, at *20. And the Fifth Circuit itself stressed in a subsequent decision that *Janvey* only involved the question of whether a debtor-creditor relationship could support a relief defendant claim. *See Janvey v. Brown*, 767 F.3d 430, 442–43 (5th Cir. 2014).

Further, where Ponzi schemes have not involved debtor-creditor relationships, courts have generally recognized that investors in a Ponzi scheme can be named as relief defendants. For example, in *SEC v. George*, 426 F.3d 786 (6th Cir. 2005), the Sixth Circuit affirmed disgorgement orders against relief defendants who each "invested his own money" in the Ponzi scheme. *Id.* at 798-99. Similarly, in *CFTC v. Gresham*, No. 09-cv-75, 2012 WL 1606037 (N.D. Ga. May 7, 2012), the district court distinguished the Fifth Circuit's decision in *Janvey v. Adams* and held that the relief defendants "were investors, not creditors of the Ponzi scheme, and thus do not have a legitimate ownership interest in the Ponzi scheme assets." *Id.* at *3; *see also SEC v. Donnan*, No. 12-CV-2831, 2014 WL 11829334, at *7-9 (N.D. Ga. Sept. 15, 2014).

Lawson and XO's reliance on an older Ponzi scheme case, *Johnson v. Studholme*, 619 F. Supp. 1347 (D. Colo. 1985), is also misplaced.  It is not clear whether the receiver in that action claimed that the Ponzi scheme investors were relief or nominal defendants—terms that aren't used in the court's decision.  *See id.* at 1348 (listing theories asserted by receiver).  Further, unlike the Bureau, the receiver appears to have been seeking relief on behalf of "creditors and claimants," and not to redress the victims injured by the unlawful conduct.  *See id.* ("The receiver does not purport to assert any claims on behalf of defrauded investors.").  In any event, to the extent *Johnson* holds that innocent investors in a Ponzi scheme cannot be required to disgorge fictitious profits, it is out of step with the modern approach to Ponzi schemes exemplified by cases like *George*, *Gresham*, and *Donnan*.

In short, the cases that Lawson and XO cite do not support their argument or are otherwise distinguishable or unpersuasive.  And none of those cases provides any persuasive reason why, as investors in an unlawful scheme, they have a *per se* legitimate claim to keeping the profits resulting from that scheme.

        3.    <u>Lawson and XO Made No Investment in Two of the Student Loan Debt Relief Companies</u>

Finally, although Lawson and XO claim that they received profits from the five Student Loan Debt Relief Companies as "consideration" for their investments, the limited partnership agreements for two of those companies—Direct Document Solutions and Secure Preparation Services—indicate that they made no investment at all.  *See supra* pp. 5-6.  That is, Lawson and XO appear to have received limited partnership interests in those companies—and later distributions—for free.[54]  For those companies, these gratuitous distributions do

---

[54] The Bureau served interrogatories on Lawson and XO on April 10, 2020, seeking information on their capital contributions to and distributions from each

1  not create any "'legitimate claim' sufficient to immunize the property from

2  disgorgement." *CFTC v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010).

3  **B.    Lawson and XO Cannot Claim to Have Received the Allegedly**

4  **Ill-Gotten Funds in Good Faith**

5  Lawson and XO's motion to dismiss for lack of subject matter

6  jurisdiction fails for an independent reason.  As noted, they are immune from a

7  relief-defendant claim only if they "[1] provided some form of valuable

8  consideration [2] *in good faith*." *LeadClick Media*, 838 F.3d at 177 (emphasis

9  added); *see also Thornes*, 2015 WL 12672734, at *3.  Even if Lawson and XO

10 had provided "valuable consideration," the evidence indicates that they knew of

11 facts that should have alerted them that the distributions they received were ill-

12 gotten.  They therefore cannot claim to have acted in "good faith."

13 As discussed above, Lawson appears to have been aware of and

14 supportive of efforts to misuse consumer reports to market the Student Loan

15 Debt Relief Companies' services.  *See supra* p. 8.  Mikael Van Loon, who was

16 the co-owner of XO and acted as a representative of Lawson and the limited

17 partners, was similarly aware of the misuse of consumer reports.  *See supra* p.

18 9.[55]  In one particularly telling email string, Van Loon expressed that it was a

19 "very serious matter" that one of the Student Loan Debt Relief Companies

20 wouldn't be distributing profits that month—but said nothing when the other

21 party to the email referenced "solv[ing]" (i.e., deceiving) Experian to obtain

22 consumer reports.[56]  Lawson and Van Loon also appear to have recklessly

23

24 of the Student Loan Debt Relief Companies.  To date, Lawson and XO have
   refused to provide answers to those interrogatories.  Ex. S.

25 [55] Given his position as co-owner of XO and representative of the limited

26 partners, Van Loon's knowledge can be imputed to XO and is circumstantial
   evidence of what Lawson knew.  *Cf. W.R. Grace & Co. v. W. U.S. Industries,*

27 *Inc.*, 608 F.2d 1214, 1218 (9th Cir. 1979) (knowledge of officers and key
   employees obtained within scope of their authority is imputed to corporation).

28 [56] Ex. O.

ignored the fact that the companies were charging unlawful advance fees, and Van Loon appears to have been aware of other red flags. *See supra* pp. 7, 9-10. All of this evidence undermines any claim that Lawson and XO received distributions of profits in good faith.

III.   **THE BUREAU HAS ADEQUATELY ALLEGED THAT LAWSON AND XO ARE RELIEF DEFENDANTS**

In their motion under Federal Rule of Civil Procedure 12(b)(6), Lawson and XO argue that the Bureau's Complaint fails to allege sufficient facts to support its relief defendant claim against them.  XO Br. at 8-11.  They are mistaken.  The Bureau has adequately alleged that Lawson and XO are relief defendants – that is, that they are "non-violating third parties who have received proceeds of others' violations to which the third parties have no legitimate claim." *World Capital Mkt.*, 864 F.3d at 1003.

Lawson and XO narrowly focus on two paragraphs in the Complaint, arguing that they should have been mentioned more.  XO Br. at 8.  Their argument is puzzling here, where Lawson's declaration admits some of the facts they claim are missing, including that he and XO received hundreds of thousands of dollars in profits.[57]  In any case, their argument fails to consider the Complaint as a whole.  *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) (when evaluating plausibility, courts consider the complaint's allegations "as a whole"); *see also Jones v. HSBC*, No. 11-CV-02939, 2012 WL 1299203, at *2 (S.D. Cal. Apr. 13, 2012).

The Complaint identifies each of the five Student Loan Debt Relief Companies[58]; describes the companies' various violations of the FCRA, CFPA,

---

[57] Lawson Decl. ¶ 6.
[58] Compl. ¶¶ 16-26.

and TSR[59]; alleges that the companies collectively charged more than $15 million in unlawful fees[60]; and describes the structure of each of the five companies, which each involved a corporation and an associated limited partnership.[61]  The Complaint further alleges that Lawson owned limited partnership interests in each of the Student Loan Debt Relief Companies, and that he held those interests through XO.[62]  The Complaint also alleges the specific type of payments that Lawson and XO received—distributions of profits.[63]  And the Complaint alleges that those profits are traceable to funds obtained from consumers through the alleged violations.[64]  Nothing more was required.

Considered as a whole, rather than in isolation, these allegations plausibly support a relief defendant claim against Lawson and XO.  It is plainly plausible that the pervasive violations of Federal consumer financial law by the Student Loan Debt Relief Companies described in the Complaint, including charging millions in unlawful advance fees, would result in distributions of ill-gotten profits to those companies' investors.  By alleging Lawson and XO's relationship to that broader scheme through limited partnership interests in the companies, as well as their receipt of distributions of profits, the Bureau has alleged sufficient facts to render its relief defendant claim against them plausible.

Lawson and XO also claim that the Complaint's allegation that they received profits through limited partnership interests in the Student Loan Debt

---

[59] Compl. ¶¶ 52-70, 147-152 (FCRA); *id.* ¶¶ 89-102, 156-68, 174-86 (deception claims under CFPA and TSR); *id.* ¶¶ 103-106, 153-55 (TSR advance fee).
[60] *Id.* ¶ 106.
[61] *Id.* ¶¶ 17, 20, 22, 24, 26.
[62] *Id.* ¶ 51.
[63] *Id.* ¶ 200.
[64] *Id.*

Relief Companies is an "admission of a legitimate claim to the funds." XO Br. at 11. But that argument rests on an error of law: As discussed above, courts have recognized that limited partners who receive profits traceable to unlawful conduct lack a legitimate claim to such funds and can properly be named as relief defendants. *See supra* pp. 12-16. The fact that Lawson and XO received ill-gotten funds through limited partnership interests renders the Bureau's relief defendant claim more plausible, not less.

In any event, if the Complaint's existing allegations were insufficient, the Bureau should be given an opportunity to amend the Complaint. Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a). That "policy is to be applied with extreme liberality," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003), and leave to amend "should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay," *Yakama Indian Nation v. State of Wash. Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir. 1999).

Granting leave to amend would be appropriate here. Contrary to Lawson and XO's claim that the alleged pleading defect is "incurable," XO Br. at 11, courts recognize that limited partners and other investors who receive profits traceable to illegal conduct may properly be named as relief defendants, *see supra* pp. 12-16, and the facts identified by the Bureau above and admitted in Lawson's declaration support the Bureau's claim that Lawson and XO are proper relief defendants. Nor is there any reason to believe that adding factual allegations to the Complaint would prejudice Lawson or XO or otherwise create undue delay.

## CONCLUSION

For the reasons set forth above, XO Media and Lawson's motion to dismiss should be denied.

Dated May 15, 2020                    Respectfully Submitted,


/s/ Colin Reardon
Leanne E. Hartmann
E. Vanessa Assae-Bille (*pro hac vice*)
Colin Reardon (*pro hac vice*)
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, D.C. 20552

*Attorneys for Plaintiff Bureau of*
*Consumer Financial Protection*