# EXHIBIT B

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU

In the Matter of:         )
                          ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC    )

Wednesday,
February 27, 2019

Federal Building
Room 7516
300 North Los Angeles Street
Los Angeles, California

The investigational hearing testimony of SEAN COWELL commenced, pursuant to notice, at 9:14 a.m.

* * *

```
                                                              Page 2
 1    APPEARANCES OF COUNSEL:

 2

 3         FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:

 4             COLIN T. REARDON, Attorney Advisor
               ELIZABETH VANESSA ASSAE-BILLE, Attorney at Law
 5             1700 G Street NW
               Washington, DC 20552
 6             210 435-9668
               Elizabeth.Assae-Bille@cfpb.gov
 7

 8

 9         FOR THE WITNESS:

10             SEAN BURKE, Attorney at Law

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

1        LOS ANGELES, CALIFORNIA, WEDNESDAY, FEBRUARY 27,
2                             2019
3                           9:14 A.M
4
5
6                     SEAN COWELL,
7    having been administered an oath, was examined and
8    testified as follows:
9
10                     EXAMINATION
11   BY MR. REARDON:
12   Q          Good morning.
13   A          Good morning.
14   Q          Before we get started with your testimony,
15   there are a few preliminary matters we are going to
16   cover on the record.  My name is Colin Reardon and
17   I'm here with Vanessa Assae-Bille.  We are attorneys
18   with the Office of Enforcement at the
19   Consumer Financial Protection Bureau.  It is
20   February 27th, 2018, 9:14 a.m.  And we are at the
21   Office of the United States Attorney in Los Angeles,
22   California.  This is an investigational hearing
23   conducted by the Bureau of Consumer Financial
24   Protection pursuant to 12 CFR 1080.
25              The objections that may be raised this

Page 7

1 morning are limited, namely, to constitutional or
2 other legal rights and privileges as set forth in
3 those rules. This is not a deposition, and it is
4 not governed by the Federal Rules of Civil
5 Procedure. We are here to conduct the
6 investigational hearing of Sean Cowell pursuant to a
7 Investigative Demand submitted October 26, 2018.
8     Could you, please, state your full name
9 for the record?
10 A    Sean Peter Cowell.
11 Q    Did you understand the oath you just took
12 with the Court Reporter?
13 A    Yes.
14 Q    Are you on any medications or other
15 substances that would impair your ability to give
16 true and accurate testimony today?
17 A    No.
18 Q    Is there any other reason you may not be
19 able to provide true and accurate testimony today?
20 A    No.
21 Q    Are you represented by an attorney today?
22 A    Yes.
23 Q    Who is your attorney?
24 A    Sean Burke.
25     MR. REARDON: Mr. Burke, could you please

Page 79

1  beginning, there were only kind of two things that
2  the company did to ensure that it was complying with
3  the Telemarketing Sales Rule and those two things
4  were, one, hear presentations at the AFSLR and two,
5  rely on the back end?
6  A       Yes.
7  Q       Nothing else besides that?
8  A       Not that I know of.
9  Q       So the company never hired an attorney to
10 review the company's operations?
11 A       I don't know.
12 Q       Would you have known that as --
13 A       No.
14 Q       -- partner?
15 A       No.
16 Q       You didn't get information on compliance
17 as a limited partner?
18 A       Not about hiring an attorney for anything
19 on the --
20 Q       Did a limited partners get briefed on
21 compliance issues?
22 A       I don't know.  I don't remember there
23 being any compliance issues, like, thrown in my
24 face, or anything like that.  So I don't know.
25 Q       If you look back at Exhibit 2, further

1   down, there's a paragraph that says, "Sean, Jawad
2   and I, parentheses, mostly them.  Are you going to
3   the sweat equity partners again but drawing no
4   salaries?  And I'm going to provide all the space
5   rent free."  Do you see that?
6   A          Yes.
7   Q          What does Tom mean by "sweat equity
8   partner" there?
9   A          It's basically leveraging somebody else's
10  capital to start the business.  So we're leveraging
11  Ken Lawson's capital and Kevin's to come in and
12  start this business.
13  Q          So does that mean that you and Jawad and
14  Tom didn't make any initial capital contribution?
15  A          Correct.
16  Q          But Kevin and Ken Lawson did make a
17  capital contribution?
18  A          Yes.
19  Q          So what was your and Sean Jawad and Tom's
20  contribution to the business?
21  A          Bring in the business to light, bring the
22  business to the table, bringing it to the building,
23  settle it up.
24  Q          Okay.  That's what does "sweat equity"
25  means?

1   Experian prescreen data for the student loan
2   companies through another course?
3   A       No.
4   Q       Did Jawad ever try to do that?
5   A       You know, I don't know.  I don't know.
6   Q       You just referenced this little bit, but
7   do you have an understanding of why the student loan
8   companies closed?
9   A       Yes.
10  Q       What is your understanding?
11  A       They shut down, the CID came, and limiteds
12  didn't want to do anything with that business
13  anymore.  Instead of the replying to the CID, they
14  scattered and went and opened up their own shops, or
15  most of them did.
16  Q       How did that decision happen to close
17  down?
18  A       It literally happened overnight.  It was
19  literally, the CID came, we looked at it, showed it
20  to Brad, Brad kind of explained it to us, and next
21  day we -- the -- the student loan shops started
22  getting CID's, as well.  I don't think it was -- I'm
23  pretty sure the other shops got them, as well, and
24  everyone just stopped.  People just stopped, that's
25  it.  We didn't want -- the LP's didn't want to have

1  anything to do with the businesses anymore and the
2  general partners just said, "Fine, I'll take it over
3  here," and they all left.
4  Q        They just shut down immediately?
5  A        Yes, Oldfield shut down -- yes.  The only
6  person that didn't shut down was Ed Martinez,
7  because he already had services that were into the
8  program.
9  Q        Did he just continue going?
10 A        He continued servicing the clients that
11 were in there and not taking on any new clients.
12 Q        He had other affiliates; right?
13 A        Yes.
14 Q        Did he continue --
15 A        I don't know.
16 Q        -- with those?
17 A        I don't know.
18 Q        Did you speak to him at any point around
19 this time or after?
20 A        Yes, I did, of course.  His thing was,
21 "Listen, I still have to stay open because I have,
22 you know, all of the student loan shops that have
23 shut down.  It takes me, at least, six months to
24 make sure that all the clients have been serviced
25 and to answer customer service phone calls, because

1  Q      If you look here, the data purchased at
2  the bottom is relating to student loans.
3  A      Yes.
4  Q      This data is the same type of data that
5  was used by Jawad to mark it for the document
6  company prior to 2017.  Do you have any explanation
7  why Lend Tech was buying this data?
8  A      I have no explanation why Anthony or Lend
9  Tech was buying this data.
10 Q      Do you see at the top of this first order
11 that is dated August 17, 2017?
12 A      I do.
13 Q      That's about a month before the Bureau
14 sent its first CID's.  Do you know that?
15 A      I can see that, yeah.
16 Q      So on the very first day the account was
17 approved, it appears that Lend Tech was purchasing
18 student loan data of the very kind that Monster
19 Loans had previously misused and provided to the
20 student loan companies.  Do you see that?
21 A      I see that.
22 Q      And the person who was doing it was
23 Anthony Sebreros, who was running one of the student
24 loan companies.
25 A      I see that.

Page 267

1  Q        And this is about two weeks after he told
2  Mike Van Loon that he was looking to solve Experian?
3  A        Sure.
4  Q        I have a hard time understanding that Lend
5  Tech Loans was doing anything except buying
6  pre-screened data for student loan companies and
7  that you and Bill Abdel and Anthony were all
8  involved in it.  So please, help me understand why I
9  shouldn't believe that that's the case.
10 A        Why you shouldn't believe that that's the
11 case?  Because the intent is the to open a mortgage
12 company branch and, obviously, the two people that
13 opened this up used it for student loan data instead
14 of mortgage data.  I don't know why Anthony's on
15 there at all, doesn't make any sense to me.  I
16 understand Bill, but I don't know why Anthony's on
17 here.
18 Q        All right.  Let's recap the facts we know.
19 A        Okay.
20 Q        First fact is Monster Loans stopped
21 allowing its Experian account to be used for outside
22 companies in June 2017; is that correct?
23 A        Correct.
24 Q        In that month, you registered Lend Tech
25 Loans; is that a correct --

1   A          Yes.
2   Q          In that same month, you also applied for
3   an Experian account; is that correct?
4   A          Yes.
5   Q          You apparently also hired -- or got Bill
6   Abdel involved in this company at the same time; is
7   that correct?
8   A          Yes.
9   Q          He previously been involved in pulling
10  Experian data for the student loan companies with
11  Jawad; is that correct?
12  A          Yes, I think so.
13  Q          Anthony Sebreros was a manager of one of
14  the student loan companies?
15  A          Yes.
16  Q          Then on August 1st, 2017, Anthony Sebreros
17  sends an email to Mike Van Loon that was forwarded
18  to you that refers to solving Experian; right?
19  A          Yes.
20  Q          Then on August 17, 2017, Lend Tech's loans
21  gets approved for and Experian account and starts
22  immediately buying student loan data.  Do you see
23  that?
24  A          Yes.
25  Q          How do you expect us to believe that this

Page 269

1  was anything except an effort to find a new company
2  to buy pre-screened data for student loan companies?
3  A        How do I expect you to believe it?  I
4  mean, it's -- you know, it's what happened.  I mean,
5  we're supposed to start a branch for Monster Loans,
6  we went down the path of starting a branch for
7  Monster Loans.  You have -- I thought they were just
8  being very loose with how things are.  And people do
9  things under my name, obviously, and sign my name
10 and, you know, I'm not paying attention, I guess,
11 what we're getting into or what we're not getting
12 into.  I mean, I see where you're coming from.  I
13 really, really do.  I see where you're coming from,
14 but I gotta tell you the whole intent was start up a
15 mortgage company, a branch of Monster Loans, that's
16 how the thing was set up.  We went through measures
17 to set it up that way.  Once of the CID's come,
18 we're done, we give this company up, don't want to
19 have anything to do with it.
20 Q        That actually is a question I have,
21 because it looks to me like you initially intended
22 for this to be a vehicle for buying student loan
23 data from Experian, but the CID's came, you freaked
24 out, and decided not to be involved in this anymore,
25 but the original intent was to buy student loan

1    data.

2    A         The original intent was to set up a

3    mortgage lender and be a branch at Monster Loans.

4    Again, we tried to hire people -- this is why the

5    wheels were in motion to start up a mortgage lender

6    -- mortgage bank.  It wasn't to --

7    Q         What wheels were put in motion?

8    A         Setting up phones, setting up computers,

9    trying to hire people.

10   Q         You just said no one was hired.

11   A         Exactly.  I said we tried to hire people.

12   We interviewed somebody and they saw the name "Lend

13   Tech" on the phone and they thought they were being

14   hired for Monster Loans and turned the job down

15   because of that.

16   Q         When was that?

17   A         I don't know what the date was, but it was

18   a referring from one of the sales managers at

19   Monster Loans.  She sent us over somebody and, I

20   think, he thought he was gonna be working for

21   Monster Loans, saw "Lend Tech" on the phones, and

22   didn't want to do it.  It was difficult to hire at

23   that time.

24   Q         What other steps did Lend Tech take to

25   become a mortgage company?