# EXHIBIT C

CONSUMER FINANCIAL PROTECTION BUREAU


In the Matter of:               )
                                ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC          )




                                Wednesday,
                                November 28, 2018

                                Federal Building
                                Room 7516
                                300 North Los Angeles Street
                                Los Angeles, California



        The investigational hearing testimony of

MIKAEL VAN LOON commenced, pursuant to notice, at

8:56 a.m.

                            * * *

```
 1   APPEARANCES:

 2   For The Consumer Financial Protection Bureau:

 3   COLIN T. REARDON, Attorney Advisor
     ELIZABETH VANESSA ASSAE-BILLE, Attorney at Law
 4   1700 G Street NW
     Washington, DC  20552
 5   (201) 435-9668
     elisabeth.assae-bille@cfpb.gov
 6

 7   For the Witness:

 8   SEAN BURKE, Esquire
     RAY BIEDERMAN, Esquire
 9   RICHARD HORN, Esquire
     Mattingly, Burke, Cohen & Biederman
10   155 E. Market Street, Suite 400
     Indianapolis, Indiana  46204
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1      LOS ANGELES, CALIFORNIA, WEDNESDAY, NOVEMBER 28, 2018

2                           8:56 A.M.

3

4                      MIKAEL VAN LOON,

5      called as a witness, having been administered an oath, was

6      examined and testified as follows:

7

8                        EXAMINATION

9      BY MS. ASSAE-BILLE:

10     Q    Good morning.  Today is November 28, 2018.  And

11     we are in the offices the U.S. Attorneys in Los Angeles,

12     California.

13          Mr. Van Loon, please state and spell your name

14     for the record.

15     A    Mikael Van Loon.  M-i-k-a-e-l.  Last name's two

16     words:  V-a-n space L-o-o-n.

17     Q    Are you represented by counsel today?

18     A    Yes, I am.

19     MS. ASSAE-BILLE:  Counsel, will you please identify

20     yourselves for the record?

21     MR. BURKE:  Yes, thank you.

22          Sean Burke on behalf of the witness.

23     MR. BIEDERMAN:  Ray Biederman on behalf of the

24     witness.

25          MR. HORN:  Richard Horn on behalf of the

Page 13

1    Q    During what period did you work there?

2    A    2010 to August of 2016.

3    Q    What did you do there?

4    A    Chief financial officer.

5    Q    And what were your responsibilities generally?

6    A    I received a finance function.

7    Q    Were you employed between 2008 and 2010?

8    A    As a W-2?  No.

9    Q    Did you have any other kind of employment during

10   this period?

11   A    I was an independent contractor.

12   Q    For what company?

13   A    Passport Capital.

14   Q    And what was your position there?

15   A    Portfolio manager.

16   Q    What does that mean?

17   A    Make decisions, make investment decisions and

18   manage a portfolio investment.

19   Q    So when did you come to Chou Team Realty?

20   A    August of 2016.

21   Q    And in what position were you hired?

22   A    CFO.

23   Q    What were your responsibilities as CFO?

24   A    Fix the reporting and accounting function,

25   principally.

Page 14

1    Q    Did you ever hold any other positions with Chou

2    Team Realty?

3    A    Yes.

4    Q    Which position?

5    A    Informally, chief operating officer from October

6    to December 2016 and then CEO from 2016 forward, Christmas

7    of 2016.

8    Q    And as CEO, what are your responsibilities?

9    A    Determine the company's direction, establish and

10   maintain corporate culture.

11   Q    Is that all?

12   A    There are countless number of responsibilities

13   as the CEO.  Those are the principal ones.  Happy to go

14   into detail if you want.  Those are the principal ones.

15   Q    Thank you.

16        Tell me about the circumstances that led you to

17   join Chou Team Realty.

18   A    The CEO of DDC and I had invested in a series of

19   opportunities over the course of several years with Tom

20   Chou.  We were engaged with the mortgage business.  The

21   limited partners asked for me to get involved to fix the

22   financial reporting and understand the pro formas.

23   Q    At the beginning of your sentence, you said DDC?

24   A    Domain Development Corporation.  Sorry.  Can I

25   refer to it as "DDC" going forward?

1      Q    Sure.

2           And when you say the CEO had invested with you

3   over the year -- over a number of years, are you referring

4   to Tom Chou?

5      A    Ken Lawson.

6      Q    Ken Lawson.

7           Who were the LPs that asked you to get involved?

8      A    Principally Ken Lawson had suggested it.  Tom

9   was supportive.

10      Q    How did you meet Ken Lawson?

11      A    He knew my brother.

12      Q    How long ago did you meet him, or the first

13   time?

14      A    2009.

15      Q    And when did you first meet Tom Chou?

16      A    Face to face, 2011.  I believe.

17      Q    But you had interacted with him prior to that?

18      A    Telephone calls.

19      Q    Did any other LPs participate in recruiting you?

20      A    I can't recall.

21      Q    And to be clear, these LPs -- for the record,

22   referring to limited partners -- were limited partners in

23   Chou Team Realty; is that right?

24      A    No.

25      Q    What were they LPs of?

Page 34

1        A     Uh-huh.

2        Q     What was the period of time you worked there?

3        A     Well, I would have joined in 2010.  And then I

4    would have worked there until August of 2016 when I joined

5    Chou Team Realty.

6        Q     And that job is essentially what led you to Chou

7    Team Realty?

8        A     The relationship that I developed with Ken in

9    that job in the investments that Ken and I made with Tom

10   Chou led me to Chou Team Realty.

11       Q     In those investments, you mentioned you invested

12   in Docu Prep.  Was there due diligence that was done

13   before the investment?

14       A     Not really.  So there was a relationship with

15   Tom, a representation -- the relationship with Tom, and

16   the investment was made based on the strength of that

17   relationship.

18       Q     So there wasn't ever an assessment of whether

19   Docu Prep was operating in a way that complied with

20   relevant laws?

21       A     Sounds really stupid, but no.  Feel like an

22   idiot having just said that.  But no, we did not.

23       Q     You mentioned that there was a period of time

24   between March and August 2016 when you would drive to

25   3 Whatney at the request of the limited partners to work

1   on accounting and reporting functions for Docu Prep and

2   other companies?

3        A    I'll try to keep this --

4        Q    Was that --

5        A    -- succinct.  So --

6        MR. BURKE:  Let him ask the question.

7        THE WITNESS:  My apologies.

8   BY MR. REARDON:

9        Q    Can you describe the work you did prior to your

10   formal start date in August 2016 for those companies?

11       A    So we had made several investments as limited

12   partners.  We weren't receiving pro formas or P&Ls or

13   balance sheets in the way that I would expect as a limited

14   investor.  I was asked to get involved to figure out why.

15            So part of the work that I was doing was asking

16   questions, why is this, and then making recommendations

17   for them, the general partners, to fix whatever it was

18   that they needed to fix to provide proper reporting to the

19   limiteds.

20       Q    Were you compensated for that work?

21       A    No.  Only in that I had an investment in those

22   companies.

23       Q    You mentioned pro formas.  What are those?

24       A    Pro formas are basically projections of what the

25   general partner believes the business will do and an

Page 49

1    Exhibit 3.  This is a letter in response to the CID from

2    MonsterLoans dated July 19, 2018.

3         A     Uh-huh.

4         Q     It states at the bottom of pages 1 and at the

5    top of pages 2 that around the time that you attend the

6    SOMB, you began to understand potential wrongdoing

7    orchestrated by Mr. Jawad Nesheiwat, a then employee of

8    MonsterLoans.

9               So I have a few questions about that.  Okay?

10        A     Uh-huh.

11        Q     What was Jawad's position at MonsterLoans when

12   you started working there?

13        A     Jawad was seen as responsible for the marketing

14   function, the sales function, and he would run into the

15   operational lane frequently.

16        Q     How would he run into the operational lane?

17        A     Jawad had prior mortgage experience.  I can't

18   tell you exactly how much.  But he would tell me that he

19   had worked at Solstice Capital, I think, and they were

20   sold to somebody for $50 million.

21              I knew nothing about mortgages other than having

22   had one.  Jawad understood the mortgage process from

23   marketing to sales, processing, not really underwriting.

24   Because our loans were taking so long to fund, he would

25   run into the processing lane shouting and yelling, banging

Page 50

1    the table.

2         Q    What was your relationship like with him when

3    you started at MonsterLoans?

4         A    Subjective question.

5              Friendly.  I needed his experience level to get

6    more understanding of the mortgage business as quickly as

7    I could.  I formed a rapport with Jawad, deferential at

8    times, to get him to help me better understand the

9    functions of the mortgage business that I didn't

10   understand.

11        Q    How much did you interact with him while you

12   were CEO on those days?

13        MR. BURKE:  Did you say CEO?

14   BY MS. ASSAE-BILLE:

15        Q    CFO, thank you.

16        A    CFO.

17        Q    Yes.  So in the beginning, how much did you

18   interact with him?

19        A    Not a ton.  Not a ton.  Emails from time to

20   time.  But again, not a ton.

21        Q    Did that change when you became CEO?  Did you

22   interact more or less?

23        A    I interacted more as CEO.  Yes.

24        Q    So tell me how you became aware that Jawad was

25   using the MonsterLoans' Experian account in ways that may

1    have been impermissible?

2         A    Quick background statement, I didn't know until

3    the end of 2016 -- I don't believe I knew until the end of

4    2016 that you needed a lending license to have an account

5    with a CRM.  I just wasn't -- I didn't have the knowledge.

6              Over the course of time, I received multiple

7    reports from Brad, Ritesh heading into Q1 of 2017 about

8    the size and scope and severity of the issue.

9         Q    Tell me about these reports that you got from

10   Ritesh and Brad about what was going on.

11        A    Mostly verbal conversations outlining be aware

12   of this, what is happening, is this -- it is my belief

13   that through middle, end of the fourth quarter of 2016,

14   Brad and Ritesh were doing deeper dives into legislation

15   and gaining a better understanding of what was happening

16   and then informing me at that point as the centralized

17   decision-maker.

18             So your question is when and how did I become

19   aware?

20        Q    Yes.

21        A    Brad and Ritesh over the course of the fourth

22   quarter and into the first quarter would provide me with

23   either emails over verbal views.

24        Q    Did you ever inform Tom Chou of these reports?

25        A    I can't think of a specific moment when I did.

Page 96

1      A     Okay.

2      Q     Have you ever seen this check?

3      A     I believe so.

4      Q     Why did M&R Partners receive money from this

5   entity?

6      A     I would be speculating because I don't remember.

7   But I believe it may be associated with that override on

8   the other limited partners.  If you remember, we discussed

9   early on compensation arrangement.  I believe that check

10  is probably associated with that arrangement.

11     Q     So under that arrangement, you would receive a

12  distribution from an entity that M&R Partners is not

13  necessarily invested in?

14     A     Yeah.  So the way that it -- and we're reaching

15  back here.

16     Q     Uh-huh.

17     A     I believe the way that it should have worked is

18  that the limited partners should have received their

19  distribution and then cut M&R Partners a check from their

20  distribution, but it appears to have come directly from

21  the company in this case.

22     Q     I need you to walk me back through this.

23     A     Okay.

24     Q     If you wouldn't mind explaining how the

25  distribution normally worked, just so I can understand.

Page 97

1      A   This was a period of sloppy chaos.   And it's two

2   years ago.  So I am a little fuzzy, but I will do my best.

3          The limited partners were not getting the

4   reporting -- the accounting and reporting that they needed

5   from the general partners.   They asked me through a series

6   of regular meetings to ask difficult questions and help

7   establish a reporting framework so that the limiteds had

8   better clarity into their investments.

9          The limiteds agreed to pay a certain percentage

10   override on the distributions they would have otherwise

11   received to enhance -- to pay M&R Partners, which is

12   essentially me.

13      Q   For?

14      A   Representing their interests relative to the

15   general partners.

16      Q   Okay.  Understand.

17   BY MR. REARDON:

18      Q   Did anyone else have a similar override?

19      A   I believe that Brad had a similar override, but

20   I do not know for sure.

21      Q   Do you have an understanding of why he had an

22   override?

23      A   I believe it's for a similar purpose, only more

24   focused on the legal and organizational issues, ensuring

25   that the structures of the companies were set up

Page 98

1    appropriately and protocols were followed.  That is my

2    belief.

3    BY MS. ASSAE-BILLE:

4        Q    Okay.  Was M&R Partners invested in Docu Prep

5    Center, Inc.?

6        A    It's all these names I don't -- I don't think

7    so.  But if it's a check like this -- take a look at the

8    check first.

9        MS. ASSAE-BILLE:  Please mark this document as

10   Exhibit 10.

11            (Exhibit No. 10 was marked for identification

12             and is attached hereto.)

13   BY MS. ASSAE-BILLE:

14       Q    I am now handing you what has been marked as

15   Exhibit 10.  This is a check from Docu Prep Center, Inc.

16   to M&R Partners from November 2017.

17            Have you ever seen this check?

18       A    I assume that I have if I cashed it.

19       Q    Why did M&R Partners receive this money from

20   Docu Prep Center?

21       A    For the exact reason that M&R Partners received

22   the Certified Doc Prep Services check.  Same.

23       Q    For override services; correct?  For the

24   override role?

25       A    Yes.  The representation of LP interests.

Page 99

1       Q      Representation of LP --

2       A      Limited investor interests.  However, from an

3   accounting perspective, this is not how -- that's what the

4   check is for.

5       Q    Have you performed this role of representing the

6   LP interests for a company called Select Student Services?

7       A    I don't -- the name is familiar.  It's likely.

8       MS. ASSAE-BILLE:  Please mark the following document

9   as Exhibit 11.

10              (Exhibit No. 11 was marked for identification

11               and is attached hereto.)

12  BY MS. ASSAE-BILLE:

13      Q    I am now handing you what has been marked as

14  Exhibit 11.

15              Do you recognize this check?

16      A    I see the -- yeah.  I mean, it's -- I don't know

17  that I recognize these checks individually, but I can see

18  that they are printed here.

19      Q    Do you recall why M&R Partners received this

20  check from Select Student Services?

21      A    No.  On this one, I don't.

22      MS. ASSAE-BILLE:  Please mark this document as

23  Exhibit 12.

24              (Exhibit No. 12 was marked for identification

25               and is attached hereto.)

Page 108

```
 1   BY MR. REARDON:

 2       Q    This might help refresh your recollection, but

 3   it's our understanding that Docu Prep Center, Inc. was the

 4   general partner registered to Document Preparation

 5   Services, LP.

 6       A    Yes, that sounds right.  Inc. should have

 7   been -- Inc. is the general partner.  LP is the limited.

 8       Q    So your answer before about Docu Prep Center,

 9   Inc. would apply to Document Preparation Services, LP

10   because --

11       A    So it's not clear to me why I would be receiving

12   a check from any Inc., and the only answer I can give you

13   is that whoever stroked the check is a moron and did it

14   incorrectly.  It should not have been cut out of that

15   account.

16            But I have no control over -- it was on behalf

17   of the limited partners, and there were several

18   investments, and the role was essentially to ask difficult

19   questions about the performance of the company.

20       Q    Maybe expedite this line of questioning.  If we

21   see a check written from one of the student loan document

22   preparation services companies to M&R Partners, would that

23   check be for either your role as a limited partner or

24   pursuant to the --

25       A    Representation of.
```

1    Q    -- the representation role that you played?

2    A    I think that's fair.  That if there is a check

3    from one of those companies, it's either a limited partner

4    investment I made or a representation of the limited

5    partners in asking difficult questions of the general

6    partners.

7    BY MS. ASSAE-BILLE:

8    Q    Are you familiar with a company called Monster

9    Tax Relief?

10    A    Yes.

11    Q    What type of business is this?

12    A    As best as I understood the business model, it

13    was to help people file back taxes and then structure

14    payment plans with the IRS, or the entity in which the

15    taxing authority.

16    Q    Do you own any part of Monster Tax Relief?

17    A    I believe so.

18    Q    Do you know how much?

19    A    I do not.

20    Q    Do you know since when?

21    A    Mid 2016 is a guess.  I don't know.

22    Q    Who were the general partners or managers of

23    Monster Tax Relief?

24    A    I believe the general partner was Desiree Hoose.

25    And there was a guy named Brady.  And then I think David

Page 110

1    Sklar took it over at some point.

2         Q     Why did David Sklar take it over?

3         A     Because Desiree was no longer managing the

4    company.

5         Q     Did the LPs in Monster Tax Relief ever instruct

6    or request the removal of Desiree Hoose from Monster Tax

7    Relief?

8         A     I believe that Desiree Hoose was asked to leave

9    as the general partner of Monster Tax Relief, LP.

10        Q     Was there a vote relating to this request

11   amongst the LPs or a discussion?

12        A     I believe there was a discussion.  I don't know

13   if there was a vote.

14        Q     So the LPs had the power to remove general

15   partners or managers from the companies they were invested

16   in?

17        A     It is my belief without reviewing the limited

18   partnership agreement that that is one of the few powers

19   that limiteds have.

20        Q     And what were some of the other powers?

21        A     Extremely restricted.  I don't know.  Not -- I

22   don't remember.

23        Q     So those LP agreements are in writing?

24        A     I believe so.

25        MS. ASSAE-BILLE:  Were you going to add something?

Page 111

1    BY MR. REARDON:

2        Q    Do you still have a copy of any of the limited

3    partnership agreements with the student loan companies?

4        A    I don't know.  I am trying to think of where I

5    would look.

6        Q    Would each of the limited partners have received

7    copies of that agreement?

8        A    It is my belief that they did or they should

9    have.  I feel like an idiot answering this way.  Again,

10   I'm sorry.  It was all done very loosey-goosey.  And it

11   was chaotic.  And there were pieces of paper and there

12   were agreements and these kinds of things.

13           And part of the process in my role was to ensure

14   that we had accounting and financial reporting.  And I

15   believe -- but you will have to ask him -- that Bradley's

16   role was to ensure that all of these things -- all of the

17   assumptions that we had about structure and roles and

18   limited partnership status were in place, meaning the

19   pieces of paper had been signed and stored somewhere.

20       Q    So he would be a better person to ask about

21   that?

22       A    From the pieces of paper perspective,

23   absolutely.

24       MS. ASSAE-BILLE:  Please mark this document as

25   Exhibit 13.

Page 112

1          (Exhibit No. 13 was marked for identification

2          and is attached hereto.)

3     BY MS. ASSAE-BILLE:

4     Q    I am now going to ask you about a few different

5     emails that were produced to us by MonsterLoans.

6     A    Okay.

7     Q    I am now handing you what has been marked as

8     Exhibit 13 ending in Bates No. 2764.

9     A    Uh-huh.

10    Q    So at the front of the exhibit, on the first

11    page, there is an email from you to several individuals.

12    And the subject line of your email references an ADS PAC,

13    P-A-C.

14    A    Uh-huh.

15    Q    And that is part of the subject line ADS PAC

16    meeting follow-up 6-12-17.

17         Can you help me understand the subject line of

18    this email, including what the "PAC" is referencing?

19    A    As part of an overall effort to more tightly

20    structure and provide better accountability and reporting

21    to the limiteds, we created a structure called the Proxy

22    Advisory Committee.  And that Proxy Advisory Committee,

23    there would be two representatives of the limited partners

24    who would have monthly meetings with the general partner.

25         In those meetings, we would provide a review of

1   the looking-forward pro forma, the backward-looking

2   financials, and then ask questions about the performance

3   of the investment that we'd made.

4          The issue with many of these general partners is

5   a total lack of experience, in my view, which is why

6   things were done in such a sloppy way.  But there we were.

7   So in the process of these meetings, as I would be asking

8   questions, they would have difficulty answering.  They

9   would ask for how would you do it or what are you doing to

10  solve those problems at MonsterLoans?

11         And so I would provide them with feedback,

12  answer the questions.  In some cases -- this looks a lot

13  like what I would have built for understanding the

14  mortgage, marketing, and sales funnel and break-even

15  volume.

16     Q    Okay.  So who would have been the second LP

17  representative at the ADS PAC meeting that took place in

18  mid June 2017, do you recall?

19     A    No, I don't recall.  I would be guessing.

20     Q    The people "cc'd" on your email, why are they

21  cc'd?

22     A    I believe Mohamed because he was helping Anthony

23  with the financials, and the "cc's," I believe, are the

24  limited investors.

25     Q    And this is after Jawad's departure; correct?

Page 123

1      A    Co-investor, yes.

2      Q    Does he invest through another company?

3      A    I don't know.

4      Q    Your next email on the page ending in Bates 3380

5  is an e-mail that you sent at 1:41 p.m. on August 1st.

6  That email drops a number of the individuals who are

7  "cc'd."

8      A    Okay.

9      Q    But it keeps Tom Chou and Mohamed Hegazi.

10         Why was Tom Chou "cc'd" on this particular email

11  but not others?

12     A    I don't know.  I'm sorry.  I don't remember.  It

13  may have been that he may have asked the question

14  directly.  I don't know.

15     Q    Are you familiar with any of the other companies

16  through which the limited partners who are co-investors

17  with you and student loan companies -- let me start back.

18  It was a very long question.

19         You are a limited partner in a number of

20  so-called student loan companies; is that correct?  The

21  ones we discussed previously, Assure Direct Services and

22  others?

23     A    Uh-huh.

24     MR. BURKE:   Yes?

25     THE WITNESS:   Yes, sorry.   Yes.

Page 124

1    BY MS. ASSAE-BILLE:

2        Q    And as a limited partner, you are invested in

3    these companies through XO Media; is that correct?   Is XO

4    Media --

5        A    Yes, yes.

6        Q    Okay.   Are other limited partners also invested

7    in this company through separate companies?

8        A    Ken and I both are in XO Media.   That, I can say

9    with certainty.   He has 90 percent.   I have 10 percent.

10   As for the way in which the other limited investors

11   invested in these entities, I don't know.

12       Q    Are you familiar with a company called Fig Tree,

13   LLC?

14       A    What -- say it again?

15       Q    Fig, F-I-G, LLC?

16       A    I'm not familiar with that company, no.

17       MS. ASSAE-BILLE:   Colin, do you have any follow-up

18   questions?

19       MR. REARDON:   Yes, a few.

20       MS. ASSAE-BILLE:   Okay.   You can have the rest of the

21   time.

22       MR. REARDON:   I will be quick.:

23       Q    In Exhibit 15 that you were just looking at,

24   your original email in the string is dated July 18th and

25   was sent to Mark Nevares and Aaron Sebreros.