# EXHIBIT Q

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU

In the Matter of:         )
                          ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC    )

                          Wednesday,
                          March 27, 2019

                          Federal Building
                          Room 7516
                          300 North Los Angeles Street
                          Los Angeles, California

   The investigational hearing testimony of

EDWARD AVALOS MARTINEZ commenced, pursuant to notice,

at 9:12 a.m.

* * *

```
 1   APPEARANCES:

 2
     For the CONSUMER FINANCIAL PROTECTION BUREAU:
 3
         CONSUMER FINANCIAL PROTECTION BUREAU
 4       BY: COLIN T. REARDON, ESQ.
             E. VANESSA ASSAE-BILLE, ESQ.
 5       1700 G Street, NW
         Washington, DC 20552
 6       (202) 435-9668
         (202) 435-7699
 7       colin.reardon@cfpb.gov
         elisabeth.assae-bille@cfpb.gov
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   INDEX, CONTINUED:

 2
     Exhibit 11    Email string from December 2016        227
 3                 with the subject line student loan
                   data meeting
 4
     Exhibit 12    Email received by CFPB from            249
 5                 Experian, plus attachments

 6   Exhibit 13    Clarity Solution Center's checking     271
                   account written to Bill Abdel,
 7                 Frank Sebreros, Starboy, Inc., and
                   BZ Marketing
 8
     Exhibit 14    Checks to Red Signature Solutions      272
 9                 from Clarity Solutions Center

10   Exhibit 15    Copy of a monthly statement from       274
                   the month of May 2018 for the
11                 Clarity Solutions Center account

12   Exhibit 16    Subpoena to Select Student             286
                   Services
13
     Exhibit 17    CID                                    287
14

15

16

17
                QUESTIONS WITNESS REFUSED TO ANSWER
18
                              (None)
19

20

21
                       INFORMATION REQUESTED
22
                              (None)
23

24

25
```

Page 5

1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 27, 2019

2                              9:12 A.M.

3

4                    EDUARDO AVALOS MARTINEZ,

5                having been first duly sworn,

6            was examined and testified as follows:

7

8                            EXAMINATION

9    BY MR. REARDON:

10       Q    Good morning.

11       A    Good morning.

12       Q    Before we get started with your testimony,

13   there are a few preliminary things I'm going to cover on

14   the record.

15            My name is Colin Reardon.  I'm here with

16   Vanessa Assae-Bille.  We are attorneys in the Office of

17   Enforcement at the Consumer Financial Protection Bureau.

18            It is March 27, 2018, at 9:12 a.m., and we are

19   at the office of the United States Attorney in Los

20   Angeles, California.  This is an investigational hearing

21   conducted by the CFPB pursuant to 12 CFR part 1080.  The

22   objections that may be raised this morning are limited,

23   namely, to constitutional and other rights and

24   privileges as set forth in those rules.

25            We are here to conduct the investigational

1   hearing of Eduardo Martinez pursuant to a civil
2   investigative demand served on October 26, 2018.
3           Could you please state your full name for the
4   record.
5       A   Eduardo Martinez.
6       Q   Do you have a middle name?
7       A   Eduardo Avalos Martinez.
8       Q   How do you spell your middle name?
9       A   A-v-a-l-o-s.
10      Q   Thank you.  Do you understand the oath that you
11  just took?
12      A   Yes.
13      Q   Are you on any medications or other substances
14  that would impair your ability to give true and accurate
15  testimony today?
16      A   No.
17      Q   Is there any other reason you may not be able
18  to provide true and accurate testimony today?
19      A   No.
20      Q   The Bureau previously informed you that you
21  have the right to have an attorney present representing
22  you today.  I understand that you are not represented by
23  counsel for purposes of this hearing.  Is that correct?
24      A   Yes.
25      Q   This investigational hearing is being

1    A    Yes.

2         MS. ASSAE-BILLE: Do you have any records at
3    home that would help you remember what the front-end
4    companies that you brought in were? Do you think you
5    could get us that information later?

6         THE WITNESS: I could confirm it. But I know
7    some off the top of my head.

8    Q    BY MR. REARDON: We'll come back to that.

9    A    They were very small. They barely even did
10   anything.

11   Q    I think you said earlier that there had been
12   kind of two phases of Red Signature Solutions, that
13   early phase that we talked about then a later --

14   A    A Lend Tech phase.

15   Q    And Lend Tech, just so the record is clear, is
16   what?

17   A    It's a mortgage company.

18   Q    Okay. And so what was the Lend Tech phase?

19   A    Now we just get to recent, I guess. Okay.
20   So -- I guess I'll tell you a little story. Kind of
21   wish I could start from the beginning. I guess you guys
22   will figure it out.

23   Q    We will.

24   A    All right. So September 22 -- these dates
25   matter to me. That's why I know them. September 22,

```
                                                          Page 51
 1   2017, I was called by Tom Chou to come down and meet at
 2   3 Whatney.  That's where he is located at all the time.
 3   And they said they wanted to talk to me.
 4            And I was informed that they decided to shut
 5   everything down.  That was around 2:00 p.m.  Because
 6   I've told this story many times.  And they told me that
 7   they had received or heard rumor of a CFPB inquiry to
 8   one of their shops.  I don't know which one.  I don't
 9   remember.
10            But it was enough to make them say, "You know
11   what, these other guys got out of it.  We didn't listen.
12   And now we think it's not worth it.  We're going to get
13   out of it."
14            And I said, "What do you guys mean?  What's the
15   problem?  Why don't you just answer the CID?  Or what's
16   the questions?"
17            I never got to see it, but they told me that,
18   you know, they had heard of one, and that they had
19   decided they wanted to shut everything down.
20            And I said, "Well, have you guys told the
21   affiliates?"  Because they own everything.  They own me,
22   they own them, they own everything.  But they didn't own
23   me.  But they thought they did.
24            And I said, "Well, can we figure something out?
25   Can I see the situation and try and solve it?"
```

Page 52

1         They said no -- it was Brad talking, actually.
2   Once I got there, it was Brad, their attorney friend,
3   his partner, and Sean and Tom were there.  It was three
4   of them.  And they said, "Sorry, we've already made our
5   decision.  We didn't come up with this slowly."
6         And I said, "Well, have you talked to the
7   affiliates?"
8         They said, "We already told them.  All of them
9   the shops have been told.  You're the last one to know.
10  So all the shops have closed."  And those guys went out
11  to have drinks at Buffalo Wild Wings or something.
12  They're closed.  They shut the doors and sent everybody
13  home.
14        And I said, "And you guys are really telling me
15  now?  Couldn't we have talked about this before?"
16        And I had flashbacks at that moment.  I had a
17  flashback of Bankruptcy Attorney Services, when
18  October 27, 2010, everybody just went away, the sales
19  floor went away.  And I'm being told that all the sales
20  floors that were feeding me went away again.
21        And I said, "Well, I can't shut down."
22        And they said, "Well, you don't have a choice.
23  We're 80 percent."
24        And I said, "Actually, I own 100 percent,
25  because we never got anything in writing."  And they

1     A    He became unemployed.  And they were trying to
2  find him a home, and nobody wanted to work with him.
3     Q    Why is that?
4     A    I don't know.  I like him.  He's a good guy.
5     Q    Do other people have issues about him?
6     A    I think because he was their boss and now
7  they're trying to be the boss.  He's a very Christian
8  guy and AA kind of guy, so he's really always telling
9  you, preaching to you.  So maybe that people don't like
10 that.  He's a good guy.
11             (Exhibit 10 was marked for
12             identification.)
13    Q    BY MR. REARDON:  So earlier we talked a little
14 bit about checks that were written to Loki Investments
15 from Docs Done Right.  The court reporter has marked as
16 Exhibit No. 10 a series of checks that were written to
17 Loki investments in 2018.  Do you recognize these
18 checks?
19    A    Yes.
20    Q    Is that your signature on these?
21    A    Yes.
22    Q    Just remind us, what was the reason for these
23 checks?
24    A    This is him taking over the rest of those
25 companies.  So when those companies got shut down, he

```
 1    became, I guess, the receiver for them.  He was the
 2    trusted manager that wouldn't blow the money and spend
 3    it on something.
 4            So I believe that he gets the money and then
 5    gives it to the owners.  He gives it to his partners.
 6    So he's supposed to split it up with the owners of each
 7    company -- Assure, Direct Document Solutions and Secure
 8    Document Solutions.
 9    Q    And it looks like these checks get smaller over
10    time.
11    A    Yes.
12    Q    Can you explain that?
13    A    When they decided to shut down on September 22,
14    2017, there was kind of a fight, too.  Because the whole
15    time I'd been telling them that I'm not charging
16    clients -- I'm not charging enough, $100 is not enough
17    to service for the life of these loans.  And they told
18    me as my partners that, "Don't worry.  If you need more
19    money, we'll get you more money.  We're not going to
20    leave you hanging, holding the bag."
21            And so when they let down and left me holding
22    the bag, I put a lien on them.  I held their money and
23    said, "You're not getting this until we service the
24    files.  And since I didn't charge enough, I'm going to
25    charge you what it's going to need to service them
```

Page 219

1  properly."

2         And then the fight continued.  Because, like,
3  "Who are you to say, to charge us?  That's our money,
4  not yours."

5         And I said, "Okay, then you service them, and
6  sign something saying that I'm not liable and that you
7  take full responsibility."

8         And they said, "Okay, take the money."

9         So then I held the money in reserve.  At the
10 same time, Debt Pay Gateway put a lien as well, because
11 I guess part of their policy is that when you stop doing
12 business with them, they want to make sure there's
13 enough money in the escrow for refunds or cancellations
14 or anything that may come down the road.  And they had
15 an equation that based on how much business you did for
16 the year, how many refunds you had, they want to have
17 that much locked for that.

18        Well, I had the same idea.  So I locked and
19 they locked.  And then, as I calculated that they were
20 not at risk, I started to distribute what belonged to
21 them.  Anything over the 125 belonged to them.

22        ==So that's their money that they should have==
23 ==gotten when they shut down on September 22.==  ==Any future==
24 ==receivables was given to them over time.==  ==But since they==
25 ==didn't have any more clients, that just got smaller and==

Page 220

1  smaller till it became zero.  Did that make sense?
2      Q    Yes.  So your understanding is that after this
3  money went to David --
4      A    It goes to Tom, Sean, Ken, Brad.  The team.
5      Q    Okay.  Who did you talk to at the time about
6  this arrangement?
7      A    Brad.  He sent me an email.  I requested
8  something in writing showing that I'm supposed to give
9  the money here, because I can't just change the bank
10 account for these companies without somebody telling me
11 from them.  So I definitely got something in writing
12 given to me saying to do this.
13     Q    Do you still have that email?
14     A    I should.  I think I would have printed it out
15 and put it in a file or something.  I can look for it.
16 But I know they have the email.
17          MS. ASSAE-BILLE:  But if you have it and can
18 get it to us, that would be very helpful.
19          THE WITNESS:  Sure.
20          Am I able to keep any of these papers?
21     Q    BY MR. REARDON:  You can't keep the stuff that
22 we have shown you today.
23     A    Is there a piece of paper so I can write myself
24 a note?
25          MS. ASSAE-BILLE:  I'll make a note.

Page 232

1   Monster Loans, and then they changed their mind.
2       Q   So the use that it's made in the Experian
3   account is just to buy data for student loan companies
4   or other outside companies?
5       A   Purely keeping up with the minimum requirement
6   from Experian.  We bought -- if the student loan shops
7   needed $15,000 worth of student loan data, we'd still
8   have to buy 35,000.  Because otherwise you still owe
9   35,000.
10      Q   Have you ever had like a title or role at Lend
11  Tech Loans?
12      A   It's not a real company.  No.
13      Q   So could you just describe what your role has
14  been with the company?  Just paying the Experian
15  invoices?
16      A   I never worked at Lend Tech.  Lend Tech is
17  owned by Sergio, and I paid the Experian invoices.
18  That's it.  I don't know how better...
19      Q   If that's all there was, that's fine.
20      A   I kind of wish you had -- if you ever talked to
21  Sergio -- I know Sergio will be pulled in, but I can
22  only imagine his face.  Because he honestly doesn't know
23  anything.  He didn't know how anything works.  He just
24  thought he was going to do a mortgage business, and he
25  still thinks he's going to do a mortgage business.

1  Still right now he talks, dreaming about, "One day we're
2  going to do mortgage."  I'm, like, "No, buddy."
3      Q     So is Sergio just kind of like a face to put on
4  the company?
5      A     Right.
6      Q     Are Bill and Anthony really kind of
7  functionally in charge?
8      A     Nobody ran Lend Tech officially.  But Lend Tech
9  came from Anthony and Bill.  They created Lend Tech.  So
10 my understanding -- and I don't know where I got this
11 from, either, but my understanding is Sean Cowell, Brad,
12 and Bill, and Anthony created Lend Tech, got approval of
13 Experian, had to create some type of office so Experian
14 could do a walk-through or something, and they did that
15 at Monster Loans location downstairs.
16          They created a desk, they put a chair, they put
17 a phone that's not connected, and Experian walks through
18 and goes, "Looks like a mortgage business.  You're
19 approved."
20          And they created pro formas and they created
21 letters to make it look like they were about to do
22 business in mortgage.  They created a paper trail to
23 show that it's going to be a mortgage business.
24     Q     And it was all a sham.
25     A     It's all a sham.  It was always designed to do

Page 234

1  student loan data for their student loan shops that they
2  owned.
3        And so when they shut down and I got Anthony
4  and Bill's -- what I was getting, to keep any business
5  open, they brought that with them.  But they presented
6  it as, "Oh, you guys are going to go do mortgage."
7        I believe, and I can't accuse Bill or anybody
8  of it, but I believe there's a chance that they
9  purposely wanted it to be in my name and Sergio's.  And
10 the only reason my name didn't get on there is out of
11 laziness.  But my name to supposed to be under Lend
12 Tech.  I'm supposed to own Lend Tech with Sergio, and it
13 never got there.  Sergio always had it.
14       And since mortgage sucked, I was, like, well,
15 it's just a company sitting there, and I never added
16 myself.  Why add myself to it?  But I was supposed to be
17 there.
18       And Anthony and Bill presented it as, "This is
19 good for you.  We trust you.  You can have it.  We don't
20 need to be on there."  But why would they do that,
21 unless -- you know.
22       And Sean sold the company to Sergio for zero.
23 Never got paid for anything.  I'm not even sure if you
24 can sell a company for zero.  But he did do it for zero.
25     Q    We saw documents suggesting he may have sold it