1  William I. Rothbard
   Law Offices of William I. Rothbard
2  2333 Canyonback Rd.
3  Los Angeles, CA  90049
   Telephone: (310) 453-8713
4  Email: Bill@Rothbardlaw.com

5  Attorney for Relief Defendants XO Media, LLC and Kenneth Lawson

6

7                UNITED STATES DISTRICT COURT
8                CENTRAL DISTRICT OF CALIFORNIA

9   | Bureau of Consumer Financial Protection, | |
10  |                          Plaintiff, | Case No. 8:20-cv-00043- JVS-ADS |
11  | | **RELIEF DEFENDANTS XO** |
12  | vs. | **MEDIA, LLC'S AND KENNETH** |
13  | | **LAWSON'S REPLY** |
14  | Chou Team Realty, LLC f/k/a Chou Team | **MEMORANDUM OF POINTS** |
    | Realty, Inc., d/b/a Monster Loans, d/b/a | **AND AUTHORITIES IN** |
15  | MonsterLoans et al., | **SUPPORT OF MOTION TO** |
16  | | **DISMISS COMPLAINT** |
17  |                          Defendants, | |
    | | **[Second Declaration of Kenneth** |
18  | Thomas "Tom" Chou; and Sean Cowell, | **Lawson filed concurrently** |
    | | **herewith]** |
19  |                   Defendants and | |
20  |                   Relief Defendants, | Assigned to Hon. James V. Selna |
21  | Kenneth Lawson; Cre8labs, Inc.; XO | Hearing Date: June 15, 2020 |
22  | Media, LLC; and TDK Enterprises, LLC | Time: 1:30 p.m. |
23  |                   Relief Defendants | |

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents

I.      INTRODUCTION...................................................................1

II.     FACTUAL BACKGROUND.....................................................3

III.    CONSIDERATION IS THE SINE QUE NON OF A DEFENSE TO A
        RELIEF CLAIM...................................................................4

IV.     THE BUREAU'S ATTEMPT TO DISTINGUISH MOVANTS'
        AUTHORITY FAILS..............................................................7

V.      THE BUREAU'S CASES DO NOT SAVE THEIR RELIEF CLAIM......12

VI.     THE BUREAU'S "EVIDENCE" OF LACK OF GOOD FAITH IS NON-
        EXISTENT AND NOTHING MORE THAN A TRANSPARENT
        ATTEMPT TO SMEAR LAWSON.............................................16

VII.    CONCLUSION...................................................................24

i

# Table of Authorities

## Cases

*SEC v. Aragon Capital Management, LLC,*

  672 F. Supp. 2d 421 (S.D.N.Y. 2009)....................1, 2, 12, 13, 14, 15

*SEC v. Ross,*

  504 F.3d 1130 (9th Cir. 2007)..........................................2, 6, 16

*S.E.C. v. Colello,*

  139 F.3d 674 (9th Cir. 1998)....................................................4

*S.E.C. v. Cherif,*

  933 F.3d 403 (7th Cir. 1991)....................................................4

*Johnson v. Studholme,*

  619 F. Supp. 1347 (D. Colo. 1985), *aff'd sub nom. Johnson v. Hendricks,*

  833 F.2d 908 (10th Cir. 1987)..............................................5, 10

*FTC v. Direct Marketing Concepts, Inc.,*

  648 F. Supp. 2d 202 (D. Mass. 2009)..................................5, 7, 8

*FTC v. LeadClick Media, LLC et al.,*

  838 F.3d 158 (2d Cir. 2016)................................................5, 8

*Commodity Futures Trading Comm'n v. Walsh,*

  618 F. 3d 218 (2d. Cir. 2011)............................................6, 14

*Janey v. Adams,*

  588 F.3d 831 (5th Cir. 2009)..............................................6, 9

*SEC v. Founding Partners Capital Management,*

  639 F.Supp.2d 1291 (M.D. Fla. 2009).......................................9

*Consumer Fin. Prot. Bureau v. Gordon,*

  819 F. 3d 1179, 1195 (9th Cir. 2016).......................................9

# Table of Authorities

## (cont.)

*FTC v. Commerce Planet, Inc.*,

    815 F. 3d 593, 603 (9th Cir. 2016)……………………………………9

*FTC v. Gill*,

    265 F.3d 944, 959 (9th Cir. 2001)……………………………………9

*John Beck Amazing Profits, LLC,*

    888 F. Supp. 2d 1006, 1018 (C.D. CA 2012)………………………..9

*FTC v. Neovi, Inc.*,

    2009 U.S. Dist. LEXIS 649 *29, 30 (S.D. CA 2009)………………………9

*SEC v. George*,

    426 F.3d 786 (6th Cir. 2005)……………………………………..10

*CFTC v. Gresham*,

    No. 09-cv-75, 2012 U.S. Dist. 2012 LEXIS 64293 (N.D. Ga. May 7,

    2012)…………………………………………………………11

CFTC v. Walsh,

    658 F. 3d 194 (2d Cir. 2011)………………………………………11

*SEC v. Donnan*,

    No. 12-CV-2831, 2014 WL 11829334 (N.D. Ga. Sept. 15, 2014)...……..12

*CFPB v. NDG Fin. Corp.*,

    No. 15-CV-5211, 2016 U.S. Dist. LEXIS 177756

    (S.D.N.Y. Dec. 2, 2016)………………………………………..12

*SEC v. Rosenthal*,

    426 Fed. App'x 1, 3-4 (2d Cir. 2011)……………………………………13

*SEC v. Aragon Capital Advisors, LLC*,

    No. 07-cv-919, 2011 U.S. Dist. LEXIS 82531 (S.D.N.Y. July 26, 2011)…14

## I.    INTRODUCTION

Relief Defendants XO Media, LLC ("XO") and Kenneth Lawson ("Lawson" ) (collectively, "Lawson Relief Defendants") cite several cases in clear support of their argument that a party, including a passive investor, who pays valuable consideration for alleged ill-gotten gains, possesses an ownership interest in and legitimate claim to those funds that bar a relief claim against that party. After presumably searching far and wide for any contrary authority, plaintiff Bureau of Consumer Protection ("Bureau"), in its opposition to the Lawson Relief Defendants' Motion to Dismiss, has managed to come up with one lower court case – *one case* – that purportedly lends some credence to its claim to XO's distributions from the Student Loan Debt Relief ("SLDR") Defendants.[1]

This solitary case involved a criminal family enterprise in which one of the convicted defendants distributed insider trading profits to close relatives named as relief defendants (one of whom didn't pay a cent for her distribution) *after* learning of, and in order to attempt to *shield* those distributions from, a Securities and Exchange Commission civil investigation following the criminal case.  On such facts, it would have been shocking if the court did not order disgorgement of those criminally ill-gotten gains received by "gratuitous transferees."

A fact set like this could not be more distinguishable from the Lawson Relief Defendant facts – an unrelated individual whose investment vehicle made arms-length capital contributions to and received distributions from the SLDR Defendants in the ordinary course of business, *before* those entities became aware they were under investigation, and *years before* they were informed by the Bureau that it intended to file this law enforcement action. Unlike in *Aragon*, XO and Lawson did not receive distributions from the SLDR companies under a cloud, as

---

[1]    *SEC v. Aragon Capital Management, LLC*, 672 F. Supp. 2d 421 (S.D.N.Y. 2009)

1

a purposeful shield to conceal alleged ill-gotten gains, and the Bureau has presented no evidence whatsoever to that effect.  As discussed more thoroughly later, *Aragon* is unhelpful to the Bureau and its attempt to distinguish the ample authority of the Lawson Relief Defendants fails.

With the law against them, the Bureau does what any litigant with a weak case does: it engages in diversion.  In this case, since the Bureau cannot effectively attack the Lawson Relief Defendants' defense on the merits, it attempts to prejudice the Court against them by suggesting Lawson had culpable knowledge of the SLDR Defendants' alleged misdeeds.  A distraction such as this is a premeditated "low blow."  Lacking the conviction to name Lawson as a real party in interest if it thinks he is culpable, the Bureau cowardly resorts to insinuation and innuendo to attempt to taint his integrity and credibility. The Ninth Circuit has chastised the government for the disingenuous and unsavory tactic of referring to or implying a party's wrongdoing while simultaneously naming him a nominal defendant and thus denying him the same amount of due process afforded an accused law violator. *SEC v. Ross*, 504 F.3d 1130, 1142 (9th Cir. 2007) ("the Constitution [does not] permit[s]…use of the nominal defendant designation to deprive one whose only plausible basis for liability is a violation of the securities laws of either his right to full and formal service of process or his right to fully litigate the question of his own liability under the securities laws.")

The Bureau wants but cannot have it both ways. If it thinks Lawson has liability, it should amend the complaint and add him as a defendant.  Otherwise, it should refrain from irrelevant and prejudicial character assassination – which is factually baseless in any event [2] – and the Court respectfully should disregard the

---

[2]  See Section VI, *infra.*

declaration of the Bureau's counsel and pertinent exhibits thereto which are the vehicle for its attempted smear of Lawson.

Whether the relief defendant is a creditor, securities salesman, or investor, the crucial element in each of the cases relied upon by the Lawson Relief Defendants that rejected a relief claim was the payment of consideration in return for the funds sought. Without consideration, the relief defendant is a mere custodian/nominee ("gratuitous transferee") and disgorgement is appropriate. With consideration, a legitimate claim to the funds exists, subject matter jurisdiction over the claimant is lost, and disgorgement is denied. It is established - indeed, the Bureau sought and obtained pre-complaint testimony confirming [3] - that the Lawson Relief Defendants paid consideration - $150,000 to be exact - for the distributions they received from the SLDR Defendants. This consideration conclusively establishes the legitimacy of their claim to the funds in question.

For this fundamental reason, and as elaborated upon below, the Bureau's opposition fails to dent the Lawson Relief Defendants' Motion to Dismiss. Accordingly, it should be granted.

## II.   FACTUAL BACKGROUND

Lawson is a businessman and investor, with a pristine legal record.  In twenty-five years of business and investing, he has never been the subject of a law enforcement action or otherwise been accused of wrongdoing in any way. Second Declaration of Kenneth Lawson, ¶2). ("2d Lawson Decl.)

XO, of which Lawson is the 90% owner, was the vehicle he used for making investments in the SLDR Defendants.  He also personally invested in settling defendant CTR Realty dba Monster Loans and lost over $720,000 on that

---

[3]   Declaration of Colin Reardon ("Reardon Decl.), ¶ 5, Ex. B, filed with the Bureau's Opposition ("Opp.).

1  investment. *Id.* ¶ 3. That loss dwarfed XO's returns from its SLDR company

2  investments, but because it was a loss, it is of no interest to the Bureau.

3      The Bureau is only interested in XO's $150,000 investment in the SLDR

4  entities because that investment did turn a profit.[4] It does not matter that the

5  Lawson Relief Defendants' loss in Monster Loans was considerably greater than

6  their SLDR company returns, resulting in a significant net overall investment loss,

7  or that Monster Loans and the SLDR companies were effectively a single

8  integrated, common enterprise.[5] Since they netted a profit on their investment in

9  the SLDR component of that common enterprise, that is all the Bureau cares to

10  see, and it is going after that money with a vengeance in defiance of the

11  established fact the Lawson Relief Defendants paid valuable consideration for it.

12  **III.  CONSIDERATION IS THE SINE QUE NON OF A DEFENSE TO
        A RELIEF CLAIM.**

13

14      A relief defendant is not a real party in an action, but is typically a trustee,

15  custodian, depository or agent, without any claim to title or ownership, that is

16  joined to an action solely as a means of facilitating the collection of funds the

17  relief defendant is holding for a named defendant. *S.E.C. v. Colello*, 139 F.3d 674,

18  676 (9th Cir. 1998). It is merely a nominal defendant who "holds property 'in a

19  subordinate or possessory capacity *as to which there is no dispute.*'" *S.E.C. v.*

20  *Cherif*, 933 F.3d 403, 414 (7th Cir. 1991) (internal quotes and citation omitted).

21

22

---

23  [4] The Bureau suggests XO may not have provided consideration to two of the
    SLDR Defendants, Direct Document Solutions, LP and Secure Preparation

24  Services, LP, yet still received an equity interest in each, thus making any
    distributions received from them gratuitous transfers subject to disgorgement.

25  Opp. at 5-6. The Bureau is mistaken. See 2d Lawson Decl. ¶¶ 10-14.

26

27  [5] Complaint ¶¶ 33-42 (alleging overlapping ownership and management between
    Monster Loans and the SLDR entities and among the SLDR entities). Dkt. 1.

28

What distinguishes a truly nominal defendant from an improper one - what creates an ownership interest in and legitimate claim to the funds at issue - is payment of valuable consideration for those funds. In each of the cases cited in the moving papers in which a relief claim was dismissed, the dispositive element in the decision was the presence of consideration. In *Johnson v. Studholme*, 619 F. Supp. 1347, 1348–49 (D. Colo. 1985), *aff'd sub nom. Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987), the court dismissed relief claims against investors for the essential reason that they had given ***value*** (paid consideration) for their investment returns ("plaintiffs' contention that the defendants were not purchasers for value is…wrong because the value given by the investors was, of course, their contributions and the risk that they may lose all or part of their investment…. While the scheme may have been illegal, from an economic perspective there is no doubt that the innocent investors gave value.").

In *FTC v. Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d 202, 222-223 (D. Mass. 2009), the court dismissed a relief claim against a shareholder in the liability defendants, seeking disgorgement of a $1,545,305 shareholder distribution,  because "[t]he bare fact of that distribution" was not a sufficient basis to order her to disgorge it….[there was] an insufficient equitable basis for requiring her to forfeit a large sum which may have been a legitimate distribution." Implicit in the court's holding is that the shareholder relief defendant had paid valuable consideration for her ownership interest in the defendant company and thus had a legitimate claim to her distribution. There can be no other logical explanation for the court's dismissal of the relief claim and allowing the shareholder to keep the distribution.

In *FTC v. LeadClick Media, LLC et al.*, 838 F.3d 158, 177 (2d Cir. 2016), the court stated that "relief defendants who have provided some form of valuable consideration in good faith . . . are beyond the reach of the district court's

1  disgorgement remedy." (quoting *Commodity Futures Trading Comm'n v. Walsh*,
2  618 F.3d 218, 226 (2d Cir. 2011).

3      In *Janvey v. Adams*, 588 F.3d 831, 834-835 (5ᵗʰ Cir. 2009), certificate of
4  deposit ("CD") investors were dismissed as relief defendants because they had
5  paid consideration for their deposits, which constituted a "sufficient legitimate
6  ownership interest to preclude treating [them] as relief defendants."

7      In *SEC v. Ross*, 504 F.3d 1130, 1142 (9th Cir. 2007), this circuit recognized
8  that the payment of consideration, whether in money or in kind, creates an
9  ownership interest in and legitimate claim to funds received in return sufficient to
10  defeat a relief claim (relief defendant securities salesman had presumptive title to
11  commissions earned on his sales of unregistered securities as "compensation in
12  return for services rendered," thus warranting reversal of district court's exercise
13  of jurisdiction over him as a relief defendant).

14      A chief principle underlying a relief claim is the prevention of unjust
15  enrichment. It would be unjust - a windfall - to allow a third party who has come
16  into possession of ill-gotten gains to keep those gains if he or she has done nothing
17  to earn them - has provided no consideration, given up nothing – and thus has no
18  entitlement to them.  In the absence of consideration, and thus of any legitimate
19  claim, the government's interest in recovering ill-gotten gains from a nominal
20  defendant for the benefit of injured consumers or investors is supreme. In the
21  presence of consideration, its interest is not supreme, but must be balanced and
22  offset by the ownership interest and legitimate claim that is created by the
23  payment of consideration.  In other words, a non-culpable party who has paid
24  consideration for tainted funds sought by the government is not unjustly enriched
25  by being allowed to retain them.

26      The fact of payment of consideration by the Lawson Relief Defendants for
27  the distributions they received from the SLDR Defendants has been established.
28

Nevertheless, in the mind of the Bureau, its interest in recovering those distributions is still supreme and overriding.  Unfortunately for it, the law and equity say otherwise. Upon proof of liability or through settlement, it has every right to seek to recover every cent of ill-gotten gains it can from the defendants, and indeed it has already scored a substantial settlement with Monster Loans and some of its principals. Dkt. 90.  It has no right to get back distributions ***earned*** by the Lawson Relief Defendants through the capital contributions they made, at risk of financial loss, to the SLDR Defendants.

## IV.    THE BUREAU'S ATTEMPT TO DISTINGUISH MOVANTS' AUTHORITY FAILS.

The Lawson Relief Defendants' facts are on all fours with the above decisions and others cited in their moving papers, where the presence of consideration for the funds in question was determinative in rejecting the government's relief claims. They paid valuable consideration – indeed, substantial sums - for their ownership interests in the SLDR entities.  That should be the end of the story.  Yet to keep the story going, the Bureau attempts to distinguish these cases. It fails.

In contending that the Lawson Relief Defendants' reliance on *FTC v. Direct Marketing Concepts* is misplaced – that an implicit finding of consideration was not the basis for rejection of the relief claim against the shareholder – the Bureau itself misreads – or at least fails to appreciate the obvious basis for - the decision. As stated, there is no logical explanation for the decision under appropriate relief claim analysis other than the fact that the shareholder had paid value for her distribution from the defendants – and that the court reasonably concluded she had.  The only evidence the FTC relied on in support of disgorgement was the "bare fact" of a federal income tax return of the shareholder showing the distribution. *Id*. at 222-223.  It had no, or at least presented no, evidence to rebut a fair, common sense presumption that a distribution the shareholder had reported

on her tax return was for an investment that she had made in – *consideration she had provided to* - the defendants. Had the distribution been gratuitous, without consideration, the FTC surely had the opportunity to discover and prove it if it could. In short, the FTC lost either because it took an ill-advised evidentiary shortcut or it didn't have the goods to show lack of consideration.

In contrast, the Lawson Relief Defendants have taken no shortcut. They have presented evidence of consideration for the distributions they received from the SLDR Defendants. For the same obvious reason – consideration - that the relief claim was dismissed against the shareholder in *Direct Marketing Concepts*, the relief claims should be dismissed against the Lawson Relief Defendants here.

The Bureau totally misreads and mischaracterizes *FTC v. LeadClick Media* in endeavoring to distinguish that case. It misleadingly suggests the appellate court reversed the district court's ruling granting the FTC's relief claim against the parent company of the defendant because it disagreed with its conclusion that the parent company's advances to its subsidiary were gratuitous distributions and not loans. Opp. at 17. In fact, the Second Circuit reversed not over a difference of characterization of the advances (investments versus loans), but because it disagreed with the lower court that a formal loan agreement was necessary to evidence a creditor-debtor relationship sufficient to shield the subsidiary's repayments of the advances from disgorgement. *Id.* at 178-79 (disagreeing with the district court's conclusion that a formal loan agreement was required, holding that the parent company was not a proper relief defendant because it had a legitimate interest in the transferred funds, and concluding that the parent company's advances to its subsidiary-defendant "constituted 'valuable consideration' entitling it to repayment from the subsidiary.")

The Bureau goes on to contend that decisions relied upon by the Lawson Relief Defendants that dismissed relief claims in the context of a creditor-debtor

1  relationship are distinguishable from an investor case such as this. Opp. at 17-18

2  (discussing *SEC v. Founding Partners Capital Mgmt.*, 639 F. Supp. 2d

3  1291 (M.D. Fla. 2009) and *Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009)). It

4  cites no authority setting forth a coherent conceptual basis for such a distinction,

5  however, and never articulates one itself. Nor can it, because on the central

6  question on which the Lawson Relief Defendant cases were decided (and this case

7  should be decided) – the presence of consideration - the cases (whether creditor,

8  investor, or some other category) are ***indistinguishable***.

9       The Bureau suggests there is a legally cognizable difference between a

10  creditor and an investor because the investor puts its "funds at risk in the hope of

11  profits." Opp. at 13. There is not. There is no material distinction between an

12  investor relief defendant who receives a distribution from profits and a creditor

13  relief defendant who receives loan payments from operating funds. In either case,

14  the source of payment is the same: ill-gotten revenue from consumers - all of

15  which, not just the profits therefrom, is subject to disgorgement. *Consumer Fin.*

16  *Prot. Bureau v. Gordon*, 819 F. 3d 1179, 1195 (9th Cir. 2016) ("net revenues" is

17  basis for measuring recoverable unjust gains (citing *FTC v. Commerce Planet,*

18  *Inc.*, 815 F. 3d 593, 603 (9th Cir. 2016) (unjust gains measured by net revenues,

19  "the amount consumers paid for the product or service minus refunds and

20  chargebacks…not the defendant's net profits.") and *FTC v. Gill*, 265 F.3d 944,

21  959 (9th Cir. 2001) ("amounts consumers paid" is the proper basis for "amount

22  Defendants should be ordered to pay for their wrongdoing.")).[6]

23

24

25  _____

26  [6] See also, *FTC v. John Beck Amazing Profits, LLC,* 888 F. Supp. 2d 1006, 1018
    (C.D. CA 2012) (citing *Gill); FTC v. Neovi, Inc.*, 2009 U.S. Dist. LEXIS 649

27  *29, 30 (S.D. CA 2009) ("appropriate measure of disgorgement is
    [wrongdoer's] total revenue.")

28

Further, a creditor puts its funds at risk, too, in the hope, but with no guarantee, of repayment.[7]  Indeed, risk, whether it be a creditor's or an investor's, is part of their consideration for the payments they receive. *Johnson v. Studholme*, 619 F. Supp. 1347, 1348–49 (D. Colo. 1985), *aff'd sub nom. Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987) ("plaintiffs' contention that the defendants were not purchasers for value is…wrong because the value given by the investors was, of course, their contributions and the ***risk that they may lose all or part of their investment***….") (Emphasis added.)  Risk, as an element of consideration, is a commonality, not a material differentiator, between a creditor relief defendant and an investor relief defendant.

The Bureau also contends that the Lawson Relief Defendants' reliance on *Johnson v.Studholme*, a Ponzi scheme case in which a relief claim was dismissed against investors, is misplaced because later Ponzi scheme decisions have upheld relief claims against investors.  While that is true, the Bureau overreads these cases in suggesting they mean an investor relief defendant who paid value for his profits from a Ponzi scheme nevertheless is always required to disgorge them, and ignores facts from those cases that distinguish them from the present case.

In one of the cases it cites, *SEC v. George*, 426 F.3d 786 (6th Cir. 2005), which involved several relief defendants, one received a "pricey diamond ring" and $32,000 as gifts from the Ponzi schemer - obvious gratuitous transfers subject to disgorgement. *Id.* at 798.  Other relief defendants, while they had invested their own money, received money back that "came not from profits on their investments but from the investments of others." *Id.* Another group tried to argue

---

[7]  That risk is all too plain to see in the Covid-19 world, in which lenders of all types, extending credit to businesses big and small, face the clear danger of default. Indeed, compared to recent stock market gains, creditor risk is far greater than investor risk.

that they were entitled to recover 100% of the money they had invested, even though hundreds of other victims were getting back only 42% of their investments. This claim was summarily shot down by the court, which said that the relief defendants were not entitled to "preferential treatment" over other investors, and noted that the use of "a *pro rata* distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,' in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *Id.* at 799 (internal citation omitted).

In *CFTC v. Gresham*, No. 09-cv-75, 2012 U.S. Dist. 2012 LEXIS 64293 *9 (N.D. Ga. May 7, 2012), another Ponzi scheme case cited by the Bureau, disgorgement was ordered against relief defendants under the general rule that to the extent innocent investors in a Ponzi scheme "have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." (internal citations omitted).[8] However, if the relief defendants had been able to show that the funds they received came from profits on their investments rather than from the investments of others, then they would have had a legitimate claim to the payments and disgorgement would not be appropriate. *Id.* (citing *CFTC v. Walsh*, 658 F.3d 194, 197 (2d Cir. 2011).[9] See

---

[8] In the Bureau's opposition, this case is cited as *CFTC v. Gresham*, No. 09-cv-75, 2012 WL 1606037 (N.D. Ga. May 7, 2012).

[9] The Bureau seizes on a line in the opinion that relief defendants "were investors, not creditors of the Ponzi scheme, and thus do not have a legitimate ownership interest in the Ponzi scheme assets." *Id.* at *10. This is dicta. As is clear from the opinion, had relief defendants been able to show that the money they received came from the profits on their investments, and not from other investors, *as investors* they would have had a legitimate claim to the funds and not been subject to disgorgement. *Id.* at *9.

11

1   also, cited by the Bureau, *SEC v. Donnan*, No. 12-CV-2831, 2014 WL 11829334,

2   at *7-9 (N.D. Ga. Sept. 15, 2014) (same).

3       Ponzi scheme cases obviously present a unique situation in which an

4   innocent bona fide investor equitably nevertheless may be forced to disgorge all or

5   part of his investment for the common good of the defrauded investor class.  Even

6   in that special circumstance, however, depending on the particular facts and

7   equities involved, an investor relief defendant (just like a creditor) who has paid

8   consideration, still has standing, contrary to the Bureau's suggestion, to assert a

9   legitimate claim to distributions, and to prevail, over a demand for disgorgement.

10  The investor-creditor distinction the Bureau attempts to draw is, in short, a

11  distinction without a legal difference.

12  **V.    THE BUREAU'S CASES DO NOT SAVE THEIR RELIEF CLAIM.**

13      Having failed to puncture any holes in the Lawson Relief Defendants' case

14  law authority – and central argument that the presence of consideration defeats a

15  relief claim against an investor (or any type of relief defendant) - the Bureau's last

16  shot at prevailing on the law are two district court cases from New York - one, in

17  all candor, unworthy of discussion, and the other distinguishable in myriad ways.

18      The first, *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211, 2016 U.S. Dist.

19  LEXIS 177756  (S.D.N.Y. Dec. 2, 2016), an action against relief defendants who

20  owned interests in and received dividends from an unlawful payday lending

21  scheme, devotes a total of *21 words* to its determination that the complaint stated a

22  relief claim sufficient to defeat a motion to dismiss ("[t]hese funds, if obtained as

23  profits from activity that violated federal law, are proper subjects of a potential

24  future disgorgement order."). *Id.* at *65.[10]  The opinion does not contain a scintilla

25

26

27      10   In the Bureau's opposition, this case is cited as *CFPB v. NDG Fin. Corp.*,
        No. 15-CV-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016).

28

of analysis of the applicable legal standard for judging a relief claim and the defense to it – ownership interest in and legitimate claim to the funds in question, including the critical dispositive element of consideration – in relation to the pleaded facts. Further, the 21 words are subordinate to the main issue decided, which was not the ultimate merit of the claims against the relief defendants (who were proper subjects only for "***potential future***" (i.e., still to be proven) disgorgement), but whether the Bureau had the authority to bring a relief claim in the first place. *Id.* at *63-64. (Emphasis added.)  The decision's cavalier conclusion, therefore, is of no value to the present case and deserves no weight.

The other case, a series of decisions, beginning with *SEC v. Aragon Capital Management, LLC*, 672 F. Supp. 2d 421 (S.D.N.Y. 2009), is starkly distinguishable. The defendants (a father and his three sons) were members of a family criminal enterprise who had already pled guilty to and been convicted of insider trading.  Following the convictions, the SEC brought a civil action for injunction, disgorgement, and civil penalties.  In addition to naming the convicted family members as defendants, it added two relief defendants, the wife and daughter of the father. The relief defendants were limited partners in an entity called Aragon, whose general partner was one of the convicted sons.  The SEC sought disgorgement of distributions that had been made to them by the son because the Aragon account contained proceeds from the illegal insider trading. On summary judgment, the district court ordered disgorgement of their distributions, which was affirmed on appeal. *SEC v. Rosenthal*, 426 Fed. App'x 1, 3-4 (2d Cir. 2011).

The decision is readily distinguishable in the following ways:

First, criminality had been involved, which created a very different backdrop from the present case.

Second, the relief defendants were not arms-length investors, but close relatives of the defendants (a wife, daughter, and sister).

Third, one of the relief defendants (the wife) had paid nothing for her distribution. *SEC v. Aragon Capital Management*, 672 F. Supp. at 443-444. Unlike the Lawson Relief Defendants, she was a "gratuitous transferee[]." *Id.* at 444.

Fourth, contributions to Aragon had been made from proceeds of the illegal insider trading and thus, unlike the source of the Lawson Relief Defendants' contributions, were tainted. *SEC v. Aragon Capital Advisors, LLC*, No. 07-cv-919, 2011 U.S. Dist. LEXIS 82531 *12, 57, 62 (S.D.N.Y. July 26, 2011).[11]

Fifth, it was found that the relief defendants did not pay fair consideration for their distributions (the wife paid none!) because Aragon had been "substantially funded" by other accounts (containing the tainted insider trading profits), and the "sheer magnitude" of the distributions that were made to them raised the strong inference that they "did not pay fair consideration and, therefore, that they had no ownership interest in those distributions." *Id.* at *62-63.[12]

Sixth, and especially damning to the Bureau's reliance on this case, the distributions to the relief defendants were made - "engineered" - by the Aragon

_____

[11] The Bureau cites this case as *SEC v. Aragon Capital Advisors, LLC*, No. 07-cv-919, 2011 WL 3278907 (S.D.N.Y. July 26, 2011). In connection with asserting that Delaware limited partnership law discussed there somehow is relevant here (it is not), the Bureau misleadingly implies that XO does not have an ownership interest in the assets of the SLDR entities. Opp. at 6,15. In fact, it does. See Declaration of Kenneth Lawson, Ex. 1 (Assure Direct Services, LP Agreement, Section 2.7 ("no Partner...shall have an ownership interest in such property [of the Partnership] ***other than as a Partner***.")) Dkt. 69. (Emphasis added.)

[12] In finding a lack of fair consideration, the court still acknowledged that in the case of a relief defendant who was a "a good faith purchaser for value of the assets in her possession[,] . . . her assets would not be subject to disgorgement." (quoting *CFTC v. Walsh*, 618 F.3d 218, 226-27 (2d Cir. 2011). *Id.* at *62.  The Lawson Relief Defendants clearly meet that standard.

general partner (the convicted son) in an attempt to shield them from the SEC *after* he had become aware of the SEC's civil investigation ("transfers from Aragon to…Relief Defendants that Amir engineered…served the same purposes as the transfers in *Cavanagh*, which was to shield the proceeds of securities law violations from disgorgement."). *SEC v. Aragon Capital Management*, 672 F. Supp. at 441 and fn. 10.  In contrast, distributions to the Lawson Relief Defendants began in October 2015, *almost two years before* the SLDR Defendants learned of the Bureau's investigation in September 2017. 2d Lawson Decl. ¶15.[13]  While there were some distributions afterward, they were made in the ordinary course of business, with no allegation or evidence whatsoever of any intent to shield ill-gotten gains, and there were *none* after the Bureau, wrapping up its long investigation, gave notice to the defendants in June 2019 of their finding of violations and intent to proceed with a law enforcement action.[14]

The Bureau disputes the Lawson Relief Defendants' contention that the Complaint's allegation that they had limited partnership interests in the SLDR Defendants is an "admission of a legitimate claim to the funds," by erroneously representing that "courts" have recognized that limited partners who receive profits traceable to unlawful conduct lack a legitimate claim to such funds and can properly be named as relief defendants. Opp. at 22-23. The plural usage is misleading on its face as the Bureau has found only one case, *Aragon*, that has sustained a relief claim against a limited partner investor based on an actual analysis of the claim versus a cavalier, unreasoned conclusion. And even under that one distinguishable case, to state a relief claim against the Lawson Relief

_____

[13] The capital contributions the Lawson Relief Defendants made as consideration for those distributions, which began in February 2015, had concluded by October 2016, almost a *year before* awareness of the Bureau investigation. *Id.*

[14] The last distribution was November 2018. *Id.*

Defendants, the Bureau would have to allege that the Lawson Relief Defendants'
capital contributions to the SLDR Defendants were made from tainted funds and
that the distributions they received were "engineered" by the SLDR Defendants to
"shield" the proceeds of law violations from disgorgement. The Complaint does
not allege such facts, as required by the Bureau's sole legal precedent, because, as
shown, such facts do not exist.

As demonstrated, the law is clearly on the Lawson Relief Defendants' side,
not the Bureau's. They meet the legal standard of "good faith purchaser[s] for
value" of the distributions they received from the SLDR Defendants, thus
exempting those assets from disgorgement. The only arrow left in the Bureau's
quiver – that the Lawson Relief Defendants were not good faith purchasers –
widely misses the mark and proves nothing other than its bad faith.

## VI. THE BUREAU'S "EVIDENCE" OF LACK OF GOOD FAITH IS NON-EXISTENT AND NOTHING MORE THAN A TRANSPARENT ATTEMPT TO SMEAR LAWSON.

The "Constitution [does not] permit[s]…use of the nominal defendant
designation to deprive one whose only plausible basis for liability is a violation of
the… laws of either his right to full and formal service of process or his right to
fully litigate the question of his own liability under the…laws."). *SEC v. Ross*, 504
F.3d, 1130,1142 (9th Cir. 2007). The Bureau has trampled on this constitutional
commandment by introducing extraneous and wholly immaterial "evidence" of
"culpability" against Lawson to compensate for the lack of merit in its substantive
legal argument. If it had true confidence in its case, there would be no need for
such a diversion. A tactic such as this speaks only of desperation. Still, that does
not excuse the fact that it is inappropriate in the extreme to name someone as a
relief defendant, without the due process rights of an actual defendant, and then
level accusations of wrongdoing against him. It is doubly wrong to do so when the
accusations are factually baseless, as seen below in an exhibit by exhibit analysis

of the information contained in Bureau counsel Colin Reardon's declaration and in the Second Declaration of Kenneth Lawson refuting the baseless accusations.

**Reardon Decl., Ex. A** – Why the Bureau thinks this shows culpability of Lawson is a head scratcher. Written in January 2015, at the very beginning of the student loan-related operation, this email thread is discussing only the initial capitalization of and projections for the business and Lawson, seeing it as an investment opportunity, simply says, "Count me in." It contains nary a word about the business practices at issue.

**Reardon Decl., Ex. B** – A partial transcript of the investigational hearing of settling defendant Sean Cowell by the Bureau, its only mention of Lawson is Cowell's confirmation, sought by the Bureau, of the fact that Lawson (through XO) made a capital contribution to the business.

**Reardon Decl., Ex. C** – A partial transcript of the investigational hearing of non-defendant Mikael van Loon, the minority member of XO, its only mention of and relevance to Lawson is van Loon's description of his business relationship with Lawson, including years of investing together and their partnership in XO, through which they invested in the SLDR entities. Because a document was presented to van Loon which the Bureau purports indicates that at some unspecified time he began to "understand potential wrongdoing orchestrated by [defendant] Jawad Nesheiwat, then an employee of Monster Loans," and because van Loon and Lawson were partners in XO, the Bureau would like to impute this purported understanding of "potential wrongdoing" of van Loon to Lawson. Opp. at 20-21. Such inferential attribution is entirely unfounded. First, the purported document purportedly evidencing van Loon's understanding of potential wrongdoing is not attached to Reardon's declaration. Second, it mentions only "potential," not actual, wrongdoing. Third, van Loon does not actually testify to any such understanding and the precise "potential wrongdoing" purportedly

17

mentioned in the document is never actually described. Fourth, it relates only to Monster Loans, not to the SLDR Defendants in which van Loon and Lawson were invested, and which investment is the sole focus of the Bureau's relief claim. Fifth, Lawson has no recollection of discussing this part of van Loons' testimony with van Loon. 2d Lawson Decl. ¶ 7. Finally, while Lawson did become aware of potential problems with the way Nesheiwat was running the business, it was not until late 2016-early 2017, well after XO had made capital contributions to the SLDR entities. Upon becoming aware, he fully supported an investigation and corrective measures, including the termination of Nesheiwat, the bad actor. *Id.* ¶¶ 5, 7; Reardon Decl, Ex. K. As the transcript shows, from this point on, to protect the limited partners' interests and to keep them apprised of steps being taken to eliminate the problems caused by Nesheiwat, van Loon monitored the business on the limited partners' behalf.

**Reardon Decl., Exs. D-E** – Not Applicable

**Reardon Decl., Ex. F** – This is another head scratcher, in that it is a letter from settling defendant Sean Cowell's counsel to the Bureau listing only his capital contributions to the SLDR entities and having nothing to do with Lawson.

**Reardon Decl., Ex. G** – Not Applicable

**Reardon Decl., Ex. H** - Yet another head scratcher, this email from settling defendant Thomas Chou to van Loon, with a copy to Lawson, simply discusses that the student-loan related business was getting off to a slower start than expected.

**Reardon Decl., Ex. I** – A July 2015 email from defendant David Sklar to Lawson, van Loon, Chou, Cowell and others, it mentions that the student loan-related business's merchant processor was now processing payments from consumers in 7-9 days, rather than over 45 days. The Bureau thinks this purportedly shows that Lawson was aware that the SLDR companies were illegally collecting advance fees, because preparation of documentation relating to

a consumer's application for debt relief couldn't reasonably be completed in such a short time. Opp. at 7.  It is mistaken.

First, the email does not place the shortened processing period in any temporal context; the processing referred to could just as easily have pertained to a consumer payment made *after* the service was provided as before. It in no way shows or supports an inference that prohibited advance fees were being collected, much less with Lawson's knowledge.

Second, this email was sent in the very early days of the business, long before Lawson became aware of the problems associated with Nesheiwat, when he had no reason to believe anything improper was occurring.  Third, Lawson was a passive investor, with no experience in any aspect of debt relief, including the student loan debt relief industry.  He wasn't knowledgeable about – and had no duty to be knowledgeable about – the specific laws and regulations governing the student loan debt relief industry, including the prohibition imposed on advance fees by the FTC's Telemarketing Sales Rule. *Id.* ¶¶ 4, 6, 8. While he has no recollection of this five-year old email, given his excusable lack of expertise in the industry, he would have had no reason to see this benign reference to shortened payment processing time as the "red flag" the Bureau would have the Court think it should have been. *Id.* ¶ 8.

**Reardon Decl., Ex. J** – An April 2016 email from Dave Sklar to Lawson and others that mentions a new cost-saving Experian data purchasing deal, this is supposed to show, in the Bureau's telling, that Lawson was aware that Experian data was being purchased for an impermissible purpose in violation of the Fair Credit Reporting Act ("FCRA").  It shows nothing of the kind. First, the email was written before the problems with Nesheiwat had been exposed and begun to be addressed with the full support of Lawson.  Second, it doesn't discuss use of the less expensive data, other than to say it was performing better. Third, that it was apparently performing better would not have told Lawson that it was being used

and performing in a way that was impermissible or illegal. Fourth, as stated above, this email was written early on and Lawson, as a passive investor, had no background or experience in the consumer credit or student loan debt relief industries and no knowledge of the laws and regulations governing those industries, including the FCRA and its restrictions on the use of consumer credit reports. *Id.* ¶¶ 4, 6, 8. The inference that the Bureau wants the Court to draw, that this email put Lawson on notice that the business was violating the FCRA, and that such notice turned him into an after-the-fact bad faith purchaser for value in the SLDR companies, is not only far-fetched, but, frankly, absurd.

**Reardon Decl., Ex. K** – A pre-complaint declaration submitted by Lawson to the Bureau, it simply acknowledges what has been stated above, that nearly two years after XO invested in February 2015, Lawson was made aware of problems associated with Nesheiwat, including, as the declaration says, the "possible" misuse of Experian consumer reports. The declaration states that upon discovery of this possible misuse, an investigation was begun and "all necessary steps to stop the practice and discipline any personnel who were involved in it" would be taken." And those steps were taken, including the firing of Nesheiwat. Reardon Decl., Ex. K (¶ 13). The declaration also states that had Lawson ever understood any activity to be unlawful under the FCRA, "as an investor with a financial interest in ensuring that my investment is not endangered by allegations of serious wrongdoing by the business, I would have brought it to the attention of CTR [Monster Loans] and asked that it be immediately investigated and stopped." *Id.* Again, for the Bureau to suggest that Lawson's being made aware long after investing of the problems caused by Nesheiwat, and of the corrective action being taken which he fully supported, nevertheless converts him into an after-the-fact bad faith purchaser for value, is preposterous.

**Reardon Decl., Ex. L** – A May 2017 email thread not involving Lawson with discussion of a need to find a new office location acceptable to Experian, it

contains hearsay of a purported suggestion by Lawson at a prior investor retreat concerning the area of a new location.  The Bureau would like the Court to believe that this is yet further evidence of Lawson's post-investment knowledge of impermissible use of consumer reporting data in violation of the FCRA because the entity for which a location was being sought was a "sham mortgage business to deceive Experian into issuing a new account so that they could continue to funnel consumer reports to the Student Loan Debt Relief Companies." Opp. at 8. The email thread does not identify the business but the Bureau suggests it was Defendant Lend Tech Loans, a mortgage brokerage.  If so, it is of no help to the Bureau in its attempt to smear Lawson, as he had told the Bureau, in his pre-complaint declaration, that prior to being advised by his counsel in June 2019 of the Bureau's notice of intent to bring this action, he had "never heard of a company called Lend Tech Loans" and "had no association or involvement with such company and no knowledge of its business purposes and practices. Reardon Decl., Ex. K (¶ 22).

**Reardon Decl., Ex. M** – A September 2017 email exchange between David Sklar and Lawson, referring to a business introduction made by Lawson that Sklar expressed excitement about, and to the SLDR companies being very close to regaining access to Experian data, with Lawson responding, "Sounds great buddy," the Bureau would have the Court believe this again shows Lawson was aware that consumer reports were being used unlawfully. Again, the Bureau is dead wrong. First, Lawson was responding positively to the report that the introduction he had made appeared to be moving forward. Second, as a passive investor without any expertise in the student loan debt relief business or any authority over or involvement in the management and operation of the companies, he did ***not know*** (and had no duty to know) the laws and regulations governing their direct acquisition and use of the data from Experian.  Thus, when informed by this email that the SLDR entities were close to regaining access to the data, he

had no reason to suspect that such anticipated use of the data was or might be improper or illegal in any way. 2d Lawson Decl. ¶¶ 4, 6, 8.

**Reardon Decl., Ex. N** – A September 2016 email from Nesheiwat to van Loon and others, but not to Lawson, which mentions ordering data for the student loan shops, the Bureau would seem to want the Court to make the double leap that this shows that van Loon was aware at this time that such use of the data was illegal under the FCRA and that he shared such knowledge and the email with Lawson. There is no logical basis for making these leaps and, in fact, van Loon did neither. *Id.* ¶ 7.  Furthermore, the date of this email precedes the discovery of Nesheiwat's possible misuse of the Experian data.

**Reardon Decl., Ex. O** – Irrelevant to Lawson for the reasons stated in the response to Exhibit N.

**Reardon Decl., Ex. P** - Irrelevant to Lawson for the reasons stated in the response to Exhibit N.  Neither awareness of FTC actions against other companies in the student loan debt relief industry, nor a merchant processor's request for assurances that DocuPrep was "different" from them, nor a recognition of the need to provide those assurances, as reflected in this email thread, proves, as the Bureau wishes it would, that DocuPrep was just like those other companies.  In any event, Lawson is not on the thread and the date of the email, May 2016, is well before discovery of the problems associated with Nesheiwat.

**Reardon Decl., Ex. Q** – A partial transcript of an investigational hearing of Eduardo Martinez, it discusses the "shut down" of the business in September 2017 upon "hearing a rumor of a CFPB inquiry to one of their shops;" Lend Tech Loans; and, with regard to Lawson, only that he and other investors received payments thereafter from pre-shutdown account receivables.  It is not unusual for companies (nor an admission of anything) to cease, suspend, or modify operations after learning they are or may be a subject of investigation by a powerful federal law enforcement agency, so no fair inference of "guilty knowledge" can be drawn

1   from that action.  As stated, Lawson has testified that he had no knowledge of
2   Lend Tech Loans until the end of the Bureau's investigation and official
3   notification this lawsuit was coming in June 2019. Reardon Decl., Ex. K (¶ 22).
4   The SLDR companies had been formally accused of nothing by the Bureau until
5   they received that notice. During that time, it was XO"s right, as a bona fide
6   purchaser for value of distributions from the SLDR companies, to receive
7   distributions.  The last distribution it received was in November 2018, seven
8   months before the Bureau's notice of violation and intent to bring this action. 2d
9   Lawson Decl. ¶ 15.
10  **Reardon Decl., Ex. Q** – Another headscratcher, these are checks from Defendant
11  Docs Done Right to Loki Investments.  As Loki Investments is not a defendant,
12  and the Lawson Relief Defendants have no interest in that entity in any event,
13  their relevance to Lawson is not readily apparent.
14  **Reardon Decl., Ex. S** – Not Applicable.
15        This review of the Bureau's evidence, or lack thereof, of Lawson's
16  "culpable" knowledge of wrongdoing by the SLDR Defendants, and hence "bad
17  faith" as an investor in them (notably, no evidence is presented whatsoever of such
18  alleged culpability and bad faith *at the time Lawson invested* through XO),
19  reveals why the Bureau had no liability case against Lawson and could only name
20  him as a relief defendant.  Yet without naming him as a defendant accused of
21  wrongdoing, it is essentially treating him as if he were one. The Bureau cannot
22  properly (and ethically) have it both ways.  If it believes he is culpable (on more
23  evidence than has been presented here, certainly), it should amend the complaint
24  to name him as a defendant. Otherwise, frankly, it should stop the cheap shots and
25  stick to the facts that are relevant, which show that the Lawson Relief Defendants,
26  having paid fair consideration for their distributions from the SLDR Defendants,
27  should, as a matter of law, not be forced to disgorge them.
28

## VII.   CONCLUSION

The Lawson Relief Defendants are not gratuitous transferees.  They are bona fide purchasers for value of the distributions they received from the SLDR Defendants.  Accordingly, those distributions are not subject to disgorgement.  For this and the foregoing reasons, and for those stated in their moving papers, the Complaint against XO Media, LLC and Kenneth Lawson should be dismissed.

Respectfully submitted,

DATED: June 1, 2020

William I. Rothbard
Law Offices of William I. Rothbard
By: */s/ William I. Rothbard*
William I. Rothbard
Attorney for Relief Defendants XO Media, LLC and Kenneth Lawson

24

1

2

3

## CERTIFICATE OF SERVICE

4       I hereby certify that on the 1st day of June 2020, I caused a copy of the foregoing to be e-

5  filed and served via the Court's electronic filing system to all parties and counsel receiving ECF

6  service.

7

8                                        /s/ William I. Rothbard
                                         William I. Rothbard, Esq.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28