William I. Rothbard
Law Offices of William I. Rothbard
2333 Canyonback Rd.
Los Angeles, CA 90049
Telephone: (310) 453-8713
Email: Bill@Rothbardlaw.com

Attorney for Relief Defendants XO Media, LLC and Kenneth Lawson

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection,<br><br>Plaintiff,<br><br>vs.<br><br>Chou Team Realty, LLC f/k/a Chou Team Realty, Inc., d/b/a Monster Loans, d/b/a MonsterLoans et al.,<br><br>Defendants,<br><br>Thomas "Tom" Chou; and Sean Cowell,<br><br>Defendants and Relief Defendants,<br><br>Kenneth Lawson; Cre8labs, Inc.; XO Media, LLC; and TDK Enterprises, LLC<br><br>Relief Defendants | Case No. 8:20-cv-00043-JVS-ADS<br><br>**SECOND DECLARATION OF KENNETH LAWSON IN SUPPORT OF RELIEF DEFENDANTS XO MEDIA, LLC'S AND KENNETH LAWSON'S MOTION TO DISMISS COMPLAINT**<br><br>Assigned to Hon. James V. Selna<br><br>Hearing Date: June 15, 2020<br>Time: 1:30 p.m. |

## SECOND DECLARATION OF KENNETH LAWSON

I, Kenneth Lawson, declare as follows:

1. I make this declaration in further support of the Motion to Dismiss the Complaint in this action as to relief defendants Kenneth Lawson and XO Media, LLC. I have knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

2. I am an entrepreneur and investor. In 25 years of business, I have never been cited for a regulatory infraction or been accused of a violation of law by any regulatory or law enforcement agency.

3. In addition to my investments in the Student Loan Debt Relief ("SLDR") Defendants in this action through XO Media ("XO"), I invested in defendant Chou Team Realty dba Monster Loans. I lost over $720,000 on that investment.

4. Prior to investing in Monster Loans, I had no experience in the mortgage loan business and prior to investing in the SLDR companies, I had no experience in the student loan debt relief business, or the debt relief industry generally. Both prior to and at that time of my investments in those businesses, I was unfamiliar with the laws and regulations governing them. As a passive investor, without responsibility for or authority over operation and management of the businesses and legal compliance, I understood and accepted that I was necessarily reliant on those running the businesses to be knowledgeable of the applicable legal requirements and to do what was necessary to comply with them.

5. After investing in the SLDR companies through XO in 2015, I was unaware of any legal compliance issues in the businesses until learning from Monster Loans management, specifically, Mikael van Loon, in late 2016-early 2017, of the possible misuse of Experian consumer reports and that the person responsible for that possible misuse was Jawad Nesheiwat. As stated in a pre-complaint declaration I provided to plaintiff Bureau of Consumer Financial Protection ("Bureau") (Exhibit K to the Declaration of Colin Reardon submitted in conjunction with the Bureau's opposition to the Motion to Dismiss), upon discovery of this possible misuse, management initiated an investigation of the problem and instituted corrective measures, which included the termination of Nesheiwat. I fully supported those remedial steps.

6. Despite my status as a passive investor in Monster Loans and the SLDR companies, my lack of involvement in or responsibility for management of those companies, and my lack of understanding of the laws and regulations governing those businesses as a first time investor in the mortgage loan and student loan debt relief sectors, the Bureau, in its opposition, attempts to pin culpability on me through the use of certain documents that purport to show knowledge on my part of certain legal violations by the SLDRC Defendants. I categorically deny any such "guilty" knowledge. As stated, I did not know the legal strictures applying to the businesses and thus did not know, until discovery of Nesheiwat's possible misuse of the Experian data, that transfer of data from Monster Loans to the SLDR companies was not allowed. Nor did I know that direct acquisition of consumer reports from Experian by the SLDR companies might also be disallowed.

7. In attempting to make me look "guilty," the Bureau seeks to impute knowledge of wrongdoing purportedly possessed by Mikael van Loon to me because we were investing partners, through XO. For example, it suggests I

would have known of potential wrongdoing because van Loon, at a pre-complaint investigational hearing, was shown a document by the Bureau purportedly indicating his awareness of such potential wrongdoing. (Bureau Opposition, Reardon Declaration, Ex. C.) Aside from the fact that the exact nature of the potential wrongdoing being discussed is unclear and did not have to do with the SLDR Defendants, I have no recollection of van Loon sharing this part of his testimony with me. Similarly, the Bureau uses a September 2016 email from Nesheiwat to van Loon and others, but not to me, that mentions ordering data for the SLDR companies. (*Id.*, Ex. N.) The Bureau would like to believe this shows that van Loon was aware at this time that such use of the data was illegal and that he shared such knowledge and the email with me. He did neither.

8. The Bureau uses the same disingenuous tactic to make it appear I knew the SLDR companies were illegally collecting advance fees from consumers prior to completion of service. It does this through a July 2015 email from defendant David Sklar to me and others, which mentions that the student loan-related business's merchant processor was now processing payments from consumers in 7-9 days, rather than over 45 days. (*Id.*, Ex. I.) The Bureau contends this shows I was aware that the SLDR companies were illegally collecting advance fees, because preparation of documentation relating to a consumer's application for debt relief couldn't reasonably be completed in such a short time. The Bureau is wrong. This email was sent in the very early days of the business, long before I became aware of the problems associated with Nesheiwat, when I had no reason to believe anything improper was occurring. As stated, as a passive investor with no experience in the student loan debt relief industry, I lacked knowledge of the particulars of the laws and regulations governing the industry, including any prohibition on advance fees. While I have no recollection of this five-year old email, given my lack of expertise and understanding of the legalities in the industry, I would not have considered this reference to shortened payment

processing time to be a legal "red flag."

9. The Bureau acknowledges and admits that XO had an ownership interest in the following SLDR Defendants: Docu Prep Center (aka Document Preparation Services, LP); Certified Doc Prep Services, LP; Assure Direct Services, LP; Direct Document Solutions, LP; and Secure Preparation Services, LP. (Complaint ¶ 51; Opposition at p. 5 and fn. 14.) It notes that my first declaration in support of the Motion to Dismiss did not attach a limited partnership agreement for Document Preparation Services, LP (aka Docu Prep Center), the first SLDR entity. As explained in the declaration, all the limited partnership agreements were essentially the same, so to avoid an unnecessarily large exhibit, I provided one, for Assure Direct Services, LP, as an exemplar for all of them. I do not have a copy of the limited partnership agreement for Document Preparation Services, LP. As explained below, though, XO was definitely an investor in this entity and, to the best of my knowledge, it was set up to operate like, and did operate like, the other SLDR entities.

10. The Bureau notes that the limited partnership agreements for Direct Document Solutions and Secure Preparation Services indicate that XO's "Initial Capital Contribution" was "zero," yet they show it received equity interests in both entities. To the Bureau, this suggests XO paid nothing for the equity and any distributions it received from them would have been without consideration, i.e., gratuitous, and therefore are not XO's (and mine) to keep under the relief claim. This hypothesis is incorrect and easily disproven, based on my knowledge, as an investor (through XO) in those entities, of the backdrop of their formation and interrelationships with other SLDR entities.

11. Direct Document Solutions LP ("DDS") is the successor-in-interest to Document Preparation Services LP (the original SLDR company). The general partner of Document Preparation Services LP was Docu Prep Center Inc., which in turn was owned by day-to-day operators, who later were replaced by new

operators who desired to run the business out of a fresh entity. As a result, Direct Document Solutions LP was formed (as well as Direct Document Solutions Inc. as the general partner). All tangible and intangible assets were transferred to DDS from Document Preparation Services LP. Also, a short-term, no interest, working capital loan was provided by Document Preparation Services LP to DDS to allow the historic employees to receive payroll from DDS as well as allow DDS to pay new expenses because DDS had no current revenue or receivables at inception. In exchange for the foregoing consideration (i.e., transfer of employees, transfer of the entire business, and an interest-free loan), the existing limited partners in Document Preparation Services LP, including XO, received near identical limited partnership interests in DDS.

12. XO had a 16% limited partnership interest in Document Preparation Services, LP. In DDS, XO received a replacement limited partnership interest of 14.88% (the slight dilution arising from new interests that were issued to the new operators while the old operators kept their historic ownership). Thus, XO's limited partner interest in DDS was a continuation of its existing investment in Document Preparation Services LP, was supported by consideration (the transfer of the historic business to the new entity along with free loan) and therefore was not "for free," as the Bureau argues. (Opposition at 19.)

13. The case with Secure Preparation Services LP ("SPS") is identical to DDS. SPS is the successor-in-interest to the assets of, and business run by, Certified DocuPrep LP (the 2nd SLDR company formed). As with Direct Document Solutions LP above, the original operators of the general partner of Certified DocuPrep LP were later replaced by new operators. The new operators also desired to run the old business out of a fresh entity, and SPS (and its companion general partner corporation) was formed. As above with DDS, all tangible and intangible assets belonging to Certified DocuPrep LP were transferred to SPS. Similarly, a short-term, no interest, working capital loan was provided by Certified

DocuPrep LP to SPS to allow the historic employees to continue to receive payroll from SPS as well as allow SPS to pay new expenses because SPS had no current revenue nor receivables at inception. In exchange for the foregoing consideration (i.e., the transfer of employees, transfer of the entire business, and an interest-free loan), the existing limited partners in Certified DocuPrep LP, including XO, received near identical limited partnership interests in SPS.

14. XO had a 12.8% limited partnership interest in Certified DocuPrep LP. In SPS, XO received a replacement limited partnership interest of 11.91% (the slight dilution occurring for the same reason as with DDS). Thus, like XO's interest in DDS, its limited partner interest in SPS was a continuation of its existing investment in Certified DocuPrep LP, was supported by consideration (the transfer of the historic business to the new entity along with a free loan) and therefore was not "for free."

15. XO made capital contributions to the SLDR entities starting in February 2015 and ending in October 2016. It received distributions from those entities between October 2015 and November 2018.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my personal knowledge.

EXECUTED this 29th day of May 2020, at Los Angeles, CA.

_____

KENNETH LAWSON

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of June 2020, I caused a copy of the foregoing to be e-filed and served via the Court's electronic filing system to all parties and counsel receiving ECF service.

/s/ William I. Rothbard
William I. Rothbard, Esq.