COLIN REARDON (NY Bar #4945655)
E-mail: colin.reardon@cfpb.gov
Phone: (202) 435-9668
E. VANESSA ASSAE-BILLE (NY Bar #5165501)
E-mail: elisabeth.assae-bille@cfpb.gov
Phone: (202) 435-7688
1700 G Street, NW
Washington, D.C. 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar #264787) – Local Counsel
E-mail: leanne.hartmann@cfpb.gov
Phone: (415) 844-9787
301 Howard St., Suite 1200
San Francisco, CA 94105
Fax: (415) 844-9788

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, <br><br> Plaintiff, <br><br> vs. <br><br> Chou Team Realty, LLC f/k/a Chou Team Realty, Inc., d/b/a Monster Loans, d/b/a MonsterLoans; Lend Tech Loans, Inc.; Docu Prep Center, Inc., d/b/a DocuPrep Center, d/b/a Certified Document Center; Document Preparation Services, LP, d/b/a DocuPrep Center, d/b/a Certified Document Center; Certified Doc Prep, Inc.; Certified Doc Prep Services, LP; Assure Direct Services, Inc.; Assure Direct Services, LP; Direct Document Solutions, Inc.; Direct Document Solutions, LP; Secure Preparation Services, Inc.; Secure Preparation Services, LP; Docs Done Right, Inc.; Docs Done Right, LP; Bilal Abdelfattah, a/k/a Belal Abdelfattah, a/k/a Bill Abdel; Robert Hoose; Eduardo "Ed" Martinez; Jawad Nesheiwat; Frank Anthony Sebreros; and David Sklar, <br><br> Defendants, <br><br> Thomas "Tom" Chou; and Sean Cowell, | Case No.: 8:20-cv-00043-JVS-ADS <br><br> **FIRST AMENDED COMPLAINT** |

Defendants and )
Relief Defendants, )
)
Kenneth Lawson; Cre8labs, Inc.; XO )
Media, LLC; and TDK Enterprises, )
LLC, )
)
Relief Defendants. )
)

## JURISDICTION AND VENUE

1.　This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.　Venue is proper in this district because Defendants and Relief Defendants are located, reside, or do business in this district. 12 U.S.C. § 5564(f).

## INTRODUCTION

3.　The Bureau of Consumer Financial Protection (Bureau) brings this action to address unlawful conduct by several companies and individuals in connection with providing debt-relief services to consumers with student loans.[1]

4.　Between 2015 and 2017, a mortgage company known as Monster Loans unlawfully obtained consumer reports from the consumer-reporting agency Experian. Monster Loans provided the reports to other companies that used the reports to market debt-relief services to consumers with student loans.

---

[1] On May 14, 2020, the Court entered a stipulated final judgment and order against Defendant Chou Team Realty, LLC, Defendants and Relief Defendants Thomas Chou and Sean Cowell, and Relief Defendants TDK Enterprises, LLC and Cre8labs, Inc., which resolved the Bureau's claims against them. ECF No. 90. On July 7, 2020, the Court entered a stipulated final judgment and order against Defendant Robert Hoose, which resolved the Bureau's claims against him. ECF No. 115.

From August 2017 through at least January 2019, a sham entity known as Lend Tech also unlawfully obtained consumer reports from Experian and provided them to other companies, including companies that used the lists to market student-loan debt-relief services.

5. In direct-mailings and in telemarketing-sales calls, certain of these debt-relief companies represented to consumers that: (1) the consumers would obtain lower interest rates by consolidating their federal student loans, (2) the consumers would improve their credit scores by consolidating their loans, and (3) the United States Department of Education (ED) would become the "new servicer" on their loans. All of this was false.

6. Additionally, several of these companies unlawfully charged and collected their fees before consumers' applications for loan consolidations, loan repayment plans, and loan forgiveness plans were approved and before consumers made payments under the altered terms of their student loans.

7. The Bureau brings this action to secure injunctive relief to stop Defendants' unlawful conduct, to obtain redress for harmed consumers, to obtain penalties against Defendants for their violations of Federal consumer financial law, and to require Relief Defendants to disgorge profits they received due to those violations.

## PLAINTIFF

8. The Bureau is an independent agency charged with enforcing Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce prohibitions on unfair, deceptive, and abusive acts or practices in the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536; the Fair Credit Reporting Act, 15 U.S.C. § 1681s; and the

Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310, as it applies to persons subject to the CFPA, 15 U.S.C. §§ 6102(c), 6105(d).

9. The Bureau has authority to bring civil actions against persons violating Federal consumer financial laws and to seek all appropriate legal and equitable relief, including injunctive relief, refund of monies paid, damages, restitution, disgorgement, and civil money penalties. 12 U.S.C. §§ 5564(a), 5565(a)(2).

**DEFENDANTS AND RELIEF DEFENDANTS**

10. Chou Team Realty, Inc. was a California corporation registered on July 18, 2003. Chou Team Realty, Inc. was registered and located at 3 Whatney, Irvine, CA 92618, and later moved to 25391 Commercentre Drive, Suite 200, Lake Forest, CA 92630. In March 2018, Chou Team Realty, Inc. was converted into Defendant Chou Team Realty, LLC. Chou Team Realty, LLC is a California limited-liability company registered and located at 25391 Commercentre Drive, Suite 200, Lake Forest, CA 92630.

11. Chou Team Realty, LLC is a successor to Chou Team Realty, Inc.

12. Chou Team Realty, Inc. and Chou Team Realty, LLC (collectively, Monster Loans) have held themselves out as doing business as Monster Loans and MonsterLoans.

13. Since 2014, Monster Loans has operated as a mortgage lender. It is licensed in at least 30 states, including California.

14. Defendant Lend Tech Loans, Inc. (Lend Tech) is a California corporation registered on June 15, 2017. Lend Tech has held itself out as doing business at 25391 Commercentre Drive, Suite 100, Lake Forest, CA 92630 and 1851 E. First St. #810, Santa Ana, CA 92705.

15. Lend Tech is licensed by the California Department of Real Estate and has held itself out as doing business as a mortgage-brokerage company.

16.     Defendant Docu Prep Center, Inc. registered as a California corporation on February 3, 2015, and it has held itself out as doing business at 3 Whatney, Suite 100, Irvine, CA 92618.

17.     Defendant Document Preparation Services, LP registered as a California limited partnership on October 19, 2015, and it has held itself out as doing business at 3 Whatney, Suite 100, Irvine, CA 92618. Docu Prep Center, Inc. was the general partner of Document Preparation Services, LP (collectively, Docu Prep Center).

18.     Docu Prep Center has held itself out as doing business as DocuPrep Center and Certified Document Center.

19.     Defendant Certified Doc Prep, Inc. registered as a California corporation on October 14, 2015, and it has held itself out as doing business at 1015 E. Imperial Highway, Unit C8, Brea, CA 92821.

20.     Defendant Certified Doc Prep Services, LP registered as a California limited partnership on October 21, 2015, and it has held itself out as doing business at 1015 E. Imperial Highway, Unit C8, Brea, CA 92821. Certified Doc Prep, Inc. was the general partner of Certified Doc Prep Services, LP (collectively, Certified Doc Prep Services).

21.     Defendant Assure Direct Services, Inc. registered as a California corporation on August 22, 2016, and it has held itself out as doing business at 23785 El Toro Road, Suite 467, Lake Forest CA 92630.

22.     Defendant Assure Direct Services, LP registered as a California corporation on August 17, 2016, and it has held itself out as doing business at 5 Oldfield, 2nd Floor, Irvine, CA 92618. Assure Direct Services, Inc. was the general partner of Assure Direct Services, LP (collectively, Assure Direct Services).

23.    Defendant Direct Document Solutions, Inc. registered as a California corporation on January 3, 2017, and it has held itself out as doing business at 23785 El Toro Road, Suite 493, Lake Forest, CA 92630.

24.    Defendant Direct Document Solutions, LP registered as a California limited partnership on January 3, 2017, and it has held itself out as doing business at 23785 El Road, Suite 493, Lake Forest, CA 92630 and 5 Oldfield, 2nd Floor, Irvine, CA 92618. From January 2017 to March 2018, Direct Document Solutions, Inc. was the general partner of Direct Document Solutions, LP (collectively, Direct Document Solutions).

25.    Defendant Secure Preparation Services, Inc. registered as a California corporation on January 12, 2017, and it has held itself out as doing business at 2500 E. Imperial Highway, Suite 201-396, Brea, CA 92821.

26.    Defendant Secure Preparation Services LP registered as a California limited partnership on January 12, 2017, and it has held itself out as doing business at 2500 E. Imperial Highway, Suite 201-396, Brea, CA 92821 and 5 Oldfield, 2nd Floor, Irvine, CA 92618. From January 2017 to March 2018, Secure Preparation Services, Inc., was the general partner of Secure Preparation Services, LP (collectively, Secure Preparation Services).

27.    Defendants Docu Prep Center, Certified Doc Prep Services, Assure Direct Services, Direct Document Services, and Secure Preparation Services (collectively, the Student Loan Debt Relief Companies) marketed and sold debt-relief services to consumers with federal student loans.

28.    Defendant Docs Done Right, Inc. registered as a California corporation on October 22, 2015, and it has held itself out as doing business at 895 Dove Street, 3rd Floor, Newport Beach, CA 92660.

29.    Defendant Docs Done Right, LP registered as a California limited partnership on March 8, 2016, and it has held itself out as doing business at 3

Whatney, Suite 100, Irvine, CA 92618. Docs Done Right, Inc. was the general partner of Docs Done Right, LP (collectively, Docs Done Right).

30.     Relief Defendant TDK Enterprises, LLC registered as a California limited-liability company on March 18, 2016, and it has held itself out as doing business at 3 Whatney, Suite 200, Irvine, CA 92618.

31.     Relief Defendant Cre8labs, Inc. registered as a California corporation on April 1, 2016, and it has held itself out as doing business at 24632 La Plata Drive, Laguna Niguel, CA 92677.

32.     Relief Defendant XO Media, LLC registered as a California limited liability company on March 2, 2010, and it has held itself out as doing business at 26500 W. Agoura Road Suite 102-595, Calabasas, CA 91302.

33.     Defendant and Relief Defendant Thomas "Tom" Chou was Monster Loans' president and owner between January 2015 and December 2017. Chou exercised substantial managerial responsibility for and control over Monster Loans' business practices.

34.     Chou owned limited partnership interests in each of the Student Loan Debt Relief Companies. At times, Chou has held those limited partnership interests through Relief Defendant TDK Enterprises, LLC. Chou is the president and sole member of TDK Enterprises, LLC.

35.     Defendant Jawad Nesheiwat was the chief operating officer of Monster Loans between January 2015 and April 2017. Nesheiwat exercised substantial managerial responsibility for and control over Monster Loans' business practices.

36.     Nesheiwat owned limited partnership interests in each of the Student Loan Debt Relief Companies.

37.     Nesheiwat exercised substantial managerial responsibility for and control over Docu Prep Center's business practices, including its sales practices, marketing practices, and fees.

38.     Nesheiwat participated in the conduct of the affairs of Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services, including their marketing practices.

39.     Defendant and Relief Defendant Sean Cowell co-founded Monster Loans and was its chief visionary officer between at least January 2015 and February 2017. Cowell exercised managerial responsibility for Monster Loans and participated in the conduct of its affairs.

40.     Cowell registered Lend Tech in June 2017, and he was its sole owner until November 2017.

41.     Cowell owned limited-partnership interests in each of the Student Loan Debt Relief Companies. At times, Cowell has held those limited-partnership interests through Relief Defendant Cre8labs, Inc. Cowell is Cre8labs, Inc.'s president and owner.

42.     Defendant David Sklar was Docu Prep Center's chief executive officer. Sklar was the part-owner of Docu Prep Center, Inc. and owned a limited-partnership interest in Document Preparation Services LP. Sklar exercised substantial managerial responsibility for and control over Docu Prep Center's business practices, including its sales practices, marketing practices, and fees.

43.     Defendant Robert Hoose was Docu Prep Center's chief operating officer. Hoose was the part-owner of Docu Prep Center, Inc. and owned a limited-partnership interest in Document Preparation Services, LP. Hoose exercised substantial managerial responsibility for and control over Docu Prep

Center's business practices, including its sales practices, marketing practices, and fees.

44.   Defendant Frank Anthony Sebreros was the president of Assure Direct Services. Sebreros owned Assure Direct Services, Inc. and he owned a limited-partnership interest in Assure Direct Services, LP. Sebreros exercised substantial managerial responsibility for and control over Assure Direct Services' business practices, including its sales practices, marketing practices, and fees.

45.   Sebreros was identified as a manager of Lend Tech in the company's application to Experian in June 2017.

46.   Defendant Bilal Abdelfattah a/k/a Belal Abdelfattah a/k/a Bill Abdel (Abdel) was a marketing manager at Monster Loans in 2015 and 2016.

47.   Abdel was a marketing manager at Docu Prep Center and was an employee of Assure Direct Services.

48.   Abdel was identified as a manager of Lend Tech in the company's application to Experian in June 2017.

49.   Defendant Eduardo "Ed" Martinez is the president of Docs Done Right. Martinez exercised substantial managerial responsibility for and control over Docs Done Right's business practices, including its assistance in the charging of fees to consumers.

50.   Martinez represented that he was a manager or employee of Lend Tech in communications with Experian in 2017 and 2018.

51.   Relief Defendant Kenneth Lawson owned limited-partnership interests in each of the Student Loan Debt Relief Companies. At times, Lawson has held those interests through XO Media, LLC. Lawson is the manager and owner of 90 percent of XO Media, LLC.

# FACTS

## Monster Loans' Purchases of Prescreened Lists

52.     Monster Loans and Lend Tech have purchased from Experian prescreened consumer reports (also known as "prescreened lists") that contained information regarding consumers with student loans, including consumers' names, addresses, number of student loans, and aggregate student loan balances.

53.     In 2015, Monster Loans applied for and received an account with Experian, which enabled it to purchase prescreened lists.

54.     In its application, Monster Loans certified to Experian that it would use prescreened lists to make firm offers of credit for mortgage loans.

55.     During and after the enrollment process, Monster Loans also represented to Experian that it would use prescreened lists to market its mortgage products.

56.     Monster Loans did not disclose to Experian that prescreened lists would be provided to other companies and used to market debt-relief services.

57.     Between at least December 2015 and May 2017, Monster Loans primarily used its account with Experian to obtain prescreened lists for use by other companies that marketed student-loan debt-relief services, including the Student Loan Debt Relief Companies.

58.     In total, Monster Loans purchased prescreened lists containing information about more than 7 million consumers with student loans.

59.     The prescreened lists that Monster Loans purchased were used to market debt-relief services, and not to make firm offers of credit or insurance.

60.     Nesheiwat oversaw Monster Loans' purchases of prescreened lists from Experian for use by the Student Loan Debt Relief Companies in their direct mailings.

61.     Several other officers and employees of Monster Loans, including Chou, Cowell, and Abdel, were aware of and participated in the company's efforts to purchase prescreened lists for the Student Loan Debt Relief Companies through the company's account with Experian.

62.     Sklar and Hoose obtained prescreened lists through Monster Loans' account with Experian and used the lists to market Docu Prep Center's student-loan debt-relief services.

63.     In or around May 2017, Monster Loans stopped purchasing prescreened lists for the Student Loan Debt Relief Companies through its account with Experian.

## Lend Tech's Purchases of Prescreened Lists

64.     In June 2017, Cowell registered Lend Tech as a purported mortgage-brokerage company.

65.     In fact, Lend Tech is a sham entity that has only ever been used to obtain prescreened lists from Experian.

66.     Lend Tech's application to Experian certified that it would use prescreened lists to make firm offers of credit for mortgage loans.

67.     Lend Tech did not disclose to Experian that the prescreened lists would be provided to other companies and used for the purpose of marketing debt-relief services.

68.     Monster Loans helped Lend Tech satisfy Experian's due-diligence review for new applicants so that Lend Tech could obtain an Experian account. For example, Monster Loans purported to provide Lend Tech office space under a sublease agreement, and also provided an approval letter agreeing to fund the loans that Lend Tech was purportedly going to broker.

69.     During August and September 2017, Lend Tech used its account with Experian to order prescreened lists containing information regarding more

than 1.5 million consumers with student loans for the Student Loan Debt Relief Companies.

70.     Cowell, Abdel, Sebreros, and Chou were aware of and participated in Lend Tech's efforts to purchase prescreened lists for the Student Loan Debt Relief Companies during August and September 2017.

71.     In November 2017, Cowell transferred ownership of Lend Tech to a friend of Martinez named Sergio Loza.

72.     At the time of the transfer, Lend Tech had no meaningful assets other than the account with Experian.

73.     Between November 2017 and at least January 2019, Abdel, Sebreros, and Martinez controlled Lend Tech's Experian account.

74.     During that period, Lend Tech obtained prescreened lists containing information regarding more than 11 million consumers.

75.     Lend Tech continued representing to Experian that it would use the prescreened lists for its own marketing of mortgage loans.

76.     In fact, Lend Tech has never used the prescreened lists to market mortgage loans.

77.     Martinez, Sebreros, and Abdel resold the prescreened lists to numerous other companies, including companies offering student-loan debt-relief services.

78.     Martinez, Sebreros, and Abdel also used the prescreened lists to market student-loan debt-relief services through new companies created during or after September 2017.

79.     The student-loan debt-relief companies that received prescreened lists purchased by Lend Tech between November 2017 and January 2019 did not use the lists to make firm offers of credit or insurance.

## Student Loan Consolidations, Repayment Programs, and Forgiveness Programs

80.     ED offers several federal student-loan repayment and forgiveness programs. Some programs potentially offer lower monthly loan payments. Some allow consumers to obtain loan forgiveness.

81.     These programs are administered through third-party student-loan servicers that handle the billing and other services on federal student loans.

82.     To access certain repayment and forgiveness programs, consumers must first consolidate (*i.e.*, combine) multiple federal student loans into one loan. Consolidating results in, among other things, a single monthly payment instead of multiple monthly payments.

83.     Following consolidation or enrollment in a new repayment or forgiveness program, the consumer's loan continues to be serviced by a third-party student-loan servicer.

### The Student Loan Debt Relief Companies and Docs Done Right

84.     The Student Loan Debt Relief Companies each offered, in exchange for a fee, to assist consumers with consolidating their federal student loans and with choosing between and enrolling in repayment and forgiveness programs offered by ED.  The Student Loan Debt Relief Companies did not themselves offer or extend credit.

85.     The Student Loan Debt Relief Companies primarily marketed their debt-relief services through direct mail.

86.     When consumers called in response to the direct-mail solicitations, sales representatives purported to advise consumers about their eligibility for and the potential benefits of consolidating their federal student loans and enrolling in ED's repayment and forgiveness programs.

87.     After Docs Done Right was created in late 2015, its employees participated in a portion of the telemarketing sales call regarding consumers' understanding of the services.

88.     Following enrollment, Docs Done Right handled communications with consumers concerning the debt-relief services, the payment of fees, and consumer complaints. Docs Done Right posed as the relevant Student Loan Debt Relief Company in those communications. Docs Done Right also handled the preparation and submission of consumers' applications to consolidate their federal student loans and enroll in ED's repayment and forgiveness programs.

**Misrepresentations about Lower Interest Rates**

89.     In direct-mail solicitations and in sales calls, the Student Loan Debt Relief Companies represented that consumers could obtain a lower interest rate by consolidating their loans.

90.     When a federal student loan is consolidated, the consolidated loan has a fixed interest rate for the life of the loan. The fixed rate is the weighted average of the interest rates on the consolidated loans, rounded up to the nearest one-eighth of one percent.

91.     As a result, after consolidation, the consumer's new loan has either the same effective interest rate as the prior loans or a higher rate.

92.     The Student Loan Debt Relief Companies' representations that consolidation would lead to a lower interest rate were therefore false.

93.     Consumers with federal student loans are generally eligible for an interest rate reduction if they set up automatic monthly payments.

94.     At times between 2015 and 2017, the Student Loan Debt Relief Companies implied that consumers were required to consolidate their loans to be eligible for the interest-rate reduction associated with setting up automatic monthly payments.

95. But consumers can receive the interest-rate reduction associated with setting up automatic monthly payments regardless of whether they consolidate their loans.

### Misrepresentations about Improved Credit Scores

96. Between 2015 and 2017, the Student Loan Debt Relief Companies represented during sales calls that consolidating federal student loans would improve consumers' credit scores.

97. In many instances, consolidating is not likely to improve a consumer's credit score, such as when the consumer is current on their student loan payments.

98. By presenting themselves as experts on student loans and making representations about credit score changes, the Student Loan Debt Relief Companies implied that the Companies had a reasonable basis to represent that consolidation would increase consumers' credit scores.

99. Prior to making such representations, the Student Loan Debt Relief Companies had no reason to believe that consumers' credit scores would improve following consolidation, and the Companies did not attempt to measure thereafter whether consumers' credit scores did in fact improve following consolidation.

### Misrepresentations that ED Would Become Consumers' "New Servicer"

100. At times between 2015 and 2017, Docu Prep Center represented to consumers that, after they consolidated their loans, ED would become their "new servicer."

101. Docu Prep Center also represented that student loan servicers did not act in consumers' best interests and implied that consumers would not have to interact with third-party student loan servicers after consolidating their loans.

102.   In fact, ED does not become the "new servicer" on loans that are consolidated.  ED contracts with third-party student-loan servicers that handle federal student loans both before and after the loans are consolidated.  Loan consolidation does not enable consumers to avoid interacting with third-party servicers.

**Collection of Advance Fees**

103.   The Student Loan Debt Relief Companies charged consumers a fee that ranged between $699 and $999.

104.   The Student Loan Debt Relief Companies charged and received fees before consumers' applications for loan consolidations, loan repayment plans, and loan forgiveness plans were approved, and before consumers had made the first payments under the altered terms of their student loans.

105.   Docs Done Right participated in the charging of fees and received its portion of the fees before consumers' applications for loan consolidations, loan repayment plans, and loan forgiveness plans were approved, and before consumers had made the first payments under the altered terms of their student loans.

106.   Collectively, the Student Loan Debt Relief Companies and Docs Done Right collected more than $15 million in illegal advance fees from thousands of consumers nationwide between 2015 and at least 2017.

**Role of Individual Defendants in Deceptive Representations**
**and Charging of Advance Fees**

107.   Nesheiwat, Sklar, and Hoose each participated directly in Docu Prep Center's making of the representations described in this Complaint or had the authority to control them, and each had knowledge of the representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or

was aware of a high probability of fraud along with an intentional avoidance of the truth.

108.   Nesheiwat, Sklar, and Hoose each participated directly in the charging of fees by Docu Prep Center or had the authority to control its charging of fees, and each had knowledge of Docu Prep Center's fee-charging practices or was recklessly indifferent to those practices.

109.   Sebreros participated directly in Assure Direct Services' making of the representations described in this Complaint or had the authority to control them, and had knowledge of the representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

110.   Sebreros participated directly in the charging of fees by Assure Direct Services or had the authority to control its charging of fees, and had knowledge of Assure Direct Services' fee-charging practices or was recklessly indifferent to those practices.

111.   Martinez participated directly in the charging of fees by the Student Loan Debt Relief Companies and Docs Done Right or had the authority to control the charging of fees, and had knowledge of the Student Loan Debt Relief Companies' and Docs Done Right's fee-charging practices or was recklessly indifferent to those practices.

## Relief Defendants Lawson and XO Media, LLC

112.   In 2010, the Federal Trade Commission (FTC) amended the TSR to add specific provisions to curb deceptive and abusive practices associated with debt relief services.  75 Fed. Reg. 48458.  Among other things, the amendments prohibited debt relief providers who sold their services through telemarketing from collecting advance fees.  16 C.F.R. § 310.4(a)(5).

113.   In 2010, the FTC put out a guide for businesses offering "debt relief services" regarding the TSR amendments, which highlighted that "It's illegal to charge upfront fees… [and] You can't misrepresent your services." *See Debt Relief Services & the Telemarketing Sales Rule: A Guide for Businesses*, FTC, Aug. 2010, *available at* https://www.ftc.gov/tips-advice/business-center/guidance/debt-relief-services-telemarketing-sales-rule-guide-business.

114.   Lawson, through XO Media, LLC, made a capital contribution to Docu Prep Center at or around the time the company was created in February 2015.

115.   Prior to and around the time Lawson and XO Media, LLC initially made a capital contribution Docu Prep Center in February 2015, Lawson received information from Chou about the nature of Docu Prep Center's business, which involved selling student loan debt relief services through direct mail and telemarketing sales calls.

116.   Prior to Lawson and XO Media, LLC's contribution, companies offering student loan debt relief services had received extensive press coverage for "scamming" consumers by engaging in deceptive marketing and charging unlawful advance fees.

117.   For example, CNBC reported in July 2014 that "[s]cammers" were operating "phony student loan 'debt relief' companies that promise to help—for a price" and that law enforcement was "cracking down" on illegal conduct by such companies. *Student Debt 'Relief' Scams Offering Nothing but Distress*, CNBC, July 29, 2014, https://www.cnbc.com/2014/07/28/student-loan-crisis-student-debt-relief-is-not-always-relieving.html; *see also* Robert Farrington, *Beware: Student Loan Scams Victimizing Students and Graduates*, Forbes, June

10, 2014, https://www.forbes.com/sites/robertfarrington/2014/06/10/beware-student-loan-scams-victimizing-students-and-graduates/#16876dec5160.

118.   News outlets also reported in December 2014 on two lawsuits the Bureau filed against student loan debt relief businesses that allegedly deceived consumers and charged unlawful advance fees, including one business based in Orange County.  *See, e.g.*, Imran Ghori and Steve Greenhut, *U.S. Agency Claims OC Company Running Student Debt-Relief Scam*, Orange County Register, Dec. 15, 2014, https://www.ocregister.com/2014/12/15/us-agency-claims-oc-company-running-student-debt-relief-scam/; *Students Tricked into High Fees by Debt Relief Companies*, American Banker, Dec. 11, 2014, https://www.americanbanker.com/news/students-tricked-into-high-fees-by-debt-relief-companies; Erin E. Arvedlund, *Investing in You: Beware Offers of Student Debt 'Help'*, The Philadelphia Inquirer, Dec. 28, 2014, https://www.inquirer.com/philly/education/20141228_Investing_in_You__Beware_offers_of_student_debt__help_.html.

119.   Prior to Lawson and XO Media, LLC's capital contribution to Docu Prep Center in February 2015, there was thus readily available information that legal prohibitions on deceptive acts or practices and the TSR's advance fee prohibition could apply to student loan debt relief companies like Docu Prep Center.  There was also readily available information indicating that failure to comply with such laws was pervasive in the student loan debt relief industry.

120.   Prior to making their capital contribution in February 2015, Lawson and XO Media, LLC did not conduct any due diligence concerning whether Docu Prep Center would comply with applicable laws.

121.   In 2015 and 2016 and prior to the creation of the other four Student Loan Debt Relief Companies, there were continued public reports about illegal

conduct by student loan debt relief companies. *See, e.g.*, Adolfo Guzman-Lopez, *California Attorney General Warns of Student Loan Scams*, 89.3KPCC, Aug. 21, 2015, https://www.scpr.org/news/2015/08/21/53909/california-attorney-general-warns-of-student-loan; Ann Carrns, *Fraudulent Student Debt Relief Firm Shut Down by Consumer Bureau*, The New York Times, Apr. 1, 2016, https://www.nytimes.com/2016/04/02/your-money/fraudulent-student-debt-relief-firm-shut-down-by-consumer-bureau.html.

122.   Lawson and XO Media, LLC also did not conduct any due diligence concerning whether the other four Student Loan Debt Relief Companies would comply with applicable laws prior to receiving limited partnership interests in those companies between October 2015 and January 2017.

123.   Given the numerous public reports about student loan debt relief companies "scamming" consumers, charging unlawful advance fees, and engaging in deceptive conduct, Lawson and XO Media, LLC's ongoing failure to conduct any due diligence of the Student Loan Debt Relief Companies was reckless and indicative of a lack of good faith.

124.   After making their initial capital contribution in Docu Prep Center in February 2015, Lawson and XO Media, LLC received detailed updates from Sklar, Hoose, and others about Docu Prep Center's operations, sales, marketing, and growth through periodic meetings and emails.

125.   In a May 18, 2015 email copying Lawson regarding Docu Prep Center's operations, Chou asked Sklar if Sklar had "any additional information about the potential ban on advance fees that might extend the time frame that we get payment."  Chou also asked whether a delay in receiving fees would "slow[] growth" towards Docu Prep Center's goal of making 1,000 sales per month, which some involved with Docu Prep Center planned to celebrate with a

trip to Las Vegas.  Chou stated that he was concerned about slowing the company's growth "because I really want to go to Vegas. :-)"

126.   Following this May 18, 2015 email, Docu Prep Center did not take any steps to comply with the TSR's ban on charging advance fees for debt relief services.

127.   On the contrary, as Sklar reported in an email to Lawson and others on June 8, 2015, Docu Prep Center arranged with a payment processor to begin receiving consumers' fees through ACH transactions within only three to five business days, with the result that the company would not have to wait 30 to 60 days before receiving consumers' fees.  Sklar's email also stated that Docu Prep Center was working to obtain a credit card merchant account so that it could "process credit cards very quickly."

128.   On July 1, 2015, Sklar emailed Lawson and others to report that Docu Prep Center was now receiving its customers' fees "7 to 9 days after the client has made their ACH payment, which is much improved over the 45 day turn time [sic] we were initially anticipating."  This meant that Docu Prep Center charged and received fees before consumers' applications for loan consolidations, loan repayment plans, and loan forgiveness plans were approved and before consumers had made the first payment under the altered terms of their student loans.

129.   By July 2015, prior to receiving any distributions from Docu Prep Center, Lawson and XO Media, LLC therefore knew or should have known that Docu Prep Center was charging unlawful advance fees for debt relief services in violation of the TSR.

130.   Lawson, through XO Media, LLC, made a capital contribution to Certified Doc Prep Services at or around the time the company was created in October 2015.

131.   Lawson, through XO Media, LLC, made a capital contribution to Assure Direct Services at or around the time the company was created in August 2016.

132.   Lawson and XO Media, LLC knew, at the time they made capital contributions, that Certified Doc Prep Services and Assure Direct Services' business models and practices were based on Docu Prep Center's.  For example, in an email Lawson received in October 2015, Certified Doc Prep Services was referred to as a "second location" of Docu Prep Center.

133.   Lawson and XO Media, LLC therefore knew or should have known when they made capital contributions that Certified Docu Prep Services and Assure Direct Services would charge unlawful advance fees for debt relief services in violation of the TSR, just as Docu Prep Center was already doing.

134.   On April 8, 2016, Sklar sent an email to Lawson and others indicating that Docu Prep Center was purchasing and using consumer reports obtained from Experian to market its debt relief services.

135.   Lawson and XO Media, LLC knew or should have known at the time they made capital contributions to Assure Direct Services in August 2016 that it too would use consumer reports obtained from Experian to market its debt relief services.

136.   In October 2016, Lawson received an email stating that the use of Monster Loans' Experian account to buy prescreened lists for the Student Loan Debt Relief Companies was generating frequent complaints and threats of lawsuits from consumers.  Thus, by that time, Lawson and XO Media, LLC knew or should have known that the Student Loan Debt Relief Companies' use of Experian consumer reports violated FCRA.

137.   Lawson and XO Media, LLC did not make any capital contributions to Direct Document Solutions or Secure Preparation Services

when those companies were formed in January 2017.  Lawson and XO Media, LLC nonetheless received limited partnership interests in those two companies. In 2017 and 2018, XO Media, LLC received distributions of purported profits from Direct Document Solutions and Secure Preparation Services.

138.   Direct Document Solutions and Secure Preparation Services' initial operations were funded with loans from certain of the earlier Student Loan Debt Relief Companies.  Those loans consisted of funds that certain of the earlier Student Loan Debt Relief Companies had unlawfully taken from consumers through the violations described in this Complaint.

139.   Lawson and XO Media, LLC knew or should have known at the time that they received limited partnership interests in Direct Document Solutions and Secure Preparation Services in January 2017 that those companies would also violate FCRA and the TSR, since those companies' business models and practices were based on the earlier companies' business models and practices.

140.   Lawson supported efforts to continue obtaining Experian consumer reports to market debt relief services even after he knew that doing so might violate FCRA.  For example, in or around May 2017, Lawson participated in a meeting with Nesheiwat, Chou, and other limited partners regarding the possibility of setting up a new mortgage company to obtain a new Experian account to buy consumer reports for the Student Loan Debt Relief Companies. In an email to Chou on May 11, 2017, Nesheiwat noted that at the meeting "Ken" (i.e., Kenneth Lawson) had recommended that the company be located "far enough away" to keep it separate from the existing businesses but be set up so that "we can still have the access."

141.   Mikael van Loon was a close associate of Lawson's, and owned 10% of XO Media, LLC beginning in around mid-2016.  During 2016 and

2017, van Loon frequently acted as a representative of Lawson, XO Media, LLC, and other limited partners in dealings with the Student Loan Debt Relief Companies.  Van Loon was also Monster Loans' CFO beginning in August 2016 and then its CEO beginning in December 2016.

142.   Like Lawson, van Loon knew or should have known about the Student Loan Debt Relief Companies' violations of the TSR by July 2015 and of FCRA by October 2016 based on information he received through meetings with the managers of the Student Loan Debt Relief Companies and emails he received regarding the companies.  For example, Van Loon also received the emails to Lawson referenced in Paragraphs 125, 127, 128, and 136.

143.   In addition, emails that van Loon received in May 2016 indicate that he was aware of other red flags about the Student Loan Debt Relief Companies.  The emails state that federal regulators were taking enforcement actions against similar student debt-relief companies for charging unlawful fees and engaging in deceptive advertising.  In one of the emails, Hoose also mentions that Docu Prep Center had "gotten … past" past banks' due diligence requirements for merchant accounts.  Docu Prep Center did that by presenting information to banks that was not consistent with its actual business practices.

144.   Between October 2015 and November 2018, XO Media, LLC received at least $585,000 in distributions of purported profits from the Student Loan Debt Relief Companies.

145.   Between October 2015 and November 2018, the Student Loan Debt Relief Companies were committing or had committed the violations described in this Complaint, resulting in potential liabilities for, among other things, damages, consumer restitution or other monetary relief, and civil money penalties that were greater than the assets of those companies.

146.   When the Student Loan Debt Relief Companies distributed purported profits to XO Media, LLC, Lawson and XO Media, LLC knew or should have known that the Student Loan Debt Relief Companies did not have assets equal to or exceeding those potential liabilities.

147.   Lawson and XO Media, LLC continued receiving distributions from the Student Loan Debt Relief Companies even after those companies shut down in September 2017 in response to the Bureau's issuance of Civil Investigative Demands seeking information regarding potential FCRA, TSR, and CFPA violations by the Student Loan Debt Relief Companies.

148.   XO Media, LLC passed at least $277,000 of the distributions from the Student Loan Debt Relief Companies on to Lawson.

149.   Lawson and XO Media, LLC commingled the distributions from the Student Loan Debt Relief Companies with their other assets.

150.   Under the limited partnership agreements that governed Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services, their limited partners, including XO Media, LLC, owned interests in the partnerships as entities.  Under those agreements, the assets of Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services were owned by the partnerships as entities, and not by their limited partners.

151.   Under the limited partnership agreements that governed Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services, limited partners, including XO Media, LLC, were not guaranteed any distributions of purported profits, including any return of capital contributions.

## LEGAL BACKGROUND

### FCRA

152.   FCRA defines a "consumer report" to include:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 604 [§ 1681b].

15 U.S.C. § 1681a(d).

153.   Monster Loans and Lend Tech purchased from Experian prescreened lists containing information regarding consumers with student loans, including consumers' names, addresses, number of student loans, and aggregate student loan balances.

154.   Information such as a consumer's number of student loans and their aggregate balance bears on, among other things, a consumer's credit worthiness and credit standing and is used or expected to be used or collected for the purpose of serving as a factor in determining a consumer's eligibility for credit.

155.   The prescreened lists that Monster Loans and Lend Tech purchased from Experian are therefore "consumer reports" under § 603(d) of FCRA.  15 U.S.C. § 1681a(d).

**The TSR**

156.   The TSR is the implementing regulation of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108.

157.   The Bureau is authorized to enforce the Telemarketing Act and the TSR with respect to the offering or provision of a consumer-financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

158.   The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

159.   The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

160.   The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(ff).

161.   The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

162.   The Student Loan Debt Relief Companies offered services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans involving the preparation and submission of requests for loan

consolidations, loan forgiveness, and loan-repayment plans to consumers' student-loan servicers.

163.   The Student Loan Debt Relief Companies offered and provided these services to consumers nationwide using the telephones and more than one interstate telephone call.

164.   The Student Loan Debt Relief Companies offered and provided these services to consumers in exchange for payment of fees in connection with a telemarketing transaction.

165.   The Student Loan Debt Relief Companies are each a "telemarketer" or "seller" offering a "debt relief service" under the TSR.

166.   Docs Done Right provided services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans by preparing and submitting requests for loan consolidations, loan forgiveness, and loan-repayment plans to consumers' student-loan servicers, and by handling communications with consumers concerning the services, payment of fees, and complaints.

167.   Docs Done Right is a "seller" offering a "debt relief service" under the TSR.

168.   Nesheiwat, Sklar, and Hoose each arranged for Docu Prep Center to provide debt-relief services to consumers in exchange for consideration. Nesheiwat, Sklar, and Hoose are each "sellers" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

169.   Sebreros arranged for Assure Direct Services to provide debt-relief services to consumers in exchange for consideration. Sebreros is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

170.   Martinez arranged for Docs Done Right to provide debt-relief services to consumers in exchange for consideration. Martinez is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

### The CFPA

171.   Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit "covered person[s]" from engaging in any "unfair, deceptive, or abusive act or practice."

172.   A representation is deceptive under the CFPA if it is likely to mislead consumers acting reasonably under the circumstances, and the information is material to consumers.

173.   The Student Loan Debt Relief Companies are each "covered persons" under the CFPA because they offered or provided consumer-financial products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

174.   Docs Done Right is a "covered person" because it offered or provided consumer-financial products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

175.   Monster Loans is a "covered person" because it offers or provides consumer-financial products or services, including extending credit for mortgage loans. 12 U.S.C. § 5481(5), (6), (15)(A)(i).

176.   Monster Loans is a "service provider" because it provided the material service of obtaining and providing prescreened consumer reports for use in marketing to the Student Loan Debt Relief Companies in connection with

the Student Loan Debt Relief Companies' offering of a consumer-financial product or service. 12 U.S.C. § 5481(26).

177.   Lend Tech is a "covered person" because it purports to offer or provide consumer-financial products or services, including extending credit by brokering mortgage loans.  12 U.S.C. § 5481(5), (6), (15)(A)(i).

178.   Section 1002(25) of the CFPA defines the term "related person" to mean "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of," or "any . . . other person . . . who materially participates in the conduct of the affairs of" a non-bank provider of a consumer-financial product or service. 12 U.S.C. § 5481(25)(C). Section 1002(25) further provides that a "related person" shall be "deemed to mean a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

179.   Chou is a "related person" and "covered person" because he was Monster Loans' president and had managerial responsibility for it.

180.   Nesheiwat is a "related person" and "covered person" because he was Monster Loans' COO and had managerial responsibility for it. Nesheiwat is also a "related person" and "covered person" because he materially participated in the conduct of the Student Loan Debt Relief Companies.

181.   Cowell is a "related person" and "covered person" because he was an officer of Monster Loans and because he materially participated in the conduct of the company's affairs. Cowell is also a "related person" and "covered person" because he was Lend Tech's owner and had managerial responsibility for it.

182.   Sklar is a "related person" and "covered person" because he was Docu Prep Center's CEO and had managerial responsibility for it.

183.   Hoose is a "related person" and "covered person" because he was Docu Prep Center's COO and had managerial responsibility for it.

184.   Sebreros is a "related person" and "covered person" because he was president of Assure Direct Services and had managerial responsibility for it.  He is also a "related person" and "covered person" because he had managerial responsibility for Lend Tech.

185.   Abdel is a "related person" and "covered person" because he was a marketing manager of Monster Loans and materially participated in the conduct of its affairs. He is also a "related person" and "covered person" because he was a marketing manager of Docu Prep Center and materially participated in the conduct of its affairs. He is also a "related person" and "covered person" because he was an employee of Assure Direct Services and materially participated in the conduct of its affairs. He is also a "related person" and "covered person" because he had managerial responsibility for Lend Tech.

186.   Martinez is a "related person" and "covered person" because he was president of Docs Done Right and had managerial responsibility for it.  He is also a "related person" and "covered person" because he had managerial responsibility for Lend Tech.

### COUNT I

### Violations of FCRA

**(Against Student Loan Debt Relief Companies, Monster Loans, Lend Tech, Chou, Nesheiwat, Cowell, Abdel, Sebreros, Martinez, Sklar, and Hoose)**

187.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

188.   FCRA prohibits persons from using or obtaining a consumer report unless the person obtains it for a permissible purpose and the purpose is certified by the prospective user of the report. 15 U.S.C. § 1681b(f).

189.    FCRA provides that using or obtaining a prescreened consumer report to make "a firm offer of credit or insurance" is a permissible purpose. 15 U.S.C. § 1681b(c). A "firm offer" is an offer that will be honored (subject to certain exceptions) if the consumer continues to meet the pre-selected criteria used to select them for the offer. 15 U.S.C. § 1681a(*l*).

190.    Using or obtaining prescreened lists to send solicitations marketing debt-relief services is not a permissible purpose under FCRA.

191.    Monster Loans' and Lend Tech's certifications to Experian did not state that the prescreened lists were being obtained for use by other companies or for the purpose of sending solicitations marketing debt-relief services.

192.    The Student Loan Debt Relief Companies, Monster Loans, Lend Tech, Chou, Nesheiwat, Cowell, Abdel, Sebreros, Martinez, Sklar, and Hoose have, directly or indirectly, used or obtained consumer reports without a permissible purpose, and without a certification of the purpose by the prospective user of the report, in violation of FCRA. 15 U.S.C. § 1681b(f).

<h1 style="text-align:center">COUNT II</h1>

<h2 style="text-align:center">Advance Fees in Violation of the TSR</h2>

<h2 style="text-align:center">(Against Student Loan Debt Relief Companies, Docs Done Right, Nesheiwat, Sklar, Hoose, Sebreros, and Martinez)</h2>

193.    The allegations in Paragraphs 1 to 186 are incorporated here by reference.

194.    Under the TSR, it is an abusive act or practice for a seller or telemarketer to request or receive payment of any fee or consideration for any debt-relief services unless and until (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has

made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

195.   In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Student Loan Debt Relief Companies, Docs Done Right, Nesheiwat, Sklar, Hoose, Sebreros, and Martinez charged and received fees before consumers' applications for loan consolidations, loan-repayment plans, and loan-forgiveness plans were approved, and before consumers had made the first payments under the altered terms of their student loans, in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

## COUNT III

### Misrepresentations in Violation of the TSR – Lower Interest Rates

### (Against Student Loan Debt Relief Companies,

### Nesheiwat, Sklar, Hoose, and Sebreros)

196.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

197.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of a debt-relief service, including the amount of money or the percentage of the debt amount that a consumer may save. 16 C.F.R. § 310.3(a)(2)(x).

198.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that:

a.      consolidating would cause consumers to obtain a lower interest rate on their student loans; and

b.      consumers were required to consolidate their student loans to obtain an interest-rate deduction.

199.   The acts or practices of the Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros, as set forth in Paragraph 158, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(x).

## COUNT IV

### Misrepresentations in Violation of the TSR – Improved Credit Scores

### (Against Student Loan Debt Relief Companies,

### Nesheiwat, Sklar, Hoose, and Sebreros)

200.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

201.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of a debt-relief service, including the effect of the service on a consumer's creditworthiness. 16 C.F.R. § 310.3(a)(2)(x).

202.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that consolidating student loans would improve consumers' credit scores.

203.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that they had a reasonable basis for representing that consolidating student loans would improve consumers' credit scores.

204.   The acts or practices of the Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros, as set forth in Paragraphs 162 and 163, are deceptive acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT V

### Misrepresentations in Violation of the TSR – New Servicer

### (Against Docu Prep Center, Nesheiwat, Sklar, and Hoose)

205.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

206.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(x).

207.   Docu Prep Center, Nesheiwat, Sklar, and Hoose misrepresented, directly or indirectly, expressly or by implication, that consolidating would result in ED becoming consumers' "new servicer" and that consolidating would enable consumers to avoid interacting with third-party student-loan servicers.

208.   The acts or practices of Docu Prep Center, Nesheiwat, Sklar, and Hoose, as set forth in Paragraph 167, are deceptive acts or practices that violate the TSR. 16 C.F.R. § 310.3(a)(2)(x).

## COUNT VI

### Substantial Assistance in Violation of the TSR

### (Against Monster Loans and Nesheiwat)

209.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

210.   The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the Rule. 16 C.F.R. § 310.3(b).

211.   Monster Loans and Nesheiwat knew, or consciously avoided knowing, the material misrepresentations that the Student Loan Debt Relief Companies made to consumers.

212.   Monster Loans and Nesheiwat knew, or consciously avoided knowing, that the Student Loan Debt Relief Companies charged and received fees from consumers before consumers' applications for loan consolidations, loan-repayment plans, and loan-forgiveness plans were approved, and before consumers had made the first payments under the altered terms of their student loans.

213.   Monster Loans and Nesheiwat provided substantial assistance to the Student Loan Debt Relief Companies in their violations of the TSR. 16 C.F.R. § 310.3(b).

## COUNT VII

### Deception in Violation of the CFPA – Lower Interest Rates

### (Against Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros)

214.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

215.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that:

a.   consolidating would cause consumers to obtain a lower interest rate on their student loans; and

b.   consumers were required to consolidate to obtain an interest-rate deduction.

216.   These representations were material and likely to mislead consumers acting reasonably under the circumstances.

217.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT VIII

### Deception in Violation of the CFPA – Improved Credit Scores

### (Against Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros)

218.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

219.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that consolidating student loans would improve consumers' credit scores.

220.   These representations were material and likely to mislead consumers acting reasonably under the circumstances.

221.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros misrepresented, directly or indirectly, expressly or by implication, that they had a reasonable basis for representing that consolidating student loans would improve consumers' credit scores.

222.   The Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT IX

### Deception in Violation of the CFPA – New Servicer

### (Against Docu Prep Center, Nesheiwat, Sklar, and Hoose)

223.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

224.   Docu Prep Center, Nesheiwat, Sklar, and Hoose misrepresented, directly or indirectly, expressly or by implication, that consolidating would result in ED becoming consumers' "new servicer," and that consolidating would enable consumers to avoid interacting with third-party student-loan servicers.

225.   These representations were material and likely to mislead consumers acting reasonably under the circumstances.

226.   Docu Prep Center, Nesheiwat, Sklar, and Hoose have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT X

### Substantial Assistance in Violation of the CFPA

### (Against Monster Loans and Nesheiwat)

227.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

228.   Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

229.   Monster Loans and Nesheiwat knew, or recklessly avoided knowing, the material misrepresentations that the Student Loan Debt Relief Companies made to consumers.

230.   Monster Loans and Nesheiwat provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

**COUNT XI**

**CFPA Violations Based on Violations of FCRA and TSR**

**(Against Student Loan Debt Relief Companies, Monster Loans,**

**Lend Tech, Docs Done Right, Chou, Nesheiwat, Cowell,**

**Abdel, Sebreros, Martinez, Sklar, and Hoose)**

231.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

232.   FCRA and the Telemarketing Act are "Federal consumer financial laws" under the CFPA. 12 U.S.C. § 5481(12)(F), (14); 15 U.S.C. § 6105(d).

233.   The violations of FCRA committed by the Student Loan Debt Relief Companies, Monster Loans, Lend Tech, Chou, Nesheiwat, Cowell, Abdel, Sebreros, Martinez, Sklar, and Hoose are deemed to be violations of the CFPA. 15 U.S.C. § 1681s(d).

234.   Because the Student Loan Debt Relief Companies, Monster Loans, Lend Tech, Chou, Nesheiwat, Cowell, Abdel, Sebreros, Martinez, Sklar, and Hoose are "covered persons" who violated FCRA by, directly or indirectly, using or obtaining consumer reports without a permissible purpose and without a certification of the purpose by the prospective user of the report, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

235.   The violations of the TSR committed by the Student Loan Debt Relief Companies, Docs Done Right, Nesheiwat, Sklar, Hoose, Sebreros, and Martinez are treated as violations of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c).

236.   Because the Student Loan Debt Relief Companies, Docs Done Right, Nesheiwat, Sklar, Hoose, Sebreros, and Martinez are "covered persons" who violated the TSR by charging and receiving illegal advance fees from

consumers, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

237.   Because the Student Loan Debt Relief Companies, Nesheiwat, Sklar, Hoose, and Sebreros are "covered persons" who violated the TSR by engaging in deceptive conduct, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

238.   Because Monster Loans and Nesheiwat are "covered persons" who substantially assisted violations of the TSR, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**COUNT XII**

**Relief Defendants**

239.   The allegations in Paragraphs 1 to 186 are incorporated here by reference.

240.   Chou, Cowell, Lawson, TDK Enterprises, LLC, Cre8labs, Inc., and XO Media, LLC have received, directly or indirectly, distributions from the Student Loan Debt Relief Companies.

241.   All of those distributions are traceable to funds obtained from consumers through one or more of the violations of the CFPA, TSR, and FCRA described herein.

242.   As limited partners, Lawson and XO Media, LLC had only an equity interest in the Student Loan Debt Relief Companies.  They therefore lack a legitimate claim to distributions from the Student Loan Debt Relief Companies traceable to the violations described herein.

243.   Lawson and XO Media, LLC also lack a legitimate claim to the distributions from the Student Loan Debt Relief Companies to the extent that, at the time of each of the distributions, those companies' liabilities exceeded their available assets such that the companies had no assets or "profits" that could

legitimately be distributed to their limited partners, including to Lawson and XO Media, LLC, under California law.  Cal. Corp. Code § 15905.08(b)(2).

244.   Lawson and XO Media, LLC also lack a legitimate claim to distributions from the Student Loan Debt Relief Companies because they did not invest in those companies in good faith or receive distributions from those companies in good faith.

245.   Lawson and XO Media, LLC also lack a legitimate claim to the distributions from Direct Document Solutions and Secure Preparation Services because they made no capital contributions to those companies.  The distributions from those companies to Lawson and XO Media, LLC were gratuitous transfers.

246.   Lawson and XO Media, LLC would be unjustly enriched if not required to disgorge the funds distributed to them or the value of the benefits they received.

## DEMAND FOR RELIEF

The Bureau requests that the Court:

a.      permanently enjoin Defendants from committing future violations of the FCRA, TSR, and CFPA and enter such other injunctive relief as appropriate;

b.      permanently enjoin Defendants from advertising, marketing, promoting, offering for sale, selling, or providing any form of assistance to any debt-relief service;

c.      grant additional injunctive relief as the Court may deem to be just and proper;

d.      order Monster Loans, the Student Loan Debt Relief Companies, Docs Done Right, Nesheiwat, Sklar, Hoose, Sebreros, and Martinez to pay redress to consumers harmed by their unlawful conduct;

1       e.     award damages and other monetary relief against Defendants;

2       f.     impose civil money penalties against Defendants;

3       g.     order disgorgement of ill-gotten funds against Relief Defendants so

4 that those funds can be returned to consumers;

5       h.     order the rescission or reformation of contracts where necessary to

6 redress injury to consumers; and

7       i.     award the Bureau the costs of bringing this action, as well as such

8 other and additional relief as the Court may determine to be just and proper.

11 Dated July 10, 2020                Respectfully Submitted,

/s/ Colin Reardon
Colin Reardon
E. Vanessa Assae-Bille
Leanne E. Hartmann
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, D.C. 20552

*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*