COLIN REARDON (NY Bar #4945655)
E-mail: colin.reardon@cfpb.gov
Phone: (202) 435-9668
E. VANESSA ASSAE-BILLE (NY Bar #5165501)
E-mail: elisabeth.assae-bille@cfpb.gov
Phone: (202) 435-7688
1700 G Street, NW
Washington, D.C. 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar #264787) – Local Counsel
E-mail: leanne.hartmann@cfpb.gov
Phone: (415) 844-9787
301 Howard St., Suite 1200
San Francisco, CA 94105
Fax: (415) 844-9788

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| Bureau of Consumer Financial Protection, | Case No.: 8-20-cv-00043-SB-ADS |
| Plaintiff, | **MEMORANDUM IN** |
| vs. | **SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY** |
| Chou Team Realty, LLC et al., | **JUDGMENT AGAINST DEFENDANT NESHEIWAT** |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................. 2

I.    Statement of Facts ................................................................. 2

    A. Overview of the SLDR Companies' Business Model and Debt Relief Services .......................................................................... 2

    B. Nesheiwat's Use of Prescreened Lists to Market Debt Relief Services........................................................................................... 5

    C. The SLDR Companies' Advance Fees ................................. 7

    D. The SLDR Companies' False Representations About the Benefits of Their Services ..................................................................... 8

        1.   Representations Regarding Lower Interest Rates ........... 8

        2.   Representations Regarding Improved Credit Scores ...... 9

        3.   Representations That the Department of Education Would Be Consumers' "New Servicer" ......................................... 10

    E. Consumer Complaints About the SLDR Companies........................ 10

ARGUMENT...................................................................................... 11

I.    Summary judgment against Nesheiwat is warranted on the FCRA Claim (Count I) ...................................................................... 11

II.   Summary judgment against Nesheiwat is warranted on the CFPA and TSR Claims (Counts II to XI) ...................................... 12

    A. Defendants are subject to the CFPA and TSR ...................... 12

    B. The SLDR Companies violated the CFPA and TSR ........................ 14

        1.   The SLDR Companies collected advance fees for debt-relief services in violation of the TSR................................... 14

        2.   The SLDR Companies engaged in deceptive acts or practices in violation of the CFPA .............................................. 14

3.  The SLDR Companies engaged in deceptive acts or practices in violation of the TSR .................................................................. 17

C.  Nesheiwat is directly liable for violating the TSR and CFPA (Counts II, III, IV, V, VII, VIII, and IX)............................................. 18

D.  Nesheiwat substantially assisted the TSR and CFPA violations by the SLDR Companies (Counts VI and X)..................................... 19

E.  Nesheiwat's violations of FCRA and the TSR are violations of the CFPA (Count XI) ............................................................ 21

III.   An adverse inference against Nesheiwat is warranted ....................... 21

IV.   The Court should grant injunctive relief, restitution, and a civil money penalty ............................................................................. 22

A. Injunctive Relief ........................................................................... 22

B. Restitution ..................................................................................... 23

C. Civil Penalty ................................................................................. 24

CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Banga v. Chevron U.S.A. Inc.*,

2013 WL 71772 (N.D. Cal. 2013)....................................................................11

*Blasi v. United Debt Services LLC*,

No. 14-cv-83, slip op. (S.D. Ohio 2014)..........................................................11

*Celotex Corp. v. Catrett*,

477 U.S. 317 (1986) ........................................................................................11

*CFPB v. D & D Mktg.*,

2016 WL 8849698 (C.D. Cal. 2016)...............................................................20

*CFPB v. Gordon*,

819 F.3d 1179 (9th Cir. 2015).........................................................................14

*CFPB v. IrvineWebWorks, Inc.*,

2016 WL 1056662 (C.D. Cal. 2016)................................................................12

*CFPB v. Mortg. Law Grp., LLP*,

196 F. Supp. 3d 920 (W.D. Wis. 2016) ...........................................................18

*CFTC v. Co Petro Marketing Grp., Inc.*,

502 F. Supp. 806 (C.D.Cal.1980)....................................................................22

*CFTC v. Driver*,

877 F. Supp. 2d 968 (C.D. Cal. 2012) ............................................................22

*FTC v. Affiliate Strategies, Inc.*,

849 F. Supp. 2d 1085 (D. Kan. 2011) .............................................................20

*FTC v. Affordable Media*,

179 F.3d 1228 (9th Cir. 1999).........................................................................19

*FTC v. All. Document Preparation*,

296 F. Supp. 3d 1197 (C.D. Cal. 2017) ..........................................................14

*FTC v. Am. Fin. Benefits Ctr.*,

324 F. Supp. 3d 1067 (N.D. Cal. 2018) ..................................................... 13, 18

*FTC v. Chapman*,
  714 F.3d 1211 (10th Cir. 2013)................................................................20

*FTC v. Cyberspace.Com LLC*,
  453 F.3d 1196 (9th Cir. 2006)........................................................ 14, 16

*FTC v. Dinamica Financiera LLC*,
  2010 WL 9488821 (C.D. Cal. 2010)........................................................15

*FTC v. Gill*,
  265 F.3d 944 (9th Cir. 2001)....................................................................23

*FTC v. John Beck Amazing Profits, LLC*,
  865 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................ 15, 16

*FTC v. Johnson*,
  96 F. Supp. 3d 1110 (D. Nev. 2015) .......................................................16

*FTC v. OMICS Grp.*,
  302 F. Supp. 3d 1184 (D. Nev. 2017) .....................................................15

*FTC v. Pantron I Corp.*,
  33 F.3d 1088 (9th Cir. 1994)........................................................ 15, 16, 17

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009)....................................................................13

*FTC v. Univ. Premium Servs., Inc.*,
  2007 WL 9728965 (C.D. Cal. 2007)............................................ 15, 16, 17

*FTC v. WV Universal Mgmt., LLC*,
  877 F.3d 1234 (11th Cir. 2017)...................................................... 20, 23

*In re Sanctuary Belize Litig.*,
  2019 WL 1934673 (D. Md. 2019) ............................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................11

*Nationwide Life Ins. Co. v. Richards*,
  541 F.3d 903 (9th Cir. 2008)....................................................................21

*Nayab v. Capital One Bank (USA), N.A.*,

   942 F.3d 480 (9th Cir. 2019)..................................................................11

*SEC v. Autocorp Equities, Inc.*,

   292 F. Supp. 2d 1310 (D. Utah 2003).....................................................22

*SEC v. Colello*,

   139 F.3d 674 (9th Cir. 1998)...................................................................21

*SEC v. Strategic Global Invs., Inc.*,

   262 F. Supp. 3d 1007 (S.D. Cal. 2017)...................................................22

*SEC v. Luna*,

   2014 WL 794202 (D. Nev. 2014) ............................................................22

*Zellerino v. Roosen*,

   2016 WL 10988763 (C.D. Cal. 2016)......................................................11

**Statutes**

12 U.S.C. § 5531................................................................................................13

12 U.S.C. § 5655....................................................................................... 23, 25

12 U.S.C. § 5565................................................................................................24

15 U.S.C. § 6105................................................................................................21

**Regulations**

12 C.F.R. § 1083.1 .............................................................................................24

16 C.F.R. § 310.2 ...................................................................................... 12, 13, 20

16 C.F.R. § 310.3 ...................................................................................... 12, 18, 20

16 C.F.R. § 310.4 ...................................................................................... 12, 14

34 C.F.R. § 685.202............................................................................................8

**INTRODUCTION**

Defendant Jawad Nesheiwat was central to a long-running scheme to illegally obtain millions of consumer reports for a group of five student-loan debt-relief businesses in which he was an investor. With Nesheiwat's assistance, the five businesses used those consumers' personal information to send millions of misleading mailers marketing student-loan debt-relief services. Over 23,000 consumers enrolled in those debt-relief services during telemarketing sales calls that featured additional deceptive statements, and then were charged millions in illegal advance fees.

Under the Fair Credit Reporting Act ("FCRA"), prescreened consumer reports (also known as "prescreened lists") may be used to send firm offers of credit, but they may not be used to market debt-relief services. Between 2015 and 2017, a mortgage company known as Monster Loans falsely represented to Experian that it was obtaining prescreened lists to send firm offers of credit to consumers for mortgage loans. Nesheiwat, Monster's chief operating officer, signed Monster's false application to Experian. Rather than use the lists to make firm offers of credit, Nesheiwat and Monster provided those lists to the five debt-relief businesses to use in their direct-mail marketing. Once Monster stopped providing those lists in 2017, Nesheiwat participated in a scheme to continue illegally purchasing consumer reports through a new sham company that purported to offer mortgages, but was actually created to provide a new source of prescreened lists.

Nesheiwat also controlled and participated in the management of the first of the debt-relief businesses, Docu Prep Center, and he knew about or recklessly disregarded its deceptive marketing practices and collection of unlawful advance fees. He is therefore liable under the Consumer Financial Protection Act of 2010 ("CFPA"), which prohibits deceptive acts or practices in connection with consumer-financial products or services like debt relief. He is

also liable under the Telemarketing Sales Rule ("TSR"), which prohibits deceptive acts or practices and prohibits the collection of advance fees for debt-relief services.

The CFPA and the TSR also prohibit recklessly or knowingly providing substantial assistance to persons committing certain CFPA or TSR violations. Nesheiwat violated these prohibitions too: he oversaw the direct-mail marketing of Docu Prep Center and the four later debt-relief businesses. Nesheiwat also substantially assisted the companies by providing them with the prescreened lists he and Monster Loans obtained. All five businesses deceptively marketed their debt-relief services to the consumers identified in those prescreened lists and then collected illegal advance fees from the consumers who purchased the companies' services.

The undisputed facts overwhelmingly establish that Nesheiwat violated the CFPA, TSR, and FCRA. Further, throughout this litigation, Nesheiwat invoked his Fifth Amendment privilege against self-incrimination regarding every fact at issue in this case, which warrants an adverse inference against him. Summary judgment should therefore be entered in favor of the Bureau and against Nesheiwat on all claims alleged against him. Further, Nesheiwat should be subjected to an injunction to prohibit future violations, ordered to pay consumer redress of $19,699,870, and ordered to pay a civil money penalty.

## BACKGROUND

I. **Statement of Facts**

A. **Overview of the SLDR Companies' Business Model and Debt-Relief Services**

Between 2015 and 2018, Nesheiwat was a limited partner in five debt-relief businesses: Docu Prep Center, Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services (collectively, the "SLDR Companies"). Statement of Undisputed Facts ("UF")

¶¶ 4-29, 38, 60-61. In February 2015, Nesheiwat helped launch Docu Prep Center, and thereafter participated extensively in its management and operations. UF ¶¶ 263-87. Docu Prep Center's managers were inexperienced, and Nesheiwat gave them instructions on how to market and sell the company's services, which they followed. UF ¶¶ 266-69. The four later SLDR Companies were "cookie-cutter" copies of Docu Prep Center, with the same business model, marketing letters, fees, and services, and they were staffed by many former Docu Prep Center employees. UF ¶¶ 46-62, 71-74. Nesheiwat oversaw those businesses' direct-mail marketing from 2015 to 2017, including after he separated from Monster Loans in April 2017. UF ¶¶ 282-287. The SLDR Companies shut down in September 2017 after certain of them received civil investigative demands from the Bureau, although they continued charging existing customers fees until 2018. UF ¶ 28, 249.

In exchange for a fee, the SLDR Companies purported to provide to consumers assistance in consolidating their federal student loans and enrolling in loan repayment and forgiveness programs offered by the U.S. Department of Education ("Department of Education" or "ED"). UF ¶¶ 55-56. ED does not charge borrowers any fees to consolidate their loans or to access any loan repayment and forgiveness programs. UF ¶ 42.

The SLDR Companies primarily attracted consumers by direct-mail marketing. UF ¶¶ 57-58, 71, 81. Between 2015 and 2017, Nesheiwat oversaw those marketing efforts. UF ¶¶ 270-72, 282-87. At the outset, Nesheiwat edited and approved the template for Docu Prep Center's direct mail solicitation, which the four other SLDR Companies then used in their direct-mail marketing. UF ¶¶ 74, 271-72. Nesheiwat also arranged for the SLDR Companies to send their solicitations through a mailing house that Monster Loans used and coordinated their marketing through the mailing house. UF ¶¶ 282-87.

In their direct-mail solicitations, the SLDR Companies represented that

they offered a "Student Loan Consolidation & Payment Reduction Program Prepared For" the consumer receiving the letter. UF ¶ 75. The solicitations also typically stated that the "Benefits of the Consolidation Program may include" an "[i]nterest rate reduction regardless of balance or pay history," "[l]ower monthly payments," and "[l]oan forgiveness." UF ¶ 80. The solicitations included a header with the phrase "FINAL NOTICE" and generally told consumers to call the SLDR Companies by specific dates or before their next student loan payment was due. UF ¶¶ 76-77. As a co-defendant testified, the solicitations were "exaggerated," "very misleading," and "designed to create urgency." UF ¶¶ 80-81, 176.

When consumers called in response to the solicitations, they reached sales representatives known as "Student Loan Advisors," who enrolled consumers over the phone. UF ¶¶ 58, 84-91. The representatives attempted to identify a repayment program for which the consumer would be eligible and then described its purported benefits. UF ¶¶ 85-86. After persuading consumers that they would benefit, the representatives explained the SLDR Companies' fees and sent consumers a set of agreements to sign electronically. UF ¶¶ 87-88. Training materials directed sales representatives to "[c]reate a sense of urgency" during sales calls and to "strike while the iron is hot," and representatives sometimes pressured consumers to sign up immediately and rushed consumers through signing the agreements while they were still on the phone. UF ¶¶ 89-91.

During these calls, sales representatives were directed to use scripts. UF ¶ 82. Nesheiwat edited and approved Docu Prep Center's sales scripts, which the four later SLDR Companies then used when they were each created. UF ¶¶ 184-85, 188, 273-76. As detailed in Section D below, these scripts contained misleading statements about the benefits of the SLDR Companies' services. Nesheiwat made no efforts to verify the truthfulness of the statements regarding

loan consolidation in Docu Prep Center's scripts, which contained statements that another defendant testified were "ridiculously bad." UF ¶¶ 212, 277.

After consumers enrolled, the SLDR Companies' service providers sent consumers a packet of documents that typically included a welcome letter, a payment schedule, a loan-consolidation application, a loan-repayment-plan request (e.g., an income-driven repayment plan), and a forbearance request. UF ¶¶ 95-96. The materials directed consumers to sign and return the consolidation applications, repayment-plan requests, and forbearance requests for submission to consumers' student-loan servicers. UF ¶¶ 97-98.

### B.     Nesheiwat's Use of Prescreened Lists to Market Debt-Relief Services

In June 2015, a few months after Docu Prep Center began operating, Nesheiwat signed Monster Loans' application for an account with the credit bureau Experian. UF ¶¶ 100, 111. In the application, he certified that Monster would only use Experian's products to make a firm offer of credit to potential mortgage customers. UF ¶¶ 102-12. Nesheiwat also signed an agreement certifying that Monster Loans would "extend a 'firm offer of credit or insurance,' as defined in the Fair Credit Reporting Act" to the consumers whose names appeared on the prescreened lists Monster purchased. UF ¶¶ 115-16.

Despite these certifications, Nesheiwat intended from the beginning to use the Experian account to buy prescreened lists to market student-loan debt-relief services. UF ¶¶ 117-18. Between December 2015 and April 2017 Nesheiwat oversaw the use of Monster's Experian account to buy prescreened lists for the SLDR Companies. UF ¶¶ 119-23, 127-29. The lists contained information about more than 6 million consumers with student loans, including consumers' names, addresses, and aggregate student-loan balances. UF ¶¶ 121, 130.  Instead of using those prescreened lists to extend firm offers of credit to mortgage consumers, Nesheiwat and the SLDR Companies used the lists to

send direct-mail marketing debt-relief services. UF ¶¶ 122-23, 140-42.

Nesheiwat directed subordinates to order the prescreened lists and to send the lists to the mailing house that the SLDR Companies used to send direct mail. UF ¶¶ 131-32, 136. He also negotiated with Experian to get lower prices for the prescreened lists for the benefit of the SLDR Companies. UF ¶ 137. Nesheiwat deliberately concealed from Experian how the prescreened lists were being used, falsely representing that Monster was purchasing the lists to provide firm offers of credit to potential mortgage borrowers. Nesheiwat also directed an employee of an associated debt-relief company to pretend that he worked at Monster Loans when communicating with Experian. UF ¶¶ 133-35.

In around May 2017, Monster stopped using its Experian account to buy prescreened lists for the SLDR Companies because of concerns about violating FCRA, and Nesheiwat began seeking a new Experian account to buy prescreened lists for the SLDR Companies. UF ¶ 143. In emails with Monster's owner, who was also an investor in the SLDR Companies, Nesheiwat described his efforts to evade Experian's due diligence process, noting that Experian "ask[ed] a ton of questions!" and that it was "very important to me personally with the risk involved to cover my butt." UF ¶¶ 144-49. In June 2017, another investor in the SLDR Companies registered Lend Tech Loans as a purported mortgage brokerage. UF ¶¶ 150-53. Nesheiwat and other investors directed the manager of one of the SLDR Companies to use Lend Tech to "obtain an Experian license so the student loan locations could survive … and pull leads." UF ¶¶ 154-55. Lend Tech told Experian that it would use prescreened lists to extend firm offers of credit to potential mortgage customers. UF ¶ 153. But Lend Tech was a sham and has never originated any mortgage loans. UF ¶¶ 156-57. Between August and September 2017, Lend Tech purchased prescreened lists containing information about more than 1.5 million consumers for the SLDR Companies.

### C.    The SLDR Companies' Advance Fees

The SLDR Companies charged a fee for their services that varied over time between $599 and $999, which consumers paid in either a single lump sum or installments. UF ¶¶ 215, 228.

The SLDR Companies did not wait for consumers' loan consolidation and repayment-plan applications to be approved to collect consumers' fees.  UF ¶ 217-21, 226. They also generally sought to put consumers' loans into forbearance for a period of 90 days. UF ¶ 222. An approved forbearance would suspend consumers' student-loan payments after their applications were approved and the consumers had a new payment plan. UF ¶ 223. The SLDR Companies collected the vast majority of consumers' fees—just over $18 million, out of about $19.7 million in total fees—within 90 days of consumers' enrollment. UF ¶¶ 260-61. Transaction data show that most fees were charged well before 90 days. For example, in ACH transactions between December 2015 and January 2018, on average the SLDR Companies took consumers' first fee payment 15 days after consumers enrolled and took consumers' final fee payment 51 days after enrollment. UF ¶¶ 250-51. In credit-card transactions, the SLDR Companies on average took consumers' first payment 13 days after consumers enrolled and the final payment after 20 days. UF ¶¶ 258-59.

By April 2015, just two months after the launch of the first company, Nesheiwat had received information calling into question the legality of the SLDR Companies' advance fees. UF ¶¶ 230-33. In that month, he received an email indicating that Docu Prep Center's payment processor was going to require Docu Prep Center to comply with the TSR and stop charging advance fees. *Id.* Subsequent emails that Nesheiwat received between May and July 2015 show that, rather than delay taking consumers' fees, Docu Prep Center switched payment processors. UF ¶¶ 234-41. Thereafter, Docu Prep Center made no effort to comply with the TSR's advance fee provision. UF ¶ 237.

**D.    The SLDR Companies' False Representations About the Benefits of Their Services**

**1.    Representations Regarding Lower Interest Rates**

Between 2015 and 2017, the SLDR Companies represented to consumers that consolidating would allow consumers to obtain a lower interest rate on their federal student loans. UF ¶¶ 160-71. During 2015, Docu Prep Center's direct-mail solicitations described a "Lower Interest Rate" as a benefit of the company's "Student Loan Consolidation & Payment Reduction Program." UF ¶ 160. During 2016 and 2017, the SLDR Companies' solicitations told consumers that "you may be eligible to convert your existing high-interest loan into a federally-backed consolidation with a lower rate" and that the "[b]enefits of the Consolidation Program may include … [i]nterest rate reduction regardless of balance or pay history."  UF ¶¶ 161, 163. Similarly, during sales calls, the SLDR Companies told consumers that, by consolidating, the consumers would receive a lower interest rate. UF ¶ 164. For example, Docu Prep Center told one consumer that consolidating would lower the interest rate by at least 2%. UF ¶ 165.

Some consumers thought, based on these representations, that consolidating would lower the interest rates on their student loans. UF ¶¶ 166-67. For example, one consumer paid Docu Prep Center's fee "because [he] believed that the interest savings [he] would receive were going to be more than $700." UF ¶¶ 168-69. But when federal student loans are consolidated, the consumer's new loan has either the same effective interest rate as the prior loans or a higher rate. UF ¶¶ 170-73; *see also* 34 C.F.R. § 685.202(a)(10)(i)(F).

While *consolidation* doesn't result in a lower interest rate, consumers with federal student loans can generally get an interest-rate reduction if they set up automatic payments, regardless of whether they consolidate those loans. UF ¶¶ 175-77. But the SLDR Companies stated and implied that consumers had to

consolidate to obtain that reduction. For example, the direct-mail solicitations
that the SLDR Companies sent during 2016 and 2017 that referred to
"convert[ing] your existing high-interest loan into a federally-backed
consolidation with a lower rate" contained an asterisk that led to the following
statement: "[t]he Department of Education may offer an interest rate reduction
with set-up of automatic payments." UF ¶¶ 161-62.

### 2. Representations Regarding Improved Credit Scores

The SLDR Companies represented during sales calls that consumers'
credit scores would improve if they consolidated their student loans. UF ¶¶ 179-
88. For example, during 2015 and 2016, Docu Prep Center used telemarketing
scripts that instructed sales representatives to tell consumers that "having
multiple trade line items will impact your credit score negatively when
compared to a profile with fewer trade lines" and that, therefore, consolidation
will reduce "your trade lines and you will not appear over extended." UF ¶ 180.
In a 2016 sales script, Certified Doc Prep Services also claimed that having
multiple loans would "put a very negative impact on your credit" and promised
that when consumers reduce those trade lines through consolidation, "this
should really help to improve your credit score." UF ¶ 186. Training materials
also instructed sales representatives to emphasize "improving the client's
credit" as a benefit. UF ¶ 183. The SLDR Companies' sales representatives also
at times "ma[d]e up fake numbers about credit scores going up." UF ¶ 196. For
example, Certified Doc Prep Services promised one consumer that
consolidating would increase his credit score by 50 to 100 points.  UF ¶ 197.

Those associated with the SLDR Companies, including Nesheiwat, did
not attempt to determine whether these representations were true. UF ¶ 200. As
the Bureau's expert Dr. David Skanderson has explained, these representations
"cannot be supported" and "likely were false for many consumers." UF ¶ 189-
90. In particular, "[t]here is no basis for a blanket assertion that consolidating a

borrower's federal student loans will have a favorable impact on the borrower's credit score, or that having multiple student loans outstanding will negatively affect a borrower's credit score compared to having the same amount of debt in fewer trade lines." UF ¶ 191.

### 3. Representations That the Department of Education Would Be Consumers' "New Servicer"

The Department of Education contracts with third-parties to service federal student loans. UF ¶ 44. During sales calls, Docu Prep Center's sales representatives criticized those third-party servicers and promised that ED would become the consumers' "new servicer" after consolidation. UF ¶¶ 201-08. For example, during 2015, Docu Prep Center used a sales script that promised a "perfect solution" to the bad service the third-party servicers gave: "Through this consolidation process, the U.S. Department of Education will be your new servicer and you will be making your new single student loan payment to the U.S. Department of Education." UF ¶ 202. In fact, ED does not become consumers' "new servicer" after consolidation. UF ¶¶ 210. Rather, its servicers continue to handle student loans, and consolidation does not enable consumers to avoid interacting with servicers. UF ¶¶ 209, 211.

### E. Consumer Complaints About the SLDR Companies

Many consumers complained and sought refunds following their enrollment, often describing the SDLR Companies as a "scam." UF ¶¶ 308, 314. Between 2015 and 2020, over 400 consumers filed complaints with state and federal agencies and the Better Business Bureau. UF ¶ 305. The SLDR Companies and their service provider also at least 250 complaints directly from consumers over the phone and in writing, including complaints from consumers who were promised a lower interest rate and higher credit scores and were told that ED would become their new servicer. UF ¶¶ 313-16.

**ARGUMENT**

Summary judgment is appropriate on all counts because "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the Bureau has made a prima facie case for summary judgment, Nesheiwat cannot rely on general denials but must designate "specific facts" showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

**I.     Summary judgment against Nesheiwat is warranted on the FCRA Claim (Count I).**

FCRA prohibits using or obtaining a consumer report unless it is for a permissible purpose and the purpose is certified by the prospective user of the report. 15 U.S.C. § 1681b(f). That prohibition applies to individuals. *See* 15 U.S.C. § 1681a(b); *Zellerino v. Roosen*, 2016 WL 10988763, at *9 (C.D. Cal. 2016). Prescreened lists are "consumer reports" under FCRA, and may only be used or obtained if, among other things, the "transaction consists of a firm offer of credit or insurance." 15 U.S.C. § 1681b(c)(1)(B)(i), (f); *see also Banga v. Chevron U.S.A. Inc.*, 2013 WL 71772, at *10 (N.D. Cal. 2013). Using prescreened lists to market debt-relief services is not permitted under FCRA. *See* ECF No. 177; *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 495 (9th Cir. 2019) (FCRA generally prohibits obtaining a consumer report unless a specific exception applies).

The undisputed evidence shows that Nesheiwat violated FCRA. He oversaw the scheme to misuse Monster's Experian account to obtain prescreened lists for the SLDR Companies, signed the application for Monster's Experian account, and made false certifications to Experian regarding how the

lists would be used. *See supra* pp. 5-6. Along with others, Nesheiwat also directed Lend Tech to apply to Experian so that the SLDR Companies would have a new source of prescreened lists. *See supra* p. 6. The SLDR Companies did not offer or extend credit, and thus did not use the prescreened lists to make firm offers of credit. He and those companies therefore lacked a permissible purpose under FCRA to use or obtain the prescreened lists.

## II.   Summary judgment against Nesheiwat is warranted on the CFPA and TSR Claims (Counts II to XI).

Summary judgment should be granted on the Bureau's CFPA and TSR claims against Nesheiwat. He, along with the SLDR Companies, was subject to the CFPA and TSR. *See infra* § II.A. The SLDR Companies violated the CFPA and TSR. *See infra* § II.B.[1] And Nesheiwat is directly liable for engaging in violations in his role at Docu Prep Center and liable for substantially assisting the violations by each of the SLDR Companies. *See infra* § II.C.

### A.   Defendants are subject to the CFPA and TSR.

Under the TSR, it is unlawful for a seller or telemarketer to receive advance fees for debt-relief services or to misrepresent any material aspect of a debt-relief service. 16 C.F.R. §§ 310.3(a)(2)(x), 310.4(a)(5)(i). The SLDR Companies and Nesheiwat offered "debt relief services" as defined in the TSR by providing a program or service represented to alter the terms of consumers' student loans by consolidating consumers' loans, lowering consumers' interest rates and monthly payments, and achieving loan forgiveness. *See* 16 C.F.R. § 310.2(o); *CFPB v. IrvineWebWorks, Inc.*, 2016 WL 1056662, at *7 (C.D. Cal. 2016) (granting summary judgment on TSR claim after finding similar services

---

[1] The Court entered a default judgment against the SLDR Companies for violating the CFPA and the TSR, as well as FCRA, *see* ECF No. 183, concluding that the merits of the Bureau's claims appeared strong and that the SAC stated claims against those companies, *see* ECF No. 177 at 4-6.

were "debt relief services"); *see also FTC v. Am. Fin. Benefits Ctr.*, 324 F.
Supp. 3d 1067, 1081-83 (N.D. Cal. 2018). Indeed, Docu Prep Center's
employee manual described it as a provider of "student debt relief." UF ¶ 56.

The SLDR Companies are "sellers" and "telemarketers" under the TSR
because they engaged in a nationwide marketing campaign to induce consumers
to purchase their services over the phone and then offered their services during
sales calls. 16 C.F.R. §§ 310.2(dd), (ff), (gg). Nesheiwat is also a "seller"
because he arranged for Docu Prep Center to provide services to consumers
through his extensive involvement in its management and operations. *Id.*
§ 310.2(dd); *see also FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009).

The SLDR Companies and Nesheiwat also fall within the scope of the
CFPA, which prohibits any "covered person" from engaging in a deceptive act
or practice in connection with the offering of a consumer financial product or
service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). A "consumer financial product or
service" includes "providing financial advisory services" to "assist a consumer
with debt management or debt settlement, modifying the terms of any extension
of credit, or avoiding foreclosure." 12 U.S.C. § 5481(5), (15)(A)(viii). By
offering services to assist consumers with modifying the terms of their student-
loan debts, the SLDR Companies provided a consumer financial product or
service and are therefore covered persons under the CFPA. A "covered person"
includes any entity that "offer[s] or provid[es] a consumer financial product or
service." 12 U.S.C. § 5481(6)(A), (19). In addition, "related person[s]" are
covered persons for all purposes of any provision of Federal consumer financial
law. 12 U.S.C. § 5481(25)(B). "Related person[s]" include officers, directors,
and employees with managerial responsibilities. *Id*. Nesheiwat is a related
person and covered person because he materially participated in the affairs of
the SLDR Companies, and because he was the chief operating officer of the
mortgage lender Monster Loans (itself a covered person because it offered

mortgage loans) and had managerial responsibility for Monster Loans. 12 U.S.C. § 5481(15)(A)(i), (25)(B).

### B.   The SLDR Companies violated the CFPA and TSR.

#### 1.   The SLDR Companies collected advance fees for debt-relief services in violation of the TSR.

The undisputed evidence shows that the SLDR Companies collected advance fees for debt-relief services. Under the TSR, sellers and telemarketers of debt-relief services can request or receive fees only after they have both (1) renegotiated or altered a debt on behalf of a consumer, and (2) the consumer has made at least one payment under the altered terms of their loans. 16 C.F.R. § 310.4(a)(5)(i). As discussed above, the SLDR Companies collected their fees before consumers' loan consolidation and repayment plan applications were approved and before consumers made the first payment under the altered terms of their student loans. *See supra* p. 7. The SLDR Companies also arranged for consumers to be placed in forbearance for 90 days while consumers' applications were being processed. *See supra* p. 7. As in another similar case in this District, "[b]ecause the loans [were] in forbearance at the time Defendants collect[ed] their fee, consumers cannot have made any payments pursuant to the new agreement—a clear violation of the up-front payment rule." *FTC v. All. Document Preparation*, 296 F. Supp. 3d 1197, 1210 (C.D. Cal. 2017).

#### 2.   The SLDR Companies engaged in deceptive acts or practices in violation of the CFPA.

Under the CFPA, an act or practice is "deceptive" if it is likely to mislead consumers acting reasonably under the circumstances and is material. *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016). Courts examine the overall "net impression" that a representation conveys when evaluating whether it is likely to mislead consumers. *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). A representation is likely to mislead consumers when "(1)

such representation was false or (2) the advertiser lacked a reasonable basis for its claims." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) (cleaned up). Express representations are presumed to be material. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. OMICS Grp.*, 302 F. Supp. 3d 1184, 1189 (D. Nev. 2017). Similarly, implied claims designed to induce a purchase are presumed to be material. *See FTC v. Dinamica Financiera LLC*, 2010 WL 9488821, at *8 (C.D. Cal. 2010); *FTC v. Univ. Premium Servs., Inc.*, 2007 WL 9728965, at *2 (C.D. Cal. 2007).

a.   <u>The SLDR Companies engaged in deceptive conduct by promising lower interest rates.</u>

The SLDR Companies violated the CFPA by falsely representing that consumers would receive lower interest rates by consolidating their loans.

The language of the SLDR Companies' direct-mail solicitations is not in dispute; those solicitations, for example, promised that "a lower rate" after consolidation or that consolidation benefits "may include" an "[i]nterest rate reduction." UF ¶¶ 160-61, 163. There is also undisputed evidence, including from consumer declarations and the SLDR Companies' records, that the SLDR Companies expressly represented during sales calls that consumers would receive lower interest rates by consolidating. UF ¶ 164. These representations were likely to—and did—lead reasonable consumers to believe that consolidating would lower their interest rates. UF ¶ 166. But in fact, as a co-defendant testified, consolidating "doesn't lower your interest" rate. UF ¶ 172.

There is also no genuine dispute that the SLDR Companies stated and implied that consumers had to consolidate their loans to be eligible for an interest-rate reduction offered to borrowers who set up automatic payments. But consumers did not need to consolidate (or use any of the SLDR Companies' services) to receive that reduction. *See supra* pp. 8-9.

These representations are presumed to be material because they were

express statements and claims designed to induce consumers to purchase the
SLDR Companies' services. *See Pantron I*, 33 F.3d at 1095-96; *Univ. Premium
Servs.*, 2007 WL 9728965, at *2. Further, while the Bureau need not prove that
any consumers were actually deceived, the existence of deceived consumers is
instructive. *Cyberspace.Com*, 453 F.3d at 1201. Many consumers enrolled
based on the promise of a lower interest rate, later complaining when they
learned the truth. *See* UF ¶¶ 166-67, 178, 309, 315, 318.

> b.   The SLDR Companies engaged in deceptive conduct
> by promising improved credit scores.

The SLDR Defendants violated the CFPA by representing to consumers
that consolidating multiple student loans into one loan would improve their
credit scores. *See supra* pp. 8-9.

These representations were deceptive for two independent reasons. First,
the SLDR Defendants lacked a reasonable basis for making these claims about
improved credit scores. To have a "reasonable basis," an advertiser "must have
had some recognizable substantiation for the representation prior to making it."
*John Beck Amazing Profits*, 865 F. Supp. 2d at 1067 (cleaned up). Defendants
have the burden of showing what substantiation they relied on; if they do so, the
burden shifts to the Bureau to show that the purported substantiation is
inadequate. *Id.*; *see also FTC v. Johnson*, 96 F. Supp. 3d 1110, 1120 (D. Nev.
2015). Here, there is no evidence that the SLDR Defendants or Nesheiwat had
any basis for their credit score claims. UF ¶ 200. When asked about the basis
for the claims at his deposition, Nesheiwat declined to answer on Fifth
Amendment grounds. UF ¶ 299. Further, even if Nesheiwat purported to have
some substantiation for the claims, the expert opinion of Dr. Skanderson
provides undisputed evidence that there is "no basis for a blanket assertion that
consolidating a borrower's federal student loans will have a favorable impact on
the borrower's credit score." UF ¶ 191.

Second, as expert testimony has shown, the representations were likely false for many consumers because "loan consolidation could increase, decrease, or have no material impact on a consumer's credit score depending upon the individual's specific credit situation and history." UF ¶ 192. The experiences of several consumers who enrolled with the SLDR Companies also show that these representations were in fact false in some instances. UF ¶ 199.

The SLDR Defendants' representations that consumers' credit scores would improve are presumed material as express representations. *See Pantron I*, 33 F.3d at 1095-96. There is also undisputed evidence from consumer complaints and declarations that the representations regarding improved credit scores influenced some consumers' decision to enroll. UF ¶ 198.

c. Docu Prep Center engaged in deceptive conduct regarding the identity of consumers' servicers.

Docu Prep Center also violated the CFPA by representing during sales calls that ED would become the consumer's "new servicer" after consolidation. *See supra* pp. 10. But student-loan servicers—not ED itself—service federal student loans after consolidation. These representations were likely to mislead reasonable consumers into believing that ED would become their new servicer, resulting in improved handling of their loans. *See* UF ¶¶ 209-11.  Indeed, one of the defendants characterized this misrepresentation as "ridiculously bad." UF ¶ 212. The representations are presumed to be material because they were express representations and were intended to induce consumers to purchase Docu Prep Center's services. *See Pantron I*, 33 F.3d at 1095-96; *Univ. Premium Servs.*, 2007 WL 9728965, at *2. Consumer complaints about these misrepresentations further demonstrate that they were material. *See* UF ¶¶ 213-14.

3. **The SLDR Companies engaged in deceptive acts or practices in violation of the TSR.**

The SLDR Companies' misrepresentations also violated the TSR's

prohibition on misrepresenting any material aspect of a debt-relief service. 16
C.F.R. § 310.3(a)(2)(x). Their misrepresentations regarding interest rates, credit
scores, and ED becoming the "new servicer" were likely to mislead reasonable
consumers and were material for reasons discussed above. *See supra* pp. 15-17.
Further, the TSR specifically recognizes that representations about "the amount
of money . . . that a consumer may save" and "the effect of the service on a
customer's creditworthiness" are material. 16 C.F.R. § 310.3(a)(2)(x).

###    C.    Nesheiwat is directly liable for violating the TSR and CFPA (Counts II, III, IV, V, VII, VIII, and IX).

The undisputed evidence establishes Nesheiwat's individual liability for
his conduct related to Docu Prep Center's violations of the CFPA and TSR.
Specifically, Nesheiwat is individually liable because "(1) he participated
directly in the deceptive acts or had the authority to control them and (2) he had
knowledge of the misrepresentations, was recklessly indifferent to the truth or
falsity of the misrepresentation, or was aware of a high probability of fraud
along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193
(cleaned up); *see also In re Sanctuary Belize Litig.*, 2019 WL 1934673, at *2
(D. Md. 2019). Under the CFPA and TSR, "[t]he degree to which the individual
participates in business affairs is probative of knowledge." *CFPB v. Mortg. Law
Grp., LLP*, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016); *see also Am. Fin.
Benefits Ctr.*, 324 F. Supp. 3d at 1080.

Nesheiwat participated in and had the authority to control Docu Prep
Center's unlawful practices. He helped create Docu Prep Center, was a part
owner of it, provided instructions to its managers on how to operate the
business, and edited and approved Docu Prep Center's sales scripts and direct
mail solicitations, including scripts and mailers containing the deceptive
representations described above. *See supra* pp. 2-3; UF ¶¶ 263-87.

Nesheiwat's control of Docu Prep Center and extensive participation in

its sales and marketing practices is itself "strong evidence" of his knowledge of Docu Prep Center's unlawful practices. *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999); *see also Gordon*, 819 F.3d at 1193 (affirming summary judgment against individual "who had control over the marketing materials and knowledge of their contents"). In addition, consumers made over 250 complaints about Docu Prep Center, including complaints about the misrepresentations described above and alleging that Docu Prep Center was a scam. *See* UF ¶¶ 213-14, 310, 317, 318. Given his central role at Docu Prep Center, Nesheiwat was or should have been aware of these complaints. *See Affordable Media*, 179 F.3d at 1235 ("The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." (cleaned up)). When asked about consumer complaints, he declined to answer on Fifth Amendment grounds. UF ¶ 301. Further, witnesses who worked closely with Nesheiwat, including the managers of Docu Prep Center, are not aware of any efforts he made to verify the truthfulness of Docu Prep Center's marketing statements. UF ¶¶ 277-78. Nesheiwat also knew or recklessly ignored that Docu Prep Center was charging advance fees in violation of the TSR, as demonstrated by emails he received calling into question the legality of Docu Prep Center's advance fees and showing that Docu Prep Center switched payment processors to avoid complying with the TSR. *See supra* p. 7.

### D.    Nesheiwat substantially assisted the TSR and CFPA violations by the SLDR Companies (Counts VI and X).

Nesheiwat also provided substantial assistance to each of the SLDR Companies in violation of the TSR and CFPA. The CFPA prohibits any person from knowingly or recklessly providing substantial assistance to a covered person engaged in a deceptive act or practice. 12 U.S.C. §§ 5481(19), 5536(a)(3). The TSR prohibits any person from providing substantial assistance

or support to a seller or telemarketer knowing or consciously avoiding knowing that the seller or telemarketer is engaged in the advance fee and deception violations at issue here. 16 C.F.R. §§ 310.2(y), 310.3(b). Demonstrating a substantial assistance violation under the CFPA and TSR requires (1) a primary violation, (2) substantial assistance, and (3) a culpable state of mind. *See CFPB v. D & D Mktg.*, 2016 WL 8849698, at *11–13 (C.D. Cal. 2016); *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1241 (11th Cir. 2017).

As described above, the SLDR Companies committed primary violations by charging advance fees in violation of the TSR and engaging in deceptive acts or practices in violation of the TSR and CFPA. *See supra* pp. 14-18.

Nesheiwat's extensive support for the SLDR Companies—including overseeing their direct-mail marketing and providing them with Experian's prescreened lists—easily satisfies the standard for "substantial assistance" under the CFPA and TSR. This is "not … a demanding standard" and requires only "that the assistance be more than mere casual or incidental dealing" with the primary violator. *D & D Mktg.*, 2016 WL 8849698, at *12 (cleaned up). Nesheiwat's support was crucial to the SLDR Companies, which relied on direct mail to attract customers. *See FTC v. Chapman*, 714 F.3d 1211, 1217 (10th Cir. 2013) (defendant who "played an integral part in the . . . scheme" provided substantial assistance under TSR); *see also FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1115 (D. Kan. 2011) (quoting FTC guidance that "providing sellers or telemarketers with mailing lists" can provide basis for TSR substantial assistance claim).

Nesheiwat also knew about the SLDR Companies' violations, or at least recklessly and consciously avoided knowing about them. He knew about Docu Prep Center's unlawful practices, *see supra* p. 7, and the four later SLDR Companies were "cookie-cutter" copies of Docu Prep Center, with the same marketing, services, fees, and business model, and with many employees who

started at Docu Prep Center.  UF ¶¶ 46-62, 71-74. Nesheiwat was familiar with the businesses as a limited partner. UF ¶¶ 265, 289.  He oversaw all the SDLR Companies' direct-mail marketing, and the four later companies' deceptive direct mail solicitations were based on Docu Prep Center's template, which Nesheiwat edited and approved. *See supra* p. 3. Nesheiwat also knew, or consciously avoided knowing, that the four "cookie-cutter" businesses were charging the same unlawful advance fees as Docu Prep Center. *See supra* p. 7.

### E.   Nesheiwat's violations of FCRA and the TSR are violations of the CFPA (Count XI).

Nesheiwat's violations of the TSR and FCRA are also violations of the CFPA, which provides that it is unlawful for covered persons to violate a Federal consumer financial law, including FCRA and the TSR. *See* 12 U.S.C. § 5536(a)(1)(A); *see also* 12 U.S.C. § 5481(12)(F), (14); 15 U.S.C. § 6105(d). In addition, his violations of FCRA are deemed to be violations of the CFPA, *see* 15 U.S.C. § 1681s(d), and his violations of the TSR are treated as a violation of a rule under the CFPA, *see* 15 U.S.C. § 6102(c).

### III.   An adverse inference against Nesheiwat is warranted.

Courts may draw adverse inferences against parties who assert their Fifth Amendment privilege against self-incrimination where there is a substantial need for the information, there is not another less burdensome way of obtaining the information, and there is independent evidence of the fact about which the party refuses to testify. *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 912 (9th Cir. 2008). When the court draws an adverse inference, it may shift the burden of proof to the defendant to disprove the fact at issue. *See SEC v. Colello*, 139 F.3d 674, 677–78 (9th Cir. 1998).

Nesheiwat has refused to provide any information or testimony regarding the facts in this case based on his Fifth Amendment privilege. UF ¶¶ 290-302. The Court can and should draw an adverse inference against him and shift the

burden to him "with respect to every question to which [he] asserted his Fifth
Amendment privilege." *CFTC v. Driver*, 877 F. Supp. 2d 968, 976–77 (C.D.
Cal. 2012). An adverse inference is particularly appropriate with respect to
Nesheiwat's knowledge. His invocation of the Fifth Amendment "support[s] the
conclusion that [he] knew exactly what was going on—or at least recklessly
disregarded the reality of the situation." *SEC v. Autocorp Equities, Inc.*, 292 F.
Supp. 2d 1310, 1324 (D. Utah 2003); *see also SEC v. Strategic Global Invs.,
Inc.*, 262 F. Supp. 3d 1007, 1023 (S.D. Cal. 2017) (drawing adverse inference
and shifting to defendants burden of proving they did not act with scienter).
Here, there is ample independent evidence establishing Nesheiwat's liability.
But to the extent that he suggests that evidence is insufficient, an adverse
inference is appropriate because the Bureau "has no other, less burdensome
means of obtaining the information than by putting questions" to Nesheiwat.
*See SEC v. Luna*, 2014 WL 794202, at *12 (D. Nev. 2014).

## IV. The Court should grant injunctive relief, restitution, and a civil money penalty.

### A. Injunctive Relief

The Court should impose injunctive relief that would protect the public
against future harm by Nesheiwat, as detailed in the proposed judgment filed
with this motion. Appropriate relief here includes permanently banning
Nesheiwat from (1) participating in the debt-relief and mortgage industries and
telemarketing consumer-financial products or services; (2) using or obtaining
prescreened lists and using or obtaining consumer reports for any business
purpose; and (3) using or disclosing the information obtained about consumers
through the illegal conduct.

Such relief is justified here because there is "some reasonable likelihood
of future violations." *CFTC v. Co Petro Mktg. Grp., Inc*., 502 F. Supp. 806, 818
(C.D. Cal. 1980) (cleaned up). Nesheiwat lied to Experian to conceal Monster

Loans' FCRA violations, oversaw Docu Prep Center's operations at the time it switched payment processors to avoid complying with the TSR, coordinated the SLDR Companies' deceptive marketing campaign, and has refused to testify about his current business activities on Fifth Amendment grounds. UF ¶ 303. "[W]here the illegal conduct is elaborate and wide-ranging—as here— regulatory agencies may seek injunctive relief, 'which extends beyond the immediate facts' of the case, using 'fencing in' provisions 'to prevent similar and related violations from occurring in the future.'" ECF No. 177 at 9 (quoting *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir. 1979)). Courts have approved industry bans such as those sought here as proper injunctive relief considering a defendant's repeated violations of laws. *See, e.g., FTC v. Gill*, 265 F.3d 944, 957–58 (9th Cir. 2001) (upholding ban on participation in credit repair business).

## B. Restitution

The CFPA authorizes the Court to order monetary relief that would go to harmed consumers, including damages, refund of moneys, and restitution. 12 U.S.C. § 5565(a)(2). "Restitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits.'" *Gordon*, 819 F.3d at 1195. Importantly, appropriate restitution includes the entire amount consumers paid, regardless of whether some consumers were satisfied with or benefited from the goods or services. *See id*. at 1195–96. Where individual liability is established, an individual may be held jointly and severally liable for full amount of the harm caused by a corporation. *Id.* at 1196. Additionally, a person who substantially assists a violation of the CFPA or TSR may be held jointly and severally liable for the violation. *See* 12 U.S.C. § 5536(a)(3); *WV Universal Mgmt.*, 877 F.3d at 1240.

The Bureau's supporting evidence establishes that between 2015 and 2018 the SLDR Companies collectively charged consumers $19,699,870 in

total fees, less fees that were refunded to consumers. UF ¶ 261. Those fees were the result of the businesses' deceptive practices, and at least $18 million of those fees were also unlawful advance fees. *See supra* p. 7. Because of his CFPA and TSR violations, which continued until the SLDR Companies shut down, Nesheiwat is jointly and severally liable (along with the SLDR Companies) for the full amount of fees charged by the SLDR Companies.[2]

## C.    Civil Penalty

The CFPA mandates the imposition of a civil money penalty against any person who violates Federal consumer financial law. 12 U.S.C. § 5565(c)(1). Nesheiwat violated numerous laws, and his conduct contributed to almost $20 million in losses to over 23,000 consumers and invaded the privacy of millions.

There are three tiers of penalties, based on the degree of scienter. Nesheiwat's violations were at least reckless, making second-tier penalties appropriate: he falsely certified to Experian that Monster Loans would use prescreened lists to market mortgages, and knew or recklessly ignored that the SLDR Companies were charging unlawful advance fees and making deceptive statements in their direct-mail solicitations and sales calls. The CFPA authorizes penalties of up to $25,000 per day for reckless violations that occurred before November 2, 2015 and up to $29,764 per day for reckless violations that occurred thereafter. 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1.[3]

Although his violations went on for a longer period, Nesheiwat

---

[2] The Bureau is not seeking a double recovery and will not seek to recover from Nesheiwat any amounts that the Bureau receives or has received towards redress through other judgments.

[3] Although the statute provides for a penalty of up to these amounts for each separate violation, ECF No. 176, the Bureau calculated the maximum penalties on a per-day basis, consistent with the Court's recent order, ECF No. 177 at 10-11. Where a violation occurred before and after November 2, 2015, the Bureau used the lower amount of $25,000 for simplicity.

committed violations between at least early 2015 and April 2017 while working at Monster Loans. In that period, he violated FCRA for at least 455 days (between January 11, 2016 and April 11, 2017, *see* UF ¶ 130), yielding a maximum penalty of $13,542,620 million. With respect to Docu Prep Center, he violated the TSR's advance-fee provision and committed the three types of deceptive practices described above for at least 679 days (between June 3, 2015 and April 17, 2017, *see* UF ¶ 23), yielding a maximum penalty of $17,100,000 for each of the four types of violations. He also violated the CFPA and TSR by substantially assisting the SLDR Companies' advance-fee violations and their multiple deceptive acts or practices, for at least 679 days (again, between June 3, 2015 and April 17, 2017). For simplicity, the Bureau has calculated Nesheiwat's substantial-assistance violations as two types of violations (i.e., assisting unlawful advance fees and assisting deception), yielding a maximum penalty of $17,100,000 for each category of violations. Thus, the undisputed evidence supports an overall maximum penalty exceeding $115 million.

While the CFPA requires the Court to consider mitigating factors in determining the penalty, *see* 12 U.S.C. § 5565(c)(3), the Bureau has identified no evidence supporting substantial mitigation. While it is likely that the first factor, size of his financial resources, may support mitigation, Nesheiwat refused to answer questions on that factor so the Bureau cannot make a recommendation on the appropriate amount of mitigation. If Nesheiwat contends there is other evidence in the record supporting mitigation, the Court can consider that evidence to ensure "the appropriateness of the penalty." 12 U.S.C. § 5565(c)(3).

## CONCLUSION

For the foregoing reasons, the Court should grant the Bureau's motion for summary judgment and enter the attached proposed judgment.

1

Dated May 14, 2021

Respectfully Submitted,

2

/s/ Colin Reardon
Leanne E. Hartmann

3

Colin Reardon (*pro hac vice*)
E. Vanessa Assae-Bille (*pro hac vice*)

4

Bureau of Consumer Financial Protection
1700 G Street, NW

5

Washington, D.C. 20552

6

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28