# **Summary Judgment Ex. 1**

# DECLARATION OF ROBERT B. HOOSE

I, Robert B. Hoose, pursuant to 28 U.S.C. § 1746, hereby declare the following:

1.    My name is Robert B. Hoose.  I live in Irvine, California.  The following facts are known to me personally and if called as a witness I could and would competently testify to them.

## Student Loan Debt Relief Companies

2.    On February 3, 2015, I incorporated Docu Prep Center, Inc. in California.  I owned fifty percent (50%) of Docu Prep Center, Inc. and served as its chief operating officer.  David Sklar ("Sklar") owned the other fifty percent (50%) of Docu Prep Center, Inc. and served as its chief executive officer.

3.    On October 19, 2015, I incorporated Document Preparation Services, LP, in California.  Docu Prep Center, Inc. was the general partner of Document Preparation Services, LP.  After Document Preparation Services, LP was incorporated, Document Preparation Services, LP and Docu Prep Center, Inc. functioned as a single business, with the profits generated by the business going to its limited partners.  In this Declaration, "Docu Prep Center" refers to the two entities collectively.

4.    Docu Prep Center initially conducted business using the name DocuPrep Center.  On or about March 31, 2016, I registered the fictitious business name Certified Document Center on behalf of Document Preparation Services, LP.  Thereafter, Docu Prep Center conducted business using the name Certified Document Center.

5.    Docu Prep Center marketed and sold services to assist consumers with consolidating their federal student loans and with enrolling in federal loan

CFPB-JN-0109487

repayment and forgiveness programs offered by the U.S. Department of Education.

6.     I was actively involved in the day to day management of Docu Prep Center from early 2015 until late 2015 to early 2016. I remained involved in managing the company to a degree in 2016, and then ceased being a manager for the company in around March 2017.

7.     In addition to managing Docu Prep Center, I held limited partnership interests in four associated businesses that offered the same type of services to consumers with student loans: Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services.

8.     In this Declaration, the term "Student Loan Debt Relief Companies" refers collectively to Docu Prep Center, Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services.

9.     Those involved with the Student Loan Debt Relief Companies sometimes referred to them informally as the "student loan shops" or the "student debt businesses."

10.     Those involved in the businesses also sometimes referred to specific businesses by their initials. "DCP" and "CDC" referred to Docu Prep Center and its d/b/a Certified Document Center. "CDP" referred to Certified Doc Prep Services, "ADS" referred to Assure Direct Services, "DDS" referred to Direct Document Solutions, and "SPS" referred to "Secure Preparation Services."

### Beginning of Docu Prep Center

11.     I first met Jawad Nesheiwat ("Nesheiwat") and Sean Cowell ("Cowell") in or around 2008 while working as a sales associate for a credit card debt-settlement company called Freedom Debt Center, which Nesheiwat

CFPB-JN-0109488

and Cowell owned and operated.  Freedom Debt Center was located at a property owned by Thomas Chou ("Chou") at 3 Whatney in Irvine, California.

12.     After leaving Freedom Debt Center in 2009, I remained in touch with Nesheiwat.

13.     In 2014, I was working in sales at a debt-settlement company in Dallas, Texas, and was interested in becoming an owner of a business.  I contacted Nesheiwat, and Nesheiwat invited me to move back to California to become involved in a new business aimed at consumers with student loans that Nesheiwat was starting with Cowell and Chou.

14.     In early 2015, I moved back to California and joined that business, which became Docu Prep Center.

15.     Docu Prep Center was located on the first floor of Chou's property at 3 Whatney in Irvine, California.  On the second floor of 3 Whatney was a mortgage company called Chou Team Realty, Inc., which did business as "Monster Loans."  My understanding when I started was that Chou, Nesheiwat, and Cowell were all involved in running Monster Loans, and that Nesheiwat ran its marketing and sales efforts.

16.     Shortly after I joined Docu Prep Center, in January or February 2015, Nesheiwat informed me that he, Cowell, and Chou had agreed that I would co-manage Docu Prep Center with David Sklar.

17.     Sklar and I began managing Docu Prep Center together in February 2015.

18.     Sklar and I managed Docu Prep Center based on instructions we received from Nesheiwat and Cowell in February 2015 regarding how the business should operate.

19.     In conversations in February 2015, Nesheiwat and Cowell explained to Sklar and me that Docu Prep Center would become an "affiliate"

CFPB-JN-0109489

of a company called Student Loan Processing Center ("SLPC").  It was my understanding that SLPC had an existing business, which involved partnering with "affiliate" companies that marketed and sold services to consumers with federal student loans using direct mail and telemarketing sales calls.  Under this structure, once the affiliate company completed a sale, SLPC would provide the actual services, which involved assisting consumers with consolidating their loans, enrolling in repayment plans, and obtaining loan forgiveness.

20.     Nesheiwat and Cowell directed Sklar and me to help them launch Docu Prep Center as a new affiliate to SLPC.  Nesheiwat and Cowell further instructed Sklar and me to work with SLPC and to use various materials provided by SLPC, including a template for direct mail marketing and a script for telemarketing sales.  Sklar and I followed these instructions as we began staffing and operating Docu Prep Center.  As part of that process, we adapted the direct mail templates and telemarketing sales scripts provided by SLPC for Docu Prep Center's own use with guidance from Nesheiwat.

21.     When Sklar and I began managing Docu Prep Center together, Sklar had the title of chief executive officer and I had the title of chief operating officer.  Sklar was generally responsible for monitoring Docu Prep Center's sales floor.  I was generally responsible for training new employees, which involved significant ongoing work because the company had high turnover.  We each covered the other's responsibilities when needed, so that at times Sklar handled training and at times I monitored the sales floor.  We were also both involved in other aspects of managing the business, such as hiring, firing, and disciplining employees.

22.     During 2015, Nesheiwat participated extensively in the management and operation of Docu Prep Center, and had authority over Sklar and me.  For instance, Nesheiwat often gave us directions regarding how to

CFPB-JN-0109490

market and sell the company's services, which Sklar and I followed.  Nesheiwat was also very involved in the company's direct mail marketing, as further described below.

23.    SLPC stopped operating in around October or November 2015. Eduardo Martinez ("Martinez") was an employee of SLPC until it closed. When SLPC shut down, Martinez became the manager of a new company, Docs Done Right, which served the same "back-end" function that SLPC had up until that time performed for Docu Prep Center.  Martinez was Docs Done Right's manager and oversaw its operations.  Docs Done Right was initially located at 3 Whatney in Irvine, where Docu Prep Center and Monster Loans were also located.

24.    Docs Done Right was composed of both a corporation (Docs Done Right, Inc.) and an associated limited partnership (Docs Done Right, LP) that functioned as a single business.  Docs Done Right's limited partners included Martinez, Chou, Nesheiwat, Cowell, Sklar, Lawson, and myself.

25.    When SLPC stopped operating in late 2015, Docu Prep Center transitioned to working with Docs Done Right.

26.    Docu Prep Center, Inc. and Document Preparation Services, LP maintained bank accounts at Wells Fargo.  I was a signatory on both entities' bank accounts.  Sklar was also a signatory on both entities' bank accounts.

### Docu Prep Center's Direct Mail Marketing Process

27.    Docu Prep Center primarily marketed its services to consumers with student loans through direct mail.

28.    The company began sending direct mail in around April 2015 using a mailing house called Automated Mailers.  At the time, Nesheiwat had an existing arrangement with Automated Mailers to send direct mail for Monster Loans.  Nesheiwat arranged for Docu Prep Center to use Automated

5

CFPB-JN-0109491

Mailers for its mailings, and Nesheiwat oversaw Docu Prep Center's relationship with Automated Mailers.  Nesheiwat sometimes emailed with Automated Mailers regarding Docu Prep Center's orders, and for most of 2015 through 2017 Nesheiwat generally wanted to be copied on communications with Automated Mailers so that he could monitor the mailings.  Nesheiwat had an ongoing relationship with the owner of Automated Mailers, who at times allowed Nesheiwat to run up large balances on his mailings.

29.   In April 2015 and at times thereafter in 2015 and 2016, I communicated with Automated Mailers regarding Docu Prep Center's orders for direct mail.

30.   The process for Docu Prep Center's orders for direct mail generally worked as follows:  Docu Prep Center would email spreadsheets containing consumer names, addresses, and student loan balances to Automated Mailers for use in the mailings.  (The source of the information on these spreadsheets is discussed further below.)  Docu Prep Center would place orders for a certain number of pieces of mail to send using that consumer data. Automated Mailers kept a copy of Docu Prep Center's direct mail template on file.  Using that template, Automated Mailers would create and email PDF "proofs" of the mailing to Docu Prep Center for review and approval.  The proofs were examples of the mailers that would be sent to consumers, and were populated with the real names, addresses, and student loan balances of consumers.  The proofs were identical aside from information unique to the specific recipient (i.e., the recipient's name, address, student loan balance, and a "benefit ID" number the recipient was assigned for tracking purposes).  Upon approval from Docu Prep Center, Automated Mailers would then print and send the mailing, which would usually be scheduled to arrive in consumers' homes

CFPB-JN-0109492

the following week.  Thereafter, Automated Mailers would send an invoice for the mailing.

31.     Belal Abdelfattah, who is also known as "Bill Abdel" ("Abdel") frequently communicated with Automated Mailers regarding Docu Prep Center's orders during 2015 and 2016.  Abdel was a marketing manager at Monster Loans, where he handled Monster Loans' mailing orders through Automated Mailers and reported directly to Nesheiwat.  Abdel was also a marketing manager at Docu Prep Center.  My understanding is that Nesheiwat directed Abdel to assist Docu Prep Center with its mailings.  Abdel was generally the person responsible for sending spreadsheets with consumer names, addresses, and student loan balances to Automated Mailers on behalf of Docu Prep Center.  Abdel also at times placed orders for mailings on behalf of Docu Prep Center and approved Docu Prep Center's proofs.

32.     Attached as Exhibit 1 is a true and correct copy of an April 2015 email exchange that I had with an Automated Mailers employee named Alex Klarow ("Klarow") regarding a mailing order, along with proofs that Klarow attached so that I could approve them.  I used my Docu Prep Center email address, rhoose@docuprepcenter.com, in the email exchange.  The email exchange reflects an order for 15,186 mailings that were expected to arrive in consumers' mailboxes the week of April 13, 2015.  The proofs in Exhibit 1 are representative of the mailers that Docu Prep Center sent when it began sending direct mail in April 2015.  (The proofs in Exhibit 1 have been redacted to omit consumer names and addresses.)

33.     Attached as Exhibit 2 is a true and correct copy of a February 2016 email from Klarow to me and attaching proofs for my approval.  Nesheiwat, Abdel, and two Automated Mailers employees are also copied on the email.  The email concerns a February 2016 order for a total of 49,878 mailings to

CFPB-JN-0109493

consumers in six states.  The proofs in Exhibit 2 are representative of the direct mailers that Docu Prep Center sent in late 2015 and during 2016.  (The proofs in Exhibit 2 have been redacted to omit consumer names and addresses.)  Attached as Exhibit 3 is a true and correct copy of my response approving the proofs.

34.   As demonstrated in Exhibits 1 and 2, Docu Prep Center made certain changes to the format and content of its direct mail template during 2015 and 2016.  The purpose of those changes was generally to try to increase the response rate to the direct mailers.

35.   Although there were some changes to Docu Prep Center's direct mail template over time, many statements in the mailings remained the same.  The statements made in Exhibits 1 and 2 were typical of Docu Prep Center's representations in its direct mail during 2015 and 2016.

36.   Nesheiwat was in charge of making the phones ring (i.e., ensuring that Docu Prep Center's mailings caused consumers to call in about its services) and presented himself as an expert in marketing through direct mail.  Nesheiwat made edits to Docu Prep Center's direct mail template.  In addition, any edits to Docu Prep Center's direct mail template had to be approved by Nesheiwat, including proposed edits that Sklar, Abdel, or I wanted to make.

37.   After a mailing was complete, Automated Mailers would send an invoice by email.  The cover email for Automated Mailers' invoices would typically list the running balance for multiple recent mailings and the associated invoice numbers.  During 2015 and 2016, Automated Mailers' invoices generally went to some combination of Nesheiwat, Sklar, Abdel, and me.  Mohamed Hegazi, a bookkeeper who worked for both Monster Loans and the Student Loan Debt Relief Companies, was also often copied on the emails containing Automated Mailers' invoices.

CFPB-JN-0109494

38.     Attached as Exhibit 4 are true and correct copies of three cover emails and attached invoices from Automated Mailers to Docu Prep Center for mailings Automated Mailers performed for Docu Prep Center during 2015 and 2016.  The cover emails and invoices in Exhibit 4 are representative of the cover emails and invoices that Automated Mailers would send Docu Prep Center for its services.

39.     Hegazi typically paid the invoices from Automated Mailers.  My understanding is that Hegazi made those payments at Nesheiwat's direction. For example, attached as Exhibit 5 is a true and correct copy of an email string from September 2016 in which Nesheiwat instructs Hegazi to pay Docu Prep Center's outstanding invoices with Automated Mailers, and Hegazi agrees to do so.  I recognize mhegazi@eliteaccounting.com as Hegazi's email address in Exhibit 5.

### Docu Prep Center's Use of Prescreened Lists

40.     As described above, Docu Prep Center sent spreadsheets to Automated Mailers containing consumers' names, addresses, and student loan balances when it placed orders for direct mail.  Sometimes, Docu Prep Center also directed Automated Mailers to re-use that same consumer information for a new mailing order, which was known as "recycling."

41.     In early 2016, I became aware that Monster Loans was using its account with the credit bureau Experian to obtain the consumers names, addresses, and student loan balances that Docu Prep Center was using to market Docu Prep Center's services.  The Experian spreadsheets containing consumer names, addresses, and student loan balances that Monster Loans purchased are generally known as "prescreened lists." Those involved with Monster Loans, Docu Prep Center, and the other Student Loan Debt Relief Companies,

CFPB-JN-0109495

including Nesheiwat and Sklar, often referred to the prescreened lists as "student loan data" or "Experian data" or just "data."

42.     My understanding is that Nesheiwat controlled the account with Experian and directed the efforts to obtain Experian prescreened lists for use by Docu Prep Center and the other Student Loan Debt Relief Companies in marketing their services.

43.     During most of 2016, Nesheiwat directed Abdel, who was Monster Loans' marketing manager, to use the Experian account to order prescreened lists for use by Docu Prep Center.  Abdel regularly – sometimes several times a month – ordered prescreened lists using criteria tailored to identify consumers with student loans, who were the consumers to whom Docu Prep Center wanted to market its services.  Abdel placed the orders for the prescreened lists through an Experian software program called iScreen.  After Abdel received the prescreened lists, Abdel emailed the prescreened lists to Automated Mailers so that Automated Mailers could populate the name, address, and student loan balance information from those spreadsheets into Docu Prep Center's direct mail templates and send direct mail marketing Docu Prep Center's services.

44.     Attached as Exhibit 6 is a true and correct copy of a February 2016 email string.  In the initial email in the string, which was from Abdel to Automated Mailers, Abdel asks Automated Mailers to send Docu Prep Center's mailers to the consumers listed in two attached spreadsheets.  Abdel's email identifies one of the spreadsheets as the "Experian file" and the file name for one of the spreadsheets is "xpn_iScreen_020816_Monster_Feb_8.csv."  My understanding is that "XPN" is a reference to Experian.  In the second email in the string, Abdel forwarded the email and its attachments to Nesheiwat and me. My understanding is that Exhibit 6 represents an example of Docu Prep Center's marketing its services using Experian prescreened lists obtained

CFPB-JN-0109496

through the account with Experian that Nesheiwat controlled.  (The
spreadsheets have been excluded from Exhibit 6.)

45.     Docu Prep Center paid the cost of the prescreened lists that were
ordered from Experian for Docu Prep Center to use to market its services.  The
cost of obtaining the Experian prescreened lists was a recurring expense for
Docu Prep Center.  To reduce that expense and benefit Docu Prep Center,
Nesheiwat negotiated with Experian to obtain lower prices for the lists
purchased through Monster Loans' Experian account.

46.     Attached as Exhibit 7 is a true and correct copy of an email string
from January and February 2016 reflecting some of Nesheiwat's efforts to
negotiate a lower price per consumer on the lists with Experian.  In Exhibit 7, I
recognize Keadrick Washington as having been the Experian sales person that
Nesheiwat dealt with.

47.     Sklar participated in Docu Prep Center's efforts to obtain and use
the Experian prescreened lists to send direct mail.  My understanding is that
Sklar also supported Nesheiwat's efforts to negotiate a lower price for the
prescreened lists.  Attached as Exhibit 8 is a true and correct copy of an April 8,
2016 "investor update" email that Sklar sent to Chou, Cowell, and Kenneth
Lawson, copying me.  The email was a general update to Docu Prep Center's
limited partner investors on Docu Prep Center's activities.  In the email, Sklar
reported that "[w]e have ironed out a new deal with Experian as far as our Data
purchasing is concerned.  We have cut the cost per record from .18 cents to .09
cents and have realized that this data is performing with greater response
percentages as well as closing ratios."  My understanding is that Sklar's
reference to "greater response percentages" meant that Docu Prep Center was
receiving more calls from consumers in response to its mailings when Docu
Prep Center sent mailers to consumers whose information was obtained from

CFPB-JN-0109497

the Experian prescreened lists.  The reference to improved "closing ratios" meant that a higher percentage of the calls resulted in sales of Docu Prep Center's services.

48.     In or around September 2016, Nesheiwat and I discovered that Abdel had given to a rival student loan debt relief company some of the consumer data that Docu Prep Center used to send direct mail.  Nesheiwat had "seeded" the consumer data with his and my home addresses, but had given us each fictitious names.  Nesheiwat received the rival company's marketing letters at his home address to the fictitious name, and then discovered that Abdel had a relationship with the owners of that company.  As a result, Nesheiwat fired Abdel from his roles at Monster Loans and Docu Prep Center in around September 2016.  (My understanding is that Abdel later resumed working with the Student Loan Debt Relief Companies, after Nesheiwat and I ceased being actively involved with the businesses associated with Monster Loans and Tom Chou in March 2017.)

49.     After Abdel was fired, Max Chou (no relation to Thomas Chou) took over Abdel's role as the primary person who ordered prescreened lists for Docu Prep Center and the other Student Loan Debt Relief Companies through Monster Loans' Experian account.  My understanding is that Max Chou was not an employee of Monster Loans, but instead worked for associated debt-relief companies that Nesheiwat, Thomas Chou, Cowell, and I were investors in.  Like Abdel, Max Chou ordered prescreened lists at Nesheiwat's direction and under Nesheiwat's supervision.

50.     Attached as Exhibit 9 is a true and correct copy of an email string from December 2016 with the subject line "Student Loan Data."  In the initial email, Sklar asked a Monster Loans employee named Ritesh Singhania to tell him who was "ordering the data from Experian for the Student Loan shops" at

CFPB-JN-0109498

that time.  Singhania responded that "Max" (which I understand to be a reference to Max Chou) had taken that role over.  Nesheiwat and I were both copied on the email string, as was Erin Mason.  Mason was a Monster Loans employee and also was a manager of Certified Doc Prep Services.  My understanding is that the email's discussion of "Student Loan Data" referred to Experian prescreened reports, and that the email's reference to "Student Loan shops" meant Docu Prep Center, Certified Docu Prep Services, and Assure Direct Services, which were the three Student Loan Debt Relief Companies operating at that time.

51.     Hegazi, the bookkeeper who worked for both Monster Loans and the Student Loan Debt Relief Companies, paid the Experian invoices relating to Monster Loan's orders of prescreened lists for use by Docu Prep Center to market its services.  Hegazi paid those Experian invoices using a Chase credit card that Hegazi controlled, which Docu Prep Center reimbursed at-cost for its share of the Experian prescreened lists.  My understanding is Nesheiwat was aware of and approved this arrangement.

52.     Attached as Exhibit 10 is a true and correct copy of six checks written in 2016 from the bank accounts for Docu Prep Center and Document Preparation Services, LP.  Each check is made out to a Chase credit card and contains a reference to "Experian" in the memo line.  I recognize my signature on three of the checks and Sklar's signature on the other three.  My understanding is that the checks reflect payments to Hegazi's Chase credit card for the cost of the prescreened lists that Monster Loans obtained and that Docu Prep Center used to market its services.

53.     In 2016, Monster Loans received complaints from consumers whose information was in the prescreened lists that Monster Loans ordered for Docu Prep Center and the other Student Loan Debt Relief Companies.  My

13

understanding is that those consumers complained after seeing on their Experian credit reports that Monster Loans had made a soft pull of their credit information.  Attached as Exhibit 11 is a true and correct copy of an email string from October 2016 that discusses those complaints.  In Exhibit 11, I recognize rhoose@consumerda.com as an email address that I used at that time.

### Docu Prep Center's Telemarketing Sales Process

54.     When consumers called Docu Prep Center in response to Docu Prep Center's mailers, consumers spoke to Docu Prep Center's sales representatives, who were generally referred to as "Student Loan Advisors." Docu Prep Center's sales representatives would work from a script, which Sklar and I required them to follow.

55.     Throughout my time working with Docu Prep Center, the sales calls were typically structured as follows:  When a consumer called in response to having received a Docu Prep Center direct mailer, a Docu Prep Center sales representative would ask some introductory questions.  The sales representative would then offer to determine whether the consumer qualified for a consolidation of their federal student loans and to determine whether the consumer was eligible for payment plans or other benefits offered by the U.S. Department of Education.  If the consumer hadn't already done so, the sales representative would also guide the consumer through the process of creating a Federal Student Aid ID ("FSA-ID") using a Department of Education website. The sales representative would then direct the consumer to download information regarding their loans using their FSA-ID and to provide that information to Docu Prep Center through a customer portal.  After reviewing that information with the consumer, the sales representative would ask a series of questions regarding the consumers' income, expenses, marital status, and family size, and then use a software program to try to identify a Department of

CFPB-JN-0109500

Education program for which the consumer would be eligible (e.g., a loan consolidation, income-based repayment program, or loan forgiveness program). The sales representative would then attempt to "sell the program" to the consumer by advising the consumer about the Department of Education program's various benefits. The sales representative would also place the consumer on hold while "an underwriter" reviewed the consumer's file for "final approval." But in reality, there were no underwriters on staff, and the sales representative always came back after the hold to say that the file was approved. Under the sales process that Sklar and I directed sales associates to follow, the sales representative was only allowed to explain Docu Prep Center's fees and the process for payment at the end of the sale. If the consumer agreed to sign up, then the sales representative would complete the sale by sending the consumer several forms, including a contract, for electronic signature. Some of the specific statements made during these sales calls are discussed further below.

56.     During the first several months of Docu Prep Center's operations in 2015, a single sales representative would handle the entire process of a sale from the initial questions through enrollment. Beginning in around July 2015, sometimes one sales representative (known as the "Opener") would gather all the information from the consumer regarding their federal student loans and finances, and would then transition the call to another sales representative (known as a "Closer") to complete the sale of Docu Prep Center's services.

57.     After a consumer signed a contract, Docu Prep Center's sales representative would transition the consumer's account to SLPC (during most of 2015) or to Docs Done Right (after SLPC closed in late 2015) to provide the services that Docu Prep Center had just sold. The Docu Prep Center sales representatives referred to SLPC and Docs Done Right as the "processing

CFPB-JN-0109501

department" or "compliance department," rather than by their company names. Both companies then referred to themselves as Docu Prep Center in emails and calls with the consumer.

58. After taking over the consumer's account, SLPC and Docs Done Right would email the consumer a package of documents, which generally included the Department of Education forms (1) to apply for a temporary deferment or forbearance, (2) to apply for a consolidation application, and (3) to request a particular payment program (e.g., income-driven repayment). The email would also include instructions on signing and returning those forms, and would also include a payment schedule.

59. As part of this process, and consistent with the terms of Docu Prep Center's sale, SLPC and Docs Done Right typically assisted the consumer with putting their student loans into forbearance. Docu Prep Center typically arranged for the consumer to remain in forbearance for a period of 60 to 90 days. The consumer would begin repayment under the new payment program for which they had signed up only after their consolidation and repayment plan applications had been approved and their forbearance period had ended.

### Docu Prep Center's Statements in Telemarketing Sales Calls

60. Docu Prep Center's initial sales scripts were based on scripts the business received from SLPC when Docu Prep Center started operating in February 2015. Nesheiwat and Cowell directed Sklar and me to adapt and use those scripts on Docu Prep Center's sales floor.

61. As the managers of Docu Prep Center, Sklar and I trained the sales representatives to follow Docu Prep Center's sales scripts during sales calls with consumers.

62. The sales calls were all recorded. Initially, Sklar and I would review these recordings and use the recordings as tools to coach sales

CFPB-JN-0109502

representatives who struggled to close sales or who deviated from the scripts. Later, other Docu Prep Center managers who reported to us would review the recordings.

63.     As a result of having trained hundreds of sales representatives at Docu Prep Center, I am deeply familiar with the sales scripts and training materials that were used to sell Docu Prep Center's services in 2015. Although there were edits to the sales script over time, many of the statements in the scripts remained consistent throughout 2015. I am less familiar with the edits made to the scripts after early 2016, because I became less involved in Docu Prep Center's daily operations around that time.

64.     Attached as Exhibit 12 is a true and correct copy of an email string and an attached sales script that SLPC's employee Manny Kashto sent to me in February 2015 before Docu Prep Center had begun training its sales staff.

65.     Attached as Exhibit 13 is a true and correct copy of an email and an updated sales script that Kashto sent to me in May 2015. I forwarded the email and script to Sklar, Nesheiwat, and Cowell on May 28, 2015. I recognize this script as one that Docu Prep Center used beginning in May 2015.

66.     Attached as Exhibit 14 is a true and correct copy of a September 2015 email and an attached Docu Prep Center sales script. I recognize nearly all of the language in the sales script as language that sales representatives used during calls with consumers in 2015. The only difference between Exhibit 14 and the sales scripts that I remember from 2015 is at the bottom of page 18 of the sales script, which contains a paragraph criticizing consumers' student loan servicers. (The paragraph begins "Through this consolidation process….") My understanding of that language is that it was added to the script by a mid-level manager of Docu Prep Center.

CFPB-JN-0109503

67.     As demonstrated by Exhibits 12, 13, and 14, Docu Prep Center's sales scripts consistently instructed sales representatives to tell consumers that consolidating their loans would improve their credit scores.

68.     Based on my knowledge of Docu Prep Center's sales scripts and review of sales calls in 2015, Docu Prep Center sales representatives told consumers in numerous sales calls that consolidating the consumer's loans would improve the consumer's credit scores.

69.     To my knowledge, those involved with Docu Prep Center, including Nesheiwat, Cowell, Sklar, and myself, never attempted to determine whether Docu Prep Center's statements regarding loan consolidation improving consumers' credit scores were true.  I am also not aware of any efforts by SLPC to verify the truth of that statement before or after it provided the sales scripts that formed the model for Docu Prep Center's scripts.

**Docu Prep Center's Fees**

70.     Docu Prep Center's fees for its services increased between 2015 and 2017, beginning at around $599 or $699, and eventually increasing to $799 or $899.

71.     Docu Prep Center gave consumers the option to pay Docu Prep Center's fees for Docu Prep Center's debt relief services by paying the full fee in a single payment or to split the fee through a payment plan.  Some consumers paid the full fee in a single payment, but most paid through a payment plan. The consumers who made a single payment generally made that payment within 10 days of the sale.  Consumers who split their payments were generally required to make an initial payment within 10 days and to complete all payments within 45 days of the sale.

72.     Because it generally took 60 or 90 days for consumers' applications for consolidations and loan repayment plans to be approved, and

CFPB-JN-0109504

because Docu Prep Center arranged for consumers to apply for forbearance for a period of 60 to 90 days, Docu Prep Center received its fees before consumers made a loan payment under any new payment plan for the consumers' student loans.

73.     Docu Prep Center also gave consumers the option to pay Docu Prep Center's fees for Docu Prep Center's debt relief services from a checking account ("ACH") or using a credit card.  The backend companies – SLPC and later Docs Done Right – had relationships with payments processors and coordinated the collection of ACH payments.  My understanding is that during 2015, the payment processors Trans2Pay, LLC and then Reliant Account Management ("RAM") processed ACH payments for Docu Prep Center's consumers.  After Docs Done Right was created in late 2015, Docu Prep Center used the company Debt Pay Gateway, Inc. to process ACH payments.

74.     Attached as Exhibit 15 is a true and correct copy of an email I sent to Nesheiwat and Cowell on April 22, 2015, which forwarded an email I received from Trans2Pay with the subject line "Important Notice from Trans2pay, LLC."

75.     In the spring of 2015, Docu Prep Center provided information about itself to the Better Business Bureau ("BBB") in an effort to bolster Docu Prep Center's reputation and appear more legitimate.

76.     Attached as Exhibit 16 is a true and correct copy of a document titled "BBB's Student Loan Assistance Services Industry Checklist," which I signed on March 20, 2015.  Attached as Exhibit 17 is a true and correct copy of a document titled "BBB's Student Loan Assistance Services Industry Checklist," dated on April 6, 2015.  Sklar's name appears on the document and I recognize his signature on the document.

CFPB-JN-0109505

77.    In Exhibits 16 and 17, Sklar and I each certified to the BBB that Docu Prep Center was in compliance with the TSR, including the "provision banning advance fees." We also each certified that the company made "no misrepresentations regarding any material aspect of the student loan assistance service."

78.    Attached as Exhibit 18 is a true and correct copy of an email string from May 2016. The last email in the string is from my Yahoo email address. The initial email in the string is by Kjell Petridis, who worked for a company called L3 Payments, which at the time was assisting Docu Prep Center with Docu Prep Center's efforts to obtain a merchant account to process credit card payments from consumers. Mike Van Loon forwarded Petridis' email to Sklar, Cowell, and me. My understanding is that at the time Van Loon was working with Docu Prep Center as a representative of the company's limited partners investors.

### Docu Prep Center's Limited Partners and Profits

79.    The profits that Docu Prep Center made were distributed to its limited partners through Document Preparation Services, LP. When Docu Prep Center became profitable in 2016, Docu Prep Center began distributing profits to the limited partners about once a month.

80.    The limited partners of Docu Prep Center at the time Docu Prep Center was incorporated in early 2015 were Chou, Nesheiwat, Cowell, Lawson, Sklar, Tuan Anh "Kevin" Nguyen and me.

81.    At Chou's instruction, Sklar and I sent monthly "investor update" emails to the limited partners, including Lawson, like the one in Exhibit 8. The emails were intended to keep the limited partners aware of significant developments regarding Docu Prep Center's operations and financial performance.

CFPB-JN-0109506

82.  Attached at Exhibit 19 is a true and correct copy of an investor update email from Sklar to the limited partners sent on May 18, 2015 and a response from Chou the same day.

83.  My understanding is that Lawson often invested in businesses operated by Chou, Nesheiwat, and Cowell.

84.  Lawson invested in Docu Prep Center through a company he controlled called XO Media, LLC.

85.  I am not aware of Lawson or XO Media, LLC having conducted any due diligence on how Docu Prep Center operated, including diligence regarding its legal compliance, before the company began operations in 2015.

86.  Mikael van Loon was a co-owner of XO Media, LLC with Lawson.  Van Loon and Lawson attended meetings together with the managers of the Student Loan Debt Relief Companies.

87.  In mid-2016, van Loon began having meetings every week with Docu Prep Center and the other Student Loan Debt Relief Companies.  In those meetings, Van Loon asked numerous questions to the managers of Docu Prep Center and the other Student Loan Debt Relief Companies and represented Lawson's interests to ensure that the companies were profitable.

88.  My understanding was that van Loon acted as a representative of Lawson when he met with the Student Loan Debt Relief Companies.  My understanding is that van Loon also acted in his own interest, since he owned a share of XO Media, LLC and also eventually received small limited partnership interests in the Student Loan Debt Relief Companies.

89.  Docu Prep Center's revenues were the result of the direct mail marketing and the telemarketing sales to consumers with student loans described above in Paragraphs 27 to 78.  Docu Prep Center relied on those

CFPB-JN-0109507

activities to generate revenue, which resulted in the profits it distributed to its limited partners.

90.     The limited partners generally received their distributions through companies that they personally controlled.  For example, I received distributions through Mosto Financial, Inc., a corporation that my wife and I own and control, which then sent the distributions directly to us.

91.     Beginning in 2016, Nesheiwat often received distributions of profits from his limited partnership interest in Docu Prep Center through a company he owned and controlled called Sales Speek, Inc.

92.     Beginning in 2016, Lawson received distributions of profits from his limited partnership interest in Docu Prep Center through a company he controlled called XO Media, LLC.

93.     Beginning in 2016, Sklar often received distributions of profits from his limited partnership interest in Docu Prep Center through a company he controlled called Prime Ad Enterprises.

94.     Beginning in about 2016, other individuals later received small limited partnership interests in Docu Prep Center, including Mike Van Loon, who worked with Docu Prep Center as a representative of the limited partners in 2016.  Van Loon also became the chief financial officer of Monster Loans in 2016 and later became Monster Loans' chief executive officer.  Monster Loans' general counsel Bradley Brigante also received a small limited partnership interest.

95.     Hegazi, the bookkeeper for Docu Prep Center and Monster Loans, consulted with Chou, Cowell, and Nesheiwat to determine the amounts of the distributions to make to Docu Prep Center's limited partners or the limited partners' designated companies and made distributions accordingly.  Sklar and I

CFPB-JN-0109508

signed the distribution checks at Hegazi's direction, and at times pre-signed checks that Hegazi later used for the distributions.

## Other Student Loan Debt-Relief Companies

96.    After the launch of Docu Prep Center in early 2015, the other four Student Loan Debt Relief Companies—Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services—were each created over the course of 2015 to early 2017.  Although I did not manage the four businesses, I am familiar with the four businesses because I owned a limited partnership interest in them and because Docu Prep Center at times coordinated marketing and sales activities with them.

97.    Like Docu Prep Center, each of those four businesses was structured as a corporation and an associated limited partnership, with the profits generated by the business going to its limited partners.  The entities associated with the four businesses were: (1) Certified Doc Prep, Inc. and Certified Doc Prep Services, LP (collectively, "Certified Doc Prep Services"); (2) Assure Direct Services, Inc. and Assure Direct Services, LP (collectively, "Assure Direct Services"); (3) Direct Document Solutions, Inc. and Direct Document Solutions, LP (collectively, "Direct Document Solutions"; (4) Secure Preparation Services, Inc. and Secure Preparation Services, LP (collectively, "Secure Preparation Services").

98.    The limited partners of Docu Prep Center overlapped with many of the limited partners of the four new businesses.  Chou, Cowell, Nesheiwat, Lawson (through XO Media, LLC), Nguyen, Sklar, and I all owned limited partnership interests in the new businesses.

99.    My understanding is that the limited partners, including Lawson, did not make capital contributions to start Direct Document Solutions and Secure Preparation Services.  Direct Document Solutions and Secure

CFPB-JN-0109509

Preparation Services received loans from the earlier Student Loan Debt Relief Companies when they started, which enabled them to operate.

100.   The managers of the four businesses were generally former employees of Docu Prep Center.  For example, Frank Anthony Sebreros was an employee of Docu Prep Center and then became the manager of Assure Direct Services in 2016.

101.   The four businesses offered the same type of services as Docu Prep Center, which involved assisting consumers with consolidating their federal student loans and with enrolling in federal loan repayment and forgiveness programs offered by the U.S. Department of Education

102.   The four businesses had the same business model as Docu Prep Center.  The four businesses each relied on direct mail to generate interest in their services, and maintained call centers whose employees sold their services through sales calls to consumers who called in response to the direct mailings.

103.   The four businesses generally used Automated Mailers to send direct mail, and Nesheiwat oversaw their mailings based on his relationship with Automated Mailers.  Nesheiwat also arranged for those businesses to use Experian prescreened lists for their direct mailings, just as Nesheiwat did for Docu Prep Center, and Nesheiwat directed Abdel and Max Chou to order the prescreened lists and send the prescreened lists to Automated Mailers.

104.   My understanding is that the four businesses relied on Hegazi to pay their share of Monster Loans' Experian invoices, their share of the direct marketing invoices from Automated Mailers, and to make distributions to the limited partners.

105.   The four businesses' revenues were the result of their direct mail marketing and telemarketing sales to consumers with student loans.  The four

CFPB-JN-0109510

businesses relied on those activities to generate revenue, which resulted in the profits they distributed to their limited partners.

106.    The four businesses also all used Docs Done Right to provide "back-end" services.

107.    In 2016 and 2017, the limited partners held meetings (sometimes called "proxy meetings") where managers of several debt-relief companies in which the limited partners were invested – including Docu Prep Center, Certified Doc Prep Services, and Assure Direct Services – provided updates on the state of the companies. I attended several of these meetings as a limited partner and as a manager of Docu Prep Center. At some of these proxy meetings, Sebreros was present to report on the state of Assure Direct Services.

108.    At these meetings, the use of Experian prescreened lists was often discussed. In particular, there were discussions in early 2017 about not buying new Experian prescreened lists because of the legal risks it posed. Van Loon, who was Monster Loans' CEO at that point, wanted the managers of the Student Loan Debt Relief Companies to rely on the Experian prescreened lists that had already been purchased (by "recycling" that data) or other methods of marketing. But the managers, including Sebreros, wanted Monster Loans to continue buying new prescreened lists. My understanding is that Monster Loans stopped and started purchasing Experian prescreened lists in early 2017 based on these concerns.

**Business Records**

109.    By reason of my position at Docu Prep Center, I am qualified to certify the authenticity of certain Docu Prep Center business records submitted with this declaration.

110.    Between February 2015 and May 2015, as part of the regularly conducted activity of Docu Prep Center, I sent and received emails (and

CFPB-JN-0109511

1  attachments to emails) using the email address robertbhoose@yahoo.com.  I

2  also kept such emails (and their attachments) as a regular practice.

3       111.   Exhibits 12, 13, and 15 are true and correct copies of emails,

4  including certain attachments, that I sent or received at the email address

5  robertbhoose@yahoo.com between February 2015 and May 2015.

6       112.   The emails and attachments in Exhibits 12, 13, and 15 are records

7  of regularly conducted activity that were made at or near the time of the

8  occurrence of the matters set forth in the emails by a person with knowledge of

9  those matters.

10       113.   The email strings in Exhibits 12 and 13 include emails from

11  Manny Kashto.  At the time of the emails, Kashto was the VP of Affiliate

12  Relations at SLPC, which as described above worked with Docu Prep Center in

13  2015.  Because of his position and responsibilities at SLPC, Kashto had

14  knowledge of the events described in his emails in Exhibits 12 and 13.

15       114.   The email string in Exhibit 15 includes an email from Michael

16  Hendrix, the CEO of Trans2pay, LLC.  As described above, Trans2pay, LLC

17  provided payment processing services to Docu Prep Center in 2015.  Because of

18  his position and responsibilities at Trans2pay, LLC, Hendrix had knowledge of

19  the events described in his email in Exhibit 15.

20

21  I declare under penalty of perjury that the foregoing is true and correct.

22  Executed on [DATE].   6-25-2020

23

24

25

26

27

28

26