# Summary Judgment Ex. 4

# DECLARATION OF DAVID SKLAR

I, David Sklar, pursuant to 28 U.S.C. § 1746, hereby declare the following:

1. My name is David Sklar. I live in Mission Viejo, California. The following facts are known to me personally and if called as a witness I could and would competently testify to them.

## Beginning of Docu Prep Center

2. From 2000 to 2014, I worked as a bartender in various bars in Orange County, California.

3. I met Sean Cowell in around 1996 and we became friends.

4. In mid-2014, Cowell informed me that he, Jawad Nesheiwat, and Thomas Chou were planning to open a new student loan debt relief company.

5. At around that time, Nesheiwat, Cowell, and Chou asked that I operate this new company, and said that I would be given an ownership interest in the business.

6. I was excited by the opportunity and saw it as a potential step forward for me after years as a bartender. I did not, however, have any management or executive experience or experience with student loans or in the debt relief industry.

7. Prior to taking on this position, Nesheiwat, Cowell, and Chou asked me to go work at a business called Advantage Student Loans for training and to get up to speed on the student loan debt relief business. Advantage Student Loans was owned by an individual named Andrew Roosen, who I believe was a business associate of Nesheiwat, Cowell, and Chou. I worked there for about four to six months in around mid to late 2014 as a telemarketing sales representative. That company was engaged primarily in marketing debt relief services to consumers with federal student loans.

8. After that experience, in early 2015, I became the manager of Docu Prep Center, Inc. and eventually was given the title of chief executive officer.

9. Docu Prep Center, Inc. registered as a California corporation in 2015 and had a business address of 3 Whatney, Suite 100, Irvine, CA 92618.

10. Document Preparation Services, LP registered as a California limited partnership in 2015. Document Preparation Services, LP was the general partner of Docu Prep Center, Inc. In this Declaration, I refer to both entities collectively as "Docu Prep Center."

11. Docu Prep Center also operated under the d/b/a's DocuPrep Center and Certified Document Center.

12. My co-manager at Docu Prep Center was Robert Hoose, who was given the title of chief operating officer. Like me, he had no prior executive experience.

13. In early 2015, Nesheiwat, Cowell, and Chou directed Hoose and me to work with Roosen to set up Docu Prep Center. Roosen ran a "back-end" company called Student Loan Processing Center ("SLPC") that worked with a number of companies that marketed and sold student debt relief services, including Advantage Student Loans, where I had previously worked. By "back-end," I mean that SLPC provided the actual services that the other companies marketed and sold. SLPC referred to the companies it worked with as its "affiliates."

14. Nesheiwat, Cowell, and Chou instructed Hoose and me to set up Docu Prep Center as a new affiliate for SLPC. Under this arrangement, Docu Prep Center was responsible for marketing and selling services to consumers with federal student loans. Once the sale was complete, SLPC would perform the actual services, assisting consumers with consolidating their loans and enrolling in the income-based repayment plans offered by the U.S. Department

of Education. SLPC provided the initial marketing materials and telemarketing scripts that Docu Prep Center used, which the company then adapted.

15. Although Hoose and I were Docu Prep Center's executives and served as its day-to-day managers, we did not have authority over the major decisions made by the company, such as decisions about how the company would market and sell its services and the types of services it offered. Instead, we followed directions from Nesheiwat, Cowell, and Chou, who each owned limited partnership interests in Docu Prep Center. Hoose and I were not allowed to make major decisions about Docu Prep Center's operations without their approval. Hoose and I also received limited partnership interests in Docu Prep Center (which were smaller than the interests held by Nesheiwat, Cowell, and Chou).

16. Hoose and I began managing Docu Prep Center together in February 2015. In general, I was responsible for monitoring the sales floor and for hiring and firing employees. Hoose was in charge of training new employees and coaching existing employees.

17. Hoose and I were also both signatories on the Wells Fargo bank accounts for Docu Prep Center, Inc. and Document Preparation Services, LP. In that capacity, we routinely signed checks on behalf of Docu Prep Center.

18. When Docu Prep Center started in early 2015, Chou Team Realty, Inc., a mortgage lender which did business as Monster Loans, was located in the same building at 3 Whatney in Irvine. Chou, Nesheiwat, and Cowell ran Monster Loans, and Nesheiwat was in charge of Monster Loans' marketing.

19. Nesheiwat had a desk on the same floor as Docu Prep Center's at the 3 Whatney address in Irvine, and I saw him at the office almost every day. Nesheiwat had strong views about how Docu Prep Center should operate, which he often expressed to Hoose and me, and which I felt compelled to follow. Out of all of Docu Prep Center's limited partners, Nesheiwat was the

3

most involved in the daily operations of the company. Nesheiwat was also the only limited partner with a desk on Docu Prep Center's floor.

20. Nesheiwat regularly instructed Hoose and me on how to manage Docu Prep Center's operations and its employees. For example, on at least one occasion, Nesheiwat directed Hoose and me to fire a Docu Prep Center employee. As further described below, Nesheiwat was also very involved in Docu Prep Center's marketing.

21. Around the end of 2015, Docu Prep Center stopped working with SLPC. A company named Docs Done Right then took over the "back-end" function that SLPC had previously performed. Docs Done Right was managed by Eduardo Martinez. Its owners included Nesheiwat, Cowell, Chou, who provided directions to Martinez regarding the company's operations and the services it provided to consumers on behalf of Docu Prep Center.

### Docu Prep Center's Direct Mail Marketing Process

22. Docu Prep Center primarily marketed its services to consumers through direct mail.

23. In early 2015, Nesheiwat arranged for Docu Prep Center to send direct mail through a mailing house called Automated Mailers (which he was already using to send Monster Loans' direct mail marketing). Thereafter, Nesheiwat oversaw Docu Prep Center's relationship with Automated Mailers. For example, for most of 2015, Nesheiwat directed Hoose and me to copy him on communications with Automated Mailers concerning Docu Prep Center's orders—a direction that we followed. Even after that, Nesheiwat continued to oversee Docu Prep Center's relationship with Automated Mailers, ensuring that Docu Prep Center paid its invoices and requesting updates from Hoose and me regarding its mailings.

24. At times in 2015 and 2016, I directly communicated with, and was copied on the communications of others with, Automated Mailers regarding

4

orders to send direct mail to consumers marketing Docu Prep Center's services. I am familiar with the process that was used to send Docu Prep Center's direct mail and with Docu Prep Center's direct mail solicitations.

25. The marketing process generally worked as follows: Docu Prep Center provided Automated Mailers with the template for its direct mail solicitations, and periodically placed orders for direct mail. For most of 2015 and 2016, Docu Prep Center placed orders about every one or two weeks. To initiate an order, Docu Prep Center provided Automated Mailers with consumer names, addresses, and student loan balances (which those involved with Docu Prep Center often referred to as consumer "data") and told Automated Mailers how many pieces of mail to send. Upon receiving the consumer data, Automated Mailers created "proofs" of the marketing letter for Docu Prep Center's review and approval. The proofs reflected the marketing language that would be contained in each outgoing Docu Prep Center letter. The marketing letters were generally identical except for the recipient's name, address, and student loan balance. Upon Docu Prep Center's review and approval, Automated Mailers printed and mailed out the marketing letters.

26. Attached as Exhibit 1 are true and correct copies of marketing letters that Docu Prep Center sent in February 2016 with Automated Mailers' assistance. The letters in Exhibit 1 are representative of the marketing letters that Docu Prep Center sent in 2016.

27. Nesheiwat oversaw Docu Prep Center's direct mail marketing through Automated Mailers. In addition, in 2015 and 2016, Nesheiwat directed Bilal Abdelfattah a/k/a Bill Abdel ("Abdel") to send Automated Mailers consumer names, addresses, and student loan balances, which were used to populate Docu Prep Center's direct mail template.

28. Mohamed Hegazi, a bookkeeper who worked for both Monster Loans and Docu Prep Center, was in charge of paying off the balances that Docu Prep Center incurred with Automated Mailers.

29. Attached as Exhibit 2 is a true and correct copy of an October 2016 email from Nesheiwat to me, forwarding an email from Automated Mailers, regarding Docu Prep Center's balance for past mailings. Hoose and Mike Van Loon ("Van Loon"), a then-executive at Monster Loans, are also copied on Nesheiwat's forwarded email. In this email string, Nesheiwat instructed Hoose and me to pay down Docu Prep Center's balance with the mailing house with no more than one week's delay whenever possible, at the request of Automated Mailers. Exhibit 2 is representative of Nesheiwat's involvement in Docu Prep Center's marketing, and of his providing directions regarding Docu Prep Center's interactions with Automated Mailers.

### Docu Prep Center's Use of Prescreened Lists

30. As described above, Docu Prep Center sent to Automated Mailers consumers' names, addresses, and student loan balances when it placed orders for direct mail. For much of the time that it operated, Docu Prep Center obtained that consumer data through Monster Loans' account with the credit bureau Experian. My understanding is that that consumer data came from "prescreened lists."

31. Before Docu Prep Center began using the prescreened lists, it was my understanding from conversations with Nesheiwat that he intended to use Monster Loans' Experian account to buy marketing lists for Docu Prep Center to use to send its direct mail.

32. Attached as Exhibit 3 is a true and correct copy of an email exchange between Nesheiwat and me from August 11, 2015. In this exchange, Nesheiwat informed me that the Experian account was "about ready" to use. At the time, I was not an employee of Monster Loans.

33. Thereafter, at Nesheiwat's direction, Docu Prep Center began using prescreened lists pulled from Monster Loans' Experian account. Initially, Abdel, who worked under Nesheiwat's supervision, was primarily responsible for placing the orders with Experian and emailing the prescreened lists to Automated Mailers for use when sending Docu Prep Center's mailings. Later, Nesheiwat directed Max Chou to take over those responsibilities after Abdel was fired.

34. Nesheiwat required Docu Prep Center to pay the cost of the prescreened lists ordered through Monster Loans' Experian account. For example, attached as Exhibit 4 is a true and correct copy of an email from Nesheiwat to Abdel, copying Hoose and me, sent on January 25, 2016. In the email, Nesheiwat directs Abdel to pay a "whopping" bill from Experian. Because Hoose and I were copied, and co-managed Docu Prep Center at the time, I understand the email to refer to a bill for marketing lists that Monster Loans purchased from Experian for Docu Prep Center's use.

35. Nesheiwat also negotiated with Experian to obtain lower costs for the prescreened lists Monster Loans obtained for Docu Prep Center's use, and provided updates to Hoose and me regarding the status of the negotiations. For example, attached as Exhibit 5 is a true and correct copy of an email Nesheiwat sent to Hoose and me on March 8, 2016, regarding his negotiations with Experian.

36. Attached as Exhibit 6 is a true and correct copy of an April 8, 2016 "investor update" email that I sent to Van Loon and Nesheiwat. This email is representative of the updates that I drafted and sent to Docu Prep Center's limited partners, on the state of Docu Prep Center, including on any efforts to increase profits by paying less for prescreened lists. My email informed Docu Prep Center's limited partners that "[w]e have ironed out a new deal with Experian as far as our Data purchasing is concerned. We have cut the cost per

record from .18 cents to .09 cents and have realized that this data is performing with greater response percentages as well as closing ratios." Although I used the word "we" in that sentence, I did not personally negotiate this deal with Experian; rather, Nesheiwat negotiated this lower pricing for the prescreened lists that Docu Prep Center would use.

37. Hegazi, the bookkeeper for both Monster Loans and Docu Prep Center, used a Chase credit card to pay the Experian invoices that Docu Prep Center incurred on the Monster Loans account. Docu Prep Center then reimbursed Monster Loans for its share of Experian prescreened lists by writing a check to Hegazi's credit card.

38. Attached as Exhibit 7 is a true and correct copy of three checks written in 2016 from Docu Prep Center and Document Preparation Services, LP's bank accounts. Each check is made out to "Chase credit services" or to "Chase card" and contains a reference to "Experian" in the memo line. I recognize my signature on all three checks. These checks are representative of the reimbursement Docu Prep Center made to Monster Loans through Hegazi's Chase credit card, for the cost of the Experian prescreened lists Monster Loans obtained for Docu Prep Center to use to market Docu Prep Center's services.

**Docu Prep Center's Sales Calls with Consumers**

39. Consumers called the phone number on Docu Prep Center marketing letters, which routed them to the company's call center. Docu Prep Center's sales representatives then answered these consumer calls.

40. Consumers were interested in Docu Prep Center's services because they wanted to improve the terms of their student loans. For example, consumers often wanted to make lower payments or receive loan forgiveness.

41. Hoose and I required Docu Prep Center's sales representatives to use a script to sell the company's services over the phone, although at times sales representatives deviated from the scripts.

42. Although some edits were incorporated into the Docu Prep Center scripts between 2015 and 2017, their substance and representations remained largely the same.

43. As a result of overseeing hundreds of sales representatives at Docu Prep Center, I am familiar with the sales scripts and training materials that Docu Prep Center used to market its services in 2015 and 2016.

44. Attached as Exhibit 8 is a true and correct copy of an email and attached sales script that Hoose forwarded to Nesheiwat, Cowell, and me on May 28, 2015 from an employee of SLPC. I recognize the sales script attached to that email as the script that Docu Prep Center sales representatives used during calls with consumers in 2015.

45. Attached as Exhibit 9 is a true and correct copy of a Docu Prep Center training manual that the company used in 2016. The manual includes a "Student Loan Advisor Script," which I recognize as a sales script that Docu Prep Center used in 2016.

46. Nesheiwat was familiar with the sales scripts that Docu Prep Center used, instructed us to use specific sales scripts, approved any changes that were made to the sales scripts, and directly made edits to the sales scripts over time.

47. To my knowledge, Nesheiwat made no efforts to verify the truthfulness of Docu Prep Center's statements regarding loan consolidation either before or after he instructed Hoose and me to use these sales scripts to market Docu Prep Center's services.

48. Docu Prep Center used software platforms to track its sales calls and other interactions with consumers. For much of its operations, Docu Prep Center used a customer relationship management platform called Debt Pay Pro to store and track information about consumers, as well as interactions with consumers as part of Docu Prep Center's regularly conducted business

9

activities. For example, Docu Prep Center's sales representatives used Debt Pay Pro to enter notes regarding calls with consumers. The information and notes entered into Debt Pay Pro by Docu Prep Center's employees were regularly made by Docu Prep Center and were kept on Debt Pay Pro as part of Docu Prep Center's regular business activities. The information and notes were also made at or near the time of Docu Prep Center's interactions with consumers.

### Docu Prep Center's Fees

49. Docu Prep Center's fees for its services increased between 2015 and 2017, beginning at around $599 or $699, and eventually increasing to $799 or $899.

50. Between 2015 and 2017, Docu Prep Center used several payment processors to process fees paid by consumers in ACH transactions.

51. In 2015, Docu Prep Center used Trans2Pay, LLC and then switched to Reliant Account Management ("RAM"). Docu Prep Center later began to use a company called Debt Pay Gateway, Inc. ("Debt Pay Gateway").

52. Docu Prep Center also at times charged fees to consumers' credit cards using a merchant account to which it had access.

53. Docu Prep Center typically charged its fees soon after a consumer's enrollment, requiring that consumers generally make their first payment within 10 days of enrollment and complete all payments within 45 days of enrollment (if the consumer paid in installments).

54. Docu Prep Center did not wait to charge or receive its fees until the consumer's loan consolidation and loan repayment plan were approved. Nor did it wait for the consumer to begin making payments under the altered terms of the consumer's loan to charge or receive its fees.

55. Before I managed Docu Prep Center, I was not familiar with the Telemarketing Sales Rule ("TSR") or with its prohibition on charging advance fees for debt relief services.

56. Attached as Exhibit 10 is a true and correct copy of an email that Chou sent on May 18, 2015 in response to an update that I sent to Docu Prep Center's owners, including Nesheiwat. Chou asked for "information about the potential ban on advance fees that might extend the time frame that we get payment" and expressed concern about "a delay in being paid … slowing growth" towards Docu Prep Center's goal of closing 1,000 deals each month, which the several of those involved with Docu Prep Center planned to celebrate with a trip to Las Vegas. Chou noted said he was concerned because he "really want[ed] to go to Vegas."

57. Following Chou's email, Docu Prep Center did not change its practices to extend how long it took to receive consumers' fees or make other efforts to comply with the TSR's requirements regarding the timing of charging fees.

58. Rather, as shown in Exhibit 11, which is a true and correct copy of a July 2015 email that I sent to Docu Prep Center's investors, Docu Prep Center switched to a new payment processor, RAM, which "ma[de] our funds available between 7 to 9 days after the client has made their ACH payment." Since consumers generally made their first payment within 10 days of enrollment and completed all payments within 45 days of enrollment, this change meant that Docu Prep Center generally received consumers' first payments within about three weeks and received all of the consumers' payments within 60 days.

**The Four New Student Loan Debt Relief Companies**

59. Because of Docu Prep Center's profitability, its limited partners, including Nesheiwat, Chou, Cowell, Hoose, and me, decided to open four new companies in the two years after Docu Prep Center was created. Those four

businesses were Certified Doc Prep Services, Assure Direct Services, Direct Document Solutions, and Secure Preparation Services (collectively, with Docu Prep Center, the "Student Loan Debt Relief Companies").

60. Like Docu Prep Center, each of those businesses was structured as a corporation and an associated limited partnership, and the profits from each business went to its limited partner owners.

61. The four new businesses were owned by the same core group of limited partners as Docu Prep Center, including Nesheiwat, Chou, Cowell, Hoose, and me.

62. Although I was not a manager of the four new businesses, I am familiar with them because I held an ownership stake in each of them, because they at times interacted with Docu Prep Center, and because they were all closely modeled on Docu Prep Center.

63. The four new businesses were managed by former employees of Docu Prep Center.

64. The four new businesses offered the same services as Docu Prep Center, which involved offering to assist consumers with consolidating federal student loans and enrolling in loan repayment and loan forgiveness programs.

65. The four new businesses marketed their services through direct mail using Automated Mailers, and used the same template for direct mail that Docu Prep Center did. They also used the same sales scripts as Docu Prep Center. As he did for Docu Prep Center, Nesheiwat generally oversaw the four businesses' relationship with Automated Mailers.

66. The four new businesses sold their services to consumers during telemarketing sales calls.

67. Like Docu Prep Center, the four new businesses used prescreened lists obtained from Monster Loans' account with Experian to send direct mail.

Nesheiwat played a similar role in overseeing the efforts to obtain prescreened lists for their use.

68. The four new businesses also each used Docs Done Right to provide "back-end" support services.

69. Two of the new businesses, which were created in 2017, were effectively continuations of earlier businesses under new names.

70. In early 2017, the limited partners of Docu Prep Center decided to begin operating that business using a new entity, Direct Document Solutions. Direct Document Solutions was managed by Tera Wray, who had previously been an employee of Docu Prep Center. Docu Prep Center's existing employees were transferred to Direct Document Solutions. Direct Document Solutions continued offering the same services that Docu Prep Center had previously offered. As a limited partner of Docu Prep Center, I received a limited partnership interest in Direct Document Solutions when it was created.

71. Similarly, in early 2017, the limited partners of Certified Doc Prep Services decided to begin operating that business using a new entity, Secure Preparation Services. Secure Preparation Services was managed by Aaron Sebreros and Mark Nevarez, who had previously been employees of Docu Prep Center and Certified Doc Prep Services. Certified Doc Prep Services' employees were transferred to Secure Preparation Services. Secure Preparation Services continued offering the same services that Certified Doc Prep Services had previously offered. As a limited partner of Certified Doc Prep Services, I received a limited partnership interest in Direct Document Solutions when it was created.

72. After these changes in 2017, there were three companies that were continuing to offer services to new customers: Assure Direct Services, Direct Document Solutions, and Secure Preparation Services.

## Closure of the Student Loan Debt Relief Companies

73. Work at the three remaining Student Loan Debt Relief Companies stopped in September 2017 after certain of the businesses received civil investigative demands from the Consumer Financial Protection Bureau.

74. Despite the cessation of operations and the Bureau's inquiries, certain of the Student Loan Debt Relief Companies were still receiving payments from consumers who had previously signed up for their services. In January 2018, the limited partners asked me to wind down the affairs of the three remaining Student Loan Debt Relief Companies and distribute their remaining assets to the limited partners, including Nesheiwat, Chou, Cowell, Hoose, and myself.

75. For the purpose of performing this duty, the limited partners authorized a corporation that I control, Prime Ad Enterprises, Inc., to serve as the new general partner of Assure Direct Services, LP, Direct Document Solutions, LP, and Secure Preparation Services, LP. I was also granted access to those businesses' bank accounts.

76. In January 2018, I began using another corporation that I control, Loki Investments, Inc. ("Loki"), to receive the remaining assets of the Student Loan Debt Relief Companies and to distribute those assets to the limited partners, including Nesheiwat and Frank Anthony Sebreros (who owned a limited partnership interest in the company he managed, Assure Direct Services). To facilitate these transfers, I opened a Wells Fargo bank account under Loki's name.

77. As part of this process, Eduardo Martinez wrote checks from Docs Done Right's bank account to my Loki account. These checks represented fees paid by consumers to the Student Loan Debt Relief Companies.

78. Attached as Exhibit 12 are true and correct copies of checks I wrote in 2018 using the Loki bank account to distribute to Nesheiwat and

Sebreros their respective shares of the Student Loan Debt Relief Companies' remaining funds. Nesheiwat received his distributions through an entity called Sales Speek, Inc., which he controlled.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 8th, 2021.

*David Sklar*