# **<u>Summary Judgment Ex. 6</u>**

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


-------------------------------------x

BUREAU OF CONSUMER FINANCIAL PROTECTION,    Case No.

          Plaintiff,                        8-20-cv-00043

v.

CHOU TEAM REALTY, LLC, et al.,

          Defendants.

---------------------------------x




REMOTE DEPOSITION OF FRANK ANTHONY SEBREROS

Wednesday, December 16, 2020






Reported by:  Linda S. Kinkade, RDR CRR RMR RPR CSR

Page 2

1    A P P E A R A N C E S:

2     (All participants appeared remotely)

3

4    On Behalf of Plaintiff, the Consumer Financial

5    Protection Bureau:

6              Consumer Financial Protection Bureau

7              1700 G Street, NW

8              Washington, DC 20552

9              (202) 435-9668

10             By:  Colin Reardon, Esq.

11             By:  E. Vanessa Assae-Bille, Esq.

12

13

14

15   On Behalf of Defendant/Deponent Anthony Sebreros:

16             Benice Law

17             3080 Bristol Street

18             Costa Mesa, California 92626

19             By: Jeffrey Benice, Esq.

20             JSB@JeffreyBenice.com

21

22

23

24   CONTINUED ON FOLLOWING PAGE

25

Page 3

```
 1    A P P E A R A N C E S (continued):

 2

 3    On Behalf of Defendant Jawad Nesheiwat:

 4              Lepiscopo & Associates

 5              695 Town Center Drive

 6              Costa Mesa, California 92626

 7              By:  Pete Lepiscopo, Esq.

 8              plepiscopo@att.net/pete@familyofficelaw.com

 9

10

11    On behalf of Defendants Eduardo Martinez, David Sklar, Docs

12    Done Right, Inc., Docs Done Right, LP, and Lend Tech Loans:

13              The Holt Law Firm

14              1432 Edinger Avenue

15              Tustin, California 92780

16              By:  David Holt, Esq.

17              dholt@holtlawoc.com

18

19

20

21

22    Also present:

23              Ed Martinez

24

25              *** Index appears at end of transcript ***
```

Page 4

```
 1                    P R O C E E D I N G S

 2           THE REPORTER:  Please note this deposition is

 3    taking place via Webex as directed by the Bureau.  The

 4    location of this deposition is California pursuant to FRCP

 5    30(b)(4).  This deposition is being conducted by remote

 6    means under FRCP 30(b)(4).

 7           Due to the need for this deposition to take place

 8    remotely, the parties hereby stipulate that the court

 9    reporter may swear in the witness over the video conference.

10           Mr. Sebreros, would you please raise your right

11    hand and I'll administer the oath.

12                    FRANK ANTHONY SEBREROS,

13           having been first duly sworn and/or affirmed

14    on his oath, was thereafter examined and testified as

15    follows:

16                         EXAMINATION

17    BY MS. ASSAE-BILLE:

18      Q.   Good morning.  My name is Vanessa Assae-Bille,

19    and with me is Colin Reardon.  We are attorneys in the

20    Office of Enforcement at the Bureau of Consumer Financial

21    Protection.  Before we get to your testimony, there are a

22    few preliminary matters that we are going to cover on the

23    record.

24           Today is December 16th, 2020, and we are here to

25    depose Frank Anthony Sebreros pursuant to a notice of
```

Page 5

1    deposition that we served on November 6th, 2020.

2         This deposition is part of a lawsuit with the

3    Bureau of Consumer Financial Protection versus Chou Team

4    Realty, LLC, et al., in which Mr. Sebreros is one of the

5    defendants.

6         This deposition is being conducted pursuant to

7    Federal Rule of Civil Procedure 30, and, due to the ongoing

8    pandemic, we are speaking by video teleconference.

9         Mr. Sebreros, please state and spell your name

10   for the record, including any middle names.

11   A.   Frank, F-R-A-N-K, Anthony, A-N-T-H-O-N-Y, and the

12   last name Sebreros, S-E-B-R-E-R-O-S.

13   Q.   Thank you.  And do you generally go by your

14   middle name Anthony?

15   A.   Yes.

16   Q.   Do you understand the oath you just took?

17   A.   Yes.

18   Q.   Is there any reason why you would not be able to

19   provide truthful, complete, and accurate testimony today?

20   A.   No.

21   Q.   Are you under the influence of any type of

22   medication that might hinder your ability to understand any

23   question?

24   A.   No.

25        MR. BENICE:  Excuse me.  Before you continue,

Page 13

1      A.   I was, yes.

2      Q.   Did the company market by mail as well?

3      A.   Yes.

4      Q.   Were you familiar with -- are you familiar with

5  those letters?

6      A.   Yes.

7      Q.   Did Docu Prep Center also use the name Certified

8  Document Center?

9      A.   Yes.

10     Q.   I may use those two names interchangeably today,

11  but so you know we're talking about the same place.  Okay?

12         While you were working at Docu Prep Center, were

13  you ever asked to open a company that provided the same

14  kinds of services?

15     A.   I was.

16     Q.   Was that new company called Assure Direct

17  Services?

18     A.   Yes, it was.

19     Q.   What was your title there?

20     A.   My title was, I guess, owner.  I was -- it was a

21  limited partnership.  I was a general partner.  And I just

22  took employees from the previous call center.  And it was

23  the same leads, the same everything.  It was just a

24  different location.

25     Q.   Okay.  We'll come back to some of what you've

Page 14

1    mentioned in a little more detail.  Did you ever use the

2    title CEO or president at Assure Direct Services?

3        A.   I don't believe I used it.  It may have been,

4    like, the title, but I'm not sure.

5        Q.   Okay.  But you were an owner and general partner,

6    correct?

7        A.   Yes.

8        Q.   Okay.  When did you start that role?

9        A.   I don't know the exact dates.

10       Q.   Was it around August 2016?

11       A.   Yes.

12       Q.   How long did you continue in that role?

13       A.   Less -- a little less than a year, I believe.

14       Q.   Were you there until the company ceased

15    operating?

16       A.   Yes.

17       Q.   Was that around September 2017?

18       A.   I'm not exactly sure on the date.

19       Q.   Was it in the fall of 2017?

20       A.   It was.

21       Q.   What were your responsibilities at Assure Direct

22    Services?

23       A.   To staff a call center.  It was already -- it was

24    kind of a cookie-cutter thing.  They already had the model,

25    so I was just to follow that over.

Page 15

1        Q.    And once the call center was started, what were

2    your responsibilities then?

3        A.    Hiring, just managing the employees, making sure

4    that the seats were filled.

5        Q.    Okay.  Did you then join a new student loan

6    business called Clarity Solutions Center?

7        A.    Yes.

8        Q.    When did you join Clarity?

9        A.    Maybe a couple weeks after the initial round of

10   the loan centers closed down.

11       Q.    When did the student loan businesses close down,

12   if you recall?

13       A.    I'm assuming it was fall of '17.

14       Q.    Did you join Clarity around October 2017?

15       A.    That could be right.

16       Q.    Did Clarity offer the same services as Assure

17   Direct Services?

18       A.    Yes.

19       Q.    And were you an owner of Clarity as well?

20       A.    It's -- I was an owner; however, there was

21   nothing on paper.  I wasn't really -- I guess it was a

22   similar situation to the first time around.

23       Q.    Oh, can you help me understand, what do you mean

24   by "the first time around"?  I want to make sure I

25   understand your answer.

1        A.    2018, I believe.

2        Q.    Do you remember if it was in the first half of

3    the year or the second half?

4        A.    I believe the second half of '18.

5        Q.    And have you ever been involved in a company

6    named Premier Prep, LLC?

7        A.    It sounds familiar.  It may be one of them that

8    just didn't go anywhere.

9        Q.    What do you recall about your involvement with

10   Premier Prep?

11       A.    Very similar to Nexum, just limited.

12       Q.    And when did you first become involved with that

13   company?

14       A.    Early 2018, I believe.

15       Q.    And when did your involvement end?

16       A.    Also early 2018, maybe mid 2018.

17       Q.    Are you still involved with -- well, no, you

18   would not be involved with Premier Prep.

19             Okay.  Let's move on.

20             To cover all of our bases, have you been involved

21    with any other company that provided services to consumers

22   seeking student loans?

23       A.    Not that I'm aware of.

24       Q.    And that includes in a consultant role, correct?

25       A.    Yes.

Page 22

```
 1        Q.   And that includes in an investor role?

 2        A.   Yes.

 3        Q.   Have you been involved with any other company,

 4   other than the ones we discussed, that provided services to

 5   consumers with debts?

 6        A.   No.

 7        Q.   Have you been involved with any other company

 8   other than the ones we discussed that sold services through

 9   telemarketing?

10        A.   Not that I remember, no.

11        Q.   In 2017 you also became involved with a company

12   called Lend Tech Loans, Incorporated, correct?

13        A.   Yes.

14        Q.   What month in 2018 did you become involved?

15        A.   I believe I was involved prior to 2018.  Lend

16   Tech, I helped -- they were trying to obtain an Experian

17   account, so my job was to, I guess, go through the process.

18        Q.   Okay.  I think I meant to say in 2017, so I'm

19   sorry about that.

20        A.   Okay.

21        Q.   To be clear, you became involved with Lend Tech

22   in 2017, correct?

23        A.   Yes.

24        Q.   And what was your title there?

25        A.   I didn't have a title.
```

Page 23

1        Q.    What was your role there?

2        A.    Just to, I guess, make an office and go through

3    the Experian process.

4        Q.    So when you say help with the Experian process,

5    can you tell me what you mean?

6        A.    Yeah.  The LP members had instructed me to obtain

7    an Experian license so the student loan locations could

8    survive, I guess, and pull leads.

9        Q.    Okay.  We'll come back to that.  Did you have any

10   other roles at Lend Tech other than that?

11       A.    No.

12       Q.    Are you still involved at Lend Tech?

13       A.    No.

14       Q.    When did you leave?

15       A.    It's hard to answer that question.  I was never

16    actually with Lend Tech.  But I haven't been involved in a

17   long time, so I don't know.

18       Q.    So you stopped being involved at some point.  Was

19   it in 2018 or later?

20       A.    It was -- it was for sure 2018.

21       Q.    Do you remember if that was in the first half of

22   the year or the second half?

23       A.    It would have been in the first half.

24       Q.    Earlier, when we were talking about your

25   responsibilities at Lend Tech, you mentioned that limited

Page 24

1   partners had instructed you to obtain an Experian account.

2   Who were those limited partners?

3        A.   The limited partners would have been Tom, Sean,

4   Jawad, David Sklar, Robert Hoose.  Just the people who were

5   ahead of me who started the whole thing.

6        Q.   And how did that instruction come about?

7        A.   I believe the LP wasn't happy with the amount of

8   money that was coming out of our location, so they wanted us

9   to find an alternative source to leads, and the Experian

10  account is how we did that.

11       Q.   And when you say "Tom," do you mean Tom Chou?

12       A.   Yes.

13       Q.   Is "Sean" Sean Cowell?

14       A.   Yes.

15       Q.   Is "Jawad" Jawad Nesheiwat?

16       A.   Correct.

17       Q.   Is "Sklar" David Sklar?

18       A.   Yes.

19       Q.   And when you say "Hoose," do you mean Robert

20  Hoose?

21       A.   Yes.

22       Q.   Okay.  Have you ever owned a company named Star

23  Boy, Inc.?

24       A.   Yes.

25       Q.   Starting when?

Page 25

 1      A.   2017, the end of '17.

 2      Q.   What was the purpose of that company?

 3      A.   I received most of my checks or all of my checks

 4 through that entity.

 5      Q.   Did it conduct any business other than that?

 6      A.   It did.  It did some business for Direct Prep as

 7 well as -- that's all I can remember right now actually.

 8      Q.   What kind of business did it do for Direct Prep?

 9      A.   We used it to -- when we first started, we didn't

10 have a bank account or an entity.  I think we used Star Boy

11 for a little bit.

12      Q.   Okay.  Were you the sole owner of Star Boy?

13      A.   Yes.

14      Q.   And so I assume Star Boy had a bank account?

15      A.   Yes.

16      Q.   Were you the sole signatory?

17      A.   Yes.

18      Q.   Do you still own Star Boy?

19      A.   Yes.  It hasn't been used in a really long time.

20      Q.   In addition to Docu Prep Center and Assure Direct

21 Services, the Bureau's complaint also names as defendants

22 three other similar companies:  Certified Doc Prep Services,

23 Direct Document Solutions, and Secure Preparation Services.

24           THE REPORTER:  Vanessa, are you there, or did we

25 lose you?

Page 26

1              MS. ASSAE-BILLE:  I'm sorry.  I lost you all.

2        Q.   Did you hear my question, Mr. Sebreros?

3        A.   No.

4        Q.   Okay.  I'll repeat it.  In addition to Docu Prep

5   Center and Assure Direct Services, the Bureau's complaint

6   also names as defendants three other similar companies:

7   Certified Doc Prep Services, Direct Document Solutions, and

8   Secure Preparation Services.  Are you familiar with those

9   three companies?

10       A.   Yes.

11       Q.   Did you have any role in running Certified Doc

12  Prep Services?

13       A.   Certified -- what was the name of that company?

14       Q.   Certified Doc Prep Services.  It might also have

15  gone by Certified Doc Prep.

16       A.   I'd have to be guessing here, yeah, so ...

17       Q.   You don't have to guess.  Did you have any role

18  in running Direct Document Solutions?

19       A.   No.

20       Q.   And did you have any role in running Secure

21  Preparation Services?

22       A.   No.

23       Q.   Did you interact with those companies through

24   your roles at Docu Prep Center and Assure Direct Services?

25       A.   Yes.

Page  27

1          Q.    In what context did you interact with them?

2          A.    The owners or the general partners of those

3                businesses, we had to provide a forecasting, and

4    then we'd

5                have a monthly meeting where the LP would kind of

6    grill us

7    or give us their expectations.  So we would all

8    collaboratively work together.

9          Q.    Other than the forecasting and monthly meetings

10   to report information, did you have any other sort of

11   regular interactions with them?

12         A.    I'm sure we exchanged emails.  I couldn't -- I

13   don't remember anything else.

14         Q.    Did those three companies offer the same services

15   as Docu Prep Center and Assure Direct Services?

16         A.    Yes.

17         Q.    You've used the word "cookie cutter" before.

18    Were those three companies also cookie-cutter companies at

19   Docu Prep Center?

20         A.    Yes.

21         Q.    I have a few last questions about your

22    background.  Have you ever held any professional licenses?

23         A.    No.

24         Q.    Aside from this lawsuit, have you ever been sued

25    by anyone?

Page 28

```
 1          A.   No.

 2          Q.   Have you ever sued anyone?

 3          A.   No.

 4          Q.   Have you ever been convicted of a crime?

 5          A.   No.

 6          Q.   So you have no criminal record?

 7          A.   No.

 8          Q.   I'd like to ask you some basic questions about

 9   Docu Prep Center.  Can you describe the kind of services

10   that Docu Prep Center provided to consumers?

11          A.   We'd offer to reduce payments and get clients

12   into the program for a fee.

13          Q.   And what was this program exactly?

14          A.   An income-based program.

15          Q.   And who offered this income-based program?

16          A.   The Department of Education.

17          Q.   So those consumers were student loan borrowers,

18   correct?

19          A.   Yes.

20          Q.   Did Docu Prep Center ever use the title "student

21   loan advisors" for the sales employees?

22          A.   Yes.

23          Q.   Did you ever hold this title?

24          A.   Most likely, yes.

25          Q.   Were you ever promoted to sales manager?
```

Page 29

1          A.   I was.

2          Q.   And how did that promotion come about?

3          A.   Probably the only person that showed up on time.

4          Q.   Did you have pretty strong sales numbers?

5          A.   Yeah.

6          Q.   Were you pretty good at selling the company's

7     services?

8          A.   I became good at it, yes.

9          Q.   Do you understand the company's business model

10    well?

11         A.   At the time I just -- there was a lot of pressure

12    and there was, like, names on a board, and I just -- I quit

13    my job prior to going there, so I didn't want to lose that.

14         Q.   Understood.  What do you mean when you say there

15    was a lot of pressure?

16         A.   I mean, there's just -- you had to perform.  You

17    had to have a certain amount of monthly deals; otherwise,

18    you didn't have a job.

19         Q.   When you first started at Docu Prep Center, as an

20     employee, so before your promotion, who did you report to?

21         A.   Robert Hoose and Dave Sklar.

22         Q.   And after you became manager, did you still

23    report to them?

24         A.   Yes.

25         Q.   How did Docu Prep Center attract customers?

Page 30

```
 1          A.   They would send out mailers.

 2          Q.   And how did consumers know to contact Docu Prep

 3    Center based on those mailers?

 4          A.   There was a toll-free number on there.

 5          Q.   Were you involved at all in sending direct mail

 6    for Docu Prep Center?

 7          A.   After managing for a little bit, they tried to

 8    kind of get us involved, but it was more just letting the

 9    mail house know how many pieces to send.

10          Q.   Do you recall the name of that mail house?

11          A.   I do not.

12          Q.   Was it Automated Mailers?

13          A.   It was.

14          Q.   And did Docu Prep Center have a call center then?

15          A.   Yes.

16          Q.   And that's the call center you worked at while

17    you were at Docu Prep Center, correct?

18          A.   Yes.

19          Q.   You testified being involved a little bit in the

20    direct mailing efforts as a sales manager.  Who else was

21    involved in that?

22          A.   Robert Hoose, David Sklar, Jawad, and that would

23    be it.

24          Q.   Was someone named Bill Abdel also involved?

25          A.   He was.
```

Page 31

1      Q.   And you've mentioned Mr. Nesheiwat also being

2    involved, correct?

3      A.   Yes.

4      Q.   What was his involvement?

5      A.   From what I know, Automated Mailers was Jawad's

6    contact.

7      Q.   And was he involved in the ordering process?

8      A.   He was.

9      Q.   In what way?

10     A.   He was the initial person to start that process.

11     Q.   What does that mean?

12     A.   Meaning the mailer itself and Automated Mailers

13   came from Jawad.

14     Q.   Did Mr. Nesheiwat give instructions to Sklar and

15   Hoose about marketing?

16     A.   Yes.  He was pretty -- pretty forceful, so I

17   would imagine that he would talk to them the same way he

18   would talk to us.

19     Q.   And how do you know that he gave instructions to

20   Sklar and Hoose?

21     A.   He was pretty open about letting everybody know,

22   like, who was in charge.

23     Q.   So Mr. Nesheiwat was in charge of Docu Prep

24   Center?

25     A.   The LP was always in charge.  If you're the

Page 32

1     general partner, it was more like do this or we'll just

2     remove you and find somebody else.

3          Q.   Okay.  Other than the people we just discussed,

4     was anyone else involved in sending direct mail for

5     Docu Prep Center?

6          A.   Not that I recall.

7          Q.   As a Docu Prep Center employee, did you answer

8     sales calls from consumers?

9          A.   I did.

10         Q.   And as a manager, did you ever listen to sales

11    calls made by other employees of Docu Prep?

12         A.   We would try, yes.

13         Q.   Were there other sales managers at the same time

14    as you, or were you the only sales manager during your

15    tenure?

16         A.   Initially it was myself and Bilal.

17         Q.   You said "initially."  Did that change later?

18         A.   Yes.  Early on, managing, Bill or Bilal was

19    fired.

20         Q.   When you say "Bilal," I just want to be clear for

21    the record, Bilal also went by Bill Abdel, correct?

22         A.   Bill, yes.

23         Q.   So Mr. Abdel was fired.  Do you remember around

24    when that happened?

25         A.   I don't have the exact date, no.

Page 35

1          Q.    So streamlining in connection with making more

2     sales, correct?

3          A.    Yes.

4          Q.    Okay.  And when you made edits, did anyone have

5     to approve those edits?

6          A.    Not that I'm aware of.  I'm not sure.

7          Q.    So as a sales manager, could you unilaterally

8     make edits to the script and not tell anyone?

9          A.    You could, yes.

10         Q.    Generally speaking, what did the sales script

11    say?

12         A.    I don't recall.

13         Q.    Did they ask consumers for information about

14    their student loans?

15         A.    Yes.

16         Q.    Did they describe the company's services?

17         A.    Yes.

18         Q.    Did they talk about consolidation?

19         A.    Yes.

20         Q.    Did they talk about income repayment plans

21    offered by the Department of Education?

22         A.    Yes.

23         Q.    Did they talk about any other kinds of services?

24         A.    I don't remember.

25         Q.    Did it describe the benefits of those services to

Page  36

1    consumers?

2         A.   I don't remember.

3         Q.   Did the scripts mention lower interest rates?

4         A.   I -- I don't remember, to be honest.

5         Q.   Did the scripts mention improved credit scores?

6         A.   I don't remember.

7         Q.   Do you remember any benefits to Docu Prep

8    Center's services that would have been mentioned on the

9    script?

10        A.   A lower payment.

11        Q.   Okay.  Anything else?

12        A.   No.

13        Q.   Did Docu Prep Center charge fees for its

14   services?

15        A.   Yes.

16        Q.   What was the fee?

17        A.   I think it started at $599 when we started and it

18   ended somewhere around $999.

19        Q.   Who decided -- who made the decision to change

20   those numbers?

21        A.   The LP most likely.

22        Q.   And when you say "the LP," who are you referring

23   to?

24        A.   Jawad, Sean, Tom, Robert, Dave.

25        Q.   How did Docu Prep Center charge those fees?  By

1    this I mean, did it come out of debit accounts, credit

2    cards, both?

3         A.   Both.  Mostly -- mostly routing an account number

4    with a checking account.

5         Q.   But credit card was an option?

6         A.   Yeah.

7         Q.   And at what point in time did Docu Prep Center

8    charge its fees?

9         A.   Before the call was over.

10        Q.   So before actual enrollment, correct?

11        A.   Well, they would -- they would set up the

12   payment.  I don't know exactly when enrollment would take

13   place.

14        Q.   Sorry.  I should have been clearer.  After

15   enrollment in the Department of Education program.

16        A.   I'm unsure.

17        Q.   Okay.  I want to talk about Assure Direct

18   Services' formation.  As we discussed earlier, while you

19   worked at Docu Prep Services as a sales manager, you became

20   involved in opening up a new branch offering those same

21   services as Docu Prep Center; is that right?

22        A.   Yes.

23        Q.   Okay.  How did the creation of Assure Direct

24   Services come about?

25        A.   I was informed by, I believe, Robert and Dave

Page 38

1   that the LP wanted to open a new location and that myself

2   and Bill would be running it.

3       Q.   But you ended up being -- sorry.  Just for the

4   record, as much as you can remember, if you can use people's

5   full names, that will be very helpful.

6            So you mentioned that Robert and Dave said the

7   LPs wanted to open a new location to be run by you and

8   Abdel, but you ended up running the new location alone,

9   correct?

10      A.   Correct, because Bill, Bill Abdel, was fired.

11      Q.   So Assure Direct Services opened around August

12  2016, right?

13      A.   Yes, sounds right.

14      Q.   So was Abdel fired around that time?

15      A.   Shortly before.

16      Q.   You've mentioned that Assure Direct Services was

17  a cookie-cutter model of Docu Prep Center Services.  So I

18   just want to nail down the exact way in which that was the

19  case.

20      A.   Yeah, I --

21      Q.   So -- go ahead.

22      A.   Assure Direct Services started inside of

23  Certified Document Center or Docu Prep.  I started with,

24  like, five or six of their employees, and we were just

25  taking their phone calls before.  Then we were moved over to

Page 39

1    a building at 5 Oldfield.

2         Q.   How else was it similar to Docu Prep Center?

3         A.   Everything was the same, same processing company,

4    same script.  It was just a different location.

5         Q.   Did it use the same marketing letters?

6         A.   Yes.

7         Q.   Did it use the same mailing house?

8         A.   Yes.

9         Q.   Did it offer the exact same services?

10        A.   Yes.

11        Q.   Did Assure Direct Services ever offer loans to

12   consumers?

13        A.   No.

14        Q.   Did it ever advance money to them?

15        A.   What was the question?

16        Q.   Did it ever advance money to them?

17        A.   No.

18        Q.   Did it ever make them an offer of credit in any

19   other way?

20        A.   No.

21        Q.   Okay.  So to make sure I understand, Assure

22   Direct Services enrolled consumers in student loan

23    consolidation just like Docu Prep Center; it enrolled them

24   in income-based repayment plans, just like Docu Prep Center.

25    Did it also enroll them in student loan forgiveness plans?

Page 40

1        A.   Yes.

2        Q.   Did it use Docu Prep Center's marketing letter as

3    a template?

4        A.   Yes.  There was no individual letter.  Every

5    letter didn't have a company's name on it.  It just had a

6    toll-free number.  It was all the same mail house.

7        Q.   Okay.  So Assure Direct Services was made up of

8    two entities, right, Assure Direct Services, Incorporated

9    and Assure Direct Services LP; is that correct?

10       A.   Yes.

11       Q.   Did the two entities function as a single

12   business?

13       A.   No.

14       Q.   Okay.  Can you explain to me how the two

15   companies were different?

16       A.   The Inc. Is just how I got paid.

17       Q.   So the Inc. Paid you, the owner --

18       A.   The LP paid --

19       Q.   -- salary -- Sorry.  I'm not sure I caught that.

20       A.   The LP paid the Inc.

21       Q.   Okay.  Did the LP also make distributions?

22       A.   Yes.

23       Q.   And those distributions were separate from your

24   salary, correct?

25       A.   Yes.

Page 41

1      Q.   Were you also a limited partner in Assure Direct

2  Services?

3      A.   Yes.

4      Q.   And the limited partnership, was that formalized

5  through a limited partnership agreement?

6      A.   Yes.

7      Q.   Did you sign that agreement?

8      A.   Yes.

9      Q.   Okay.  Did that agreement identify the other

10  limited partners and their shares?

11      A.   Yes.

12      Q.   You've mentioned that Assure Direct Services was

13  located at Oldfield, correct?

14      A.   5 Oldfield, yes.

15      Q.   Were there other businesses in that building?

16      A.   There were.

17      Q.   Which businesses?

18      A.   There was, I believe, Monster Tax, as well as a

19  failed debt consolidation business.

20      Q.   What's the name of that second business?

21      A.   I don't recall.

22      Q.   In your role as Assure Direct Services owner,

23  were you responsible for hiring employees?

24      A.   Yes.

25      Q.   Did you supervise employees?

Page 42

1      A.   Yes.

2      Q.   What did that entail?

3      A.   Mostly just walking the floor, making sure that

4  everybody was following the script, and just providing

5  feedback to the LP.

6      Q.   How often did you have to provide feedback to the

7  LPs?

8      A.   Often.

9      Q.   Every couple of weeks?

10     A.   No.

11     Q.   More than that?  Less?

12     A.   Every other day.

13     Q.   Did you report to all the LPs together, or were

14  there certain LPs that you reported to?

15     A.   It would -- it would vary.  They would all just

16  come up -- we were more like -- we were minority owners, so

17  they were always checking on like their checks to see what's

18  going on, to see if it's working.  And then once a month we

19  would all meet in the conference room, and Mike Van Loon

20  would grill us on why we weren't pushing out enough money --

21  or they all would.  Mike Van Loon just led the meeting.

22     Q.   Would Mr. Nesheiwat be present at those meetings?

23     A.   Sometimes.

24     Q.   And would he provide you feedback?

25     A.   Yeah.

Page 43

1          Q.   What kind of feedback?

2          A.   All the feedback was the same.  Everybody just

3     wanted to get paid.

4          Q.   Did middle-level managers at Assure Direct report

5     to you?

6          A.   I had, yeah, I had one sales manager for a few

7     months, yes.

8          Q.   Who was that?

9          A.   Jimmy Calderon.

10         Q.   As the owner of Assure Direct Services, were you

11    the one who set sale targets?

12         A.   No.  That was the LP.

13         Q.   Did you train employees on making sales?

14         A.   Yes.

15         Q.   Did you coach them on sales tactics?

16         A.   Yes.

17         Q.   Did you coach them on what kind of language to

18    use with consumers?

19         A.   I don't remember.

20         Q.   Did you monitor their times on the phones?

21         A.   Yes.

22         Q.   How were you able to monitor that?

23         A.   Through our phone system we were able to see how

24    long somebody was on the phone.

25         Q.   Besides you, who else had access to that talking

Page 57

1      A.   Yes.

2      Q.   And how could they cancel?  How did that work?

3      A.   They could just call in.  We always gave a

4   refund.

5      Q.   Did Docs Done Right have a role in handling

6   cancellations?

7      A.   They would also issue refunds, yes.

8      Q.   Did anything else typically happen after the sale

9   involving the consumers?

10      A.   No, after the sale, everything was handled by

11   Docs Done Right.

12      Q.   I want to ask you a few questions about the

13   services that Assure Direct Services provided.

14           MS. ASSAE-BILLE:  This may be a good place for us

15   to break before I start a new section, so I would suggest we

16    go off the record and take a ten-minute break.  It is 9:40

17   a.m. Pacific Time; 12:40 p.m. our time.  If we could

18    reconvene at 9:50 a.m. your time.  Does that sound good to

19   everyone?

20           MR. BENICE:  That should work.  I have a 10:00

21   ten-minute court call that I have to do that's been

22   scheduled.  So if you want to continue until 10:00, that may

23   be a better approach.

24           MS. ASSAE-BILLE:  Is that Mr. Benice speaking?

25           MR. BENICE:  Yes.

Page 58

1          MS. ASSAE-BILLE:  Okay.  Let's go another 20

2     minutes, then, and we'll break then.

3          MR. LEPISCOPO:  Thank you.

4     Q.   Okay.  So I want to ask you a few questions about

5     the services that Assure Direct provided.  It's my

6     understanding that Assure Direct Services offered consumers

7     to assist them with consolidating their student loans; is

8     that right?

9     A.   Yes.

10    Q.   Can you tell me what student loan consolidation

11    is?

12    A.   We would take all of their loans, we had

13    different tradelines, and we would just have them

14    consolidated into two different loans.

15    Q.   What are the effects of consolidation?

16    A.   Nine or ten loans to two loans.

17    Q.   And what are the benefits of doing that, of

18    consolidating your loans?

19    A.   I don't know.

20    Q.   What did Assure Direct Services tell consumers

21    was the benefit of doing that?

22    A.   Make their life easier, it was a lower payment.

23    Q.   Did Assure Direct Services tell them whether this

24    would have any impact on the interest rate of their student

25    loans?

Page 59

1          A.   I don't recall.

2          Q.   Did Assure Direct Services tell them whether it

3     had any impact on their credit scores?

4          A.   I don't remember.

5          Q.   Do you remember any other benefits that Assure

6     Direct Services might have told consumers were connected

7     with consolidation?

8          A.   I don't.  I just remember a lower payment.

9          Q.   Okay.  Did Assure Direct Services actually

10    negotiate a lower interest rate for consumers?

11         A.   No.

12         Q.   Did it ever represent to consumers that

13    consolidating their loans would cause them to get a lower

14    interest rate?

15         A.   Not that I'm aware of.

16         Q.   Are you aware of whether Assure Direct Services

17    mentioned interest rates in its letters to consumers?

18         A.   No.

19         Q.   Did Assure Direct Services ever represent that it

20     was necessary to consolidate loans in order to get a lower

21    interest rate?

22         A.   Not that I recall.

23         Q.   Did the company's letters state anything like

24    this?

25         A.   We weren't in control of the letters.  I don't --

Page 67

1    payments."  Do you see that?

2         A.   Yes.

3         Q.   If a consumer consolidated but didn't sign up for

4    automated payments, do you know if they would get that

5    interest rate reduction?

6         A.   I don't.

7              MR. LEPISCOPO:  Objection, lacks foundation.

8         Q.   If a consumer signed up for automated payments

9    but not consolidation, could they get an interest rate

10   reduction?

11        A.   I don't know.

12             MR. LEPISCOPO:  Objection, lacks foundation.

13        Q.   Do you know why the marketing letter didn't say

14   more about the interest rate reduction and automatic

15   payments?

16        A.   No.

17             MR. BENICE:  Is now a good time to break?  It's

18   9:58.  I've got to make that call.

19             MS. ASSAE-BILLE:  Yes, counsel, now is a good

20   time to break.  Thank you for the reminder.

21             If the court reporter could take us off.

22             (Proceedings recessed at 9:58 a.m. Pacific

23   Standard Time)

24             (In session at 10:21 a.m. Pacific Standard Time)

25   BY MS. ASSAE-BILLE:

Page 68

1    Q.   Mr. Sebreros, earlier today you testified that

2    the email system that Assure Direct Services used was set up

3    for you by someone else; is that right?

4    A.   Yes.

5    Q.   Okay.  Who set the email up?

6    A.   Monster Loans IT.

7    Q.   Any particular individual, do you remember?

8    A.   I believe Don Kim was the individual to do it.

9    Q.   Thank you.  Did you have an email address at

10   Certified Document Center?

11   A.   I did.

12   Q.   Was that email address

13   fsebreros@certifieddocumentcenter.com?

14   A.   Maybe.  I'm not sure.

15   Q.   I'm going to share my screen again.  Please take

16   a look at document G, which is being marked as Exhibit 3.

17         MS. ASSAE-BILLE:  Court Reporter, is that right?

18         THE REPORTER:  That's correct, yes.

19         MR. BENICE:  You said it's G?

20         MS. ASSAE-BILLE:  G as in GO.

21         MR. BENICE:  Got it.  I'll have to go get it.

22         MS. ASSAE-BILLE:  The Bates number for the first

23   page is CFPB-JN-0150679.

24             (Exhibit 3 marked for identification.)

25   Q.   And it's quite long, so I'd like to give you time

Page 69

1    to review it, Mr. Sebreros.  So it sounds like you are still

2    downloading the document; is that right?

3         A.   Yeah.  They're coming right now.

4         Q.   Okay.  So I'll give you time to do that.  Take a

5     couple of minutes to review it and let me know when you're

6    ready.

7         A.   Okay.

8              MR. BENICE:  The password came through.  My

9    secretary is printing it out.  They're all in one big group.

10             MS. ASSAE-BILLE:  Understood.  So you should have

11   the documents before you in a minute or two; is that right?

12             MR. BENICE:  Yes, she is printing them now.

13             MS. ASSAE-BILLE:  Okay.  Maybe we can start with

14   what's on the screen now.  I assume that soon you will be

15   able to follow along.

16        Q.   Let's take a look at the first page, which has

17   been shared on the screen.  This is a copy of an email that

18   appears to have been sent by you on September 29th, 2016.

19   Do you recognize this email?

20        A.   No.  I can read it.

21        Q.   I'm sorry.  You said you don't think you can read

22   it?

23        A.   No, I can read it.

24        Q.   Okay.  Let me know when you're done reading the

25   email.

Page 70

1          A.    Yeah.

2          Q.    Okay.  This is your Certified Document Center

3     email address in the center line, right?

4          A.    Yes.

5          Q.    And this is your signature block?

6          A.    Yep.

7          Q.    So I see that this email was sent to Erin Mason

8     at a certified.com email address.  Who is Erin Mason?

9          A.    Erin Mason was a Monster Loans employee that they

10    had given one of the locations to.

11         Q.    Was she a manager of that location?

12         A.    She was an owner, yeah.

13         Q.    And was the location Certified Doc Prep?

14         A.    Yes.

15         Q.    Okay.  I see below the subject -- so the subject

16    line says, Training Manual, and then below that there is an

17    attachment that says, Training Manual Revised 1.1, and it

18    appears to be a Word doc document.

19              So you attached a training manual to this email,

20    correct?

21         A.    Yes.

22         Q.    I'm going to scroll down.  The next 78 pages are

23    the attachment, so I'll scroll down.  Hopefully you'll have

24    your own copy very soon.

25              MR. BENICE:  We have the copy.

Page 71

1          MS. ASSAE-BILLE:  Very good.

2      Q.   Flipping through this manual, was this manual

3  used at Certified Document Center around the time that you

4  sent this email, so late September 2016?

5      A.   Yes.  I don't remember, but ...

6      Q.   Did Certified Document Center have a training

7  manual in use usually?

8      A.   I believe we had one.  I don't know how -- how

9  much it was actually used.

10      Q.   When it was used, in what context was it?

11      A.   This is probably something that was given to a

12  new employee.

13      Q.   So is this something Document Prep Center would

14  use to train new employees?

15      A.   Yes.

16      Q.   Do you recognize this particular manual?

17      A.   Yes.

18      Q.   Have you reviewed it before?

19      A.   Yes.

20      Q.   Turn to page 11 of the manual, and I'll do the

21  same on my screen.

22      A.   Okay.

23      Q.   So the top of that page says "Student Loan

24  Advisor Script."  Do you recognize this page and the next

25  few pages as the script that Certified Document Center used

Page 72

1    on its sales floor?

2        A.    Yes.

3        Q.    Have you ever read this script on calls?

4        A.    Yes.

5        Q.    And did the student loan advisors that you

6    managed read that script on calls?

7        A.    Yes.

8        Q.    Okay.  Let's turn to page 19, which I have pulled

9    up on top of the screen.  In case it's hard for you to

10   follow, the Bates number at the bottom ends in 33053.

11   That's the 19th page.  And the title of the section says,

12   "How to Handle Mailer Calls."  Do you see that?

13       A.    Yes.

14       Q.    Very good.  So under the last subtitle, "The

15   Close," it says, in the third bullet point, "recap to the

16   client all the benefits of the program such as improved

17   credit, one monthly payment, lower interest rate and

18    possible forgiveness."  Do you recognize this instruction?

19       A.    Yes.

20       Q.    In that sentence what program is being referred

21   to?

22       A.    Income-based.

23       Q.    Okay.  The marketing letters refer to -- the

24   marketing letters that I showed you earlier, I believe

25   Exhibit 2, refer to a consolidation program.  Is that

Page  73

1    different from the program that you just mentioned, or did

2    you think of them as the same?

3         A.   I thought of them as the same.

4         Q.   Okay.  And so were sales employees at Certified

5    Document Center expected to follow these instructions as

6    they closed the sales?

7         A.   Yes.

8         Q.   Okay.  Did Assure Direct Services have a version

9    of this manual as well?

10        A.   Yes.

11        Q.   Did Assure Direct Services' manual contain this

12   exact instruction?

13        A.   I don't remember.

14        Q.   Do you remember if Assure Direct Services' manual

15   ever contained a similar instruction on recapping all the

16   benefits of the program?

17        A.   It would have been somewhat similar, yes.

18        Q.   In this recap, in that third bullet point,

19    there's no disclosure that consumers could get an interest

20    rate reduction without consolidating or without entering a

21   repayment program, correct?

22        A.   Can you repeat the question?

23        Q.   Sure.  So looking at the third bullet point under

24   "The Close" --

25        A.   Which page?

Page 81

1    Upsell," another instruction telling sales employees to get

2    back to the benefits, and then listing improving the

3    client's credit as one of the benefits.  That's correct,

4    right?

5         A.   Yes.

6         Q.   And now we're back in the script where the direct

7    language that is included in the script mentions, again,

8    that having multiple tradelines will improve your credit

9    score negatively, correct?

10        A.   It does.

11        Q.   So at Docu Prep Center did you expect the sales

12   employees to represent that consolidation would improve

13   their credit?

14        A.   The only thing that we expected from employees

15   was that they did their job and that they had sales.  I

16   mean, that's all we were taught.

17        Q.   And their job included reading off of this

18   script, correct?

19        A.   Everybody was supposed to go off of whatever

20   script was out at the time, yes.

21        Q.   And their job also entailed following the

22   instructions in the training manual, correct?

23        A.   Yes.

24        Q.   Okay.  Since Assure Direct Services' script came

25   from Certified Document Center, did it contain the statement

Page 82

1    that I just read and that is now on the shared screen, that

2    paragraph about improved credit?

3         A.   I don't remember.  It may have.  I don't know.

4         Q.   Do you have any reason to believe that it would

5    be excluded from Assure Direct Services' script?

6         A.   I just don't remember.

7         Q.   Do you remember if Assure Direct Services' script

8    was different from Certified Document Center's script in any

9    way?

10        A.   I don't.

11        Q.   But earlier you testified that Assure Direct

12   Services procured its script from Certified Document Center,

13   correct?

14        A.   Correct.

15             MR. LEPISCOPO:  Objection, misstates the

16   testimony.

17        Q.   Is that correct, Mr. Sebreros?

18        A.   That is correct.  That's where the script came

19   from.  I just --

20        Q.   Okay.

21        A.   How many variations of it, I don't know.

22        Q.   Were Assure Direct Services employees trained to

23   bring up improving a customer's score by decreasing

24   tradelines?

25        A.   Most of my employees came from Certified Document

Page 83

1    Center.  There wasn't --

2         Q.   And so what does that mean?

3         A.   There wasn't much training involved.  They had

4    already been doing the job.

5         Q.   So were they trained to continue doing what they

6    were doing at Certified Document Center?

7         A.   Yes.

8         Q.   If a consumer called and asked about whether the

9    program would improve their credit, what were Assure Direct

10   Services' employees supposed to say?

11        A.   I don't remember, to be honest.

12        Q.   What would refresh your memory?

13        A.   I don't know.

14        Q.   Do you have access to anything that could refresh

15   your memory?

16        A.   No.

17        Q.   Are you aware of whether Direct Document

18   Solutions made similar claims to the claims in the script

19   that we just looked at as far as improved credit scores?

20        A.   I don't know.

21        Q.   Do you know if Secure Preparation Services made

22   claims about improved credit scores?

23        A.   No, I don't recall.

24        Q.   Do you recall whether Certified Doc Prep Services

25   made similar claims about improved credit scores?

Page 84

1       A.   No.

2       Q.   Okay.  Please take a look at the document labeled

3   I in the file, which is being marked as Exhibit 5.  This is

4   an email dated April 20th -- sorry -- April 6th, 2017, and

5   the Bates number at the bottom right says CFPB-JN-0063906.

6               (Exhibit 5 marked for identification.)

7       Q.   Please let me know when you are done reviewing

8   this email.

9       A.   I'm done.

10      Q.   Okay.  Is this your email address in the Sender

11  line?

12      A.   Yes.

13      Q.   Did you send this email?

14      A.   I don't remember, but it looks like I did.

15      Q.   In the recipient line it says "Closers," and then

16  it says "Advisors."  Who received emails at these addresses?

17      A.   They were all advisors.

18      Q.   What did advisors do?  Is that just the sales

19  employees?

20      A.   The closers and advisors were sales employees.

21      Q.   What was the difference between the two?

22      A.   The difference was the closers had somebody do

23  the hard work for them, which was the opening of the call.

24      Q.   Did you sometimes coach advisors and closers on

25  sales tactics?

Page 85

1        A.   I'm sure I did, yes.

2        Q.   Did you sometimes coach them on training issues?

3        A.   More so my manager.

4        Q.   But did you personally do it sometimes?

5        A.   Not very often.  Maybe.  Maybe.  Not sure.

6        Q.   And when you say your manager, are you referring

7   to Jimmy Calderon who you named earlier?

8        A.   Yes.

9        Q.   So you've said you didn't coach them too often;

10  is that right?

11       A.   Yes.

12       Q.   So it was pretty infrequent for you to provide

13  coaching on training issues --

14       A.   Yes.

15       Q.   -- and matters of that nature?  Okay.  So let's

16  take a look at the exhibit.  The subject line here says

17  "Training Issues."  Do you see that?

18       A.   Yes.

19       Q.   That title suggests there were maybe problems on

20  the sales floor.  Am I understanding that right?

21       A.   It looks that way, yes.

22       Q.   Okay.  And then below that the importance of the

23  email is set as high.  Do you see that?

24       A.   Yes.

25       Q.   What did it mean when you set an email importance

Page 86

1   as high?

2        A.   Just wanted the employees to see it.

3        Q.   Okay.  Did you write this email because the

4   issues outlined in the email were happening on the sales

5   floor?

6        A.   That would have been the reason, yes.

7        Q.   What was your goal in sending the email?

8        A.   Just that the sales reps take notice.

9        Q.   Okay.  Would you have wanted them to change

10  anything they were doing?

11       A.   I don't know what the specific issue was the

12  backend was having, so I couldn't tell you.

13       Q.   Okay.  The first line of the email says, "We had

14  a meeting with our backend and there's several issues we

15  have to address."

16            When you said the backend earlier, you mentioned

17  Docs Done Right.  Is that who you're talking about here?

18       A.   Yes.

19       Q.   Did Docs Done Right sometimes identify issues for

20  your review?

21       A.   Yes.

22       Q.   How did they couch those issues?

23       A.   I would imagine they would get a large amount of

24  emails or phone numbers from students who had signed up.

25       Q.   Okay.  So did they have excessive complaints?

Page 87

1     A.   Yes.

2     Q.   Would they receive complaints in writing

3  sometimes?

4     A.   I would assume more so than the actual front end

5  would, yes.

6     Q.   And then did they receive complaints by phone?

7     A.   Yes.

8     Q.   And as we discussed earlier, they had access to

9  cancellations, right?

10    A.   Yes.

11    Q.   They were able to cancel services for customers

12  who requested it?

13    A.   Yes.

14    Q.   Okay.  Did they have any other way to receive

15  complaints or cancellations, any other means?

16    A.   Email and phone number, which is provided to them

17  at the end of the sales call.

18    Q.   Was there a system for Docs Done Right to

19  communicate issues to Assure Direct Services?

20    A.   Mostly we would just hear from Ed Martinez.

21    Q.   Was that on a regular basis?

22    A.   Somewhat.

23    Q.   Were there meetings for the purpose of

24  communicating issues that DDR noticed?

25    A.   Yep.

Page 88

1       Q.   Okay.  And you mentioned Ed Martinez.  Is that

2   who would typically communicate on behalf of Docs Done

3   Right?

4       A.   Yes.

5       Q.   And who at Assure Direct Services would he reach

6   out to, to talk about issues that Docs Done Right was

7   noticing?

8       A.   Myself.

9       Q.   And to anyone else?

10      A.   Possibly Jimmy.

11      Q.   And that's because you were the owner and Jimmy

12  was a manager, correct?

13      A.   Yes.

14      Q.   Okay.  Did Assure Direct Services ever receive

15  consumer complaints through the Better Business Bureau?

16      A.   Yes.

17      Q.   Did you personally review those?

18      A.   No.

19      Q.   Did you direct someone to?

20      A.   I don't remember.

21      Q.   Who would typically review the Better Business

22  Bureau complaints for Assure Direct Services?

23      A.   It would have been somebody else's

24  responsibility.

25      Q.   You don't recall who?

Page 89

1      A.    No.

2      Q.    Okay.  Any other sources from which Assure Direct

3  Services would get complaints?

4      A.    Sometimes mailed letters.

5      Q.    Okay.  What did consumers tend to complain about?

6      A.    I don't recall.

7      Q.    Did consumers ever complain about things that

8  sales employees had told them over the phone?

9      A.    I don't recall.

10     Q.    Okay.  Do you recall if they complained about

11 services not being completed?

12     A.    No.

13     Q.    Okay.  So in the next paragraph of this email you

14 write, quote, "You are not allowed to tell clients they can

15 call back and reschedule payments.  This is poor

16 salesmanship and just leads to a high amount of

17 cancellations."

18          Did you write this because clients were calling

19 back and rescheduling payments?

20     A.    It looks that way, yes.

21     Q.    And this was leading to cancellations?

22     A.    That's what it says, yes.

23     Q.    How could you tell that this was leading to

24 cancellations?

25     A.    We would have been told from the backend, Docs

Page 90

1    Done Right.

2         Q.   What was Assure Direct Services' cancellation

3    rate?

4         A.   It was high.  I don't remember exactly.

5         Q.   When you say "high," can you give me an estimate,

6    a ballpark range?

7         A.   Forty, 50 percent.

8         Q.   Okay.  And why didn't you want consumers to

9    reschedule payments?

10        A.   The email was intended for the sales reps to not

11    even set up those payments initially because it was likely

12   that the student or the customer never was going to pay

13   anyway.  So it was a waste of everybody's time.

14        Q.   Any other reason?

15        A.   No.

16        Q.   In the second-to-last paragraph of this email you

17   write, "Specifics," and then all caps, "DO NOT GET INTO

18   SPECIFICS.  You cannot quote someone on interest rates or

19   make up fake numbers about credit scores going up.  Yes,

20   this can increase a credit score and yes, this can get them

21   an interest rate reduction, but stay out of quoting specific

22   numbers.  This is another reason for high cancellations."

23             So it sounds like sales employees were mentioning

24   an interest rate reduction on calls, right?

25        A.   Yeah, it looks that way.

Page 91

1      Q.   Okay.  I want to clarify a word in the second

2   part of the sentence that I just read.  So you wrote, "this

3   can get them an interest rate reduction."  Did the word

4   "This" refer to consolidation?

5      A.   I -- I don't know.  It looks like I was writing

6   the email because I was given the information and I was told

7   to make sure that whatever was going on no longer continued

8   to be a problem.

9      Q.   When you say you were told to make sure it was no

10  longer a problem, who would have told you to do that?

11     A.   Either the backend or the LP.

12     Q.   Did you write this particular paragraph because

13  the behavior in the paragraph, this specific quoting, was

14  happening on the sales floor?

15          MR. LEPISCOPO:  Objection, calls for speculation,

16  foundation.

17     Q.   Mr. Sebreros?

18     A.   I don't remember.

19     Q.   Okay.  It sounds from what you wrote that Assure

20  Direct Services were not permitted to quote specific numbers

21  with respect to the interest reduction; is that right?

22     A.   I -- I don't remember in what -- what context we

23  were doing this.  I don't remember.

24     Q.   Okay.  I'll just go back to the email paragraph

25  where you wrote in all caps, DO NOT GET INTO SPECIFICS, and

Page  92

1    the next line says, "you cannot quote someone on interest

2    rates."  How do you understand those two sentences which you

3    wrote?

4         A.    All I can say is maybe some employees were saying

5    things they shouldn't have and we didn't want them doing

6    that.

7         Q.    Is there a reason why giving specific quotes on

8    interest rates would be inappropriate?

9         A.    I don't know.

10        Q.    Was this a common problem, this quoting of

11   specific numbers?

12        A.    I don't remember.

13        Q.    Were the specific quotes on interest rates that

14   sales employees were giving, were those quotes accurate?

15        A.    I don't remember.

16        Q.    Did Assure Direct Services employees have enough

17   information about any individual consumer to quote them a

18   specific quote on an interest rate reduction?

19        A.    I don't know.

20        Q.    But you know what kind of information your

21   employees had about consumers that called in, right?

22        A.    We knew their name and how much debt they owed.

23        Q.    Okay.  Any other insight into their finances?

24        A.    Or debt they approximately owed.  No.

25        Q.    And when you say you knew the debt they

Page 93

1    approximately owed, you did not know the precise number,

2    right --

3        A.   No.

4        Q.   -- when they called in?  You did not know the

5    specific interest rate of which loan, right?

6        A.   No.

7        Q.   Okay.  Do you recall if Assure Direct Services

8    ever received consumer complaints about the representations

9    it made on interest rates?

10       A.   No.

11       Q.   Do you know whether -- do you know how such

12   complaints would have been resolved?

13       A.   In a refund.

14       Q.   Okay.  Did you ever personally respond to

15   consumer complaints while you owned Assure Direct Services?

16       A.   Not that I recall.

17       Q.   Who at Assure Direct Services would have been

18   responding to consumer complaints, if not you?

19       A.   The majority of the consumer complaints would

20   have went to the backend.

21       Q.   Okay.  And then the backend would -- would the

22   backend notify Assure Direct Services of how it had resolved

23   the complaint?

24       A.   No.  They would just cancel it or refund or fix

25   it however they did.  They wouldn't tell us.

Page 106

1   script as Assure Direct Services, right?

2        A.   Everything was probably the same.

3        Q.   So that was about two years ago.

4        A.   Yeah.

5        Q.   That's not that long ago.

6        A.   I don't remember what I did last week.

7        Q.   Okay.  Can you tell me what Assure Direct

8   Services told consumers about when their first payment would

9   be due?

10       A.   No.  I don't remember.

11       Q.   Okay.  So at some point during the call -- sorry.

12            Can you tell me -- can you estimate how long --

13   how long it took for consumers to get approval on

14   consolidations?

15       A.   The actual sales call?

16       Q.   No, for the actual consolidation to go through

17   with the Department of Education.

18       A.   I don't remember.

19       Q.   Did it take more than a day?

20       A.   I don't remember.  That wasn't something we

21   handled.

22       Q.   But wasn't it something consumers would ask about

23   on the call?

24       A.   I don't remember.

25       Q.   At some point during the call consumers provided

Page 107

1    their payment -- their payment information to Assure Direct

2    Services, right?

3         A.   Yes.

4         Q.   And earlier you testified that consumers could

5    pay by debit or by a credit card; is that right?

6         A.   Yes.

7         Q.   Did Assure Direct Services use a payment

8    processor to collect payments?

9         A.   We used Debt Pay Gateway.

10        Q.   Debt Pay Gateway.  Okay.  And then what was Debt

11   Pay Gateway's role exactly?

12        A.   So that was the -- DebtPayPro was the software

13    that was licensed to all the front ends by Ed Martinez and

14   Docs Done Right.

15        Q.   Did they receive the consumers' fees?

16        A.   They did.

17        Q.   And then did they disburse them to Assure Direct

18   Services?

19             MR. LEPISCOPO:  Lacks foundation.

20        A.   It disbursed them to Docs Done Right first, and

21   then Docs Done Right chose what the front ends would get.

22        Q.   Okay.  Typically, how soon after the consumer

23   made their payments -- well, first, let me go back.

24             When the consumer was dealing with Docs Done

25   Right, were they told that they were dealing with Docs Done

Page 111

```
 1        Q.   When Assure Direct Services used a merchant
 2   account, whose merchant account was it?
 3        A.   It was mine.
 4        Q.   It was yours?
 5        A.   Mm-hmm.
 6        Q.   Okay.  How did you get that merchant account?
 7        A.   Mohamed Hegazi had opened it for me.
 8        Q.   Okay.  When did he open it?
 9        A.   A month or two after Assure Direct Services
10   opened.
11        Q.   And what was the -- why did you get that merchant
12   account?  What was the purpose of that?
13        A.   The ability to charge credit cards.
14        Q.   Okay.  So it was only for that purpose, right?
15        A.   Yes.
16        Q.   Any other purpose?
17        A.   No.
18        Q.   Do you have any -- sorry.  What bank was that
19   through, the merchant account?
20        A.   I don't remember.  I didn't open it.
21        Q.   Okay.  Is the account still active?
22        A.   No.
23        Q.   When did it close?
24        A.   Years ago.
25        Q.   Can you estimate when?
```

Page 112

1        A.    2018?

2        Q.    Do you have any further knowledge regarding how

3    Assure Direct Services' fee charging worked?

4        A.    As far as?  I'm not understanding the question.

5        Q.    Do you have any further knowledge regarding the

6    timing of Assure Direct Services' fee charging?

7        A.    As to when the student was billed?

8        Q.    That's right.  So earlier I asked you questions

9    about when Assure Direct Services billed the consumer, when

10    it received those fees.

11        A.    I don't remember like the specifics or how it was

12    released or when we got it.

13        Q.    What do you remember about the fee charging?

14        A.    That we charged $799 to $999, and that's all I

15    remember.

16        Q.    So you have no further knowledge about the timing

17    of the fee charging, right?

18        A.    No.

19        Q.    Do you have any further knowledge regarding who

20    was involved in collecting the fees other than what we've

21    discussed?

22        A.    No.

23        Q.    Do you have any further knowledge about whether

24    fees were charged within a week or two of enrollment?

25        A.    I don't remember.

Page 113

1       Q.   Okay.  Anything else -- do you know anything else

2   about Assure Direct Services' fees?

3       A.   No.

4       Q.   I am now sharing another document with you.  This

5   is document K, which is being marked as Exhibit 6.

6                 (Exhibit 6 marked for identification.)

7       Q.   And the Bates number at the bottom of the first

8   page is CFPB-JN-0167302.

9                 MR. BENICE:  I'm going to have to check the

10  documents.

11                (Brief interruption.)

12                MS. ASSAE-BILLE:  Mr. Sebreros, is your counsel

13  next to you?  I can't see him on camera.

14                THE WITNESS:  Yes, he is.

15                MS. ASSAE-BILLE:  Okay.  For the record, I'm

16  noting that the defendant and his counsel stepped away.

17      Q.   Mr. Sebreros, did you speak to your attorney

18  while you were away?

19      A.   No.

20      Q.   So please take a look at document K, which is

21  being marked as Exhibit 6.  This is a contract between

22  Assure Direct Services and a consumer.  Earlier I asked you

23   if Assure Direct Services used a template for its consumer

24  contracts.  Do you remember that?

25                Mr. Sebreros, did you hear my question?

Page 123

1    that?

2           THE REPORTER:  The response I heard was "I'm

3    unaware."

4      Q.   Okay.  Good.

5           MS. ASSAE-BILLE:  We're going to go off the

6    record and pause for lunch.

7           (Proceedings recessed at 12:08 p.m. Pacific

8    Standard Time)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 124

                        AFTERNOON SESSION

1

2              (In session at 1:20 p.m. Pacific Standard Time)

3    BY MS. ASSAE-BILLE:

4         Q.   I want to go back to the marketing process.  You

5    testified earlier that Assure Direct Services marketed

6     services to consumers through direct mail.  Remember that?

7         A.   Yes.

8         Q.   And that Assure Direct Services used a mailing

9    house, correct?

10        A.   Yes.

11        Q.   And one of the mailing houses was Automated

12   Mailers; is that right?

13        A.   Yes.

14        Q.   I believe you testified that Automated Mailers

15   was Jawad's contact; is that right?

16        A.   Yes.

17        Q.   And what did you mean by that?

18        A.   Meaning nobody else was allowed to talk to the

19   mail house but Jawad.

20        Q.   But did you ever yourself email with Automated

21   Mailers?

22        A.   Maybe towards the, like the end of it I may have,

23   but in the beginning and for the most of the duration of,

24   like, the call center run, we didn't.

25        Q.   Okay.  Can you estimate when approximately you

Page 125

1    began to be allowed to talk with Automated Mailers on your

2    own?

3         A.   I couldn't give you a time frame.

4         Q.   What year?

5         A.   2018 most likely.

6         Q.   Okay.  And so I understand, was there a direction

7    that only Mr. Nesheiwat was permitted to contact with

8    Automated Mailers?

9         A.   What's the question?

10        Q.   In other words, was there an instruction that

11   only Mr. Nesheiwat was allowed to talk or to communicate

12   with Automated Mailers?

13        A.   Yeah, we weren't allowed to do our own thing or

14   find our own sources.  We just had to do as we were told.

15   And we weren't allowed to speak with the -- his contact,

16   Automated Mailers.

17        Q.   Why was Mr. Nesheiwat only the one allowed to

18   communicate with them?

19             MR. LEPISCOPO:  Objection, calls for speculation.

20        Q.   Why was it that way, Mr. Sebreros?

21        A.   I don't know.  I can only assume.  I don't know

22   why.

23        Q.   Okay.  Did Assure Direct Services use a vendor

24   named Orange County Direct Mail?

25        A.   We did.

Page 126

1      Q.   Did it ever switch from Automated Mailers to

2   Orange County Direct Mail or --

3      A.   It did.

4      Q.   Okay.  When did that switch happen?

5      A.   I don't know the exact dates.

6      Q.   Can you estimate the time and year?

7      A.   Towards the end of the Assure Direct Services'

8   run.

9      Q.   Is that --

10     A.   It would have been 2017 at some point, but I

11  don't know when.

12     Q.   Okay.  Did Mr. Nesheiwat also -- did

13  Mr. Nesheiwat have the same relationship with Orange County

14  Direct Mail?

15     A.   No.

16     Q.   Okay.  So how come Assure Direct Services was

17  able to work with that mailing house?

18     A.   Towards the -- after everybody running their own

19  little location towards the end of, like, the run, they had

20  put it on us to find other ways.  So eventually the LP gave

21  everybody a little more responsibility or freedom, but it

22  was towards the end of it.

23     Q.   Okay.  A number of the LPs were associated with

24  Monster Loans, correct?

25     A.   Yes.

Page 127

1       Q.    Was Mr. Nesheiwat associated with Monster Loans?

2       A.    Yes.

3       Q.    At some point did Mr. Nesheiwat leave Monster

4    Loans?

5       A.    I don't know.

6       Q.    Was the mailing process the same with both

7    Automated Mailers and Orange County Direct Mail?

8       A.    I don't know how the process worked.

9       Q.    Who knew how the process worked at Assure Direct

10   Services for mailing?

11      A.    Bill Abdel.

12      Q.    And did Bill Abdel report to anyone?

13      A.    No.

14      Q.    Did Bill Abdel take any direction from the group

15   that you've been calling the LPs?

16      A.    Yes.

17      Q.    Who in that group did he take direction from?

18      A.    The same people.  It was Jawad, Sean, Robert,

19   Dave.

20      Q.    Okay.  As far as the process, did Automated

21   Mailers create proofs of the final letters before they went

22   out?

23      A.    I don't remember.

24            MR. LEPISCOPO:  Objection, calls for speculation,

25   lack of foundation.

Page 128

1      Q.   Did Assure Direct Services have to approve the

2   final letters before they went to print?

3      A.   That would have been something that Bill would

4   have done.

5      Q.   Do you know what a proof is?

6      A.   The beforehand copy before it went out.

7      Q.   Okay.  And to be clear, I just want to make sure

8    I understood your second-to-last answer.  Mr. Abdel had to

9   approve the final letters before they went to print; is that

10   right?

11      A.   Yes.  Yes.

12      Q.   Did Assure Direct Services ever order direct mail

13   jointly with some of the other student loan debt relief

14   companies that we talked about earlier?

15      A.   Yes.

16      Q.   So -- go ahead.

17      A.   Yes, mailed together.

18      Q.   Okay.  How was this coordinated?

19      A.   We all knew each other, and it was, just like I

20   said, at the direction of the group.  They would just

21   instruct us to do the task.

22      Q.   Okay.  The task being getting the letters out?

23      A.   Correct.

24      Q.   Did Assure Direct Services have to pay the

25   mailing house for the printing and mailing that it did?

Page 129

1        A.    I don't know who -- who the check came from or

2    how it was paid, but I would imagine that we had to pay,

3    yes.

4        Q.    Did the mailing house invoice Assure Direct

5    Services individually?

6        A.    I don't remember.

7        Q.    What was the process for paying the invoices?

8        A.    I don't remember.

9        Q.    Who would know the answer to that at Assure

10   Direct Services?

11            MR. LEPISCOPO:  Objection, calls for speculation,

12   lacks foundation.

13       A.    I don't know.

14       Q.    Who was in charge of paying for the marketing at

15   Assure Direct Services?

16       A.    I don't remember.

17       Q.    So you mentioned that Bill Abdel was involved in

18   the marketing for Assure Direct Services, correct?

19       A.    Yes.

20       Q.    Was anyone else at Assure Direct Services

21   involved with the marketing aspect of the business -- the

22   mailing aspect, rather?

23            MR. LEPISCOPO:  Objection, calls for speculation,

24   lacks foundation.

25       A.    I don't know.  I don't remember.

Page 130

1      Q.   Was Jimmy Calderon in charge of paying for the

2   mailing house invoices?

3      A.   I don't remember.

4      Q.   Okay.  So you were the owner of the company,

5   right?

6      A.   Yes.

7      Q.   And Jimmy Calderon was sales manager, correct?

8      A.   Yes.

9      Q.   And Bill Abdel assisted with marketing.  Do I

10   understand that right?

11      A.   Yes.

12      Q.   Okay.  Is there anyone else at Assure Direct

13   Services who was in a managerial position other than you

14   three that we haven't discussed yet?

15      A.   No.

16      Q.   So did one of you three handle the mailing

17   process?

18      A.   It would have been Bill.

19      Q.   Who would be in charge of signing the checks for

20   those invoices?

21      A.   Myself or the accountant.

22      Q.   Did you ever sign checks paying for mailing work

23   that Automated Mailers had done?

24      A.   I don't remember.

25      Q.   So my understanding is that the student debt

Page 131

1    relief companies, including Assure Direct Services, provided

2    Automated Mailers with spreadsheets that contained consumer

3    names and addresses; is that right?

4        A.   Yes.

5        Q.   And where did those spreadsheets come from?

6        A.   Bill handled it.  I don't.

7        Q.   Did the spreadsheets come from Experian?

8        A.   Bill Abdel would pull them, yes, from Experian.

9        Q.   Did Assure Direct Services have an Experian

10   account?

11       A.   No.

12       Q.   So whose Experian account was Bill pulling them

13   from?

14       A.   Monster Loans as well as Lend Tech.

15            MR. LEPISCOPO:  Objection.

16       Q.   And then who was in charge of transferring the

17   lists from the Monster Loans Experian account to Assure

18   Direct Services?

19       A.   Bill.

20       Q.   And did Bill also send the lists to the mailing

21   house?

22       A.   Yes.

23       Q.   I'm going to refer to those lists as "prescreened

24   lists."  Are you familiar with that term?

25       A.   No.

Page 132

1          Q.    Okay.  Well, that's what I will mean when I use

2     the term "lists."

3               MR. LEPISCOPO:  I'm going to object to the use of

4     that term to not include necessarily what the codes say

5     about that term, whether that is a term of art as opposed to

6     the way you're using it in this deposition.

7               MR. REARDON:  Pete, that's not a proper

8      objection.  We're using the term "prescreened list," which

9     is a kind of recognized term, and the witness has already

10    acknowledged that these lists came from Experian.

11              MR. LEPISCOPO:  Then call them Experian lists as

12     opposed to calling them prescreened lists, which he has no

13    foundation to understand what that term means because it is

14    a term of art.

15              MS. ASSAE-BILLE:  It's my deposition, and I will

16    call them prescreened lists.  Let's move on.

17         Q.   Mr. Sebreros, were you ever personally involved

18    in using or obtaining prescreened lists that were ordered

19    through Monster Loans' Experian account?

20              MR. LEPISCOPO:  Objection, vague and ambiguous,

21    lacks foundation, calls for speculation, outside of the

22    witness's knowledge.

23              MR. REARDON:  Pete, you got to stop this.  This

24    is not appropriate to interrupt someone else.  You're not

25    representing the witness.

Page 135

1      Q.   When you say "much," is there anything?

2      A.   Other than what you've reminded me of, yeah.

3      Q.   Did you have any other involvement in the order

4   of prescreened lists through Monster Loans?

5      A.   No.

6      Q.   Did you, as the president -- sorry.  As the owner

7   of Assure Direct Services, did you support the use of those

8   prescreened lists?

9      A.   I didn't support or not support.  I just didn't

10  know.

11     Q.   When did you first hear about -- sorry.  When did

12  you first learn that the prescreened lists were coming from

13  Monster Loans?

14     A.   I don't remember.

15     Q.   Do you remember who first mentioned it to you?

16     A.   Dave Sklar.

17     Q.   Around what period?

18     A.   I don't remember.

19     Q.   What did Dave Sklar say about it?

20     A.   I don't remember specifics.

21     Q.   At the time were you at Certified Document

22  Center --

23     A.   Yes.

24     Q.   -- when -- okay.  So David Sklar would have been

25  your supervisor?

Page 136

```
 1        A.   Yes.

 2        Q.   Did Assure Direct Services ever reuse prescreened

 3   lists?

 4        A.   I don't remember.

 5        Q.   Are you familiar with the term "recycled data"?

 6        A.   No.

 7        Q.   Are there any circumstances in which Assure

 8   Direct Services would have to reuse prescreened lists?

 9        A.   I don't know the specifics, no.

10        Q.   Did Assure Direct Services have uninterrupted

11   access to Experian prescreened lists from Monster Loans?

12        A.   Yes.

13        Q.   Were there ever periods where Monster Loans

14   stopped providing prescreened lists?

15        A.   Yes.

16        Q.   Tell me about those time periods.

17        A.   I don't have the time periods.

18        Q.   Why would Monster Loans stop providing the lists?

19        A.   I don't know.

20             MR. LEPISCOPO:  Objection, calls for speculation,

21   lack of foundation.

22        Q.   Would they --

23             THE REPORTER:  I didn't get that.

24        A.   I just don't know.  I don't know the specifics.

25        Q.   How often would Monster Loans stop providing
```

Page  137

1    Assure Direct Services with data, with prescreened lists?

2         A.   I don't remember.

3         Q.   Did it happen more than once?

4         A.   I don't remember.

5         Q.   Did you have any conversations about losing

6    access to the prescreened lists from Monster Loans?

7         A.   Possibly.  I don't remember.

8         Q.   Did it ever come up at meetings with the LPs?

9         A.   Probably.  I don't know.

10        Q.   Did Mike Van Loon ever talk to you about the

11   prescreened lists while you were the owner of Assure Direct

12   Services?

13        A.   It would have been something that we went over in

14   the meetings, yes.

15        Q.   Did he ever talk about stopping Monster Loans

16   from providing prescreened lists to Assure Direct Services?

17        A.   I don't remember.

18        Q.   I want to go back to paying for the prescreened

19             lists.  Did Mohamed Hegazi ever assist with paying

20   -- assist

21   Assure Direct Services with paying for the prescreened

22   lists?

23        A.   I would imagine so.

24        Q.   How did he assist?

25        A.   I don't know.  I mean, he would have written a

Page 141

1          So are those checks -- are the checks he's

2     referring to, to pay off mailing invoices?

3          A.   Yes.

4          Q.   Where did Automated Mailers typically pick up the

5     checks from?

6          A.   I don't remember.

7          Q.   Did it pick them up for several companies at

8     once?

9          A.   I don't remember.

10         Q.   Okay.  In the second paragraph Contardi writes

11    that he is concerned over who should be copied on the email

12     tree, and then he says, "just to make sure I am sending to

13    both of you."  Why was he sending this email to you and

14    Abdel?

15              THE REPORTER:  We had crosstalk.  Excuse me.

16              MR. LEPISCOPO:  I just objected, calls for

17    speculation.

18              THE WITNESS:  It seems like he doesn't know where

19    to send them.

20         Q.   Okay.  Was it common for Automated Mailers to

21     discuss the invoices of several student loan businesses at

22    once?

23              MR. LEPISCOPO:  Objection, calls for speculation,

24    lacks foundation.

25         A.   Don probably knew that all of us were the same,

Page 142

1    so it didn't really matter.

2       Q.   So was there some coordination at the top to

3    ensure these invoices were going to be taken care of no

4    matter who he emailed?

5       A.   He knew exactly where our accountant's office

6    was, so I'm sure he would just send it there.

7       Q.   And the accountant being Mr. Hegazi?

8       A.   He could probably sign checks for everybody,

9    yeah.

10      Q.   So Mr. Hegazi was involved in paying off

11   invoices?

12      A.   Yes.

13      Q.   Okay.  I am now showing you document N, as in

14   Nancy, in the file, which is being marked as Exhibit 8.

15           (Exhibit 8 marked for identification.)

16           MS. ASSAE-BILLE:  For the court reporter, the

17   bottom right Bates number is CFPB-JN-0094268.

18      Q.   Please take your time to review this email, and

19   then let me know when you've looked it over.

20      A.   Okay.

21      Q.   So this is an email from Bill Abdel to several

22   Automated Mailers employees copying you.  Abdel writes that

23   he is attaching the data for the student shops, and he

24   instructs Automated Mailers to, quote, "split records as

25   evenly as possible by company."  Do you see that?

Page 143

1       A.   Yes.

2       Q.   Was it common for Mr. Abdel to do that?

3       A.   I don't remember his specific role besides -- I

4  don't know how he communicated with Don.

5       Q.   Were you typically copied on these -- on his

6  emails to Automated Mailers as you are in this email?

7       A.   Possibly, but I don't read my emails.

8       Q.   There's an attachment, as you can see from the

9   attachment line, that says, "ADS data."  Did ADS stand for

10  Assure Direct Services?

11      A.   Yes.  And it looks like it's half the order of

12  everybody else.

13      Q.   So if we look in the body of the email, are you

14   referring to the number of records that is next to each of

15  the initials for the student loan companies?

16      A.   Yes.

17      Q.   So SPS would stand for Secure Preparation

18  Services, right?

19      A.   Yes.

20      Q.   And then DDS for Direct Document Solutions?

21      A.   Yes.

22      Q.   It looks like the attachment ADS data was an

23  Excel spreadsheet.  Do you see that?  It ends in xlsx.

24      A.   No, I don't see that.

25      Q.   So under the subject line where you can see the

Page 144

1    title of the attachment.

2         A.   Okay.

3         Q.   Do you see it?

4         A.   Yes.

5         Q.   Okay.  So this was a spreadsheet, right?

6         A.   It appears so, yes.

7         Q.   And did that spreadsheet contain the names and

8    addresses of consumers?

9         A.   I've never seen this spreadsheet.

10        Q.   When Abdel writes about the data for student

11   shops, would that data have come from Experian?

12        A.   Yes.

13        Q.   So debt relief companies provided the mailing

14    house with data that contained information about consumers

15   for the mailings, correct?

16        A.   Correct.

17        Q.   Okay.  I want to go back and talk about

18   Lend Tech, which we touched on a little bit at the beginning

19   of this deposition.

20             Tell me everything you know about Lend Tech.

21   What was this company?

22             MR. LEPISCOPO:  Objection, calls for a narrative.

23        A.   I was asked to go through the process, the

24   Lend Tech process, because there was no other way at the

25   time to pull Experian data.  So they gave us an office next

Page 145

1    door to Monster Loans.  This was done with the discretion of

2    the Monster Loans attorney.

3         Q.   When you say you were asked to do this, who asked

4    you?

5         A.   The LP.

6         Q.   Would you name them for me?

7         A.   Tom, Sean, Jawad, Robert, Dave.

8         Q.   When did they tell you this?

9         A.   I don't remember the dates.

10        Q.   Was it in the summer of 2017?

11        A.   May have been.

12        Q.   Was there a meeting?  How did they inform you of

13   what you had to do?

14        A.   I don't remember the specifics.

15        Q.   What did they say generally?

16        A.   We're not going to have a job any longer if we

17   don't get this done.

18        Q.   When you say there was no other way to pull

19   Experian data, does this mean that Monster Loans had stopped

20   providing Experian data to Assure Direct Services and

21   others?

22        A.   I don't remember the specific reasons.

23        Q.   Did you ask?

24        A.   No.

25        Q.   If Assure Direct Services wasn't getting data,

Page 146

1    then it couldn't reach consumers, right?

2         A.   Correct.

3         Q.   Is that something you would have noticed on the

4    sales floor?

5         A.   Possibly.

6         Q.   In other words, if there was no data to reach

7    customers, then the phones wouldn't ring, right?

8              MR. LEPISCOPO:  Objection, calls for speculation,

9    vague and ambiguous as to time.

10        A.   I don't remember.  I don't remember.

11        Q.   As the owner of Assured Direct Services, one of

12   your responsibilities was managing employees, right?

13        A.   Yes.

14        Q.   And making sure they had work to do?

15        A.   Yes.

16        Q.   Was part of your job making sure the phones rang?

17        A.   No.

18        Q.   Whose job was that?

19        A.   The LPs.  It was, like I said, it was already a

20   process that was already in place.  We just -- we were just

21   bodies to manage people and make sure --

22        Q.   So you were asked by the LPs to create Lend Tech

23   so that Assure Direct Services could get new sources of

24   Experian marketing lists; is that right?

25        A.   So Assure Direct Services and every other find

Page 147

1    could, yes.

2         Q.   Okay.  And what were the other companies?

3         A.   Secure, the other locations, I don't remember the

4    names.

5         Q.   Direct Document Solutions as well?

6         A.   Yes.

7         Q.   Docu Prep Center?

8         A.   Same thing.

9         Q.   And Certified Doc Prep Services?

10        A.   Also Secure, same thing.

11        Q.   You said that they gave you an office next to

12   Monster Loans.  When you say "they," are you, again,

13   referring to the LPs?

14        A.   Yes.

15        Q.   What was the line of business of Lend Tech?

16        A.   I don't know.

17        Q.   Was it -- did it offer the same services as

18   Docu Prep Center and Assure Direct Services?

19        A.   No.

20        Q.   What did it offer?

21        A.   I don't believe it offered anything.

22        Q.   So were you directed to assist Lend Tech with

23   getting an Experian account?

24        A.   Yes.

25        Q.   Okay.  Tell me who gave you that instruction.

Page 148

1       A.   That came from Jawad, Sean, and Tom.

2       Q.   What exactly were you instructed to do?

3       A.   They just gave us an office.  They told us to

4   fill it with chairs and computers, and that was it.

5       Q.   Was it -- there were chairs and computers, but

6   the company didn't offer any real services, right?

7       A.   No.

8       Q.   So was it a real business?

9       A.   Doesn't appear that way.

10      Q.   What was Lend Tech going to do with that Experian

11  account?

12      A.   Supply it to the student loan locations.

13      Q.   Describe your role to me in setting up the -- in

14  obtaining the Experian account.  What were the steps?

15      A.   I don't remember the steps.

16      Q.   Did you have to fill out an application?

17      A.   I don't remember filling out an application.

18      Q.   Did you have to communicate with Experian in any

19  way?

20      A.   Bill Abdel did.  I didn't communicate with

21  Experian.

22      Q.   Who was the owner of Lend Tech?

23      A.   It was Sean Cowell initially.

24      Q.   Did you have to assist Sean Cowell with applying

25  for an Experian account?

Page 149

1      A.   No.

2      Q.   Did you work -- did you interact with him much

3    while you were assisting Lend Tech?

4      A.   I don't remember.

5      Q.   Who did you interact with the most at Lend Tech?

6      A.   I didn't really interact with anybody at

7    Lend Tech.

8      Q.   So in assisting the company you didn't interact

9    much with others, right?

10     A.   No.

11     Q.   And that's because it wasn't a real company,

12   correct?

13     A.   Correct.

14     Q.   So I understand that you didn't interact much

15   with others, so it sounds like you had a pretty solitary

16    task, but what was your -- what was your job exactly?  How

17   did you carry out the instruction that was given to you?

18     A.   I don't remember how we carried anything out.  It

19   was Bill Abdel who pretty much did all of this as far as

20   setting everything up.

21     Q.   And what did Bill Abdel set up?

22     A.   The Experian account with Lend Tech.

23     Q.   Do you know how he did that?

24     A.   No.

25     Q.   Did you assist Bill Abdel at Lend Tech in any

Page 153

1          Q.    Why are you listed as a manager on this

2    application?

3                MR. LEPISCOPO:  Objection, calls for speculation,

4    lack of foundation.

5          A.    They asked me to do it, so they probably put my

6    information on there.

7          Q.    When you say "they" --

8          A.    The LP.

9          Q.    The LP.  So Mr. Cowell and others?

10         A.    Or Bill.  I don't know.

11         Q.    You're listed here under the box that says "Head

12   Designate."  Do you know what head designate is?

13         A.    No.

14         Q.    How do you explain your name on this application?

15               MR. LEPISCOPO:  Objection, calls for speculation,

16   lacks foundation.

17         A.    I don't know.

18         Q.    Were you ever given credentials to access this

19   Experian account?

20         A.    Bill handled that.

21         Q.    So Mr. Abdel had credentials to Lend Tech's

22   Experian account?

23         A.    Yes.

24         Q.    Did he ever share those credentials with you?

25         A.    No.

Page 154

1      Q.   Have you personally ever ordered a prescreened

2   list from Lend Tech's Experian account?

3      A.   I've never ordered a list.

4      Q.   I am now sharing with you document P, as in Past,

5   and this document is being marked as Exhibit 10.

6             (Exhibit 10 marked for identification.)

7        MS. ASSAE-BILLE:  For the court reporter, the

8   Bates number on the first page is CFPB-JN-0037052.

9      Q.   Please take a minute to look over these emails,

10   and then I'll ask you a few questions.

11        MR. HOLT:  Vanessa, can you give me the alpha

12   exhibit number again?

13        MS. ASSAE-BILLE:  Sure.  That's CFPB-JN-00 --

14        MR. HOLT:  I'm sorry.  What exhibit number is it?

15        MS. ASSAE-BILLE:  Oh, I'm sorry.  P as in Paul.

16        MR. HOLT:  Thank you.

17      A.   We have it.

18      Q.   This is an email exchange dated August 1st, 2017.

19      A.   Okay.

20      Q.   If you scroll or if you take a look at page 2 of

21   the exhibit, it appears Mike Van Loon sent an email to you,

22   Anthony Sebreros, saying "Hello, Anthony.  What is the

23   status of the $25,000 July distribution?"

24             And the response from Anthony Sebreros was, "Hi

25   Mike.  ADS is going to hold the distribution this month.  We

Page 155

1    have to ramp up the marketing spend to compensate for the

2    low response of the recycled data."

3           Can you help me understand what you are saying in

4    that email?

5       A.   It just sounds like the phones weren't ringing

6    enough and there was no money to give them, so ...

7       Q.   And what did you mean by "recycled data"?

8       A.   I'm assuming people we've already mailed.

9       Q.   Okay.  So was recycled data referring to

10    prescreened lists from Experian that had already been used

11   before?

12      A.   Yes.

13      Q.   And did these previously used prescreened lists

14   generate a lower response --

15      A.   I don't remember.

16      Q.   -- typically?

17      A.   It appears that way.

18      Q.   Okay.  Let's look at the last email of the chain

19   from the afternoon.  It's on the first page of this exhibit,

20   still dated August 1st, 2017, and that's an email from

21   Anthony Sebreros to Mike Van Loon.

22           In the first line you write, "We have moved

23   strictly into recycled data until Experian is solved (3-4

24   weeks)."  Do you see that line?

25      A.   Yes.

Page 156

1        Q.   Okay.  And here, again, recycled data is

2    referring to prescreened lists that had already been used,

3    correct?

4        A.   Yes.

5        Q.   What did you mean when you wrote, "until Experian

6    is solved"?

7        A.   I'm assuming this was until we were able to

8    obtain the Lend Tech account.

9        Q.   Okay.  So at the time you sent this email, did

10   Assure Direct Services have access to any unused prescreened

11   lists?

12       A.   I don't know.

13       Q.   When you write that until -- when you write that

14    line, until Experian is solved, it sounds like there was a

15   problem of some type with getting Experian; is that correct?

16       A.   Sounds like I just threw a bunch of numbers at

17   Mike Van Loon to leave me alone.

18       Q.   Do you recall seeing this email string before?

19       A.   No, but I know I've seen similar in the past.

20       Q.   Okay.  And this was your email account, correct?

21       A.   Yes.

22       Q.   Any doubt that you sent this email?

23       A.   It looks a little too clean for me to write but

24   maybe.  I don't know.

25       Q.   Okay.  So what was the context in which you were

Page 161

1          (Exhibit 12 marked for identification.)

2          MS. ASSAE-BILLE:  For the court reporter, the

3     Bates number for the first page is CFPB-JN-0056043.

4          A.   Okay.

5          Q.   These are order summaries that were produced to

6     the CFPB by Experian in response to a request for records

7     reflecting Lend Tech Loans' purchases of prescreened lists.

8          A.   Mm-hmm.

9          Q.   If you take a look at the first page, each --

10          sorry.  If you look at the first box on each of

11     these order

12     summaries, the first box contains your name, Anthony

13     Sebreros, next to first and last name.  Do you see that?

14          A.   Yes.

15          Q.   Above that, for the user ID, it contains your

16     initials, AS, and then Lend Tech.  Do you see that?

17          A.   Yes.

18          Q.   And then below your first and last name it

19     contains an email address that says Anthony@LendTech

20     Loans.com.  Do you see that?

21          A.   Yes.

22          Q.   Why was your name on these order summaries?

23          MR. LEPISCOPO:  Objection, speculation.

24          THE REPORTER:  Wait.  We had crosstalk.  Go

25     ahead.  Your answer, please?

Page 162

1      A.    Yeah, I don't know why my name is there.

2      Q.    Do you recognize these order records?

3      A.    I don't.

4      Q.    Did you place these orders for prescreened lists?

5      A.    I did not.

6      Q.    Then how do you explain your name, email address

7   with your first name in it, and initials in the user ID?

8            MR. LEPISCOPO:  Objection, calls for speculation,

9   argumentative.

10           MR. BENICE:  Join in the objection.

11     A.    I don't know.

12     Q.    Let's take a look at the third box on the first

13  page.  This is a chart, and in the second column of the

14  chart says "Attributes," and then in that column there are a

15  number of references to student loans.  Do you see that?

16     A.    Yes.

17     Q.    Was Lend Tech Loans focused on borrowers of

18  student loans because the prescreened lists were going to

19  student loan businesses?

20           MR. LEPISCOPO:  Objection, calls for

21  speculation --

22     A.    Yeah, I don't know.

23           MR. LEPISCOPO:  -- lack of foundation.

24     Q.    But the Lend Tech Experian account was being used

25   to provide them -- to provide student loan businesses with

Page 163

1    prescreened lists, correct?

2         A.   Yes.

3         Q.   And Lend Tech was selling these prescreened lists

4    to those student loan businesses, correct?

5         A.   Yes.

6         Q.   The first order that we have here is dated, you

7    can see from the third row in the first box, the first date

8    of the order is August 17th, 2017.  That's two weeks and two

9     days after your email to Mike Van Loon, which is marked as

10   Exhibit 11 -- sorry, as Exhibit 10, pardon me -- in which

11    you wrote that the Experian -- Experian would be solved in

12   three or four weeks.

13           So did this first order go to Assure Direct

14   Services?

15           MR. LEPISCOPO:  Objection, calls for speculation,

16   lacks foundation.

17        Q.   Mr. Sebreros, I couldn't hear your answer.

18        A.   I don't know.

19        Q.   How do you explain the timing referenced in your

20   August 1st email to the three-four weeks until Experian was

21   solved and the appearance of your name all over this August

22   17th order?

23           MR. LEPISCOPO:  Objection, calls for speculation,

24   lacks foundation, and argumentative.

25        A.   I don't know.

Page 164

1        Q.   Can you offer any explanation other than

2   Lend Tech was obtaining prescreened lists on August 17th for

3   Assure Direct Services?

4             MR. LEPISCOPO:  Objection, calls for speculation,

5   lacks foundation.

6        A.   I'd be guessing.  I don't know.  It's more than

7   three years ago.

8        Q.   In your August 31st email that we went over where

9   you wrote that Assure Direct Services was going to scale in

10  the next couple of months, was this referring to this

11  scaling to these several orders from Lend Tech?  Was that

12  the scaling?

13            MR. LEPISCOPO:  Objection, vague and ambiguous.

14       A.   I don't remember.

15       Q.   So it's our understanding that Assure Direct

16  Services and the other student loan companies businesses

17  stopped operating around September 2017.  Is that right?

18            MR. LEPISCOPO:  Objection, calls for speculation

19  as to what the Bureau's understanding is.

20       A.   It seems about right.

21       Q.   So did Assure Direct Services shut down --

22       A.   Every location shut down.

23       Q.   -- at some point?  Why did -- why did the student

24  loan businesses shut down?

25       A.   We were instructed to do so.

Page 165

1       Q.   Who provided that instruction?

2       A.   The LP.

3       Q.   And who were those LPs?

4       A.   Mike Van Loon, Brad Brigante, Tom Chou, Sean

5    Cowell, Jawad, Robert, Dave.

6       Q.   How did they communicate that instruction to you?

7       A.   They called us over and just said, hey, it's

8    done, and that was it.  We didn't get explanations.  We just

9    had to go home.  Sent all our employees home.

10      Q.   Did you have any say in the decision then?

11      A.   No.

12      Q.   Were you involved in the decision to shut down

13   Assure Direct Services?

14      A.   No.  I walked in and it was already done.

15      Q.   Okay.  At the time of the shutdown were you aware

16   of civil investigative demands that the Bureau had issued to

17   some of the student loan businesses?

18      A.   No.

19      Q.   Did the LPs mention the CFPB or documents it had

20   sent to student loan businesses?

21           MR. LEPISCOPO:  Objection, calls for speculation.

22      Q.   Mr. Sebreros, I couldn't hear your answer.

23      A.   Nobody was really talking to anybody, so I don't

24   know.

25      Q.   So did you discuss the shutdown with anyone else?

Page 166

1    I'm sorry.  You have to give me a verbal answer.

2          A.   Oh, no.

3          Q.   What happened to Assure Direct Services office in

4    the shutdown?

5          A.   We sent our employees home and I was removed and

6    replaced with Dave Sklar.

7          Q.   What do you mean by "removed," in what way?

8          A.   I was voted out or fired, and Dave Sklar was to

9    handle the shutdown.

10         Q.   So in being removed, were you no longer the owner

11   of Assure Direct Services?

12         A.   Correct.

13         Q.   And when was that approximately?

14         A.   It was after the shutdown.

15         Q.   Was it -- could you estimate?  I mean, are we

16   talking about weeks?  Months?

17         A.   I don't remember.

18         Q.   Was it still 2017?

19         A.   I don't remember.

20         Q.   Did the shutdowns have any effect on Lend Tech?

21              MR. LEPISCOPO:  Objection, calls for speculation,

22   lacks foundation, vague as to "effect."

23         A.   Can you repeat the question?

24         Q.   Did the shutdown of the student loan businesses

25   have any effect on Lend Tech?

Page 182

1    lists that it got from Lend Tech with any other companies?

2        A.   No.

3        Q.   We briefly discussed the company Premier Prep

4             earlier.  Did they get access to the Lend Tech

5    prescreened

6     lists at any point?

7        A.   Premier Prep may have for a month or so, but they

8    mostly operated on live transfers.

9        Q.   Okay.  And, I'm sorry, what are live transfers?

10       A.   They were phone calls that are transferred in

11   from a different call center.

12       Q.   Okay.  So when you said that Nexum was getting

13   Direct Prep calls, were those live transfers as well?

14       A.   Those were just mailers.

15       Q.   Okay.  How did that work?

16       A.   They were phone calls that our staff couldn't

17   answer so they overflowed to them.

18       Q.   Okay.  So Nexum and Direct Prep had some overlap

19   on the sales floor, then, correct?

20       A.   No.  They weren't anywhere near us.  They were

21   just routed somewhere else.

22       Q.   Okay.  I'm going to ask you one more question,

23   and then I'd like to take a very short break and come back.

24   Before we break, is there anything else you know about

25   Lend Tech that we have not yet covered?

Page 183

1      A.   Not off the top of my head.

2           MS. ASSAE-BILLE:  Let's take a short break until

3      3:30 p.m. your time, and let's go off the record now.

4           (Proceedings recessed at 3:25 p.m. Pacific

5      Standard Time)

6           (In session at 3:33 p.m. Pacific Standard Time)

7      BY MS. ASSAE-BILLE:

8      Q.   So, Mr. Sebreros, how involved was Nesheiwat in

9      the day-to-day at Docu Prep Center?

10          MR. LEPISCOPO:  Objection.

11     A.   When I first started there he was on the floor.

12     Q.   What was he doing on the floor?

13     A.   Just monitoring everybody.

14     Q.   What kind of boss was he?

15     A.   The kind nobody wants to work for.

16          MR. LEPISCOPO:  Objection.

17     Q.   I didn't catch your answer.

18     A.   The kind of boss nobody wants to work for.

19     Q.   What does that mean?

20     A.   Controlling, screams at everybody, belittles

21     people.

22     Q.   Was he involved in the day-to-day at Assure

23     Direct Services?

24     A.   No.

25     Q.   Was he kept up to date on the happenings on the

Page 184

1    sales floor?

2         A.    Yeah.  He would like walk the sales floor.  There

3    was one instance where he tried to send one of my employees

4    home for not acknowledging who he was.

5         Q.    Was he more involved in Assure Direct Services

6    and the other student loan businesses than the other LPs?

7         A.    He was just as involved.

8         Q.    So were Tom Chou and Jawad Nesheiwat equally

9    involved in Assure Direct Services?

10        A.    Yes.

11              MR. LEPISCOPO:  Objection, calls for speculation.

12        A.    They were.

13        Q.    Earlier you testified that Nesheiwat was involved

14   in Monster Loans' Experian accounts.  What do you know about

15   that?  What else do you know about it?

16        A.    I just remember conversations between him and

17   Dave Sklar.

18        Q.    What was the context of those conversations?

19        A.    How many different pieces they were going to

20   mail.

21        Q.    Was that at the monthly meeting or in other

22   contexts?

23        A.    Just randomly throughout on the floor.

24        Q.    Do you remember any other discussions with

25   Nesheiwat about the prescreened lists?

Page 185

1        A.    No.

2        Q.    Did Nesheiwat oversee the orders of prescreened

3    lists made through Monster Loans' Experian account --

4        A.    Yes.

5        Q.    -- for Assure Direct Services?

6        A.    Early on, yes.

7        Q.    In what way did he oversee it?

8        A.    We would have to deal with Jawad to get to

9    Automated Mailers.  Sometimes Jawad would come collect the

10   checks for Automated Mailers.

11       Q.    But did he -- I should clarify my question.  Did

12   he oversee orders of prescreened lists from Experian?

13       A.    Yes.

14       Q.    Okay.  And that's while you were at Docu Prep

15   Center, correct?

16       A.    Yes.

17       Q.    And was it also the case while you were at Assure

18   Direct Services?

19       A.    Early on, yes.

20       Q.    And when you say "early on," when did that

21   change?

22       A.    I don't have the exact date.

23       Q.    Can you estimate?

24       A.    I couldn't.

25       Q.    What year?

1                    CERTIFICATE OF REPORTER

2

3              I, Linda S. Kinkade, Registered Diplomate

4    Reporter, Certified Realtime Reporter, Registered Merit

5    Reporter, Registered Professional Reporter, Certified

6    Shorthand Reporter (CA), and officer duly authorized to

7    administer oaths and/or affirmations, do hereby certify that

8    prior to the commencement of examination the deponent herein

9    was duly sworn by me to testify truthfully under penalty of

10   perjury;

11             I FURTHER CERTIFY that the foregoing is a true

12   and accurate transcript of the proceedings as reported by me

13   stenographically, to the best of my ability;

14             I FURTHER CERTIFY that I am neither counsel for

15   nor related to nor employed by any of the parties to this

16   case and have no interest, financial or otherwise, in its

17   outcome.

18             IN WITNESS WHEREOF, I have hereunto set my hand

19   this 24th day of December 2020.

20

21

22   ss//   _Linda Kinkade_

23   Linda S. Kinkade, RDR CRR RMR RPR CSR

24

25