# **Summary Judgment Ex. 7**

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


---------------------   X

BUREAU OF CONSUMER
FINANCIAL PROTECTION          No.
                              8-20-CV-00043-JVS-ADS
-vs-

CHOU TEAM REALTY,        X
LLC., ET AL

---------------------



REMOTE DEPOSITION OF JAWAD NESHEIWAT



Orange County, California

Tuesday, January 19, 2021

8:00 a.m. Pacific Standard Time



Reported by:  Teresa A. Crossin, RPR, RMR

1  A P P E A R A N C E S:

2          ** ALL BY VIDEO CONFERENCE **

3  On behalf of the Consumer Financial Protection
   Bureau:
4
          Consumer Financial Protection Bureau
5
          1700 G Street, NW
6
          Washington, DC 20552
7
          (202) 435-7357
8
          By:  Colin Reardon, Esq.
9
               Vanessa Assae-Bille, Esq.
10
          colin.reardon@cfpb.gov
11
          elisabeth.assae-bille@cfpb.gov
12

13  Also Present:

14          Annais Ramirez-Velazquez, Paralegal, CFPB

15          annais.ramirez-velazquez@cfpb.gov

16
    On behalf of Jawad Nesheiwat:
17
          Lepiscopo & Associates
18
          695 Town Center Drive
19
          Costa Mesa, CA 92626
20
          By:  Peter Lepiscopo, Esq.
21
          plepiscopo@att.net/pete@familyofficelaw.com
22

23

24

25

1     On behalf of Eduardo Martinez, David Sklar, Lend Tech Loans, Docs Done Right, Inc., and Docs Done

2   Right, LP:

3           The Holt Law Firm

4           1432 Edinger Avenue

5           Tustin, CA 92780

6           By:  David Holt, Esq.

7           dholt@holtlawoc.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    (8:26 a.m., Pacific Standard Time.)

2                    REPORTER:  Please note this

3    deposition is taking place via WEBEX as directed by

4    the Bureau.  The location of this deposition is

5    Orange County, California, pursuant to FRCP 30

6    (b)(4).

7                    The deposition is being conducted by

8    remote means by stipulation of the parties or order

9    on motion under FRCP 30(b)(4).

10                    Due to the need for this deposition to

11   take place remotely, the parties hereby stipulate

12   that the court reporter may swear in the witness

13   over the video conference.  At this time the court

14   reporter would request that the witness hold up

15   their identification to their computer camera and

16   then after verified, raise their right hand so they

17   may be sworn in,

18                    JAWAD NESHEIWAT,

19   WAS CALLED, AND HAVING BEEN DULY SWORN,

20   WAS EXAMINED AND TESTIFIED AS FOLLOWS:

21

22                    MR. REARDON:  We will get started,

23                    Good morning.  My name is Colin

24   Reardon and with me today is Vanessa Assae-Bille

25   from the Bureau.  We are attorneys in the office of

Page 7

1    enforcement at the Bureau of Consumer Financial

2    Protection.

3              Before we get to your testimony today,

4    a few preliminary matters we are going to cover.

5              Today is January 19, 2021, and we are

6    here to depose Defendant, Jawad Nesheiwat, pursuant

7    to the Amended Deposition Notice of the Bureau

8    served on him on January 6, 2021.

9              The deposition is part of a lawsuit of

10   the Bureau of Consumer Financial Protection versus

11   Chou Team Realty, et al, in which Mr. Jawad is one

12   of the Defendants.

13             This deposition is being taken

14   pursuant to Federal Rule of Civil Procedure 30, and

15   due to the ongoing pandemic, the Bureau is

16   conducting this deposition via WEBEX.

17

18                    EXAMINATION

19   BY MR. REARDON:

20        Q.    Mr. Nesheiwat, please state your full

21   name for the record, including any middle names.

22        A.    J-A-W-A-D, Jawad, last name Nesheiwat,

23   N-E-S-H-E-I-W-A-T.

24        Q.    Do you understand the oath that you

25   just took?

1      A.     Yes.

2      Q.     Is there any reason why you would not

3  be able to provide truthful, complete, and accurate

4  testimony today?

5      A.     No.

6      Q.     Are you under the influence of any type

7  of medication that might hinder your ability to

8  understand any questions?

9      A.     No.

10      Q.     Are you represented by counsel today?

11      A.     Yes.

12             MR. REARDON:  Counsel, please identify

13  yourself for the record?

14             MR. LEPISCOPO:  Yes, Pete Lepiscopo on

15  behalf of Jawad Nesheiwat.

16             MR. REARDON:  I see that David Holt is

17  also on the line.

18             David, could you identify yourself for

19  the record, as well?

20             MR. HOLT:  Yes.  This is David Holt

21  representing Defendants Eduardo Martinez, David

22  Sklar, Lend Tech Loans, Inc., Docs Done Right, Inc.,

23  and Docs Done Right, LP.

24             MR. REARDON:  I will note for the

25  record that we also provided notice of this

Page 9

1    deposition to Mr. Jeffrey Benice, who represents

2    Frank Sebreros.  He was served with the updated

3    deposition notice and we attempted to reach him this

4    morning and haven't heard from him, so we are

5    proceeding without him.

6    BY MR. REARDON:

7         Q.    Mr. Nesheiwat, I am going to start with

8    some ground rules for today.

9               First, this deposition is being

10   transcribed by a court reporter.  No other recording

11   is allowed, whether through electronic device or

12   otherwise; however, note-taking is fine.

13              Second, your attorney or other

14   attorneys may make objections to today's deposition.

15   In general, those objections will be noted on the

16   record but the examination will still proceed and you

17   will still need to answer my questions.

18              An exception to that is that your

19   counsel may instruct you not to answer to preserve a

20   privilege.  Your counsel may not otherwise consult

21   with you while a question directed to you is pending.

22              I understand, based on your prior

23   objections during discovery and communications with

24   your attorney, Mr. Lepiscopo, before today, that you

25   intend to decline to answer questions today relating

```
 1    to the Bureau's claims against you in this lawsuit

 2    based on the Fifth Amendment privilege of

 3    self-incrimination, is that correct?

 4         A.    It is, yes.

 5         Q.    Are you aware that you previously

 6    asserted the Fifth Amendment privilege against

 7    self-incrimination in response to discovery requests

 8    that the Bureau has issued to you in this case?

 9         A.    Yes.

10         Q.    To your knowledge, have you been

11    charged with committing a crime by any criminal law

12    enforcement agency for any of the conduct that is at

13    issue in this case?

14              MR. LEPISCOPO:  Is he aware?  You

15    could answer.

16              THE WITNESS:  No.

17    BY MR. REARDON:

18         Q.    To your knowledge, are you presently

19    under criminal investigation for any of the conduct

20    at issue in this case?

21              MR. LEPISCOPO:  You could answer.

22              THE WITNESS:  No.

23    BY MR. REARDON:

24         Q.    Have you been contacted by any criminal

25    law enforcement agency regarding any of the conduct
```

1    at issue in this case?

2        A.     No.

3        Q.     Thank you.  So, based on your answer,

4    we understand that up haven't currently been charged

5    with committing a crime or contacted by a law

6    enforcement agency.  We understand that you are still

7    intending to assert the Fifth Amendment right against

8    self-incrimination today.

9            Mr. Nesheiwat, we, at Bureau, urge you

10   to carefully consider each of the questions that are

11   asked today in this deposition in order to determine

12   whether the Fifth Amendment would apply and to

13   carefully consider whether you can or cannot answer

14   within your Fifth Amendment right.

15           Will you carefully consider my

16   questions before you assert the Fifth Amendment

17   today?

18           MR. LEPISCOPO:  He is not going to be

19   asserting the objection, I will assert the objection

20   and he will follow the instruction.  That's what you

21   should ask him.

22           You are not going to get into his

23   knowledge and not understanding of the law.  He is

24   going to follow my instructions.

25   BY MR. REARDON:

Page 12

1        Q.      Mr. Nesheiwat, is it your intention to

2    follow your counsel's instructions any time today

3    that he asserts the Fifth Amendment on your behalf?

4                MR. LEPISCOPO:  You can answer.

5                THE WITNESS:  Yes.

6                MR. LEPISCOPO:  Just so we are clear,

7    we discussed this, so we are going to try use

8    shorthand, as we discussed.  If I object and say

9    objection, Fifth Amendment, what that will mean is

10   that I am asserting the Fifth Amendment as the

11   objection, that the witness will not answer the

12   question, he will be instructed not to answer the

13   question.

14              You would have asked him did you hear

15   the question, did you hear your counsel's objection,

16   do you understand that if we compel you in court,

17   the Judge compels your testimony to answer the

18   question, that sanctions could be imposed against

19   you and that you could later on be compelled to

20   answer the question, to all of which he will respond

21   "yes".  And you can then go on to say will you

22   follow your attorney's instructions in spite of what

23   I just told you, and the answer will be yes.

24              So you can go through that once with

25   him, if you want, or we can just agree that's what

Page 13

1    it means when I assert the Fifth Amendment, that it

2    is going to satisfy all of your additional requests

3    and questions in order to make your foundation for

4    each objection.  And I will stipulate that you have

5    made a foundation as far as -- so we don't have to

6    waste time with all the follow-up questions by

7    yourself.

8                    MR. REARDON:  Okay.  Thank you, Pete.

9    We can agree to use the shorthand and to streamline

10   the assertion of the Fifth Amendment.

11                   I just do want to be clear on the

12   record that our understanding is that throughout

13   today when you, Pete Lepiscopo, the attorney, are

14   asserting the Fifth Amendment, you are doing so on

15   behalf of Mr. Nesheiwat and he has had a full and

16   informed opportunity to consider the effect of doing

17   that on his behalf.

18                   MR. LEPISCOPO:  Yes, I will stipulate

19   to that.

20   BY MR. REARDON:

21        Q.    Mr. Nesheiwat, I just want to hear you

22   say that you agree to proceed in this fashion so that

23   we don't have to get you on the record every single

24   time in response to the question.

25        A.    I agree.

1    Q.    Okay.  All right.  I have a couple of

2  additional preliminary things to say.

3           As noted earlier, this deposition is

4  being conducted remotely.  We are not in the same

5  room.

6           Mr. Nesheiwat, you are not allowed to

7  use a cell phone or other electronic device to

8  communicate while we are on the record.

9           Will you agree not to do that?

10   A.    Yes.

11   Q.    Can you confirm there is no one else

12  there in the room with you besides Mr. Lepiscopo?

13   A.    That is correct.

14         MR. LEPISCOPO:  I will confirm that

15  and the doors are shut.

16         MR. REARDON:  Thank you.

17  BY MR. REARDON:

18   Q.    Because this deposition is being

19  transcribed by a court reporter, be sure to provide a

20  verbal answer to each question so we can avoid the

21  response of um-hum or nods, et cetera; instead,

22  please say yes or no or provide a narrative answer

23  where.

24         Do you understand that?

25   A.    Yes.

Page 23

1    BY MR. REARDON:

2           Q.      Were you an owner of that company?

3                   MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6           Q.      Was Sean Cowell also involved in that

7    company?

8                   MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11          Q.      While working at Freedom Debt Center,

12   did you ever learn about the Telemarketing Sales

13   Rule?  It is a law.

14                  MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17          Q.      Did you have any responsibilities with

18   regard to compliance with the Telemarketing Sales

19   Rule while you were at Freedom Debt Center?

20                  MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23          Q.      Besides Freedom Debt Center, have you

24   ever worked for another debt consolidation company?

25                  MR. LEPISCOPO:  Objection, Fifth

Page 24

```
 1   Amendment.

 2   BY MR. REARDON:

 3        Q.    Where did you work after Freedom Debt

 4   Center?

 5              MR. LEPISCOPO:  Objection, Fifth

 6   Amendment.

 7   BY MR. REARDON:

 8        Q.    Are you planning to assert Fifth

 9   Amendment objections to any questions relating to

10   your past professional involvement in Freedom Debt

11   Center companies?

12              MR. LEPISCOPO:  That's correct.

13   BY MR. REARDON:

14        Q.    Are you planning to assert the Fifth

15   Amendment to any questions relating to Mr.

16   Nesheiwat's involvement in mortgage companies?

17              MR. LEPISCOPO:  That's correct.

18   BY MR. REARDON:

19        Q.    Mr. Nesheiwat, have you ever worked for

20   a company called Chou Team Realty?

21              MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24        Q.    Chou Team Realty does business under

25   the name Monster Loans, isn't that correct?
```

Page 25

 1                    MR. LEPISCOPO:  Objection, Fifth

 2    Amendment.

 3    BY MR. REARDON:

 4         Q.    During today's deposition, I will be

 5    referring to Chou Team Realty using its d/b/a Monster

 6    Loans.  Will you understand that when I refer to

 7    Monster Loans, I am referring to Chou Team Realty

 8    which does business under the name Monster Loans?

 9                    MR. LEPISCOPO:  Objection, Fifth

10    Amendment.  I understand it.  I understand your

11    question.

12    BY MR. REARDON:

13         Q.    Mr. Nesheiwat, when did you work for

14    Monster Loans?

15                    MR. LEPISCOPO:  Objection, Fifth

16    Amendment.

17    BY MR. REARDON:

18         Q.    Can you provide a date range?

19                    MR. LEPISCOPO:  Objection, Fifth

20    Amendment.

21    BY MR. REARDON:

22         Q.    Mr. Nesheiwat, are you currently

23    employed?

24                    MR. LEPISCOPO:  Objection, Fifth

25    Amendment.

Page 26

```
 1   BY MR. REARDON:

 2        Q.      Where do you currently work?

 3                MR. LEPISCOPO:  Objection, Fifth

 4   Amendment.

 5   BY MR. REARDON:

 6        Q.      What is the nature of the business that

 7   you currently work for?

 8                MR. LEPISCOPO:  Objection, Fifth

 9   Amendment.

10   BY MR. REARDON:

11        Q.      Where did you work before your current

12   job?

13                MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.      Were there any other businesses you

17   have worked for since 2017?

18                MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.      Is there any aspect of work you have

22   done since 2017 that you are willing to provide

23   testimony about today?

24                MR. LEPISCOPO:  Objection, Fifth

25   Amendment.  The answer is no.
```

Page 27

1    BY MR. REARDON:

2          Q.      Do you currently own any businesses?

3                  MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6          Q.      What type of businesses do you

7    currently own?

8                  MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11         Q.      Do you currently have any involvement

12   in any company that offers services to consumers with

13   student loans?

14                 MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17         Q.      Were any of those companies engaged in

18   telemarketing?

19                 MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22         Q.      Have you had any involvement in any

23   companies that offer services to consumers with

24   student loans since 2017?

25                 MR. LEPISCOPO:  Objection, Fifth

Page 28

1   Amendment.

2   BY MR. REARDON:

3       Q.      Do you currently have any involvement

4   in any companies that offered services to consumers

5   with other kinds of debts besides student loans, such

6   as credit cards?

7                   MR. LEPISCOPO:  Objection, Fifth

8   Amendment.

9   BY MR. REARDON:

10      Q.      Do any other companies you have worked

11  for you have been involved with since 2018 engage in

12  telemarketing?

13                  MR. LEPISCOPO:  Objection, Fifth

14  Amendment.

15  BY MR. REARDON:

16      Q.      Do you currently have any involvement

17  in any company that offers mortgage loans?

18                  MR. LEPISCOPO:  Objection, Fifth

19  Amendment.

20  BY MR. REARDON:

21      Q.      Have you had any involvement in any

22  mortgage companies since 2017?

23                  MR. LEPISCOPO:  Objection, Fifth

24  Amendment.

25  BY MR. REARDON:

Page 29

1          Q.     Are you familiar with a company called

2     Ladera Ranch Home Loans?

3                  MR. LEPISCOPO:  Objection, Fifth

4     Amendment.

5     BY MR. REARDON:

6          Q.     Have you ever had any role with that

7     company?

8                  MR. LEPISCOPO:  Objection, Fifth

9     Amendment.

10    BY MR. REARDON:

11         Q.     I am going to ask a few questions about

12    your role at the mortgage company Chou Team Realty,

13    known as Monster Loans.  Were you an employee of

14    Monster Loans?

15                 MR. LEPISCOPO:  Objection, Fifth

16    Amendment.

17    BY MR. REARDON:

18         Q.     Was your title at Monster Loans chief

19    operating officer?

20                 MR. LEPISCOPO:  Objection, Fifth

21    Amendment.

22    BY MR. REARDON:

23         Q.     Did you have the position of chief

24    operating officer between January of 2015 and April

25    of 2017?

Page 30

 1                    MR. LEPISCOPO:  Objection, Fifth

 2    Amendment.

 3    BY MR. REARDON:

 4         Q.    Was Monster Loans a mortgage lender?

 5                    MR. LEPISCOPO:  Objection, Fifth

 6    Amendment.

 7    BY MR. REARDON:

 8         Q.    Did Monster Loans market mortgage loans

 9    through direct mail?

10                    MR. LEPISCOPO:  Objection, Fifth

11    Amendment.

12    BY MR. REARDON:

13         Q.    What were your job responsibilities at

14    Monster Loans?

15                    MR. LEPISCOPO:  Objection, Fifth

16    Amendment.

17    BY MR. REARDON:

18         Q.    Did your job responsibilities at

19    Monster Loans include overseeing the company's direct

20    mail marketing?

21                    MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24         Q.    Did your job responsibilities at

25    Monster Loans include supervising Monster Loans'

Page 31

1   employees?

2              MR. LEPISCOPO:  Objection, Fifth

3   Amendment.

4   BY MR. REARDON:

5        Q.    Did Monster Loans have employees who

6   worked on the company's direct mail marketing?

7              MR. LEPISCOPO:  Objection, Fifth

8   Amendment.

9   BY MR. REARDON:

10       Q.    Did you supervise Monster Loans'

11  employees who worked on the company's direct mail

12  marketing?

13             MR. LEPISCOPO:  Objection, Fifth

14  Amendment.

15  BY MR. REARDON:

16       Q.    Was an individual named Bill Abdel a

17  Monster Loans employee while you worked there?

18             MR. LEPISCOPO:  Objection, Fifth

19  Amendment.

20  BY MR. REARDON:

21       Q.    Has Bill Abdel also gone under the name

22  of Bilal Abdelfattah?

23             MR. LEPISCOPO:  Objection, Fifth

24  Amendment.

25  BY MR. REARDON:

Page 32

1          Q.      Did you supervise Bill Abdel?

2                  MR. LEPISCOPO:  Objection, Fifth

3     Amendment.

4     BY MR. REARDON:

5          Q.      Was an individual named Rateesh

6     Segana(sic) a Monster Loans employee while you worked

7     there?

8                  MR. LEPISCOPO:  Objection, Fifth

9     Amendment.

10    BY MR. REARDON:

11         Q.      Did you supervise Rateesh Segana?

12                 MR. LEPISCOPO:  Objection, Fifth

13    Amendment.

14    BY ATTY1:

15         Q.      Was an individual named Aaron Mason a

16    Monster Loans employee while you worked there?

17                 MR. LEPISCOPO:  Objection, Fifth

18    Amendment.

19    BY MR. REARDON:

20         Q.      Did you supervise Aaron Mason?

21                 MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24         Q.      Was an individual named Mike Van Loon a

25    Monster Loans employee while you worked there?

Page 33

1              MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.    Did you interact with Mike Van Loon as

5    part of your job at Monster Loans?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Was an individual named Thomas Chou the

10   owner of Monster Loans while you worked there?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did you interact with Thomas Chou as

15   part of your job at Monster Loans?

16             MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    I am going to ask you some questions

20   regarding several companies that are named as

21   Defendants in this lawsuit that offered services to

22   consumers with student loans.

23             The first of these -- there are going

24   to be five related companies.  The first of those

25   companies is Docu Prep Center.

Page 34

1            Are you familiar with a company called

2    Docu Prep Center, Inc.?

3              MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6        Q.    Are you familiar with a company called

7    Document Preparation Services, LP?

8              MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11       Q.    Was Docu Prep Center, Inc., the general

12   partner of Document Preparation Services, LP?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16       Q.    Did you hold a limit partnership

17   interest in Document Preparation Services, LP?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21       Q.    Going forward during today's

22   deposition, I am going to refer to those two entities

23   together as Docu Prep Center.  Will you understand

24   that when I do that?

25             MR. LEPISCOPO:  Objection, Fifth

Page 35

1    Amendment.  I understand it and agree to that.

2    BY MR. REARDON:

3         Q.    Did Docu Prep Center also do business

4    under the named Certified Document Center?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Going forward in today's deposition, I

9    am just going to refer to Docu Prep Center and my

10   questions are meant to include any activities it did

11   under the name Certified Document Center; do you

12   understand that?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.  I understand and I am fine with that.

15   BY MR. REARDON:

16        Q.    The second of the businesses I want to

17   talk about today is Certified Doc Prep Services.  Are

18   you familiar with an entity called Certified Doc

19   Prep, Inc.?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Are you familiar with an entity called

24   Certified Doc Prepare Services, LP?

25             MR. LEPISCOPO:  Objection, Fifth

1   Amendment.

2   BY MR. REARDON:

3          Q.     Was Certified Doc Prep, Inc., the

4   general partner of Certified Doc Prep Services, LP?

5                 MR. LEPISCOPO:  Objection, Fifth

6   Amendment.

7   BY MR. REARDON:

8          Q.     Do you hold a limited partnership

9   interest in Certified Doc Prep Services, LP?

10                MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13          Q.     Going forward during today's

14   deposition, I am going to refer to those two entities

15   together as Certified Doc Prep Services; do you

16   understand that?

17                MR. LEPISCOPO:  Objection, Fifth

18   Amendment.  I understand and I am fine with that.

19   BY MR. REARDON:

20          Q.     Are you familiar with an entity called

21   Assure Direct Services, Inc.?

22                MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25          Q.     Are you familiar an entity called

Page 37

1    Assure Direct Services, LP?

2               MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Was Assure Direct Services, Inc., the

6    general partner of Assure Direct Services, LP?

7               MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    Did you hold a limit partnership

11   interest in Assure Direct Services, LP?

12              MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.    Going forward during today's

16   deposition, I am going to refer to those two entities

17   together as Assure Direct Services; do you understand

18   that?

19              MR. LEPISCOPO:  Objection, Fifth

20   Amendment.  And that's fine with me and I

21   understand.

22   BY MR. REARDON:

23        Q.    The fourth entity is Direct Document

24   Solutions.  Are you familiar with an entity called

25   Direct Document Solutions, Inc.?

Page 38

1              MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.    Are you familiar an entity called

5    Direct Document Solutions, LP?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Was Direct Document Solutions, Inc.,

10   the general partner of Direct Document Solutions, LP?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did you hold a limited partnership

15   interest in Direct Document Solutions, Inc.?

16             MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    Going forward during today's

20   deposition, I am going to refer to those two entities

21   together as Direct Document Solutions; you understand

22   that?

23             MR. LEPISCOPO:  Objection, Fifth

24   Amendment.  I understand it and I am fine with that,

25   sir.

Page 39

1  BY MR. REARDON:

2        Q.      The fifth entity is Secure Preparation

3  Services.  Are you familiar with an entity called

4  Secure Preparation Services, Inc.?

5                  MR. LEPISCOPO:  Objection, Fifth

6  Amendment.

7  BY MR. REARDON:

8        Q.      Are you familiar with an entity called

9  Secure Preparation Services, LP?

10                 MR. LEPISCOPO:  Objection, Fifth

11  Amendment.

12  BY MR. REARDON:

13        Q.      Was Secure Preparation Services, Inc.,

14  the general partner of Secure Preparation Services,

15  LP?

16                 MR. LEPISCOPO:  Objection, Fifth

17  Amendment.

18  BY MR. REARDON:

19        Q.      Did you hold a limited partnership

20  interest in Secure Preparation Services, LP?

21                 MR. LEPISCOPO:  Objection, Fifth

22  Amendment.

23  BY MR. REARDON:

24        Q.      Going forward during today's

25  deposition, I am going to refer to those entities

Page 40

1   today as Secure Preparation Services; you understand

2   that?

3                    MR. LEPISCOPO:  Objection, Fifth

4   Amendment.  I understand and I am fine with that,

5   too.

6   BY MR. REARDON:

7        Q.    So we have now gone through five

8   businesses that we have agreed to kind of go by

9   names.  Those are Docu Prep Center, Certified Doc

10  Prep Services, Assure Direct Services, Direct

11  Document Solutions, and Secure Preparation Services.

12  All of those business are named as Defendants in the

13  Bureau's Complaint.

14                    I am going to refer at times today to

15  those five businesses as the student loan debt relief

16  defendants.  So if I ask a question about the student

17  loan debt relief defendants, will you understand that

18  I am referring to those five businesses?

19                    MR. LEPISCOPO:  Objection, Fifth

20  Amendment.  I understand it and that's fine.

21  BY MR. REARDON:

22       Q.    I am going to start with some questions

23  about Docu Prep Center.  Docu Prep Center created as

24  a business in early 2015?

25                    MR. LEPISCOPO:  Objection, Fifth

Page 41

1    Amendment.

2    BY MR. REARDON:

3         Q.    Were you involved in starting Docu Prep

4    Center as a business?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Do you know an individual named Thomas

9    Chou?

10             MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.    Did you work with Thomas Chou to start

14   Docu Prep Center as a business?

15             MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.    Do you know an individual named Sean

19   Cowell?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Did you work with Sean Cowell to start

24   Docu Prep Center as a business?

25             MR. LEPISCOPO:  Objection, Fifth

Page 42

1    Amendment.

2    BY MR. REARDON:

3         Q.    Do you know an individual named David

4    Sklar?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Did you work with David Sklar to start

9    Docu Prep Center as a business?

10             MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.    Do you know an individual named Robert

14   Hoose?

15             MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.    Did you work with Robert Hoose to start

19   Docu Prep Center as a business?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Were David Sklar and Robert Hoose the

24   co-managers of Docu Prep Center?

25             MR. LEPISCOPO:  Objection, Fifth

Page 43

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did you ever provide Sklar and Hoose

4    instructions regarding how Docu Prep Center should

5    operate?

6                   MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    What was Docu Prep Center's business

10   model?

11                  MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    What services did Docu Prep Center

15   provide?

16                  MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    Did Docu Prep Center provide services

20   to consumers with federal student loans?

21                  MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24        Q.    Did Docu Prep Center offer to assist

25   consumes with consolidating their federal student

Page 44

 1  loans?

 2                MR. LEPISCOPO:  Objection, Fifth

 3  Amendment.

 4  BY MR. REARDON:

 5        Q.    Did Docu Prep Center offer to assist

 6  consumers with enrolling in loan repayment plans

 7  offered by the Department of Education?

 8                MR. LEPISCOPO:  Objection, Fifth

 9  Amendment.

10  BY MR. REARDON:

11        Q.    Did Docu Prep Center offer to assist

12  consumers with enrolling in loan forgiveness plans

13  offered by the Department of Education?

14                MR. LEPISCOPO:  Objection, Fifth

15  Amendment.

16  BY MR. REARDON:

17        Q.    Did Docu Prep Center arrange for

18  consumers to put their student loans into

19  forbearance?

20                MR. LEPISCOPO:  Objection, Fifth

21  Amendment.

22  BY MR. REARDON:

23        Q.    Did Docu Prep Center extend credit to

24  consumers?

25                MR. LEPISCOPO:  Objection, Fifth

Page 45

1    Amendment.

2    BY MR. REARDON:

3         Q.    What involvement did you have in Docu

4    Prep Center's operation?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Were you involved in Docu Prep Center's

9    direct mail marketing?

10             MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.    What involvement did you have in Docu

14   Prep Center's direct mail marketing?

15             MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.    Did you arrange for Docu Prep Center to

19   send direct mail to consumers?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Were you involved in Docu Prep Center's

24   sales of its services?

25             MR. LEPISCOPO:  Objection, Fifth

Page 46

1   Amendment.

2   BY MR. REARDON:

3       Q.      What involvement did you have in Docu

4   Prep Center's sales of its services?

5               MR. LEPISCOPO:  Objection, Fifth

6   Amendment.

7   BY MR. REARDON:

8       Q.      How did Docu Prep Center market its

9   services?

10              MR. LEPISCOPO:  Objection, Fifth

11  Amendment.

12  BY MR. REARDON:

13      Q.      Are you familiar with Docu Prep

14  Center's direct mail solicitations?

15              MR. LEPISCOPO:  Objection, Fifth

16  Amendment.

17  BY MR. REARDON:

18      Q.      What did Docu Prep Center's direct mail

19  solicitations say about its services?

20              MR. LEPISCOPO:  Objection, Fifth

21  Amendment.

22  BY MR. REARDON:

23      Q.      What did Docu Prep Center's direct mail

24  solicitations say about consolidating student loans?

25              MR. LEPISCOPO:  Objection, Fifth

Page 47

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did you ever review the solicitations

4    that Docu Prep Center sent through direct mail?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Did you ever review the template that

9    Docu Prep Center used to send direct mail

10   solicitations?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did you ever edit Docu Prep Center's

15   template for the direct sales solicitations it sent

16   to consumers?

17             MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    Did you ever instruct Robert Hoose to

21   use a specific template for Docu Prep Center's direct

22   mail solicitations?

23             MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 48

1          Q.     Did you ever instruct David Sklar to

2     use a template, to use a specific template for Docu

3     Prep Center's direct mail solicitations?

4                    MR. LEPISCOPO:  Objection, Fifth

5     Amendment.

6     BY MR. REARDON:

7          Q.     Do you know what Docu Prep Center said

8     in its direct mail solicitations?

9                    MR. LEPISCOPO:  Objection, Fifth

10    Amendment.

11    BY MR. REARDON:

12         Q.     Did you control what Docu Prep Center

13    said in its direct mail solicitations?

14                   MR. LEPISCOPO:  Objection, Fifth

15    Amendment.

16    BY MR. REARDON:

17         Q.     At this time I would like to mark as

18    Exhibit 16 a document that contains examples of the

19    mailers that Docu Prep Center sent.

20                   (Exhibit No. 16 was marked for

21    identification.)

22    BY MR. REARDON:

23         Q.     Mr. Nesheiwat, do you have that exhibit

24    in front of you?

25                   MR. LEPISCOPO:  Do you want to just

Page 49

1   mark each person's letter separately so I don't mess

2   it up on this end.  Just tell me which one you are

3   going to go to first and I will pull it out to make

4   sure he has it.

5   BY MR. REARDON:

6        Q.    The first one is dated April 10, 2015,

7   if you see the date on the right side?

8              MR. LEPISCOPO:  Maybe the Bates stamp

9   number would be a better way.

10             MR. REARDON:  Sure.

11  BY MR. REARDON:

12       Q.    The first one is two letters which have

13  two different Bates numbers.  The first one is

14  CFPB-KN-0109 through 74.  The second letter the Bates

15  number ends in 34.

16             MR. LEPISCOPO:  I don't see those

17  numbers.  Can you use the benefit ID number at the

18  top?  The Bates stamp is not on the printed version.

19  I remember last time we had this problem with the

20  Bates stamps.  So if you could use the benefit ID

21  number, I have those numbers, and they start at 312,

22  503, 314.

23             MR. REARDON:  Off the record.

24  (A recess was taken at 9:13 a.m., PST, after which

25  the deposition resumed at 9:16 a.m., PST.)

Page 50

```
 1                    MR. REARDON:  Let's go back on the
 2   record.
 3   BY MR. REARDON:
 4        Q.     We are back on the record and I think I
 5   have now sorted out the contents of Exhibit 16.
 6                    So, Mr. Nesheiwat, do you have
 7   Exhibit 16 in front of you?
 8        A.     Yes.
 9        Q.     Do you recognize the two letters in
10   front of you as examples of mailers that Docu Prep
11   Center sent?
12                    MR. LEPISCOPO:  Objection, Fifth
13   Amendment.
14   BY MR. REARDON:
15        Q.     Do these letters appear to be based on
16   the template that Docu Prep Center used?
17                    MR. LEPISCOPO:  Objection, Fifth
18   Amendment.
19   BY MR. REARDON:
20        Q.     Did you approve the use of the template
21   reflected in these letters?
22                    MR. LEPISCOPO:  Objection, Fifth
23   Amendment.
24   BY MR. REARDON:
25        Q.     Did you have any role in editing the
```

Page 51

1    templates reflected in this exhibit?

2                    MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    How did Docu Prep sell its services?

6                    MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Did Docu Prep Center have sales

10   representatives?

11                   MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did Docu Prep Center's sales

15   representatives sell its services over the phone?

16                   MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    What did Docu Prep Center's sales

20   service representatives say to its consumers about

21   its services during sales calls?

22                   MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.    What did Docu Prep Center's sales

Page 52

 1    representatives say to consumers about consolidating

 2    student loans?

 3                   MR. LEPISCOPO:  Objection, Fifth

 4    Amendment.

 5    BY MR. REARDON:

 6        Q.    What did Docu Prep Center's sales

 7    representatives say to consumers about the benefits

 8    of its services?

 9                   MR. LEPISCOPO:  Objection, Fifth

10    Amendment.

11    BY MR. REARDON:

12        Q.    Did Docu Prep Center's sales

13    representatives work from a script during sales

14    calls?

15                   MR. LEPISCOPO:  Objection, Fifth

16    Amendment.

17    BY MR. REARDON:

18        Q.    What did Docu Prep Center's sales

19    scripts instruct representatives to say during sales

20    calls?

21                   MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24        Q.    Were you aware at the time of what

25    those representatives said to consumers during Docu

Page 53

1    Prep Center's sales calls?

2                   MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    At the time were you familiar with the

6    sales scripts that Docu Prep Center used?

7                   MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    At the time did you approve the sales

11   scripts that Docu Prep Center used?

12                  MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.    Now I am going to ask some questions

16   about the other four student loan debt relief

17   defendants, Certified Doc Prep Services, Assure

18   Direct Services, Direct Document Solutions, and

19   Secure Preparation Services.

20                  Did those four businesses have the same

21   business model as Docu Prep Center?

22                  MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.    Did these four businesses provide the

1    same services as Docu Prep Center?

2              MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Did those four businesses provide

6    services to consumers with federal student loans?

7              MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    Did those four businesses offer to

11   assist consumers with consolidating their federal

12   student loans?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    Did those four businesses offer to

17   assist consumers with enrolling in loan repayment

18   plans offered by the Department of Education?

19             MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    Did those four businesses offer to

23   assist consumers with enrolling in loan forgiveness

24   plans offered by the Department of Education?

25             MR. LEPISCOPO:  Objection, Fifth

Page 55

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did those four businesses arrange for

4    consumers to put their student loans into

5    forbearance?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Did those four businesses extend credit

10   to consumers?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did those four businesses all send

15   solicitations to consumers through direct mail?

16             MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    Are you familiar with the direct mail

20   solicitations that those four businesses sent?

21             MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24        Q.    Did you have any role in those four

25   businesses sending direct mail solicitations to

Page 56

1    consumers?

2                    MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Now I am going to ask the court

6    reporter to mark as Exhibit 17 an exhibit that

7    contains four marketing letters.

8                    Mr. Nesheiwat, do you have that exhibit

9    in front of you?

10        A.    Yes.

11                   (Exhibit No. 17 was marked for

12   identification.)

13   BY MR. REARDON:

14        Q.    Do you recognize the four letters in

15   Exhibit 3 as examples of the mailers that the four

16   businesses sent?

17                   MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    Just so the record is clear, do you

21   recognize these as examples of letters sent by

22   Certified Doc Prep Services, Assure Direct Services,

23   Direct Document Solutions, and Secure Preparation

24   Services?

25                   MR. LEPISCOPO:  Objection, Fifth

Page 57

1    Amendment.

2    BY MR. REARDON:

3          Q.    Do you have any role in editing letters

4    like the ones in Exhibit 17?

5                MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8          Q.    Did you have approve those companies

9    using this template?

10               MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13         Q.    Did you have any role in approving the

14   template that those four companies used in that

15   direct mail?

16               MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19         Q.    Did you have any role in editing the

20   template that those four businesses used in their

21   direct mail?

22               MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25         Q.    Are the letters in Exhibit 17

Page 58

1    representative of the letters that those four

2    companies sent to consumers?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6        Q.    And going back to Exhibit No. 16, which

7    we were talking about earlier, are the letters in

8    Exhibit 16 representative of the letters that Docu

9    Prep Center sent to consumers?

10                   MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12                   MR. REARDON:  I will note for the

13   record that the Bureau is designating Exhibits 16

14   and 17 as confidential pursuant to the protective

15   order in this case because they contain personally

16   identifiable information about consumers?

17   BY MR. REARDON:

18       Q.    We were talking about four businesses,

19   Certified Doc Prep Services, Assure Direct Services,

20   Direct Document Solutions, and Secure Preparation

21   Services.  Did those four businesses all sell their

22   services during telephone calls?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 59

1          Q.     Is that something you were aware of at

2     the time?

3                 MR. LEPISCOPO:  Objection, Fifth

4     Amendment.

5     BY MR. REARDON:

6          Q.     Did those four businesses have their

7     sales representatives work from scripts during sales

8     calls?

9                 MR. LEPISCOPO:  Objection, Fifth

10    Amendment.

11    BY MR. REARDON:

12         Q.     Were you familiar with those scripts at

13    the time?

14                MR. LEPISCOPO:  Objection, Fifth

15    Amendment.

16    BY MR. REARDON:

17         Q.     What involvement did you have in

18    Certified Doc Prep Services' operation?

19                MR. LEPISCOPO:  Objection, Fifth

20    Amendment.

21    BY MR. REARDON:

22         Q.     What involvement did you have in

23    Certified Doc Prep Services' direct mail marketing?

24                MR. LEPISCOPO:  Objection, Fifth

25    Amendment.

Page 60

1  BY MR. REARDON:

2        Q.     Did you arrange for Certified Doc Prep

3  Services to send direct mail to consumers?

4              MR. LEPISCOPO:  Objection, Fifth

5  Amendment.

6  BY MR. REARDON:

7        Q.     Did you provide any assistance to

8  Certified Doc Prep Services in its sending of direct

9  mail to consumers?

10              MR. LEPISCOPO:  Objection, Fifth

11  Amendment.

12  BY MR. REARDON:

13        Q.     Do you control what Certified Doc Prep

14  Services said in its direct mail solicitations?

15              MR. LEPISCOPO:  Objection, Fifth

16  Amendment.

17  BY MR. REARDON:

18        Q.     Did you know at the time what Certified

19  Doc Prep Services said in its direct mail

20  solicitations?

21              MR. LEPISCOPO:  Objection, Fifth

22  Amendment.

23  BY MR. REARDON:

24        Q.     Were you involved in Certified Doc Prep

25  Services' sale of its services?

Page 61

1           MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4        Q.    What involvement did you have in

5    Certified Doc Prep Services' sales of its services to

6    consumers?

7           MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10       Q.    What involvement did you have in Assure

11   Direct Services' operations?

12          MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15       Q.    What involvement did you have in Assure

16   Direct Services' direct mail marketing?

17          MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20       Q.    Did you arrange for Assure Direct

21   Services to send direct mail to consumers?

22          MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25       Q.    Did you help Assure Direct Services

Page 62

```
 1    send direct mail to consumers?

 2                MR. LEPISCOPO:  Objection, Fifth

 3    Amendment.

 4    BY MR. REARDON:

 5         Q.    Do you control what Assure Direct

 6    Services said in its direct mail solicitations?

 7                MR. LEPISCOPO:  Objection, Fifth

 8    Amendment.

 9    BY MR. REARDON:

10         Q.    Did you know at the time what Assure

11    Direct Services said in its direct mail

12    solicitations?

13                MR. LEPISCOPO:  Objection, Fifth

14    Amendment.

15    BY MR. REARDON:

16         Q.    Were you involved in Assure Direct

17    Services' sales of its services?

18                MR. LEPISCOPO:  Objection, Fifth

19    Amendment.

20    BY MR. REARDON:

21         Q.    What involvement did you have in Assure

22    Direct Services' sale of its services?

23                MR. LEPISCOPO:  Objection, Fifth

24    Amendment.

25    BY MR. REARDON:
```

Page 63

1          Q.    I am going to ask the same questions

2     about Direct Document Solutions.

3                What involvement did you have in the

4     operations of Direct Document Solutions?

5                MR. LEPISCOPO:  Objection, Fifth

6     Amendment.

7     BY MR. REARDON:

8          Q.    What involvement did you have in Direct

9     Document Solutions' direct mail marketing?

10               MR. LEPISCOPO:  Objection, Fifth

11    Amendment.

12    BY MR. REARDON:

13         Q.    Did you arrange for Direct Document

14    Solutions to send direct mail to consumers?

15               MR. LEPISCOPO:  Objection, Fifth

16    Amendment.

17    BY MR. REARDON:

18         Q.    Did you help Direct Document Solutions

19    send direct mail to consumers?

20               MR. LEPISCOPO:  Objection, Fifth

21    Amendment.

22    BY MR. REARDON:

23         Q.    Did you control what Direct Document

24    Solutions said in its direct mail solicitations?

25               MR. LEPISCOPO:  Objection, Fifth

Page 64

 1    Amendment.

 2    BY MR. REARDON:

 3         Q.    Did you know at the time what Direct

 4    Document Solutions said in its direct mail

 5    solicitations?

 6                   MR. LEPISCOPO:  Objection, Fifth

 7    Amendment.

 8    BY MR. REARDON:

 9         Q.    Were you involved in Direct Document

10    Solutions' sales of its services?

11                   MR. LEPISCOPO:  Objection, Fifth

12    Amendment.

13    BY MR. REARDON:

14         Q.    What involvement did you have in Direct

15    Document Solutions' sales of its services?

16                   MR. LEPISCOPO:  Objection, Fifth

17    Amendment.

18    BY MR. REARDON:

19         Q.    I am going to ask about Secure

20    Preparation Services.

21                   What involvement did you have in the

22    operations of Secure Preparation Services?

23                   MR. LEPISCOPO:  Objection, Fifth

24    Amendment.

25    BY MR. REARDON:

1          Q.      What involvement did you have in Secure

2     Preparation Services' direct mail marketing?

3                  MR. LEPISCOPO:  Objection, Fifth

4     Amendment.

5     BY MR. REARDON:

6          Q.      Did you arrange for Secure Preparation

7     Services to send direct mail to consumers?

8                  MR. LEPISCOPO:  Objection, Fifth

9     Amendment.

10    BY MR. REARDON:

11         Q.      Did you help Secure Preparation

12    Services send direct mail to consumers?

13                 MR. LEPISCOPO:  Objection, Fifth

14    Amendment.

15    BY MR. REARDON:

16         Q.      Did you control what Secure Preparation

17    Services said in its direct mail solicitation?

18                 MR. LEPISCOPO:  Objection, Fifth

19    Amendment.

20    BY MR. REARDON:

21         Q.      Did you know at the time what Secure

22    Preparation Services said in its direct mail

23    solicitation?

24                 MR. LEPISCOPO:  Objection, Fifth

25    Amendment.

Page 66

1    BY MR. REARDON:

2         Q.    Were you involved in Secure Preparation

3    Services' sales of its services?

4                   MR. LEPISCOPO:  Objection, Fifth

5    Amendment.

6    BY MR. REARDON:

7         Q.    What involvement did you have in Secure

8    Preparation Services' sales of its services?

9                   MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12        Q.    Are you familiar with a company called

13   Automated Mailers?

14                  MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17        Q.    Is Automated Mailers a company that

18   sends direct mail on behalf of its clients?

19                  MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    Have you ever placed orders for direct

23   mail through Automated Mailers?

24                  MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

1    BY MR. REARDON:

2         Q.    Did the five student loan debt relief

3    Defendant companies we have been talking about use

4    Automated Mailers to send direct mail?

5                   MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Did you arrange for the student loan

9    debt relief defendants to send direct mail through

10   Automated Mailers?

11                  MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Did you oversee the relationship

15   between the student loan debt relief defendants and

16   Automated Mailers?

17                  MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    Were you involved in paying the

21   invoices that Automated Mailers sent to the student

22   loan debt relief defendants?

23                  MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 68

1          Q.     Are you familiar with the term

2     "consumer report", also known as a credit report?

3                    MR. LEPISCOPO:  Objection, Fifth

4     Amendment.

5     BY MR. REARDON:

6          Q.     Are you familiar with a term

7     "prescreened consumer reports" or "prescreened

8     lists"?

9                    MR. LEPISCOPO:  Objection, Fifth

10    Amendment.

11    BY MR. REARDON:

12         Q.     What is your understanding of a

13    prescreened list?

14                   MR. LEPISCOPO:  Objection, Fifth

15    Amendment.

16    BY MR. REARDON:

17         Q.     Have you ever been involved in

18    purchasing a prescreened list?

19                   MR. LEPISCOPO:  Objection, Fifth

20    Amendment.

21    BY MR. REARDON:

22         Q.     Have you ever been involved in using a

23    prescreened list to send direct mail?

24                   MR. LEPISCOPO:  Objection, Fifth

25    Amendment.

Page 69

1  BY MR. REARDON:

2        Q.     For today's deposition, I am going to

3  be using the term "prescreened list" to refer to

4  lists of consumers sold by credit bureaus that

5  contain consumer names, addresses, and other

6  information about the consumer's credit profile, such

7  as the balance of the consumer's student loans.

8              These lists are often used in sending

9  direct mail and are subject to certain legal

10 requirements.

11             Do you understand what I mean by a

12 prescreened list when I ask the questions today?

13             MR. LEPISCOPO:  Objection, Fifth

14 Amendment.  I understand and you can use it that

15 way.

16             MR. REARDON:  We will proceed on the

17 assumption that Mr. Nesheiwat understands these

18 questions.

19             MR. LEPISCOPO:  That's not what I

20 said.  He has testified to nothing.  I am just

21 telling you I understand when you ask the questions

22 so I can properly object.  He is not offering any

23 yes, no, maybe, or anything to anything that you are

24 saying.

25             MR. REARDON:  Okay.  Well, we are going

Page 70

1    to proceed with our questions

2    BY MR. REARDON:

3          Q.    Mr. Nesheiwat, are you familiar with

4    the credit bureau Experian?

5                MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8          Q.    While you worked there, did Monster

9    Loans have an account with Experian that it could use

10   to purchase consumer reports?

11               MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14         Q.    Did Monster Loans apply for an account

15   with Experian in 2015?

16               MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19         Q.    Did you arrange for Monster Loans to

20   submit its application for an account with Experian

21   in 2015?

22               MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25         Q.    Did you direct a Monster Loans employee

Page 71

1    named Aaron Mason to prepare an application for an

2    Experian account in 2015?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6         Q.    Why did Monster Loans apply for an

7    account with Experian in 2015?

8                    MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11        Q.    Did you sign Monster Loans' application

12   for an Experian account?

13                   MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    Did Experian approve Monster Loans'

17   application for an account?

18                   MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.    Did Monster Loans enter into any

22   agreements with Experian in 2015?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 72

1           Q.     Did you sign any agreements with

2    Experian on behalf of Monster Loans in 2015?

3                  MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6           Q.     Did you sign Experian's standard terms

7    and conditions agreement on behalf of Monster Loans?

8                  MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11          Q.     Did you sign an Experian document

12   called a Pre-Screening Services Schedule on behalf of

13   Monster Loans?

14                 MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17          Q.     Did Experian's Pre-Screening Services

18   Schedule indicate that Monster Loans could purchase

19   prescreened lists?

20                 MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23          Q.     Did Experian approve Monster Loans for

24   an account in 2015?

25                 MR. LEPISCOPO:  Objection, Fifth

Page 73

1    Amendment.

2    BY MR. REARDON:

3         Q.    Were you Monster Loans' primary point

4    of contact with Experian between 2015 and April of

5    2017?

6                   MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Between 2015 and 2017, did you receive

10   E-mails from Experian relating to Monster Loans'

11   Experian account?

12                  MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.    Between 2015 and April of 2017, were

16   you the person at Monster Loans with primary

17   responsibility for its account with Experian?

18                  MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.    Did Monster Loans ever use its account

22   with Experian to purchase prescreened lists?

23                  MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 74

1           Q.      Did Monster Loans use an Experian

2    website called iScreen to purchase prescreened lists?

3                   MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6           Q.      Did Monster Loans begin purchasing

7    prescreened lists from Experian in December of 2015?

8                   MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11          Q.      Did Monster Loans purchase prescreened

12   lists from Experian that contained information

13   regarding consumers with student loans?

14                  MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17          Q.      Did that information include consumers'

18   names, addresses, and the total balances of

19   consumers' student loans?

20                  MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23          Q.      Why did Monster Loans purchase

24   prescreened lists from Experian containing

25   information regarding consumers with student loans?

Page 75

```
 1                    MR. LEPISCOPO:  Objection, Fifth

 2   Amendment.

 3   BY MR. REARDON:

 4        Q.     Did Monster Loans purchase prescreened

 5   lists from Experian containing information regarding

 6   consumers with student loans for the student loan

 7   debt relief defendants?

 8                    MR. LEPISCOPO:  Objection, Fifth

 9   Amendment.

10   BY MR. REARDON:

11        Q.     Did Monster Loans use its account with

12   Experian to purchase prescreened lists for the

13   student loan debt relief defendants between

14   December 2015 and May 2017?

15                    MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.     Did Monster Loans use prescreened lists

19   containing information regarding consumers with

20   student loans to market mortgage loan products?

21                    MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24        Q.     Did the student loan debt relief

25   defendants use prescreened lists containing
```

Page 76

 1    information regarding consumers with student loans to

 2    market mortgage loan products?

 3               MR. LEPISCOPO:  Objection, Fifth

 4    Amendment.

 5    BY MR. REARDON:

 6         Q.     Did the student loan debt relief

 7    defendants use prescreened lists containing

 8    information regarding consumers with student loans to

 9    market insurance?

10               MR. LEPISCOPO:  Objection, Fifth

11    Amendment.

12    BY MR. REARDON:

13         Q.     Were you involved in purchasing

14    prescreened lists from Experian for the student loan

15    debt relief defendants through Monster Loans'

16    account?

17               MR. LEPISCOPO:  Objection, Fifth

18    Amendment.

19    BY MR. REARDON:

20         Q.     Did you oversee purchases of

21    prescreened lists from Experian for the student loan

22    debt relief defendants through Monster Loans'

23    account?

24               MR. LEPISCOPO:  Objection, Fifth

25    Amendment.

Page 77

 1    BY MR. REARDON:

 2         Q.    Did you authorize anyone to purchase

 3    prescreened lists from Experian for the student loan

 4    debt relief defendants?

 5                   MR. LEPISCOPO:  Objection, Fifth

 6    Amendment.

 7    BY MR. REARDON:

 8         Q.    Did you instruct Bill Abdel to purchase

 9    prescreened lists from Experian for the student loan

10    debt relief defendants?

11                   MR. LEPISCOPO:  Objection, Fifth

12    Amendment.

13    BY MR. REARDON:

14         Q.    Did you instruct an individual named

15    Max Chou to purchase prescreened lists from Experian

16    for the student loan debt relief defendants?

17                   MR. LEPISCOPO:  Objection, Fifth

18    Amendment.

19    BY MR. REARDON:

20         Q.    Did you supervise the purchases of

21    prescreened lists made through Monster Loans'

22    Experian account?

23                   MR. LEPISCOPO:  Objection, Fifth

24    Amendment.

25    BY MR. REARDON:

Page 78

1      Q.     Were the prescreened lists purchased

2   through Monster Loans' Experian account for the

3   student loan debt relief defendants sent to Automated

4   Mailers?

5                 MR. LEPISCOPO:  Objection, Fifth

6   Amendment.

7   BY MR. REARDON:

8      Q.     Did Automated Mailers use Experian

9   prescreened lists to extend direct mail on behalf of

10  the student loan debt relief defendants?

11                MR. LEPISCOPO:  Objection, Fifth

12  Amendment.

13  BY MR. REARDON:

14     Q.     Did you instruct Bill Abdel and Max

15  Chou to send prescreened lists to Automated Mailers

16  on behalf of the student loan debt relief defendants?

17                MR. LEPISCOPO:  Objection, Fifth

18  Amendment.

19  BY MR. REARDON:

20     Q.     Did you have a user name to access

21  Experian's iScreen platform?

22                MR. LEPISCOPO:  Objection, Fifth

23  Amendment.

24  BY MR. REARDON:

25     Q.     Did you allow Bill Abdel and Max Chou

Page 79

1    to use your user name for the Experian account?

2                    MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Was Max Chou an employee of Monster

6    Loans?

7                    MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    Would you instruct Max Chou to

11   communicate with Experian using a Monster Loans'

12   E-mail address?

13                   MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    Did you ever instruct Max Chou to

17   conceal from Experian the fact that he was not an

18   employee of Monster Loans?

19                   MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    Did you coordinate the purchases of

23   prescreened lists for the student loan debt relief

24   defendants with David Sklar?

25                   MR. LEPISCOPO:  Objection, Fifth

Page 80

1    Amendment.

2    BY MR. REARDON:

3         Q.     Did you coordinate the purchases of

4    prescreened lists for the student loan debt relief

5    defendants with Robert Hoose?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.     Did you ever negotiate with Experian to

10   obtain lower prices for prescreened lists that

11   Monster Loans purchased?

12             MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.     Did you negotiate for lower prices with

16   Experian in order to benefit the student loan debt

17   relief defendants?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.     How many consumers' information was

22   contained in the prescreened lists that Monster Loans

23   purchased for the student loan debt relief

24   defendants?

25             MR. LEPISCOPO:  Objection, Fifth

Page 81

1    Amendment.

2    BY MR. REARDON:

3         Q.     Did Monster Loans purchase prescreened

4    lists containing information regarding more than 7

5    million consumers for the student loan debt relief

6    defendants?

7                    MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.     Did Monster Loans ever disclose to

11   Experian that it purchased prescreened lists for the

12   student loan debt relief defendants?

13                   MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.     Did you ever lie to Experian about who

17   was using the prescreened lists that Monster Loans

18   purchased?

19                   MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.     Did the prescreened lists that Monster

23   Loans purchased for the student loan debt relief

24   defendants enable those companies to market their

25   services?

Page 82

```
 1                     MR. LEPISCOPO:  Objection, Fifth

 2    Amendment.

 3    BY MR. REARDON:

 4         Q.      Earlier on I asked you about the fact

 5    that you held a limited partnership interest in the

 6    five student loan debt relief Defendant companies.

 7                     Did you receive distributions of

 8    profits from the student loan relief Defendants?

 9                     MR. LEPISCOPO:  Objection, Fifth

10    Amendment.

11    BY MR. REARDON:

12         Q.      Did you receive distributions of

13    profits from the student loan debt relief defendants?

14                     MR. LEPISCOPO:  Objection, Fifth

15    Amendment.

16    BY MR. REARDON:

17         Q.      Were those profits the result of sales

18    to consumers who received direct mail marketing from

19    the student loan debt relief defendants?

20                     MR. LEPISCOPO:  Objection, Fifth

21    Amendment.

22    BY MR. REARDON:

23         Q.      Did the student loan debt relief

24    defendants make sales to consumers whose contact

25    information was obtained through Experian's
```

Page 83

1    prescreened lists?

2              MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Were the profits that you received from

6    the student loan debt relief defendants the result of

7    marketing using the prescreened lists obtained from

8    Experian?

9              MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11             MR. REARDON:  This might be a good time

12   to take a 5- to 10-minute break.  Off the record.

13   (A recess was taken at 9:51 a.m., PST, after which

14   the deposition resumed at 10:06 a.m., PST.)

15             MR. REARDON:  Let's go back on the

16   record.

17   BY MR. REARDON:

18        Q.    Mr. Nesheiwat, are you there?

19        A.    Yes.

20        Q.    Mr. Nesheiwat, before I kind of

21   continue with my questions, I wanted to confirm

22   something.

23             Before, in earlier questions, your

24   attorney, Mr. Lepiscopo, asserted the Fifth Amendment

25   privilege against self-incrimination on your behalf

Page 84

1    in response to many questions.  I want to confirm

2    that you do not intend to provide answers to any of

3    those questions based on your attorney's instruction;

4    is that correct?

5         A.    Yes.

6         Q.    Mr. Nesheiwat, earlier today you may

7    recall we also urged you to carefully consider each

8    of the questions that we are asking in order to

9    determine whether the Fifth Amendment would apply.

10              Do you recall that?

11              MR. LEPISCOPO:  I believe we went over

12   this.

13   BY MR. REARDON:

14        Q.    Do you recall that, Mr. Nesheiwat?

15        A.    I believe so.

16        Q.    Okay.  Well, I will just repeat for the

17   record that we are urging you personally to carefully

18   consider each of the questions that we are asking in

19   order to determine whether the Fifth Amendment

20   applies and to carefully consider whether you can or

21   cannot answer given your Fifth Amendment rights.

22              Earlier, Mr. Lepiscopo suggested that

23   he understood our questions and that that was

24   possibly an adequate substitute for you understanding

25   our questions.

Page 85

1              I want to make clear on the record that

2    if you, Mr. Nesheiwat, do not understand a question,

3    you should say so.  And, so, that is what we would

4    ask you to do.

5              If you intend to assert your Fifth

6    Amendment right in response to a question and you

7    don't say that you don't understand a question, we

8    are just going to assume that you understand the

9    question.

10             Do you understand that?

11             MR. LEPISCOPO:  I am fine with that

12   assumption, but he is not testifying -- we are not

13   going to have that implication that he agrees with

14   the foundation or the premise and facts asserted

15   into your question.

16             So ask your questions, I will object,

17   and we can deal with it at another time.  But he is

18   not going to say he understands or doesn't

19   understand his knowledge of what you are putting in

20   his question.

21             MR. REARDON:  Well, I think that's not

22   what we are getting at.  We are just getting at that

23   Mr. Nesheiwat is making a knowing and intelligent

24   assertion of his Fifth Amendment rights.

25             So, Pete, I just -- this is directed to

Page 86

1    Mr. Nesheiwat and I just wanted him to kind of

2    confirm that he understands what our position is.

3    BY MR. REARDON:

4         Q.    Mr. Nesheiwat, if you do not say that

5    you don't understand a question, then we are going to

6    assume you understand it.  If Mr. Lepiscopo asserts

7    the Fifth Amendment on your behalf in response to a

8    question, we are going to assume and take from that

9    that you understood the question and are knowingly

10   asserting your Fifth Amendment rights in response to

11   the question.

12              Mr. Nesheiwat, do you understand that?

13              MR. LEPISCOPO:  I am not going to let

14   him testify to facts or by implication that he

15   understands the facts.  This is not going to serve

16   as a waiver.

17              MR. REARDON:  Pete, you are breaking

18   up constantly.  Can you relocate to a better

19   position in your office?

20              MR. LEPISCOPO:  Let us try to restart

21   the thing and see what happens.  Hold on.

22              Court reporter, can you read back the

23   previous exchange?

24              Pete, can you respond with whatever

25   you want to say?

Page 87

1                    (The referred to portions of the

2      transcript were read back by the reporter.)

3                    MR. REARDON:  The court reporter has

4      just read back the statement I made earlier before

5      noting the Bureau's position that if Mr. Nesheiwat

6      asserts the Fifth Amendment and does not say that he

7      doesn't understand a question that he understood the

8      question and is knowingly asserting the Fifth

9      Amendment.  We are noting that for the record.

10                    Pete, do you want to make any response

11     to that?

12                    MR. LEPISCOPO:  Yeah, I will just

13     object on the Fifth Amendment and just say that --

14     and we will indicate if we don't understand the

15     question or lack of asserting that we don't

16     understand the question does not mean that we agree

17     with the facts that you are putting in your

18     question.

19                    We are just re-asserting what I said

20     in the beginning.

21                    MR. REARDON:  Let us proceed.

22     BY MR. REARDON:

23          Q.    Mr. Nesheiwat, are you familiar with a

24     company called Lend Tech Loans?

25                    MR. LEPISCOPO:  Objection, Fifth

1    Amendment.

2    BY MR. REARDON:

3         Q.    What involvement have you had with Lend

4    Tech Loans?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Did Lend Tech Loans have an account

9    with Experian?

10              MR. LEPISCOPO:  Objection, Fifth

11    Amendment.

12    BY MR. REARDON:

13         Q.    Was Lend Tech Loans created in order to

14    buy prescreened lists from Experian for its student

15    loan debt relief defendants?

16              MR. LEPISCOPO:  Objection, Fifth

17    Amendment.

18    BY MR. REARDON:

19         Q.    Did you support the creation of Lend

20    Tech Loans?

21              MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24         Q.    Did you instruct Anthony Sebreros to

25    have Lend Tech apply for an Experian account?

Page 89

1               MR. LEPISCOPO:  Objection, Fifth

2     Amendment.

3     BY MR. REARDON:

4          Q.     Did you direct Anthony Sebreros to have

5     Lend Tech Loans buy prescreened lists from Experian

6     for the student loan debt relief defendants?

7               MR. LEPISCOPO:  Objection, Fifth

8     Amendment.

9     BY MR. REARDON:

10         Q.     Are you familiar with a law called the

11    Fair Credit Reporting Act?

12              MR. LEPISCOPO:  Objection, Fifth

13    Amendment.

14    BY MR. REARDON:

15         Q.     Are you aware that the Bureau has

16    alleged in this lawsuit that you violated the Fair

17    Credit Reporting Act?

18              MR. LEPISCOPO:  Objection, Fifth

19    Amendment.

20              MR. REARDON:  He is not going to

21    testify as to his awareness of the case?

22              MR. LEPISCOPO:  Objection, Fifth

23    Amendment.

24    BY MR. REARDON:

25         Q.     Between 2015 and 2017, did you take any

Page 90

1    steps to ensure that those loans complied with the

2    Fair Credit Reporting Act?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6          Q.    Between 2015 and 2017, did you know

7    whether the Fair Credit Reporting Act limited how

8    consumer reports could be used?

9                    MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12         Q.    Between 2015 and 2017, did you know

13   whether the Fair Credit Reporting Act limited the

14   purpose for which prescreened lists could be used?

15                   MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18         Q.    Between 2015 and 2017, did you know how

19   the Fair Credit Reporting Act limited the purposes

20   for which prescreened lists could be used or

21   obtained?

22                   MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25         Q.    Are you familiar with the concept of a

Page 91

1    firm offer of credit?

2             MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5        Q.    What is your understanding of a firm

6    offer of credit?

7             MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10       Q.    Between 2015 and 2017, were you

11   familiar with the concept of a firm offer of credit?

12            MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15       Q.    Between 2015 and 2017, did you know

16   that providing prescreened lists to the student loan

17   debt relief defendants was a violation of the Fair

18   Credit Reporting Act?

19            MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22       Q.    Between 2015 and 2017, did you ever

23   violate the Fair Credit Reporting Act?

24            MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

Page 92

1   BY MR. REARDON:

2        Q.      Between 2015 and 2017, did you know

3   that you were violating the Fair Credit Reporting

4   Act?

5               MR. LEPISCOPO:  Objection, Fifth

6   Amendment.

7   BY MR. REARDON:

8        Q.      Between 2015 and 2017, did you ever

9   take steps to conceal violating the Fair Credit

10  Reporting Act?

11              MR. LEPISCOPO:  Objection, Fifth

12  Amendment.

13  BY MR. REARDON:

14       Q.      Since 2017, have you violated the Fair

15  Credit Reporting Act?

16              MR. LEPISCOPO:  Objection, Fifth

17  Amendment.

18  BY MR. REARDON:

19       Q.      Since 2017, have you been involved in

20  providing prescreened lists to any companies that

21  provide debt relief services?

22              MR. LEPISCOPO:  Objection, Fifth

23  Amendment.

24  BY MR. REARDON:

25       Q.      I am going to ask you a few questions

Page 93

1    about the statements that the student loan debt

2    relief companies made to consumers in their marketing

3    and in their sales calls.

4                    MR. LEPISCOPO:  Objection, Fifth

5    Amendment.

6    BY MR. REARDON:

7          Q.     That wasn't a question.  The statement

8    was that I am going to ask a few questions about the

9    statements that the student loan debt relief

10   companies made to consumers in their marketing and

11   sales calls.

12                   Here is the question.  I asked you

13   earlier about whether the student loan debt relief

14   defendants offered to assist consumers with

15   consolidating their federal student loans, and I

16   think you invoked the Fifth Amendment for that

17   question.

18                   Are you familiar with consolidation of

19   a federal student loan?

20                   MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23         Q.     What is your understanding of a federal

24   student loan, consolidated loan?

25                   MR. LEPISCOPO:  Objection, Fifth

Page 94

1    Amendment.

2    BY MR. REARDON:

3         Q.     Were you familiar with consolidated

4    federal student loans between 2015 and 2017?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.     What are the effects of consolidating a

9    federal student loan?

10             MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.     Do you understand the effects of

14   consolidating federal student loans between 2015 and

15   2017?

16             MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.     What are the benefits to a consumer of

20   consolidating a federal student loan?

21             MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24        Q.     Did you understand those benefits

25   between 2015 and 2017?

Page 95

```
 1                    MR. LEPISCOPO:  Objection, Fifth

 2    Amendment.

 3    BY MR. REARDON:

 4         Q.      Did the student loan debt relief

 5    defendants make representations to consumers about

 6    the benefits of consolidating student loans?

 7                    MR. LEPISCOPO:  Objection, Fifth

 8    Amendment.

 9    BY MR. REARDON:

10         Q.      Did you know between 2015 and 2017 what

11    representations the student loan debt relief

12    defendants made to consumers about the benefits of

13    consolidating federal student loans?

14                    MR. LEPISCOPO:  Objection, Fifth

15    Amendment.

16    BY MR. REARDON:

17         Q.      Did the student loan debt relief

18    defendants represent that through their services

19    consumers would receive a lower interest rate on

20    their federal student loans?

21                    MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24         Q.      Did the student loan debt relief

25    defendants represent that consumers will receive a
```

Page 96

1    lower interest rate on their federal student loans by

2    consolidating?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6         Q.    Did the student loan debt relief

7    defendants make representations about getting a lower

8    interest rate by consolidating in their direct

9    mailing solicitations?

10                    MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.    At the time did you know about the

14   representations about lower interest rates in the

15   student loan debt relief defendants' direct mail

16   solicitations?

17                    MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    Did you participate in sending direct

21   mail solicitations that made representations that

22   they would have a lower interest rate by

23   consolidating?

24                    MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

Page 97

1    BY MR. REARDON:

2          Q.      Did you supervise the sending of direct

3    mail solicitations that made representations about

4    getting a lower interest rate by consolidating?

5                  MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8          Q.      Did the student debt relief Defendants

9    make representations about the benefits of

10   consolidating a federal student loan during sales

11   calls?

12                 MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15         Q.      At the time did you know about the

16   representations about lower interest rates that the

17   student loan debt relief defendants made in sales

18   calls?

19                 MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22         Q.      Did you authorize the student loan debt

23   relief defendants to make representations about

24   getting a lower interest rate during sales calls?

25                 MR. LEPISCOPO:  Objection, Fifth

Page 98

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did the student loan debt relief

4    defendants represent that consolidating would cause

5    consumers to get a lower interest rate?

6                   MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Did you know between 2015 and 2017 that

10   the student loan debt relief defendants represented

11   that consolidating would cause consumers to get a

12   lower interest rate?

13                  MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    During that period, did consolidating

17   federal student loans cause consumers to get a lower

18   interest rate?

19                  MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    During that period did you know whether

23   consolidation of federal loans caused consumers to

24   get a lower interest rate?

25                  MR. LEPISCOPO:  Objection, Fifth

Page 99

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did the student loan debt relief

4    defendants represent that it was necessary to

5    consolidate to get a lower interest rate?

6                   MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Did you know between 2015 and 2017 that

10   the student loan debt relief defendants represented

11   that it was necessary to consolidate to get a lower

12   interest rate?

13                  MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    During that period, was it necessary

17   for consumers to consolidate their student loans to

18   get a lower interest rate?

19                  MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    During that period, did you know

23   whether it was necessary for consumers to consolidate

24   their student loans to get a lower interest rate?

25                  MR. LEPISCOPO:  Objection, Fifth

Page 100

1    Amendment.

2    BY MR. REARDON:

3         Q.     Was the student loan debt relief

4    defendants representations to consumers about getting

5    a lower interest rate true?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.     Did consumers ever complain about the

10   student loan debt relief defendants' representations

11   to consumers about getting a lower interest rate?

12             MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.     Between 2015 and 2017, were you aware

16   of consumer complaints about the representations to

17   consumers about getting a lower interest rate?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.     Between 2015 and 2017, did you do

22   anything to ensure that the student loan debt relief

23   defendants' representations to consumers about

24   getting a lower interest rate was true?

25             MR. LEPISCOPO:  Objection, Fifth

Page 101

1   Amendment.

2   BY MR. REARDON:

3        Q.      Between 2015 and 2017, did you know

4   that student loan debt relief defendants were making

5   false statements to consumers about getting a lower

6   interest rate on their federal student loans?

7                MR. LEPISCOPO:  Objection, Fifth

8   Amendment.

9   BY MR. REARDON:

10       Q.      Between 2015 and 2017, did you know

11  that student loan relief Defendants were making

12  misleading statements to consumers about getting a

13  lower interest rate on their student loans?

14               MR. LEPISCOPO:  Objection, Fifth

15  Amendment.

16  BY MR. REARDON:

17       Q.      Between 2015 and 2017, did you provide

18  assistance to the student loan debt relief defendants

19  while knowing that they were making false statements

20  to consumers about a lower interest rate?

21               MR. LEPISCOPO:  Objection, Fifth

22  Amendment.

23  BY MR. REARDON:

24       Q.      During their sales calls, did the

25  student loan debt relief defendants make

Page 102

1    representations to consumers about the consumers

2    receiving an improved credit score?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6         Q.      Did the student loan debt relief

7    defendants represent to consumers that their service

8    would cause consumers' credit scores to improve?

9                    MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12        Q.      Did the student loan debt relief

13   defendants represent that consumers' credit scores

14   would improve if the consumers consolidated their

15   federal student loans?

16                   MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.      Did the student loan debt relief

20   defendants represent to consumers that having

21   multiple student loans had a very big impact on their

22   credit?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 103

1      Q.      Did the student loan debt relief

2   defendants sales representatives ever make up fake

3   numbers about how much credit scores were going to

4   improve with their services?

5              MR. LEPISCOPO:  Objection, Fifth

6   Amendment.

7   BY MR. REARDON:

8      Q.      Between 2015 and 2017, did you know

9   that the student loan debt relief defendants

10  represented to consumers that their services would

11  cause consumers' credit scores to improve?

12             MR. LEPISCOPO:  Objection, Fifth

13  Amendment.

14  BY MR. REARDON:

15     Q.      Between 2015 and 2017, did you know

16  that the student loan debt relief defendants

17  represented to consumers that their credit scores

18  would improve if the consumers consolidated their

19  federal student loans?

20             MR. LEPISCOPO:  Objection, Fifth

21  Amendment.

22  BY MR. REARDON:

23     Q.      Did you instruct the student loan debt

24  relief defendants to make representations about

25  improved credit scores during sales calls?

Page 104

1                    MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.     Earlier we spoke a little bit about the

5    scripts that the student loan debt relief defendants

6    used during sales calls.  Did the scripts that the

7    student loan debt relief defendants used make

8    statements about consumers' credit scores improving

9    with the companies' services?

10                   MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.     Did you instruct Docu Prep Center to

14   use scripts that contained statements about

15   consumers' credit scores improving with its services?

16                   MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.     Did you instruct any of the other four

20   student loan debt relief defendants to use scripts

21   that contained statements about consumers' credit

22   scores improving through those companies' services?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 105

1          Q.      Between 2015 and 2017, did the student

2    loan debt relief defendants' services, in fact, cause

3    consumers' credit scores to improve?

4                  MR. LEPISCOPO:  Objection, Fifth

5    Amendment.

6    BY MR. REARDON:

7          Q.      Between 2015 and 2017, did

8    consolidating federal student loans cause consumers'

9    credit scores to improve?

10                 MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13         Q.      Were the student loan debt relief

14   defendants' representations to consumers about credit

15   scores true?

16                 MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19         Q.      Did consumers ever complain about the

20   student loan debt relief defendants' representations

21   to consumers about getting an improved credit score?

22                 MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25         Q.      What was the basis of the student loan

Page 106

1    debt relief defendants' representations to consumers

2    about getting an improved credit score?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6          Q.    Was there any factual basis for the

7    student loan debt relief defendants' representations

8    to consumers about getting an improved credit score?

9                    MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12         Q.    Between 2015 and 2017, did you do

13   anything to ensure that the student loan debt relief

14   defendants' representations to consumers about

15   getting an improved credit score was true?

16                   MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19         Q.    To your knowledge, between 2015 and

20   2017, did anyone associated with the student loan

21   debt relief defendants do anything to ensure that

22   their representations to consumers about getting an

23   improved credit score were true?

24                   MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

Page 107

1    BY MR. REARDON:

2         Q.     Between 2015 and 2017, did you know

3    that the student loan debt relief defendants were

4    making false statements to consumers about improving

5    their credit scores by consolidating their student

6    loans?

7                     MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.     Between 2015 and 2017, did you know

11   that the student loan debt relief defendants were

12   making misleading statements to consumers about

13   improving their credit score by consolidating their

14   student loans?

15                    MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.     Between 2015 and 2017, did you provide

19   assistance to the student loan debt relief defendants

20   while knowing that they were making false statements

21   to consumers about improving their credit scores by

22   consolidating loans?

23                    MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 108

1          Q.     Do you know what a student loan

2    servicer is?

3                 MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6          Q.     Was the United States Department of

7    Education known as a student loan servicer?

8                 MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11         Q.     Do consumers with federal student loans

12   have a servicer who administers their loans?

13                MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16         Q.     Do servicers handle things like

17   collecting on student loans?

18                MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21         Q.     What other things do student loan

22   servicers do?

23                MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 109

1          Q.      Between 2015 and 2017, did Docu Prep

2    Center ever make representations to consumers about

3    the effect of consolidating their federal student

4    loans on who the servicer would be?

5                    MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8          Q.      Between 2015 and 2017, did Docu Prep

9    Center represent to consumers that the Department of

10   Education would become the, quote, new servicer,

11   close quote, for the consumers' loans after the loans

12   were consolidated?

13                   MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16         Q.      How often did Docu Prep Center tell

17   consumers that the Department of Education would

18   become the new servicer for the consumers' loans

19   after the loans were consolidated?

20                   MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23         Q.      Did Docu Prep Center tell consumers

24   that they would not have to interact with a loan

25   servicer after consolidating loans?

Page 110

1               MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.    Did Docu Prep Center tell consumers

5    that they would just be able to interact directly

6    with the Department of Education after consolidating

7    their loans?

8               MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11        Q.    Did Docu Prep Center make negative and

12   disparaging statements about student loan servicers?

13              MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    Between 2015 and 2017, did the

17   Department of Education, in fact, become a servicer

18   for consumers' student loans after the loans were

19   consolidated?

20              MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Were Docu Prep Center's statements that

24   the Department of Education would become the new

25   servicer for the consumers' loans truthful?

Page 111

1            MR. LEPISCOPO:  Objection, Fifth

2   Amendment.

3   BY MR. REARDON:

4        Q.    Why did Docu Prep Center represent the

5   Department of Education would become the new servicer

6   for consolidated loans?

7            MR. LEPISCOPO:  Objection, Fifth

8   Amendment.

9   BY MR. REARDON:

10       Q.    Between 2015 and 2017, did you know

11  that Docu Prep Center represented to consumers that

12  the Department of Education would become the new

13  servicer of consumers' loans if they consolidated?

14           MR. LEPISCOPO:  Objection, Fifth

15  Amendment.

16  BY MR. REARDON:

17       Q.    Did you direct and instruct Docu Prep

18  to make representations about the Department of

19  Education becoming the consumers' new servicer?

20           MR. LEPISCOPO:  Objection, Fifth

21  Amendment.

22  BY MR. REARDON:

23       Q.    Did the scripts used by Docu Prep

24  Center contain information about the Department of

25  Education becoming the new servicer if consumers

Page 112

1    consolidated?

2              MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Did you instruct Docu Prep Center to

6    use scripts that contained statements about the

7    Department of Education becoming consumers' new

8    servicer?

9              MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12        Q.    Between 2015 and 2017, did you do

13   anything to ensure that Docu Prep Center's

14   representations in its sales scripts were true?

15             MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.    Between 2015 and 2017, did you do

19   anything to ensure that Docu Prep Center's

20   representations about the identity of consumers'

21   servicer were true?

22             MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.    Between 2015 and 2017, did Docu Prep

1    Center hear any complaints about statements that the

2    Department of Education would become consumers' new

3    servicer?

4              MR. LEPISCOPO:  Objection, Fifth

5    Amendment.

6    BY MR. REARDON:

7         Q.    During that time period, were you aware

8    of any consumer complaints about Docu Prep's

9    representations that the Department of Education

10   would become the new server of consumers' loans?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Between 2015 and 2017, did you know

15   that Docu Prep made false statements to consumers

16   about the Department of Education becoming the new

17   servicer of consumers' student loans?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.    Between 2015 and 2017, did you provide

22   assistance to Docu Prep Center while knowing that it

23   was making false statements to consumers about the

24   Department of Education becoming the next servicer on

25   consumers' student loans?

Page 114

```
 1                    MR. LEPISCOPO:  Objection, Fifth
 2    Amendment.
 3    BY MR. REARDON:
 4         Q.    What involvement did you have in the
 5    student loan debt relief defendants' collection of
 6    fees?
 7                    MR. LEPISCOPO:  Objection, Fifth
 8    Amendment.
 9    BY MR. REARDON:
10         Q.    What do you know about how the student
11    loan debt relief defendants collected fees?
12                    MR. LEPISCOPO:  Objection, Fifth
13    Amendment.
14    BY MR. REARDON:
15         Q.    What was the amount of the fees that
16    the student loan debt relief defendants charged
17    consumers for their services?
18                    MR. LEPISCOPO:  Objection, Fifth
19    Amendment.
20    BY MR. REARDON:
21         Q.    What services did consumers receive in
22    exchange for these fees?
23                    MR. LEPISCOPO:  Objection, Fifth
24    Amendment.
25    BY MR. REARDON:
```

Page 115

1          Q.     At what point in the sales process did

2    the student loan debt relief defendants collect their

3    fees from consumers?

4                  MR. LEPISCOPO:  Objection, Fifth

5    Amendment.

6    BY MR. REARDON:

7          Q.     How long after consumers enrolled with

8    the student loan debt relief defendants did consumers

9    pay the fees?

10                 MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13         Q.     Can you provide a time range?

14                 MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17         Q.     How long did it take for the

18   applications that the student loan debt relief

19   defendants prepared for consumers to be approved by

20   the Department of Education or its servicers?

21                 MR. LEPISCOPO:  Objection, Fifth

22   Amendment.

23   BY MR. REARDON:

24         Q.     How long after consumers enrolled with

25   the student loan debt relief defendants did the

Page 116

1    consumers make payments under the new terms of their

2    student loans?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6         Q.     Would it generally be more than three

7    months that they began making payments under the new

8    terms of their student loans?

9                    MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12        Q.     Did the student loan debt relief

13   defendants receive consumers' fees for their services

14   before consumers' consolidation applications were

15   approved?

16                   MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.     Did the student loan debt relief

20   defendants receive consumers' fees for their services

21   before consumers made their first payment following

22   the consolidation of their federal student loans?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 117

1          Q.    Did the student loan debt relief

2    defendants receive consumers' fees for their services

3    before consumers' loan repayment plan applications

4    were approved?

5                    MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8          Q.    Did the student loan debt relief

9    defendants receive consumers' fees for their services

10   before the consumers made a payment following

11   enrollment in their new repayment plans?

12                   MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15         Q.    Did the student loan debt relief

16   defendants receive consumers' fees for their services

17   before consumers' loan forgiveness applications were

18   approved?

19                   MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22         Q.    Did the student loan debt relief

23   defendants receive consumers' fees for their services

24   before consumers made their first payment following

25   their loan forgiveness plans?

Page 118

```
 1                    MR. LEPISCOPO:  Objection, Fifth

 2   Amendment.

 3   BY MR. REARDON:

 4         Q.    Do you know what a forbearance on a

 5   loan is?

 6                    MR. LEPISCOPO:  Objection, Fifth

 7   Amendment.

 8   BY MR. REARDON:

 9         Q.    Are you familiar with how forbearance

10   works?

11                    MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14         Q.    Did the student loan debt relief

15   defendants offer to assist consumers with putting

16   their federal student loans into forbearance?

17                    MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20         Q.    How long were the forbearances that the

21   student loan debt relief defendants applied for?

22                    MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25         Q.    Did the student loan debt relief
```

Page 119

1    defendants receive consumers' fees for services

2    before consumers' period of forbearance ended?

3                     MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6         Q.     Did the student loan debt relief

7    defendants receive consumers' fees for their services

8    before consumers made their first payment after

9    forbearance?

10                    MR. LEPISCOPO:  Objection, Fifth

11   Amendment.

12   BY MR. REARDON:

13        Q.     Did the student loan debt relief

14   defendants wait to take their fees until after

15   consumers made the first payment on the altered terms

16   of their student loans?

17                    MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.     Between 2015 and 2017, do you know how

21   soon after enrollment the student loan debt relief

22   defendants collected consumers' fees?

23                    MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 120

1          Q.      Between 2015 and 2017, did you

2     participate in the student loan debt relief

3     defendants' collection of consumers' fees in any way?

4                    MR. LEPISCOPO:  Objection, Fifth

5     Amendment.

6     BY MR. REARDON:

7          Q.      Between 2015 and 2017, did you provide

8     any instructions to the student loan debt relief

9     defendants regarding their collection of consumers'

10    fees?

11                   MR. LEPISCOPO:  Objection, Fifth

12    Amendment.

13    BY MR. REARDON:

14         Q.      Between 2015 and 2017, did you know

15    that the student loan debt relief defendants received

16    consumers' fees before consumers' applications were

17    approved?

18                   MR. LEPISCOPO:  Objection, Fifth

19    Amendment.

20    BY MR. REARDON:

21         Q.      Between 2015 and 2017, did you know

22    that the student loan debt relief defendants received

23    consumers' fees before consumers made the first

24    payment under the altered terms of their student

25    loans?

Page 121

1              MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.    Between 2015 and 2017, did the student

5    loan debt relief defendants sell their services over

6    the telephone?

7              MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    Was that something you were aware of at

11   the time?

12             MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.    Between 2015 and 2017, did you arrange

16   for Docu Prep Center to provide services to consumers

17   with student loans?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.    Between 2015 and 2017, did you provide

22   any assistance or support to the student loan debt

23   relief defendants?

24             MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

Page 122

1   BY MR. REARDON:

2          Q.      Between 2015 and 2017, did you assist

3   the student loan debt relief defendants by arranging

4   for them to use marketing lists obtained through

5   Monster Loans' Experian account?

6                  MR. LEPISCOPO:  Objection, Fifth

7   Amendment.

8   BY MR. REARDON:

9          Q.      Are you familiar with a law known as

10  the Telemarketing Sales Rule?

11                 MR. LEPISCOPO:  Objection, Fifth

12  Amendment.

13  BY MR. REARDON:

14         Q.      Are you aware that in this lawsuit the

15  Bureau has alleged that you violated the

16  Telemarketing Sales Rule between 2015 and 2017, Mr.

17  Nesheiwat?

18         A.      Yes.

19         Q.      Between 2015 and 2017, were you

20  familiar with the Telemarketing Sales Rule?

21                 MR. LEPISCOPO:  Objection, Fifth

22  Amendment.

23  BY MR. REARDON:

24         Q.      Are you familiar with the concept of an

25  advanced fee?

Page 123

```
 1              MR. LEPISCOPO:  Objection, Fifth

 2   Amendment.

 3   BY MR. REARDON:

 4        Q.     Between 2015 and 2017, did you know

 5   that the Telemarketing Sales Rule prohibited

 6   companies from charging advanced fees under certain

 7   circumstances?

 8              MR. LEPISCOPO:  Objection, Fifth

 9   Amendment.

10   BY MR. REARDON:

11        Q.     Between 2015 and 2017, were you

12   familiar with the Telemarketing Sales Rule's

13   provisions regarding the collection of advanced fees

14   for debt relief services?

15              MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.     Between 2015 and 2017, did you know

19   whether the Telemarketing Sales Rule's advanced fee

20   provision applied to the student loan debt relief

21   defendants?

22              MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.     Between 2015 and 2017, did you ever
```

Page 124

1    have discussions, either orally or in writing, with

2    others involved in operating the student loan debt

3    relief defendants regarding the TSR's advanced fee

4    provisions?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    I may use the phrase TSR as a shorthand

9    for Telemarketing Sales Rule, if that's okay.

10             MR. LEPISCOPO:  That is fine.

11   BY MR. REARDON:

12        Q.    Mr. Nesheiwat, between 2015 and 2017,

13   did you ever receive any E-mails regarding the TSR's

14   advanced fee provision?

15             MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.    Between 2015 and 2017, did you ever

19   receive any E-mails regarding how the TSR's advanced

20   fee provision might apply to the student loan debt

21   relief defendants?

22             MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.    Between 2015 and 2017, were you aware

Page 125

1    of any lawsuits property by government regulators to

2    enforce the TSR's advanced fee provisions against

3    companies similar to the student loan debt relief

4    defendants?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    In 2015, did Docu Prep Center change

9    the payment processor it used for ACH transactions to

10   a company known as Reliant Account Management or RAM?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Were you aware of that switch to the

15   payment processor RAM at the time?

16             MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    Did Docu Prep Center change to use RAM

20   as its payment processor because its previous payment

21   processor planned to change its processes to comply

22   with the TSR's advanced fee provisions?

23             MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 126

1      Q.     Is that something you were aware of at

2  the time?

3             MR. LEPISCOPO:  Objection, Fifth

4  Amendment.

5  BY MR. REARDON:

6      Q.     Did Docu Prep Center change to RAM in

7  order to avoid having to comply with the TSR's

8  advanced fee provision?

9             MR. LEPISCOPO:  Objection, Fifth

10  Amendment.

11  BY MR. REARDON:

12      Q.     Did you approve of Docu Prep Center's

13  change to RAM at the time?

14             MR. LEPISCOPO:  Objection, Fifth

15  Amendment.

16  BY MR. REARDON:

17      Q.     Between 2015 and 2017, did you take any

18  steps to ensure that the student loan debt relief

19  defendants complied with the Telemarketing Sales

20  Rule's provisions relating to advanced fees?

21             MR. LEPISCOPO:  Objection, Fifth

22  Amendment.

23  BY MR. REARDON:

24      Q.     Between 2015 and 2017, did you know how

25  the student loan debt relief defendants charged their

Page 127

1    fees violated the Telemarketing Sales Rule?

2                MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.     Between 2015 and 2017, did you

6    personally violate the Telemarketing Sales Rule's

7    advanced fee provision?

8                MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11        Q.     Between 2015 and 2017, did you provide

12   assistance to the student loan debt relief defendants

13   while knowing that they were violating the

14   Telemarketing Sales Rule?

15               MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18        Q.     Did you have a Monster Loans E-mail

19   account while you worked at Monster Loans?

20               MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.     Was the E-mail address for your Monster

24   Loans E-mail account jawad@monsterloans.com?

25               MR. LEPISCOPO:  Objection, Fifth

Page 128

1    Amendment.

2    BY MR. REARDON:

3         Q.    Did you use that E-mail account to send

4    and receive E-mails relating to Monster Loans'

5    mortgage business?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Did you use your Monster Loans E-mail

10   account to send E-mails relating to the business

11   activities of the student loan debt relief

12   defendants?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    Did you keep E-mails that were sent and

17   received using your Monster Loans E-mail account as a

18   regular practice?

19             MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    Did Monster Loans keep E-mails that

23   were sent and received from your Monster Loans E-mail

24   account as a regular practice?

25             MR. LEPISCOPO:  Objection, Fifth

Page 129

1    Amendment.

2    BY MR. REARDON:

3         Q.      Do the E-mails that you sent and

4    received through your Monster Loans E-mail account

5    reflect Monster Loans' regular business activities?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.      Do the E-mails that you sent and

10   received through your Monster Loans E-mail account

11   also reflect the regular business activities of the

12   student loan debt relief defendants?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.      Were the E-mails that you sent and

17   received through your Monster Loans E-mail account

18   created at or near the time of the occurrence of the

19   matters described in those E-mails?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.      When you sent E-mails through your

24   Monster Loans E-mail account, did you have knowledge

25   of the matters described in the E-mails that you

Page 130

1  sent?

2              MR. LEPISCOPO:  Objection, Fifth

3  Amendment.

4  BY MR. REARDON:

5       Q.    When you received E-mails through your

6  Monster Loans E-mail account, did the persons who

7  sent E-mails to you have knowledge of the matters

8  described in the E-mails that you received?

9              MR. LEPISCOPO:  Objection, Fifth

10 Amendment.

11 BY MR. REARDON:

12      Q.    To your knowledge, has anyone besides

13 you ever sent an E-mail from your Monster Loans

14 E-mail account?

15             MR. LEPISCOPO:  Objection, Fifth

16 Amendment.

17 BY MR. REARDON:

18      Q.    Are you aware that Monster Loans

19 previously produced to the Bureau E-mails that were

20 sent or received through your Monster Loans E-mail

21 account?

22             MR. LEPISCOPO:  Objection, Fifth

23 Amendment.

24 BY MR. REARDON:

25      Q.    Are you aware that the Bureau has

Page 131

1    produced those E-mails to you in discovery in this

2    litigation?

3                    MR. LEPISCOPO:  Objection, Fifth

4    Amendment.

5    BY MR. REARDON:

6          Q.    Do you have any reason to doubt that

7    the E-mails that Monster Loans produced from your

8    E-mail account are authentic?

9                    MR. LEPISCOPO:  Objection, Fifth

10   Amendment.

11   BY MR. REARDON:

12         Q.    Do you have any reason to believe that

13   the E-mails are untrustworthy in any way?

14                   MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17         Q.    Are you aware that Experian previously

18   produced to the Bureau documents relating to Monster

19   Loans' Experian account?

20                   MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23         Q.    Are you aware that the Bureau has

24   produced those Experian documents to you in discovery

25   in this case?

Page 132

1              MR. LEPISCOPO:  Objection, Fifth

2     Amendment.

3     BY MR. REARDON:

4         Q.     Are you aware that many of the Experian

5     documents that the Bureau has produced to you have

6     your name on them?

7              MR. LEPISCOPO:  Objection, Fifth

8     Amendment.

9     BY MR. REARDON:

10        Q.     Do you have any reason to doubt that

11    those Experian documents are authentic?

12             MR. LEPISCOPO:  Objection, Fifth

13    Amendment.

14    BY MR. REARDON:

15        Q.     Are you aware that the mailing house

16    Automated Mailers previously produced to the Bureau

17    E-mails and other documents relating to the marketing

18    activities of the student loan debt relief companies?

19             MR. LEPISCOPO:  Objection, Fifth

20    Amendment.

21    BY MR. REARDON:

22        Q.     Are you aware that the Bureau has

23    produced those Automated Mailers to you in discovery

24    in this litigation?

25             MR. LEPISCOPO:  Objection, Fifth

Page 133

1    Amendment.

2    BY MR. REARDON:

3         Q.    Are you aware that many of the E-mails

4    Automated Mailers produced were sent to or from your

5    Monster Loans E-mail address?

6               MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.    Do you have any reason to doubt that

10   those Automated Mailers documents are authentic?

11              MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Do you have any reason to believe that

15   those Automated Mailers are untrustworthy in any way?

16              MR. LEPISCOPO:  Objection, Fifth

17   Amendment.

18   BY MR. REARDON:

19        Q.    Going back to the Experian records, do

20   you have any reason to believe that the Experian

21   documents that the Bureau received from Experian and

22   then produced to you are untrustworthy in any way?

23              MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 134

1          Q.     Earlier I asked some questions about

2    you holding a limited partnership interest in each of

3    the student loan debt relief defendants.  Did you

4    receive distribution of profits from the student loan

5    debt relief defendants?

6                 MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9          Q.     How much in total distributions did you

10   receive from the student loan debt relief defendants?

11                MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14         Q.     Between 2015 and 2017, did you

15   knowingly violate the Fair Credit Reporting Act in

16   order to receive profits from the student loan debt

17   relief defendants?

18                MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21         Q.     Between 2015 and 2017, did you

22   knowingly violate the Telemarketing Sales Rule's

23   advanced fee provision in order to receive profits

24   from the student loan debt relief defendants?

25                MR. LEPISCOPO:  Objection, Fifth

Page 135

1    Amendment.

2    BY MR. REARDON:

3        Q.      Between 2015 and 2017, did you provide

4    assistance to the student loan debt relief defendants

5    while knowing that they were violating the

6    Telemarketing Sales Rule's advanced fee provision in

7    order to receive profits?

8               MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11       Q.      Between 2015 and 2017, did you provide

12   assistance to the student loan debt relief defendants

13   while knowing that they were making false statements

14   to consumers in order to receive profits?

15              MR. LEPISCOPO:  Objection, Fifth

16   Amendment.

17   BY MR. REARDON:

18       Q.      So far today we have been talking about

19   the five student loan debt relief defendant

20   companies, Docu Prep Center, Certified Docu Prep

21   Services, Direct Document Solutions, and Secure

22   Preparation Services.  We have also talked about

23   Monster Loans.

24              I also want to ask you some questions

25   about your involvement in other companies since 2017.

Page 136

1                  Since 2017, have you engaged in any of

2    the conduct alleged in the Bureau's complaint against

3    you through any companies besides the student loan

4    debt relief defendants and Monster Loans?

5                  MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8         Q.    Since 2017, have you provided

9    prescreened lists to any companies that lacked a

10   permissible purpose to use those lists?

11                 MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.    Since 2017, have you violated the

15   Telemarketing Sales Rule's advanced fee prohibition

16   through any other companies?

17                 MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    Since 2017, have you engaged in any

21   deceptive acts or practices through any other

22   companies?

23                 MR. LEPISCOPO:  Objection, Fifth

24   Amendment.

25   BY MR. REARDON:

Page 137

1          Q.     Since 2017, have any companies that you

2     have owned or managed made false or misleading

3     statements to consumers in their marketing?

4                    MR. LEPISCOPO:  Objection, Fifth

5     Amendment.

6     BY MR. REARDON:

7          Q.     Sips 2017, have you been the owner or

8     manager of any companies that offered services

9     similar to the services offered by the student loan

10    debt relief defendants?

11                   MR. LEPISCOPO:  Objection, Fifth

12    Amendment.

13    BY MR. REARDON:

14         Q.     Are you familiar with a company called

15    Student Support Live?

16                   MR. LEPISCOPO:  Objection, Fifth

17    Amendment.

18    BY MR. REARDON:

19         Q.     Has Student Support Live done business

20    under the name Certified Enrollment Center?

21                   MR. LEPISCOPO:  Objection, Fifth

22    Amendment.

23    BY MR. REARDON:

24         Q.     What services does Student Support Live

25    provide?

Page 138

1              MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.     Have you been an owner or manager of

5    Student Support Live?

6              MR. LEPISCOPO:  Objection, Fifth

7    Amendment.

8    BY MR. REARDON:

9         Q.     When were you involved in running

10   Student Support Live?

11             MR. LEPISCOPO:  Objection, Fifth

12   Amendment.

13   BY MR. REARDON:

14        Q.     Does Student Support Live provide the

15   same kind of services that the student loan debt

16   relief defendants provided?

17             MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.     Has Student Support Live ever used

21   prescreened lists to market its services?

22             MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.     Does Student Support Live make sales to

Page 139

1    consumers over the phone?

2                    MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Has Student Support Live charged fees

6    to consumers before consumers' applications to

7    consolidate their loans are approved?

8                    MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11        Q.    Has Student Support Live ever violated

12   the Telemarketing Sales Rule's prohibition on

13   charging advanced fees for debt relief services?

14                   MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17        Q.    Are you familiar with a company called

18   Ladera Ranch Home Loans?

19                   MR. LEPISCOPO:  Objection, Fifth

20   Amendment.

21   BY MR. REARDON:

22        Q.    Is Ladera Ranch a mortgage lender?

23                   MR. LEPISCOPO:  Objection, Fifth

24   Amendment?

25   BY MR. REARDON:

Page 140

1          Q.     Mr. Nesheiwat, are you an owner of

2   Ladera Ranch Home Loans?

3                 MR. LEPISCOPO:  Objection, Fifth

4   Amendment.

5   BY MR. REARDON:

6          Q.     Are you a manager of Ladera Ranch Home

7   Loans?

8                 MR. LEPISCOPO:  Objection, Fifth

9   Amendment.

10  BY MR. REARDON:

11         Q.     Is your wife also an owner of and

12  manager of Ladera Ranch Home Loans?

13                MR. LEPISCOPO:  Objection, Fifth

14  Amendment.

15  BY MR. REARDON:

16         Q.     Has Ladera Ranch Home Loans ever

17  applied for an account with Experian?

18                MR. LEPISCOPO:  Objection, Fifth

19  Amendment.

20  BY MR. REARDON:

21         Q.     Mr. Nesheiwat, have you ever attempted

22  to use Ladera Ranch Home Loans to obtain prescreened

23  lists for debt relief companies?

24                MR. LEPISCOPO:  Objection, Fifth

25  Amendment.

Page 141

1    BY MR. REARDON:

2        Q.    Has Ladera Ranch Home Loans ever made

3    false or misleading representations to consumers in

4    its marketing?

5              MR. LEPISCOPO:  Objection, Fifth

6    Amendment.

7    BY MR. REARDON:

8        Q.    I want to ask a few questions about

9    your present financial situation.  Are you married?

10       A.    Yes.

11       Q.    What is your and your wife's total net

12   worth?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16       Q.    Can you identify for me the assets that

17   you and your wife own?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21       Q.    Do you own any real property?

22             MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25       Q.    Does your wife hold any assets

Page 142

1    separately from you?

2              MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Have you ever transferred any assets

6    into your wife's name?

7              MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    Have you ever transferred any assets to

11   any other person in order to avoid potential

12   liability in this case?

13             MR. LEPISCOPO:  Objection, Fifth

14   Amendment.

15   BY MR. REARDON:

16        Q.    How much cash do you have in your bank

17   account?

18             MR. LEPISCOPO:  Objection, Fifth

19   Amendment.

20   BY MR. REARDON:

21        Q.    How much money do you have invested in

22   other kinds of accounts, like investment accounts or

23   retirement accounts?

24             MR. LEPISCOPO:  Objection, Fifth

25   Amendment.

Page 143

 1    BY MR. REARDON:

 2         Q.     Do you currently own any businesses?

 3                MR. LEPISCOPO:  Objection, Fifth

 4    Amendment.

 5    BY MR. REARDON:

 6         Q.     Do you have any other assets that I

 7    haven't asked about?

 8                MR. LEPISCOPO:  Objection, Fifth

 9    Amendment.

10    BY MR. REARDON:

11         Q.     Does your wife have any assets that I

12    haven't asked about?

13                MR. LEPISCOPO:  Objection, Fifth

14    Amendment.

15    BY MR. REARDON:

16         Q.     What is your current source of income?

17                MR. LEPISCOPO:  Objection, Fifth

18    Amendment.

19    BY MR. REARDON:

20         Q.     What was your main source of income in

21    2020?

22                MR. LEPISCOPO:  Objection, Fifth

23    Amendment.

24    BY MR. REARDON:

25         Q.     Did you have any other sources of

Page 144

1    income in 2020?

2                    MR. LEPISCOPO:  Objection, Fifth

3    Amendment.

4    BY MR. REARDON:

5         Q.    Do you have any bank accounts

6    presently?

7                    MR. LEPISCOPO:  Objection, Fifth

8    Amendment.

9    BY MR. REARDON:

10        Q.    What banks do you have bank accounts

11   with?

12                   MR. LEPISCOPO:  Objection, Fifth

13   Amendment.

14   BY MR. REARDON:

15        Q.    Are you a signatory on any business

16   bank accounts presently?

17                   MR. LEPISCOPO:  Objection, Fifth

18   Amendment.

19   BY MR. REARDON:

20        Q.    What businesses are those bank accounts

21   associated with?

22                   MR. LEPISCOPO:  Objection, Fifth

23   Amendment.

24   BY MR. REARDON:

25        Q.    Mr. Nesheiwat, I am nearly done with my

Page 145

1    questions.

2              You have now asserted, through your

3    attorney, the Fifth Amendment privilege in response

4    to nearly all of my questions today.

5              Mr. Nesheiwat, could you confirm on the

6    record that you are following and have followed your

7    attorney's instruction not to answer all of the

8    questions today?

9         A.    Yes.

10        Q.    Mr. Nesheiwat, is there anything

11   further pertaining to any of the matters I have asked

12   about today that you are willing to provide testimony

13   about?

14             MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17        Q.    Mr. Nesheiwat, is there anything you

18   can testify about about any of the facts at issue in

19   this case?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22   BY MR. REARDON:

23        Q.    Mr. Nesheiwat, is there anything at all

24   that you can testify about your role in the conduct

25   at issue in this case?

1              MR. LEPISCOPO:  Objection, Fifth

2    Amendment.

3    BY MR. REARDON:

4         Q.    Mr. Nesheiwat, is there any testimony

5    at all that you can provide about the allegations

6    asserted against you in the Bureau's complaint in

7    this lawsuit?

8              MR. LEPISCOPO:  Objection, Fifth

9    Amendment.

10   BY MR. REARDON:

11        Q.    Mr. Nesheiwat, are there any facts that

12   you believe are favorable to you that you wish to

13   testify to on the record during this deposition?

14             MR. LEPISCOPO:  Objection, Fifth

15   Amendment.

16   BY MR. REARDON:

17        Q.    Mr. Nesheiwat, is there anything

18   exculpatory about the facts here that you would like

19   to identify or testify about on the record today?

20             MR. LEPISCOPO:  Objection, Fifth

21   Amendment.

22             MR. REARDON:  I believe I am now done

23   with my questions.

24             I did want to note for the record that

25   Defendant Martinez joined us at one point relatively

1    COMMONWEALTH OF PENNSYLVANIA, to wit:

2        I, Teresa A. Crossin, the officer before whom

3    the *foregoing* deposition was taken, do hereby

4    certify that the within-named witness virtually

5    appeared before me at the time and place herein set

6    out, and after having been duly sworn by me,

7    according to law, was examined by counsel.

8        I further certify that the examination was

9    recorded stenographically by me and this transcript

10   is a true record of the proceedings.

11       I further certify that I am not of counsel to

12   any of the parties, nor an employee of counsel, nor

13   related to any of the parties, nor in any way

14   interested in the outcome of this action.

15       As witness my hand and notarial seal this 26th

16   day of January, 2021.

17

18                    *Teresa Crossin*

19              TERESA A. CROSSIN

20                 Notary Public

21   MY COMMISSION EXPIRES:  3-6-21

22

23

24

25