# **<u>Summary Judgment Ex. 8</u>**

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
BUREAU OF CONSUMER FINANCIAL      )
PROTECTION,                       )
                                  ) Case No:
          Plaintiff,              )
                                  ) 8-20-cv-00043-JVS-ADS
vs.                               )
                                  )
CHOU TEAM REALTY, LLC, et al.,    )
                                  )
          Defendants.             )
_____   )
```

VIDEOCONFERENCE 30(b)(6)DEPOSITION OF DOCS DONE RIGHT,

by and through its corporate representative,

EDUARDO AVALOS MARTINEZ

TUSTIN, CALIFORNIA

January 22, 2021

REPORTED BY CYNTHIA R. OTT, CSR NO. 13744
REGISTERED DIPLOMATE REPORTER
CERTIFIED REALTIME REPORTER

Page 2

1                    ** ALL BY VIDEO CONFERENCE **

2     APPEARANCES:

3     FOR THE PLAINTIFF:

4         BUREAU OF CONSUMER FINANCIAL PROTECTION
          COLIN REARDON, ESQUIRE
5         E. VANESSA ASSAE-BILLE, ESQUIRE
          1700 G Street, Northwest
6         Washington, D.C. 20552
          (202) 435-9668
7         colin.reardon@cfpb.gov
          elisabeth.assae-bille@cfpb.gov
8

9     FOR THE DEFENDANT DOCS DONE RIGHT:

10        THE HOLT LAW FIRM
          DAVID HOLT, ESQUIRE
11        1432 Edinger Avenue, Suite 130
          Tustin, California 92780
12        dholt@holtlawoc.com

13    FOR THE DEFENDANT JAWAD NESHEIWAT:

14        LEPISCOPO & ASSOCIATES
          PETE LEPISCOPO, ESQUIRE
15        695 Town Center Drive, 7th Floor
          Costa Mesa, California  92626
16        plepiscopo@att.net

17

18

19

20

21

22

23

24

25

Page 5

```
1              P R O C E E D I N G S

2                                      (8:30 a.m. Pacific)

3         THE REPORTER:  The time is currently 8:30 a.m.

4    Please note that this investigational hearing (sic) is

5    taking place via Webex as directed by the Bureau.  The

6    location of this investigational hearing (sic) is Tustin,

7    California, pursuant to CFPB rules and regulations.

8         Due to the need for this investigational hearing

9    (sic) to take place remotely, the parties hereby

10   stipulate --

11        MR. REARDON:  This is actually a deposition, not

12   an investigational hearing.

13        (Discussion off the record.)

14        THE REPORTER:  I'm just going to note that the

15   parties hereby stipulate that the court reporter may

16   swear in the witness over the video conference.

17        The court reporter has already verified the

18   witness' identification.

19        Sir, will you please raise your right hand.

20        EDUARDO AVALOS MARTINEZ, WITNESS, SWORN

21                        EXAMINATION

22   BY MR. REARDON:

23     Q.   Good morning.  My name is Colin Reardon, and

24   with me on this Webex deposition today is my colleague,

25   Vanessa Assae Bille, and we are attorneys in the Office
```

Page 6

1    of Enforcement at the Bureau of Consumer Financial

2    Protection.

3              Before we get to your testimony, there are a few

4    preliminary matters that we are going to cover on the

5    record.

6              Today is January 22nd, 2021, and we are here for

7    the Rule 30(b)(6) deposition of Docs Done Right, Inc.,

8    pursuant to the notice of their deposition served on

9    December 22nd, 2020.

10             This deposition is part of a lawsuit with the

11   name Bureau of Consumer Financial Protection versus Chu

12   Team Realty, LLC, et al.  This deposition is being

13   conducted pursuant to Federal Rule of Civil Procedure 30,

14   and, due to the ongoing pandemic, we are speaking via

15   Webex video conference today.

16   BY MR. REARDON:

17        Q.   Mr. Martinez, could you please state and spell

18   your name for the record, including your middle name.

19        A.   Eduardo Avalos Martinez.  E-D-U-A-R-D-O.  Avalos

20   is A-V-A-L-O-S.  Martinez is M-A-R-T-I-N-E-Z.

21        Q.   You understand the oath that you just took?

22        A.   Yes.

23        Q.   Is there any reason why you would not be able to

24   provide truthful, complete and accurate testimony today?

25        A.   No.

Page 8

1    depositions of organizations such as a corporation.

2           Are you the person who has been designated by

3    Docs Done Right, Inc., to testify on its behalf today?

4       A.   Yes.

5       Q.   Do you understand that you are testifying here

6    today as a representative of Docs Done Right, Inc.?

7       A.   Yes.

8       Q.   Do you understand that you, Eduardo Martinez,

9    are also separately an individual defendant in this case?

10      A.   Yes.

11      Q.   Do you understand that the Bureau may also seek

12   to separately depose you in your individual capacity?

13      A.   Yes.

14      Q.   Thank you.  I will start with some ground rules

15   for today.

16          First, this deposition is being transcribed by a

17   court reporter.  No other recording of this deposition is

18   allowed, whether through an electronic device or

19   otherwise.

20          Second, your attorney or other attorneys may

21   make objections during today's deposition.  In general,

22   those objections will be noted on the record, but the

23   examination will still proceed and you will still need to

24   answer my questions.  Do you understand that?

25      A.   Yes.

Page 14

1      Q.   If you turn to page two, if you look at lines 16

2   to 18, it says, "The persons designated must testify

3   about information known or reasonably available to

4   Defendant," and defendant being Docs Done Right.

5           Are you prepared to testify about information

6   known or reasonably available to Docs Done Right today?

7      A.   Yes.

8      Q.   What is your role at Docs Done Right?

9      A.   Manager.

10     Q.   How long have you been the manager?

11     A.   I'm sorry, do you mean right now, today, or are

12   you talking previously?

13     Q.   Previously.  When did you --

14     A.   Oh.

15     Q.   -- begin being the manager of Docs Done Right?

16     A.   Around October 2015, I believe.

17     Q.   Have you been the manager of Docs Done Right

18   since that time?

19     A.   Yes.  Up until it stopped doing business.

20     Q.   And when was that?

21     A.   I believe it was December 2018.

22     Q.   So between the time it started in 2015 and when

23   it stopped in 2018, what were your job duties?

24     A.   I managed the company.

25     Q.   And what did that involve?

Page 30

```
1        Q.   -- refunds?

2        A.   Yes.

3        Q.   What happened to Docs Done Right's portion of

4   the fee when a consumer got a refund?  Did Docs Done

5   Right keep the hundred dollars, or did it have to give

6   the hundred dollars back?

7        A.   Part of our agreement with defendants is to give

8   that money back as well.

9             Same thing with Debt Pay Gateway.  They would

10  give their money back as well.

11       Q.   So basically Docs Done Right wouldn't get a fee

12  unless the student loan debt relief companies also got

13  their fee?

14       A.   Not always.

15       Q.   Why do you say that?

16       A.   Because sometimes the client wouldn't finish

17  paying off their fees to the debt relief defendants, but

18  they made their first payment.  We would charge our fee.

19  Once the client went through compliance, we did the work,

20  and we would charge that to the affiliate.

21            If they never got their full fee, we would still

22  get our fee because our work was done.

23       Q.   I see.  So if -- Docs Done Right would

24  keep -- I'm trying to understand the general practice

25  here.  It sounds -- and correct me if I'm wrong.  It
```

Page 31

1   sounds to me that if the customer pays the full fee, then

2   Docs Done Right would get its portion.  That's right?

3       A.   Correct.

4       Q.   And if the customer paid only part of the fee,

5   then Docs Done Right would also get its portion of the

6   fee; is that correct?

7       A.   We would do our portion unless the client

8   requested a refund.

9       Q.   So basically the only circumstance in which Docs

10  Done Right got nothing would be if the client received a

11  full refund; is that correct?

12      A.   Correct.  I believe so.

13      Q.   So we've talked a bit about the Student Loan

14  Debt Relief Defendants.  What was Docs Done Right's

15  relationship with the Student Loan Debt Relief

16  Defendants?

17           MR. HOLT:  Let me just object.  It's vague and

18  ambiguous as phrased.

19           But, Mr. Martinez, you can answer the question

20  if you understand it.

21           THE WITNESS:  We serviced their consumers.

22  BY MR. REARDON:

23      Q.   And was that for the -- scratch that.

24           What did it mean to service their consumers?

25      A.   We provided customer service.  We'd answer the

Page 32

1  phone calls on behalf of the debt relief clients.  We

2  would do a compliance call during the onboarding process

3  after they did their sale.  We would verify the client

4  understood what they were getting into.

5      Q.   Can you explain how the relationship between

6  Docs Done Right and the student loan debt relief

7  companies came about?

8          MR. LEPISCOPO:  I'm going to object to this as

9  lacking foundation and being vague and ambiguous as to

10  the relationship -- whether it's his individual

11  relationship you're talking about in the answer or a

12  conglomerate as to all of them.  It seems to me that

13  that's vague and ambiguous.

14         MR. HOLT:  I would join and, also, add overly

15  broad.

16         MR. REARDON:  You can answer.

17         THE WITNESS:  Can you be more specific with your

18  question?

19  BY MR. REARDON:

20      Q.   When did Docs Done Right start working with the

21  Student Loan Debt Relief Defendants?

22         MR. HOLT:  Same objection.

23         THE WITNESS:  We began working with the Student

24  Loan Debt Relief Defendants when they hired us to service

25  our clients.  They all had different start dates, so I'm

Page 33

1    not sure of what dates those are.

2    BY MR. REARDON:

3        Q.   So was DocuPrep Center the first of those

4    companies that Docs Done Right worked with?

5        A.   I believe so.

6            MR. HOLT:  Now, Mr. Martinez I just want -- he's

7    asking you about -- as Docs Done Right, Inc.  So if there

8    were -- keep in mind that if there were others before

9    you, before you got involved, you need to clarify that

10   this is only, you know, since you've been involved or

11   since the inception of the company.

12           THE WITNESS:  Yes, Docs Done Right, Inc., only

13   serviced DocuPrep Center.

14   BY MR. REARDON:

15       Q.   At the beginning?

16       A.   Docs Done Right, Inc., only serviced for about a

17   few months.  After that, it was Docs Done Right, LP.

18       Q.   Okay.  And then how is it that Docs Done Right

19   began working with DocuPrep Center?

20       A.   I'm not sure what you mean.  Like why?

21       Q.   What happened that brought those two companies

22   together?

23       A.   They hired Docs Done Right, Inc., or Docs Done

24   Right, LP, to service their clients.  The owners of their

25   companies also owned Docs Done Right, LP.

1      Q.   When you say they, who are you referring to?

2      A.   I don't have all the names in front of me, but

3   they were partners of Docs Done Right, LP, that -- the

4   limited partners of Docs Done Right, LP, also owned those

5   sales companies.

6      Q.   Are you referring to a group that included Tom

7   Chou, Sean Cowell, and Jawad Nesheiwat?

8      A.   Yes.

9      Q.   And did it also include a few other limited

10  partners?

11     A.   Yes.

12     Q.   So did that limited partnership group that owned

13  DocuPrep Center have a role in hiring Docs Done Right?

14     A.   They owned Docs Done Right.

15     Q.   They owned Docs Done Right.

16     A.   Right.

17     Q.   So did they tell Docs Done Right to work with

18  DocuPrep Center?

19     A.   Yes.

20     Q.   Did that same ownership group then tell Docs

21  Done Right to work with the other four Student Loan Debt

22  Relief Defendants once they were created?

23     A.   Yes.

24          MR. LEPISCOPO:  Objection, lacks foundation.

25  BY MR. REARDON:

1   Q.   Was that something you knew about at the time

2   that those new companies kind of started working with

3   Docs Done Right?

4        MR. HOLT:  Let me just object.  It's vague and

5   ambiguous as phrased.

6        THE WITNESS:  Can you rephrase that question?

7   Or repeat it?

8   BY MR. REARDON:

9   Q.   So I believe you just testified that the limited

10  partners of the Student Loan Debt Relief Defendants told

11  Docs Done Right to start working with the -- each of the

12  later Student Loan Debt Relief Defendants as they were

13  created; is that correct?

14  A.   I'm -- I'm questioning -- you said told Docs

15  Done Right, but they are Docs Done Right.  So I don't

16  understand when you say they told Docs Done Right, if

17  they are Docs Done Right.

18  Q.   They're the owners of Docs Done Right?

19  A.   Right.  So they chose to service those clients.

20  It wasn't something they told.  It was their decision.

21  Q.   So let me ask you a different question.  Did

22  the -- did the limited partner owners of Docs Done Right

23  tell you, the manager of Docs Done Right, to start

24  working with those new companies?

25  A.   Yes.

Page 36

```
 1            MR. LEPISCOPO:  Objection, vague as to time.
 2            MR. HOLT:  And, Mr. Martinez, it's a little
 3    difficult when we're on the Zoom deposition and there's
 4    a -- you know, a little bit of time delay.  So if you can
 5    just wait, pause a little bit, to make sure that, if
 6    there are objections, we're not talking all over each
 7    other.  We get the objections in.  And then you can give
 8    your response, okay?
 9            THE WITNESS:  Yes.
10    BY MR. REARDON:
11       Q.   You used the term "back end" earlier.  Do you
12    recall that?
13       A.   Yes.
14       Q.   Have you also heard of the term "front end"?
15       A.   Yes.
16       Q.   Was that a term that was used sometimes to refer
17    to the Student Loan Debt Relief Defendants?
18       A.   Yes.
19       Q.   When did Docs Done Right stop working with the
20    Student Loan Debt Relief Defendants?
21       A.   I believe, 2017, September.
22       Q.   And what happened?
23       A.   They decided to close all their doors.  They
24    decided to stop doing business.
25       Q.   So you talked earlier about the -- the services
```

1   that Docs Done Right provided to the Student Loan Debt

2   Relief Defendants.  Did Docs Done Right provide the same

3   services to all of those Student Loan Debt Relief

4   Defendants?

5            MR. LEPISCOPO:  Objection, vague and ambiguous

6   as to time.

7            THE WITNESS:  The services that were provided

8   were pretty standard for all of the defendants.

9   BY MR. REARDON:

10       Q.   Were you -- and when I say you, I mean Docs Done

11   Right -- was Docs Done Right familiar with the services

12   that those companies provided to consumers?

13       A.   Can you repeat the question?

14            MR. REARDON:  Could you read it back.

15            (The reporter read back the requested portion.)

16            THE WITNESS:  I believe so.

17   BY MR. REARDON:

18       Q.   And I think we testified earlier -- I think you

19   testified earlier that those companies would market

20   services as the front end, and then Docs Done Right would

21   actually provide the services as the back end; is that

22   correct?

23       A.   We would provide services on behalf of their

24   company name.

25       Q.   So with that clarification, Docs Done Right

Page 38

1    provided the services that those companies kind of

2    offered to consumers, on their behalf; is that correct?

3        A.   I believe so.

4        Q.   And did all five of those companies sell the

5    same kind of services to consumers?

6             MR. LEPISCOPO:  Objection, foundation, vague and

7    ambiguous, and overbroad as to time.

8             MR. HOLT:  Join.

9             THE WITNESS:  I don't know.

10   BY MR. REARDON:

11       Q.   You don't know if they all provided the

12   same -- they all sold the same kinds of services?

13            MR. LEPISCOPO:  Objection, asked and answered.

14            THE WITNESS:  That's correct.  I don't know.

15   BY MR. REARDON:

16       Q.   Are you familiar with the types of services that

17   Docs Done Right provided on their behalf?

18       A.   Yes.

19       Q.   And did Docs Done Right provide the same kinds

20   of services on their behalf to each of those companies?

21       A.   Yes.

22       Q.   What were the services that those companies

23   provided to consumers?

24            MR. LEPISCOPO:  Objection, overbroad, vague and

25   ambiguous, and foundation.

Page 39

1          MR. HOLT:  Join.

2          You can provide your understanding,

3    Mr. Martinez.

4          THE WITNESS:  Sure.  From the clients that were

5    sent to Docs Done Right, the services that were sold to

6    them, from my understanding, was document preparation

7    services for student loan -- federal student loan debt.

8    BY MR. REARDON:

9      Q.   We spoke earlier about the -- the owners of the

10   student loan debt relief companies and Docs Done Right.

11   I think you indicated that that was a group that included

12   Tom Chou and Jawad Nesheiwat and Sean Cowell.  Do you

13   recall that?

14     A.   Yes.

15     Q.   What involvement did that group of owners have

16   in kind of overseeing or directing Docs Done Right's

17   operations?

18         MR. LEPISCOPO:  Objection, vague and ambiguous,

19   and overbroad and lacks foundation.

20         MR. HOLT:  Join.  You keep beating me to the

21   punch, Pete.

22         THE WITNESS:  Can you -- more specifically --

23   or -- I'm sorry, can you repeat the question?

24         MR. REARDON:  Can you read it back.

25         (The reporter read back the requested portion.)

1          MR. LEPISCOPO:  Same objection.

2          THE WITNESS:  Any big decisions had to be

3     approved by them.

4     BY MR. REARDON:

5      Q.   When you say big decisions, what do you mean?

6      A.   For example, the price of a hundred dollars per

7     client, I couldn't charge more.  I told them that a

8     hundred dollars was not enough to service the clients.  I

9     needed more money to service the clients.  They didn't

10    let me charge the affiliates more because they owned a

11    larger percentage of those front ends than they did of

12    Docs Done Right.

13     Q.   Any other big decisions that they -- they

14    didn't --

15     A.   Office location was decided by them.  Which

16    companies I could service was decided by them.  Refund

17    policies were decided by them.  Compliance questions were

18    decided by them.

19     Q.   And when you say were decided by them, how did

20    the actual decisionmaking work?  Was there --

21          MR. LEPISCOPO:  Objection -- I'm sorry, excuse

22    me.

23    BY MR. REARDON:

24     Q.   Yeah.  Scratch that.

25          How did you learn about the decisions that the

Page 41

1   owners made?  How did they communicate them to you?

2       A.   I can't recall specifics top of my head.

3       Q.   Did you have meetings with the owners?

4       A.   Yes.

5       Q.   Would they provide decisions to you in those

6   meetings?

7       A.   I believe so.

8       Q.   Would the decisions that they made have been

9   communicated to you by e-mail?

10      A.   No, it was usually in person.  They sit right

11  next to me.

12      Q.   What do you mean by that?

13      A.   I was in their office.

14      Q.   Was that at 3 Whatney?

15      A.   Yes.

16      Q.   So Docs Done Right was located at 3 Whatney for

17  a period of time; is that correct?

18      A.   That's where it got started.

19      Q.   And how long was it at that location?

20      A.   I don't remember.

21      Q.   Was it at that location the entire time it

22  worked with the Student Loan Debt Relief Defendants?

23      A.   No.

24      Q.   Did it move to another location at some point in

25  time?

Page 42

1      A.    Yes.

2      Q.    And where was that?

3      A.    In Lake Forest, off of Raymond.  I don't

4   remember the address.

5      Q.    So during the period of time when Docs Done

6   Right was located at 3 Whatney, which of its owners were

7   also present at 3 Whatney?

8      A.    Sean Cowell, Jawad Nesheiwat and Tom Chou,

9   Robert Hoose and David Sklar.

10      Q.    The decisions that you mentioned that were

11   provided by the owners, would they be provided by all the

12   owners together or a particular owner?

13      A.    It's usually Sean Cowell and Jawad Nesheiwat.

14      Q.    They would communicate on behalf of the

15   owner -- other owners to Docs Done Right; is that

16   correct?

17      A.    Correct.

18      Q.    What other involvement did Jawad Nesheiwat have

19   in Docs Done Right's operations?

20          MR. LEPISCOPO:  Objection, lacks foundation,

21   vague and ambiguous, and overbroad as to time.

22          THE WITNESS:  I don't understand.

23   BY MR. REARDON:

24      Q.    Did Jawad Nesheiwat ever provide instructions to

25   you, as the manager of Docs Done Right?

Page 43

1              MR. LEPISCOPO:  Same objection.

2              THE WITNESS:  Instruction in regards to what?

3    BY MR. REARDON:

4        Q.   Did he ever provide instructions about how Docs

5    Done Right should do its business?

6              MR. LEPISCOPO:  Objection.  Same objection.

7              THE WITNESS:  Not that I can recall.

8    BY MR. REARDON:

9        Q.   It's been a few years?

10       A.   Yes.

11       Q.   But he was part of the group that provided you

12   instructions; is that correct?

13             MR. LEPISCOPO:  Objection.  Again, same

14   objection, along with asked and answered.

15             THE WITNESS:  Yes.  As far as major decisions.

16   BY MR. REARDON:

17       Q.   Right.

18       A.   Not day to day.

19       Q.   So were you responsible for the day-to-day

20   operations of the company?

21       A.   Yes.

22       Q.   The -- we've been talking a lot about the

23   Student Loan Debt Relief Defendants which are defined in

24   the deposition notice.  Has Docs Done Right ever provided

25   services to any other front end companies besides those

Page 46

1    Q.   I think we've already covered this, but just so

2    the record is clear, you know, today I'm primarily

3    interested in Docs Done Right's relationship with and

4    services to the five Student Loan Debt Relief Defendants

5    that we've been focused on.

6         So I'm going to ask you to essentially assume

7    that when I ask you a question today, I am asking about

8    those companies, and not the other affiliates that Docs

9    Done Right may have serviced over the years.  Do you

10   understand that?

11   A.   Yes.

12   Q.   I believe you said that Docs Done Right provided

13   Document Preparation Services on behalf of the Student

14   Loan Debt Relief Defendants; is that correct?

15   A.   Yes.

16   Q.   What do you mean by document preparation

17   services?

18   A.   We would prepare applications for the student

19   loan debt consolidation or repayment plans.

20   Q.   That's what Docs Done Right did; is that

21   correct?

22   A.   That's what I just said.

23   Q.   So I think you described what Docs Done Right

24   did.  It prepared the actual documents on behalf of those

25   other companies; is that correct?

Page 47

1      A.   Correct.

2      Q.   And that would be -- that would include

3  applications for student loan consolidations, loan

4  repayment plans; is that correct?

5      A.   Correct.

6      Q.   And did -- did that also include preparing

7  documents for loan forgiveness plans?

8      A.   I don't believe so for loan forgiveness.  I

9  think that takes 20 years to get to that point, so I

10  don't think we ever got to that.

11      Q.   Would they enroll -- not enroll, but would they

12  assist consumers in signing up for loan repayment plans

13  that eventually would allow consumers to get loan

14  forgiveness if they stayed in those plans?

15      A.   Correct.

16      Q.   You mentioned student loan consolidations.  What

17  is a consolidation of a federal student loan?

18          MR. LEPISCOPO:  Objection, calls for a legal

19  conclusion, lacks foundation.

20          MR. HOLT:  You can answer if you understand,

21  Mr. Martinez.

22          THE WITNESS:  I'm not sure how to answer that

23  question.  I thought it was self-explanatory.  You're

24  consolidating two or more federal student loans and

25  consolidating it into one.

Page 48

 1   BY MR. REARDON:

 2       Q.   So it essentially combines multiple loans into a

 3   single loan?

 4       A.   Correct.

 5            MR. LEPISCOPO:  Objection, lacks foundation and

 6   calls for a legal conclusion.

 7            THE WITNESS:  That's what I believe.

 8   BY MR. REARDON:

 9       Q.   When you prepared -- or when Docs Done Right

10   prepared applications for loan consolidations, did it

11   understand what it was doing?

12            MR. LEPISCOPO:  Objection, calls for

13   speculation, lacks foundation.

14            THE WITNESS:  To the best of my knowledge, yes.

15   BY MR. REARDON:

16       Q.   Was Docs Done Right familiar with the process

17   for consolidating a student loan?

18            MR. LEPISCOPO:  Same objection.

19            THE WITNESS:  I believe so.

20   BY MR. REARDON:

21       Q.   Was Docs Done Right familiar with the effect of

22   consolidating a student loan?

23            MR. LEPISCOPO:  Same objection.

24            THE WITNESS:  I believe so.

25   BY MR. REARDON:

Page 49

1      Q.   What is the effect of consolidating a federal

2   student loan?

3           MR. LEPISCOPO:  Same objections.

4           THE WITNESS:  It combines it into one loan.

5   BY MR. REARDON:

6      Q.   Are there any other effects on the loan besides

7   combining it?

8           MR. LEPISCOPO:  Same objection.

9           THE WITNESS:  I don't know what you're referring

10  to.

11  BY MR. REARDON:

12     Q.   Are there any benefits for a consumer --

13     A.   Can you be more specific?

14     Q.   Are there any benefits to a consumer from

15  consolidating a federal student loan?

16     A.   Not that I know of.

17     Q.   Was that something that Docs Done Right knew?

18          MR. LEPISCOPO:  Objection, vague and ambiguous,

19  overbroad.

20          THE WITNESS:  Is what -- is what would Docs Done

21  Right knew?

22  BY MR. REARDON:

23     Q.   At the time that it was providing services to

24  the Student Loan Debt Relief Defendants, was Docs Done

25  Right familiar with the benefits of consolidating a

Page 59

1              MR. HOLT:  All right.  Thank you.

2              (A recess was taken.)

3    BY MR. REARDON:

4        Q.   Mr. Martinez, earlier I asked you about the

5    services --

6              (Discussion off the record.)

7    BY MR. REARDON:

8        Q.   So, Mr. Martinez, earlier I asked you about the

9    services that Docs Done Right provided to the Student

10   Loan Debt Relief Defendants, and you provided some

11   information in response to that.  I just want to make

12   sure I kind of understand all the services that Docs Done

13   Right provided to them.

14             I believe one of the things you said that they

15   did was -- that Docs Done Right did was servicing the

16   customers of the Student Loan Debt Relief Defendants; is

17   that correct?

18       A.   Correct.

19       Q.   I think you also said that Docs Done Right

20   provided customer service; is that correct?

21       A.   Yes.

22       Q.   Docs Done Right also answered phone calls on

23   behalf of the Student Loan Debt Relief Defendants; is

24   that correct?

25       A.   Yes.

Page 60

1     Q.   Docs Done Right also conducted what you referred

2  to as a compliance call; is that correct?

3     A.   Yes.

4     Q.   And besides those things that I just listed, was

5  there any other services that Docs Done Right provided to

6  the Student Loan Debt Relief Defendants?

7     A.   Not that I can think of.

8     Q.   Did Docs Done Right provide the Student Loan

9  Debt Relief Defendants with access to the DebtPayPro

10 platform?

11    A.   Yes.

12    Q.   Did Docs Done Right also provide the Student

13 Loan Debt Relief Defendants with access to payment

14 processing services through Debt Pay Gateway?

15    A.   Yes.

16    Q.   And when you said customer service, would

17 customer service include handling consumer complaints?

18    A.   Yes.

19    Q.   And would it also include handling refund

20 requests?

21    A.   Yes.

22    Q.   And did it also include handling cancellation

23 requests?

24    A.   Yes.

25    Q.   So I believe you testified earlier that Docs

Page 61

1   Done Right prepared applications for student loan

2   consolidations; is that correct?

3       A.   Correct.

4       Q.   And what was the process for preparing a student

5   loan consolidation?

6       A.   I don't remember.

7       Q.   Did Docs Done Right essentially fill out a

8   student loan consolidation form for the customer?

9       A.   The -- the information that was filled out on

10  the form was done by the Student Loan Debt Relief

11  Defendants.  When we did a compliance call, we would

12  verify that the information that was entered by them was

13  correct.

14      Q.   I see.  And so did Docs Done Right have any

15  other role in kind of filling out those student loan

16  consolidation forms?

17      A.   If there was an error on the form, then we could

18  correct it.

19      Q.   And the -- where did the information on those

20  forms come from?

21      A.   It'll come from --

22           MR. LEPISCOPO:  Objection.  Objection, lack of

23  foundation, vague and ambiguous, overbroad.

24  BY MR. REARDON:

25      Q.   You can answer.

Page 62

1    A.   My understanding is that information -- that

2    information came from the consumer.

3    Q.   Would the consumer provide that information

4    during the sales call?

5    A.   Yes.

6    Q.   So we've been talking about the student loan

7    consolidation applications form process, and now I want

8    to ask questions on the loan repayment form application

9    process.

10        Did the student loan debt relief companies fill

11   out the loan repayment application forms too?

12        MR. LEPISCOPO:  Objection, lacks foundation,

13   vague and ambiguous, overbroad.

14        THE WITNESS:  I believe so.

15   BY MR. REARDON:

16   Q.   What role did Docs Done Right have, if any, in

17   filling out the loan repayment application forms?

18   A.   If there was an error during the compliance call

19   that we identified, we would correct it, if there was a

20   spelling error or any other error.

21   Q.   So once the form was filled out, what happened

22   to it?

23   A.   It would be sent --

24        MR. LEPISCOPO:  Objection, vague and ambiguous,

25   overbroad, lacks foundation.

Page 63

1    BY MR. REARDON:

2        Q.   Would you start your answer again.

3        A.   It would be sent to the consumer for them to

4    review.

5        Q.   And who did the sending?

6        A.   Docs Done Right.

7        Q.   And then what happened when the customer

8    reviewed it?

9        A.   Ideally, they would sign the documents, and then

10   it would be sent to their servicer.

11       Q.   Did the customer return those documents to Docs

12   Done Right?

13           MR. LEPISCOPO:  Objection, calls for

14   speculation, lacks foundation, vague and ambiguous, and

15   overbroad.

16           THE WITNESS:  That would be case by case.

17   Different consumers might have done different things.

18   Some would have kept it.  Some didn't return it.  Some

19   sent it themselves to the servicer, and some sent it to

20   us to send it to the servicers.

21   BY MR. REARDON:

22       Q.   Was it more common -- in the scenario when the

23   customer actually kind of uses the documents, was it more

24   common for the consumer to send it back to Docs Done

25   Right or to just send it directly to the student loan

Page 64

1   servicer?

2           MR. LEPISCOPO:  Objection, vague and ambiguous,

3   lacks foundation, calls for speculation, overbroad.

4           THE WITNESS:  I don't know.

5   BY MR. REARDON:

6       Q.   So if I understand you correctly, at least for

7   some consumers, the documents would be sent back to Docs

8   Done Right; is that correct?

9           MR. LEPISCOPO:  Same objections.

10          THE WITNESS:  They would be sent back to

11  their -- their -- Student Loan Debt Relief Defendants.

12  And then they would give it to us, and then we would

13  submit it for the consumer, as a courtesy.  Correct.

14  BY MR. REARDON:

15      Q.   So Docs Done Right would submit it to the -- the

16  student loan servicer for the consumer; is that correct?

17      A.   In those cases, yes.

18      Q.   I think you testified earlier that one of the

19  things that Docs Done Right did was communicate with

20  consumers on behalf of the Student Loan Debt Relief

21  Defendants; is that correct?

22      A.   That's correct.

23      Q.   Did those -- what were the kind of methods of

24  communication that Docs Done Right used, e-mail,

25  telephone?

Page 65

1      A.   Telephone.

2      Q.   Did Docs Done Right communicate with consumers

3   by e-mail?

4      A.   Not -- not commonly.  If somebody had a

5   hearing -- they couldn't hear or they had hearing impair

6   issues or -- I don't know what you call it -- there might

7   be a communication by e-mail.

8      Q.   Are you familiar with an e-mail address called

9   docs@clientenrollment.com?

10      A.   Yes.

11      Q.   Was that an e-mail address that Docs Done Right

12   used?

13      A.   Yes.

14      Q.   And what did Docs Done Right use that e-mail

15   address for?

16      A.   For incoming e-mails.

17      Q.   From consumers?

18      A.   Yes.

19      Q.   Was that essentially an e-mail inbox that --

20      A.   Yes.

21      Q.   -- employees had access to?

22      A.   Yes.

23      Q.   Did Docs Done Right send e-mails out from that

24   e-mail address?

25      A.   I don't know.

Page 66

1      Q.   Are you familiar with the welcome e-mail?

2      A.   Yes.

3      Q.   Was that an e-mail that Docs Done Right sent to

4  consumers?

5      A.   On behalf of the Student Loan Debt Relief

6  Defendants, yes.

7      Q.   So in those e-mails, would the e-mail appear to

8  be from one of the Student Loan Debt Relief Defendants?

9      A.   I believe so.

10      Q.   So the customer wouldn't necessarily know that

11  they were communicating with Docs Done Right; is that

12  correct?

13           MR. LEPISCOPO:  Objection, calls for

14  speculation, vague and ambiguous, and overbroad.

15           MR. HOLT:  It's also argumentative as phrased.

16           But go ahead and answer it then, if you

17  understand it.

18           THE WITNESS:  That's correct.

19  BY MR. REARDON:

20      Q.   And you mentioned earlier that Docs Done Right

21  communicated with consumers on behalf of the Student Loan

22  Debt Relief Defendants over the phone too, right?

23      A.   Yes.

24      Q.   And during those phone calls, would Docs Done

25  Right employees act as if they were an employee of one of

1    the Student Loan Debt Relief Defendants?

2            MR. LEPISCOPO:  Objection, calls for

3    speculation, vague and ambiguous, overbroad.

4            THE WITNESS:  Yes.

5    BY MR. REARDON:

6       Q.   And why did Docs Done Right do that?

7            MR. LEPISCOPO:  Objection, assumes facts not in

8    evidence, vague and ambiguous, overbroad, calls for

9    speculation.

10           MR. HOLT:  Argumentative as phrased.

11           THE WITNESS:  That was our job.

12   BY MR. REARDON:

13      Q.   What do you mean by that?

14      A.   That was what we agreed to do on behalf of those

15   companies.

16      Q.   Docs Done Right agreed to --

17      A.   Answer the phone as the debt relief defendants.

18      Q.   And who asked Docs Done Right to do that?

19      A.   I'm not sure how to answer that.  It was an

20   understanding from the LP.  The owners of the debt

21   relief -- Student Loan Debt Relief Defendants and the

22   owners of Docs Done Right were the same owners, and

23   that's what they wanted it to be.

24      Q.   I think we touched on this a little bit earlier,

25   but were there essentially like standard templates for

1   communications that Docs Done Right used when it

2   communicated with consumers?

3       A.   What do you mean, templates?

4       Q.   Well, you mentioned -- we talked about the

5   welcome letter.  Was that essentially a standard e-mail

6   or letter that went out to consumers?

7       A.   Yes.

8       Q.   And did Docs Done Right have other standard

9   communications that it sent?

10      A.   Yes.

11      Q.   And what were those?

12      A.   I believe there might have been an NSF

13  notification.  When a payment didn't go through for a

14  consumer, they would get a notification saying, hey,

15  please call us.

16      Q.   Any others besides that?

17      A.   Not that I can think of.  Any of them would be

18  inside the DebtPayPro.

19      Q.   Was that something that was tracked in

20  DebtPayPro?

21      A.   I don't know.  But if it was sent to a consumer,

22  it would be in DebtPayPro, in the history.

23      Q.   The fact that it was sent would be noted

24  somewhere in DebtPayPro; is that correct?

25      A.   I believe so.

Page 69

1     Q.   So we've been talking about the welcome e-mail.

2   What was the purpose of the welcome e-mail?

3     A.   It was -- the purpose was to welcome the client

4   to -- to the student loan debt relief company and to give

5   them an expectation of what will come next while they're

6   in the program with them, as far as the documents that

7   they'll be receiving.

8     Q.   I'd like to introduce as Exhibit 19 an example

9   of a welcome letter.  It's -- when we e-mailed it to you,

10  it was labeled Document B.  Do you have that in front of

11  you?

12    (Exhibit Number 19 was marked for identification.)

13        MR. HOLT:  Ed, I think she -- you were given a

14  packet of documents, and I think she renumbered it as 19.

15        THE WITNESS:  Yes.

16        MR. HOLT:  It's a -- it looks like a Gmail, from

17  a Gmail.

18        THE WITNESS:  For April Davis?

19        MR. HOLT:  Yes.

20        Is that what you've got, Colin?

21        MR. REARDON:  Yep.

22        MR. HOLT:  Okay.  Yeah, we got it.

23  BY MR. REARDON:

24    Q.   So we're marking this document as Exhibit 19.

25  It's a Gmail printout.  The subject of the e-mail is:

Page 70

1    Welcome Email and Consolidation Packet for APRIL DAVIS

2    (Certified Doc Prep Services LP).  And the e-mail is

3    dated March 30th, 2017.

4            And you may or may not remember this, Ed, but

5    this was an exhibit in your investigational hearing in

6    2019, which is why it has an exhibit marker in the

7    corner.

8            Do you recognize this as an example of a welcome

9    e-mail that was sent to consumers?

10   A.   No.  The part that looks familiar to me is page

11   three.

12   Q.   So when you say page three, are you referring to

13   the letter that has immediate action required in the

14   upper right-hand corner?

15   A.   Yes.

16   Q.   You've seen this before?

17   A.   Yes.

18   Q.   Was this a standard letter that went to

19   consumers?

20   A.   I believe so.

21   Q.   If you go back to page one, do you recognize the

22   docs@clientenrollment.com e-mail address that we talked

23   about earlier as in the sender line?

24   A.   Yes.

25   Q.   So is this -- was it Docs Done Right's practice

1    to kind of e-mail this welcome letter and other documents

2    to consumers?

3        A.   During the compliance call, the client could

4    choose to receive it by e-mail or by mail.

5        Q.   I see.  So if -- if the consumer chose to

6    receive the welcome packet by e-mail, is this the e-mail

7    that they would get?

8        A.   I believe so.

9        Q.   And, I mean, do you have any reason to believe

10   that this was -- that there was some other e-mail, that

11   this is not a kind of genuine example of the kind of

12   e-mails that were sent?

13       A.   I don't remember this e-mail.  And I have no

14   reason to believe that it's not authentic.  I just don't

15   remember it.

16       Q.   So if you look at the first page of the e-mail,

17   it indicates that there were several attachments such as

18   a welcome letter, payment schedule, forbearance requests,

19   consolidation application.  Do you see that?

20       A.   Uh-huh.  Yes.

21       Q.   So would Docs Done Right essentially send a

22   packet of materials like this to each new customer?

23       A.   I believe so.

24            MR. HOLT:  Well, let me -- I assume you're

25   talking about the ones that elected to take it by e-mail,

Page 72

1    Mr. Reardon?

2            MR. REARDON:  Yes.  Yes.

3    BY MR. REARDON:

4        Q.   So when a customer elected to do this by e-mail,

5    they would receive by e-mail a packet like this; is that

6    correct?

7        A.   I believe so.

8        Q.   If a customer received -- scratch that.

9            If a customer elected to proceed by mail, would

10   they receive a packet of materials in the mail?

11       A.   I believe so.

12       Q.   What would that packet contain?

13       A.   I believe it would be very similar to this.  But

14   I don't -- I don't --

15       Q.   So it would contain a welcome letter and a

16   payment schedule and a -- you know, application forms; is

17   that correct?

18       A.   It should.

19       Q.   That was the general practice; is that correct?

20       A.   Correct.

21       Q.   If you look at page one of this e-mail, it says,

22   you can return your documents using one of the methods

23   below, and then it provides an e-mail address, a fax

24   number and a mailing address.

25       A.   Yes.

Page 73

1    Q.   So are those all methods that the consumer could

2    use to return the documents?

3    A.   Yes.

4    Q.   So, I mean, we spoke earlier about how in some

5    scenarios the consumer would return these documents to

6    Docs Done Right or to the student loan debt relief

7    company; is that correct?

8    A.   It would be returned to the Student Loan Debt

9    Relief Defendants, and then they would -- it would

10   go -- we would answer it on behalf of them, correct.

11   Q.   And then would -- after that point, would Docs

12   Done Right provide other updates to consumers?  I think

13   you mentioned the NSF update.

14   A.   If the client had a missed payment, we would

15   contact them.

16   Q.   Would Docs Done Right notify a consumer that

17   their consolidation application was submitted to a

18   servicer?

19   A.   I don't understand.  Wouldn't the consumer get

20   that?  I believe the consumer got that from the servicer.

21   Q.   I'm just asking, did Docs Done Right -- you

22   know, I think you testified earlier that for some

23   customers Docs Done Right submitted application forms to

24   the servicer; is that correct?

25   A.   Correct.  Wait -- I don't remember, but I

Page 74

1    believe that if the client sent it to the servicer

2    themselves -- once we sent the documents and they were

3    signed, our job was done.

4         If the client sent it to us, and as a courtesy

5    we sent it out to the servicer for them, I'm not sure if

6    there was any follow-up after that because, technically,

7    our work was done once the doc prep was completed.  That

8    wasn't something that was part of our job.

9    Q.   So do you know whether Docs Done Right ever sent

10   out notifications to consumers that their consolidation

11   application had been submitted?

12   A.   I don't remember.

13   Q.   You mentioned that Docs Done Right submitted the

14   documents to the servicers as a courtesy.  What do you

15   mean by as a courtesy?

16   A.   It wasn't part of their fee.  Like, we didn't

17   charge a fee -- we didn't charge postage or anything else

18   to do that for them.  Like, we didn't -- it

19   wasn't -- their fee was -- their fee that they owed the

20   Student Loan Debt Relief Defendants was for document

21   preparation only, not for anything else.

22        But we found out that, with customer

23   satisfaction, it was helpful that we help with that

24   process as well.

25   Q.   Was there any indication in the welcome e-mail

1    or welcome letter that consumers essentially had the

2    option of submitting their document?

3         A.   I believe so.

4         Q.   Would you be able to point me to that language

5    in the e-mail or the letter?

6         A.   Where am I looking for it?

7         Q.   I don't know.  You tell me.  We haven't found

8    it.

9         A.   Okay.  Then I don't know.

10             Is it this right here that you gave me?

11        Q.   Uh-huh.

12        A.   It'd be useless for me to read through this, if

13   you are saying it's not on here.

14        Q.   I know.  Please read through it.  I mean, if you

15   want to correct us, please read through it.

16        A.   I believe, as part of the packet that was mailed

17   to them, there's -- there's a paper that says where to

18   send it to their servicer, or, if they want, they can

19   return it back to us, if they'd like us to review it, but

20   I don't see it as part of this package.

21             I don't know, is there anything else on this

22   e-mail besides this?  Was there only one page to the

23   e-mail?

24        Q.   Only the two pages that you have in front of

25   you.

1      A.   Where's the rest of the packet?

2      Q.   We haven't included the forbearance request or

3    the consolidation application or the repayment plan.

4    Would any of those have that instruction?

5      A.   I would think that those forms themselves

6    actually tell you where to submit them, also, as well.

7      Q.   Well, those forms are forms kind of -- the forms

8    that the Department of Education kind of issues for

9    applications; is that right?

10     A.   Yes, it's from the Department of Education.

11     Q.   So if a consumer looked at the attachments to

12   this e-mail, they could figure out that they could submit

13   these directly themselves; is that right?

14          MR. LEPISCOPO:  Objection, calls for

15   speculation, lacks foundation, overbroad.

16          MR. HOLT:  Join.

17          MR. REARDON:  What was that?

18          MR. HOLT:  I said join.

19          THE WITNESS:  I didn't answer.  I mean, you're

20   asking me what the consumer would think.  I mean, I don't

21   think I can answer for consumers.

22          I'd like to see the whole packet.  Maybe I can

23   give you a better answer that way.  But, I mean, I'm only

24   looking at two pages.

25          And my belief is that the Department of

Page 77

1    Education made it very clear on their own forms how to

2    fill out the forms.  If people read them, it gives you

3    clear instructions on what to do.  That's my belief.

4    BY MR. REARDON:

5        Q.   I think you said earlier that one of the things

6    that Docs Done Right did was handle consumer complaints

7    on behalf of the Student Loan Debt Relief Defendants.  Do

8    you recall that?

9        A.   Yes.

10       Q.   And it also handled cancellation requests; is

11   that correct?

12       A.   Yes.

13       Q.   How frequently did consumers cancel after they

14   initially enrolled?

15            MR. LEPISCOPO:  Objection, vague and ambiguous,

16   calls for speculation, overbroad.

17            THE WITNESS:  I don't -- I don't remember.

18   BY MR. REARDON:

19       Q.   Can you provide an estimate?

20       A.   I would guess around 40 percent would cancel.

21            MR. HOLT:  You're estimating?

22            THE WITNESS:  Yeah, it's an estimation.

23   BY MR. REARDON:

24       Q.   And if you wanted to determine what portion of

25   consumers cancelled, is that something you would use

Page 78

1    DebtPayPro to figure out?

2        A.   Yes.

3        Q.   Earlier you also testified that Docs Done Right

4    handled refund requests for consumers too; is that

5    correct?

6        A.   Yes.

7        Q.   How frequently did consumers ask for a refund?

8            MR. LEPISCOPO:  Objection, lacks foundation,

9    calls for speculation, overbroad, and vague and

10   ambiguous.

11           THE WITNESS:  I would say not frequently.

12   BY MR. REARDON:

13       Q.   Would you be able to estimate a percentage of

14   the customers who asked for a refund?

15           MR. LEPISCOPO:  Lacks foundation, vague and

16   ambiguous.

17           THE WITNESS:  No.

18   BY MR. REARDON:

19       Q.   How about what percentage of customers actually

20   received a refund?

21       A.   Of the people that requested a refund, I would

22   say most of them got a refund.

23       Q.   Did they always get -- did -- sorry, scratch

24   that.

25           Did those people get full refunds, partial

1    people that requested got it.  Most of them.  I mean,

2    over 90 percent, I would believe.

3         Q.   Sure.  And let me reframe the question so it's

4    clearer.  Overall, of all of the customers that paid a

5    fee, what percentage of those got a refund?

6              MR. LEPISCOPO:  Objection, calls for

7    speculation, lacks foundation, vague and ambiguous, and

8    overbroad.

9              THE WITNESS:  I don't know.

10   BY MR. REARDON:

11        Q.   Is that something you would use DebtPayPro to

12   figure out, if you wanted to figure it out?

13        A.   Correct.

14        Q.   You mentioned earlier that Docs Done Right

15   handled a compliance call; is that correct?

16        A.   Yes.

17        Q.   And what was the compliance call?

18        A.   The compliance call was a set of questions that

19   was -- I think it's an interview -- or more like a survey

20   to kind of gauge the quality of the sale and to verify

21   that the data that was entered by the sales rep was

22   correct.

23             It was put in place to assure that the sales

24   reps were being ethical and selling correctly and

25   truthfully.

Page 87

1    may not be true, but the client wants to either save

2    money, get money back, get a refund, or reverse an NSF

3    FEE.  Whatever a client says, there's some cause to it,

4    and we can only do what we can to prevent it, but that

5    doesn't stop complaints.  No matter if you're the most

6    perfect company out there, if you're Apple, you're still

7    going to have a complaint.

8             So when you say, then why did you get

9    complaints, that doesn't have anything to do with us

10   doing -- that we -- we resolved that stuff from

11   happening.  As far as I'm concerned, that compliance call

12   helped.

13   BY MR. REARDON:

14        Q.   Could the compliance call have been more

15   effective?

16             MR. HOLT:  Objection, calls for speculation,

17   assumes facts not in evidence, argumentative as phrased.

18             THE WITNESS:  I don't believe so.

19   BY MR. REARDON:

20        Q.   And why not?

21             MR. HOLT:  Objection, it's argumentative as

22   phrased.

23             THE WITNESS:  I'm sorry, I didn't hear your

24   question.  Did you say why?

25             MR. REARDON:  Why not?

Page 88

1          MR. HOLT:  Yeah, he said why not.

2          THE WITNESS:  I would say that the example I

3    just told you regarding Discover card, there's always

4    going to be complaints, no matter how effective you are

5    as a back end or as a customer service provider.

6    BY MR. REARDON:

7     Q.   I think earlier you said that Docs Done Right

8    used the services of a company called Debt Pay Gateway;

9    is that correct?

10    A.   Yes.

11    Q.   When did that begin?

12    A.   I don't remember.

13    Q.   Would it have been in 2015?

14    A.   Possibly.  End of 2015 or beginning of 2016.

15    Q.   And why did Docs Done Right begin using Debt Pay

16    Gateway?

17          MR. HOLT:  Objection, argumentative.  You can

18    answer, if you understand it.

19          THE WITNESS:  Uh-huh.  That was the account that

20    I was told to use by the partners at Docs Done Right.

21    BY MR. REARDON:

22    Q.   And what services did Debt Pay Gateway provide?

23    A.   I'm not sure.

24    Q.   Did you do any preparation for that as part of

25    today's deposition?

Page 89

1    A.   No, I'm just not -- I'm not remembering the

2    verbiage of what they call their accounts.  I believe

3    they're either special purpose accounts or an escrow

4    account.

5         I would -- in my own words, I would assume

6    they're a payment processor.

7    Q.   Did Debt Pay Gateway provide payment processing

8    services for Docs Done Right?

9    A.   Yes.

10   Q.   And I think you testified earlier that Docs Done

11   Right provided the Student Loan Debt Relief Defendants to

12   payment processing services through that Debt Pay Gateway

13   account; is that correct?

14   A.   Yes, but I believe the Debt Pay Gateway account

15   was originally brought in by DocuPrep Center, and it was

16   inherited by Docs Done Right.

17   Q.   Was Debt Pay Gateway a payment processer for ACH

18   transaction?

19   A.   Yes.

20   Q.   And is an ACH transaction essentially a

21   transaction involving a bank account?

22   A.   Yes.

23   Q.   Did Docs Done Right submit an application to

24   Debt Pay Gateway for services?

25   A.   Yes.

Page 90

1    Q.   Did you submit that application to Debt Pay

2   Gateway on behalf of Docs Done Right?

3    A.   Yes.  And DocuPrep Center at the time.

4    Q.   Say that again.

5    A.   At the time that it was created, it was -- it

6   was a -- I believe I got hired at the same time that

7   DocuPrep Center was getting their Debt Pay Gateway

8   account.  So when I came in, they gifted or -- I'm not

9   sure what you call it -- they went from DocuPrep Center

10  to Docs Done Right.

11   Q.   Okay.  And then Docs Done Right essentially

12  handled the account after that point, after the

13  application; is that right?

14   A.   Yes.  I was assigned to take over that part.

15  That was one of the first things I did when I got hired.

16   Q.   And then did Docs Done Right continue using Debt

17  Pay Gateway for the remainder of the time that it worked

18  with the student loan debt relief companies?

19   A.   Correct.  Docs Done Right, LP.

20   MR. REARDON:  I'd like to mark Exhibit

21  Number 20.

22  (Exhibit Number 20 was marked for identification.)

23   MR. REARDON:  -- which is a -- which is -- it

24  was originally labeled Document C when we e-mailed it.

25  Does everybody have that in front of them?

Page 91

1              MR. HOLT:  Is it a three-page document?

2              THE WITNESS:  Yeah.

3              MR. HOLT:  Well, me and you, Ed, will have the

4      same one.  I'm just making sure with Colin.

5              THE WITNESS:  Oh, sorry.

6              MR. HOLT:  It looks like it goes from --

7      BY MR. REARDON:

8         Q.   And do you have the document in front of you?

9              MR. HOLT:  Yeah.

10             THE WITNESS:  It's an e-mail between me and

11     Christopher Queen.

12             MR. HOLT:  Hello?

13             THE WITNESS:  Hello?

14             MR. REARDON:  Sorry, I lost audio.

15             MR. HOLT:  So, Colin, is it a three-page

16     document?  The last four digits on the Bates are 1864

17     through 1866?

18             MR. REARDON:  Yes.

19             MR. HOLT:  Okay.  Yeah, Ed, you have the three

20     pages.

21             THE WITNESS:  Yeah, I have them.

22     BY MR. REARDON:

23        Q.   Do you recognize this e-mail and its attachment?

24        A.   Yes.

25        Q.   Is that your personal e-mail address at the top

Page 92

1   of the e-mail?

2       A.   Yes.

3       Q.   This e-mail was sent to an individual named

4   Christopher Queen.   Who is Christopher Queen?

5       A.   I believe he's the owner of Debt Pay Gateway and

6   DebtPayPro.

7       Q.   If you look at the attachment to this e-mail, do

8   you recognize your handwriting on this attachment?

9       A.   Yes, I do.

10      Q.   There's a statement in what you wrote that,

11  "Fees are charged once document preparation services have

12  been provided."

13      A.   Correct.

14      Q.   Do you see that?   And what did that mean?

15      A.   Once the forms are filled out, the

16  consolidation, IBR forms or payment change request forms

17  are filled out and given to the consumer, our fees are

18  completed.

19      Q.   And then the customer is charged?

20      A.   Correct.   Yes.

21      Q.   And if you look further down in that paragraph,

22  second -- third to last line, it says, "Our fee is not

23  based on the result of the document preparation."   Do you

24  see that?

25      A.   Yes.

Page 93

1      Q.   So what does that mean?

2      A.   What it says, our fee is not based on the result

3   of the document preparation.  Our fee is based on

4   completing the document preparation.

5           Like, what happens with those documents, if the

6   client uses it or not, if the client submits it to their

7   servicer or not.  If they decide to throw it away and

8   never use it, that's up to the client.  Our fees are for

9   creating the documents and submitting them to the

10  consumer.

11     Q.   So the fee didn't depend on whether the

12  application that was prepared was actually approved; is

13  that correct?

14     A.   That's my understanding.

15     Q.   Was that Docs Done Right's practice?

16     A.   Yes.  But this is being written on behalf of the

17  front end.

18     Q.   And what do you mean by that?

19     A.   Well, it says here, "document preparation fee is

20  $799."  That wasn't our fee, that was DocuPrep Center's

21  fee.  This is being written on behalf of us as a whole.

22     Q.   Essentially, Docs Done Right and DocuPrep Center

23  together; is that what you mean?

24     A.   Well, that's their fee.  That's not Docs Done

25  Right's fee.  Our fee was only a hundred dollars.

Page 94

1            But when I talked to them, they wanted the

2     overall consumer charge, which was 799 at the time, I

3     believe, that was being charged by DocuPrep Center.

4            Well, it says it on the paragraph, actually.  I

5     just realized that.

6        Q.    What part are you referring to?

7        A.    It says, We at Docs Done Right do not have a

8     marketing piece as we service front end affiliates.  The

9     normal fee for document preparation is $799 if done in

10    payments or $699 if done in one lump sum.

11       Q.    So the affiliates at that point would have been

12    DocuPrep Center; is that what you're saying?

13       A.    At that time, it was only DocuPrep Center.

14       Q.    So essentially Docs Done Right was submitting

15    this as part of working kind of with DocuPrep Center; is

16    that right?

17       A.    I got hired, I believe, October 26th, and this

18    is within the first four days of me being hired --

19       Q.    Uh-huh.

20       A.    -- it looks like.  So there was some sloppiness

21    going on here regarding who was setting -- who was

22    signing up with DebtPayPro.  Because I'm noticing, on 21,

23    it says DocuPrep Center was who they were signing up

24    with, but, yet, over here, it's with Docs Done Right.

25       Q.    We haven't really introduced that exhibit yet,

1    so why don't we just stay focused on this one.

2        A.   Well, I'm just making a point.

3        Q.   And what's the point you're making?

4        A.   That it looks like there was two company names

5    being used to sign up with DebtPayPro and Debt Pay

6    Gateway, we used Docs Done Right and also DocuPrep

7    Center, which was what I told you we took over from

8    DocuPrep Center, but originally it was a DocuPrep Center

9    sign-up by Sean Cowell, as you see on here.

10       Q.   Okay.  Why don't we -- let's leave that -- that

11   other exhibit aside -- to the side for a moment.

12            How did -- did there come a point in time when

13   Docs Done Right's relationship with Debt Pay Gateway

14   ended?

15       A.   Yes.

16       Q.   What happened?

17       A.   Debt Pay Gateway told me that they were no

18   longer going to service student loan doc prep clients.

19       Q.   Did they say anything else?

20       A.   I don't remember.

21       Q.   Did Debt Pay Gateway ever contact Docs Done

22   Right about its return rates?

23       A.   Did they -- can you repeat the question?

24       Q.   Are you familiar with a return rate?

25       A.   Unauthorized rate?

Page 96

```
 1      Q.   Unauthorized rate is one kind of return.

 2      A.   Right -- yes.

 3      Q.   Did Debt Pay Gateway ever contact Docs Done

 4   Right about its return rate?

 5      A.   Yes.

 6      Q.   And what did it say?

 7      A.   They said that it was too high.

 8      Q.   Did it say anything else?

 9      A.   Not that I can remember.

10      Q.   Did Debt Pay Gateway ever threaten to cut off

11   Docs Done Right because of its high return rates?

12      A.   Maybe in writing.  They might have sent us

13   something saying that if it continues to go up that they

14   would no longer be able to service us.

15      Q.   And did -- what did Docs do -- Done Right do in

16   response to that?

17      A.   I don't remember, but I know we did something.

18   I think we -- we started sending courtesy notifications

19   to consumers before the payment came out, to remind them

20   that the payment was coming out.  We sent out

21   notification to clients saying that their payment would

22   say Debt Pay Gateway, because part of the reason that

23   people were unauthorizing their payments is they didn't

24   recognize the company that was on their bank account.

25           It didn't say DocuPrep Center.  It said Debt Pay
```

Page 97

1  Gateway.  And clients would get confused and say who's

2  Debt Pay Gateway, and they would not authorize it.

3         So we tried to correct that.

4     Q.   And were those correction efforts successful?

5     A.   I believe it improved, yes.

6     Q.   Did Debt Pay Gateway cite the high return rates

7  as a reason when it cancelled Docs Done Right's account?

8     A.   I don't believe so.  I believe when I spoke to

9  them they told me that it was just a space they didn't

10 feel comfortable being in anymore.

11        They told me I had the best return rate out of

12 the student loan industry that they had.  They said that

13 the student loan industry, itself, had a higher return

14 rate overall.

15    Q.   We've talked a little bit already about

16 DebtPayPro, and I believe you said it was a customer

17 relationship management software; is that right?

18    A.   Yes.

19    Q.   And I think you also testified that Debt Pay

20 Gateway and DebtPayPro were affiliated companies; is that

21 right also?

22    A.   I believe so.

23    Q.   And was the company that managed the DebtPayPro

24 software called Debt Pay, Inc.?

25    A.   I don't know.

Page 98

1      Q.   You just knew them as DebtPayPro?

2      A.   Yes.

3      Q.   And I believe you testified earlier that Docs

4  Done Right provided the Student Loan Debt Relief

5  Defendants with access to DebtPayPro; is that correct?

6           MR. LEPISCOPO:  Objection, vague and ambiguous,

7  assumes facts not in evidence, foundation, and overbroad,

8  and calls for speculation.

9  BY MR. REARDON:

10      Q.   I'm just reciting the testimony you provided

11  earlier, I believe.

12           MR. HOLT:  I was going to object, asked and

13  answered.  But go ahead, Ed.

14           THE WITNESS:  I believe so.

15  BY MR. REARDON:

16      Q.   So how did it work when Docs Done Right provided

17  the Student Loan Debt Relief Defendants access to

18  DebtPayPro?

19      A.   The partners would tell me that there's a new

20  company being formed and it needed to be added to

21  DebtPayPro.

22      Q.   And was there some process that Docs Done Right

23  had to go through to add them?

24      A.   I believe so, but I don't remember the process.

25      Q.   Was there a fee for adding new companies?

Page 99

1       A.   I don't remember.

2       Q.   Did the Student Loan Debt Relief Defendants pay

3   a fee to Docs Done Right for the costs of their accounts?

4       A.   Can you repeat the question?  You cut out.

5       Q.   Did the Student Loan Debt Relief Defendants pay

6   Docs Done Right for access to DebtPayPro?

7       A.   Yes.

8       Q.   Could -- could Docs Done Right employees see the

9   information that the Student Loan Debt Relief Defendants

10   entered into DebtPayPro?

11       A.   If it was submitted to the -- through

12   compliance, yes.

13       Q.   Was -- go ahead.

14       A.   If they didn't sell the client, we couldn't

15   see -- we couldn't see the data.  Only the ones that

16   enrolled and got through compliance we could see.

17       Q.   And then once the client enrolled, essentially

18   Docs Done Right had access to all the information about

19   them on DebtPayPro; is that correct?

20       A.   Yes.  Once it was approved.

21       Q.   And were the Student Loan Debt Relief

22   Defendants -- well, scratch that.

23            Once the sale happened and the Docs Done Right

24   had access to it, then would Docs Done Right update the

25   consumer's file on DebtPayPro?

Page 100

1      A.   I don't understand what you mean by update.

2      Q.   Would they add additional information about

3   interactions with the consumer?

4      A.   Yes.

5      Q.   And would the Student Loan Debt Relief

6   Defendants, would they be able to see essentially what

7   Docs Done Right was doing with the clients that they had

8   sold?

9           MR. LEPISCOPO:  Objection, calls for

10   speculation, overbroad, vague and ambiguous, and lacks

11   foundation.

12          THE WITNESS:  Yes, I believe so.

13   BY MR. REARDON:

14      Q.   They were -- scratch that.

15          Let's turn to the next exhibit, which is the one

16   you wanted to talk about earlier.

17          MR. HOLT:  21?

18          MR. REARDON:  Yes, this will be number 21.

19     (Exhibit Number 21 was marked for identification.)

20   BY MR. REARDON:

21      Q.   This appears to be an agreement for DebtPayPro.

22   Do you have that in front of you?

23      A.   Yes.

24          MR. HOLT:  And that goes from -- the Bates stamp

25   from 1824 through and including 1837?

1            MR. REARDON:  That's correct.

2    BY MR. REARDON:

3        Q.   Do you recognize this agreement?

4        A.   Yes.

5        Q.   If you turn to page five, is that your signature

6    on this agreement?

7        A.   Yes.

8        Q.   And if you turn back to page three, there's a

9    section that says Multi-Company -- Multi -- or sorry,

10   scratch that -- the section that says

11   Multi-Company/Affiliate Management and the box is

12   checked.

13       A.   I'm sorry, what page?

14       Q.   Page three.

15           MR. HOLT:  Page three toward the middle.

16           THE WITNESS:  Where?  Multi-Company/Affiliate

17   Management, okay.

18   BY MR. REARDON:

19       Q.   Do you see that?

20       A.   Yes.

21       Q.   So is this -- is this essentially consistent

22   with what you were saying earlier, that Docs Done Right

23   was signing up for an account that would allow it to add

24   affiliate companies to use DebtPayPro?

25       A.   I'm sorry, what did I say?

1    Q.   Did -- was Docs Done Right signing up with

2   DebtPayPro for an account that allowed it to add

3   affiliates?

4    A.   Yes.

5    Q.   And we've talked mostly about the Student Loan

6   Debt Relief Defendants, but earlier you noted that there

7   were some additional other affiliates that Docs Done

8   Right had.  Do you recall that?

9    A.   Yes.

10    Q.   Did Docs Done Right also allow those affiliates

11   to use its DebtPayPro account?

12    A.   Yes.

13    Q.   So we've now gone through a lot of different

14   services that Docs Done Right provided to the Student

15   Loan Debt Relief Defendants:  The compliance call,

16   document preparation, customer service, the access to

17   DebtPayPro, the access to Debt Pay Gateway.

18        Beyond all of those, is there anything else that

19   Docs Done Right provided as a service to the Student Loan

20   Debt Relief Defendants?

21    A.   Not that I recall.

22    Q.   Are there any other services that Docs Done

23   Right provided to consumers on behalf of the Student Loan

24   Debt Relief Defendants that we haven't covered yet?

25    A.   Not that I can think of.

1       Q.   So if you look back at the deposition notice

2    exhibit, which is Exhibit Number --

3            MR. HOLT:  18.

4            MR. REARDON:  -- 18 -- thank you, David -- I'd

5    like to talk about topic 11, which is the functions of

6    DebtPayPro used by Docs Done Right and the Student Loan

7    Debt Relief Defendants, including logging --

8            MR. HOLT:  Can we take a restroom break before

9    you start the new category?

10           MR. REARDON:  Sure.

11           MR. HOLT:  Thank you.

12           MR. REARDON:  Five-minute break?

13           MR. HOLT:  Yeah.

14           (A recess was taken.)

15   BY MR. REARDON:

16      Q.   So as I was about to say before the break, I'd

17   like to talk about topic 11, which has to do with the

18   DebtPayPro software platform.

19           Are you familiar with the functions of

20   DebtPayPro?

21      A.   Yes.

22      Q.   And are you familiar with how it was used by

23   Docs Done Right?

24      A.   I believe so.

25      Q.   Are you familiar with how it was used by the

Page 104

1   Student Loan Debt Relief Defendants?

2       A.   I believe so.

3       Q.   What were the functions of DebtPayPro that the

4   companies used?

5            MR. HOLT:   I'm sorry, can you repeat that

6   question, Colin?

7   BY MR. REARDON:

8       Q.   What were the functions of DebtPayPro that the

9   companies used?

10           MR. LEPISCOPO:   Objection.

11           MR. HOLT:   Are you talking about the student

12  loan relief defendants, or are you talking about Docs

13  Done Right?

14           MR. REARDON:   Both.

15           MR. LEPISCOPO:   Objection as to lack of

16  foundation, calls for speculation, overbroad, and vague

17  and ambiguous.

18           MR. HOLT:   Yeah, definitely vague and ambiguous.

19           But go ahead, Ed.

20           THE WITNESS:   I believe they used it to enter

21  consumer information, like their name, address, phone

22  number, and anything that was needed to fill out the

23  document preparation, and track conversations as far as

24  notations.

25  BY MR. REARDON:

1     Q.   Are you referring to the Student Loan Debt

2  Relief Defendants or Docs Done Right or both?

3     A.   Both.

4     Q.   Would those companies use DebtPayPro to store

5  information about customers?

6     A.   Yes.

7     Q.   Would they use DebtPayPro to track the status of

8  providing services to customers?

9     A.   You cut out.

10    Q.   Would they use DebtPayPro to track the status of

11 providing services to customers?

12    A.   Yes.

13    Q.   Would they use DebtPayPro to track the status of

14 the preparation of documents for the consumer?

15    A.   Yes.

16    Q.   Would they use DebtPayPro to track the status of

17 Docs Done Right's submission of applications on behalf of

18 a consumer to the student loan servicer?

19    A.   Yes.

20    Q.   I believe you said that they used a note-taking

21 function; is that correct?

22    A.   Yes.

23    Q.   And how did they use the note-taking function?

24    A.   They entered notes into it.

25    Q.   What kinds of notes would they enter?

Page 106

1       A.   Spoke to consumer, they said this, and then

2  they'd enter it.

3       Q.   And both Docs Done Right and the Student Loan

4  Debt Relief Defendants used DebtPayPro for that purpose;

5  is that correct?

6       A.   I believe so.

7       Q.   Was DebtPayPro used to store documents relating

8  to the services provided to a customer?

9       A.   Yes.

10       Q.   Was it used to store consumer contracts?

11       A.   Yes.

12       Q.   Was it used to store the application documents

13  that were prepared for consumers?

14       A.   Yes.

15       Q.   Were there any other kinds of documents that it

16  stored?

17       A.   Anything that was sent to the -- was sent to the

18  debt relief companies by the consumer was supposed to be

19  scanned in and attached to the CRM on behalf of the

20  consumer.  Any correspondence we received should have

21  been attached to the client's account.

22       Q.   So essentially anything that came in to Docs

23  Done Right from the consumer; is that correct?

24       A.   Correct.

25       Q.   And would any outgoing correspondence also be

Page 107

1    put on DebtPayPro?

2        A.   Yes.

3        Q.   Were there any other functions of DebtPayPro

4    that the companies used besides the ones we've talked

5    about?

6        A.   Not that come to mind.

7        Q.   Were there any functions that were specific for

8    managers that the companies used?

9        A.   Reporting capability?

10       Q.   What kind of reporting capabilities did

11   DebtPayPro have?

12       A.   It was able to pull a report based on different

13   fields off their system.  So you could search by client

14   name -- any field that they had, you could search by it.

15       Q.   And what kind of reports did Docs Done Right use

16   frequently?

17       A.   I would look at the number of clients that were

18   enrolling per month.  I would look at their cancellation

19   rate.  Anybody that's had -- their NSF rate, I would look

20   at that.

21            I would look at the staging of the back end, as

22   far as did they get the job done by servicing and

23   completing a file, and just to see that we're working

24   efficiently.

25       Q.   And anything besides that?

Page 108

1      A.   I would see how much work was done by each

2   individual customer service rep to see how efficient they

3   were at their job, how much workload they were completing

4   on a monthly, daily, weekly basis.

5      Q.   Anything else?

6      A.   Not that I can think of.

7      Q.   Was it used for any other kind of purpose

8   relating to supervising employees or monitoring what

9   employees were doing?

10     A.   I would use it to see how much work was being

11  completed by each employee.  So, yes.

12     Q.   Was it used to track things like commissions?

13     A.   For the debt relief companies?  I believe so.

14     Q.   Were there any other reporting functions, to

15  your knowledge, that the student loan debt relief

16  companies used?

17     A.   Not that I can think of.

18     Q.   Was DebtPayPro the only system that Docs Done

19  Right used to track customer interactions, or were there

20  other systems?

21     A.   There was another system.

22     Q.   What was that?

23     A.   I don't remember the name of it, but it was

24  before DebtPayPro -- or it was -- I don't remember the

25  name of it, but it was similar to DebtPayPro.  We used it

Page 109

1   very little.

2       Q.   Did Docs Done Right stop using that system when

3   it started using DebtPayPro?

4       A.   Yes.

5       Q.   So once DebtPayPro came online, that was -- was

6   that the only system that Docs Done Right used to track

7   interactions with consumers?

8       A.   For the most part, yes.

9       Q.   And why do you say for the most part?

10      A.   Because we used another one in the beginning for

11  different -- different -- different companies, not

12  for -- for these companies, this is all we used.

13      Q.   Okay.  And that's what I'm interested in.

14      A.   Okay.

15      Q.   And are you aware that Docs Done Right has

16  produced many records from DebtPayPro to the Bureau as

17  part of discovery in this case?

18          MR. HOLT:  I'm sorry, can you reread the

19  question, Ms. Reporter.

20          (The reporter read back the requested portion.)

21          MR. HOLT:  Oh, okay.  Thank you.

22          THE WITNESS:  You mean -- you got the whole

23  database of DebtPayPro; is that what you're referring to?

24  BY MR. REARDON:

25      Q.   Yes.

Page 110

1      A.   Yes.

2      Q.   And so were -- I want to ask you some questions

3   about that database.  Were the documents and records that

4   were part of that database essentially made as part of

5   Docs Done Right's kind of regular business activities?

6      A.   Oh -- I didn't know you were done with your

7   question?

8      Q.   Were the --

9           MR. REARDON:  Can you reread the question.

10          (The reporter read back the requested portion.)

11          THE WITNESS:  I don't understand that question.

12   Can you rephrase that?

13   BY MR. REARDON:

14      Q.   So was it the regular part of Docs Done

15   Right -- scratch that.

16          Docs Done Right used DebtPayPro essentially

17   every day, right?  Is that correct?

18      A.   Correct.

19      Q.   And it -- and so the records that the Bureau

20   received from DebtPayPro were --

21   essentially were -- scratch that.

22          The records that the Bureau received from

23   DebtPayPro are the product of Docs Done Right's ordinary

24   business activities; is that correct?

25      A.   I believe so.

Page 111

```
 1      Q.   And Docs Done Right maintained -- scratch that.

 2           Docs Done Right used DebtPayPro to store

 3  records; is that correct?

 4      A.   Correct.

 5      Q.   And it was Docs Done Right's regular practice to

 6  store records on DebtPayPro; is that correct?

 7      A.   Yes.

 8      Q.   And was the same true of the Student Loan Debt

 9  Relief Defendants; did they also use DebtPayPro to make

10  and keep records of their activities?

11      A.   I believe so.

12      Q.   Were the documents and information that got put

13  onto DebtPayPro, would that have all -- would those

14  documents and information have all been created at around

15  the time they were entered into DebtPayPro?

16      A.   Are you saying that the documents were created

17  the day they were entered?

18      Q.   Around the time.  So, for example, if someone

19  made a call note, would they make the call note at around

20  the time that a call occurred?

21      A.   I believe so.

22      Q.   And if they put another piece of information,

23  like an information about the consumer's student loan or

24  a consolidation application, would that information

25  essentially have been entered around the time that
```

Page 112

1   whatever the activity was occurred?

2       A.   I believe so.

3       Q.   And would the same go for the documents on

4   DebtPayPro?  If -- if Docs Done Right or a student loan

5   debt relief company stored a contract on DebtPayPro,

6   would that contract have been put on DebtPayPro around

7   the time it was created?

8       A.   Correct.

9       Q.   When Docs Done Right employees entered

10  information into DebtPayPro, did they essentially have an

11  understanding of what it was they were entering?

12      A.   I hope so.

13      Q.   For example, if a Docs Done Right employee made

14  a note about a call, would they generally be the person

15  who had the call with the consumer that's reflected in

16  the note?

17      A.   Yes.

18      Q.   If a Docs Done Right employee entered a document

19  on behalf of a consumer, would they know that that was,

20  you know, the correct document associated with that

21  consumer, generally?

22      A.   Would they know the document belongs to the

23  consumer; is that what you're saying?

24      Q.   Would they -- would they -- yeah.  Would

25  they -- you know, if Joe Smith submitted an application,

1    and one of Docs Done Right's employees put Joe Smith's

2    application on to DebtPayPro, would they -- would they

3    know to correctly associate, you know, this document --

4        A.    Yeah.

5        Q.    -- from Joe Smith?

6        A.    I believe so.

7        Q.    So, in general, is this DebtPayPro database, you

8    know, was it a trustworthy source of information for the

9    company?

10       A.    That was what it was designed to be, yes.

11       Q.    And you -- and Docs Done Right trusted it; is

12   that correct?

13       A.    Yes, we did.

14       Q.    And it was -- in your view, was it an accurate

15   record of Docs Done Right's activities?

16       A.    It's only as accurate as the people entering the

17   information.

18       Q.    Generally speaking, did the people enter

19   information into it accurately for Docs Done Right?

20       A.    There was no reason for them to purposely enter

21   inaccurate information.  That would only make their job

22   harder.

23       Q.    We spoke briefly about the call notes on

24   DebtPayPro.  I think you -- correct me if I'm wrong, but

25   I believe you testified that you're familiar that that

Page 114

1   was a function of DebtPayPro, the call notes?

2       A.   Yeah, but I don't think we utilized it.

3       Q.   You don't believe DebtPayPro -- or, sorry, you

4   don't believe Docs Done Right used the call note

5   function?

6       A.   When you say call note, are you talking about

7   logging as far as an inbound or an outbound phone call?

8       Q.   Well, what kinds of notes -- go ahead.

9       A.   If we made an inbound call, we would notate the

10  conversation to DebtPayPro.

11      Q.   And if -- if Docs Done Right received a call

12  from a consumer, would that be noted in DebtPayPro?

13      A.   I think that's what I just said.  If we received

14  an inbound call, we would notate the conversation.

15      Q.   Ah, got it, inbound call.  So if Docs Done Right

16  made an outbound call to a consumer, would that be noted

17  in DebtPayPro?

18      A.   It's supposed to be, yes.

19      Q.   Was making notes about calls with consumers

20  essentially a kind of regular part of what Docs Done

21  Right employees did?

22      A.   Yes.

23      Q.   And those notes would generally be made by the

24  employee who spoke to the customer, I think you

25  testified; is that correct?

Page 115

1      A.    Yeah.  Yes.

2      Q.    Why did Docs Done Right make notes about calls

3  with customers?

4            MR. HOLT:  Let me just object.  It's

5  argumentative as phrased.

6            Go ahead, Ed.

7            THE WITNESS:  It was beneficial to us, to be

8  efficient, that we knew the last conversation we had with

9  the consumer.  In case they ever called us back or we

10  needed to follow up with them, the next customer service

11  representative would be able to read the notation and

12  know where we left off as a company with the consumer.

13  BY MR. REARDON:

14      Q.    Did the Student Loan Debt Relief Defendants also

15  use that note function?

16      A.    I believe so.

17      Q.    Would -- would Docs Done Right employees be able

18  to see notes from the Student Loan Debt Relief Defendants

19  when they were looking at a customer's file?

20      A.    Sometimes.

21      Q.    Would they when the customer was one who had

22  completed the compliance project -- process?

23      A.    Yes.

24      Q.    Did DebtPayPro have functions that allowed Docs

25  Done Right and the Student Loan Debt Relief Defendants to

Page 116

1    track the status of consumer's payments?

2        A.   Yes.

3        Q.   Was that a function that the companies used?

4        A.   Yes.

5        Q.   Are you aware that Docs Done Right, in discovery

6    in this case, has produced data from DebtPayPro relating

7    to credit card transactions by consumers?

8        A.   If it's in the DebtPayPro database, yes.

9        Q.   Well, are you aware that early on in discovery

10   in this case Docs Done Right provided spreadsheets from

11   DebtPayPro customer transactions involving credit cards?

12       A.   Docs Done Right provided that to -- to you?

13       Q.   Yes.

14       A.   I don't remember that.  That would have been me.

15   I don't remember giving you a spreadsheet.

16       Q.   Well, you did.

17            But let me ask this a different way.  Did --

18       A.   When?

19       Q.   Let me just -- I'll get at this another way.

20            Did DebtPayPro allow the Student Loan Debt

21   Relief Defendants and Docs Done Right to track credit

22   card transactions?

23       A.   I believe so.

24       Q.   And were -- did the companies use DebtPayPro to

25   track the status of credit card payments?

1      A.   I believe so, for the most part.

2      Q.   And would the companies update DebtPayPro with

3   the status of a credit card transaction, you know, at the

4   time a card was charged?

5      A.   They're supposed to.

6      Q.   Was that the general practice?

7      A.   Yes.

8      Q.   And would the employees who updated that

9   information into DebtPayPro, would they typically be the

10  employees who actually charged the credit cards?

11     A.   I don't know.  I believe, unless the front end

12  told us, we assumed the payment went through.

13        So I believe there might be cases where the

14  client declined on their credit card, and the debt relief

15  defendant failed to notify us.  We provided services even

16  though the client didn't pay because the debt relief

17  defendant maybe didn't notify us.

18     Q.   Would the company in that circumstance -- you

19  know, would someone reach out to the consumer to try and

20  get them to charge their credit card?

21     A.   If we were notified that the payment declined,

22  yes, we would.

23     Q.   And would that get noted in DebtPayPro?

24     A.   If it was handled by us, yes.

25     Q.   So if I understand you correctly, there may have

Page 118

1   been some circumstances in which the credit card was

2   declined but Docs Done Right never found out about it; is

3   that correct?

4       A.   Yeah, we -- yes, we were never notified.

5       Q.   How frequently did that occur?

6       A.   I don't know, but I do recall that at least a

7   couple times those debt relief defendants thought they

8   could do a better job of collecting on credit cards, and

9   they were trying to call on them without us.

10      Q.   I see.

11           Would those companies update DebtPayPro with the

12  credit card payment status?

13      A.   They were supposed to.

14      Q.   Did they generally do that?

15      A.   I don't know.  There was an issue where my

16  recollection is they didn't do a good job of notifying

17  us, and we ended up doing work for free because the

18  client never paid, but I don't remember how many of that.

19      Q.   Would that have just been a few instances or --

20      A.   Yes.

21      Q.   Like more than 10?  Less than 10?

22      A.   I don't know.

23      Q.   But it sounds like it was rare?

24      A.   Yes.

25      Q.   Did all employees of Docs Done Right have access

Page 119

1   to DebtPayPro?

2       A.   Yes.

3       Q.   We covered this a little bit earlier, but did

4   you, as the manager of DebtPayPro, have access to any

5   kind of special functions of DebtPayPro that we haven't

6   covered yet?

7       A.   Yes.  The reporting.  Oh, sorry, that we haven't

8   covered, no, not that I know of.

9       Q.   Yeah.  We talked about the reporting functions.

10          So we spoke earlier about the sort of process

11  that happened once the sale was completed and the events

12  that happened after that.  And if I understood you

13  correctly, there's sort of a series of steps that

14  happened.  And correct me if I get this wrong.

15      A.   Okay.

16      Q.   You know, when the consumer agreed to the sale,

17  they would sign a contract.  They would also complete a

18  compliance call.  And assuming they agreed to keep going,

19  they would at some point after that receive a welcome

20  e-mail in the mail or the welcome -- sorry -- they would

21  receive the welcome e-mail by e-mail or the welcome

22  letter in the mail; is that correct?

23      A.   And their documents.

24      Q.   And their documents.  Sorry.  So all of that

25  stuff would happen.

Page 120

1              How long, you know, from the time of the sale

2    and the compliance call did it take for the welcome

3    e-mail packet or the welcome mail packet to be sent?

4         A.   I believe it was same day.

5         Q.   And then I believe you testified earlier that at

6    least some consumers would send their application

7    documents back in, right?

8         A.   Yes.

9         Q.   About how long did that take?

10        A.   It was different per client.  There were some

11   clients that would take six months.  Others said, we

12   never submitted it, and they'd send it to us, and we'd

13   still help them.

14        Q.   Did the -- was there a typical return time?

15        A.   Not that I can recall, but -- no.  It was very

16   scattered.

17        Q.   And did Docs Done Right ask consumers to return

18   documents within a certain period of time?

19        A.   I'm not sure.  It sounds like a good idea

20   though.

21        Q.   If you look at -- back at the welcome letter

22   exhibit, Document 19.

23        A.   I'm sorry.  19.  Okay.  What part?

24        Q.   Was there anything in this kind of asking

25   consumers to return their application documents within a

Page 121

1    certain amount of time?

2        A.   I don't see it.  It says here that within five

3    to seven days they would get a courtesy call to confirm

4    that they got the package.

5        Q.   And did Docs Done Right --

6        A.   It says that --

7        Q.   -- make those courtesy calls?

8        A.   What's that?

9        Q.   Would Docs Done Right be the one that placed

10   that courtesy call?

11       A.   Yes.

12       Q.   All right.  So consumers at some point would

13   return these documents if they decided to proceed with

14   the services; is that correct?

15       A.   Yeah, it says here that it takes about 45 to

16   60 days to finalize when they submit it.

17       Q.   That was going to be my next question.

18            So once the consumer's application documents

19   were submitted to a student loan servicer, how long did

20   it take for those application documents to be approved?

21       A.   Apparently 45 to 60 days.

22       Q.   That was what the company told consumers?

23       A.   That's what it says right here.  I -- my memory

24   was 45 to 90 days.

25       Q.   So it could be a big range?

Page 122

1     A.   I think the range was mostly based on how

2    quickly the clients took care of it, or if they made a

3    mistake, or if they did it correctly, or if their hand

4    signature was hard to read.

5     Q.   Okay.

6     A.   We tried to leave the range as high as possible,

7    but...

8     Q.   And would it take about the same amount of time

9    for the consolidation and the loan repayment plans to be

10   approved?

11    A.   I think those are two different timelines.  One

12   goes before the other.  I believe consolidation goes

13   first.  And then, once consolidation is done, then the

14   repayment plan goes into effect.

15    Q.   All right.

16    A.   But this is supposed to encompass the whole

17   thing.

18    Q.   I see.  So at some point in the process the

19   consolidation application would get approved, if it was

20   approved.  And then later -- about how long later would

21   the repayment plan application get approved?

22    A.   I don't remember.  I just recall that there was

23   a two-part process on the servicer side.

24    Q.   So in some instances I think it could -- it

25   could take up to 90 days, as I believe you said; is that

Page 123

1   correct?

2       A.   I mean, it depends on the consumer.  Unless I

3   know when the client submitted it, I wouldn't really know

4   when to start the clock.

5       Q.   Uh-huh.  Are you familiar with forbearance?

6       A.   Yes.

7       Q.   What is forbearance on a student loan?

8       A.   It's a request requesting the stopping of

9   payments temporarily for their student loans.

10      Q.   And did the document preparation services

11  include preparing forbearance applications for consumers?

12      A.   Yes.

13      Q.   And how long did the companies -- or how long

14  was the forbearance request typically for?

15      A.   I don't remember.

16      Q.   Did it vary?

17      A.   I think so.

18      Q.   Why would it vary?

19      A.   It might have varied on the individual client's

20  request.

21      Q.   Was 90 days a common forbearance period?

22      A.   Possibly.

23      Q.   You're not sure?

24      A.   No.

25      Q.   So how long -- how did the forbearance work?

Page 124

1   Would -- suppose a consumer applied for a 90-day

2   forbearance.  Would their next student loan payment be

3   due on the 91st day or sometime after that?

4       A.   My understanding is that the purpose of the

5   forbearance is so the client would not have to have a

6   payment until the consolidation was approved and

7   processed and they had a new payment amount.

8            So the idea is that the client would have their

9   next payment with their student loans be whatever they

10  got approved for.

11      Q.   Right.  And what I'm trying to understand is how

12  long after the forbearance expired would the new payment

13  be due?

14      A.   I don't know.  That's between the client and

15  their servicer.

16      Q.   Docs Done Right didn't track that?

17      A.   No.

18      Q.   I'd like to introduce as Exhibit 22 a

19  forbearance request.

20  (Exhibit Number 22 was marked for identification.)

21  BY MR. REARDON:

22      Q.   Do you have that in front of you?  It was

23  Document E.

24      A.   Is it two pages long?

25      Q.   Yes.

Page 127

1    Q.   So did the Student Loan Debt Relief Defendants

2    track this in DebtPayPro?

3    A.   I don't know.

4    Q.   I think we talked earlier about the fees that

5    the customers paid to Docs Done Right -- or,

6    rather -- scratch that.

7         We talked earlier about the sales calls that the

8    Student Loan Debt Relief Defendants had.  Would consumers

9    agree to pay a fee during the sales call?

10   A.   They should have, yes, because we were going to

11   ask that question during our compliance call, if they

12   understand that that was the fee that was being paid to

13   their company.

14   Q.   That was a standard part of the sale?

15   A.   That was a standard part of the compliance call.

16   So I don't see how anybody would pass the compliance call

17   if they weren't made aware by their sales rep that they

18   were being charged a fee.

19   Q.   What were the Student Loan Debt Relief

20   Defendants' fees?

21   A.   It was the amount that they were charging that

22   they would collect to create revenue for their company.

23   Q.   And what were the amount of the fees that they

24   charged?

25   A.   My estimate is what I can give you.  I don't

Page 128

1    remember.  I believe it was around -- multiples of 599,

2    699 and 799, or 899, possibly.

3        Q.   Did those fees change over time?

4        A.   Yes.

5        Q.   Would consumers provide payment information

6    during a sales call?

7        A.   Would consumers provide -- I believe so.

8        Q.   For example, would they provide their bank

9    account information or credit card number?

10       A.   By the time the client was sent to compliance,

11   that information was in their contract, so I would deduce

12   yes.

13       Q.   And I think we talked about this earlier a

14   little bit in connection with the welcome letter, but

15   would the contract include a payment schedule?

16       A.   Yes.

17       Q.   I'd like to introduce as Exhibit 23 a -- an

18   example of a consumer contract.  This was Document F in

19   what we e-mailed earlier.

20       (Exhibit Number 23 was marked for identification.)

21            THE WITNESS:  Okay.

22   BY MR. REARDON:

23       Q.   This was an example of a consumer contract that

24   we received as part of the production that Docs Done

25   Right made from the DebtPayPro database, so it doesn't

Page 129

1    have a Bates number.

2         Do you recognize this as an example of the

3    agreements that the Student Loan Debt Relief Defendants

4    used?

5    A.   Yes.

6         MR. REARDON:  I'll note for the record that this

7    exhibit also has been redacted for certain EII of the

8    customer.

9    BY MR. REARDON:

10   Q.   This is -- do you see the name Secure

11   Preparation Services LP at the top of this agreement?

12   A.   Yes.

13   Q.   And we talked earlier about the other various

14   Student Loan Debt Relief Defendants.  Did they all use

15   the same standard agreement when they entered into

16   agreements with consumers?

17   A.   I believe so.

18   Q.   Did that agreement change over time?

19   A.   I believe so.

20   Q.   How did it change?

21   A.   I don't remember.  Those changes would have been

22   made by the LP.

23   Q.   From Docs Done Right's perspective, were any of

24   the changes significant in terms of how Docs Done Right

25   operated?

Page 132

1   useless, I believe.

2       Q.   Do you know whether the Student Loan Debt Relief

3   Defendants ever used this limited power of attorney for

4   any purpose?

5       A.   Not that I know of.

6       Q.   Did Docs Done Right ever rely on this limited

7   power of attorney to communicate with the servicer on

8   behalf of a consumer?

9       A.   I don't believe so.  We never used this.

10      Q.   Did Docs Done Right, just putting aside the

11  limited power of attorney, did it ever communicate with

12  student loan servicers?

13      A.   On a three-way call with the consumer, I believe

14  that happened sometimes.  The consumer would have to be

15  on the phone in order to be able to help them.

16      Q.   And what -- in what circumstances would those

17  three-way calls occur?

18      A.   If the client had misunderstanding of what was

19  going on with the payment, they hadn't received a

20  payment, they hadn't seen a change to their payment.

21           And, I mean, we'd try to explain it to them or,

22  you know, look at their mail, if they don't see anything.

23  Then we would go, okay, well, if you want, we can get in

24  the call with you, and we'll tell you who to talk to and

25  then ask them these questions.

Page 133

1          So it was kind of designed for problem solving,

2     after all the work was completed by us.

3          Q.   After the applications were --

4          A.   It was -- it was, I guess, really, to avoid a

5     situation where there's a refund.  It was to create

6     customer -- I don't know -- happiness?  I mean, it's to

7     keep them happy as a client.

8          Q.   Did consumers have the option to pay in a single

9     lump sum or in installments?

10         A.   I believe so.

11         Q.   So if a customer paid in a single lump sum, how

12    soon after their enrollment would they -- their fees be

13    charged?

14         A.   If a client would -- it would be charged in one

15    lump sum -- say -- I'm sorry, say that one more time.

16              MR. REARDON:  Could you read the question back.

17              (The reporter read back the requested portion.)

18              THE WITNESS:  It would vary from consumer to

19    consumer.  Whatever date they agreed to pay.

20    BY MR. REARDON:

21         Q.   Was there a typical timeline?

22         A.   I don't believe for ACH we could charge the same

23    day.  So it would be maybe three, four days later.  And

24    usually, the company wanted to charge them within

25    14 days.

Page 134

1      Q.   And that's for a single lump sum?

2      A.   That's for any particular payment.  Their first

3  payment could have been as early as a few days; but, for

4  the most part, they wanted to pay within 14 days -- their

5  first payment.

6      Q.   So when customers paid in installments, when

7  would the second or third payments be due?

8      A.   Whatever the agreed -- client agreed to.

9      Q.   Was there a typical timeline for that?

10     A.   I would see a lot of monthly payments.  So if

11  that was paid within 14 days, the next payment's probably

12  due the next month.

13     Q.   So just so I understand you, if a client can

14  pay -- paid the first payment after 14 days, the second

15  payment would be due 30 days after that, typically?

16     A.   You would start seeing monthly payments,

17  whatever date the client chose.

18     Q.   So would the second payment typically be, say,

19  you know, 14 plus a month, which is about 45 days out?

20     A.   I would believe so.  But, I mean, there's going

21  to be exceptions where a client wants to pay every two

22  weeks.  They could do that too.

23     Q.   If you wanted to determine how long after the

24  enrollment a consumer made their payment, would you use

25  DebtPayPro to determine that?

Page 135

1      A.    Yes.

2      Q.    And for Debt Pay Gateway, did Debt Pay Gateway

3   have -- track when consumers paid their fees?

4      A.    Yes, but I believe you use DebtPayPro to do

5   that.

6      Q.    So, essentially, the Debt Pay Gateway and

7   DebtPayPro were linked; is that right?

8      A.    Correct.

9      Q.    How soon after a consumer enrolled when they

10  paid by installments would their last payment be due of

11  their enrollment fee?

12     A.    It just varies.  I wouldn't be able to give a

13  perfect answer to that.

14     Q.    Was there --

15     A.    I can estimate.

16     Q.    What was your estimate?

17     A.    They would probably pay within 60 days to

18  90 days maybe.  60 to 90 days, they would pay their

19  payments.

20     Q.    Would a consumer generally pay all of their fees

21  before they began making payments under the -- kind of in

22  terms of their loan?

23     A.    Their first payment, I would -- I would say,

24  typically, yes, because, obviously, it takes about

25  45 days to get the -- their process completed once we'd

Page 136

1    send it to them.

2           But our fees were charged after we completed our

3    work.

4    Q.   So at least some of the fees the customer -- the

5    DebtPayPro -- sorry, scratch that.

6    A.   Debt Pay Gateway?

7    Q.   Well, scratch that.

8           Just let me see if I understand your testimony

9    correctly.  Docs Done Right, through Debt Pay Gateway and

10   working with the student loan debt relief companies,

11   would essentially charge the consumer's fee without

12   regard to kind of when the consumer's new loan payment

13   was due; is that correct?

14   A.   Correct.  Our fee was due after the document

15   preparation was prepared only.

16   Q.   So at least some of the time, in your view, the

17   consumer would pay their fee before the student -- the

18   new terms of their loan -- sorry, scratch that.

19          At least some of the time, Student Loan Debt

20   Relief Defendants would receive their fees before the

21   consumer made the first payment on the new terms of their

22   loans; is that correct?

23   A.   There was a reserve that Debt Pay Gateway kept.

24   So the money would go into that reserve, that -- whatever

25   you call it -- an escrow account, and that reserve was

Page 137

1   there to maintain based on volume or how many clients

2   they were enrolling.

3          So as far as when it was released to the sales

4   company, it usually would be once they reached that

5   escrow level that they needed to have.

6          Our payments being released to the sales company

7   was not based on the client having a new payment plan

8   with their servicer.  Our payments and fees were based

9   off of us preparing document preparation on behalf of the

10  client.

11         So we didn't correlate it, if that's what you're

12  saying.  And neither did Debt Pay Gateway.

13  Q.   I'm just trying to compare the two timelines

14  that we've been talking about.  One timeline is how long

15  it takes for customers' applications to get approved.

16  The other timeline is the -- how long it takes for the

17  companies to get their fees.

18         And what I want to know is did the -- did the

19  student loan debt relief companies receive customers'

20  fees before the consumers' applications were approved and

21  they began making payments under the new terms of their

22  loan?

23  A.   In order to do that, you would need to know when

24  the client started making payments on their new

25  programming.  We didn't measure that or track that, so

Page 138

1    it's not correlated in our system.

2            You would have to literally call each client and

3    say, hey, when did you make your first payment, so I

4    could answer that.

5        Q.    Well, I think you said before that the first

6    payment would typically be within 14 days; is that

7    correct?

8        A.    Correct.

9        Q.    So would the companies receive the result -- or

10   receive the proceeds of that first payment before the

11   customer began making payments under the altered terms of

12   their loans?

13       A.    One would assume that, but one doesn't know

14   that, unless you talk to the consumer, when they started

15   paying.

16       Q.    Are you aware of any consumers who would have

17   paid all of their fees or any part of their fees after

18   their loans -- loan applications were approved and after

19   they began making payments?

20       A.    I wouldn't know because I don't know when their

21   applications are approved.

22            I mean, the client wasn't -- a good majority of

23   clients wouldn't tell us that.  There was clients that

24   would call us and say, thank you, I got my new payment;

25   but, I mean, it's not something we tracked or measured.

Page 139

1    There was no field in DebtPayPro for that.

2        Q.   So if you wanted to find that information out,

3    you -- would you ask an individual consumer that?

4        A.   Correct.  And then hope that they remember when

5    they paid their first bill.  Or I guess you could ask the

6    servicer?

7        Q.   Now, we talked earlier about the forbearance

8    period.  And I think you didn't remember what the typical

9    forbearance period was, but was it the case that

10   customers would usually pay all of their fees before the

11   forbearance ended?

12       A.   I don't know about all their fees, but it was

13   not common for somebody to pay later than 14 days.  It

14   did happen, but most consumers paid their first payment

15   within 14 days.

16       Q.   And what about the second or third payment?

17       A.   As I said earlier, I mean, usually the next

18   month --

19       Q.   Would those --

20       A.   -- or the month after that.

21       Q.   Would those payments be charged before the

22   forbearance ended?

23       A.   It was not -- it was not correlated to

24   forbearances or schedules, so it's whatever the schedule

25   fee was in DebtPayPro.

Page 140

```
 1      Q.   But I think you said earlier that in some

 2  instances, for example, a second payment might be due

 3  45 days after enrollment?

 4      A.   Correct.

 5      Q.   Correct?  Is that --

 6      A.   Yeah, that money -- that money could have stayed

 7  in the escrow account, and that doesn't necessarily get

 8  released to the sales company.  That could be part of the

 9  money that stayed in escrow with Debt Pay Gateway.

10           Once they reach a certain amount of money in

11  their escrow, that reserve amount that we felt

12  comfortable was enough, then anything above that escrow

13  level would start being released to the company.

14      Q.   Let's talk about how the escrow payments worked.

15           So, just so we're on the same page, when you say

16  escrow, we're referring to Debt Pay Gateway's accounts?

17      A.   Yeah.

18      Q.   So what was the process when a customer paid by

19  ACH?  How did Debt Pay Gateway receive its fees, and how

20  did those fees reach the student loan debt relief

21  companies and Docs Done Right?

22      A.   Debt Pay Gateway had a contract that the client

23  signed as part of their enrollment process with the debt

24  relief company.  Debt Pay Gateway would review that that

25  contract was signed, and then they would -- they would
```

Page 141

1    charge the client on the date that was scheduled.

2           I believe the reason they didn't charge same day

3    is that Debt Pay Gateway wanted to have enough time to

4    review that the contract was signed by the consumer and

5    assign them their account, whatever their process is.

6           Once Debt Pay Gateway received their money, they

7    would then disperse a payment to themselves, a payment to

8    us, and a payment to the debt relief defendants.

9    Q.    And how long did the consumer's funds stay in

10   Debt Pay Gateway's account?

11   A.    That's difficult to ascertain because I would

12   say that in the very beginning of the company's creation,

13   debt relief defendant, all the payments start going into

14   the reserve.  It doesn't get released to them right away

15   until they hit a certain amount of escrow.

16          Once they start enrolling more consumers, the

17   escrow would grow because there's more client liability

18   out there, and then they would grow the reserve.

19          So it just depends on when that client signed

20   up.  If a client signed up on a day that the escrow got

21   increased, that client's money is sitting in escrow.  It

22   could be for a year.  It could be for a week or a month.

23   It all depends on when did they -- when did they join, at

24   the time of growth for that company or at a time of

25   shrinkage of that company.

Page 142

1    Q.   Is that something that Docs Done Right monitored

2    at the time?

3    A.   The escrow?  The reserve, you mean?

4    Q.   Yeah.

5    A.   Yeah.  The reserve was a calculation based off

6    of volume from each affiliate.

7         Debt Pay Gateway gave us an equation of how much

8    needed to be in reserve as a minimum requirement.  My

9    goal was -- what I did is I went above and beyond that

10   goal that they told me for each company.

11   Q.   So if you wanted to understand how long a

12   consumer's funds stayed in those Debt Pay Gateway

13   accounts, what would you do?

14   A.   I would talk to Debt Pay Gateway and ask them

15   that question to confirm.  I mean, I'm sure there was a

16   transaction showing the payment, and then there is a

17   disbursement going to whoever it belongs to because of

18   that payment.  And some clients' money is staying in

19   reserve, and some clients' money is being disbursed

20   because that level reserve has been met.

21   Q.   So you think that Debt Pay Gateway's records

22   would be --

23   A.   More helpful -- well, I'd have to go to them

24   anyways, if I wanted to figure that out.  But it grew

25   little bit little.  I mean, it was -- that reserve would

Page 143

1    be grown every week sometimes, as a precaution, because

2    affiliates, not just the defendants, but anybody that

3    went through Docs Done Right, we didn't want to be in a

4    position where a client was upset a year later, and there

5    wasn't funds to give them back their money.

6        Q.   Was there some condition or event that would

7    trigger the disbursement from Debt Pay Gateway to the

8    Student Loan Debt Relief Defendants and Docs Done Right?

9        A.   Not that I know of.

10       Q.   And so it wasn't based on the, say, approval of

11   the consumer's application for consolidation?

12       A.   Debt Pay Gateway was willing to do it off of us

13   doing the work first, and the work that we did was doc

14   prep.  So they were comfortable with disbursing the money

15   any time after it cleared.  Because we would do the work

16   first and then charge them.  There was never an instance,

17   according to Debt Pay Gateway, where we didn't charge our

18   fees after the fees were earned.

19       Q.   If I understand you correctly, you're saying

20   that Debt Pay Gateway essentially agreed with Docs Done

21   Right that its fees were earned once the document

22   preparation was completed; is that correct?

23       A.   That's what I'm -- yes.

24       Q.   And so Debt Pay Gateway didn't wait to receive

25   any kind of confirmation that the documents were actually

Page 148

1      Q.   And I'll explain what this document is.  This is

2   something that the Bureau put together for today's

3   deposition.  As we said before the break, we received

4   data from Debt Pay Gateway that was transaction data as

5   part of our investigation, and that was produced as part

6   of the productions to Docs Done Right.

7           So the first four columns on here all come

8   directly from the data that we received from Debt Pay

9   Gateway, and then the last column is one that the Bureau

10   created based on that information we received.

11           I want to ask you kind of first, you know, you

12   said earlier that Debt Pay Gateway and DebtPayPro were

13   linked; is that right?

14      A.   That's my understanding.

15      Q.   Did Docs Done Right and the student loan debt

16   relief companies use individual customer numbers in the

17   DebtPayPro system?

18      A.   Yes.

19      Q.   So the Debt Pay Gateway data that the Bureau

20   received had individual customer numbers, and it also had

21   company names, and it had enrollment date fields and date

22   fields for when a first disbursement was made from Debt

23   Pay Gateway to one of those companies.  So that's what

24   you're seeing on this chart.

25      A.   Okay.

Page 149

1    Q.   Was a customer's enrollment date something that

2    was tracked in DebtPayPro?

3    A.   Yes.

4    Q.   So -- so when we got this data, we took a look

5    at it, and we created that days between column on the

6    right-hand side.  Do you see that?

7    A.   The days between?

8    Q.   Yeah.  And we just chose a bunch of examples

9    from the Student Loan Debt Relief Defendants' data, you

10   know, over a period of time and compared their enrollment

11   date and the first disbursement date.  And the typical

12   amount of time -- you know, it varied a bit, but it was

13   often in the teens or 20s in terms of how many days it

14   took.  Is that consistent with your understanding of how

15   long it took for the companies to get the fees disbursed?

16   A.   This is showing disbursement to where, though?

17   Q.   To one of the Student Loan Debt Relief

18   Defendants.

19   A.   So it would go to the account that holds the

20   reserve; is that what you mean?

21   Q.   Our understanding is that this -- the

22   disbursement dates represent when -- I'm sorry, when Debt

23   Pay Gateway took a consumer's fees that were held in the

24   escrow account and disbursed it to one of the Student

25   Loan Debt Relief Defendants.

Page 151

1    we're trying to use this exhibit to see if -- if it kind

2    of refreshes your recollection of how this process

3    worked, so --

4        A.    What I believe you're looking for is debit date,

5    not disbursement date, the date that Debt Pay Gateway

6    charged the consumer.

7              How long Debt Pay Gateway kept it and then put

8    it into another account, that's different than the date

9    that the money dropped into the actual companies.

10             Each company had their own reserve based on

11   volume.

12       Q.    Yeah, I'm not asking about the reserve.

13             I'm just trying to ask, from the time that a

14   consumer initially enrolled to the time that Debt Pay

15   Gateway eventually made a disbursement, the first

16   disbursement to the Student Loan Debt Relief Defendant,

17   how long did that take?

18       A.    I don't know.  I don't know because I believe

19   these dates are disbursement to an escrow account, not

20   the date that it's given to the defendant.

21       Q.    I understand --

22       A.    But I don't know.

23       Q.    -- you're not familiar with this data.  We --

24   based on information that you don't have, I don't believe

25   that what you're saying is correct, but we can move on.

Page 152

1   All I want is what your understanding is of how long it

2   took.

3       A.   The client would get changed [as spoken] within

4   14 days.  This looks like it parallels with the client

5   being charged within 14 days.

6       Q.   And then it took some amount of time after the

7   charge to disburse to the document preparation company's

8   bank account; is that right?

9       A.   Probably, yes.

10      Q.   And do you know how long that was, typically?

11      A.   No.

12      Q.   Is that something that could be figured out by

13   looking at the Debt Pay Gateway data?

14      A.   Yes.  Yes.

15      Q.   We spoke a bit earlier about -- you can put that

16   exhibit to the side.

17           We spoke a bit earlier about credit card

18   payments, and I just want to make sure I have down the

19   process for that.

20           What was the process for collection of a

21   consumer's fee when a consumer paid by credit card?

22           MR. LEPISCOPO:  Objection, lacks foundation,

23   vague and ambiguous, and overbroad.

24           THE WITNESS:  I believe the student loan debt

25   relief company would use a merchant to process that

Page 153

1   payment.

2   BY MR. REARDON:

3       Q.   They had a merchant account or access to

4   merchant accounts?

5       A.   I believe so.

6       Q.   Who controlled the merchant accounts?

7       A.   I don't know.

8       Q.   Did Mohamed Hegazi have a merchant account that

9   he let the Student Loan Debt Relief Defendants use?

10          MR. LEPISCOPO:  Objection, asked and answered.

11          THE WITNESS:  Yeah, I'm not a hundred percent

12   sure.

13   BY MR. REARDON:

14      Q.   Do you have any knowledge about a merchant

15   account that Frank Sebreros used?

16      A.   My understanding is that Mohamed Hegazi helped

17   them identify and find merchant accounts, but I do not

18   know who owned them or who was in charge of them.

19      Q.   And I believe you testified earlier that the

20   Student Loan Debt Relief Defendant would be the one who

21   charged the credit card, not Docs Done Right; is that

22   correct?

23      A.   Yes.

24      Q.   And do you know how soon after a consumer's

25   enrollment a credit card was charged?

Page 154

1        A.   I would assume they'd charge them on a date that

2    they agreed with the consumer to charge them on.

3        Q.   And was there a typical amount of time for that?

4        A.   I don't know.  It would be on -- the schedule

5    would show it on DebtPayPro.

6        Q.   So that information would be on the consumer's

7    payment schedule; is that part of what you're saying?

8        A.   Yes.

9        Q.   And that information would also be tracked in

10   DebtPayPro; is that right?

11       A.   Yes.

12       Q.   When a consumer paid by credit card, would they

13   have their credit card charged before they began making

14   payments under the new terms of their student loans?

15            MR. LEPISCOPO:  Objection, calls for

16   speculation, lacks foundation, overbroad, and ambiguous.

17            MR. HOLT:  Join.

18            THE WITNESS:  I don't know, but it would be a

19   similar answer as to what I said regarding ACH payments.

20   I mean, it wasn't correlated.  It was based off of us

21   doing the doc preparation work, and then they should be

22   charging their fee.

23            So we wouldn't know unless we talked to each

24   consumer when their payments started.

25   BY MR. REARDON:

Page 165

1     Q.   I think you testified earlier that the Student

2  Loan Debt Relief Defendants had sales calls; is that

3  right?

4          MR. LEPISCOPO:  Objection, asked and answered,

5  calls for speculation.

6          THE WITNESS:  Can you repeat the question?

7          THE REPORTER:  Do you want me to read it back?

8          MR. HOLT:  Yes, please.

9          (The reporter read back the requested portion.)

10         THE WITNESS:  Yes.

11 BY MR. REARDON:

12    Q.   Now we're talking about the fees -- charging

13 process and the fees that the Student Loan Debt Relief

14 Defendants charged for a long time.

15         Does Docs Done Right have any other knowledge

16 about the fees or how the fees were charged?

17    A.   Not that we already mentioned.

18    Q.   Does Docs Done Right have any other knowledge

19 about the timing of when fees were charged that we

20 haven't covered already?

21    A.   No.

22    Q.   Does Docs Done Right have any knowledge about

23 its policies regarding the TSR advanced fee rule that we

24 haven't covered already?

25    A.   I don't think so.

Page 166

1    Q.   Do you want to think about that?  Is there

2  anything else about the TSR that we should know from Docs

3  Done Right?

4    A.   Not that I can think of.

5    Q.   All right.  I'd like to switch gears and talk

6  about topic seven in the deposition notice, if you have

7  that handy, which is, "Docs Done Right's policies and

8  procedures for receiving, tracking, responding to, and

9  resolving complaints and refund requests made by

10  consumers of the Student Loan Debt Relief Defendants."

11        Do you see that?

12    A.   Yes.

13    Q.   We talked a little bit earlier about consumer

14  complaints, but, just so the record is clear, did Docs

15  Done Right handle consumer complaints on behalf of the

16  Student Loan Debt Relief Defendants?

17    A.   Yes.

18    Q.   What were Docs Done Right's procedures for

19  handling consumer complaints?

20    A.   Make contact with the consumer and have the

21  conversation with them and figure out what's the best way

22  to resolve it with each client.

23    Q.   Would that usually be over the phone?

24    A.   Yes.

25    Q.   And what would Docs Done Right do to try and

Page 167

1    resolve the consumer's complaint?

2        A.    Correct whatever the client is upset about.  And

3    if it's not correctable, up to give a full refund.

4        Q.    How did Docs Done Right initially receive

5    consumer complaints?

6        A.    Mostly over the phone.

7        Q.    Was that the most common way?

8        A.    Yes.

9        Q.    Did Docs Done Right also receive consumer

10   complaints by e-mail?

11       A.    I believe so.

12       Q.    Did Docs Done Right receive consumer complaints

13   at the docs@clientenrollment e-mail address that we

14   talked about earlier?

15       A.    I'm not sure.

16       Q.    Did Docs Done Right receive consumer complaints

17   from the Student Loan Debt Relief Defendants?

18       A.    We would.

19       Q.    And then what would happen when you received

20   them -- a complaint from a Student Loan Debt Relief

21   Defendant?

22       A.    We would reach out to the consumer and try and

23   solve it.

24       Q.    And how would the Student Loan Debt Relief

25   Defendant tell Docs Done Right that there was a consumer

Page 184

1    investigate what Docs Done Right knew about the Student

2    Loan Debt Relief Defendants' representations to consumers

3    about getting a lower interest rate?

4        A.   I don't even know how to go about that.  Those

5    companies are closed.  I'd have to call them and ask

6    them, did you guys do this?

7        Q.   Did you look at any records in DebtPayPro about

8    that?

9        A.   No.

10       Q.   Did you look at any e-mails about that?

11       A.   No.

12       Q.   Did you look at any other discovery in this case

13   about that?

14       A.   No.

15       Q.   Do you have any knowledge about what --

16       A.   You're talking about question number eight,

17   right, lowering interest rates.

18       Q.   We're now on topic number eight, yes.

19            What knowledge to have about --

20       A.   No, just everybody cut out.  Hello?

21            MR. HOLT:  Yeah, I can hear you, Ed.

22            MR. REARDON:  Can you hear me?

23            THE DEFENDANT:  Yeah, I just asked, you're

24   talking about question number eight, lowering interest

25   rates, right?

Page 185

1  BY MR. REARDON:

2      Q.   Yep.

3      A.   Yeah.  Now repeat your question.  You

4  disappeared for a bit.

5      Q.   Yeah.  What did the Student Loan Debt Relief

6  Defendants tell consumers about receiving a lower

7  interest rate through their services?

8      A.   I don't know.

9      Q.   Did the Student Loan Debt Relief Defendants

10  represent that consumers would receive a lower interest

11  rate on their federal student loans by consolidating?

12          MR. LEPISCOPO:  Objection, calls for

13  speculation, lacks foundation, overbroad, and vague and

14  ambiguous.

15          THE WITNESS:  I don't know.

16  BY MR. REARDON:

17      Q.   We talked earlier about how consolidating works

18  and student loan consolidations.  What is the

19  effect -- are you -- is Docs Done Right familiar with the

20  effect of student loan consolidation on a student's

21  interest rate?

22      A.   I believe so.

23      Q.   And how did -- at the time, what was the effect

24  of consolidating on a student's interest rate?

25      A.   It's the weighted average of

Page 186

1   whatever -- whatever interest rates they have.

2       Q.   So that means, essentially, that they would be

3   at a blended rate, a single rate that was an average of

4   their existing interest rates; is that right?

5       A.   Which would equal -- which would equal no

6   change, up or down, correct.

7       Q.   And at the time -- did consumers

8   receive -- well, scratch that.

9            Was Docs Done Right also familiar with an

10  interest rate reduction that was available when consumers

11  signed up for automated payments?

12      A.   Say that again.

13      Q.   Was Docs Done Right familiar with the

14  possibility that consumers could receive an interest rate

15  reduction on their student loans by signing up for auto

16  pay on their student loans?

17      A.   Yes.

18      Q.   Docs Done Right was familiar with that at the

19  time, correct?

20      A.   Yes.

21      Q.   And was it the case at the time that a consumer

22  who signed up to auto pay their student loans could

23  receive an interest rate reduction?

24           MR. LEPISCOPO:  Objection, calls for speculation

25  and asks for a legal conclusion.

Page 187

1              MR. HOLT:  Join.

2              THE WITNESS:  I have to switch off my headsets.

3    They just died.

4              Hello?  Can you hear me?

5              MR. HOLT:  Okay.  We can hear you.

6              THE WITNESS:  Can I get the chargers -- the

7    chargers for that -- the head set real quick?

8              (Discussion off the record.)

9              THE WITNESS:  Can you repeat the last question

10   he gave me?

11             (The reporter read back the requested portion.)

12             THE WITNESS:  I believe so.

13   BY MR. REARDON:

14       Q.   What was the amount of the reduction that

15   consumers were able to receive?

16       A.   I don't remember.

17       Q.   Did a consumer need to consolidate their student

18   loans to get that interest rate reduction?

19       A.   I don't believe so.

20       Q.   Did the Student Loan Debt Relief Defendants ever

21   represent to consumers that they needed to consolidate in

22   order to get that interest rate reduction?

23       A.   I don't believe so.  I don't know.

24       Q.   So which is it, you don't know or you don't

25   believe so?

Page 188

1      A.   I'd say I don't know.

2      Q.   At the time, what did Docs Done Right know about

3   what the Student Loan Debt Relief Defendants told

4   consumers about receiving a lower interest rate?

5      A.   All we knew was what we did on the compliance

6   call.  Those were the only questions we covered.

7      Q.   Did the compliance call cover statements about

8   interest rates?

9      A.   I don't believe we ever received complaints to

10  the level that we needed to do that.

11     Q.   So interest rates was never part of the

12  compliance call; is that right?

13     A.   I don't believe so.

14     Q.   Was Docs Done Right at the time familiar with

15  the direct mail marketing letters that the Student Loan

16  Debt Relief Defendants used?

17     A.   At the time, no.

18     Q.   Did Docs Done Right ever review those marketing

19  letters when it started working with the Student Loan

20  Debt Relief Defendants?

21     A.   I don't remember.

22     Q.   Did consumers ever reference those direct mail

23  marketing letters and complaints that Docs Done Right

24  handled?

25     A.   I don't believe so.

Page 207

1      Q.   It should be four pages.  Do you have that?

2      A.   Yeah.

3      Q.   As we discussed earlier, Docs Done Right

4  provided the database from DebtPayPro to the Bureau, and

5  the Bureau has been reviewing client notes that were

6  produced to us.

7           So I just -- and the Bureau used those client

8  notes to create all of the information that appears on

9  this document.  This is all excerpted from files that

10 Docs Done Right provided us that had the name client

11 notes files.

12          MR. HOLT:  Okay.  So this is a document that the

13 Bureau has put together?

14          MR. REARDON:  Correct.  It's all based on

15 information that was included in the files we received

16 from the DebtPayPro database.

17 BY MR. REARDON:

18     Q.   We talked earlier, Ed, about how customers had a

19 unique number.  Do you recall that?

20     A.   Sure.

21     Q.   So we included the unique number field.  We also

22 included the created at field, which had dates in it.  Do

23 you see that?

24     A.   Yeah.

25     Q.   Was it possible in DebtPayPro to see the date in

Page 208

1    which a note was created?

2         A.   Yes.

3         Q.   And we also included on this exhibit the created

4    by field.  Was it possible in DebtPayPro to see what

5    person created a note?

6         A.   Yes.

7         Q.   If you'll look at the created by field, do you

8    recognize the names in that column as names of former

9    employees of Docs Done Right?

10        A.   Yes.

11        Q.   So Mariza Duarte, was she a former employee?

12        A.   I believe so.

13        Q.   Was Nicole Garcia?

14        A.   Yes.

15        Q.   Was Genessee Mauras?

16        A.   Yes.

17        Q.   Was Andrea Velazquez?

18        A.   I believe so.

19        Q.   Was Irza Diaz?

20        A.   Yes.

21        Q.   And was Brandon Granados?

22        A.   Yes.

23        Q.   Were any of those employees supervisors?

24        A.   I don't remember.

25        Q.   Was Genessee Mauras a supervisor?

Page 209

1       A.    I believe so.

2       Q.    I'd like to walk through these notes one by one.

3             If you look at the first one, it was created in

4    February 2016, by Mariza Duarte.  Would you just review

5    the note.

6       A.    Okay.

7       Q.    This appears to be an e-mail that was uploaded

8    into DebtPayPro.  Do you see that?

9       A.    Yes.

10      Q.    And you said earlier that there was a way to

11   upload e-mails into DebtPayPro to store them?

12      A.    Yes.

13      Q.    The consumer -- what do you understand this

14   consumer's complaint to be based on reading this e-mail?

15      A.    I don't know enough about this client to know

16   what's going on.  None of it makes sense to me.

17      Q.    If you look at the second sentence, it says,

18   "The results of your action have not reduced my balances

19   of interest rates."

20      A.    Yeah.

21      Q.    Which may be a typo for or.

22            It appears that the client in this e-mail is

23   complaining about not getting a lower interest rate.  Do

24   you see that?

25      A.    Yes.

Page 237

1      Q.   Part of the DebtPayPro, you mean?

2      A.   Yeah -- no, never mind.  I don't -- I don't

3   know.

4      Q.   Do you recognize DocuPrep Center's kind of name

5   and logo in the upper right hand of this document?

6      A.   Yes.

7      Q.   And the title of this document is a Student Loan

8   Advisor Script.  Did the DocuPrep Center refer to its

9   sales representatives as student loan advisors?

10      A.   Okay.

11      Q.   That's a question.

12      A.   Oh.  Yes.

13      Q.   Do you know why those sales representatives were

14   called student loan advisors?

15           MR. HOLT:  It calls for speculation.

16   Argumentative as phrased.

17           THE WITNESS:  Sorry, guys, I got cut out.  I'm

18   back.

19   BY MR. REARDON:

20      Q.   Do you know why the sales representatives were

21   called student loan advisors?

22      A.   No, I do not.

23      Q.   I'd like you to turn to page eight of this

24   document.

25           MR. HOLT:  Colin, this is Exhibit 29, right?

Page 238

1        MR. REARDON:  Yes.  It's --

2        MR. HOLT:  This has -- this has a Bates stamp

3    starting of ML and then 4737 through --

4        MR. REARDON:  That's correct.  That's correct.

5        MR. HOLT:  -- through 4747?

6        MR. REARDON:  Yes.

7        MR. HOLT:  So this is a document you got from

8    Monster Loans, I take it?

9        MR. REARDON:  That's right.

10       THE WITNESS:  Well, it doesn't say page eight.

11   Can you tell me the last four numbers of that page?

12   BY MR. REARDON:

13       Q.   The ML Bates number is 4744.

14       A.   Okay.

15       Q.   I'd like -- do you see that page?

16       A.   Okay.

17       Q.   I'd like to draw your attention to the statement

18   in the middle of that page that has the number one in

19   front of it, and it says, "Improved Credit."  Do you see

20   that?

21       A.   Okay.  Yes.

22       Q.   That statement says, "Improved Credit.

23   According to the Fair Credit Reporting Act (FCRA) the

24   rules and law that govern how credit reporting companies

25   report and generate your three digit credit score, having

Page 239

1    multiple trade line items will impact your credit score

2    negatively when compared to a profile with fewer trade

3    lines.

4         "Therefore, through this consolidation process

5    we will be reducing your trade lines and you will not

6    appear overextended."

7         Is that a statement you've seen or heard before?

8    A.   No.

9    Q.   Was Docs Done Right familiar with that statement

10   at the time?

11   A.   I don't believe so.

12   Q.   Do you know whether this statement was made to

13   customers of DocuPrep Center?

14   A.   I do not.

15   Q.   Do you know whether this statement was truthful?

16   A.   I don't believe that's truthful.

17   Q.   Why do you say that?

18   A.   Because I don't believe that's correct.

19   Q.   Well, how come?

20   A.   I don't think FCRA says that.

21   Q.   Okay.  Any other reason for thinking this wasn't

22   truthful?

23   A.   I don't believe that the number of trade lines

24   affects you compared to how much you owe.

25   Q.   I know you said you weren't aware of this

Page 240

1    statement.  I assume you were also not aware of any

2    efforts by DocuPrep Center to verify whether this

3    statement was true?

4        A.   No.

5             MR. HOLT:  Let me just object.  It's

6    argumentative, and it assumes facts not in evidence,

7    lacks foundation.

8             THE WITNESS:  My answer is no.

9             MR. HOLT:  I know -- I know you're tired, Ed,

10   but just kind of --

11            THE WITNESS:  Sorry, I'll wait.

12   BY MR. REARDON:

13       Q.   I'd like to go back to an earlier exhibit that

14   we talked about, which is Exhibit Number 27.  That would

15   be Frank Sebreros' e-mails that we looked at.

16       A.   This one?

17       Q.   Yes.

18       A.   Okay.

19       Q.   As you may recall, the -- this e-mail references

20   a meeting with the back end.  And then the paragraph that

21   we talked about earlier says, "Specifics, do not get into

22   specifics.  You cannot quote someone on interest rates or

23   make up fake numbers about credit scores going up.  Yes,

24   this can increase credit score," and then it goes on to

25   say, "but stay out of quoting specific numbers.  This is

Page 253

1          THE WITNESS:  No.

2   BY MR. REARDON:

3       Q.   You're not aware of any efforts like that?

4       A.   No.

5       Q.   Do you think that Docs Done Right should have

6   done more to try to stop the Student Loan Debt Relief

7   Defendants from making statements about improved credit

8   scores?

9          MR. HOLT:  Objection.

10          MR. LEPISCOPO:  Objection.

11          MR. HOLT:  Argumentative, lacks foundation, it's

12   vague and ambiguous.

13          MR. LEPISCOPO:  Calls for speculation, and also

14   is irrelevant.

15          THE WITNESS:  If I was made aware that somebody

16   was saying that they can improve their credit score, that

17   is something I would have brought up to their sales

18   floor.

19          If it happened, I probably would have notified

20   them.  I just don't remember doing it because it's been a

21   while.

22   BY MR. REARDON:

23       Q.   Does Docs Done Right have any further knowledge,

24   beyond, you know, what you've already said, about

25   statements that the Student Loan Debt Relief Defendants

Page 254

1   made about consumers receiving improved credit scores?

2       A.   No.

3       Q.   Does Docs Done Right -- scratch that.

4            Does Docs Done Right have any further

5   information about what consumers said in complaints about

6   being told that they would receive a higher credit score?

7       A.   If it does, it would be in the CRM.

8       Q.   I'd like to transition to topic 10 in the

9   deposition notice, which was, "DocuPrep Center's

10  representations to consumers concerning the Department of

11  Education becoming the 'new servicer' on student loans,

12  including Docs Done Right's knowledge of those

13  representations and consumer complaints."

14           We talked about this earlier in the day, but

15  what is a student loan servicer?

16      A.   I believe it's a company picked by the

17  Department of Education to service the loans.

18      Q.   Would a servicer do things like send customers

19  bills?

20      A.   Yeah.  Process their payments.

21      Q.   Would a servicer also handle things like

22  consolidations or changing payment plans?

23      A.   Correct.

24      Q.   Did DocuPrep Center tell consumers during sales

25  calls that the U.S. Department of Education would become

Page 255

1   the new servicer on a consumer's loans after the consumer

2   consolidated their loans?

3       A.   Not that I know.

4       Q.   Did you -- scratch that.

5           Not that you know now, or not that you ever

6   knew, or what do you mean?

7       A.   I didn't manage their sales floor.  I wasn't on

8   their sales -- I didn't -- I wasn't there for their

9   sales, just whatever happened to compliance.

10      Q.   Do you have any memory of that statement being

11  made?

12      A.   I have a memory that we put something in the

13  compliance call that the client understands that we're

14  not a servicer and we're not the Department of Education.

15  Because there was confusion between servicing and

16  Department of Education at one point, and that question

17  was entered into the compliance call.

18      Q.   Let me ask you this, did the DocuPrep Center say

19  negative things about student loan servicers in their

20  sales calls?

21      A.   I believe so, yes.

22      Q.   Do you know why they did that?

23          MR. LEPISCOPO:  Calls for speculation.

24          THE WITNESS:  Probably to make a sale.

25  BY MR. REARDON:

Page 256

1    Q.    How was that helpful in making a sale?

2    A.    In my opinion?  I don't know how it's helpful in

3  making a sale, but I would believe that they think that

4  they needed to make a villain out of whoever the client

5  was being serviced by.  And they probably thought that it

6  would be good to make the client feel that, by signing up

7  with them, they would have a new servicer.  They could

8  switch their servicer.

9    Q.    When a consumer consolidates their loan, what

10 happens to their student loan servicer?

11   A.    What do you mean?

12   Q.    Does the student -- when a consumer consolidates

13 their loan, do they receive the Department of Education

14 as the new servicer on their loan?

15   A.    No.

16   Q.    Did -- what happened?  Did their loan stay with

17 the student loan servicer?

18   A.    If the client chose to keep the same servicer,

19 then yes.  If the client switched to a different

20 servicer, then no.

21   Q.    So, regardless, the consumer would stay with

22 some student loan servicer; is that right?

23   A.    A servicer, yes.

24   Q.    We spoke earlier about how Docs Done Right

25 applied to Debt Pay Gateway for payment processing.  Do

Page 257

1    you recall that?

2        A.   Yes.

3        Q.   And I believe you said that as part of that

4    process Docs Done Right submitted a call script to Debt

5    Pay Gateway.  Do you recall that?

6        A.   I was reminded of that by you, yes.

7        Q.   Was that what, in fact, happened?

8        A.   Yes.

9             MR. REARDON:  I'd like to mark as Exhibit 31 a

10   document that has the Bates number CFPB-EM-0001869 in the

11   lower right-hand corner.

12        (Exhibit Number 31 was marked for identification.)

13            MR. REARDON:  It also has an additional Bates

14   number of 0000140 in the lower right-hand corner.

15            THE WITNESS:  I only show the 140 number.

16            MR. REARDON:  Okay.  Well, I'll use that number

17   when we're talking about the exhibit.

18            THE WITNESS:  Okay.

19   BY MR. REARDON:

20        Q.   This is a document that Debt Pay Gateway

21   produced to the Bureau in response to the document

22   requests that the Bureau sent before we filed this

23   lawsuit.

24        A.   Okay.

25        Q.   And our understanding is that this is the call

```
1              CERTIFICATE OF SHORTHAND REPORTER

2          I, Cynthia R. Ott, CSR No. 13744, Certified

3    Shorthand Reporter certify:

4          That the foregoing proceedings were taken before

5    me at the time and place therein set forth, at which time

6    the witness was put under oath by me;

7          That the testimony of the witness, the questions

8    propounded, and all objections and statements made at the

9    time of the examination were recorded stenographically by

10   me and were thereafter transcribed;

11         That the foregoing is a true and correct

12   transcript of my shorthand notes so taken.

13         I further certify that I am not a relative or

14   employee of any attorney of the parties, nor financially

15   interested in the action.

16         I declare under penalty of perjury under the

17   laws of California that the foregoing is true and

18   correct.

19         Dated this 1st day of February 2021.

20

21   _____

22   CYNTHIA R. OTT
     CSR NO. 13744, RDR, CRR

23

24

25
```