# **<u>Summary Judgment Ex. 9</u>**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NUMBER 8-20-cv-00043-JVS-ADS


BUREAU OF CONSUMER FINANCIAL

PROTECTION,

              Plaintiff,

   vs.

CHOU TEAM REALTY, LLC, et al.,

          Defendants.



REMOTE DEPOSITION OF

EDUARDO AVALOS MARTINEZ



Tustin, California

8:25 a.m. PST



Tuesday, March 2, 2021



REPORTED BY Raymond G. Brynteson, RMR, CRR, RDR

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF: (Via Webex)

 4

 5       BUREAU OF CONSUMER FINANCIAL PROTECTION

 6           COLIN REARDON, ESQ.

 7           E. VANESSA ASSAE-BILLE, ESQ.

 8       1700 G Street, Northwest

 9       Washington, D.C. 20552

10       (202) 435-9668

11       colin.reardon@cfpb.gov

12       elisabeth.assae-bille@cfpb.gov

13

14   FOR THE DEFENDANT DOCS DONE RIGHT: (Via Webex)

15

16       THE HOLT LAW FIRM

17           DAVID C. HOLT, ESQ.

18       1432 Edinger Avenue

19       Suite 130

20       Tustin, California 92780

21       dholt@holtlawoc.com

22

23

24

25
```

Page 3

1   APPEARANCES: (Continued)

2

3   FOR THE DEFENDANT JAWAD NESHEIWAT: (Via Webex)

4

5        LEPISCOPO & ASSOCIATES

6            PETE LEPISCOPO, ESQUIRE

7        695 Town Center Drive

8        7th Floor

9        Costa Mesa, California   92626

10        plepiscopo@att.net

11

12

13   Also Present: (Via Webex)

14

15        Abigail Kelati (CFPB)

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                              (8:25 a.m. PST)

3           THE REPORTER:  Good morning.

4    Please note this deposition is taking

5    place via Webex as directed by the Bureau.

6    The location of this deposition is

7    California, pursuant to FRCP 30(b)(4).

8           The deposition is being conducted

9    by remote means under FRCP 30(b)(4).

10          Due to the need for this

11   deposition to take place remotely, the

12   parties hereby stipulate that the court

13   reporter may swear in the witness over the

14   video conference.

15          Mr. Martinez has shown me

16   identification, so I would ask him to

17   raise his right hand, please.

18   Whereupon--

19               EDUARDO AVALOS MARTINEZ,

20   having been first duly sworn, was examined and

21   testified as follows:

22                  EXAMINATION

23   BY MS. ASSAE-BILLE:

24     Q.   Good morning.  My name is Vanessa

25   Assae-Bille.  And with me is Colin

1   Reardon.  We are attorneys in the Office

2   of Enforcement at the Bureau of Consumer

3   Financial Protection.

4          Before we get to testimony there

5   are a few preliminary matters we are going

6   to cover on the record.

7          Today is March 2nd, 2021 and we

8   are here to depose Eduardo Martinez

9   pursuant to the Amended Notice of

10  Deposition served on February 20th, 2021.

11         This deposition is part of a

12  lawsuit with the name Bureau of Consumer

13  Financial Protection versus Chow Team

14  Realty, LLC, et al., in which Mr. Martinez

15  is a named defendant.

16         This deposition is being conducted

17  pursuant to Federal Rule of Civil

18  Procedure 30 and, due to the ongoing

19  pandemic, we are speaking by video

20  teleconference.

21         Mr. Martinez, please spell --

22  sorry, please state and spell your name

23  for the record, including any middle

24  names.

25     A.   Eduardo Avalos, E-d-u-a-r-d-o,

1   A-v-a-l-o-s, M-a-r-t-i-n-e-z.

2      Q.   Thank you.  Do you understand the

3   oath you just took?

4      A.   Yes.

5      Q.   Is there any reason why you would

6   not be able to provide truthful, complete

7   and accurate testimony today?

8      A.   No.

9      Q.   Are you under the influence of any

10  type of medication that might hinder your

11  ability to understand any questions?

12     A.   No.

13     Q.   Are you represented by counsel

14  today?

15     A.   I think so.  I mean, David Holt.

16          MS. ASSAE-BILLE:  Counsel, please

17  identify yourself for the record.

18          MR. HOLT:  My name is David

19  Christopher Holt, H-o-l-t, and I'm

20  representing this fine young man today.

21          MS. ASSAE-BILLE:  Okay.  Thank

22  you.  Counsels for Defendant Frank Anthony

23  Sebreros should have noticed -- has

24  received notice of this deposition but is

25  not here today.

 1    Loan Direct Processing, or SLDP for short?

 2        A.   I don't remember.

 3        Q.   Okay.  Well, as I noted

 4    previously, I will refer to it as SLPC.

 5             Was SLPC a back-end for companies

 6    that offered services to consumers with

 7    student loans?

 8        A.   I believe so.

 9        Q.   What services did SLPC offer

10    exactly?

11        A.   I'm a little bit confused.  I'm

12    not sure if you are talking about a

13    front-end or a back-end.  I don't remember

14    what the name of the front-end was or the

15    back-end.

16        Q.   What --

17        A.   So if it's a back-end it offered

18    back-end services.  If it was a front-end

19    it offered front-end services.

20             I'm just not sure which one you're

21    referring to.  Well, they changed their

22    name.

23        Q.   Did you start at the front-end?

24        A.   Yes.

25        Q.   Did you eventually move to the

1  back-end?

2     A.   Yes.

3     Q.   Okay.  I would like to talk about

4  the back-end.

5     A.   Okay.

6     Q.   So what services did the SLPC

7  back-end offer?

8     A.   They offered document preparation

9  for student loans.

10    Q.   What did that involve?

11    A.   Can you be more specific?  What do

12 you mean?

13    Q.   What did it mean for SLPC to

14 provide debt support; in practical terms

15 what did it look like?

16    A.    It would fill out the documents

17 that the front-end -- for the clients that

18 the front-end had sold, and then they

19 would send those documents to the

20 consumer.

21         The consumer would review it.

22 They would sign it and they would send it

23 back.

24    Q.   Okay.  So the front-end companies

25 would sell the services to the consumers

Page 39

1    and then SLPC would actually provide the

2    services, including completing the

3    documents.  Is that right?

4        A.   Yes.

5        Q.   Was DocuPrep Center one of the

6    companies that SLPC supported?

7        A.   I believe so.

8        Q.   Is that a yes?

9        A.   I don't remember what name they

10   were using at the time.  I believe yes.

11       Q.   Did SLPC have a role in collecting

12   the consumer's fees?

13       A.   Can you explain how?  I'm sorry.

14       Q.   Was SLPC --

15       A.   They were the back-end so they

16   serviced the client once they were sold.

17       Q.   Did servicing the client include

18   collecting fees from consumers?

19       A.   I mean, they would use Global

20   Client Solutions -- I forgot their name --

21   GSR or some other name to collect fees.

22       Q.   Are you referring here to a

23   payment processor?

24       A.   Yes.

25       Q.   So SLPC worked with the payment

Page 40

1    processor to collect fees.  Is that right?

2        A.   Correct.

3        Q.   So you testified a few minutes ago

4    to starting on the front-end of the

5    business and then moving to the back-end.

6             Is that right?

7        A.   Yes.

8        Q.   How soon after you started did you

9    move to the back-end?

10       A.   I'm not sure.  Maybe a few months.

11       Q.   Was it still in 2014?

12       A.   I believe it was in 2015.

13       Q.   Do you remember the season,

14   approximately, in 2015?

15       A.   Around Valentine's.

16            MR. HOLT:  That's a season?

17   BY MS. ASSAE-BILLE:

18       Q.   Were you soon promoted to the

19   position of customer service manager?

20       A.   Yes.

21       Q.   Was that after about three months?

22       A.   Yes.

23       Q.   And that was also in 2015,

24   correct?

25       A.   Yes.

1    they had to log in with a log-in and

2    password, an FSA ID, and the client's

3    password.

4          And I didn't believe we should

5    ever ask anybody for their password.  That

6    just didn't seem right.

7       Q.   Who were the other managers of

8    SLPC?

9       A.   Sam Brust.

10      Q.   Is that, for the court reporter,

11   is that B, as in boy, r-u-s-t, as in Tom?

12      A.   I believe so.

13      Q.   Go on.

14      A.   Manny Kashto.  I don't recall the

15   other manager names at this moment.

16      Q.   Was Andrew Rosen one of the

17   managers?

18      A.   I don't know what his title was.

19      Q.   Who did you report to?

20      A.   I reported to Sam.

21      Q.   In any of these roles at SLPC, did

22   you interact with DocuPrep Center?

23      A.   No.

24      Q.   Did you, while at the back-end of

25   SLPC, did you handle DocuPrep Center's

Page 48

1    customers?

2       A.    Yes.

3       Q.    Did you handle complaints from

4    DocuPrep Center customers?

5       A.    I don't know specifically for

6    them, but if there was complaints that was

7    part of my job.

8       Q.    Did you interact with DocuPrep

9    Center employees?

10      A.    No.

11      Q.    Did you interact with its

12   managers?

13      A.    No.

14      Q.    When did you stop working at SLPC?

15      A.    I believe somewhere in October of

16   2015.

17      Q.    What happened to the company?

18      A.    They decided to shut down.

19      Q.    Why did they shut down?

20      A.    They were going to go some other

21   business model.

22      Q.    Why did you not join them?

23           MR. HOLT:  Let me just object as

24   argumentative as phrased.

25           THE WITNESS:  They didn't want me.

Page 49

```
 1    BY MS. ASSAE-BILLE:

 2        Q.   Did they say why?

 3        A.   They didn't need me.

 4        Q.   Are you familiar with the company

 5    West One Group, LLC?

 6        A.   Yes.

 7        Q.   Were you an owner of West One

 8    Group?

 9        A.   Yes.

10        Q.   What was your ownership stake?

11        A.   I believe it was 2 percent.

12        Q.   Who were the other owners?

13        A.   Wes -- I forgot his last name.

14    Sam.

15        Q.   And when you say Sam, are you

16    referring to Sam Brust?

17        A.   Yes.  And I believe Tim Meyers.

18    It was W-e-s-t, Wes, Ed, Sam, Tim.

19        Q.   Clever.  Do you recall how Tim's

20    last name was spelled, for the record?

21        A.   I don't.

22        Q.   Since when were you an owner of

23    West One Group?

24        A.   I believe I was an owner for a few

25    months before they shut down.
```

Page 52

1    A.   I don't know if I ever got a
2    check.
3    Q.   Did West One Group receive
4    consumer fees from the payment processor
5    RAM?
6    A.   I don't know.
7    Q.   Did West One Group receive
8    consumer fees from any payment processor?
9    A.   I don't know.
10   Q.   Did you use West One Group for any
11   other purpose than what we've discussed so
12   far?
13   A.   No.
14   Q.   So what happened to West One
15   Group?
16   A.   They let me go.  I'm not sure what
17   happened to them.
18   Q.   Okay.  Did you join Docs Done
19   Right after you left SLPC?
20   A.   Yes.
21   Q.   Was that in late 2015?
22   A.   Yes.
23   Q.   And you became Docs Done Right's
24   manager, correct?
25   A.   Yes.

Page 53

1    Q.  And you have been in charge of

2  Docs Done Right since that time, correct?

3    A.  Yes.

4       MR. HOLT:  Let me just object as

5  vague and ambiguous.

6       THE WITNESS:  What do you mean by

7  in charge?

8       MR. HOLT:  I am going to sustain

9  the objection.

10  BY MS. ASSAE-BILLE:

11    Q.  Are you the manager of Docs Done

12  Right?

13    A.  Yes.

14    Q.  Do you oversee its operations?

15    A.  Yes.

16    Q.  Do you oversee its personnel?

17    A.  Yes.

18    Q.  Do you make major decisions about

19  Docs Done Right?

20       MR. HOLT:  Let me just object as

21  vague and ambiguous.

22       THE WITNESS:  Yes.

23  BY MS. ASSAE-BILLE:

24    Q.  Okay.  So have you been in charge

25  of Docs Done Right since 2015?

Page 54

1          MR. HOLT:  Let me just object as

2    ambiguous.

3          THE WITNESS:  I had partners that

4    would, I mean, they had a say so, so I

5    don't know to what level of in charge you

6    mean.

7          I was a manager of the employees.

8    I made personnel decisions, yes, since

9    2015.

10   BY MS. ASSAE-BILLE:

11   Q.   How did your joining Docs Done

12   Right come about?

13   A.   When I was laid off at the

14   previous company, I was told that one of

15   their affiliates -- which I didn't know

16   who they were at the time -- was kind of

17   continuing to stay in the business and

18   they needed to have a back-end.

19          And I was offered to go interview

20   with them to see if they would hire me.

21   Q.   Did you have a conversation with

22   an individual named Sean Cowell about

23   joining Docs Done Right?

24   A.   Yes.

25   Q.   Did Cowell tell you that you would

1   get to make the decisions at Docs Done

2   Right?

3       A.   Yes.

4       Q.   And did you get to make the

5   decisions at Docs Done Right?

6       A.   Most of the time.

7       Q.   What was Docs Done Right's

8   business model?

9            MR. HOLT:  Let me just object as

10  vague and ambiguous, calls for a

11  narrative.

12           THE WITNESS:  Can you be more

13  specific?

14  BY MS. ASSAE-BILLE:

15      Q.   Was Docs Done Right a back-end for

16  DocuPrep Center?

17      A.   Yes.

18      Q.   Did Docs Done Right become a

19  back-end for the other Student Loan Debt

20  Relief defendants?

21      A.   Yes.

22      Q.   Did you own 100 percent of Docs

23  Done Right, Incorporated?

24      A.   Not in the beginning.

25      Q.   What was your ownership in Docs

Page 56

1    Done Right, Incorporated in the beginning?

2       A.   10 percent.

3       Q.   Okay.  I just want to be clear for

4    the record that I'm now referring

5    specifically to Docs Done Right,

6    Incorporated and Docs Done Right, LP.

7            So I want to make sure there is no

8    mix-up between the two.

9            So can you confirm your ownership

10   of Docs Done Right, Incorporated?

11      A.   It was 10 percent, and then it

12   moved to 100 percent.

13      Q.   When did it move to 100 percent?

14      A.   When they created the LP.

15      Q.   Can you estimate the month and

16   year?

17      A.   That would be the beginning of

18   2016.

19      Q.   And did you own 20 percent of Docs

20   Done Right, LP?

21      A.   In the beginning I owned 10

22   percent of Docs Done Right, LP and then it

23   moved to 20 percent.

24      Q.   When did it move to 20 percent?

25      A.   I'm not sure.

Page 63

1     Q.   Who was the managing partner for

2   American DocuPrep?

3     A.   Carlos Lopez.

4     Q.   Was he the only managing partner?

5     A.   Yes.

6     Q.   Okay.  Have you ever been involved

7   in a company called Lend Tech Loans?

8     A.   No.

9     Q.   Have you ever been involved in a

10   company called Lend Tech Loans,

11   Incorporated?

12     A.   What do you mean by involved?  Can

13   you explain?  Like am I familiar with

14   them?  Yes, I am familiar with them.

15          (Reporter clarification.)

16          THE WITNESS:  Am I familiar with

17   the company?  I am familiar with them, but

18   I don't understand "involved."

19          Hello?

20   BY MS. ASSAE-BILLE:

21     Q.   Yes, just a moment.  Tell me what

22   Lend Tech Loans was.

23     A.   Lend Tech Loans was a company that

24   was created by the LP partnership which we

25   mentioned.  And they created it to -- to

Page 64

1    continue their efforts to collect leads

2    for the student loan companies.

3            Instead of Monster Loans doing it,

4    they created Lend Tech to take over.

5        Q.   And when you say leads, what do

6    you mean by that?

7        A.   Data, consumer data.

8        Q.   Are you referring to pre-screened

9    lists from Experian?

10       A.   Yes.

11       Q.   And what happens to Lend Tech?

12       A.   It closed.

13            MR. HOLT:  Let me just object as

14    vague and ambiguous.

15    BY MS. ASSAE-BILLE:

16       Q.   You said that it closed?

17       A.   I believe.  I'm not sure if it's

18    closed, actually.  I think they closed.

19    They stopped doing business with Experian.

20       Q.   Was Lend Tech Loans supposed to be

21    a mortgage company?

22       A.   Can you repeat the question?

23       Q.   Sure.  Was Lend Tech Loans

24    supposed to be a mortgage company?

25       A.   Yes.

Page 65

```
 1     Q.   Has it ever made any mortgages?

 2     A.   No.

 3     Q.   Has it only ever been used to

 4  purchase pre-screened lists from Experian

 5  for other businesses?

 6          MR. HOLT:  Let me just object.

 7  It's argumentative as phrased.  It's also

 8  vague and ambiguous.

 9          THE WITNESS:  I believe so.

10  BY MS. ASSAE-BILLE:

11     Q.   Are you aware of any other

12  business that Lend Tech has done?

13     A.   I don't know.

14     Q.   Are you familiar with the company

15  Red Signature Solutions?

16     A.   Yes.

17          MR. HOLT:  Oh, Vanessa, if you are

18  going to switch companies, can we just

19  take a quick bathroom break?

20          MS. ASSAE-BILLE:  So my line of

21  questions for Red Signature Solutions are

22  fairly short, so perhaps we could take a

23  break after that.

24          MR. HOLT:  Okay.

25  BY MS. ASSAE-BILLE:
```

Page 66

1    Q.   Did you say that, yes, you are

2    familiar with Red Signature Solutions, Mr.

3    Martinez?

4    A.   Yes.

5    Q.   Are you the sole owner of Red

6    Signature Solutions?

7    A.   I am, yes.

8    Q.   Since when?

9    A.   I don't know.

10   Q.   Can you estimate the year?

11   A.   Since I opened it.

12   Q.   Can you estimate when you opened

13   it?

14   A.   No.

15   Q.   Did you open it before 2017?

16   A.   I don't know.

17   Q.   Did you open it several years ago?

18   A.   Yes.

19   Q.   And what did you use Red Signature

20   Solutions for?

21   A.   I used it as a company to broker

22   the marketing cost between Monster Loans

23   and affiliates of Docs Done Right.

24   Q.   What do you mean by brokering the

25   marketing costs?

Page 67

1      A.   Meaning that Monster Loans didn't

2   want to sell data to affiliates that they

3   didn't know who they were.  They didn't --

4   it wasn't owned by them.

5           And so when the affiliates

6   approached me that they wanted to know who

7   they can get marketing from, when I told

8   the owners of Monster Loans that these

9   people were looking for marketing, they

10   said, yes, they would sell it to them as

11   long as they didn't pay Monster Loans

12   directly.

13           And so they told me that they

14   wanted me to create a company so that that

15   company could pay that company and then

16   that company could pay them because they

17   didn't want to show how they got

18   marketing.

19      Q.   Did you use it to perform -- when

20   you say marketing, pardon me, are you

21   again referring to Experian pre-screened

22   lists?

23      A.   Yes.

24      Q.   Did you use Red Signature

25   Solutions to perform the same function for

1   Lend Tech Loans?

2      A.   Yes.

3      Q.   What happened to Red Signature

4   Solutions?

5      A.   It's still in business.

6      Q.   How did it work when you brokered

7   the Experian pre-screened lists for

8   Monster Loans?

9           MR. HOLT:  Are you switching --

10          THE WITNESS:  I'm not sure if

11   brokered --

12          MR. HOLT:  Hold on.  Hold on.  I

13   asked to go on a break a while ago.  Are

14   you finished with Red Signature?

15          MS. ASSAE-BILLE:  Yes, this is

16   still involving the Red Signature account.

17   That's who was doing the brokering.

18          MR. HOLT:  Okay.  Just take a few

19   minutes.  We can go off the record.

20          (A recess was taken at 9:49 a.m.,

21   after which the deposition resumed at 9:58

22   a.m.)

23   BY MS. ASSAE-BILLE:

24      Q.   Have you ever been involved in a

25   company called Clarity Solutions Center?

Page 92

1    issues, correct?

2       A.   I don't remember the reasons, but

3    he was trying to make Monster Loans

4    better, whatever verbiage he used for

5    that.

6       Q.   Okay.

7       A.   Because I wasn't there to know

8    exactly what the thing was.  I just knew

9    that he didn't like the way it was being

10   done and --

11      Q.   Were you --

12      A.   -- it was going to cause problems.

13      Q.   Understood.  Were you told, as you

14   testified to us in your IH, that he was

15   not supposed to share his leads for some

16   kind of compliance purposes?

17      A.   I think this is me assuming after

18   the fact that I found out what the

19   situation was.  I don't think it was

20   something I knew at the time.

21      Q.   Did you ever ask what compliance

22   issues there might have been involved

23   there?

24      A.   No, I don't recall that.

25      Q.   Were you told that Mike Van Loon

1    had taken a class and that at that class

2    he had learned that he shouldn't share

3    leads?

4        A.   No.  I remember being told that he

5    took a class and that he got how mortgage

6    worked and that he was coming up with a

7    bunch of new ideas of how to run the

8    company.

9            And I think I merged that memory

10   to why he got rid of it, but not

11   specifically to the students, and that he

12   went to a class, came back a brand new

13   man, and all of a sudden was changing

14   things in the company.  I remember

15   something like that at some point.

16           But that was before they closed

17   and that was -- I don't know what time

18   period that was in comparison to them

19   doing this.

20       Q.   Okay.  Was Lend Tech created to

21   provide Experian pre-screened lists to the

22   Student Loan Debt Relief defendants?

23       A.   That is my understanding, yes.

24       Q.   Was Lend Tech a sham company?

25       A.   What is a sham company?

Page 94

1    Q.   Was it like a fake company?

2    A.   No.  I mean, it was a real

3  company.  They had it incorporated and

4  everything.

5    Q.   But it didn't do -- it didn't

6  offer any mortgages, correct?

7    A.   Correct.

8    Q.   And it didn't broker any

9  mortgages, correct?

10   A.   Not that I know of.

11   Q.   Did Cowell and others initially

12  put together a fake office to dupe

13  Experian into thinking that they were a

14  real company for an inspection?

15        MR. LEPISCOPO:  Objection, vague

16  and ambiguous, calls for speculation,

17  lacks foundation.

18        THE WITNESS:  I don't know.

19  BY MS. ASSAE-BILLE:

20   Q.   Did Lend Tech create fake letters

21  to make it look like it was going to do

22  mortgage business?

23        MR. LEPISCOPO:  Same objection.

24        THE WITNESS:  I don't know.

25  BY MS. ASSAE-BILLE:

Page 95

```
 1      Q.   We're going to take a look at your

 2   Investigational Hearing testimony again.

 3      A.   Okay.

 4      Q.   I will try to find the page.  Just

 5   a moment.

 6           Please turn to page 233 and let me

 7   know when you're there.

 8      A.   Okay, I'm there.

 9      Q.   Okay.  We will start at line 11.

10   Just a moment.  Okay.  I'm going to start

11   reading where my curser is.

12           You testified under oath:  "My

13   understanding is Sean Cowell, Brad, and

14   Bill, and Anthony created Lend Tech, got

15   approval of Experian, had to create some

16   type of office so Experian could do a

17   walk-through or something, and they did

18   that at Monster Loans location downstairs.

19   They created a desk, they put a chair,

20   they put a phone that's not connected, and

21   Experian walks through and goes, 'looks

22   like a mortgage business.  You're

23   approved.'  And they created pro formas

24   and they created letters to make it look

25   like they were about to do business in
```

1          So they gave me a script.  I go,

2    here you go.  I didn't have time to sit

3    there and read it.

4          What you guys showed me was in the

5    script was completely incorrect and I

6    didn't agree with it and I told you that.

7    And I would have never been okay with that

8    if I would have read that.

9       Q.   Understood.  Just so we're clear,

10   I was asking about -- I switched back to

11   the marketing letters.  I know that's a

12   bit confusing.

13      A.   Okay.

14      Q.   So I was asking whether you ever

15   reviewed the marketing letters to

16   determine if the statements in them were

17   truthful?

18      A.   They showed me some type of

19   marketing at some point because we asked

20   what they were using.  And I remember

21   looking at it and thinking that everything

22   looked okay.

23          I don't remember what was on the

24   letter.  I don't remember what the

25   verbiage was.  I just remember that at

Page 203

1    some point I was criticizing their

2    marketing or their sales.  I was trying to

3    help them improve.

4        Q.   Do you remember for what company

5    the letter was?

6        A.   To me they all felt like one big

7    company.

8        Q.   Did the companies -- did the

9    Student Loan Debt Relief defendants use

10   the same letter, the same template?

11       A.   I believe they did.

12       Q.   Were employees of the Student Loan

13   Debt Relief defendants sometimes called

14   student loan advisors?

15       A.   Yes.

16       Q.   Did these employees advise

17   consumers on what income-based repayment

18   plans to select?

19       A.   I wasn't part of the sales call.

20   I don't know what they said.  I could

21   assume yes, but I don't know.

22       Q.   Do you know whether the employees

23   of the Student Loan Debt Relief defendants

24   advised consumers on whether to

25   consolidate?

Page 204

1    A.   I don't know.

2    Q.   Do you know whether employees of

3  the Student Loan Debt Relief defendants

4  advised consumers on whether to enter

5  forbearance?

6    A.   I don't know.

7    Q.   During the sales -- during the

8  sales call -- well, during the sales call

9  Docs Done Right communicated with

10  consumers who purchased services from the

11  Student Loan Debt Relief defendants,

12  right?

13    A.   Wait.  Repeat the question,

14  please.

15    Q.   During the sales call did Docs

16  Done Right employees communicate with

17  consumers who had purchased services from

18  the Student Loan Debt Relief defendants?

19    A.   No.

20    Q.   Did the Student Loan --

21    A.   Not that I can recall.

22    Q.   Okay.  Was there a transfer of the

23  sales call to Docs Done Right?

24    A.   Once the client enrolled and

25  signed the contract with the sales

Page 219

1          MR. HOLT:  Objection.  Hold on,

2     Ed.  It's argumentative and vague and

3     ambiguous and calls for speculation.

4          THE WITNESS:  The impression that

5     I'm getting from this letter is that it's

6     acting as if they've already done it,

7     they've already created some kind of

8     program for that.

9     BY MS. ASSAE-BILLE:

10        Q.   Who is "they" in that sentence?

11        A.   The company.

12        Q.   The Student Loan Debt Relief

13    defendants?

14        A.   Yes, correct.

15        Q.   Are you aware of any U.S.

16    Department of Education program called a

17    "Student Loan Consolidation & Payment

18    Reduction Program"?

19        A.   No.

20        Q.   Have you ever seen any document

21    published by the U.S. Department of

22    Education that uses that specific phrase?

23        A.   No.

24        Q.   Did the Student Loan Debt Relief

25    defendants provide their customers with a

1   Student Loan Consolidation & Payment

2   Reduction Program?

3       A.   No.

4       Q.   What was the program that the

5   Student Loan Debt Relief defendants

6   offered?

7       A.   They didn't offer any programs.

8       Q.   Did it offer services?

9       A.   Yes.

10      Q.   Did the Student Loan Debt Relief

11   defendants refer to the services as a

12   payment reduction program?

13      A.   I don't know.

14      Q.   Did the Student Loan Debt Relief

15   defendants offer service to -- well, did

16   the Student Loan Debt Relief defendants

17   offer service to reduce consumers' student

18   loan payments?

19      A.   I don't know.

20      Q.   What services did the Student Loan

21   Debt Relief defendants offer?

22      A.   I don't know what services they

23   offer.

24      Q.   Docs Done Right does the back-end

25   for the Student Loan Debt Relief

Page 221

1    defendants, correct?

2        A.    Correct.

3        Q.    And Docs Done Right supported the

4    Student Loan Debt Relief defendants,

5    correct?

6        A.    Yes, ma'am.

7        Q.    Was it important to you to

8    understand what services the Student Loan

9    Debt Relief defendants offered?

10       A.    Yes, ma'am.

11       Q.    Do you know what services the

12   Student Loan Debt Relief defendants

13   offered?

14       A.    I do not.

15       Q.    Did you take any steps to find

16   out?

17       A.    Yes.

18       Q.    What steps?

19       A.    I asked them.

20       Q.    And what did they say?

21       A.    They told me they were offering

22   document preparation services.  But I

23   don't know what they were offering, if

24   this was what they were mailing.

25       Q.    Why do you say that the companies

1    didn't offer a Student Loan Consolidation

2    & Payment Reduction Program?

3       A.   Because those programs are not

4    ours to provide.   Those programs are being

5    provided to the client.

6            Any program that they qualify for

7    with the Department of Education through

8    the services is available to them, but

9    it's not our -- it's not us providing it.

10   All we can do is have them apply for

11   whatever is available to them.

12      Q.   I'm trying to understand why the

13   marketing letters describe the services,

14   in bold, as a Student Loan Consolidation &

15   Payment Reduction Program; can you explain

16   that?

17      A.   No.

18      Q.   In your mind is there a difference

19   between a document preparation service and

20   the Student Loan Consolidation & Payment

21   Reduction Program described in this

22   letter?

23      A.   Yes.

24      Q.   What's the difference?

25      A.   They are making it sound like --

Page 225

1      Q.   Are you familiar with each of the

2   benefits of the consolidation program that

3   are listed in those bullets?

4      A.   Am I familiar with what it says

5   here?

6      Q.   Yes.  Are you familiar with those

7   benefits as benefits of the consolidation

8   program?

9      A.   Yes.

10     Q.   Were each of these listed items

11   benefits of the Student Loan Debt Relief

12   defendants' services?

13     A.   Well, I mean, there are plenty of

14   things here that don't -- don't

15   necessarily need to be on here, saying no

16   credit check, because when you apply to

17   consolidate your loans there is no credit

18   check.

19          That's not even a thing.  So I

20   guess it's true.  There is no credit

21   check.

22          Interest rate reduction regardless

23   of balance or pay history.  I don't know

24   why they -- they word it that way.

25          I see here that they had debt

1    consolidation with a lower rate, with a

2    little star.  And then at the very bottom

3    the star says "the Department of Education

4    may offer an interest rate reduction with

5    set-up of automatic payments."

6          So obviously they are trying to

7    allude to the fact that, if you're set up

8    with automatic payments, you get like a

9    point -- I think it's like .025 reduction,

10   but that's automatic.

11         So they are trying to take credit

12   for that.  And I think that's what they

13   are referring to on interest rate

14   reduction, but they didn't put the star

15   there.  So it kind of -- very misleading.

16         And then lower monthly payments

17   based on income and family size is true.

18   But that's only possible if you qualify.

19   I mean, not necessarily.  So they should

20   have said may possibly have lower monthly

21   payments.

22         And then it says loan

23   forgiveness -- oh, well, never mind.  On

24   top of that it says "may include."  So

25   maybe that's how they got around it.

Page 227

1          Did that answer your question?

2      Q.   Yes, it did.  Thank you.

3          So why did the marketing letters

4      tell consumers that they could receive

5      these benefits?

6          MR. HOLT:  Objection, calls for

7      speculation.

8          THE WITNESS:  My impression or

9      opinion, based on what I'm reading here,

10     that the whole letter is designed to

11     create urgency and make clients feel that

12     this was something special that could only

13     be done through them.

14         It says here "due to a high call

15     volume we ask that you complete the

16     process below prior to calling," like they

17     are so busy that please be ready.

18         I think it was designed to create

19     more calls.  It's marketing.  I get a lot

20     of junk letters in my mail which look very

21     similar to this.

22     BY MS. ASSAE-BILLE:

23     Q.   Let's look at the language below

24     that, where it says in bolded, all cap

25     letters:  "Call toll-free today to redeem

Page 228

1    your federal benefits."  And there is a

2    phone number and a reference benefit ID.

3    Do you see that?

4        A.   Yes.

5        Q.   Okay.  What do you understand the

6    phrase call toll-free today to redeem your

7    federal benefits to mean?

8            MR. HOLT:  Objection, calls for

9    speculation.

10           THE WITNESS:  My opinion is damage

11   control, that those benefits are there

12   waiting for me.  I just need to redeem it,

13   like it's owed to me.

14   BY MS. ASSAE-BILLE:

15       Q.   And the federal -- what were the

16   federal benefits that the Student Loan

17   Debt Relief defendants provided?

18       A.   Well, obviously they didn't

19   provide any kind of federal benefits.

20   Federal benefits would be something that

21   was provided by the government.  And it's

22   something that was there for everybody.

23       Q.   So consumers couldn't redeem

24   federal benefits by calling the phone

25   number on this letter, correct?

Page 229

1      A.   I'm not a marketer.  I mean, one

2   could argue that technically they could

3   call their servicer, and I guess the word

4   redeem is access, or I don't know.

5          I mean, I'm not -- I'm not really

6   into these words.  Obviously this was

7   designed to make you feel like it's owed

8   to you.

9      Q.   In your opinion, did the parts of

10   the letter that we read so far accurately

11   represent the Student Loan Debt Relief

12   defendants' services?

13      A.   No.

14          MR. LEPISCOPO:  Objection, calls

15   for speculation.  Assumes facts not in

16   evidence.

17          MR. HOLT:  And argumentative as

18   phrased.

19   BY MS. ASSAE-BILLE:

20      Q.   Why do you say that?

21          MR. HOLT:  Same objection.

22          THE WITNESS:  It seems very

23   "salesy" to me, exaggerated.  But, I mean,

24   but most marketing material is, so.  The

25   only thing that's correct seems to be this

Page 230

1    paragraph.

2    BY MS. ASSAE-BILLE:

3        Q.   Sorry, if you point that doesn't

4    appear in the record so can you verbalize

5    to me?

6        A.   It says:  "Our records indicate

7    that your federal student loans may be

8    eligible for a consolidation with the U.S.

9    Department of Education.

10           "As a federal student loan holder,

11   you may be eligible to convert

12   your existing high interest" -- oh, I

13   don't know about high interest.  I think

14   that's just fancy "salesy" stuff.

15       Q.   I'm going to stop showing this

16   document.

17       A.   Okay.

18       Q.   Okay.  Earlier I asked about Docs

19   Done Right's conversations with consumers

20   on the phone and consumer goals.

21           I also asked you about what

22   results consumers expected to receive from

23   the Student Loan Debt Relief defendants'

24   services.

25           Do you recall that?

Page 234

1    would have been a situation where the

2    caller felt they didn't get what they

3    thought they were getting.

4        Q.   Do you recall consumer complaints

5    that the consumer's interest never went

6    down?

7        A.   No.

8        Q.   Did consumers ever complain that

9    their monthly payments didn't go down?

10       A.   Yes, but I believe -- I believe it

11   usually was because they thought the

12   payment would go down immediately.  And it

13   takes a few months for the payment to take

14   effect.

15       Q.   Did consumers ever complain about

16   their monthly payments going up?

17       A.   I don't know.  I don't recall.

18       Q.   Did consumers ever complain that

19   their student loans were not

20   consolidating?

21       A.   I don't -- I don't remember.  I

22   mean, if it happened it would be in the

23   notes.

24       Q.   And -- okay.  So if consumers

25   complained about other things I've asked

Page 235

1    you about so far, it would be in the

2    DebtPayPro records, correct?

3        A.   Correct.

4        Q.   Did consumers ever complain --

5    pardon me.

6             You mentioned that it took several

7    months for payments to go down.  What do

8    you mean by that?

9        A.   The document preparation process

10   was around 45 to 90 days, average.

11       Q.   Okay.  So did it take several

12   months for consumer applications to be

13   approved?

14       A.   It would take at least a month, at

15   least two months, or a month and a half.

16       Q.   So would it take at least, I'm

17   sorry, at least a month and a half, did

18   you say?

19       A.   45 to 90 days.

20       Q.   Okay.  So would it take at least

21   45 to 90 days for the consumer's new

22   payment under their new repayment plan to

23   be due?

24       A.   Correct.

25       Q.   And how did you know that?

Page 236

1    A.    I don't know.  I just knew that.

2  I don't remember when I learned that.

3    Q.    Okay.  Did consumers ever complain

4  about their student loans not being

5  forgiven?

6    A.    Not that I know of.  I mean, it

7  would be too soon for anybody to have -- I

8  mean, that takes years.  So nobody should

9  have been upset this early.

10   Q.    And did consumers ever complain

11  that they had paid for services that they

12  never got?

13   A.    If it did happen it was very rare.

14   Q.    And if it did happen it might also

15  be recorded on DebtPayPro, correct?

16   A.    It would be.

17   Q.    If such complaints came in.  Okay.

18  I want to ask you -- well, I'm sorry,

19  well, this is a good time for a break.

20        So let's pause here and we can

21  come back together in 10 minutes.

22        (A recess was taken at 2:32 p.m.,

23  after which the deposition resumed at 2:49

24  p.m.)

25  BY MS. ASSAE-BILLE:

1          THE WITNESS:  I didn't know any of

2     these people until October of 2015.  So I

3     didn't have any conversations with them.

4     BY MS. ASSAE-BILLE:

5          Q.   You knew Manny Kashto, correct?

6          A.   Correct.

7          Q.   Did Kashto ever discuss the 90-day

8     wait with you?

9          A.   No.  Manny Kashto had an office

10    and I sat at a cubicle.  So he wasn't --

11    he didn't talk to me.  He -- he's in the

12    back office area.

13         Q.   Okay.  Were you part of any other

14    discussions regarding a 90-day wait to

15    receive consumer fees through GCS?

16         A.   No.  That would have been Sam

17    conversations.  Sam and Manny were

18    friends.

19         Q.   And when you say Sam and Manny

20    conversations, you're referring to Sam

21    Brust and Manny Kashto, correct?

22         A.   Yes.

23         Q.   Okay.  So around October 2015 you

24    became the owner and manager of Docs Done

25    Right, correct?

Page 272

1      A.   Around October 2015.

2      Q.   Okay.  I want to ask you -- well,

3   pardon me.  So during the 30(b)(6)

4   deposition you provided testimony about

5   the role of Docs Done Right in the Student

6   Loan Debt Relief defendants' sales

7   process.  I want to ask you just a few

8   more questions about that.

9           Are you familiar with -- sorry.

10          So the consumer fees collected for

11  the Student Loan Debt Relief defendant

12  services went into accounts maintained by

13  a company named Debt Pay Gateway.  Is that

14  right?

15     A.   Yes.

16     Q.   Were those Debt Pay Gateway

17  accounts referred to as custodial,

18  custodial accounts?

19     A.   I think so.

20     Q.   Is that your recollection?

21     A.   Yes.

22     Q.   How did the custodial accounts

23  work?

24     A.   For Debt Pay Gateway?

25     Q.   Yes, the custodial accounts at

Page 273

1    Debt Pay Gateway, how did those work?

2        A.   Can you be more specific?  What

3    part?

4        Q.   Did consumers pay fees to Debt Pay

5    Gateway?

6        A.   Yes.

7        Q.   And then Debt Pay Gateway put

8    these fees into custodial accounts?

9        A.   Yes, they were accounts under the

10   client's name with Debt Pay Gateway.

11       Q.   Did Debt Pay Gateway then disburse

12   the fees to the Student Loan Debt Relief

13   defendants?

14       A.   Yes.

15       Q.   And did a portion of the fees go

16   to Docs Done Right?

17       A.   Yes.

18       Q.   Were the custodial accounts ever

19   used for the purpose of paying the

20   consumers' loans, student loans?

21       A.   No.

22       Q.   Okay.  So the custodial accounts

23   were only used for the purpose of paying

24   consumer fees for the Student Loan Debt

25   Relief defendants' services, correct?

Page 274

1    A.   Yes.

2    Q.   Did Docs Done Right track whether

3  consumers' forbearance requests were

4  approved?

5    A.   No.

6    Q.   Did Docs Done Right ever

7  receive -- sorry, did the Student Loan

8  Debt Relief defendants track that

9  information?

10   A.   No.

11   Q.   Did Docs Done Right ever receive

12 complaints that forbearance requests were

13 denied?

14   A.   Yes.

15   Q.   Was that a common complaint?

16   A.   No.

17   Q.   Do you have any reason to believe

18 that consumers' forbearance requests were

19 denied frequently?

20   A.   No.

21   Q.   How soon after a consumer paid

22 their services -- sorry.  How soon after a

23 consumer paid their fees were the fees

24 disbursed by Debt Pay Gateway?

25   A.   I would say as long as there was

Page 275

1    not a reserve that needed to be met, it

2    would be about seven days after Debt Pay

3    Gateway received the money.

4        Q.   Are Debt Pay Gateway's records the

5    most accurate place to find this

6    disbursement information for each consumer

7    that Docs Done Right ever serviced for the

8    Student Loan Debt Relief defendants?

9        A.   Yes.

10       Q.   Did Docs Done Right at times have

11   funds held in reserve in Debt Pay Gateway

12   accounts?

13       A.   Yes.

14       Q.   Tell me how the reserve worked.

15       A.   Depending on how much business was

16   going through the account, Debt Pay

17   Gateway would rate the reserve

18   accordingly.

19           In case that the company that was

20   sending clients there eventually cancelled

21   without notice, there was enough money to

22   cover refunds for a certain period of

23   time.  I don't remember.  Maybe it was a

24   six-month period.

25           There was a calculation that Debt

```
 1              CERTIFICATE OF REPORTER

 2

 3       I, Raymond G. Brynteson, Registered

 4   Diplomate Reporter, Certified Realtime Reporter,

 5   Registered Merit Reporter, and officer duly

 6   authorized to administer oaths and/or

 7   affirmations, do hereby certify that prior to

 8   the commencement of examination the deponent

 9   herein was duly sworn to testify truthfully

10   under penalty of perjury;

11           I FURTHER CERTIFY that the foregoing

12   is a true and accurate transcript of the

13   proceedings as reported by me stenographically,

14   to the best of my ability;

15           I FURTHER CERTIFY that I am neither

16   counsel for nor related to nor employed by any

17   of the parties to this case and have no

18   interest, financial or otherwise, in its

19   outcome.

20           IN WITNESS WHEREOF, I have hereunto

21   set my hand this 8th day of March, 2021.

22

23

24   _____

25   Raymond G. Brynteson, RDR, CRR, RMR
```