# Summary Judgment Ex. 10

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU

In the Matter of:          )
                           ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC     )

                           Wednesday,
                           November 28, 2018

                           Federal Building
                           Room 7516
                           300 North Los Angeles Street
                           Los Angeles, California

The investigational hearing testimony of MIKAEL VAN LOON commenced, pursuant to notice, at 8:56 a.m.

\* \* \*

```
 1   APPEARANCES:

 2   For The Consumer Financial Protection Bureau:

 3   COLIN T. REARDON, Attorney Advisor
     ELIZABETH VANESSA ASSAE-BILLE, Attorney at Law
 4   1700 G Street NW
     Washington, DC  20552
 5   (201) 435-9668
     elisabeth.assae-bille@cfpb.gov
 6

 7   For the Witness:

 8   SEAN BURKE, Esquire
     RAY BIEDERMAN, Esquire
 9   RICHARD HORN, Esquire
     Mattingly, Burke, Cohen & Biederman
10   155 E. Market Street, Suite 400
     Indianapolis, Indiana  46204
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1      LOS ANGELES, CALIFORNIA, WEDNESDAY, NOVEMBER 28, 2018

2                            8:56 A.M.

3

4                         MIKAEL VAN LOON,

5   called as a witness, having been administered an oath, was

6   examined and testified as follows:

7

8                           EXAMINATION

9   BY MS. ASSAE-BILLE:

10      Q    Good morning.  Today is November 28, 2018.  And

11  we are in the offices the U.S. Attorneys in Los Angeles,

12  California.

13           Mr. Van Loon, please state and spell your name

14  for the record.

15      A    Mikael Van Loon.  M-i-k-a-e-l.  Last name's two

16  words:  V-a-n space L-o-o-n.

17      Q    Are you represented by counsel today?

18      A    Yes, I am.

19      MS. ASSAE-BILLE:  Counsel, will you please identify

20  yourselves for the record?

21      MR. BURKE:  Yes, thank you.

22           Sean Burke on behalf of the witness.

23      MR. BIEDERMAN:  Ray Biederman on behalf of the

24  witness.

25           MR. HORN:  Richard Horn on behalf of the

Page 13

| | | |
|---|---|---|
| 1 | Q | During what period did you work there? |
| 2 | A | 2010 to August of 2016. |
| 3 | Q | What did you do there? |
| 4 | A | Chief financial officer. |
| 5 | Q | And what were your responsibilities generally? |
| 6 | A | I received a finance function. |
| 7 | Q | Were you employed between 2008 and 2010? |
| 8 | A | As a W-2?  No. |
| 9 | Q | Did you have any other kind of employment during this period? |
| 11 | A | I was an independent contractor. |
| 12 | Q | For what company? |
| 13 | A | Passport Capital. |
| 14 | Q | And what was your position there? |
| 15 | A | Portfolio manager. |
| 16 | Q | What does that mean? |
| 17 | A | Make decisions, make investment decisions and manage a portfolio investment. |
| 19 | Q | So when did you come to Chou Team Realty? |
| 20 | A | August of 2016. |
| 21 | Q | And in what position were you hired? |
| 22 | A | CFO. |
| 23 | Q | What were your responsibilities as CFO? |
| 24 | A | Fix the reporting and accounting function, principally. |

Page 14

1      Q    Did you ever hold any other positions with Chou
2  Team Realty?
3      A    Yes.
4      Q    Which position?
5      A    Informally, chief operating officer from October
6  to December 2016 and then CEO from 2016 forward, Christmas
7  of 2016.
8      Q    And as CEO, what are your responsibilities?
9      A    Determine the company's direction, establish and
10 maintain corporate culture.
11     Q    Is that all?
12     A    There are countless number of responsibilities
13 as the CEO.  Those are the principal ones.  Happy to go
14 into detail if you want.  Those are the principal ones.
15     Q    Thank you.
16          Tell me about the circumstances that led you to
17 join Chou Team Realty.
18     A    The CEO of DDC and I had invested in a series of
19 opportunities over the course of several years with Tom
20 Chou.  We were engaged with the mortgage business.  The
21 limited partners asked for me to get involved to fix the
22 financial reporting and understand the pro formas.
23     Q    At the beginning of your sentence, you said DDC?
24     A    Domain Development Corporation.  Sorry.  Can I
25 refer to it as "DDC" going forward?

Page 61

```
 1      A     -- I believe.
 2      Q     -- who would be speaking on the topic?
 3      A     Everybody was talking.  It was chaos.  Jawad,
 4   Ritesh, if Bobby was there.
 5      Q     For the record, who is Bobby?
 6      A     Bobby Hoose, H-o-o-s-e.  And there may have been
 7   others.
 8      Q     Okay.  So I would like to go back to the time
 9   after the SOMB training around October 2016 when you
10   realized that there may have been some misuse of the
11   Experian data.
12            Did you confront Jawad about that at all?
13      A     Can I clarify the question?
14      Q     Yes.
15      A     From the point after the SOMB --
16      Q     Yes.
17      A     -- meeting to any point forward, did I confront
18   Jawad?
19      Q     I mean immediately after the SOMB 2000 -- the
20   2016 SOMB.  If I'm misunderstanding MonsterLoans'
21   representations, feel free to let me know.
22            The way I understand it is that you and Brad
23   Brigante attended the training in October 2016 and then
24   realized that some of Jawad's activities with the Experian
25   account may have been improper.
```

Page 62

1         So I would like to know the soonest point in
2    time at which you, if at all, had a discussion with Jawad
3    about those activities.
4         A    So I want to clarify that the School of Mortgage
5    Banking point in time is more useful as a mile marker than
6    as a light switch.
7         Q    Okay.
8         A    And in that, I mean the amount of time during
9    that two- to three-day period dedicated to compliance,
10   period.  And FCRA as a part of compliance was extremely
11   limited.  I think what that School of Mortgage Banking did
12   for me mostly was help me realize just how -- I won't say
13   out of my league, but like overwhelmed with complexity.
14        It is -- as a mile marker, it's probably more
15   useful to understand -- more like a growing awareness of
16   that being a point in time where the awareness level
17   begins to rise.  I wanted to clear that context up.
18        The answer to your question is:  I'm not sure
19   whether it was immediately after, which would have been
20   end of October, or whether it was November or whether it
21   was in December or early January, but there certainly was
22   multiple conversations in my memory with words like, "This
23   has to stop.  This is threatening the mortgage business."
24        Q    And how did Jawad respond?
25        A    Each time the conversation was had, his response

Page 63

1  was different.  His response might have been, from my
2  memory, a cooperative one, "Oh, yeah, yeah.  I agree.
3  Absolutely."  And then the next meeting it might have been
4  tears, crying and screaming, pounding on the wall.  A
5  third meeting would have been threats.
6         So I don't have a specific way in which he
7  responded because -- I don't know if this is helpful, and
8  it's just my opinion of who he is.  Extremely volatile
9  person.  Needed control and could feel his control ebbing
10 as I -- it's an opinion.
11    Q   Was anyone else present during those
12 conversations between you and Jawad about the Experian
13 data?
14    A   All I can see is him.  I don't know.
15    Q   After having these conversations with Jawad, did
16 you ever memorialize them in writing or report them to
17 another person?
18    A   I may have, but I also may not have.  Things
19 were happening very quickly.  Like make a decision, go on
20 to the next thing.  Sorry.
21    Q   So MonsterLoans has communicated to the Bureau
22 that you learned that Jawad took efforts to conceal the
23 extent of his activities with the Experian account from
24 you and the management team.
25         What efforts did he take, exactly?

Page 64

1    A    The one I can objectively tell you is that he
2    did not send the Experian invoices to our accounting
3    department.  Beyond that, I am speculating.
4    Q    But other people at MonsterLoans knew what he
5    was doing; correct?
6    A    I think that's a fair statement.
7    Q    Because Jawad was possibly directing other
8    people to assist him?
9    A    Correct.
10   Q    So it was not a secret that the MonsterLoans'
11   Experian data was being used for other purposes than the
12   mortgage business?
13   A    I think it's fair to say that it was not a
14   secret.
15   Q    So who else knew at MonsterLoans before
16   June 2017?
17   A    And I don't know who knew and who didn't know.
18   I'm confident that Ritesh was aware, confident that Brad
19   was aware, and confident that I was aware.  Beyond that, I
20   don't -- I don't know exactly who knew what.
21   Q    Who was assisting Jawad?
22   A    I don't know that it was somebody within
23   MonsterLoans assisting Jawad.  I believe Jawad had
24   credentials.  This is my belief.  Okay?
25        I believe Jawad has his credentials, and he had

Page 68

1  relation to the same.

2          Who exactly did this?

3      A   Okay. Hold on. Sorry.

4          Okay. There's a lot underneath that paragraph,

5  yeah.

6      Q   Okay. Let's get into it.

7      A   Okay. You want to ask me specific questions or

8  just describe?

9      Q   I will listen, if you would like to clarify

10 anything.

11     A   Several conversations were had, demands were

12 made. I can't remember the dates which those demands were

13 made.

14         Jawad became -- okay. I'm trying to paint the

15 picture.

16         The first quarter and into the second quarter of

17 2017 we have a business that's on fire, literally

18 crashing. The only way to get through that situation was

19 to focus on getting deals in the door, which is sales.

20         I am not a salesperson. I needed Jawad, who had

21 a ton of experience in the mortgage business, specifically

22 in the origination side, to teach me sales. I had to --

23 but I knew he couldn't have him in the building. He would

24 come into my office as I'm issuing these -- pushing for

25 more structure and transparency. It's an objective fact.

Page 69

1  He would come in my office. He would spend two
2  to three hours in my office, emotionally blowing up,
3  pounding walls, crying, screaming. He was a distraction.
4  But I needed him because I needed to formalize the sales
5  training process and I needed to take control and build
6  rapport with the sales managers because I had nobody else
7  in place.
8  And additionally, we had one marketing
9  relationship, the mail house, and it was Jawad's
10 relationship that drove that mail house. I needed to
11 wrest control of that relationship from Jawad or we would
12 go out of business.
13     Q   And what is the name of the mail house?
14     A   It is Advanced Image Direct, Automated Mailers,
15 which is a reseller of Advanced Image Direct.
16 So that was -- in the first quarter of 2017,
17 primary business objective was don't die. Secondary
18 business objective was remove Jawad's fingers from the
19 steering wheel.
20 When I identified -- began to assume control of
21 the marketing relationship, identified a VP of sales, I
22 sat down with Jawad in early April of 2017 and told him
23 that he needed to leave the building.
24 My assumption was, having issued -- having
25 issued orders not to -- issued orders that that behavior

Page 70

1  needed to stop, it would stop.  When I found out it had
2  not, I realized I needed to get control of the Experian
3  account.
4         I began that process.  I don't know the exact
5  date.  I believe it was the end of May.  Experian was slow
6  in getting back to me.
7         Finally, at some point in June, I was able to
8  name my head of IT, Don Kim, as the head designate on the
9  Experian account and lock the IP down, meaning no one
10 could access the account from outside of our building in
11 June of 2017.
12        I am not sure, I think that answers your
13 question.
14    Q    So the steps to remove Jawad's access to any
15 consumer reporting agency accounts were taken by you with
16 the assistance of Don Kim, the IT personnel, and did
17 anyone else assist you?
18    A    I don't think so.  I don't think so.
19    Q    So Jawad had access to the Experian account
20 until June 2017; correct?
21    A    The account was in Jawad's name.  Jawad was the
22 head designate.  And Jawad's credentials could access the
23 account, and the account could be accessed from anywhere.
24    Q    Okay.  When -- so what happened to Jawad's
25 Experian credentials?  Were they revoked or did they just

Page 71

1   expire?  What happened to them?

2       A    They went away.

3       Q    Okay.

4       A    I believe.  I don't know.  Once again -- I am
5   not an especially thorough person, meaning my goal is to
6   get shit done, and then I have to move on.  So once I have
7   identified the problem, and I have lended my authority to
8   it to ensure it happens and I have delegated it, I assume
9   it gets done.

10           So it is my belief having informed Don and
11  secured the relationship with Experian that Don would have
12  gone through the proper protocol from an IT security
13  perspective to lock the account down.  What happened to
14  Jawad's credentials, I do not know.

15      Q    Did you ever directly or by instructing someone
16  else at MonsterLoans to do this, did you ever alert
17  Experian that the MonsterLoans account had previously
18  obtained consumer data for purposes not related to
19  MonsterLoans?

20      A    I did not do that.

21      Q    Why not?

22      A    Oversight.  Sloppy.  Trying to move too fast on
23  too many things.  I had assumed that once the account was
24  locked down, I needed to move on to the next urgent item.

25      Q    And then your head designate was Don Kim; is

```
1    STATE OF CALIFORNIA      )
                              ) ss.
2    COUNTY OF LOS ANGELES    )

3

4          I, ANN BONNETTE, C.S.R. No. 6108, do hereby

5    certify:

6          That prior to being examined, the witness named in

7    the foregoing Transcript of Proceedings, MIKAEL VAN LOON,

8    was administered  an oath to testify the truth, the whole

9    truth, and nothing but the truth;

10         That said hearing was taken before me at the

11   time and place therein set forth and was taken down by me

12   in shorthand and transcribed into computer-generated text

13   under my direction and supervision; and I hereby certify

14   the foregoing transcript of my shorthand notes so taken.

15         I further certify that I am neither counsel for nor

16   related to any party to said action nor in any way

17   interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have hereunto subscribed my

19   name this 7th day of December, 2018.

20

21

22
                              _____
23                                      ANN BONNETTE

24

25
```