# **Summary Judgment Ex. 11**

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU


In the Matter of:               )
                                ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC          )



                        Wednesday,
                        March 27, 2019


                        Federal Building
                        Room 7516
                        300 North Los Angeles Street
                        Los Angeles, California



        The investigational hearing testimony of

EDWARD AVALOS MARTINEZ commenced, pursuant to notice,

at 9:12 a.m.

                        * * *

Page 2

```
 1    APPEARANCES:

 2
      For the CONSUMER FINANCIAL PROTECTION BUREAU:
 3
          CONSUMER FINANCIAL PROTECTION BUREAU
 4        BY: COLIN T. REARDON, ESQ.
              E. VANESSA ASSAE-BILLE, ESQ.
 5        1700 G Street, NW
          Washington, DC 20552
 6        (202) 435-9668
          (202) 435-7699
 7        colin.reardon@cfpb.gov
          elisabeth.assae-bille@cfpb.gov
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 27, 2019

2                          9:12 A.M.

3

4                     EDUARDO AVALOS MARTINEZ,

5                having been first duly sworn,

6                was examined and testified as follows:

7

8                          EXAMINATION

9    BY MR. REARDON:

10       Q    Good morning.

11       A    Good morning.

12       Q    Before we get started with your testimony,

13   there are a few preliminary things I'm going to cover on

14   the record.

15            My name is Colin Reardon.  I'm here with

16   Vanessa Assae-Bille.  We are attorneys in the Office of

17   Enforcement at the Consumer Financial Protection Bureau.

18            It is March 27, 2018, at 9:12 a.m., and we are

19   at the office of the United States Attorney in Los

20   Angeles, California.  This is an investigational hearing

21   conducted by the CFPB pursuant to 12 CFR part 1080.  The

22   objections that may be raised this morning are limited,

23   namely, to constitutional and other rights and

24   privileges as set forth in those rules.

25            We are here to conduct the investigational

Page 6

1    hearing of Eduardo Martinez pursuant to a civil

2    investigative demand served on October 26, 2018.

3          Could you please state your full name for the

4    record.

5    A    Eduardo Martinez.

6    Q    Do you have a middle name?

7    A    Eduardo Avalos Martinez.

8    Q    How do you spell your middle name?

9    A    A-v-a-l-o-s.

10   Q    Thank you.  Do you understand the oath that you

11   just took?

12   A    Yes.

13   Q    Are you on any medications or other substances

14   that would impair your ability to give true and accurate

15   testimony today?

16   A    No.

17   Q    Is there any other reason you may not be able

18   to provide true and accurate testimony today?

19   A    No.

20   Q    The Bureau previously informed you that you

21   have the right to have an attorney present representing

22   you today.  I understand that you are not represented by

23   counsel for purposes of this hearing.  Is that correct?

24   A    Yes.

25   Q    This investigational hearing is being

1   director of operations, and before the year was over, I

2   became partner of that company for 2 percent ownership

3   for 100 percent liability, is what I was told.  They

4   said, "How would you like to be a partner?  You get

5   2 percent ownership and you're 100 percent liable."  And

6   I said, "Okay, I'll do it."

7          After I said yes to that -- the reason I think

8   that happened is the owners didn't want to have it in

9   their name and they wanted to have it in my name.  But I

10  had only 2 percent.  But I was the managing partner.  So

11  that why it was explained to me I'd be 100 percent

12  liable.  And I took that on because I felt like if I

13  have 100 percent control, then I'm 100 percent liable,

14  if I know what we're doing, how we're doing it.

15         And the reason they decided to shut down, I'm

16  not 100 percent sure.  I'm guessing they didn't like the

17  industry.  There was a lot of talks about up-front fees.

18  There was talk that the CFPB or FTC, I don't remember

19  who was saying that, you can't charge fees until the

20  work's done or something.  And so they didn't like the

21  industry and they wanted to get out.

22         I had a solution for it, which I thought I had

23  already solved for us, but they didn't care.  And they

24  said, "Sorry, we own 98 percent of the company.  We're

25  closing it down."  And that was 2015.  I started in

Page 20

1   2015, became partner in 2015, and got fired in 2015.

2          And then October 26, I started Docs Done Right.

3   Well, Docs Done Right was given to me by Sean Cowell and

4   Tom and Jawad and all.  They owned Docs Done Right.  And

5   pretty much they were one of the affiliates for SLDP.  I

6   was their back end.

7          And when that back end shut down, the group

8   that owned it decided they wanted to shut everything

9   down, and they decided to go to debt settlement, I

10  think.  So they went into a different industry.

11         I was introduced -- go ahead.

12     Q    That was a lot of information.

13     A    I have a whole story.

14     Q    Yeah, and we're going to get the whole story.

15  But before you get into the whole Docs Done Right story,

16  I'm going to ask a few follow-up questions about some of

17  the stuff you just said about the prior companies you

18  were involved in.

19         So the first one, the first question I want to

20  go back to, you mentioned a couple companies you were

21  involved in where you were in collections, Alarm One and

22  PDI.  Is that right.

23     A    Uh-huh, yeah.

24     Q    What was your role there?

25     A    Bill collector.

1     Q     So calling people who hadn't paid their debts?

2     A     Yeah.  Alarm One is more of a customer service

3  bill collecting, because they were customers that

4  payment didn't go through.

5     Q     And then after that -- or sorry -- what time

6  period approximately was Alarm One and PDI?

7     A     I'm thinking 1999, 2000.  I was like 19, 20

8  years old, something like that.

9     Q     And then at some point after that, you went to

10  Quality Support Services?

11     A     Well, there's a lot of jobs in between there.

12  I highlighted.  I didn't know if you cared for all of

13  them.  I was a longshoreman for a little bit.  I was a

14  pretend teamster.  And I was a fake butcher.

15     Q     Not as that interested in that.  But let's talk

16  about Quality Support Services.

17     A     Sure.

18     Q     You said that was a debt settlement company?

19     A     It was a back end.  It was a customer service

20  back end for debt settlement.

21     Q     And so it had affiliates that provided the

22  front end.

23     A     That's how I learned about how the affiliate

24  process and back end versus front end worked.

25     Q     And what was the time period, approximately, of

Page 38

1           MR. REARDON:  Let's go off the record.

2               (Off record 10:00:02 to 10:00:44 a.m.)

3           MR. REARDON:  We're going back on the record.

4   The time is 9 o'clock -- 10 o'clock.

5       Q    Did the EMC Professional Services company that

6   we spoke about earlier ever invest, or rather, loan

7   money to student loan front-end companies?

8       A    No. EMC was my debt settlement days.  Mimo is

9   my student loan days.

10      Q    Did Mimo ever receive money from student loan

11  company front ends for any reason other than paying back

12  a loan?

13      A    No, I don't think so, no.

14      Q    Did it ever receive profits from student loan

15  companies?

16      A    No.  None of our student loan companies are

17  profitable.  All the ones that I'm doing business with

18  have had a hard time this year.

19      Q    And you mentioned that Mimo has also made loans

20  to debt settlement companies; is that correct?

21      A    Yes.

22      Q    What debt settlement companies?

23      A    Olive Branch.  Olive Branch something.  I

24  forget the last name.

25      Q    Who runs that company?

Page 39

1      A      Tera.

2      Q      Tera Wray?

3      A      Wray.

4      Q      So besides consulting services and making

5   loans, has that Mimo Services Company been used for any

6   other purpose?

7      A      Give me a second to think.  I think I've done

8   some personal loans to some people, individuals.  But

9   not more than like $600 or something like that.  No, I

10   don't believe so, anything else.  Mimo is what I used to

11   either invest in a business or give a loan, depending

12   what the offer that I'm being given is.

13           It's my idea -- may be hard to explain, but

14   when I went out of business in 2010, I didn't diversify

15   myself.  I did one thing.  And that was my biggest

16   regret.  So I thought if I spread myself out, something

17   will succeed.  One of these businesses might work out.

18   And so far the only one that works out is the one that I

19   run myself.

20      Q      Docs Done Right?

21      A      Docs Done Right, yeah.  Also Select Student

22   Services as well.

23      Q      I see.  Are you also involved in a company

24   called Red Signature Solutions?

25      A      Yes, I own that company.

Page 40

1      Q     What is that company?

2      A     Red Signature Solutions was supposed to be

3    originally a company that was designed as a shell for

4    back when it did Docs Done Right, I want to say 2017,

5    2017, I'm not sure what year.  But as I brought in new

6    affiliates, Monster Loans, they didn't want them to buy

7    their leads from them directly, because they didn't know

8    them.

9           So Monster Loans, when they sold their leads to

10   these front ends, they own all those front ends, so they

11   trusted those front ends, and so they felt comfortable

12   with those front ends.

13          As a back end, I all of a sudden started

14   attracting front ends that were not part of their

15   circle.  And these people wanted marketing.  And they

16   said that they would be comfortable giving them

17   marketing, but they didn't want a link through them.

18   They didn't want them telling their secret sauce.

19          And so Red Signature Solutions was created for

20   them to pay Red Signature, so that Red Signature would

21   then pay whoever it is they had to pay.  I don't

22   remember the name of the company.  I think it was

23   like -- I don't remember the name of the company, but it

24   was pretty much, it was designed so that my front ends

25   that had nothing to do with them could pay their

Page 41

1    marketing.

2          I think they only did a little bit with them.

3    I don't think it was a lot.  But it was to create

4    anonymity between their lead source and my clients, my

5    affiliates.

6    Q    That's helpful.

7          MS. ASSAE-BILLE:  Can I...

8          MR. REARDON:  I have some follow-up questions.

9    Or do you want to ask yours?

10          MS. ASSAE-BILLE:  Yes.  If you could tell us a

11   little more about how the payments worked.  Were those

12   front ends to pay Monster Loans for this --

13          THE WITNESS:  Okay, so there's two time periods

14   for Red Signature.  There's the DDR time period, and

15   there's after they all shut down and left me hanging.

16          So Red Signature was an account that I didn't

17   have any use for, just an account I had sitting around.

18   But I'll go with circa 2017, or no, 2016, around there.

19          Almost feel like it would be more helpful if

20   you guys understood how we got there.  But ask your

21   question again regarding Red Signature?  How the

22   payments worked?

23          MS. ASSAE-BILLE:  Right.  So you said that Red

24   Signature Solutions provided some anonymity and some

25   separation between the front-end companies --

Page 42

1          THE WITNESS:  Yeah.

2          MS. ASSAE-BILLE:  -- that were not affiliated

3     with Monster Loans, but that wanted access to some

4     marketing --

5          THE WITNESS:  Correct.  Yeah, so the marketing

6     that was being provided, Monster Loans was being

7     provided, through a guy named Jawad.  Jawad Nesheiwat,

8     something like that.  And they ran the whole process.

9          When I had affiliates join me -- and my

10    affiliates were small, by the way.  I want to say

11    they -- it was like three-man teams, like companies that

12    -- none of them worked out.  The only companies that did

13    any volume were theirs.  They owned them all.  The ones

14    that I brought on were people just trying to do business

15    and then they failed after, like, a month or two.  So

16    they would try some marketing and then they'd disappear.

17         But either way, when I said, "Hey, these guys

18    want marketing.  You guys provide it," they said, "Yeah,

19    we'll charge an up fee," whatever that fee was, but they

20    wanted to go through Red Signature, because they didn't

21    want them to know where the data came from, because they

22    felt like people -- they don't want to be connected with

23    these front ends.  They don't know want what kind of

24    drama they bring or problems they would bring.  So they

25    described it to me as, they just wanted separation.

Page 43

1    Q    BY MR. REARDON:  So let me see if I understand

2    that earlier time period for Red Signature, which is

3    before the student loan companies shut down.

4    A    Okay.

5    Q    I think, as I understand it, Red Signature was

6    essentially used as a buffer between your affiliates

7    that you brought in and the Monster Loans affiliates.

8    Is that correct?

9    A    Correct.

10   Q    And Jawad at Monster Loans was the source of

11   the marketing information that those affiliates wanted.

12   Is that also correct?

13   A    All of them were.  But Jawad was the one that

14   dealt with it, my understanding.

15   Q    I see.  And who did you have conversations with

16   at that point about --

17   A    The marketing?

18   Q    -- this marketing relationship?

19   A    Jawad and Robert.  Robert Hoose is his

20   brother-in-law.  He ran Docu Prep.  And I remember

21   something else.  And I'm not 100 percent accurate on

22   this, but my memory is this way, so I'll tell you what

23   my memory is.

24        When I created Red Signature Solutions, there

25   was a plan for Red Signature to be actually something.

Page 44

1    I had created the company name first, not knowing that I

2    ended up using it for this.  Because when they told me

3    that role, I said, "I don't have a buffer."  I go, "I

4    can use the one that I'm sitting on that I just

5    created."

6         And Red Signature originally was R for Robert,

7    Ed -- and Ed.  It was supposed to be a business me and

8    him were supposed to do.  I hadn't done front end yet.

9    I was only back end.  And so to me, I wanted to get -- I

10   realized the money was in the front end, and I wanted to

11   one day do a front end.  Since they were popping up

12   front ends here and there.  I was pretty much wanting to

13   do something.

14        So I created -- I got a relationship with

15   Robert.  It was up and down.  It didn't end well,

16   because Robert ended up taking the money out of Red

17   Signature Solutions without telling me, and then I

18   kicked him off the bank account.  And it was like 2,000

19   bucks.  But it wasn't good.

20        I just remembered the reason I created Red

21   Signature to begin with was I wanted to do it as a

22   business model for me and Robert to work together on

23   something.  And then we never did.

24        And then when I was approached that they needed

25   to pay someone else, they wanted me to pay Docs Done

Page 99

1   understanding.

2          I believe you testified earlier that Docs Done

3   Right was created in late 2015; is that correct?

4      A   Yes.

5      Q   And have you been in charge of that since that

6   time?

7      A   Yes.

8      Q   Do you have a title?

9      A   Owner.

10     Q   Owner?  And you're the manager of the company?

11     A   Yes.

12     Q   I believe you said earlier that Docs Done Right

13  provides back-end services to affiliates; is that

14  correct?

15     A   Correct.

16     Q   What's the kind of breakdown of who does what

17  between Docs Done Right and its affiliates?

18     A   I need clarification on that question.

19     Q   So what services --

20     A   Does Docs Done Right?

21     Q   -- does Docs Done Right provide to the

22  affiliates?

23     A   So the sales company sell the client into a

24  program.  They send it over to Docs Done Right to act as

25  them.  So we act as that company.  So I'll use Assure,

1    open it up and sign it.  E-sign it.

2        Q    And I think you said earlier the salesperson

3    would work from a script; right?

4        A    I'm sure a lot of them went off script.

5    They're supposed to work off the script.

6        Q    The salespeople would enroll people in federal

7    student loan consolidations; right?

8        A    Yes.

9        Q    What was the process for enrolling someone in a

10   federal student loan consolidation?

11       A    They would enroll them for us to do the

12   document preparation.  They didn't enroll them into the

13   consolidation.  They enrolled them to doc prep.  So

14   forgive me --

15       Q    Oh, yeah, that's a helpful clarification.  So

16   one of the services that the sales rep would sign the

17   person up for was enrollment in consolidation.

18       A    We would prepare the documents for the client

19   to enroll themselves into one of these programs.

20       Q    What is the effect of consolidating federal

21   student loans on a customer?

22       A    What is the effect?

23       Q    What does it do for them?

24       A    Different scenarios.  But one scenario as an

25   example would be the client came out of college and they

Page 168

1    have student loans they can't afford.  And based on

2    their income, they're allowed by the government to have

3    payments affordable based on their income.

4           And so by consolidating their loans, they're

5    now in this consolidation program where the payment

6    works with their income.  So if they make more money,

7    they pay more.  They make less money, they pay less.

8    And after 240 attempts of making whatever you can

9    afford, that program gives you forgiveness after 240

10   payments.

11   Q    Is it necessary to consolidate in order to get

12   that benefit?

13   A    I don't think it is.  I think you just need to

14   be in an IDR program.  So you can have them individually

15   that way.  But the reason consolidation is the most

16   common is that most clients weren't in that direct pay

17   program.  The easiest way to get in is direct

18   consolidation.  It doesn't raise your interest, doesn't

19   lower your interest, just keeps the interest the same

20   into one payment.  And the --

21   Q    You said that consolidating doesn't affect your

22   interest?

23   A    It does not.  Your interest stays the same.

24   It's a weighted average of your interest rate.

25          Another thing is, the overall effect, and it's

1   short-term, if you're only going to do it for five years

2   and then you're going to become a doctor and make

3   hundreds of thousands of dollars a year, you're going to

4   end up paying your debt in full.  But for those five

5   years, you did something affordable without ruining your

6   credit.  That's another benefit to consolidation.

7           Another thing that happens is --

8   Q    Sorry.  How does it improve your credit?

9   A    No, it doesn't improve it.  It doesn't hurt

10  your credit.  Because if you didn't consolidate it and

11  you can't keep up with your payments, you become past

12  due.  You become past due, that hurts your credit.  So

13  it helps your credit through by not ruining it, because

14  if you were past due on your payments, that would be bad

15  for your credit.

16  Q    So just so I understand, is it enrolling in one

17  of the income-based replacement plans that helps you

18  avoid defaulting?

19  A    It's enrolling into something you can afford

20  that helps you avoid defaulting.  A lot of people that

21  sign up are already sometimes past due, or they're on a

22  deferment and their interest is just accruing and

23  they're not getting any credits towards forgiveness.

24          If you want to get credits for forgiveness, you

25  need to be on a direct consolidation loan.  So by moving

1    it into that loan, now the clock starts to get maybe

2    forgiveness if you get to 240 payments, or 120 payments

3    if you work for the government or a nonprofit that's

4    approved.

5        Q    I assume you're familiar with student loan

6    servicers?

7        A    Yes.

8        Q    What is a student loan servicer?  It's not a

9    trick question.

10       A    The companies are assigned to service the loans

11   for the Department of Education.

12       Q    And what happens to a customer in terms of what

13   services they have after the loans are consolidated?

14       A    What happens to the --

15       Q    Let me rephrase the question.  If a customer

16   consolidates, do they keep the same servicer?

17       A    They can, yeah.

18       Q    What can happen?

19       A    Most times they keep the same servicer.

20       Q    Does the Department of Education ever itself

21   act as a servicer?

22       A    No.  Not that I know of.  Why?

23             (Exhibit 7 was marked for

24             identification.)

25       Q    BY MR. REARDON:  The court reporter has marked

Page 171

1    as Exhibit No. 7 a sales script that was provided to the

2    Bureau by Debt Pay Gateway.  And our understanding is

3    that this was part of the application materials that

4    were sent to Debt Pay Gateway as part of the enrollment.

5              If you look at the --

6         A    This was given to?

7         Q    Debt Pay Gateway, by you, as part of the

8    application.  If you look on the first page, it says,

9    "Thank you for calling Docu Prep Center.  My name is

10   adviser."  Do you see that?

11        A    Uh-huh.

12        Q    Do you recognize this as a telemarketing script

13   used by Docu Prep Center?

14        A    Yes, uh-uh, yes.

15        Q    You've seen this before?

16        A    Looks familiar, yes.

17        Q    So this is something that you would have

18   submitted to Debt Pay Gateway?

19        A    Yes.

20        Q    Could you describe how you obtained this

21   originally?

22        A    I probably got this from Robert Hoose.  So I

23   believe -- my memory is that Debt Pay Gateway, as part

24   of their enrollment process, they wanted a copy of the

25   script.  So I had to give them a copy of the script from

Page 172

1    the only stock I had, which was Docu Prep.  So I asked

2    them for a copy of the script so I could submit.

3            And I believe Chris ended up kicking it back,

4    said, "We don't like something."  And we had to resubmit

5    it.  And there was a second one that was submitted.

6    Because there was one that Chris was, like, this is

7    awful.

8            And so I went back to sales floor and I said,

9    "This is not okay.  They need something else."  And

10   there was changes that they made.  I don't know, is

11   there a second one besides this one?  I don't know if

12   this is the second one or the first one.  I do remember

13   Chris telling me, "This is not okay," something I

14   submitted to him for approval.

15   Q    So this, my understanding, was submitted in

16   2015 when you first enrolled.  Would the kickback have

17   come later?

18   A    Would have been within a day or two, and then I

19   would have submitted one within a week.

20   Q    So the kickback was just as part of the

21   original application?

22   A    Possibly.  I'm not 100 percent sure, but I

23   remember they kicked something back that I submitted.  I

24   don't even know if it's a script, to be honest.

25            Is this the one that they accepted?

Page 173

1      Q    My understanding is that it is.  I don't -- I

2   want to ask you questions about it.  And I'm not aware

3   of any other script from 2015 that was provided to them.

4           If you look at the second page, which has the

5   number 141 at the bottom.  There's a paragraph in the

6   middle that says:

7                "Through this consolidation process,

8                the U.S. Department of Education will be

9                your new servicer and you will be making

10                your new single loan payment to the U.S.

11                Department of Education."

12           And then it says, quote, "It's because of this

13   main reason that servicers such as, [name of servicer],

14   did not go out of their way to assist borrowers with

15   consolidation process.  "They don't want to lose your

16   business."  And then it continues.

17           We just talked about this, but it's not the

18   case that --

19      A    That's not the case.

20      Q    -- that U.S. Department of Education becomes

21   the servicer; right?

22      A    Correct.  That's not the case.

23      Q    Can you explain why this is in the script that

24   you provided to Debt Pay Gateway?

25      A    No, I can't.  I don't even remember this being

Page 174

1   in the script.

2       Q    Did you read the script at the time?

3       A    I would have thought I would have, but I don't

4   remember reading this.  This is like ridiculously bad.

5       Q    Do you know if the student loan shops made this

6   representation in other scripts they used?

7       A    I don't know.  But if this is what I provided,

8   I must have not read it.  It's the only thing I can

9   think of.  Because this is the kind of stuff I would

10  have been, "What are you guys doing?  You don't need

11  that to make a sale."

12      Q    If you turn to page 4, which has 143 at the

13  bottom.  There's a section that says "document

14  preparation fees."  Do you see that?

15      A    Uh-huh.

16      Q    And it says:

17           "Now, as for the document

18           preparation cost, you have the option of

19           two easy payments, or payment in one

20           lump sum."  I'm summarizing.  Quote, "We

21           normally bill this about ten days out

22           and that money pays for document

23           preparation and any other costs

24           associated with this process.  Once we

25           perform the document preparation

Page 175

1           services, your funds will be released to

2           us, which is why you were billed a

3           little further out."

4      Is that essentially an accurate description of

5  how the e-charging worked?

6      A    Yes and no.  It is correct that we did not

7  charge our fee till the document preparation is done.

8  But the document preparation now gets done in, like, one

9  day.  So I could theoretically charge two days later,

10  three days later.  My understanding from the sales floor

11  is that they wanted their first payment within ten days.

12  Not out ten days.

13     Q    That's helpful.  And I just want to be clear, I

14  note practices may have changed slightly over time.  But

15  how did this work for the Whatney Tom Chou student loan

16  companies?  They all charged kind of relatively quickly

17  after the sale?

18     A    From information that I'd given to our shops

19  back then, and them, even before that, we noticed that

20  people that pay within ten days are less likely to

21  cancel, and people that pay in full within 45 days are

22  less likely to cancel.

23          So my understanding that these shops were

24  trying to do is that they did a one, two, or three pay.

25  No matter if it's a two pay or three pay, everything's

Page 176

1   paid within 45 days.  And no matter what, the first

2   payment is within ten days.  No sooner than I think two

3   days.  I don't think they ever did anything faster

4   than -- and I don't remember exactly what it was then,

5   but I think it's -- there was no same-day charges, ever.

6          Everything should have been out a few days,

7   because it gives us time to process and make sure we got

8   it done.  And then once it hits the escrow account, it

9   sits there for seven days after that payment goes into

10  escrow.

11         So let's just say fastest we ever charged was

12  two days, maybe three days, actually.  Even though the

13  client's payment went out, the first payment, it sits

14  there for days before it -- that's how long it takes for

15  them to clear it.  And that automatically would have

16  given maybe ten days.  Maybe that's why they added ten

17  days.

18         But in reality, the client paid within -- under

19  ten days.  We never got our money till enough time had

20  gone through.  In case there was a charge or a refund or

21  cancellation, it sits in escrow, goes right back in the

22  client.  We don't collect it.

23         MS. ASSAE-BILLE:  Unless the client paid by

24  credit card?

25         THE WITNESS:  Unless the client paid by credit

1    card, which is what they would have collected.

2        Q    BY MR. REARDON:   The front-end company?

3        A    Yeah.  But we don't collect that fee from them

4    for 30 days.

5        Q    Right.  So there's a sentence later, in the

6    last paragraph here that says:

7                "In addition, once the U.S.

8                department pays off your current loans,

9                your new payment to them will not be due

10               for up to 60 days thereafter."

11               Was that correct?  Did it typically --

12       A    It takes them about that long.

13       Q    It takes the Department of Education that long?

14       A    Yeah.  Takes them about that long to get it

15   done.

16       Q    So during that 60-day period, would the

17   customer usually be in forbearance?

18       A    They'd usually be in forbearance, or whatever

19   their payment is, they'd continue that payment until the

20   new payment takes place, which could take 90 days

21   sometimes.

22       Q    So is it correct that the customer's funds

23   would usually have been received by -- scratch that.

24               Would the customer have already been charged

25   the fees for all their services before their new payment

Page 178

1   was due?

2       A    Oh, yes.  Because it's doc prep, not -- we're

3   not changing your payment.  We charge you for sending

4   you the documents.  So our fee should be regardless

5   whether you sign the contract or not.  If we send you

6   the documents, and you get them and you do nothing with

7   them, just throw them away, we still charge you the fee,

8   regardless if you submit them to the servicer or not.

9       Q    Would Docs Done Right ever submit documents to

10  a servicer?

11      A    Once the client signs it, they would send it

12  back to us, and if we saw there was an error, we'd let

13  the client know.  If there's no error, we forward it for

14  them.  The client can send it themselves or we can send

15  it to them, if they want us to send it for them.

16      Q    So I think, if I understand you correctly, your

17  belief was that the TSR advanced fee provisions didn't

18  apply to your company because it was engaged in doc

19  prep?

20      A    Correct.

21      Q    And how did you get that understanding?

22      A    Because we don't negotiate debt.  We don't

23  lower their payment.  We don't negotiate their payment.

24  There is no -- there is no settlement.  We don't settle

25  debt.

Page 194

1    essentially, why would Sean Cowell be on an email like

2    this?

3        A    This is probably during the mentorship time of

4    Haithem.  So Haithem decided to include Sean Cowell.

5    That's it.  It's almost for Sean just to read it.  But

6    it wasn't for Sean to have a say.

7            I was very -- they would describe me in that

8    period as hard to deal with.  Because I wasn't budging

9    to their idea.  They had ideas of what should be done.

10   They wanted us to -- and it's off memory -- they wanted

11   us to, like, say no to the refund and then only if they

12   filed a complaint, then we do a partial refund.  They

13   had all these ideas.

14           And I said it's not worth -- my position was,

15   it's not worth having a complaint over a refund.  If the

16   client wants a refund, they get a refund.  You can't

17   force somebody to be your customer if they don't want to

18   be your customer.  That's it.

19           Reminds me of a time when they were really

20   arguing with me.  And I guess this is probably Genessee

21   proving we did everything we could, to calm down these

22   affiliates' owners from complaining.  This happened

23   often.  This wasn't once in a while.

24       Q    So there would often be disputes?

25       A    It almost felt like every couple weeks there'd

Page 195

1   be, like -- it would be him or it'd be Anthony or it'd

2   be David or it'd be Tera.  They all had ideas how --

3   they all wanted to do the back end themselves.  Every

4   one of them wanted to, like, "I think we could do it

5   better."

6       Q    What percentage of customers in the student

7   loan shops cancelled?

8       A    Overall?  If you include stuff that should have

9   never made a payment -- do you want to include people

10  that made a payment and cancelled, or never made a first

11  payment and cancelled?  Because if they didn't make the

12  first payment, they're never really a customer.

13      Q    How about everybody who signed a contract?

14      A    60 percent stuck.  You'd have like a 40 percent

15  cancellation rate overall.

16      Q    And what was the reason for that?

17      A    Number one reason?  It's kind of a joke.  Did

18  not say.  That's the number one reason.  It says, "Did

19  not say."

20           We would ask them why they were cancelling or

21  why they chose to go with us.  Some of them would say

22  they're doing it on their own.  Some changed their mind.

23  It wasn't -- people don't really go out of their way to

24  tell you why.  I don't know why they cancelled.

25           Or there was some reasons where the client was

1   sold improperly.  The client was told something that was

2   not true, And they found out through customer service

3   that it wasn't true, so they cancelled.

4        One of the ones that came up quite a bit was

5   that they thought they were getting a loan with the

6   Department of Education directly, and when they find out

7   they're going to be a servicer, they say, "Well, that's

8   not what I was told," so they want to cancel.

9        That ended up changing our compliance calls.

10  Those kind of issues changed our compliance calls.

11  Anything the sales rep said that was incorrect that we

12  found out was a straight-out lie, it was one of the

13  reasons for cancelling.  But number one reason, it was

14  unknown.  We didn't really know why.  People just

15  cancelled.

16  Q    I want to follow up on something you just said

17  about there were complaints about customers thinking

18  their loan would be with the Department of Education.

19  A    That's an example, yeah.

20  Q    I think we talked about earlier in that sales

21  script how there was a representation that the

22  Department of Education would become the customer

23  servicer.  Do you remember that?

24  A    I remember seeing that earlier, yeah.

25  Q    So is that kind of script language similar to

Page 197

1    the kind of complaint you got?

2        A     The things that they were complaining about

3    were not -- I'd seen their script, because I'd met with

4    them and talked about their script.

5              I never saw that section, that one right there

6    that you showed me today.  They showed me a compliance

7    script, this is what we say, this is what we do.  I was,

8    like, "Okay, then why are people saying this?"

9              And they're, like, "This is not what we're

10   teaching our reps.  Our reps are getting bad habits from

11   reps that have been here a long time, and they're

12   learning tricks from each other."  That kind of stuff.

13             The script was supposed to be very

14   straightforward and boring.  It wasn't supposed to be

15   what I just saw.  And maybe that was when we first

16   joined them in 2015.  Maybe that's what they were using.

17   But my memory of the script, that they were compliance

18   sales script, at least, Docu Prep or the shops that they

19   had.

20             Because Tera, for example, she was very much

21   about that.  Tera's like medicinal, herbs, and

22   everything needs to be natural, and oh, my gosh, the

23   script better be very compliant.  It has to be -- she

24   had a big input, and I know that 100 percent her, she

25   wanted to be by the book on everything.

Page 198

1          So she'd always ask the back end, who does

2    this?  Who does that?

3          And we'd tell her, she goes, "Oh, I thought it

4    was this."

5          Like, "No, it's this."

6          And she goes, "I'm going to fix that on my

7    thing."  I don't remember examples, but she would not

8    have been okay with that kind of script that you showed

9    me, for sure, at least her.  The other guys, I don't

10   know.

11         But what she did, other people did.  And they

12   were all copying each other.  I believe that those

13   complaints come from individual sales reps trying to

14   make a sale, because they think they're going to lose a

15   sale, so they lie or they exaggerate, thinking that it

16   will never come back up.

17         For example, "I thought my servicer was the

18   Department of Education."

19         And we're, like, "No, your servicer's going to

20   be this."

21         I can tell you this.  On our calls, our back

22   end never said anything that wasn't correct.  We're very

23   strict.  None of my employees would have worked for me

24   if we asked them to do something that was not on the up

25   and up.

Page 199

1      Q    Just to follow up on it, it does sound to me

2   like this issue that was in this one script also

3   appeared in some of the complaints.

4      A    Sure.

5      Q    And that the department -- people thinking that

6   the Department of Education would be the new servicer

7   was an issue in the complaints.

8      A    Yes.  Not common, but we got that once in a

9   while.

10     Q    Do you know of any steps that were ever taken

11  to fix that in the scripts?

12     A    Anytime we had something that was blatantly

13  bad, we would tattletale to the owner of their company.

14  That's the only thing we can do, is tell the owner, say,

15  "Hey, we've got a cancellation because of this."

16          We had -- just examples, not common, but we got

17  a call where "The client says they never even signed the

18  contract.  Apparently your sales rep signed the contract

19  for them using his own email.  And the client sent us

20  this, and that's not her email.  This is an email that

21  your sales rep has."

22          And usually that would probably end up in a

23  firing or something.  But there was weird situations

24  that we would catch as the back end, and we would

25  tattletale to the front ends.

Page 200

1          As far as we understood it, they're front-end

2     owners.  They weren't in the business of trying to sneak

3     things in and run off.  They all had this premise of,

4     "I'm going to be the best student loan shop ever.  I'm

5     going to do things right."  They didn't come as evil

6     people, as far as my impression.

7          Q    Would customers ever charge back their credit

8     cards or claim that an ACH payment was unauthorized?

9          A    Yeah, we had unauthorized rates.  We would have

10    people claim that they didn't authorize the payment, and

11    it would get charged back.

12         Q    Why did that happen?

13         A    I don't know.  Some people would rather do that

14    than call and cancel.  Unauthorized rate for the student

15    loan industry is higher than debt settlement.  They want

16    it to be at a .05, and we were hitting like 1 percents

17    on unauthorized rates, 1-1/2, even, at some point.

18         Q    Did Debt Pay Gateway ever raise concerns about

19    that high rate?

20         A    Yes.

21         Q    What did they say?

22         A    They said you need to get that lowered.

23         Q    And when was that?

24         A    I don't remember the date, but I did everything

25    I could.  We started to implement courtesy calls before

Page 201

1   the payment was coming out to remind them that their

2   payment was coming out, hoping that we would catch

3   somebody that was saying, "Oh, yeah, I forgot about

4   that.  Can you change the date?"  Hopefully avoiding an

5   unauthorized rate.

6         It helped a little bit.  Our rate was starting

7   to go down.  And then we had a couple spikes, and then

8   we'd find that the spikes came from one particular shop,

9   and then we identified that unauthorized rates were

10  higher for certain sales reps.

11        We were trying to identify what the cause and

12  issue was.  But when we called the clients, some of the

13  times we'd run into, "Oh, I didn't unauthorize that.  I

14  didn't recognize your company because it said Debt Pay

15  Gateway, and we thought it was going to say Assure."

16        But in the compliance call, it was, like, your

17  payment's going to come out, it's going to say Debt Pay

18  Gateway.  But sometimes people don't remember that, and

19  so they don't recognize the names, so they unauthorized

20  it.

21        But I think most people, it wasn't because -- I

22  don't think it was ever a true unauthorized.  Because

23  these people sign contracts and had a recorded

24  conversation with us where they said yes, this is what

25  we're doing.  They verified their bank account.  The

1    chances of somebody, a sales rep tricking them into

2    something they didn't do is not realistic.

3          I think those unauthorized rates were because

4    people changed their mind or they didn't recognize who

5    it was that was charging them.

6    Q    Do customers ever call and complain and say, "I

7    was scammed by the salesperson"?

8    A    Yes.

9    Q    What would they say?

10   A    They said that "I found out from my neighbor

11   that I could have done this for free without you guys."

12          And we say, "Yes, you can.  It's in your

13   compliance call."  That's it.  But, I mean --

14   Q    Was there any other complaints that people had

15   about things that were said?

16   A    "I was told my interest rate would be lowered,"

17   and that's not true, either.  We've had that.  "I was

18   told that" -- I can't remember all the complaints.  But

19   there's complaints, just like with any industry.  You're

20   going to have unhappy customers.  And we dealt with

21   them, whatever they were.

22   Q    You said there were complaints about interest

23   rates being lowered.

24   A    Yeah, people said, "I thought I'd get a lower

25   interest rate," or they'd complain and say, "I thought

Page 203

1    this would all be done by next week.  Nobody told me

2    it's going to take 45 days."  Or, "I didn't get approved

3    for a deferment," or a forbearance, because they had

4    already used up all their forbearances, and we weren't

5    aware of this.  And so we would work with them.

6         Q    Going back to the interest rate, did the

7    salespeople --

8         A    It was a huge no-no to ever mention your

9    interest rate, because the interest rate does not

10   change.  The interest rate is weighted average.  That

11   was supposed to be part of their sales script.  Our

12   whole customer service --

13        Q    Do you know if that was part of the sales

14   script?

15        A    I know there was conversations about that.

16   When I did sales, it was part of my sales script.

17        Q    Do you know if the Monster Loans student loan

18   companies had that as part of their sales script?

19        A    They should have.  Their sales script probably

20   came from the other group, Andrew Roosen's group, that I

21   used to work for.  And then when I was a sales rep, it

22   was part of mine.

23             When I was a sales rep, I was pretty boring.

24   That's maybe why I wasn't that good.  I overexplained.

25   But I was following the script at that time.

Page 232

1    Monster Loans, and then they changed their mind.

2        Q    So the use that it's made in the Experian

3    account is just to buy data for student loan companies

4    or other outside companies?

5        A    Purely keeping up with the minimum requirement

6    from Experian.  We bought -- if the student loan shops

7    needed $15,000 worth of student loan data, we'd still

8    have to buy 35,000.  Because otherwise you still owe

9    35,000.

10       Q    Have you ever had like a title or role at Lend

11   Tech Loans?

12       A    It's not a real company.  No.

13       Q    So could you just describe what your role has

14   been with the company?  Just paying the Experian

15   invoices?

16       A    I never worked at Lend Tech.  Lend Tech is

17   owned by Sergio, and I paid the Experian invoices.

18   That's it.  I don't know how better...

19       Q    If that's all there was, that's fine.

20       A    I kind of wish you had -- if you ever talked to

21   Sergio -- I know Sergio will be pulled in, but I can

22   only imagine his face.  Because he honestly doesn't know

23   anything.  He didn't know how anything works.  He just

24   thought he was going to do a mortgage business, and he

25   still thinks he's going to do a mortgage business.

Page 233

1   Still right now he talks, dreaming about, "One day we're

2   going to do mortgage."  I'm, like, "No, buddy."

3       Q    So is Sergio just kind of like a face to put on

4   the company?

5       A    Right.

6       Q    Are Bill and Anthony really kind of

7   functionally in charge?

8       A    Nobody ran Lend Tech officially.  But Lend Tech

9   came from Anthony and Bill.  They created Lend Tech.  So

10  my understanding -- and I don't know where I got this

11  from, either, but my understanding is Sean Cowell, Brad,

12  and Bill, and Anthony created Lend Tech, got approval of

13  Experian, had to create some type of office so Experian

14  could do a walk-through or something, and they did that

15  at Monster Loans location downstairs.

16          They created a desk, they put a chair, they put

17  a phone that's not connected, and Experian walks through

18  and goes, "Looks like a mortgage business.  You're

19  approved."

20          And they created pro formas and they created

21  letters to make it look like they were about to do

22  business in mortgage.  They created a paper trail to

23  show that it's going to be a mortgage business.

24      Q    And it was all a sham.

25      A    It's all a sham.  It was always designed to do

Page 234

1    student loan data for their student loan shops that they

2    owned.

3           And so when they shut down and I got Anthony

4    and Bill's -- what I was getting, to keep any business

5    open, they brought that with them.  But they presented

6    it as, "Oh, you guys are going to go do mortgage."

7           I believe, and I can't accuse Bill or anybody

8    of it, but I believe there's a chance that they

9    purposely wanted it to be in my name and Sergio's.  And

10   the only reason my name didn't get on there is out of

11   laziness.  But my name to supposed to be under Lend

12   Tech.  I'm supposed to own Lend Tech with Sergio, and it

13   never got there.  Sergio always had it.

14          And since mortgage sucked, I was, like, well,

15   it's just a company sitting there, and I never added

16   myself.  Why add myself to it?  But I was supposed to be

17   there.

18          And Anthony and Bill presented it as, "This is

19   good for you.  We trust you.  You can have it.  We don't

20   need to be on there."  But why would they do that,

21   unless -- you know.

22          And Sean sold the company to Sergio for zero.

23   Never got paid for anything.  I'm not even sure if you

24   can sell a company for zero.  But he did do it for zero.

25      Q    We saw documents suggesting he may have sold it

Page 235

1    for $100.  Is that possible?

2        A    No.  100 percent zero.  It was gifted.  "For

3    doing such a good job, Ed, you are doing such a good job

4    in DDR that we are going to let you run this mortgage

5    business.  And since you don't have time to do it right

6    now, your partner, Sergio, he can start doing it and

7    you're going to help him be great."

8            That's the original it was of presented to me.

9    Plus, "A perk is that now you have data for your student

10   loan shops.  And Bill knows how to do all that."

11           I was, like, "Okay.  Sounds good."

12           30 days later, "We don't want you as a branch,

13   and you'll have a $350,000 liability."  35,000 times 12.

14       Q    Do you think Sean Cowell misled you?

15       A    Yes.

16       Q    How did he do that?

17       A    I don't think they had any intention to do

18   mortgage with me.  I think that's the not true part.  I

19   can't accuse them of it, I have no proof of it, but

20   that's my gut.  I felt like they knew what they were

21   doing.  I know for sure Brad knew what he was doing.

22   And I think that advice came from Brad.  Sean doesn't

23   think calculating like this.  This is Brad advice.

24       Q    You said that you thought that Brad was

25   involved in the creation of Lend Tech Loans?

```
 1                      REPORTER'S CERTIFICATE

 2

 3            I, Lindsay Pinkham, Certified Shorthand

 4    Reporter No. 3716 of the State of California, do hereby

 5    certify:

 6            That the witness named in the foregoing

 7    investigational hearing, prior to being examined, was by

 8    me first duly sworn;

 9            That said investigational hearing was taken

10    before me at the time and place therein set forth and

11    was taken down by me in shorthand and thereafter

12    transcribed into typewriting under my direction and

13    supervision;

14            That the transcript of said investigational

15    hearing is a true record of the testimony given by the

16    witness and of all objections made at the time of the

17    examination;

18            I further certify that I am neither counsel for

19    nor related to any party to said action, nor in anywise

20    interested in the outcome thereof.

21            In witness whereof, I have subscribed my name

22    this 8th day of April, 2019.

23
                      _____
24
                      Lindsay Pinkham, CSR 3716
25
```