# Summary Judgment Ex. 12

Page 1

CONSUMER FINANCIAL PROTECTION BUREAU

In the Matter of:            )
                             ) Case No. 2017-1876-02
QUICKDEBTSERVICES, LLC       )

Wednesday,
February 27, 2019

Federal Building
Room 7516
300 North Los Angeles Street
Los Angeles, California

The investigational hearing testimony of SEAN COWELL commenced, pursuant to notice, at 9:14 a.m.

* * *

```
 1   APPEARANCES OF COUNSEL:

 2


 3       FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:

 4           COLIN T. REARDON, Attorney Advisor
             ELIZABETH VANESSA ASSAE-BILLE, Attorney at Law
 5           1700 G Street NW
             Washington, DC 20552
 6           210 435-9668
             Elizabeth.Assae-Bille@cfpb.gov
 7


 8


 9       FOR THE WITNESS:

10           SEAN BURKE, Attorney at Law

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      LOS ANGELES, CALIFORNIA, WEDNESDAY, FEBRUARY 27,

2                              2019

3                            9:14 A.M

4

5

6                       SEAN COWELL,

7    having been administered an oath, was examined and

8    testified as follows:

9

10                       EXAMINATION

11   BY MR. REARDON:

12   Q         Good morning.

13   A         Good morning.

14   Q         Before we get started with your testimony,

15   there are a few preliminary matters we are going to

16   cover on the record.  My name is Colin Reardon and

17   I'm here with Vanessa Assae-Bille.  We are attorneys

18   with the Office of Enforcement at the

19   Consumer Financial Protection Bureau.  It is

20   February 27th, 2018, 9:14 a.m.  And we are at the

21   Office of the United States Attorney in Los Angeles,

22   California.  This is an investigational hearing

23   conducted by the Bureau of Consumer Financial

24   Protection pursuant to 12 CFR 1080.

25           The objections that may be raised this

1   morning are limited, namely, to constitutional or
2   other legal rights and privileges as set forth in
3   those rules.  This is not a deposition, and it is
4   not governed by the Federal Rules of Civil
5   Procedure.  We are here to conduct the
6   investigational hearing of Sean Cowell pursuant to a
7   Investigative Demand submitted October 26, 2018.
8           Could you, please, state your full name
9   for the record?
10  A       Sean Peter Cowell.
11  Q       Did you understand the oath you just took
12  with the Court Reporter?
13  A       Yes.
14  Q       Are you on any medications or other
15  substances that would impair your ability to give
16  true and accurate testimony today?
17  A       No.
18  Q       Is there any other reason you may not be
19  able to provide true and accurate testimony today?
20  A       No.
21  Q       Are you represented by an attorney today?
22  A       Yes.
23  Q       Who is your attorney?
24  A       Sean Burke.
25          MR. REARDON:  Mr. Burke, could you please

Page 36

1    services?

2    A          I don't recall.  I don't believe so.

3    Q          So before you started at Monster Loans --

4    A          Yes.

5    Q          -- in 2015, did you work for any other

6    companies that we haven't covered yet?

7    A          No.

8    Q          Did you register or own any other

9    companies that we haven't covered?

10   A          Besides the -- no.  No.

11   Q          It is my understanding that while you

12   worked at Monster Loans, you were a limited partner

13   in several companies that provided companies

14   services to consumers with student loans; correct?

15   A          Yes.

16   Q          I'm gonna list several companies and ask

17   whether you were a limited partner in each company.

18   Okay?

19   A          Yes.

20   Q          First company is Docu Prep Center/Document

21   Preparation Services, LP, were you a limited partner

22   in that company?

23   A          Yes.

24   Q          Certified Doc Prep Services?

25   A          Yes.

```
 1   Q         Assure Direct Services?
 2   A         Yes.
 3   Q         Direct Document Solutions?
 4   A         Yes.
 5   Q         Secure Preparation Services?
 6   A         I don't know about that one.
 7   Q         That's Mark Navarez and Aaron Seberos'
 8   company?
 9   A         Yes.
10   Q         You were limited partner?
11   A         Yes.
12   Q         Docs Done Right?
13   A         No.
14   Q         You were not?
15   A         No.
16   Q         Select Student Services?
17   A         No.
18   Q         Did you have any ownership stake in either
19   of those two companies?
20   A         We were trying to negotiate ownership
21   stake in that.
22   Q         Besides those companies I just went
23   through, were you a limited partner or owner of any
24   other similar student loan companies?
25   A         Yes.  There's one more, that's -- maybe
```

```
 1   you -- you said, "Assured"?
 2   Q         I did say "Assure."
 3   A         That's there.
 4   Q         Was there an ACCL Service Center, A-C-C-L?
 5   A         Yes.
 6   Q         You were a limited partner?
 7   A         That's the one more.
 8   Q         None besides that?
 9   A         No.
10   Q         After you left Monster Loans in
11   February 2017, were you involved in any other
12   student loan companies?
13   A         No.
14   Q         Beyond those?
15   A         No more.
16   Q         Are you familiar with a company called,
17   "Consumer Debt Advisors"?
18   A         Yes.
19   Q         Could you describe your involvement in
20   that company?
21   A         That was going to be a debt settlement
22   company.
23   Q         What was your involvement?
24   A         I believe it was an LP in that.
25   Q         And beyond that?
```

1   multiple lenders.
2   Q         Would that be a consolidation?
3   A         I don't know if it's a consolidation.  I
4   guess, yes, if it's one payment, it could be
5   consolidated.
6   Q         Did Docu Prep Center ever make loans?
7   A         No.
8   Q         Did it extend credit in any way?
9   A         No.
10  Q         What kind of fees did it charge?
11  A         I think, initially, when we first started,
12  the fees were, like, 499 or 599, or something like
13  that.  I don't remember what the fees were.  It was
14  based on what program, I guess, the client would
15  choose.
16  Q         You said you were involved in hiring the
17  general partners; is that correct?
18  A         Yes.
19  Q         Who was hired to be the general partner?
20  A         Robert Hoose and David Sklar were both
21  GP's of Docu Prep.
22  Q         How were they chosen?
23  A         David Sklar was already working with us.
24  There's another company that we had that I might be
25  on is Quantum by Medical.  He was working with us in

Page 76

```
 1   cost.
 2   Q         And that was Andrew Roosen?
 3   A         Yeah.
 4   Q         But you had an idea of the fundraising you
 5   wanted, sounds like?
 6   A         Yes.
 7   Q         Later in that same paragraph, Tom says,
 8   quote, the good news is that the cash comes in
 9   quickly in and the capital payback should be fairly
10   quick.  What did he mean, the cash comes in quickly?
11   A         I think, unlike other businesses where,
12   you know, you get paid in pieces every time it's
13   over, the cash comes in quickly.  It doesn't take
14   years or months to get paid.
15   Q         Why does it come in quickly?
16   A         Because services are done pretty quickly.
17   The documents are filed within ten days, we're
18   filling out the documents for the client and having
19   them sign it and -- it's right away.
20   Q         When -- around that time when Docu Prep
21   Center was started, were there any conversations
22   about how the company could legally charge these
23   clients?
24   A         Yes, there was conversations.  It was
25   through -- I don't even know the name of it.
```

1   for outside companies by June 2017.  Is that
2   consistent with your understanding?
3   A         Yes.
4   Q         Did you support the decision to stop Jawad
5   to stop him from using Experian for outside
6   companies?
7   A         I supported the decision for Jawad to be
8   removed, absolutely.
9   Q         Did you -- sorry.  That wasn't quite my
10  question.  Did you support the decision to stop the
11  kind of use of the Experian account for outside
12  companies?
13  A         Yes.
14  Q         You remained an investor in the student
15  loan companies after they no longer had access to
16  Experian data; is that correct?
17  A         Yes.
18  Q         Did that loss of action items Experian
19  data affect their performs?
20  A         Very quickly, the VID came after that.  I
21  think they did a recycle mail and didn't affect her
22  performance too much.  And then I don't know how
23  many months later the CID came, and then that was
24  it.
25  Q         Are you aware of any efforts to obtain an

1  Experian prescreen data for the student loan
2  companies through another course?
3  A        No.
4  Q        Did Jawad ever try to do that?
5  A        You know, I don't know. I don't know.
6  Q        You just referenced this little bit, but
7  do you have an understanding of why the student loan
8  companies closed?
9  A        Yes.
10 Q        What is your understanding?
11 A        They shut down, the CID came, and limiteds
12 didn't want to do anything with that business
13 anymore. Instead of the replying to the CID, they
14 scattered and went and opened up their own shops, or
15 most of them did.
16 Q        How did that decision happen to close
17 down?
18 A        It literally happened overnight. It was
19 literally, the CID came, we looked at it, showed it
20 to Brad, Brad kind of explained it to us, and next
21 day we -- the -- the student loan shops started
22 getting CID's, as well. I don't think it was -- I'm
23 pretty sure the other shops got them, as well, and
24 everyone just stopped. People just stopped, that's
25 it. We didn't want -- the LP's didn't want to have

1  anything to do with the businesses anymore and the
2  general partners just said, "Fine, I'll take it over
3  here," and they all left.
4  Q          They just shut down immediately?
5  A          Yes, Oldfield shut down -- yes. The only
6  person that didn't shut down was Ed Martinez,
7  because he already had services that were into the
8  program.
9  Q          Did he just continue going?
10 A          He continued servicing the clients that
11 were in there and not taking on any new clients.
12 Q          He had other affiliates; right?
13 A          Yes.
14 Q          Did he continue --
15 A          I don't know.
16 Q          -- with those?
17 A          I don't know.
18 Q          Did you speak to him at any point around
19 this time or after?
20 A          Yes, I did, of course. His thing was,
21 "Listen, I still have to stay open because I have,
22 you know, all of the student loan shops that have
23 shut down. It takes me, at least, six months to
24 make sure that all the clients have been serviced
25 and to answer customer service phone calls, because

1   people have questions about the product to give
2   refunds," do all the things he does.  Anyways, it's
3   like a long fail once you stop, he still has to keep
4   going.
5   Q         What happened to the company's records?
6   A         What kind of records?
7   Q         Physical records, computers.
8   A         I don't think there was any physical
9   records.  There was probably Debt Pay Pro records.
10  Q         They use computers?
11  A         Yes.
12  Q         Do you know what happened to the
13  computers?
14  A         They took everything.  They took TV's off
15  the wall, they took computers, they took chairs,
16  they took cubes, plants, they took everything.
17  Q         Monster Loans has produced a number of
18  emails that are in its possession for the student
19  loan companies or communications between people at
20  Monster Loans and student loan companies.  My
21  understanding is that Monster Loans provided us
22  with -- and searched your Monster Loans email
23  account but unable to search any of your other email
24  accounts; is that correct?
25  A         I don't know.

1  Q          And earlier we spoke about the student
2  loan companies.  They don't offer credit; right?
3  A          No.
4       (Exhibit 27 was marked for identification.)
5  BY MR. REARDON:
6  Q          This is another document provided to the
7  Bureau by Experian, Bates number 2763.  And the
8  title, "Experian Consumer Services Schedule," is
9  that your signature on this document?
10 A          No.
11 Q          How do you explain how a signature
12 purporting to be yours got on this document?
13 A          Bill probably signed it for me.
14 Q          And he had authority to do that?
15 A          Yes.
16 Q          Paragraph 4 says, "Data used restrictions,
17 client agrees it will not directly or indirectly" --
18 sorry, scratch that.  Paragraph 3, "FCRA application
19 use."  Paragraph 3 says, "FCRA application use.
20 Client can request and use the services strictly in
21 accordance with the Federal Fair Credit Reporting
22 Act."  Do you see that?
23 A          Yes.
24 Q          This is something Lend Tech loan agreed
25 to; is that correct?

```
1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF LOS ANGELES    )

3

4        I, Katherine Jones, a Certified Shorthand

5    Reporter, do hereby certify:

6        That prior to being examined, the witness in the

7    foregoing proceedings was by me duly sworn to testify to

8    the truth, the whole truth, and nothing but the truth;

9        That said proceedings were taken before me at the

10   time and place therein set forth and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13       I further certify that I am neither counsel for,

14   nor related to, any party to said proceedings, not in

15   anywise interested in the outcome thereof.

16       In witness whereof, I have hereunto subscribed my

17   name.

18

19   Dated:  March 19, 2019

20

21
          _____
22        Katherine Jones
          CSR No. 10097
23

24

25
```