# <u>Summary Judgment Ex. 17a</u>

**Expert Report of**

**David M. Skanderson, Ph.D.**

**in the matter of**

*Bureau of Consumer Financial Protection, Plaintiff,*

*v.*

*Chou Team Realty, LLC f/k/a Chou Team Realty, Inc., d/b/a Monster Loans, d/b/a*

*MonsterLoans, et al., Defendants*

**United States District Court**

**Central District of California**

**Case No. 8:20-cv-00043-SB-ADS**

December 14, 2020

Expert Report of David M. Skanderson
December 14, 2020

# Table of Contents

1.  Qualifications ........................................................................................................... 2

2.  Scope of Assignment ............................................................................................... 3

3.  Summary of Relevant Allegations and Assumptions............................................... 4

4.  Summary of Opinions............................................................................................... 6

5.  Overview of Credit Scores and Credit Scoring Models .......................................... 8

     5.1.    What is a Credit Score?................................................................................... 8

     5.2.    Categories of Information Used in Credit Bureau Scoring Models................. 12

6.  Analysis of Defendant's Representations .............................................................15

     6.1.    Impact of Student Loans in General ............................................................. 16

     6.2.    Impact on Payment History .......................................................................... 16

     6.3.    Impact on Amounts of Debt Owed ............................................................... 19

     6.4.    Impact on Length of Credit History .............................................................. 21

     6.5.    Impact on New Credit ................................................................................... 21

     6.6.    Impact on Credit Mix .................................................................................... 22

     6.7.    Summation .................................................................................................... 23

Appendix 1:  Curriculum Vitae .....................................................................................25

Appendix 2:  Information Relied Upon or Considered ...................................................33

Expert Report of David M. Skanderson
December 14, 2020

## 1.    Qualifications

1.        My name is David M. Skanderson.  I am a Vice President at Charles River Associates ("CRA"), an economic consulting firm.  Prior to joining CRA in 2009, I was a First Vice President at Washington Mutual Bank, F.A.  Prior to that, I was a Senior Manager at KPMG LLP and KPMG Consulting, Inc.  I received my M.A. and Ph.D. degrees in Economics from the University of Rochester, with a concentration in Finance at the Wm. E. Simon Graduate School of Business at the University.  I received my B.A. degree in Economics from California State University, Sacramento.  A copy of my curriculum vitae is attached as Appendix 1.

2.        During my professional career, I have been extensively involved in analysis of consumer credit matters, including extensive analysis of credit data and credit scoring models. At CRA, I consult with a range of financial institutions on economic and data analysis, including on matters related to consumer credit and credit scoring, including the statistical validation of credit scoring models and testing such models for risk of potential discriminatory impacts.[1] Through my work I have a deep understanding of the content and structure of a range of consumer credit scoring models, and the techniques used to develop such models.

3.        I have previously provided expert testimony on matters related to mortgage loan underwriting, credit analysis, and mortgage loan servicing, among other mortgage lending topics.  My testimony has often included detailed analysis of consumer credit reports, and has included providing opinions regarding allegations of credit damages to consumers, particularly in terms of the alleged impacts of particular credit events or credit reporting information on commercially available credit scores.

---

[1] Statistical validation is the process of reviewing and testing a model to determine whether (among other things) it was developed in a statistically sound manner, and follows generally accepted model development techniques and methods.

Expert Report of David M. Skanderson
December 14, 2020

4.      At Washington Mutual Bank, I was a senior leader in the Corporate Compliance
department, where I led departments responsible for fair lending analysis, Home Mortgage
Disclosure Act compliance, and regulatory compliance loan review.  I also worked on issues of
data systems, credit model validation, and regulatory compliance governance.  At KPMG, I
provided economic analysis, statistical analysis, and modeling services to corporate and
government clients on federal regulatory, tax, budgetary, and statistical issues.  This included
work with financial institutions on consumer lending matters, and work with private-sector and
government clients on statistical analysis and statistical sampling matters.

## 2.      Scope of Assignment

5.      I was retained by Plaintiff, the Bureau of Consumer Financial Protection ("the
Bureau"), to provide expert testimony in this matter based on my knowledge of and experience
with consumer credit scoring models and consumer credit analysis. I was asked to explain the
potential impacts of federal student loan consolidation on a person's credit score and to
evaluate whether representations Defendants allegedly made through their sales personnel
between 2015 and 2017 to consumers with federal student loans regarding favorable credit
score impacts of loan consolidation were accurate and objectively supportable.

6.      For purposes of this report, "Defendants" refers to the five "Student Loan Debt
Relief Companies" named as defendants in the Bureau's Second Amended Complaint: (1) Docu
Prep Center, Inc. and Document Preparations Services, LP (collectively, "Docu Prep Center"); (2)
Certified Doc Prep, Inc. and Certified Doc Prep Services, LP (collectively, "Certified Doc Prep
Services"); (3) Assure Direct Services, Inc. and Assure Direct Services, LP (collectively, "Assure
Direct Services"); (4) Direct Document Services, Inc. and Direct Document Services, LP

Expert Report of David M. Skanderson
December 14, 2020

---

(collectively, "Direct Document Solutions"); and (5) Secure Preparation Services, Inc. and Secure

Preparation Services, LP (collectively, "Secure Preparation Services").[2]

7.      My analysis and opinions are based upon my knowledge and professional

expertise, my review of certain documents produced in this matter and publicly available

information, and my years of professional experience working on consumer credit and credit

scoring matters.  In performing my analysis, I have relied on or considered the documents listed

in Appendix 2.  My opinions are based on the information available to me as of the date of this

report.  I may revise or update my opinions in the event additional relevant information is

produced in this matter.

8.      CRA is compensated $815 per hour for my work in this matter, an amount not

contingent on the outcome of this matter or the nature of my opinions.

## 3.      Summary of Relevant Allegations and Assumptions

9.      The Bureau alleges that Defendants marketed and sold services to assist

consumers with consolidating their federal student loans and with enrolling in federal loan

repayment and forgiveness programs offered by the U.S. Department of Education.[3]  By

consolidating loans, a consumer combines multiple federal student loans into one loan with a

single monthly payment instead of multiple monthly payments.[4]  The consolidation involves

paying off and closing the consumer's existing federal student loan accounts and opening one

---

[2] Second Amended Complaint at ¶¶ 16-27.

[3] *Id.* at ¶ 84.

[4] *Id.* at ¶ 82; *see also* U.S. Department of Education, Federal Student Aid, "Consolidating your federal
education loans can simplify your payments, but it also can result in the loss of some benefits."  Web
links to this and other documents cited in subsequent footnotes that are available through Internet
sources are provided in Appendix 2.

Expert Report of David M. Skanderson
December 14, 2020

new, consolidated federal student loan account.  The Bureau alleges that Defendants misrepresented during sales calls that consolidating federal student loans would improve consumers' credit scores.[5]

10.     For purposes of this opinion, I have been asked by the Bureau to assume that between 2015 and 2017 the Defendants made representations during sales calls contained in telemarketing scripts or employee guidance provided to me by the Bureau.[6] Those scripts instructed sales representatives to tell consumers, among other things, that (a) having multiple student loan trade lines as opposed to a single student loan trade line was adversely affecting the consumer's credit score and (b) consolidating their federal student loans would improve their credit score.[7]

11.     In particular, the scripts and guidance included the following statements, among others.

i.     Docu Prep Center and Certified Doc Prep Services scripts instructed sales personnel to state, "Right now you have (X Amt) open trade lines for every loan you have and this puts a very negative impact on your credit. When they get reduced down to one this should really help to improve your credit score" and "Just to go over the benefits again of what you are receiving throughout this process is One, you're going

---

[5] Second Amended Complaint at ¶¶ 99-102, 210-214, 228-232.

[6] The sales scripts on which I have relied are listed in Appendix 2.

[7] The term "trade line" means the record of activity for a credit account that appears on a consumer's credit bureau record.

Expert Report of David M. Skanderson
December 14, 2020

to have a lower interest rate, Two, you're going to improve your credit, and Three ...."[8]

ii.   A Docu Prep Center employee handbook instructed sales personnel to state, "According to the Fair Credit Reporting Act (FCRA) the rules and law that govern how credit reporting companies report and generate your three digit credit score, having multiple trade line items will impact your credit score negatively when compared to a profile with fewer trade lines.  Therefore, through this consolidation process, we will be reducing your trade lines and you will not appear over extended."[9]

iii.   Docu Prep Center sales scripts instructed sales personnel to state that when consumers consolidated, "The Department of Education will pay off all your existing Federal loans for you in full! This will have the benefit of improving your credit."[10]

## 4.    Summary of Opinions

12.     Based on my understanding of credit scoring models that are commonly used in the consumer credit industry, I concluded that the representations allegedly made by Defendants cannot be supported and likely would be false for many consumers.  There is no basis for a blanket assertion that consolidating a borrower's federal student loans will have a favorable impact on the borrower's credit score, or that having multiple student loans outstanding will negatively affect a borrower's credit score compared to having the same amount of debt in fewer trade lines.

---

[8] CFPB-JN-0050976 and CFPB-JN-0052152.

[9] CFPB-JN-0051038 and CFPB-JN-0001820.

[10] CFPB-JN-0109397 and CFPB-JN-0109411-412.

Expert Report of David M. Skanderson
December 14, 2020

13.     As an initial matter, there is no single unique credit score for any given consumer.  Instead, there is a multiplicity of different credit scores, including numerous versions of the widely used commercially available "FICO" and "Vantage" scores and proprietary credit scores developed by numerous banks and other lenders.  Because all of those scores differ from each other and their inner workings are proprietary, it is not possible to make blanket statements about the impact of loan consolidation on "your credit score."

14.     Based on the structure and complexity of credit scores available from credit reporting agencies (such as the FICO and Vantage scores), the impact of student loan consolidation on a borrower's credit score will generally depend upon the specific credit situation and credit history of each individual borrower, including such factors as (among others) whether the borrower is current or delinquent on their student loans or on other credit obligations at the time of the loan consolidation, the history of the borrower's payments on all of their credit accounts, and the breadth and length of the individual's credit bureau record.

15.     As a result, while there may be some borrowers for whom consolidation of their federal student loans would result in a small increase in their credit score, there will be other borrowers for whom consolidation would reduce their credit score or for whom there would be a negligible impact. Without reviewing each borrower's full credit report and having access to the proprietary credit scoring models used by credit reporting agencies, there would have been no way for Defendants to determine with confidence whether the impact would be favorable, unfavorable, or neutral for any given borrower.[11]  As a result, Defendants' broad representations that loan consolidation will improve their customers' credit scores cannot be supported.  There is no reason to believe that an increased credit score was a likely result of

---

[11] I note that Defendants' sale scripts made no distinctions regarding different representations that should be made based on specific borrower credit profiles or histories.

Expert Report of David M. Skanderson
December 14, 2020

federal student loan consolidation, and the representations likely were false for many borrowers.

16.     Furthermore, because commercially available credit scores are proprietary "black boxes," it would not have been possible for Defendants to reliably determine or predict the impact of loan consolidation on any individual's credit score (let alone for all borrowers in general) even if Defendants had knowledge of each borrower's credit history.

17.     Finally, contrary to the representations in certain of Defendants' sales scripts, the Fair Credit Reporting Act has no bearing on how the number of student loan trade lines will affect a consumer's credit score.[12]

## 5.     Overview of Credit Scores and Credit Scoring Models

### 5.1.     What is a Credit Score?

18.     As defined in the Fair Credit Reporting Act, a credit score is "a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default (and the numerical value or the categorization derived from such analysis may also be referred to as a risk predictor or risk score)."[13]   Put more simply, a credit score is a numerical indicator constructed to predict a consumer's credit risk.   Such scores are derived from complex statistical models ("credit scoring models"), which are sets of mathematical equations or algorithms developed based on analysis of historical data about consumer credit behavior.

19.     Standard credit scores (or "credit bureau scores") available from the three major national credit reporting agencies (Equifax, Experian, and TransUnion) are three-digit numbers

---

[12] *See* 15 U.S.C § 1681 et seq.

[13] 15 U.S.C. §1681g(f)(2)(A). Internal quotes omitted.

Expert Report of David M. Skanderson
December 14, 2020

that represent a gauge of a consumer's likelihood of defaulting on a credit obligation in the future, with a higher score representing a lower expected likelihood of default.[14]  Standard credit bureau scores are commonly used by creditors in deciding whether to grant credit to a consumer, how much credit to grant, and how much to charge for credit, among other purposes.

20.    It is important to note that there is not simply one single, unique credit score for any given consumer.  There are actually multiple credit scores that are widely used in the consumer credit market, the most commonly used of which are various versions of the "FICO" score developed by Fair Isaac Corporation (now known as "FICO") and versions of the VantageScore, developed by VantageScore Solutions, LLC.[15]  Each of the various versions of FICO and Vantage scores are based on different sets of mathematical equations or algorithms. In addition, numerous banks and other consumer lenders use their own internally developed credit scores for underwriting and pricing various types of credit products (either together with FICO or Vantage scores or separately from those scores).

21.    It is not even possible to speak of "the" FICO score for any given consumer, because there is not a single unique FICO score for any individual consumer.  According to a FICO publication, there are actually 28 different FICO scores that are commonly used by lenders, including general purpose credit scores and scores that are specialized for predicting

---

[14] The most commonly used general purpose FICO and Vantage scores (such as FICO 8 and VantageScore version 3.0 and 4.0) range in value from 300 to 850. The FICO and Vantage scores are designed to predict a measure of "default" that is defined as becoming 90 days or more past due on a credit account within the next 24 months.  TransUnion LLC, "Scores Overview – TransUnion Scores," 2015.

[15] According to a FICO report, FICO scores are used in more than 90% of lending decisions in the U.S. See FICO, "Understanding FICO Scores." See Oliver Wyman, "2019 Vantage Score Market Study Report" regarding the prevalence of the VantageScore.

Expert Report of David M. Skanderson
December 14, 2020

risk in specific types of credit (e.g., auto, mortgage, or credit card lending), and including
different versions of the FICO score that have been developed over the years (e.g., FICO 8 and
FICO 9).[16]  Adding further complexity, each of the three major credit reporting agencies
produces its own version of a given FICO score for any given consumer, and the values of those
scores tend to differ across the three credit reporting agencies because the structure and
content of their credit data differs.[17]

22.      Credit bureau scores, such as the various FICO and Vantage scores, are
proprietary,[18] so it is not possible for a person without access to the scoring mechanism to
calculate exactly what the impact of a given credit event (such as student loan consolidation)
would be for any given consumer, or to make the broad representations about positive credit
score impacts for consumers as a whole allegedly made by Defendants.  Nevertheless, some
conclusions can be drawn regarding the alleged representations based on the available public
information about those scores and my experience with consumer credit scoring models
generally, as I discuss in Section 6 of this report.

23.      It is also important to understand that any given credit score (whether a FICO,
Vantage, or some other score) is not generated by a single, unitary mathematical model, but is

---

[16] See FICO, "Understanding FICO Scores," *Id*., p. 7.

[17] The three major national credit reporting agencies may not all receive the same credit information
about a given consumer because not all creditors report data to all three agencies, and the way the
agencies tabulate that information and make it available as inputs to credit scoring models may differ.
*Id*. and Written Testimony of Tom Quinn, FICO Vice President, Scores, Before the U.S. House of
Representatives, Committee on Financial Services, Subcommittee on Financial Institutions and
Consumer Credit, March 24, 2010.

[18] For example, see Consumer Financial Protection Bureau, "The impact of differences between
consumer- and creditor-purchased credit scores," Report to Congress on Credit Scores, July 19, 2011, p.
5: "credit scoring models are highly valuable, closely guarded intellectual property."

Expert Report of David M. Skanderson
December 14, 2020

instead based on a collection of distinct sub-models ("scorecards") that are tailored to specific segments of the customer population.  At a basic level, it is typical in credit score modeling to have separate sub-models for scoring consumers with limited credit history ("thin" credit files) versus consumers with extensive credit history ("thick" or "full" files), separate models for scoring consumers with serious negative ("derogatory") credit history versus consumers with no serious derogatory credit history ("clean" files), and separate models for scoring consumers with a past bankruptcy versus no bankruptcy, among other segmentations, and there may be additional segmentation within those kinds of broad segments.[19]  For example, the FICO 8 score is based on 12 different segment-level sub-models, and VantageScore 3.0 is based on 13 different segment-level sub-models.[20]

24.  Credit scoring models are "segmented" in this way because different credit characteristics interact with each other such that the relationships between consumer credit data attributes (scoring model inputs) and future consumer credit performance (i.e., the likelihood of default) tend to differ across consumer segments.  There are different credit behaviors among different segments of consumers and in some cases there are differences in the credit information that is available among consumer segments.  For example, if a "prime" consumer with an extensive and positive credit history opened a new credit account, this may be perceived by some models as raising the consumer's risk of credit default, resulting in a decrease in their credit score. But if a consumer with subprime credit opened a new credit account, this may be perceived by some models as lowering the consumer's risk of default,

---

[19] See VantageScore Solutions, LLC, "Segmentation for Credit Based Delinquency Models White Paper," May 2006. The term "thin credit file" refers to consumers with very few (e.g., two or fewer) trade lines and/or limited recent or total credit experience (e.g., no accounts with at least 12 or 24 months of history).  The term "serious derogatory credit" generally refers to instances of serious delinquency (typically 60 days or more past due), charged-off accounts, collection accounts, bankruptcies, or other public record items.

[20] TransUnion LLC, "Scores Overview – TransUnion Scores," *Id*.

Expert Report of David M. Skanderson
December 14, 2020

resulting in an increase in their credit score.  As a result, different statistical models are required to reliably predict credit performance for such different consumer segments.

25.     Such complexities can make it difficult or impossible for a person without detailed knowledge of to the model itself, and without detailed knowledge of a specific consumer's overall credit profile, to predict whether a given change in a consumer's credit profile (such as loan consolidation) will increase or decrease their credit score.  I discuss this point further in relation to Defendants' alleged representations in Section 6 below.

## 5.2.    Categories of Information Used in Credit Bureau Scoring Models

26.     While the details of FICO credit score models are proprietary and not publicly available, some general information about the composition and relative importance of the score inputs is publicly available.  For example, the categories of credit history factors used in the most commonly used FICO scores and the approximate weights attached to each category are as follows.[21]

    i.   Payment history (35%)

    ii.   Amounts of debt owed (30%)

    iii.   Length of credit history (15%)

    iv.   New credit (10%)

    v.   Credit mix (10%)

27.     It should be noted, however, that the exact weights applied to the different categories of information tend to differ across consumers because of both the model

---

[21] See FICO, "Understanding FICO Scores," *Id.*, pp. 14-19.  I focus here on FICO scores because they are the most widely used scores in the consumer credit industry.  The VantageScore uses the same types of credit information, but categorizes and weights it differently.  See VantageScore Solutions, LLC, "VantageScore 3.0 White Paper," December 2013, p. 7.

Expert Report of David M. Skanderson
December 14, 2020

segmentation and the multiplicity of different credit scores, as discussed in Section 5.1 above.[22]

28. Factors related to "payment history" generally receive the greatest weight in FICO scores.  These factors include information about the timeliness of debt payments and the severity of any credit delinquencies.  Factors related to payment history include the history of payments on credit cards, retail charge accounts, installment loans, mortgage loans, and other types of accounts; the number of accounts that are being paid as agreed; information about current and past payment delinquencies (e.g., the number of times an account was 30, 60, or 90 days past due in the last 12 months); the amounts owed on delinquent accounts or collection items; the number of past due accounts; negative public records (such as bankruptcies, civil judgments, tax liens, and foreclosures); and the amount of time passed since instances of negative credit experience.

29. Factors related to "amounts of debt owed" include such things as the total amount owed across all credit accounts, the amounts owed on particular types of accounts (such as revolving credit lines or installment loans), the number of accounts that have a

---

[22] See FICO.com, "What's in my FICO Scores?": "Your FICO Scores are unique, just like you. They are calculated based on the five categories referenced above, but for some people, the importance of these categories can be different." See also FICO, "Understanding FICO Scores," *Id*., p. 14: "Keep in mind that the importance of any one ingredient depends on the information on your entire credit report. Credit Mix, for instance, only makes up 10% of a FICO® Score, but it'll be a more important FICO® Score factor if there isn't a lot of other information on your credit report."  See also, Written Testimony of Tom Quinn, *Id*., "the importance of any factor depends on all of the information in the consumer's credit report. For some people, a particular factor may be more important to their score than for someone else with a different credit history."

Expert Report of David M. Skanderson
December 14, 2020

balance, balances on revolving credit accounts as a percentage of the credit limit (i.e., "revolving utilization"), and the remaining unpaid balances of installment loans.[23]

30.    Factors related to "length of credit history" include the age of the oldest credit account a consumer has on record, the average age of accounts, and the ages of specific types of accounts.

31.    "New credit" refers to information about credit accounts recently opened by a consumer and requests for new credit ("inquiries"). This includes how many new accounts have been opened and how recently they have been opened (e.g., the number of new accounts opened in the last 12 months), as well as the number and recency of inquiries regardless of whether they resulted in new accounts being opened.

32.    "Credit mix" refers to information about the different types of credit accounts that a consumer has, such as the existence and number of installment loans, retail charge accounts, bank credit cards, mortgage loans, or other types of installment loans. As discussed further in Section 6.1 below, in the consideration of credit mix factors, the FICO score generally does not distinguish student loans or treat them differently from other types of installment loans.[24]

---

[23] An installment loan usually involves a one-time disbursement of funds with a fixed monthly or other periodic payment until the original loan balance is paid in full. Revolving credit accounts (such as bank credit cards, retail charge cards, and other lines of credit) are those that provide a credit line that may be used at the consumer's discretion and allow flexibility in the amount of monthly payment (subject to a minimum payment requirement).

[24] However, VantageScores do treat student loans differently from other installment loans in certain respects, because VantageScore has found the relationships to credit risk differ among types of installment loans. See VantageScore, "Peeling back layers for a closer look at debt," The Score: Monthly Credit Scoring News, October 2013.

Expert Report of David M. Skanderson
December 14, 2020

33.     One type of information that is <u>not</u> considered in FICO or other commercially available credit scores is the interest rate paid on a credit account, because interest rate information is not reported by creditors to the credit reporting agencies.[25]

## 6.     Analysis of Defendant's Representations

34.     As summarized in Section 3, Defendants allegedly made representations to consumers, through their sales personnel, that consolidating the consumer's federal student loans would improve their credit score or, more generally, have a favorable impact on their "credit."  Defendants also made representations that having multiple student loan trade lines affected a consumer's credit score negatively compared to having fewer student loan trade lines.  In this section I explain why such representations cannot be supported, because loan consolidation could increase, decrease, or have no material impact on a consumer's credit score depending upon the individual's specific credit situation and history.  My analysis also supports the conclusion that Defendants' representations likely were false for many consumers.

35.     Based on the general categories of information considered in credit bureau scoring summarized in Section 5.2, any effect of loan consolidation on a credit score would have to operate through its impacts on either (1) the person's payment history, (2) the amounts of debt they owed, (3) the length of their credit history, (4) any new credit accounts, and/or (5) the person's credit mix.  Therefore, the analysis of credit score impacts of loan consolidation boils down to evaluating the impact of consolidation on each of these categories of credit score inputs.  I begin by discussing the general impact of student loans on credit scores and then discuss each of these five channels in turn.

---

[25] For information about the types of information appearing in consumer credit reports, see TransUnion LLC, "TransUnion Credit Report User Guide," 2015.

Expert Report of David M. Skanderson
December 14, 2020

## 6.1.    Impact of Student Loans in General

36.     In general, student loan debt is treated like other forms of installment debt. According to an article published by VantageScore Solutions, "Student loans are seen and evaluated by credit scoring models just like any other debts that are reported to the [credit reporting companies]. That means if you are managing your student loan debt properly by making payments each month, your credit scores will benefit."  Further, student loan debt tends to have little impact on credit scores as long as the borrower is not delinquent: "When it comes to student loan debts, you'd be surprised how little negative impact they have on your credit scores as long as they are being paid on time. Generally speaking, installment debt is less predictive of elevated credit risk than other loan types and, as such, even large amounts tend to be much less problematic for your credit scores than, say, large amounts of unsecured credit card debt."[26]

37.     As a result, and because the two most heavily weighted types of credit scoring information (payment history and the amounts of debt owed) are not affected by loan consolidation, as discussed below, any changes to the person's credit record directly associated federal student loan consolidation are likely to be relatively small in magnitude.

## 6.2.    Impact on Payment History

38.     A person's payment history, which tends to be the most heavily weighted factor in a general-purpose FICO score (as noted in Section 5.2), would be unchanged by loan consolidation if the person was current on their student loans prior to the consolidation and remained current once the loans were consolidated.  As long as loan consolidation does not affect a borrower's delinquency status, consolidating multiple student loans into a single

---

[26] John Ulzheimer, "Student loans and credit reporting," June 2013.

Expert Report of David M. Skanderson
December 14, 2020

student loan would have no direct effect on the person's credit score through payment history attributes related to delinquency status.

39.     Indeed, if a borrower with multiple federal student loans was current on those loans prior to consolidation, then consolidation would reduce their number of open and active trade lines that are being paid as agreed.[27]  By contrast, Defendants allegedly made representations to consumers that having multiple student loan trade lines "puts a very negative impact" on a borrower's credit score compared to having fewer student loan trade lines and "having multiple trade line items will impact your credit score negatively when compared to a profile with fewer trade lines."  In terms of the payment history component of credit scoring, however, loan consolidation might *reduce* a person's credit score by reducing the number or percentage of open accounts that are being paid as agreed.

40.     The main potential for a favorable credit score impact of loan consolidation through payment history attributes would be indirect:  if the person were delinquent on their student loans prior to the consolidation and the act of consolidating loans enabled the person to cure their delinquency on the student loans and/or other debts.[28]  That could potentially occur if, for example, consolidation made the borrower's monthly federal student loan payment more affordable or more manageable, such as by reducing their monthly loan

---

[27] The number or percentage of a consumer's open accounts that are being paid as agreed is typically considered in credit scoring, and loan consolidation would decrease the number of accounts being paid as agreed (by reducing the number of open accounts) and may reduce the percentage of accounts being paid as agreed.  The latter would occur if the consumer was paying all student loans as agreed but had at least one non-student loan that was delinquent, because reducing the number of open student loan accounts would reduce the share of total accounts being paid as agreed.

[28] In general, a borrower who is in default on their student loans is not allowed to obtain a federal direct consolidation loan until they have cured that default, or unless they agree to repay the new loan under the Income-Based Repayment Plan, Pay As You Earn Repayment Plan, Revised Pay As You Earn Repayment Plan, or Income-Contingent Repayment Plan. U.S. Department of Education, *Id.*

Expert Report of David M. Skanderson
December 14, 2020

payment and reducing the complexity of managing multiple monthly loan payments.[29]  Even in this case, however, it is not the consolidation itself that would directly affect the person's credit score.  Any favorable impact would depend on the borrower's payment behavior post-consolidation.  In addition, any favorable impact would not be immediate, but would occur over time as the borrower built up a history of on-time payments on the consolidation loan and the period of delinquency (which remains on the borrower's credit bureau history) faded farther into the past.

41.     Also, the determination of whether or not there would be a favorable credit score impact from curing a student loan delinquency would be borrower-specific, in that it would depend upon the borrower's overall credit profile, including the depth and breadth of their credit history and their performance on other credit accounts.  If the borrower's only delinquent accounts were the student loans being consolidated, a positive impact of curing the delinquency could be expected over time.  However, if the borrower continued to have delinquencies on other credit accounts or had other serious derogatory credit events within the past three years (e.g., collections, charge-offs, foreclosure, or bankruptcy), curing the student loan delinquency through consolidation likely would have no immediate material impact on their score.

42.     Based on the analysis above, there is no basis in terms of payment history effects for the Defendants' broad representations, such as those in Docu Prep Center sales scripts, that loan consolidation "will have the benefit of improving your credit score."

---

[29] A borrower's aggregate monthly student loan payment might be reduced due to loan consolidation by amortizing the loans over a longer term and/or through an income-based repayment plan.  A borrower's interest rate on the loans would not decrease, because the interest rate on the new consolidated loan would be set equal to the weighted average of the interest rates on the loans being consolidated, rounded up to the nearest one-eighth of one percent.  U.S. Department of Education, *Id*.

Expert Report of David M. Skanderson
December 14, 2020

### 6.3. Impact on Amounts of Debt Owed

43.     The amount of debt a person owes on installment loans generally affects their credit scores through two mechanisms:  the aggregate amount of debt owed and the ratio of the outstanding loan balances to the original credit amount.  In general, other things equal, paying off an installment loan (like a student loan) would have a favorable impact on a person's credit score for many, but not all, consumers because it would decrease their total indebtedness.[30]  However, loan consolidation does not have the same effect as a simple payoff, because the borrower's total indebtedness does not change.  Holding all other factors constant, when student loans are consolidated, one new student loan account is opened and two or more existing student loan accounts are closed, with no change in the total amount of the borrower's student loan debt.  The borrower simply exchanges multiple student loans with a total balance of $X for a single new student loan with the same balance.  Therefore, there can be no impact on a person's credit score through the total dollar amount of debt owed.

44.     Another element of "debts owed" is typically the ratio of loan balances owed to the original loan amounts.  Having a lower ratio of installment loan balances to original loan amounts typically has a favorable impact on a person's credit score because it demonstrates that a person is willing and able to manage and pay down their debt.[31]  However, loan consolidation actually *increases* that ratio.  For a new consolidation loan, this ratio would

---

[30] VantageScore Solutions, LLC, "Understanding Your Credit Score and How it Changes," July 2020, pp. 6-7.  For a person with an established credit history and low loan balances, or for a person with very limited credit history, paying off an installment loan can be expected to have no material impact on their credit score.

[31] Fair Isaac Corporation, "FICO® Score Factors Guide – Experian," 2014, p. 5.  This is further supported by the "reason statements" reported along with a credit score, which indicate the most important kinds of negative credit information affecting a given consumer's credit score. The FICO score reason statement, "Proportion of balances to loan amounts is too high," indicates that this factor is treated as a negative factor in credit scoring. See FICO, "US FICO® Score Reason Codes," p. 4.

Expert Report of David M. Skanderson
December 14, 2020

initially be 100%, while for many borrowers the ratio for the combined previous student loans
would be less than 100%, reflecting the amounts they had already paid off for those previous
loans.  As a result, consolidation could actually have a *negative* impact on a person's credit
score through this channel.

45.     Yet another element of "debts owed" is typically the number of credit accounts
with a balance.  While it is true that, other things equal, having too many accounts with a
balance could indicate a higher risk that a consumer is over-extended and thus could negatively
affect the person's credit score,[32] such an impact tends to be a relatively minor for installment
loans because the consumer does not have the ability to increase the amount of indebtedness
on an installment loan once the loan has been granted.[33]  Furthermore, whether and to what
extent the number of open student loan accounts negatively affects a consumer credit score
will depend on their overall credit profile, and any positive impact of reducing the number of
open student loan accounts could be offset by other negative effects of consolidation on their
credit score (as discussed above and in Section 6.4 below).

46.     Given how the "debts owed" factor affects credit scores, Docu Prep Center's and
Certified Doc Prep Services' blanket statements to consumers in their sales scripts that having
multiple open trade lines "puts a very negative impact on your credit" cannot be supported.
Indeed, there is the potential for a negative credit score impact of loan consolidation through
the "debts owed" channel for some borrowers.

---

[32] FICO, "Understanding FICO Scores," *Id.*, p. 16.

[33] For example, a VantageScore report indicates that paying off credit card balances tends to have a
more favorable impact on a person's credit score than paying off an installment loan because of the
different way in which revolving credit utilization percentages are factored into credit scores compared
to installment account balances.  See VantageScore, "Understanding Your Credit Score and How It
Changes," *Id.*, pp. 5-6.

Expert Report of David M. Skanderson
December 14, 2020

---

### 6.4.    Impact on Length of Credit History

47.    Having a greater average age of trade lines generally has a favorable impact on a person's credit score (other things equal).  However, loan consolidation has the *opposite* effect: opening a new credit trade line associated with a federal consolidation loan and simultaneously closing the original federal student loan <u>reduces</u> the average age of a person's trade lines (both the average age of all trade lines and the average age of open installment loans), thus potentially reducing their credit score.[34]  Such a negative effect would tend to be small and temporary for a borrower with a well-established credit history, but would tend to be larger for a borrower with few or no open trade lines other than student loans.

48.    For this reason, broad statements that loan consolidation "will have the benefit of improving your credit score," such as those in Docu Prep Center sales scripts, cannot be supported based on impacts to credit scoring factors related to "length of credit history."

### 6.5.    Impact on New Credit

49.    Student loan consolidation would have a potential effect on a person's credit score through the "new credit" channel because it would result in opening a new trade line on

---

[34] See Fair Isaac Corporation, "FICO® Score Factors Guide – Experian," *Id.*, p. 7; and VantageScore Solutions LLC, "The Basics of Credit Scoring," The Score: Monthly Credit Scoring News, September 2020 edition.

Expert Report of David M. Skanderson
December 14, 2020

the person's credit record.[35]  However, other things equal, that effect would tend to be a
*reduction* in the consumer's credit score for many consumers.[36]

50.     The direction of the impact of opening new credit (increasing or decreasing the
score) will generally depend upon the specifics of a person's credit bureau profile.  For example,
a VantageScore publication shows that opening a new installment loan would tend to have a
negative impact on a person's credit score if their score is in the prime credit range (roughly
660 to 740) but would tend to have a positive impact for a person with a score in the subprime
range (roughly 550 to 600).[37]

51.     Given that the impact of opening a new student loan account is individual-
specific and could be either negative, positive, or nil, broad and general assertions that loan
consolidation "will have the benefit of improving your credit score," such as those in Docu Prep
Center sales scripts, are not supportable based on impacts to credit scoring factors related to
"new credit."

### 6.6.    Impact on Credit Mix

52.     Other things equal, a change in credit mix could have a favorable impact on a
person's credit score if it represented an increase in the diversity of accounts successfully

---

[35] Credit scoring factors related to "new credit" also include credit inquiries.  However, my
understanding is that federal direct loan consolidation does not involve a credit check, so it would not
result in a new inquiry on the borrower's credit report.

[36] FICO, "How New Credit Impacts Your Credit Score."  See also VantageScore, "Understanding Your
Credit Score and How It Changes," July 2020, *Id.*, p. 7: "The direction and the magnitude of the impact
on the credit score [of obtaining new credit] depends on the information contained in the consumers'
credit profiles."

[37] VantageScore Solutions, LLC, "VantageScore's Guide to How Common Actions Impact Credit Scores,"
December 21, 2018, p. 7.

Expert Report of David M. Skanderson
December 14, 2020

managed by the consumer, because that could demonstrate the consumer's ability to both obtain and manage different types of credit.[38]  However, opening a new federal student consolidation loan trade line and simultaneously closing existing federal student loan trade lines would not increase the diversity of types of credit accounts that a consumer has, so no favorable credit score impact should be expected due to a change in the person's "credit mix" when student loans are consolidated.  Therefore, the "credit mix" channel provides no basis to support a broad and general assertion that loan consolidation "will have the benefit of improving your credit score."

### 6.7.    Summation

53.    Considering the multiple ways in which student loan consolidation would change a borrower's credit bureau record, and based on the complex and individual-specific nature of the effects of such changes on a borrower's credit score, I conclude that Defendants' broad statements that loan consolidation would increase the credit score of any given federal student loan borrower cannot be supported.  There is no channel through which loan consolidation would directly and unambiguously increase the credit scores of all student loan borrowers, and there are channels through which one can expect loan consolidation to decrease a borrower's credit score (at least in the immediate term). It is not possible to generalize across borrowers regarding the net effect on their credit scores of the different impacts of loan consolidation on their credit record.  I further conclude that Defendants' statements likely were false for many consumers.

54.    The main scenario in which loan consolidation potentially would help a consumer to increase their credit score would be if the borrower was delinquent on their existing federal student loan payments prior to consolidation and consolidation helped the

---

[38] *Id.*

Expert Report of David M. Skanderson
December 14, 2020

borrower to cure the delinquency.[39]  However, as I noted above, any such impact would not be directly attributable to the loan consolidation itself.  The determination of whether curing a student loan delinquency would have a favorable credit score impact would be dependent on the borrower's behavior, would be based on borrower-specific factors, and would only be expected to occur over time.  The immediate, direct impacts of loan consolidation are difficult or impossible to predict with any certainty, absent detailed analysis of each consumer's credit history profile and a knowledge of the inner workings of credit scoring models.


I declare that the foregoing is true and correct to the best of my knowledge.

Signed this 14th day of December 2020, at Seattle, WA.


Expert Report of David M. Skanderson


/s/ David M. Skanderson

David M. Skanderson

---

[39] I note that the vast majority of student loan borrowers in the US population are not delinquent on their loans.  The serious delinquency rate for student loans during the 2015-2017 period was around 11% (although this includes all types of student loans, not just federal direct student loans).  Federal Reserve Bank of New York, "Quarterly Report on Household Debt and Credit," 2017Q4, February 2018, p. 2 of electronic document.  Also, as noted above, a borrower is not allowed to obtain a federal direct consolidation loan until they have cured their default, or unless they agree to enter an income-based repayment plan.

Expert Report of David M. Skanderson
December 14, 2020

## Appendix 1:  Curriculum Vitae

**David M. Skanderson**

Vice President

PhD Economics
University of Rochester

MA Economics
University of Rochester

BA Economics and Italian
California State University,
Sacramento

Bank Compliance School
American Bankers Association

Dr. David M. Skanderson is a Vice President in the Financial Economics Practice at CRA.  He is a quantitatively focused economist with more than 25 years of experience providing practical solutions to regulatory compliance, risk management, risk model governance, litigation and public policy issues.  He specializes in analysis for regulatory and litigation matters.  Dr. Skanderson has focused especially on issues related to consumer credit underwriting, pricing, marketing, and servicing, with a specialization in fair lending/non-discrimination matters.  His experience with fair lending issues includes extensive analysis of mortgage, credit card, unsecured lending, and small business lending issues.  He works extensively with both traditional and Fintech lenders to test their automated decision systems and credit scoring models for disparate impact risk, as well as to statistically validate those models and systems.  He also regularly serves as a testifying expert in litigation matters on topics related to consumer credit, mortgage loan underwriting practices, loan servicing, and loan modifications, including analysis of class action and damages claims.  He previously led departments at a large bank responsible for fair lending analytics, Home Mortgage Disclosure Act compliance, and compliance loan review; and served on enterprise committees and working groups responsible for governance of regulatory compliance, data systems, and model validation.

**Professional history**

2009–Present       Financial Economic Practice, Charles River Associates, Washington, DC

2003–2009       *First Vice President*, Washington Mutual Bank FA

2006–2009, *Senior Manager*, Compliance Review, Analytics & HMDA, Corporate Compliance, Enterprise Risk Management

Led a geographically distributed team of up to 75 staff responsible for the following areas:

- *Compliance Risk Analytics*: Statistical analysis, modeling, and model validation for regulatory compliance matters with a principal focus on

Expert Report of David M. Skanderson
December 14, 2020

fair lending compliance for all consumer business lines of the company (mortgage, equity lending, credit cards).

- *Corporate Compliance Review*: Transaction testing for regulatory compliance in all lending lines of business, including the data, systems, reporting, and analysis support for this function.

- *HMDA Compliance*: Responsible for compliance oversight related to the Home Mortgage Disclosure Act (Regulation C) and the preparation and submission of the annual HMDA and Community Reinvestment Act (CRA) Loan Application Registers.

- Served on enterprise committees and working groups responsible for governance of regulatory compliance, data systems, and model validation.

2005–2006, *Senior Manager*, Group Operations and Analytics, Corporate Compliance—Corporate Risk Oversight, Enterprise Risk Management

- Led a staff of 45 providing centralized expertise in statistical analysis/modeling, model validation, data management, technology tools, reporting, project management, policy administration, regulatory liaison, process improvement, risk issue tracking, and communications across Compliance and Credit Risk Oversight functions. Reported to the Chief Compliance Officer/Chief Risk Oversight Officer of the company. Actively involved in corporate governance activities, including membership on the Compliance Governance Committee, Enterprise Risk Management Project Review Council, and Credit Model Review Working Groups.

2004–2005, *Manager*, Analytics & Data Management, Corporate Compliance—Corporate Risk Oversight, Enterprise Risk Management

- Led analytics, statistical sampling, and database systems supporting all Corporate Compliance and Credit Risk Oversight functions (including Fair and Responsible lending, HMDA, and various loan review functions). Successfully built a cohesive analytics and data management function from the consolidation of multiple groups in a corporate reorganization. Became recognized as the "go-to" person for all statistical and data matters affecting Compliance and Risk Oversight.

2003–2004, *Manager,* Fair Lending Analytics & Monitoring, Corporate Fair Lending Program Office

- Managed the fair lending analytics and examination program in the newly formed Fair Lending Program Office. Responsible for building the program from scratch.

Expert Report of David M. Skanderson
December 14, 2020

---

| 1994–2003 | KPMG LLP and Affiliates |
|---|---|

Nearly 10 years of experience providing clients with analysis and expertise required to achieve their public policy objectives and manage regulatory risk.

2002–2003, *Senior Manager*, Economic Consulting Services, KPMG LLP

2001, *Senior Manager*, KPMG Consulting, Inc. (formed by the public offering by KPMG LLP of KPMG Consulting, which included Barents Group LLC)

1994–2001, Barents Group LLC of KPMG LLP

    1998–2001, *Senior Manager*

    1996–1998, *Manager*

    1994–1996, *Senior Associate*, Barents Group LLC (a wholly owned subsidiary of KPMG LLP, formed from the Policy Economics Group of KPMG Peat Marwick LLP)

    1994, *Senior Consultant*, Policy Economics Group, KPMG Peat Marwick LLP

**Academic teaching experience**

| 1988–1994 | *Part-time Instructor*, Department of Economics, University of Rochester, New York. Taught undergraduate-level courses on financial institutions and markets (intermediate and advanced courses covering stock, bond, futures, options, foreign exchange, and swap markets) and microeconomics. Included two appointments as a Dean's Teaching Fellow at the University. |
|---|---|
| 1993 | *Adjunct Instructor*, College of Business, Rochester Institute of Technology, New York.  Taught MBA-level corporate finance theory, covering issues of capital structure, dividend policy, debt instruments, leasing policy, and options. |
| 1989 | *Adjunct Instructor*, Department of Business and Economics, State University of New York, College at Brockport. Taught undergraduate microeconomics. |

**Publications and other papers**

"Managing Discrimination Risk of Machine Learning and AI Models," *ABA Journal of Labor & Employment Law*, forthcoming 2021.

"Implications and Risks of New HMDA Data Disclosure," *ABA Bank Compliance*, American Bankers Association, January-February 2018.

"Fair Lending in the Brave New World of Big Data," *ABA Bank Compliance*, American Bankers Association, May-June 2017.

Expert Report of David M. Skanderson
December 14, 2020

---

"Redlining Risk – Walking a Fine Line," *Mortgage Banking*, Mortgage Bankers Association, Vol.
76 No. 10, July 2016.

"Fair Lending Monitoring - Where to Focus Statistical Analysis," *ABA Bank Compliance*,
American Bankers Association, May-June 2016.

"Managing the Risk of Pricing Discretion," with Mike McAuley and Joe Garrett, *Mortgage
Banking*, Mortgage Bankers Association, Vol. 75 No. 6, March 2015.

"Managing the Fair Lending Risk of Pricing Discretion:  A Survey of Mortgage Industry
Practices," with Mike McAuley and Joe Garrett, CRA White Paper, October 2014.

"Containing Fair Lending Risk," with Ivan Darius and Tammy Butler, *Mortgage Banking*,
Mortgage Bankers Association, Vol. 74, No. 12, September 2014.

"Real-Time Control and Detection of Fair Lending Risks in Mortgage Origination," with Ivan
Darius, *CRA White Paper*, September 2014.

"Analyzing the Fair Lending Risk of Credit Card Operations," *CRA Insights:  Financial Economics*,
August 2014.

"Fair Lending Analysis of Credit Cards," *Federal Reserve Bank of Philadelphia Payment Cards
Center Discussion Paper*, with Dubravka Ritter, July 2014.

"Evaluating the Fair Lending Risk of Credit Scoring Models," *CRA Insights:  Financial Economics*,
with Alex Stricker, February 2014.

"Fair Lending Risk Management: Lessons from Recent Settlements," *CRA Insights:  Financial
Economics*, November 2012.

"Hazards of The Home Affordable Modification Program," *Financial Services Law360*, guest
column, May 14, 2010.

"Emerging HAMP-Related Lawsuits," with Marsha Courchane, Alex Stricker and David Kogut,
*CRA Insights:  Financial Economics*, April 2010.

"Impact of the Mortgage Meltdown on HMDA Data," with Rajeev Darolia, *ABA Bank
Compliance*, American Bankers Association, January/February 2010, Volume 31, No. 1, pp. 26–
33.

## Conference, workshop and other speaking engagements

"Fair Lending:  Reports of My Death Have Been Greatly Exaggerated," National Council of
Higher Education Resources Virtual Annual Conference, November 12, 2020.

Expert Report of David M. Skanderson
December 14, 2020

"Calling All Bank Directors Episode 22: Redlining in the Current Environment, Part 2," American Association of Bank Directors, podcast interview, October 19, 2020.

"Calling All Bank Directors Episode 21: Redlining in the Current Environment, Part 1," American Association of Bank Directors, podcast interview, October 13, 2020.

"Calling All Bank Directors Episode 14: Disparate Impact and Its Significance to Your Bank and Board," American Association of Bank Directors, podcast interview, August 17, 2020.

"Managing the Risk of Machine Learning and AI Models," Artificial Intelligence & Automation: Impact on Work and Workers, 72nd Annual New York University Law School Conference on Labor, June 13, 2019.

"I Lender: How to Avoid a Regulatory Nightmare when using Artificial Intelligence and Alternative Data to Reach Credit Invisibles," RegTech 2018, American Banker, October 15, 2018.

"Implications and Risks of New HMDA Data Disclosure," Risk Management, Quality Assurance and Fraud Prevention Forum, Mortgage Bankers Association, September 24, 2018.

Analyzing Redlining Risk," Risk Management, Quality Assurance and Fraud Prevention Forum, Mortgage Bankers Association, September 25, 2017.

"Fair Lending:  Avoiding the Pitfalls," Real Estate Service Providers Council (RESPRO) Fall Seminar, September 23, 2016.

"Why Fair Lending Still Matters in an Automated World," Marketplace Lending Policy Summit, September 13, 2016.

"HMDA: The New Four-Letter Word," Independent Community Bankers Association Webinar, July 19, 2016.

"Focus on Fair Lending," HMDA Implementation Workshop, Mortgage Bankers Association, Austin, TX, June 10, 2016.

"Fair Lending Considering the HMDA Data," Mortgage Bankers Association Legal and Regulatory Issues Conference, May 3, 2016.

"Proxy Methods in Fair Lending Analysis," California Bankers Association 37th Annual Regulatory Compliance Conference, October 8, 2015.

"Preparing for Disparate Impact Claims: Strategies for the Financial Services Industry," Arnold & Porter LLP Webinar, July 21, 2015.

"Best Practices for Fair Lending Monitoring," Optimal Blue Client Conference, June 2015.

"Supervisory Findings & Implications for Compliance Programs," Optimal Blue Client Conference, June 2015.

Expert Report of David M. Skanderson
December 14, 2020

---

"Testing for Lending Discrimination Based on Proxies," Attorneys General Education Program Fifth Annual Institute on Financial Services Regulation, George Mason University, April 2015.

"Risk Concerns of Loan Originator Compensation and Fair Lending," Mortgage Bankers Association Risk Management and Quality Assurance Forum, September 2014.

"Fair Lending:  Getting Ahead of the Game," Optimal Blue Client Conference, June 2014.

"At the Intersection of QM and Fair Lending," Optimal Blue Client Conference, June 2014.

"Challenges in Underwriting and Fair Lending:  Measuring and Monitoring Fair Lending Risk," Mortgage Bankers Association Risk Management and Quality Assurance Forum, September 2013.

"Defending Against Fair Lending & Disparate Impact Claims," Optimal Blue & Secondary Interactive Client Conference, June 2013.

"Secondary Marketing Strategies for Fair Lending and Compliance:  Identifying and Controlling the Risk," Mortgage Bankers Association National Secondary Market Conference & Expo, May 2013.  Repeated as a Mortgage Bankers Association Webinar, July 2013.

"Fair Lending Risk Assessment Workshop," 34th Annual Regulatory Compliance Conference, California Bankers Association, October 2012.

"Fair Lending Update," 34th Annual Regulatory Compliance Conference, California Bankers Association, October 2012.

"Fair Lending—Beyond the Basics," American Bankers Association Telephone Briefing, May 22, 2012.

"Fair Lending: Keeping Current & Compliant," Building Our Community:  Optimal Blue & Secondary Interactive Client Community Conference, April 2012.

"Fair Lending Monitoring of Credit Cards," Program in Consumer Credit and Payments Workshop, Payment Cards Center, Federal Reserve Bank of Philadelphia, November 2011

"Fair Lending Analysis for Small Banks," 33rd Annual Regulatory Compliance Conference, California Bankers Association, October 2011.

"Fair Lending Evaluation and Enforcement in Loan Modifications," National Mortgage Servicing Conference & Expo, Mortgage Bankers Association, February 2011.

"Fair Lending Analysis for the Current Environment," Fair Lending Modeling Symposium, American Bankers Association Regulatory Compliance Conference, June 2008.

Expert Report of David M. Skanderson
December 14, 2020

---

"Modeling and Managing: Making Decisions and Taking Action Based on Analysis," Fair Lending Modeling Symposium, American Bankers Association Regulatory Compliance Conference, June 2007.

Panelist, Workshop on the Effectiveness of the Research and Experimentation Tax Credit, sponsored by the Office of Technology Assessment, Congress of the United States, July 1995.

Presented a research paper entitled "Evidence on the Long-Run Fisher Effect" at the Annual Meetings of the Eastern Economic Association, March 1993.

**Expert testimony**

- *Interest on mortgage escrow accounts, damages:*  Deposition in the matter of William Kivett, et al., Plaintiffs, v. Flagstar Bank, FSB, Defendant, United States District Court, Northern District of California, Case No. 3:18-DV-05131-WHA, February 7, 2020, in support of Defendant.

- *Interest on mortgage escrow accounts, damages*:  Deposition in the matter of Donald M. Lusnak, et al., Plaintiffs, v. Bank of America, N.A., Defendant, United States District Court, Central District of California, Case No. 14-cv-01855-GW (AFM), October 1, 2019, in support of Defendant.

- *Mortgage loan modifications, damages:*  Deposition in the matter of Bobbi Jackson and Matthew Jackson, on behalf of themselves and all others similarly situated, Plaintiffs, v. Bank of America, N.A., Defendant, United States District Court, Western District of New York, Buffalo Division, Case No. 1:16-cv-00787, June 12, 2019, in support of Defendant.

- *Damages/mortgage loan servicing:*  Deposition in the matter of Heartwood 2, LLC, Plaintiff, v. Nationstar Mortgage LLC, Defendant, United States District Court, Southern District of Florida, Case No. 0:18-cv-60806-KMW, March 11, 2019, in support of Defendant.

- *Mortgage underwriting and credit report analysis*:  Deposition in the matter of James Banneck, et al., Plaintiff, v. Federal National Mortgage Association, Defendant, United States District Court, Northern District of California, Case No. 3:17-cv-04657-WHO, September 24, 2018, in support of Defendant.

- *Mortgage underwriting and credit report analysis*:  Deposition in the Matter of Brandon M. Walsh, et al., Plaintiff, v. Federal National Mortgage Association, Defendant, United States District Court, District of Arizona, Case No. CV-15-007761-PHX-JTT, January 9, 2018, in support of Defendant.

- *VA mortgage lending/loan origination fees/damages/False Claims Act*:  Deposition in the matter of United States of America Ex Rel. Victor E. Bibby and Brian J. Donnelly, Relators/Plaintiffs, v. Mortgage Investors Corporation, et al., Defendants, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:12-CV-04020-AT, March 22, 2017, in support of Defendant.

Expert Report of David M. Skanderson
December 14, 2020

---

- *Mortgage loan modifications, statistical sampling, damages*:  Deposition in the matter of America Ex rel. Michael J. Fisher, Brian Bullock and Michael Fisher, Individually, and Brian Bullock, Individually, Plaintiffs, v. Ocwen Loan Servicing, LLC and Ocwen Financial Corporation, Defendants, United States District Court, Eastern District of Texas, Sherman Division, Case No. 4:12-cv-543, June 7, 2016, in support of Defendants.

- *Mortgage loan servicing/credit damages/other damage claims:*  Deposition in the matter of Flint W. Murfitt, Plaintiff, v. Bank of America N.A., Defendant, United States District Court, Central District of California, Eastern Division, Case No. 5:13-cv-01182-JGB (SPx), May 26, 2016, in support of Defendant.

- *Mortgage lending/credit reporting/credit damages:*  Deposition in the matter of Joseph L. Kauffman and Kimberly K. Kauffman, Plaintiffs, v. Equifax Information Services, LLC; Experian Information Solutions; Transunion, LLC; and Bank of America N.A., Defendants, United States District Court, District of Montana, Billings Division, Case No. 1:14-cv-00148-SPW-CSO, March 24, 2016, in support of Defendant.

Expert Report of David M. Skanderson
December 14, 2020

## Appendix 2:  Information Relied Upon or Considered

<u>Case Documents</u>

- Second Amended Complaint in the matter of Bureau of Consumer Financial Protection, Plaintiff, v. Chou Team Realty, LLC f/k/a Chou Team Realty, Inc., d/b/a Monster Loans, d/b/a MonsterLoans et al., Defendants, United States District Court, Central District of California, Case No. 8:20-cv-00043-SB-ADS, August 26, 2020.

- Responses and Objections to Defendant Jawad Nesheiwat's First Set of Interrogatories.

- Declaration of Robert B. Hoose, June 25, 2020, CFPB-JN-0109487, including the following exhibits:

  - Exhibit 12: CFPB-JN-0109386-400

  - Exhibit 13: CFPB-JN-0109401-423

  - Exhibit 14: CFPB-JN-0109424-435

- Defendant Sales Scripts, Manuals, and Related Documents:

  - CFPB-JN-0001793-1824

  - ML00004751-757 / CFPB-JN-0050972-978

  - ML00004799-890 / CFPB-JN-0051020-1111

  - ML00006067-073 / CFPB-JN-0052148-154

  - ML00013345 / CFPB-JN-0063906

<u>Documents and Information from Public Sources</u>

- Consumer Financial Protection Bureau, "The impact of differences between consumer- and creditor-purchased credit scores," Report to Congress on Credit Scores, July 19, 2011, available at https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf (Last viewed December 6, 2020).

- Fair Isaac Corporation, "FICO® Score Factors Guide – Experian," 2014.

- Federal Reserve Bank of New York, Quarterly Report on Household Debt and Credit, 2017Q4, February 2018, available at

https://www.newyorkfed.org/microeconomics/hhdc/background (Last viewed December 9, 2020).

- FICO, "US FICO® Score Reason Codes," July 2013, available at https://www.fico.com/en/resource-access/download/3425 (Last viewed December 6, 2020).

- FICO, "Understanding FICO Scores," available at https://www.fico.com/en/latest-thinking/fact-sheet/understanding-fico-scores (Last viewed December 6, 2020).

- FICO, "How New Credit Impacts Your Credit Score," available at https://www.myfico.com/credit-education/credit-scores/new-credit (Last viewed December 6, 2020).

- FICO, "What's in My FICO Scores?", available at https://www.myfico.com/credit-education/whats-in-your-credit-score (Last viewed December 6, 2020)

- Oliver Wyman, "2019 Vantage Score Market Study Report," available at https://vantagescore.com/education/blog/vantagescore-market-adoption-study-2019 (Last viewed December 6, 2020).

- Quinn, Tom, Written Testimony Before the U.S. House of Representatives, Committee on Financial Services, Subcommittee on Financial Institutions and Consumer Credit, March 24, 2010, available at https://www.politico.com/pdf/PPM136_written_testimony_of_tom_quinn_-_financial_institutions_and_consumer_credit_subc_-_3-24-10_final.pdf (Last viewed December 6, 2020).

- TransUnion LLC, "TransUnion Credit Report User Guide," 2015, available at https://www.transunion.com/docs/rev/business/clientResources/HowToReadCreditReport.pdf (Last viewed December 6, 2020).

- TransUnion LLC, "Scores Overview – TransUnion Scores," 2015, available at https://www.transunion.com/docs/rev/business/financialservices/FS_ModelsOverview.pdf (Last viewed December 6, 2020).

- Ulzheimer, John, "Student loans and credit reporting," June 2013, available at https://thescore.vantagescore.com/article/61/student-loans-and-credit-reporting (Last viewed December 6, 2020).

- U.S. Department of Education, Federal Student Aid, "Consolidating your federal education loans can simplify your payments, but it also can result in the loss of some benefits," https://studentaid.gov/manage-loans/consolidation (Last viewed December 6, 2020).

Expert Report of David M. Skanderson
December 14, 2020

- VantageScore Solutions, LLC, "Segmentation for Credit Based Delinquency Models White Paper," May 2006.

- VantageScore, "Peeling back layers for a closer look at debt," The Score:  Monthly Credit Scoring News, October 2013, available at https://thescore.vantagescore.com/article/86/peeling-back-layers-closer-look-debt (Last viewed December 6, 2020).

- VantageScore Solutions, LLC, "VantageScore 3.0 White Paper," December 2013, p. 7, available at https://vantagescore.com/education/blog/vantagescore-3-0-white-paper (Last viewed December 6, 2020).

- VantageScore Solutions, LLC, "VantageScore's Guide to How Common Actions Impact Credit Scores," December 21, 2018, available at https://vantagescore.com/education/blog/understanding-your-credit-score-how-it-changes (Last viewed December 6, 2020).

- VantageScore Solutions, LLC, "Understanding Your Credit Score and How it Changes," July 2020 (Last viewed December 6, 2020).

- VantageScore Solutions LLC, "The Basics of Credit Scoring," The Score: Monthly Credit Scoring News, September 2020 edition, available at https://thescore.vantagescore.com/article/526/did-you-know-basics-credit-scoring (Last viewed December 6, 2020).