# Summary Judgment Ex. 18

# DECLARATION OF APRIL GLAZE

I, April Glaze, pursuant to 28 U.S.C. § 1746, hereby declare the following:

1. The following facts are known to me personally and if called as a witness I could and would competently testify to them.

2. I worked at Experian Information Solutions, Inc. ("Experian") between 2004 and 2009. I rejoined Experian in 2013 as a sales associate and have worked at Experian continuously since then. My title changed to client support specialist in 2018, but my responsibilities remained the same.

3. Since rejoining Experian in 2013, my job responsibilities have included supporting accounts of new and existing Experian clients. These responsibilities include handling day-to-day issues that arise on accounts, responding to questions from Experian clients (e.g., if they are having technical difficulties), and helping to onboard new Experian clients. I am assigned accounts by two account executives, and typically support about 40 accounts at any given time. When a potential new client expresses interest in Experian's services to one of those account executives, the account executive will refer the new client to me to onboard and support the new account.

4. The clients I support frequently come to Experian to buy prescreened consumer reports (also known as "prescreened lists") to use in making a firm offer of credit.

5. During the onboarding process, I am responsible for ensuring that Experian receives from new clients Experian's membership application and other agreements confirming the client's permissible purpose under the Fair Credit Reporting Act ("FCRA"). I also act as a liaison to coordinate Experian's investigations of new clients.

6. Because of my position and responsibilities, I am familiar with the steps that Experian takes during the onboarding process for new clients seeking to access information regulated by FCRA, including prescreened lists.

7. It is the general practice of the Experian account executives I've worked with to discuss with new clients seeking to access information regulated by FCRA, including prescreened lists, how the new clients intend to use that information and to explain that Experian policies require that clients must comply with FCRA's limits on the use of consumer reports.

8. Experian requires new clients to attest in their membership application to their permissible purpose to obtain consumer credit information under the FCRA by describing their intended use of Experian's consumer data and the nature of their business interactions with consumers. Experian also requires new clients to certify that they will comply with FCRA in its Standard Terms and Conditions agreement and in other applicable agreements, such as its Prescreening Services Schedule.

9. In addition, during the onboarding process it is my general practice to coordinate with Experian's credentialing and membership departments, which investigate new clients as part of Experian's onboarding process for new clients seeking to access information regulated by FCRA. The investigations typically involve, among other things, checking the client's licensing status, conducting an on-site inspection, and reviewing the mailing template the business intends to use to extend firm offers of credit.

10. In around June 2015, Chou Team Realty, Inc., which did business using the name Monster Loans ("Monster Loans") applied for an account with Experian to purchase prescreened lists. One of the account executives I worked with at the time assigned me to support the Monster Loans account during and after the onboarding process. I continued supporting the Monster Loans account until around August 2017.

11. In the course of supporting the Monster Loans account, I interacted with several individuals associated with Monster Loans, including Jawad Nesheiwat, Bilal Abdelfattah (who went by the name Bill Abdel), David Sklar, and Max Chou.

12. When it applied for an Experian account, Monster Loans presented itself as a mortgage lender and represented that it would use Experian's prescreened lists to make firm offers of credit.

13. Attached as Exhibit 1 is a true and correct copy of Monster Loans' membership application. The application identifies Monster Loans as a mortgage lender and the section on Permissible Purpose/Appropriate Use states that "Monster Loans will be using Experian products and consumer data to select specific demographic information that will be used for marketing purposes" and "to prescreen consumers to make a firm offer of credit." The application also identifies Nesheiwat as Monster Loans' Director of Operations and as the person certifying the application on behalf of Monster Loans. Among other things, Nesheiwat certified that he would "use the Experian product information for no other purpose other than what is stated on this application and for the type of business listed on this application." Exhibit 1 at 2.

14. Attached as Exhibit 2 is a true and correct copy of the Standard Terms and Conditions agreement between Experian and Monster Loans, which Monster Loans agreed to as part of enrolling for an account with Experian. The agreement identifies Nesheiwat as the person signing the agreement on behalf of Monster Loans.

15. Attached as Exhibit 3 is a true and correct copy of the Prescreening Services Schedule between Experian and Monster Loans, which supplemented the Standard Terms and Conditions agreement. The schedule identifies Nesheiwat as the person signing the agreement on behalf of Monster Loans. In

paragraph 8 of the schedule, Monster Loans certified, among other things, that it would "extend a 'firm offer of credit or insurance,' as defined in the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq. ("FCRA") to every Consumer" whose name appears on a prescreened list or (if applicable) whose name appeared on a final list produced after additional processing of a prescreened list.

16. Experian approved Monster Loans' application for an account to purchase prescreened lists on or about August 10, 2015. At that time, Monster Loans signed up for Experian's batch prescreen service, through which Monster Loans could order prescreened lists with the assistance of Experian employees. In November 2015, Monster Loans signed up to use Experian's iScreen web platform, which allowed Monster Loans to order and download prescreened lists online. Thereafter, Monster Loans placed numerous orders for prescreened lists through iScreen.

17. Throughout my time supporting the Monster Loans account, everyone associated with Monster Loans who I dealt with, including Nesheiwat, consistently represented that the company was purchasing prescreened lists to make firm offers of credit to potential mortgage customers.

18. To my knowledge, no one associated with Monster Loans, including Nesheiwat, ever disclosed to Experian that Monster Loans intended to use or was using the prescreened lists it purchased for any purpose other than making a firm offer of credit to potential mortgage customers. Nor, to my knowledge, did anyone associated with Monster Loans, including Nesheiwat, ever disclose that Monster Loans intended to provide or was providing prescreened lists to other companies offering debt relief services.

19. If Monster Loans had disclosed to Experian that it was not using the prescreened lists it purchased make a firm offer of credit or that it was providing prescreened lists to debt relief companies, that conduct would have

been inconsistent with Monster Loans' agreements with Experian and would have raised serious concerns regarding Monster Loans' lack of compliance with FCRA. Under Experian policy, Monster Loans would no longer have been permitted to order prescreened lists.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2021.

*April Glaze*

April Glaze