# Summary Judgment Ex. 19

# DECLARATION OF PATRICIA MARPLE

I, Patricia Marple, pursuant to 28 U.S.C. § 1746, hereby declare the following:

1. The following facts are known to me personally and if called as a witness I could and would competently testify to them.

2. I have worked at Experian Information Solutions, Inc. ("Experian") since 2012 as a senior account executive on Experian's new business development team.

3. In my position, I am responsible for identifying potential new clients and selling Experian's products and services to them. I am also responsible for onboarding new clients and managing new client accounts. After I have managed a new account for one to two years, I transition the client to another account executive who will permanently handle the account.

4. The clients whose accounts I handle frequently come to Experian to buy prescreened consumer reports (also known as "prescreened lists") to use in making a firm offer of credit.

5. Because of my position and responsibilities as an account executive, I am familiar with the steps that Experian takes during the onboarding process for new clients seeking to access information regulated by the Fair Credit Reporting Act ("FCRA"), including prescreened lists.

6. At the beginning of the onboarding process, it is my general practice to discuss with new clients seeking to access information regulated by FCRA, including prescreened lists, how the new clients intend to use that information and explain to the new clients that they must comply with FCRA's limits on the use of consumer reports.

7. During the onboarding process it is also my general practice to oversee the new client's submission of their membership application and the

1. execution of their contractual agreements with Experian. Experian requires new clients to attest in their membership application to their permissible purpose to obtain consumer credit information under the FCRA by describing their intended use of Experian's consumer data and the nature of their business interactions with consumers. Experian also requires new clients to certify that they will comply with FCRA in its Standard Terms and Conditions agreement and in other applicable agreements, such as its Prescreening Services Schedule.

8. In addition, during the onboarding process it is my general practice to coordinate with Experian's credentialing and membership departments, which investigate new clients as part of Experian's onboarding process for new clients seeking to access information regulated by FCRA. The investigations typically involve, among other things, checking the client's licensing status, conducting an on-site inspection, and reviewing the mailing template the business intends to use to extend firm offers of credit.

9. I was the Experian account executive for Lend Tech Loans, Inc. ("Lend Tech") between June 2017 and July 2018.

10. In June 2017, Lend Tech applied for an account with Experian to purchase prescreened lists. I dealt primarily with Bill Abdel ("Abdel") on Lend Tech's application. Lend Tech presented itself as a mortgage brokerage start-up and represented that it would use Experian's prescreened lists to make a firm offer of credit. Lend Tech expressed interest in using iScreen, which is a web platform through which Experian clients can order and download prescreened lists online.

11. Attached as Exhibit 1 is a true and correct copy of an email Abdel sent me on July 5, 2017, attaching an updated version of Lend Tech's membership application and several Experian agreements, including Experian's Standard Terms and Conditions agreement and its Prescreening Services Schedule. In its membership application, Lend Tech identified itself as a

DECLARATION OF PATRICIA MARPLE
2

1  mortgage business and stated in the section on Permissible Purpose/Appropriate
2  Use: "We are a mortgage company looking to purchase records of potential
3  clients to market via direct mail.  We will be making a firm offer of credit."
4  The application also identified Sean Cowell as Lend Tech's owner.

5        12.    Experian approved Lend Tech's application for an account to
6  purchase prescreened lists on or about August 17, 2017.  Once Lend Tech's
7  account was approved, it placed numerous orders for prescreened lists through
8  iScreen.

9        13.    As an account manager, I am familiar with the steps that iScreen
10 users must take to access and use the iScreen platform.  While Lend Tech had
11 access to iScreen, the platform showed users a message containing certain terms
12 and conditions each time they logged into iScreen.  The terms and conditions
13 included a reminder that users of the iScreen database were bound by FCRA
14 and the applicable terms and conditions of their Experian agreements regarding
15 the use of prescreened lists.  The terms and conditions further stated that
16 consumers whose information was purchased and downloaded for use must be
17 extended a valid offer of credit in accordance with the FCRA, and that
18 consumer information may not be shared or resold without written authorization
19 from Experian.  Users were required to check a box agreeing to the terms and
20 conditions set forth in the message before they could access the iScreen service.

21       14.    In November 2017, Cowell contacted me and informed me that he
22 was selling Lend Tech to an individual named Sergio Loza.

23       15.    Following the sale, I continued to interact with Abdel regarding
24 Lend Tech's account with Experian.  At times, I also interacted with Ed
25 Martinez.

26       16.    Throughout my time handling the Lend Tech account, those
27 associated with Lend Tech whom I dealt with consistently represented that
28

DECLARATION OF PATRICIA MARPLE
3

Lend Tech was purchasing prescreened lists to make firm offers of credit to potential mortgage customers.

17. For example, attached as Exhibit 2, is a true and correct copy of an email I received on December 28, 2017 from Ed Martinez attaching the "current rendition of [Lend Tech's] firm offer letter" for its mortgage marketing.

18. In July 2018, consistent with Experian's practice of transitioning established accounts from my new business development team to other Experian employees, I transitioned responsibility for the Lend Tech account to Experian relationship manager Amy Salinas. Thereafter, Salinas managed the Lend Tech account, although I continued to occasionally assist her in dealing with Lend Tech.

19. To my knowledge, no one associated with Lend Tech, including Abdel, Cowell, and Martinez, ever disclosed to Experian that Lend Tech intended to use or was using the prescreened lists it purchased for any purpose other than making a firm offer of credit to potential mortgage customers. Nor, to my knowledge, did anyone associated with Lend Tech ever disclose that Lend Tech intended to provide or was providing prescreened lists to other companies offering debt relief services.

20. If Lend Tech had disclosed to Experian that it was not using the prescreened lists it purchased to make a firm offer of credit or that it was providing prescreened lists to debt relief companies, that conduct would have been inconsistent with Lend Tech's agreements with Experian and would have raised serious concerns regarding Lend Tech's lack of compliance with FCRA. Under Experian policy, Lend Tech would no longer have been permitted to order prescreened lists.

I declare under penalty of perjury that the foregoing is true and correct.

1  Executed on April 20, 2021.

*Patricia Marple*
Patricia Marple